● ORIGINAL ●

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA A. WILHELM,                      :
                                     :
    Plaintiff              :
                                     :
    v.                     :         NO. 1:CV-01-1057
                                     :
COMMONWEALTH OF PA.;                     :         (JUDGE RAMBO)
PENNSYLVANIA STATE POLICE;               :
COLONEL PAUL J. EVANKO,                  :
COMMISSIONER; LIEUTENANT                 :
COLONEL THOMAS K. COURY; and             :
CAPTAIN MICHAEL. D. SIMMERS,             :
                                     :
    Defendants             :

FILED
HARRISBURG

APR 1 8 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

### STATEMENT OF MATERIAL UNDISPUTED FACTS

### The Parties

1.    Plaintiff is Barbara A. Wilhelm who was employed as a legislative specialist in the Office of Legislative Affairs with the Pennsylvania State Police (Complaint ¶¶ 3, 15, 97; Answer ¶¶ 3, 15, 97).

2.    Defendant Pennsylvania State Police is an agency of the government of the Commonwealth of Pennsylvania (Complaint ¶4; Answer ¶4; Pa. Stat. Ann., tit., 71, §§ 65, 250, 251, 252 (Purdon's 1990 and Purdon's Supp. 2001)).

3.    Defendant Paul J. Evanko is the Commissioner of the State Police who holds the rank of Colonel (Complaint ¶ 5, Answer ¶5).

4.    Defendant Thomas K. Coury is the former Deputy Commissioner for Administration of the State Police who held the rank of Lieutenant Colonel (Complaint ¶ 6; Answer ¶ 6; Coury Dep. 4-6).

5.    Defendant Michael D. Simmers is a Captain in the State Police who was the Assistant Director of the Office of Legislative Affairs for most of the time relevant to the complaint (Complaint ¶7; Answer ¶7; Evanko Dep. 45; Evanko Ex. 7).

## Office of Legislative Affairs

6.    Major Richard D. A. Morris served as the Director of the Office of Legislative Affairs from February, 1997 to January, 2000 (Morris Dep. 5-6; *see also*, Plesco Dep. 48-49).

7.    Prior to his tenure the position was referred to as Legislative Liaison (Morris Dep. 6).

8.    The Legislative Liaison for the State Police was always a uniformed member of the State Police (Bonney dep.52-53, 55; Bonney Dec. ¶19).

9.    Major Morris' predecessor was Major David Miller (Morris Dep. 7).

10.    As Legislative Liaison, Major David Miller did not have a staff (Morris Dep. 12, 16).

11.    Historically, when a vacancy occurred in the Legislative Liaison position, it was not posted (Morris Dep. 8).

12.    Instead persons interested in the position made their interest known to the Commissioner in some fashion (Morris Dep. 8).

13.    When Major Morris learned that Major Miller was retiring he informed Lieutenant Colonel George March that he was interested in the position and he submitted a resume (Morris Dep. 8-9).

14.    Major Morris and several other people were then interviewed by personnel in the Governor's Office, who then selected him to be the Legislative Liaison for the State Police (Morris Dep. 9-10).

15.    As Legislative Liaison, Major Morris reported or was responsible to both the Governor's Office and the Commissioner (Morris Dep. 13).

16.    Soon after Major Morris became the Legislative Liaison, Ronald Plesco was assigned to be a member of his staff (Morris Dep. 12-13).

17.    Captain Simmers was also assigned to the Office as the Assistant Legislative Liaison, although he was not Major Morris' choice (Morris Dep. 17-19; Evanko Dep. 45; Evanko Ex. 7).

18.     The last member of the professional staff added during Major Morris' tenure was the plaintiff, who was assigned to the Office primarily to do research and legislative analysis (Morris Dep. 19-20).

20.     Plaintiff began her employment with the Office on January 10, 1998 as a Legislative Specialist 1 (Complaint ¶15, Answer ¶15).

21.     Major Morris sought the expansion of the Office staff to support the expansion tasks the Office would perform under his direction (Morris Dep. 16-17).

22.     Before Major Morris assumed the position, the Legislative Liaison served primarily as a public relations representative from the State Police to the Legislature (Morris Dep. 16; Plesco Dep. 7).

23.     Major Morris expanded the functions of the Office to include working on a legislative agenda, attending committee meetings, working on proposals for legislation and monitoring legislation that would affect the State Police (Morris Dep. 17, 22).

### Major Morris' Job

24.     As Director of the Office of Legislative Affaris, Major Morris was responsible for and directly supervised the work of the Office (Morris Dep. 16-22, 38; Evanko Dep. 45, Evanko Ex. 6, pp. 1937-1936).

-4-

25.    He attended legislative meetings on issues that affected the State Police (Morris Dep. 22).

26.    He provided testimony before legislative committees and represented the Commissioner and the State Police at meetings with members of the General Assembly (Morris Dep. 22; Evanko Dep. 45; Evanko Ex. 6, p. 1936).

27.    In addition to performing these duties, Major Morris was a sworn law enforcement officer, who was responsible for taking appropriate police action when required regardless of whether he was on or off duty ( Morris Dep. 40; Evanko Dep. 16-19, 45; Evanko Ex. 2, pp. 3298, 3301; Evanko Ex. 6, p. 1938; Pa. Stat. Ann., tit. 71, §252 (Purdon's 1990)).

28.    Appropriate police action includes making arrests, serving warrants and taking whatever other action is appropriate to enforce the laws of the Commonwealth (Pa. Stat. Ann., tit. 71, §252; Evanko Ex. 2, 3292; Evanko Ex. 6, p. 1938).

29.    Appropriate police action also includes taking action in response to requests for assistance from the public and emergencies, civil disorders and disasters (Evanko Ex. 2, p. 3297; Evanko Ex. 6, p. 1938).

30.    As a uniformed member of the State Police, Major Morris was subject to a code of conduct that did not apply to civilian employees (Evanko Dep. 16-19; Evanko 2).

31.    Uniformed members of the State Police are required to reside in the Commonwealth and maintain telephones in their homes (Evanko Ex. 2, p. 3282).

32.    Uniformed members of the State Police are required to carry an issued pistol and ammunition when on duty and when off duty in public (Evanko Ex. 2, pp. 3286-3288).

33.    Uniformed members of the State Police are also required to be physically and mentally fit (Evanko Ex. 2, p. 3295).

### Captain Simmers' Job

34.    As a uniformed member of the State Police, Captain Simmers was responsible for performing the same law enforcement duties under the same conditions as Major Morris (Morris Dep. 40; Evanko Dep. 16-19, 45-46; Evanko Ex. 2, pp. 3282, 3286-3288, 3292, 3297, 3295, 3298; Evanko Ex. 7, p. 1942).

35.    As the Assistant Legislative Liaison or Assistant Director of the Office of Legislative Affairs, Captain Simmers was also responsible for acting as the Director in Major Morris' absence and for approximately three months after Major Morris' retirement (Complaint ¶23; Morris Dep. 43; Morris Ex. 2; Evanko Dep. 45-46; Evanko Ex. 7, p. 1940; Simmers Dep. 52-54).

36.    Captain Simmers was also plaintiff's immediate supervisor for approximately the first year of her employment with the Office (Complaint ¶16;

-6-

Wilhelm Dep. 27-29, 194-195; Wilhelm Ex. 13; Morris Dep. 36-37; Evanko Dep. 45-46; Evanko Ex. 7, p. 1940).

37.    Initially, Captain Simmers was responsible for doing some legislative analysis and responding to correspondence (Morris Dep. 36-37).

38.    Later, Major Morris limited his duties to picking up mail at the Capitol and responding to telephone calls requesting information.  Responding to calls included the responsibility for doing whatever research was necessary to provide the information requested (Morris Dep. 36-37).

### Ronald Plesco's Job

39.    Ronald Plesco took a position with the State Police in 1996 at the request of the Governor's Office to perform legislative and policy functions (Plesco Dep. 4-5; Bonney Dep. 50-51; Bonney Ex. 2).

40.    Mr. Plesco was a lawyer and a former assistant District Attorney (Plesco Dep. 29-30).

41.    The Legislative Liaison at the time, Major David Miller, did not provide the substantive communication on issues that the Governor's Office desired (Plesco Dep. 7).

42.    As a result, Major Miller performed the public relations function for the State Police to the General Assembly while Mr. Plesco did the substantive work of

developing the State Police position on issues and communicating them to the Governor's Office (Plesco Dep. 7-9).

43.    Mr. Plesco developed information on the State Police position on issues by meeting with the Commissioner and various deputies and discussing the relevant issues (Plesco Dep. 7-8).

44.    He used his training as a lawyer and his prior experience as a district attorney in analyzing and discussing the issues (Plesco Dep. 29-30).

45.    He then reported the information he developed back to the Governor's Office along with a recommendation on what position should be taken (Plesco Dep. 7-8).

46.    His work included bringing legislative initiatives from the State Police to the attention of the Governor's Office and assisting in getting those initiatives enacted (Plesco Dep. 37).

47.    Throughout the time Mr. Plesco worked with the State Police, he reported directly to the Governor's Office (Plesco Dep. 11-12, 38-39; Morris Dep. 13).

48.    At various times he also reported directly to the Commissioner, the Deputy Commissioner of Administration or to Major Morris (*Id.*; Bonney Ex. 2).

49.    He never reported to or was supervised by Major David Miller (Plesco Dep. 39, 42-43; Bonney Ex. 2).

50.    After Major Morris became the Director of the Office of Legislative Affairs, Mr. Plesco continued to gather information to assist the Governor's Office to ensure that correct information was being disseminated on politically sensitive issues and to ensure that the State Police was taking positions consistent with the administration's policies (Plesco Dep. 24, 26-27. 38-39; Morris Dep. 23-24, 27-28; Morris Ex. 1).

51.    Mr. Plesco also continued to analyze and recommend positions on policy issues that arose (Plesco Dep. 27-28, 38-39, 54-55; Morris Dep. 23-24).

52.    Legislative work and policy work are closely related with some differences (Plesco Dep. 14, 38-39; Morris Dep. 22-23).

53.    Policy relates to the view the administration takes on issues regardless of whether they relate to pending legislation (*see* Plesco Dep. 27-27, 38-39; Morris Dep. 23-24).

54.    An example of a policy issue is whether the authorized complement or number of positions the State Police can fill should be changed.  While the State Police supported an increase in the complement, the Governor's Office did not (*Id.*).

-9-

55.   Mr. Plesco's responsibilities included handling particular issues to the point where he provided briefings to legislators and testimony at legislative hearings on those issues in conjunction with uniformed members of the Department (Plesco Dep. 26, 33-34; Morris Dep. 25-26).

56.   Mr. Plesco also advised Major Morris on legislative strategies, how to approach particular issues and where pitfalls might lie (Morris Dep. 27).

57.   Mr. Plesco was also responsible for developing and publishing State Police regulations, particularly with regard to the Instant Check System (Morris Dep. 27-28, 156-159; Morris Ex. 1; Plesco Dep. 30-31, 34-35).

58.   The Instant Check System relates to provisions of the state statute that requires criminal record checks be done on prospective purchasers of firearms (18 Pa.C.S. §6111.1; Morris Dep. 25; Plesco Dep. 54).

59.   The State Police is responsible for doing the checks (*Id.*).

### Plaintiff's Job

61.   Plaintiff was a legislative specialist within the Office of Legislative Affairs (Complaint ¶15; Answer ¶15).

62.   She was hired as a Legislative Specialist 1 and was reclassified as a Legislative Specialist 2 in January of 1999 (*Id.*; Burkholder Ex. 1)

-10-

63.    Plaintiff functioned as the staff assistant to Major Morris (Wilhelm Dep. 26-29; Wilhelm Ex. 1).

64.    Plaintiff had no legal training nor had she worked in a district attorneys's office (Wilhelm Dep. 5-6, 7-11, 15-16).

65.    Initially, plaintiff's immediate supervisor was Captain Simmers (Complaint ¶16; Wilhelm Dep. 27-29, 194-195; Wilhelm Ex. 13; Morris Dep. 36-37; Evanko Dep. 45-46; Evanko Ex. 7, p. 1940).

66.    Later, her immediate supervisor was the Director of the Office, Major Morris (Wilhelm Dep. 26-29; Wilhelm Ex. 1).

67.    Major Morris gave her assignments and reviewed her written work before it was submitted elsewhere (*Id.*; Morris Dep. 28-29; 34-36; Wilhelm Dep. 54, 60-61, 64-65, 66-68).

68.    Plaintiff spent most of her time responding to requests for information from members of the General Assembly and their staff (Wilhelm Dep. 26-27, 51-53, 72-74; Wilhelm Ex. 1).

69.    These requests were made over the phone or by correspondence and included a wide variety of matters (Wilhelm Dep. 73-74).

70.    Typical requests included seeking information about a criminal history check, asking for copies of reports, inquiring about the status of a driver's license as

-11-

a form of identification and seeking assistance with personal matters (Wilhelm Dep. 74-76; 32-34).

71.    The most important work the plaintiff did was collecting information from units within the State Police regarding proposed legislation and combining that information into a document called an analysis (Wilhelm Dep. 54-61; Morris Dep. 34).

72.    In preparing an analysis, plaintiff sent a copy of the legislation and a form or template to units within the State Police that might be affected by the legislation (Wilhelm Dep. 54-57).

73.    The form or template contained blanks to be filled in by the units regarding the background of the legislation, the interest groups that might be interested in it, the impact it might have on the unit and whether the unit supported or opposed it (*Id.*).

74.    The units returned the form or template to the plaintiff who merged the information into a format required by the Governor's Office (Wilhelm Dep. 58-59; *see also* Plesco Dep. 29).

75.    The document created by plaintiff was then reviewed by Major Morris and the Commissioner (Wilhelm Dep. 60-61).

76.     Major Morris and the Commissioner then decided what the State Police position should be on the piece of legislation (*Id.*).

77.     The plaintiff did not participate in the discussions between Major Morris and the Commissioner regarding what position should be taken (Wilhelm Dep. 84).

78.     Plaintiff also gathered information for use in responding to legislators' requests for the State Police position on particular issues (Wilhelm Dep. 66-68).

79.     When a request came in, plaintiff in conjunction with Major Morris determined if the Office had sufficient information to respond (*Id.*).

80.     If additional information was required, plaintiff might forward the request to other units of the State Police for input (*Id.*).

81.     Plaintiff then reviewed the information provided with Major Morris and prepared a response to the inquiry based on their conversation (*Id.*).

82.     The proposed response was sent to the Commissioner for final approval before being sent out (*Id.*)

83.     Plaintiff performed a similar role when the State Police considered seeking an amendment to legislation (Wilhelm Dep. 64-67).

84.     Plaintiff sought draft language from the affected unit within the State Police and provided it to Major Morris for further review and discussion with the Commissioner (Wilhelm Dep. 65-66).

-13-

85.    Plaintiff was not a uniformed member of the State Police (Morris Dep. 40; Wilhelm Dep. 26-29; Wilhelm Ex. 1).

86.    Plaintiff was not responsible for policy issues (Wilhelm Dep. 26-29, 54, 60-61, 64-65, 66-68; Wilhelm Ex. 1).

87.    Plaintiff did not report directly to the Governor's Office (*Id.*).

88.    Plaintiff did not report directly to the Commissioner (*Id.*).

89.    Plaintiff did not testify at legislative hearings nor did she present briefings to legislators (Wilhelm Dep. 84-85).

90.    Plaintiff did not have any responsibilities for the development and publication of regulations (Wilhelm Dep. 26-29; Wilhelm Ex. 1).

### Plaintiff's Complaints

91.    In July 1998 plaintiff complained to Major R. Dane Merryman about Captain Simmers and Ronald Plesco (Complaint ¶52; Pl. Answ. Interrog. 10).

92.    At the time Major Merryman was the Director of the Bureau of Professional Responsibility (Merryman Dep. 4-5).

93.    The Bureau of Professional Responsibility investigates alleged misconduct of uniformed members and employees of the State Police and it performs audits of departmental organizational segments to insure compliance with internal procedures and policies (Merryman Dep. 5; Conley Dep. 6, 79-80).

-14-

94.    The Internal Investigations Division of the Bureau investigates complaints of misconduct while the Systems Process Review Division reviews organizational segments to ensure compliance with procedures and policies (*Id.*).

95.    Complaints of misconduct are submitted on a Use of Force or Complaint Reception and Processing Worksheet (Conley Dep. 80; *see also* Morris Dep. 70; Morris Ex. 3).

96.    A complaint is necessary for the Bureau to do an investigation (Rain Dep. 4, 21).

97.    Plaintiff told Major Merryman that Captain Simmers was creating a difficult work environment, that he was not required to have the necessary knowledge and skills to perform his assigned duties, that he was not required to have knowledge of work practices in the office, that he was not held accountable for assigned work products, that he was incapable of performing as a supervisor and that he was misusing his state car and abusing work hours.  She also told him that Captain Simmers and Ronald Plesco were not being held accountable for leave usage and attendance (Pl. Answ. Interrog. 10).

98.    Major Merryman told plaintiff that if she made a complaint the Bureau would investigate it (Merryman Dep. 26).

99.    Plaintiff did not submit a complaint to the Bureau or to Major Merryman (Merryman Dep. 25-26; *see also* Wilhlem Dep. 146).

100.    Major Merryman does not recall reporting plaintiff's concerns to his superiors (Merryman Dep. 22).

101.    In June 1999 Major Morris submitted a complaint alleging that Captain Simmers "harassed" the plaintiff (Morris Dep. 70-71, 73-75, 79-83; Morris Ex. 3).

101.    The complaint did not allege that Captain Simmers "harassed" plaintiff based on her sex (Morris Ex. 3).

102.    The complaint alleged that the plaintiff believed actions and comments by Captain Simmers were intended to undermine her assignment and cast doubt on her qualifications and abilities (Morris Ex. 3).

103.    The complaint stated that plaintiff requested that it not be submitted and stated that she would not talk with the Bureau of Professional Responsibility, the Equal Employment Opportunity Office or the Bureau of Personnel (Morris Ex. 3).

104.    Plaintiff spoke with Corporal Rain who was assigned to investigate the complaint (Wilhelm Dep. 149; Rain Dep. 4, 8, 10, 11).

105.    Plaintiff provided Corporal Rain with information concerning Captain Simmers competence and mentioned that Captain Simmers abused work hours and engaged in misconduct (Wilhelm Dep. 150-151; Wilhelm Ex. 5; Rain Dep. 5).

-16-

106.    Corporal Rain explained to plaintiff that the Bureau did not address the competence or personnel issues (Wilhelm Dep. 150-152; *see also* Rain Dep. 9-10; Evanko Dep. 20-22).

107.    Competency issues are generally handled by supervisors ( Rain Dep. 18).

108.    Supervisors are supposed to articulate their expectations to their subordinates, train them, counsel them and if necessary discipline them if they do not live up to their expectations (Rain Dep. 17-18; Evanko Dep. 20-22, 113-114).

109.    Appropriate documentation must be maintained by supervisors if subordinates are going to be disciplined for failure to perform their duties (Rain Dep. 19-20; Evanko Dep. 22, 113-114 ).

110.    Corporal Rain did ask whether Major Morris had documentation on Captain Simmers performance, which he did not (Rain Dep. 20).

111.    Plaintiff did describe to Corporal Rain, Captain Simmers comments which she considered harassing.  They included statements that the Commissioner was considering reclassifying her position and that she would be moved out of the Office (Wilhelm Dep. 138, 143-144, 146-148, 153; Wilhelm Ex.8).

112.    Corporal Rain asked for information about the alleged abuse of work hours and misconduct, but plaintiff refused to provide it (Wilhelm Dep. 158; Rain Dep. 10-12).

-17-

113.   The Commissioner did not read the report of Corporal Rain's investigation, but he understood that the complaint was determined to be unfounded (Evanko Dep. 94-96; Evanko Ex. 10).

114.   On September 13, 1999, plaintiff sent a memorandum to Lieutenant William Horgas with the Systems Process Review Division of the Bureau of Professional Responsibility (Complaint ¶51, Ex. B; Morris Dep. 138; Morris Ex. 11).

115.   The memorandum asked for a confidential meeting with Major Morris and Lieutenant Horgas to discuss a variety of issues involving Captain Simmers including his creation of a hostile/harassing work environment (Morris Dep. 138-147; Morris Ex. 11).

116.   A meeting was held as a result of plaintiff's request which Major Morris and Lieutenant Horgas attended (Morris Dep. 138-147).

117.   Major Morris understood the memorandum's reference to a hostile/harassing environment to mean the hostility which existed among the staff of the Office (Morris Dep. 144).

118.   Major Morris could not say that the hostility was focused on gender (Morris Dep. 145).

-18-

119.   At the conclusion of the meeting Lieutenant Horgas explained that the matters raised were properly the concern of the Internal Affairs Division and not the Systems Process Review Division (Morris Dep. 147).

120.   Plaintiff did not file a complaint with the Internal Affairs Division.

121.   Plaintiff complained about disparate treatment in connection with compensatory leave in a memorandum to Major Morris dated January 3, 2000, a few days before his retirement from the State Police (Complaint ¶51, Ex. G; Morris Dep. 98, 101; Morris Ex. 5).

122.   The Commissioner received a copy of the memorandum (*Id.*; Evanko Dep. 32-33; Evanko Ex. 5).

123.   By a memorandum dated January 7, 2000, the Commissioner recounted his views of when compensatory leave was available to members and employees of the State Police and directed the Acting Director of the Legislative Affairs Office to forward the plaintiff's memorandum to the Director of the Bureau of Professional Responsibility, to the Chief Counsel and to the Equal Opportunity Officer to ensure that action was taken in accordance with Department rules with regard to possible discrimination in the management of compensatory leave (Evanko Ex. 5).

**The Selection of Major Morris' Successor**

-19-

124.   At the beginning of January, 2000, Major Morris retired leaving his position vacant as Director of the Office of Legislative Affairs (Complaint ¶71; Answer ¶71; Morris Dep. 101).

125.   About two weeks after Major Morris retired, the plaintiff asked the Personnel Director, Linda Bonney, whether she had any information about how the position would be filled (Wilhelm Dep. 164-165, Wilhelm Ex. 7).

126.   Ms. Bonney responded that she anticipated that a Major would be placed in the job and that no bids would be accepted because the job had historically been L-1 bargaining unit work (Wilhelm Ex. 7).

127.   The L-1 bargaining unit consists of the uniformed members of the State Police from the rank of Trooper through the rank of Major and is represented by the Pennsylvania State Troopers Association (Bonney Dec. ¶10).

128.   Ms. Bonney went on to say that she did not know what the Commissioner intended to do, but she provided the plaintiff with information on how she got her job (Wilhelm Ex. 7).

129.   Ms. Bonney said she submitted her resume to the Deputy Commissioner for Administration along with a letter indicating her interest (*Id.*).

130.   Other than her communication with Ms. Bonney, plaintiff did not submit anything indicating her interest in the Director's position (Wilhelm Dep. 166-169).

131.   In the meantime, the Commissioner, unaware that plaintiff was interested in the Director's position, identified several people that he thought could do the job (Evanko Dep. 70, 75-76).

132.   All the persons he selected were uniformed members of the State Police (*Id.*).

133.   The Commissioner thought the position had to be filled by a uniformed member because of the Department's obligations to the L-1 bargaining unit and because he believed that a uniformed member brought credibility to the Department's dealings with the legislature and to testimony presented at legislative hearings on the Commissioner's behalf (Evanko Dep. 110-111; Defendants' Interrog. Resp. 2 and 3).

134.   The Commissioner also thought that their credibility was based in part on their knowledge of State Police operations (*Id.*).

135.   The Commissioner then submitted the names of the persons he identified to the Governor's Office which finally selected Captain Jeffrey B. Miller as Major Morris's successor (*See* Evanko Dep. 70; Miller Dep. 6; Defendants Interrog. Resp. 2 and 3).

136.   The Commissioner followed the same procedure when Major Miller's vacancy was filled by Major Morris (Morris Dep. 7-10).

**The Selection of the Assistant Director**

-21-

137.   When Captain Simmers was transferred out of the Office of Legislative Affairs, a similar process was used to choose his successor, except that the final decision on who to select was made by Captain Miller (Defendants' Interrog. Resp. 5, Miller Dep. 90, 106-108).

138.   Captain Miller and the Commissioner spoke about several people that they identified as possible candidates for the job (Miller Dep. 106).

139.   At the time neither Captain Miller nor the Commissioner were aware that the plaintiff was interested in the position (Evanko Dep. 112-113; Miller Dep. 107-108; Defendants' Interrog. Resp. 5).

140.   In addition, the Commissioner believed that the Assistant Director should be a uniformed member of the State Police for the same reasons he thought the Director should be (Evanko Dep. 110-111).

141.   One of the people the Commissioner suggested to Captain Miller was Sergeant William McHale (Miller Dep. 106).

142.   Captain Miller knew the sergeant and contacted him to assess his interest in the job (Miller Dep. 106-107).

143.   After they talked Captain Miller concluded that he would be a good choice for the job  based on his years of experience with the State Police and his communication skills (Miller Dep. 107; Defendants' Interrog. Resp. 5 and 6).

-22-

144. Captain Miller informed the Commissioner and he concurred in the selection. (Miller Dep. 107).

### Plaintiff's Dismissal

145. After Captain Miller spent approximately two months working in the Legislative Affairs Office, he concluded that he needed clerical help more than he needed a legislative specialist (Miller Dep. 13-14, 61-62).

146. He also concluded that the plaintiff was not able to meet his expectation that she openly communicate with all members of the executive staff regarding matters of concern to the Office (Miller Dep. 61-62; Defendants' Interrog. Resp. 8).

147. Based on these conclusions he recommended to the Commissioner that plaintiff be removed from the Office and that a clerical position be added (Miller 61-64; Defendants' Interrog. 8; Evanko Dep. 102-103).

148. The Commissioner concurred in his recommendation (Evanko Dep. 102-103, *see also* Miller dep.67; Coury Dep. 21).

149. The Commissioner's decision to reorganize the Office as recommended by Captain Miller was communicated to Lieutenant Colonel Coury, the Deputy Commissioner for Administration who was in charge of the Bureau of Personnel (Coury Dep. 5-6, 21-22).

150.    The Deputy Commissioner then instructed the Personnel Director, Linda Bonney to handle the plaintiff's situation according to past practice in the Department, including trying to place her in another position, if appropriate  (*Id.*; Bonney Dec. ¶¶25-26).

151.    The Deputy Commissioner did not tell Ms. Bonney that the plaintiff was dismissed (Coury Dep. 21-22.).

152.    The plaintiff was an at-will employee, meaning that she had no rights under the Civil Service Law or a collective bargaining agreement (Bonney Dec. ¶¶27-28).

153.    Ms. Bonney concluded that the elimination of plaintiff's position required her dismissal unless she was qualified to fill another vacancy within the Department (Bonney Dec. ¶28).

154.    Although Ms. Bonney inquired about other positions, no appropriate positions were available (Bonney Dep. 64-65; Bonney Dec. ¶¶29-30).

155.    Ms. Bonney then concluded that the only way to effect the reorganization of the Legislative Affairs Office was to terminate the plaintiff's employment (Bonney Dec. ¶32).

156.    Ms. Bonney drafted the letter informing plaintiff of her dismissal (Bonney Dec. ¶34).

157.    Ms. Bonney specifically referred to the reorganization in the letter to clarify that the dismissal was not for cause (Bonney Dec. ¶34; Wilhelm Dep. 180, Wilhelm Ex. 8).

158.    Plaintiff was dismissed on May 1, 2000 (Wilhelm dep.187-188, Wilhelm Exs. 8, 11, p. 2411).

159.    Subsequently, a clerical employee was hired and began working in the Legislative Affairs Office (Bonney Dep. 70; Miller Dep. 59, 68, 105, Miller Ex. 6, 7).

### Civilianization

160.    Uniformed members of the State Police ("members") from the rank of Trooper through the rank of Major are members of the L-1 bargaining unit, which is represented by the Pennsylvania State Troopers Association ("PSTA").    This was also true from January, 1998 through May, 2000 (Bonney Dec. ¶10).

161.    The Personnel Director Linda Bonney understands that when a position has been performed by a member of a particular collective bargaining unit, that position is considered bargaining unit work under state labor law and cannot be unilaterally assigned to a person who is not a member of the bargaining unit (Bonney Dec. ¶16).

162.    At various times Ms. Bonney has discussed with Commissioner Evanko her understanding of the State Police obligation to ensure that bargaining unit work is performed by members of the appropriate bargaining unit (Bonney Dec. ¶17).

163.    In Ms. Bonney's experience with the State Police, when management has attempted to fill a position previously performed by a member of the L-1 bargaining unit, with a nonmember, PSTA has filed an unfair labor practice with the Pennsylvania Labor Relations Board (Bonney Dec. ¶18).

164.    In the mid 1990's the Legislative Budget and Finance Committee reviewed the State Police and prepared a report that in part, identified positions within the Department that were being performed by uniformed members that could perhaps be performed by civilians (Bonney Dec. ¶21; Bonney Dec. Ex. 1).

165.    The Ridge administration encouraged the "civilianization" of certain jobs in order to free members of the State Police to devote themselves to police work (Bonney Dec. ¶22).

166.    From 1995 through 2000, two positions were "civilianized" pursuant to the administration's initiative. Those positions are Chief of the Transportation Division which was "civilianized" in 1995 and the Director of the Technical Support Division which was "civilianized" in 1996 (Bonney Dec. ¶23).

167.   In both cases, the union filed charges before the labor board.  After extensive negotiations with the union, an agreement was reached as a result of which the charges were withdrawn and the civilians were permitted to keep the positions (Bonney Dec. ¶24).

### Dismissal of Uniformed Members of the State Police

168.   Uniformed members of the State Police have detailed and specific contractual rights regarding discipline and dismissal (Bonney Dec. ¶35; *see also* Evanko Dep. Ex. 11, Article 26).

169.   Article 26, section 12 of the collective bargaining agreement prohibits the imposition of discipline until the entire disciplinary process is concluded, including the final disposition of any grievances (Bonney Dec. ¶36; *see also* Evanko Dep. Ex. 11, Article 26, section 12).

170.   The substance of Article 26, section 12 continues to be part of the current collective bargaining agreement as Article 28, section 12 (Bonney Dec. ¶37; Bonney Dec.,  Ex. 2).

171.   It is not unusual for a uniformed member of the State Police who is in danger of serious discipline  to resign or retire before disciplinary procedures begin or before the procedures conclude (Bonney Dec. ¶38).

172. That is the situation in which Trooper Michael Evans resigned. He was being investigated for crimes which could give rise to serious discipline but he resigned before disciplinary action could be taken (Bonney Dec. ¶39).

### Barbara Christie's Job

173. Barbara Christie is the Chief Counsel to the Pennsylvania State Police (Christie Dec. ¶1).

174. As Chief Counsel, Ms. Christie is responsible for all the legal services provided to the Department from the Office of Chief Counsel. Those services include providing legal advice to the Commissioner of the State Police, the Deputy Commissioners and other supervisors and managers regarding the operations of the Department, and representing the Department in arbitrations, court martials and other legal proceedings (Christie Dec. ¶3).

175. In the course of performing her duties, Ms. Christie is occasionally asked to speak with legislators or their staffs concerning legal issues (Christie Dec. ¶5).

176. Ms. Christie does not speak to legislators or their staffs on behalf of the State Police regarding the Department's position on legislation or policy (Christie Dec. ¶6).

### Plaintiff's Administrative Complaints

-28-

177.   After her dismissal, plaintiff filed a complaint with the Pennsylvania Human Relations Commission alleging discrimination and retaliation in connection with her employment with the State Police (Wilhelm Dep. 218-219; Wilhelm Ex. 26).

178.   The complaint identifies the respondent as the Pennsylvania State Police (Wilhelm Ex. 26).

179.   The complaint identifies Captain Michael D. Simmers as a male employee who was treated differently than plaintiff (Wilhelm Ex. 26).

180.   The complaint does not allege that Commissioner Evanko, Lieutenant Colonel Coury or Captain Simmers aided and abetted discrimination (Wilhelm Ex. 26).

181.   Plaintiff filed an amended complaint with the Pennsylvania Human Relations Commission in February of 2001 (Wilhelm Dep. 219; Wilhelm Ex. 28).

182.   The amended complaint identifies the State Police as the respondent (Wilhelm Ex. 28).

183.   The amended complaint does not allege that Commissioner Evanko, Lieutenant Colonel Coury or Captain Simmers aided or abetted discrimination (Wilhelm Ex. 28).

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**


BY:      _Susan J. Forney_
        **SUSAN J. FORNEY**
        **Chief Deputy Attorney General**
        **I.D. No. 27744**


**Office of Attorney General**
**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**(717) 787-9831**

**DATED: April 16, 2002**

## CERTIFICATE OF SERVICE

I, **SUSAN J. FORNEY**, Chief Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on April 16, 2002, I caused to be served a copy of the foregoing document entitled **Statement of Material Undisputed Facts,** by depositing same in the Untied States Mail, first class, postage prepaid, in Harrisburg, Pennsylvania upon the following:

**Nathan C. Pringle, Jr., Esquire**
**360l N. Progress Avenue, Suite 200**
**Harrisburg, PA 17110**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**I.D. No.  27744**