



# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA A. WILHELM,      :
      **Plaintiff**      :
      :
      v.      :      **NO. 1:CV-01-1057**
      :
COMMONWEALTH OF PA.;      :      **(JUDGE RAMBO)**
PENNSYLVANIA STATE POLICE;      :
COLONEL PAUL J. EVANKO,      :
COMMISSIONER; LIEUTENANT      :
COLONEL THOMAS K. COURY; and      :
CAPTAIN MICHAEL. D. SIMMERS,      :
      **Defendants**      :

FILED
HARRISBURG, PA

MAY 0 8 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

NATHAN C. PRINGLE, JR.
ATTORNEY I.D. 30142
3601 N. PROGRESS AVENUE
SUITE 200
HARRISBURG, PA 17110
(717) 909-8520

DATED: May 8, 2002

# TABLE OF CONTENTS

**PAGE**

TABLE OF CITATIONS……………………………………………………ii

STATEMENT OF THE CASE………………………………………...1

STATEMENT OF THE FACTS……………………………………….2

QUESTIONS PRESENTED…………………………………………5

ARGUMENT……………………………………………………6

    I.    THE PLAINTIFF DID NOT FAIL TO
          EXHAUST HER ADMINISTRATIVE
          REMEDIES AGAINST THE INDIVIDUAL
          DEFENDANTS…………………………………………7

    II.    THE WHISTLEBLOWER CLAIM IS NOT
          BARRED BY THE STATUTE OF LIMITATIONS…………………10

    III.    THE PLAINTIFF HAS ESTABLISHED A CLAIM
          UNDER THE EQUAL PAY ACT……………………………12

    IV.    THE PLAINTIFF CAN ESTABLISH A CLAIM OF
          SEX DISCRIMINATION WITH REGARD TO THE
          REFUSAL TO PROMOTE HER………………………………15

    V.    PLAINTIFF WAS DISMISSED FOR DISCRIMINATORY
          REASONS………………………………………………17

    VI.    PLAINTIFF'S RETALIATION CLAIMS DO NOT FAIL
          BECAUSE SHE SHOWED THAT HER COMPLAINTS ABOUT
          DISCRIMINATION CAUSED THE FAILURE TO PROMOTE
          HER AND HER DISMISSAL………………………………19

CONCLUSION……………………………………………..……..20

i

# TABLE OF CITATIONS

**CASES:**                                                                                                          **PAGE**

*ARLINGTON SCHOOL DISTRICT*,
      32 PPER 32129 (FINAL ORDER, 2001),.........................................15

*Crouse v. Cyclops Industries*,
      745 A.2d 606, 611, 560 Pa. 394, 404 (Pa. 2000)...............................10

*Stanziale v. Jargowsky*,
      200 F.3d 101, 105 (3rd Cir. 2000)...........................................6, 12

**CONSTITUTIONAL PROVISIONS:**

Eleventh Amendment........................................................................2

**STATUTES:**

29 U.S.C. §206(d).............................................................................1
42 U.S.C. §2000e .............................................................................1
43 Pa. C.S. § 955 .............................................................................1
43 Pa. C.S. § 1421, *et seq.*................................................................1

## STATEMENT OF THE CASE

This is an employment action alleging sex discrimination and retaliation for various actions taken regarding the plaintiff, including her dismissal from employment.

The plaintiff, Barbara A. Wilhelm, was employed by the Pennsylvania State Police as a legislative specialist within the Office of Legislative Affairs (Complaint ¶ 15).

The defendants are the Pennsylvania State Police, Colonel Paul J. Evanko, Commissioner, former Lieutenant Colonel Thomas Coury, former Deputy Commissioner and Captain Michael D. Simmers (Complaint ¶¶ 4-7; Coury Dep. 5, 6).

Ms. Wilhelm alleges that during her employment she was subjected to sexual discrimination, and was subjected to retaliation for complaining about it. Specifically, she asserts claims under the Equal Pay Act of 1963, 29 U.S.C. §206(d) (Complaint ¶¶ 29-33); the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e (Complaint ¶¶ 82-86, 120-125); the Pennsylvania Human Relations Act, 43 Pa. C.S. § 955 ("PHRA") (Complaint ¶¶ 35-39,88-92); and the state Whistleblower Law, 43 Pa. C.S. § 1421, *et seq.* (Complaint ¶¶ 133-137).

Defendants answered the complaint and raised various defenses including, (1) the Eleventh Amendment, (2) the statute of limitations, (3) the failure to file timely charges before the Pennsylvania Human Relations Commission ("PHRC"), and (4) the failure to state a cause of action. (Answer pp. 20, 21).

Discovery closed on March 30, 2002, and defendants have moved for partial summary judgment.

Defendants have moved for partial summary judgment of plaintiff's claims.[1] Plaintiff has moved for partial summary judgment on some of the claims described above. Plaintiff submits this memorandum in opposition to defendants' motion.

## STATEMENT OF THE FACTS

In July of 1996, Ronald Plesco, was appointed by the Pennsylvania State Police as a legislative liaison. (Plesco Dep. 5). As part of his compensation he received use of a state owned vehicle. (Plesco Dep.5). He had a dual chain of command. He reported to State Police Commissioner and the Governor's Office. (Plesco Dep. 6). He worked directly with Major David Miller, the agency Legislative Liaison, who had the same dual reporting responsibility. (Plesco Dep. 7; Morris Dep. 13). As the Legislative

Liaison, Major Miller was primarily responsible for public relations for the agency. Mr. Plesco was responsible for legislative and policy analysis; although he regularly interacted with legislators by telephone (Plesco Dep. 7-11). During much of Major Miller's tenure, Mr. Plesco performed most the duties of the Legislative Liaison (Plesco Dep. 33-45; Bonney Ex. 2) In January of 1997, Major Miller retired. (Plesco Dep. 9, 10; Morris Dep. 11).[2] From the time of his retirement until the appointment of Major Morris[3] in February of 1997, Mr. Plesco performed the work of the Legislative Liaison, even though he did not have the title. (Plesco Dep. 10; Morris Dep. 11-13). For a brief period of time after Major Morris was appointed as Legislative Liaison, Mr. Plesco continued to perform the same functions as the Legislative Liaison. (Plesco 14, 33-35, 48-53; Morris Dep. 25, 26; Bonney Ex. 2).

Eventually Mr. Plesco was made a part of the Legislative Liaison's staff. (Plesco Dep. 12). Sometime in 1997, Major Morris was ordered to accept Captain Simmers as the Assistant Legislative Liaison (Morris Dep. 17-19). When Ms. Wilhelm was hired in January of 1998, Captain Simmers

---

[1] Defendants submitted numerous documents in support of their motion for partial summary judgment. Citations to the record in this memorandum refer either to those documents or to the documents submitted in support of this memorandum.

[2] There is a error on lines 22 and 23 of page 9 of the Plesco deposition. It should read: "And Major Miller was retired in January '97 I believe?"

[3] Richard Morris will be referred to here as Major Morris even though he was appointed as Legislative Liaison as a captain.(Plesco Dep. 41).

was made her supervisor.   Ms. Wilhelm's primary responsibility was legislative analysis (Morris Dep. 29, 34). Captain Simmers' supervisory responsibilities ended when Major Morris discovered Captain Simmers was delegating to Ms. Wilhelm assignments given to him. (Morris Dep. 38). Moreover, Captain Simmers proved to be less than competent. (Morris Dep. 38, 39). Captain Simmers was a friend of Commissioner Evanko and Lieutenant Colonel Coury (Evanko Dep. 78; Coury Dep. 12).

On or about September 13, 1999, Ms. Wilhelm drafted a complaint in the form of a memorandum which was submitted to be investigated by the Internal Affairs Division;   the resulting report was sent to Deputy Commissioner Coury  (Conley Dep. 43-65; Conley Ex. 2; Conley Ex. 3).

In January 2000, Major Morris retired. Captain Simmers was appointed as the Acting Director.(Simmers Dep. 51, 52). Ms. Wilhelm contacted Linda Bonney, Personnel Director, to get information on applying for the Director position. (Wilhelm Dep. 164, 165; Wilhelm Ex. 7). Ms. Bonney indicated that she did not believe non-enlisted personnel would be considered, but provided no additional information. (Wilhelm Dep. 166-168). Colonel Evanko only considered men for the position, despite the availability of qualified women. (Evanko Dep. 104, 105).

4

In February 2000, Captain Jeffrey Miller was selected (Miller Dep. 61). About the same time of his appointment, Captain Miller was informed by Colonel Evanko that a reorganization was planned. (*Id.*). By mid-March 2000, Captain Miller was conducting a search for an assistant director. (Miller Dep. 107-109). Ms. Wilhelm contacted Ms. Barbara Christie, Counsel for the department, in order to get information on applying for the assistant director position (Defendants' Answer ¶ 78). Captain Miller took his list of candidates, which included a women, and presented them to the Commissioner. (Miller Dep. 106-109). The Commissioner suggested Sergeant William McHale.(*Id.*). Sergeant McHale, the only person interviewed, was appointed. (*Id.*).

On May 1, 2000, Ms. Wilhelm was dismissed. Ms. Wilhelm filed a claim with the PHRC alleging various acts of discrimination and retaliation. As part of the intake process, the PHRC required Ms. Wilhelm to complete questionnaires set forth her allegations. The questionnaires completed by Ms. Wilhelm identified the Pennsylvania State Police ("department") and all of the defendants here as liable. A representative of the PHRC drafted the complaint.

## QUESTIONS PRESENTED

1. **Whether the plaintiff failed to exhaust her administrative remedies against the individual defendants?**

5

2. **Whether the Whistleblower claim is barred by the statute of limitations?**

3. **Whether the plaintiff has established a claim under the Equal Pay Act?**

4. **Whether the plaintiff can establish a claim of sex discrimination with regard to the refusal to promote her?**

5. **Whether the plaintiff can establish a discrimination claim for her dismissal?**

6. **Whether plaintiff's retaliation claims fail because she cannot show that her complaints about discrimination caused either the failure to promote her or her dismissal.**

## ARGUMENT

In reviewing a motion for summary judgment, this court must determine whether the record, when viewed in a light favorable to plaintiff, shows that there is no genuine issue of material fact and that defendants are entitled to summary judgment. *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3rd Cir. 2000). Generally, in a discrimination case a plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all the elements of a prima facie case of discrimination. *Id.* If a plaintiff can establish a prima facie case, the burden of production shift to defendants, who must present evidence sufficient, if believed, to support a finding that the defendants had a nondiscriminatory reason for their actions. *Id.* If that burden is satisfied, the motion shall fail if the plaintiff submits evidence for

which a factfinder could reasonably either (1) disbelieve the defendants' articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants behavior. *Id.*

## I.  THE PLAINTIFF DID NOT FAIL TO EXHAUST HER ADMINISTRATIVE REMEDIES AGAINST THE INDIVIDUAL DEFENDANTS.

As part of the PHRC intake process all claimants must complete a questionnaire related to the alleged discrimination. (Wilhelm Unsworn Declaration) Ms. Wilhelm completed several questionnaires. (Wilhelm Unsworn Declaration) In them she specifically alleged:

> "My discharge occurred a direct result of my sex and retaliation for complaints of discriminatory practices, selective and preferential treatment of the male employees in the office a condoned by Colonel Paul J. Evanko, Commissioner" (Discharge Questionnaire p.2)

She alleged:

> "My discharge from the position of Legislative Specialist 2, Legislative Affairs Office, Pennsylvania State Police by Colonel Paul J Evanko, (male) Commissioner, Pennsylvania State Police and sexual discrimination and retaliation." (Discharge Questionnaire, Continuation Page).

She alleged:

"Feb. 2000, I was informed by Capt. Jeffrey B. Miller, (white male) that he told the commissioner, he wanted someone in the Asst. Leg. Liaison position that could do analysis and use a computer. I was not given an opportunity to apply for the position. It was filled by the commissioner with a (white male)" (Non-Promotion Questionnaire p.2).

She alleged:

"That Colonel Paul J. Evanko, (male) Commissioner, Pennsylvania State Police was aware of and supported sexual discrimination against me by not responding to my correspondence dated December 20, 1998, June 21, 1999, September 13, 1999, and January 3, 2000, that the Legislative Specialist position was performing at a higher level with more responsibility than Captain Michael D. Simmers, (male), Assistant Legislative Liaison. Also, no action was taken to resolve the matter. Additionally, Colonel Paul J. Evanko, Commissioner was aware of and supported sexual discrimination against me by not giving me an opportunity to apply for the vacant Assistant Legislative Liaison position, for which I was the best qualified." (Non-Promotion Questionnaire Continuation Page p. 1).

She alleged:

"April 1, 2000, by the authority of Colonel Paul J. Evanko, Commissioner, Sgt. William J. McHale (male) was transferred to the Legislative Affairs Office to the position of Assistant legislative Liaison. Sgt. William J. McHale was transferred out of the Bureau of Drug Law, From the position of Section Supervisor, Area VI Tactical Narcotic Team to the Legislative Affairs Office having no legislative related experience." (Non-Promotion Questionnaire Continuation Page p. 2).

She alleged:

8

"Colonel Paul J. Evanko was aware of the discriminatory treatment and supported the selective preferential treatment of Captain Simmers, specifically resulting in Captain Simmers not being required to develop the necessary skills to perform the duties and responsibilities of the Assistant Legislative Liaison position thus allowing Captain Simmers to shirk his responsibilities on me." (Non-Promotion Questionnaire Continuation Page p. 3).

Additional references to Colonel Evanko can be found in the Unequal Pay Questionnaire on page 2, the Unequal Pay Questionnaire pages 1 and 3, and the Retaliation Questionnaire on page 1. The Harassment Questionnaire discloses specific references to Captain Simmers on pages 2 and 3.

The Harassment Questionnaire Continuation Page cites allegations against Lt. Colonel Coury.

A PHRC drafted the complaint based on the information provided by Ms. Wilhelm. Accordingly, Ms. Wilhelm did everything should could to exhaust her administrative remedies. Moreover, the PHRC had an opportunity to receive, investigate and resolve Ms. Wilhelm's allegations against all of the defendants.

## II.  THE WHISTLEBLOWER CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS.

"The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Crouse v. Cyclops Industries*, 745 A.2d 606, 611, 560 Pa. 394, 404 (Pa. 2000).

When Ms. Wilhelm was dismissed she had no way of knowing how the department would record the event in her personnel file. In December of 2000, Ms. Wilhelm learned the department had entered the transaction code "02200" into the Commonwealth of Pennsylvania's ("Commonwealth") personnel database. (Complaint ¶ 114) The code meant "dismissal/removal." (Polek Ex. 2  p. 2) Her problem was getting someone to interpret the meaning of "dismissal/removal." Her best efforts took approximately three months. She did not learn that the code 02200 was derogatory until she spoke Richard Clites, Chief Personnel Systems Division, Bureau of Personnel, Office of Administration, Governor's Office on Monday, March 5, 2001. (Wilhelm Unsworn Declaration; Complaint ¶ 116) Mr. Clites explained that the code 02200 was derogatory, and that there were

alternative, non-derogatory, codes to describe a termination of employee resulting from a reorganization. (Wilhelm Unsworn Declaration; Complaint ¶ 116). Specifically, she learned that Commonwealth managers who hire regard the code a negative. (Wilhelm Unsworn Declaration). Thus, her reputation and her future as a Commonwealth employee was injured. His assessment was confirmed during discovery. Linda Bonney, the department's Personnel Director, stated that Rose Polek was the department's transaction code expert.(Bonney Dep. 71) According to Ms. Polek, the only reason she used the 02200 dismissal/removal code was because the letter terminating Ms. Wilhelm was already written and stated she was dismissed. (Polek Dep. 11). The department should have described the termination following a reorganization as a "furlough." (Polek Dep. 5, 6,10,11; Evanko Ex. 3 p. 4) Commonwealth hiring managers have access to the database used by the department. (Polek Dep. 13, 14). The removal code would not be regarded favorably by those hiring managers.. (Polek Dep. 14, 15). This would adversely affect Ms. Wilhelm prospects for future Commonwealth employment

Accordingly, under the discovery rule the statute of limitations was tolled until March 5, 2001, when Ms. Wilhelm learned of the harm to her reputation and future as a Commonwealth employee.

## III.   THE PLAINTIFF HAS ESTABLISHED A CLAIM UNDER THE EQUAL PAY ACT.

In order to prevail at the summary judgment stage in a Equal Pay Act claim, the plaintiff must first establish a prima facie case by demonstrating that the employees of opposite sex were paid differently for performing "equal work"- work of substantially equal skill, effort and responsibility, under similar working conditions; if that burden is met the employer must prove at least one affirmative defense "'so clearly that no rational jury could find to the contrary.' *Delaware Dept. of health, 865 F.2d at 1414*" *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir. 2000).

Ms. Wilhelm performed Captain Simmers' duties as the Assistant Legislative Liaison. The department reached this finding in two instances. In a classification review conducted in January of 1999, a report was issued describing the duties of Ms. Wilhelm. Among other things, the report found:

> "I have thoroughly reviewed the specifications for the Legislative Aide, Legislative Specialist 1 and Legislative Specialist 2 classes. I am recommending that this position be reclassified a Legislative Specialist 2. The primary reason for this recommendation is the complexity of issues handled by the incumbent and the independent manner in which she carries out assignment and assumed tasks.

> ***The 2 level class calls for an employee to function as the chief staff assistant to the Legislative Liaison. This position is performing in that capacity. The organization chart reflects a State Police Captain serving in that capacity, however, due to various circumstances which cannot be addressed here, the incumbent has been and will continue to perform in this capacity.*** (Emphasis added.)

(Burkholder Ex. 1 p.1736).

A report issued by the department's Systems and Process Review team found in pertinent part:

> "Major Morris reports Captain Simmers is not competent to fulfill the duties of Assistant Legislative Liaison,…he lacks the necessary reporting skills…poor speaking and writing skill…Captain Simmers does delegate a large portion of his work to Ms. Wilhelm…***Review of the work product done by Captain Simmers did support the Major's assessment.*** Based upon the Captain's abilities, the Major identified answering telephone call for constituent issues as appropriate work for him." (Emphasis added.)

(Evanko Ex. 9 p. 0009).

Thus by the department's own standards, Ms. Wilhelm performed the duties assigned to Captain Simmers. Ms. Wilhelm does not assert entitlement to the equal pay during periods when Captain Simmers acted as Director. Plaintiff seeks equal pay for the periods during which he did not supervise anyone. During those periods she performed his job as Assistant Legislative Liaison and was not paid equally her work.

Ms. Wilhelm performed work equal to Mr. Plesco during the period in which he was supervised by Major Morris. During that period she was paid significantly less than Mr. Plesco. The best description of Ms. Wilhelm's work is found in the classification review report. It describes, in detail, the broad range of complex responsibilities regularly performed by Ms. Wilhelm. It states, in pertinent part:

> "The complexity of issues that this position deals with is the other allocation factor that caused me to recommend reclassification of this position. The incumbent is involved in every phase of legislative review and, most importantly, develops and finalizes the bill analysis for the Department which includes determining and documenting the Department's position relative to the legislative proposal. Proposals cover the full range of law enforcement issues, involve many Bureaus and Offices and, at times, result in interaction with other agency legislative affairs offices."

(Berkholder Ex. 1. p. 1736).

The complete report details the complexity of her work from an objective third party. (Berkholder Ex. 1). By any comparison the Ms. Wilhelm did more than Ronald Plesco. She is only asking for equal pay.

In neither case has the employer bothered to articulate an affirmative defense so clearly that no rational jury could find to the contrary.

## IV.    THE PLAINTIFF CAN ESTABLISH A CLAIM OF SEX DISCRIMINATION WITH REGARD TO THE REFUSAL TO PROMOTE HER.

Several facts belie the reasons articulated by Colonel Evanko regarding his refusal to promote Ms. Wilhelm to the positions of Director and Assistant Director. Before the federal claim was filed, the articulated reason for not selecting a civilian was that the department preferred enlisted employees to civilian employees. (PHRC Answer p. 5). The department did not state that it believed it was required to appoint an enlisted employee. The law does not support such a position. Under Pennsylvania law, in order for the union to assert any rights to a position, it must have performed the work exclusively. *Arlington School District*, 32 PPER 32129 (Final Order, 2001). According to the undisputed testimony of Mr. Plesco, he performed the duties of the Legislative Liaison when Major David Miller was the Legislative Liaison. (Plesco Dep. 33-45; Bonney Ex. 2). In January of 1997 Major Miller retired. (Plesco Dep. 9, 10; Morris Dep. 11). From the time of his retirement until the appointment of Major Morris in February of 1997, Mr. Plesco performed the work of the Legislative Liaison, even though he did not have the title. (Plesco Dep. 10; Morris Dep. 11-13).  Thus, the work was shared with a non-enlisted employee. It is also undisputed that

15

Ms. Wilhelm, not Captain Simmers, performed the duties of the Assistant Legislative Liaison (Burkholder Ex. 1 p.1736; Evanko Ex. 9 p. 0009). Here, the work was performed by a non-enlisted employee primarily. In fact, the Commissioner never believed that there was a statutory or regulatory requirement that an enlisted employee be appointed as director or assistant director (Defendants' Interrog. Resp. 4; Defendants' Interrog. Resp. 7).

What is also undisputed is that the Commissioner did not want any women, including qualified enlisted women, considered for either position (PHRC Ans. page 5; Evanko Dep 104, 105; Miller Dep. 106-109). It is not likely that he did not know of Ms. Wilhelm's interest. To believe that you must believe that neither his Personnel Director nor his Chief Counsel notified him of Ms. Wilhelm's interest. (Wilhelm Dep. 166-168; Defendants' Answer ¶ 78). In addition, notwithstanding argument to the contrary, the Commissioner had no specific knowledge as to why he believed Ms. Wilhelm was less knowledgeable than other enlisted department employees (Evanko Dep. 85, 86). Finally, his stance on sexual harassment is the best evidence of Colonel Evanko's true disposition toward women. The Commissioner took no disciplinary action when a male officer employee committed an overt act of sexual harassment against a female employee (Balsbaugh Dep. 6-9; Coury Dep. 6-7).

On these undisputed facts a factfinder could reasonably either (1) disbelieve the defendants articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants behavior.

## V.    PLAINTIFF WAS DISMISSED FOR DISCRIMINATORY REASONS.

The entire so-called reorganization is suspect. As early as April 1999, the Legislative Affairs Office planned to hire a clerical person with Ms. Wilhelm acting as supervisor (Complaint ¶¶ 100, 101). Yet, there was no attempt to place a clerical person in the office until after Ms. Wilhelm submitted her September 13, 1999, complaint. If Captain Miller, as Ms. Wilhelm's supervisor, really believed she had performance problems he would have maintained supervisory notes of deficiencies, attempted to correct the deficiencies through instructions, articulated his expectations to her, trained her, counseled her and if necessary disciplined her (Evanko Dep. 113, 114). Captain Miller did not believe Ms. Wilhelm's behavior or performance warranted any type of disciplinary response (Miller Dep. 78,79). As to the reorganization, the Commissioner decided to reorganize the office before Captain Miller was appointed (Miller Dep. 61). Incredibly, the

Commissioner denies that he decided to reorganize the office (Evanko Dep. 102, 103).

Several undisputed facts strongly support a finding that the purpose of the reorganization was to harm Ms. Wilhelm. The department offered no explanation as to why Ms. Wilhelm was not given advance notice to prepare for the termination. Likewise, no explanation was given for not allowing her to resign in lieu of termination. The department selected a negative transaction code, 02200, which harmed Ms. Wilhelm's opportunity for Commonwealth employment. The department did not consult Ms. Polek, the transaction specialist, before the dismissal letter was written so that a neutral code could be selected. (Polek Dep. 11). According to Ms. Polek, there were several other appropriate neutral transaction codes which could have been selected. (Polek Dep. 5, 6,10-13; Evanko Ex. 3 p. 4).

Taken as a whole, on these undisputed facts a factfinder could reasonably either (1) disbelieve the defendants articulated legitimate reasons; or (2) believe  that an invidious discriminatory reason was more likely than not a motivating  or determinative cause of the defendants behavior.

18

## VI.    PLAINTIFF'S RETALIATION CLAIMS DO NOT FAIL BECAUSE SHE SHOWED THAT HER COMPLAINTS ABOUT DISCRIMINATION CAUSED THE FAILURE TO PROMOTE HER AND HER DISMISSAL.

The defendants concede the showing of a prima facie case,  and argue that there are nondiscriminatory reasons for the failures to promote and dismissal. The defendants argue the Ms. Wilhelm's retaliation claim fails because she cannot establish a causal link between her complaints and the failures to promote her and her dismissal. The defendant correctly cite complaints submitted by Ms. Wilhelm (Defendants' memorandum for summary judgment pp. 25-27). Citing their articulated reasons for the decisions not to promote Ms. Wilhelm and to dismiss her, the defendants reason no causal connection has been established on the assumption that Ms. Wilhelm could not show the articulated reasons were pretext. In parts IV and V  of this memorandum Ms. Wilhelm has demonstrated that the articulated reasons are pretext.

## **CONCLUSION**

For all of the preceding reasons, this Court should deny defendants'

motion for partial summary judgment.

Respectfully submitted,


Nathan C. Pringle, Jr.
Attorney I.D. No. 30142
3601 N. Progress Ave.
Suite 200
Harrisburg, PA 17110
(717) 909-8520
Attorney for Plaintiff

Dated: May 8, 2002

## CERTIFICATE OF SERVICE

I, Nathan C. Pringle, Jr., hereby certify that on May 8, 2002, I

caused to be hand-served a copy of the foregoing document entitled

Plaintiff's Memorandum in Opposition to Defendants' Partial Motion

for Summary Judgement upon the following:


Susan J. Forney
Chief Deputy Attorney General
Office of Attorney General
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120


Nathan C. Pringle, Jr.

COMMONWEALTH OF PENNSYLVANIA
STD-552       REV. 5-87

 

# DESK MEMORANDUM

**SUBJECT**

## EXECUTIVE SUMMARY - LEGISLATIVE LIAISON OFFICE

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Legislative Liaison Office | Director, Bureau of Professional Responsibility *HmcCR* |

| DATE SENT | DATE DUE |
|---|---|
| October 7, 1999 | |

|   |   |   |   |   |   |
|---|---|---|---|---|---|
|   | PLEASE CALL |   | APPROVAL | | SEE ME |
|   | RETURNED YOUR CALL |   | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | X | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| X | NECESSARY ACTION |   | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

A copy of this report has been provided to the Commissioner and Deputy Commissioner of Administratio

You are required to correct any discrepancies and prepare an Inspection Correction Report as identifi
on the cover page. If you have questions regarding the review findings, or would like to arrange a meeti
to discuss them, please contact the Director, Systems and Process Review Division, at (717) 657-421

Also included is a Service Evaluation. Please adhere to the guidelines which appear on the first page



**EXHIBIT**
*Evanko 9*
*2-28-02 SS*

00022

STD-501X (9-86)

COMMONWEALTH OF PENNSYLVANIA

**DATE:** November 16, 1999

**SUBJECT:** Inspection Correction Report

**TO:** Director, Bureau of Professional Responsibility

**FROM:** Major Richard D.A. Morris
Director, Legislative Affairs Office

**Enclosure:** (1)   Inspection Correction Report
(2)   Service Evaluation

1.    Enclosure (1) is submitted in accordance with OM 7- 4, (Inspection).

2.    Enclosure (2) is voluntarily submitted to assist the Systems and Process Review Division in identifying its strengths in the process. The team acted professionally during their inventory of the Legislative Affairs Office and rose above the internal discord they observed to prepare a responsible and balanced Executive Summary.

3.    The process has prompted the Legislative Affairs Office to look at opportunities for improvement above those items listed in the Executive Summary.

00023

| | | | | |
|---|---|---|---|---|
| SP 3-214 (3-00) | | 1. TROOP OR BUREAU | | 2. LOCATION AND CODE |
| PENNSYLVANIA STATE POLICE | | Legislative Affairs Office | | 5006 |
| INSPECTION CORRECTION REPORT | | 3. DATE | | 4. INSPECTION OR REVIEW DATE |
| CHECK ONE: ☐ LINE INSPECTION  ☒ SYSTEMS AND PROCESS REVIEW | | 11/15/99 | | 9/13/99 |

| 5. ITEM NO. | 6. DATE CORRECTIVE ACTION TAKEN | 7. CORRECTIVE ACTION TAKEN |
|---|---|---|
| 98 | 11/12/99 | Purging schedules are being developed as part of the Legislative Affairs Office Operations Manual. Files not covered by AR 1-3, such as Legislative Correspondence and Legislation will be maintained for 5 years and reviewed and purged annually. Testimony and Bill Analysis files will be maintained for 10 years. |
| 677 | 11/12/99 | A Permanent Firearms Scoring Record has been established for Major Morris and Captain Simmers. |
| 678 | 10/01/99 | The Personnel Roster File has been updated to include the change of classification to Legislative Specialist 2 for Ms. Barbara Wilhelm. |
| 683 | 11/12/99 | Personnel Files have been reviewed and corrected. |
| 114 | 11/12/99 | Ms. Wilhelm and Mr. Plesco have been provided with personal copies of AR 4-6, AR 4-9, and FR 5-4. |
| 115 | 11/12/99 | Record of Absence, Form C336L, was originally maintained in the supervisors file with the approval of the Bureau of Personnel because of private concerns. Those issues have been resolved and will be maintained in Ms. Wilhelm's Personnel File. |
| 116 | 11/12/99 | The current EPR for Ms. Wilhelm was placed in her supervisory file. The lack of EPR's for Captain Simmer's was explained during the Systems and Process Review process. |
| 117 | 11/12/99 | The current job description for Captain Simmers has been placed in his personnel file. |
| 169 | 10/04/99 | Staff meetings have been established and held more frequently. THe goal is to meet formally on a weekly schedule and daily informally to keep staff current on legislative issues. When two or more staff members are unavaila formal meetings are rescheduled or cancelled. Increased use of e-mail has been initiated to share information. |
| 95 | 11/12/99 | Annotations and maintenance of Directives Files have been initiated, but have not been completed. Lack of clerical support has left this process low on the priority schedule. Changes/corrections will be completed before 11/30/99. |
| 99 | 11/12/99 | The standard to mark the outside of cabinets is not pratical with new cabinet designs. The Office files are well labeled. Staff shall become familiar with the files so they may locate needed information. Outside cabinet marking is not anticipated. |

8.

SECTION, STATION, OR DISTRICT OFFICE COMMANDER

9.

I HAVE REVIEWED THIS REPORT AND CONSIDER THE CORRECTIVE ACTION TAKEN TO BE APPROPRIATE.

TROOP COMMANDER OR DIVISION DIRECTOR        DATE

10.

I HAVE REVIEWED THIS REPORT AND CONSIDER THE CORRECTIVE ACTION TAKEN TO BE APPROPRIATE.

AREA COMMANDER OR BUREAU DIRECTOR        DATE

11/16/99

00024

PSP-501X

**COMMONWEALTH OF PENNSYLVANIA**

**DATE:** January 7, 2000

**SUBJECT:** Systems and Process Review Division Report

**TO:** Acting Director, Legislative Affairs Office

**FROM:** Colonel Paul J. Evanko *PJE*
Commissioner

**ENCLOSURE:** (1) Correspondence from Barbara A. Wilhelm, Legislative Specialist 2, Legislative Affairs Office, to Major Richard D. A. Morris, Director, Legislative Affairs Office, dated January 3, 2000, regarding Subject.

1. I have received a copy of Enclosure (1) from Ms. Wilhelm.

2. As I had previously stated to Major Morris, the SPR Report which was conducted on the Legislative Affairs Office should be provided to each office member for review. I say that not only as it relates to the Legislative Affairs Office, but for all organizational segments of the Department for which reviews have been conducted. Review of findings is essential to the correction and learning process. Review provides final closure to the overall process.

3. You are hereby directed to permit all personnel of the Legislative Affairs Office to review Subject SPR. Additionally, you are directed to take the necessary corrective actions identified in said report in compliance with existing Department rules, regulations, policies or established procedures.

00071

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

**DATE:**   January 3, 2000

**SUBJECT:**   Systems and Process Review Division Reports

**TO:**   Major Richard D. A. Morris
Director
Legislative Affairs Office

**FROM:**   *Barbara A. Wilhelm*
Barbara A. Wilhelm
Legislative Specialist 2
Legislative Affairs Office

**ENCLOSURE:**   (1)   Copy of e-mail forwarded to Major Morris for response.

1.   As you are aware, I forwarded an e-mail to you reminding you that back in November you stated to me that you would provide each staff member with a copy of the response that you prepared relating to the Review done by the Pennsylvania State Police, Bureau of Professional Responsibility, Systems and Process Review Division, Central Section. Thank you for letting me remind you once-again, that to date, I have not received a copy of your response.

2.   Regarding the remaining issues in the enclosed e-mail, specifically, the selective sharing of confidential information with my co-workers by the Department, your statement to me telephonically, that I need to know the Review was about me, and the targeted investigation led by employee Simmers are being addressed by my legal counsel.

**cc:**   Colonel Paul J. Evanko, Commissioner
Major Virginia L. Smith-Elliott, Director, Equal Employment Opportunity Office
File

**WILHELM, BARBARA A.**
**To:**          MORRIS, RICHARD D
**Subject:**     The Bureau of Professional Responsibility, Systems & Process Review Division

Major:

You may recall informing me that two reports were being prepared by the Systems & Process Review Division. The first report addressing the first group of meetings and the second report addressing the meeting that I had asked for regarding Asst. Leg. Liaison Simmers.

Also, you may recall that back in November, you stated to me that you would provide each staff member with a copy of the response that you had prepared relating to the review done by the Systems & Process Review Division. Thank you for letting me remind you that to date, I have not received my copy of your response.

Additionally, I have become aware that issues regarding the second meeting, which I would have thought the Department would want to handle in a professional and confidential manner, are being openly discussed by my co-workers within the Legislative Affairs Office. Sadly, and now for the third time, I am documenting the selective sharing of confidential information.

Finally, I am reflecting on a statement that you made to me during a telephone call that was made from downtown, to my personal office telephone number, which included the statement that I need to know that the Review was about me.

Because my co-workers are openly discussing the second report and because you were very clear in informing me that the Review was about me, please consider this a formal request to obtain a copy of all Reports and responses relating to the Review conducted on the Legislative Affairs Office by the Systems & Process Review Division.

Thank you for you attention to this matter.

cc: File

RECEIVED
Office of Attorney General

SEP 1 9 2001

Litigation Section

# PENNSYLVANIA STATE POLICE

## BUREAU OF PROFESSIONAL RESPONSIBILITY
### SYSTEMS AND PROCESS REVIEW DIVISION

## EXECUTIVE SUMMARY

### LEGISLATIVE LIAISON OFFICE

### SEPTEMBER 1999

# TROOPER

0006




# PENNSYLVANIA STATE POLICE
## BUREAU OF PROFESSIONAL RESPONSIBILITY
### SYSTEMS AND PROCESS REVIEW DIVISION

## EXECUTIVE SUMMARY

| | |
|---|---|
| **COMPONENT:** | Executive and Administrative Offices<br>Legislative Liaison Office |
| **OFFICE DIRECTOR:** | Major Richard D. A. Morris |
| **REVIEW TEAM LEADER:** | Lieutenant William A. Horgas |
| **REVIEW TEAM MEMBERS:** | Sergeant Janet A. McNeal<br>Trooper Farzad Sharif |
| **DATE OF REVIEW:** | September 13 – 20, 1999 |
| **DATE OF REPORT:** | October 7, 1999 |

An Inspection Correction Report shall be forwarded directly to the Director, Bureau of Professional Responsibility, by **November 15, 1999.** Additional copies are to be distributed in accordance with OM 7-4, (Inspections), Chapter 5, Section E, paragraph 2.

## REVIEW FINDINGS

The Legislative Liaison Office (LLO) is directed by Major Richard D. A. Morris, the Department's Legislative Liaison. A staff of three includes Captain Michael D. Simmers, the Department's Assistant Legislative Liaison, Ronald E. Plesco Jr., Executive Policy Specialist 2; and Barbara A. Wilhelm, Legislative Specialist 2. The Office setting, located on the third floor of Department Headquarters directly adjacent to the Commissioner's Office, provides an overall professional appearance and enhances the Department's image. Over the last several years the LLO has grown from one member to two members and two civilians. The quality and quantity of service has similarly increased. However, the same can not be said about the inner-office professional relationships.

Some significant accomplishments of the Office are the development of a Commonwealth of Pennsylvania Legislative Directory in 1998 and a State Law Enforcement Legislative Directory in 1999. The State Law Enforcement Directory includes law

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 2

enforcement agencies throughout the United States and Canada. Both publications will be updated annually. Additionally, Criminal History Information has been placed on-line and the Office is currently working on creating an on-line guide to Pennsylvania State Police services.

Previously no records or files were maintained by the Legislative Liaison. Files for House and Senate Bills, correspondence from legislators, transcripts of testimony given by Department personnel at legislative hearings, and "hot files" of most commonly raised issues have been newly established for this Office. Most contain information for only the current and prior year. They are well maintained with some minor filing errors. All personnel of the Office can easily access information. Currently no retention schedule has been established and needs to be addressed.

During the Systems and Process Review (SPR), team members were provided with strong testimony from the Office personnel indicating morale is at extremely low levels. In all cases this was attributed to the poor professional relationships between LLO staff personnel. Individual interviews revealed a lack of trust, respect, and tolerance among the staff for each other; and, in some cases it is apparent the relationships border on hatred, all of which impedes operations. Allegations that some staff have undermined the efforts of other staff in an effort to further themselves has created additional conflict.

Major Morris was interviewed on September 16, 1999, and it was apparent he takes great pride in the evolution of the Office. His goals for the Office include increased awareness of the Office and Department web site, increased visibility and interaction in the legislative process, and improved service to the legislators, constituents, and Department personnel. Presently, an attempt is made to respond to all calls while in progress or by the end of the day. Worst case scenario is a next day response.

While interviewing Major Morris, the subject of morale and poor relationships quickly became the central theme. He was quick to point out he has never completed an Employee Performance Review for Captain Simmers. When asked why, he responded: "The Colonel wouldn't like it. I've been accused of keeping the Captain under my thumb. I didn't want the Captain to be here. I voiced my opinion at first. I wanted a Sergeant, but I was given him…I would not give him any responsibilities unless the Colonel orders me because he is incompetent. I have no confidence in him." In reference to improving the efficiency of his Office, Major Morris related his Office receives more than 30 calls per day from legislators alone and he believes a clerk would be able to handle most of them. His concern is there is insufficient work for a full-time clerk. Major Morris has researched the feasibility of obtaining an intern, however, security issues have deterred him from doing so. Major Morris believes the Public Information Office and his Office could share a full-time clerk without any difficulty. He also added, a clerk would allow Ms. Wilhelm to perform more analysis

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 3

work, which is what she should be doing. An operations manual for the Office does not exist, although Major Morris has discussed this with his staff and they intend to develop one in the future.

Major Morris admitted he has not been holding weekly staff meetings. He stated: "Ninety percent of my time should be spent downtown visiting legislators, people dealing with appropriations and rules committee meetings. This tension in the Office has reduced my time in the Capitol to twenty-five percent. The rest of the time I'm in here to prevent bloodshed. The Office could work more efficiently. I have to force the Captain and Barb to communicate." Major Morris also related that because of this situation he has "missed opportunities at the Hill in making amendments to Bills." In response to questions about the low morale and conflict between Ms. Wilhelm and Captain Simmers, he admitted the tense working atmosphere creates problems, but they get the job done in spite of the problems. He admitted he probably has not done enough to resolve the issue and has, himself, been a victim of the Office conflict.

Major Morris explained an instance in which he was a victim of not receiving required information on time. He failed to attend a mandatory State Employee Combined Appeal (SECA) campaign kickoff because, according to him, Captain Simmers, who had received the correspondence mandating his attendance, failed to tell him so. On the morning of the campaign kickoff he had seen Captain Simmers in the Office in full uniform and Captain Simmers did tell him he was going to the SECA campaign kickoff. But, in Major Morris' opinion, Captain Simmers, in an attempt to get him in trouble, purposely did not tell him he was to attend the event as well.

Major Morris reports Captain Simmers is not competent to fulfill the duties of Assistant Legislative Liaison, in part, because of his hearing problem, and also because he lacks the necessary reporting skills for the position. He has stripped Captain Simmers of most of his duties in an effort to minimize damage to the Office, claiming Captain Simmers is unable to comprehend and accurately report information he receives while attending legislative affairs. He cites poor speaking and writing skills as problematic in accomplishing the objectives of his position, adding that Captain Simmers does delegate a large portion of his work to Ms. Wilhelm and the remainder is often only handwritten notes on the original correspondence, not the form requested by Major Morris. Review of the work product done by Captain Simmers did support the Major's assessment. Based upon the Captain's abilities, the Major identified answering telephone calls for constituent issues as appropriate work for him.

Major Morris reported Ms. Wilhelm is very competent in her position and is probably overworked, but it is her nature to be busy. Her work is timely and high quality, and in that regard she is an asset to the Office. Captain Simmers has tasked her with doing his work and

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 4

she becomes frustrated and resentful with what she perceives as the lack of valid work performed by Captain Simmers. He added that personal issues also impact the hostile atmosphere between Captain Simmers and Ms. Wilhelm, as they were friends prior to her assignment to the Office. A reclassification of her position placing her under the purview of Major Morris for supervisory purposes did not resolve the problems. He feels a great deal of the problem between them is personal and probably will never be resolved. In closing, Major Morris made the following statements: "Barb has not made the transition to working in this Office. She still has the mindset of working downtown. I could manage with only Barb. I could use a different Captain. I don't think the problem between the two of them will ever be resolved."

In an interview with Captain Simmers, he showed concern about having been reduced to performing minor secretarial duties within the Office, such as answering the telephone and getting the mail for the rest of the staff. It is Captain Simmers' belief the Office telephone lines were purposely wired in such fashion so the phone would only ring in his office and the front desk, which is not staffed, forcing him to act as a telephone operator. He added: "Ninety percent of all calls within the Office could be handled by a Clerk Typist 1, and a Captain in the Pennsylvania State Police getting paid $40 per hour should be doing more than taking personal telephone messages for others." He further complained about not being given any flexibility by Major Morris. Captain Simmers is required to work a 0800 – 1600 shift without any deviation. He related if he needs to go to a dentist's appointment at 1530, as he did on the day of this interview, he cannot work a 0730 – 1530 shift and consequently is forced to put in for 30 minutes annual leave. Captain Simmers also complained he is limited to exactly a 30 minute lunch break no matter how many extra hours he works during the day.

Captain Simmers stated: "In May or June of 1998, without any explanation, I was ordered by Major Morris not to go downtown and perform my Legislative Liaison duties." In September of 1998 he was ordered by Major Morris to have a hearing test conducted at the Department's expense. He is embittered by the issues surrounding his hearing loss and feels he has been unfairly singled out when ordered to pursue hearing correction. He stated that even though he obtained hearing aids and could return to his duties, Major Morris took it upon himself to keep him from returning to full active duty status. According to Captain Simmers, that status just changed when Major Morris learned SPR was coming to perform a review, and he is now allowed to attend meetings downtown.

Captain Simmers also shared his concerns about existing double standards. He recently was weekend Officer of the Day and worked extra hours but would not put in for overtime. He stated: "Overtime and trips are non-existent. I had to put in a leave slip for going to Colonel Coury's father's funeral, even though 13 Commissioned Officers went in state cars on duty and no one else had to put in for leave." Captain Simmers stated: "A

00010

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 5

double standard exists within the LLO because last year Major Morris chose to schedule himself for hundreds of dollars of overtime even though there was not a need for it. He had plenty of time to change his schedule to avoid overtime." (Major Morris informed the review team that last year he was instructed by the Commissioner to work on an overtime basis for some of his duties.)

A deliberate lack of communication was another concern of Captain Simmers. He related Ms. Wilhelm and Major Morris constantly keep him in the dark so he would not be aware of the LLO's involvement in upcoming events and important issues. He cited a recent example: on September 13, 1999, Captain Simmers almost missed attending a mandatory meeting at the Capitol with Colonel Evanko and Lieutenant Colonel Westcott. He stated: "Major Morris was off that day and I was returning from delivering mail downtown. I was paged by the Colonel's secretary and, after calling her back immediately because she had put in '911' on her page, was advised I had to be at the Capitol for a meeting right away. This was the first I had heard about it. Afterwards I went back to the Office and located a note in the Major's in-basket, which was dated days prior to Major Morris going on leave, instructing me to attend this meeting." Captain Simmers was unable to recall with certainty whom the note was from, but he believed it was from Colonel Evanko. Captain Simmers also stated: "These acts are deliberately carried out to make me appear incompetent."

Captain Simmers believes a large portion of the poor inner-office relationships could be blamed on Ms. Wilhelm. According to Captain Simmers, Mr. Plesco caught Ms. Wilhelm telling a lie. This, along with a telephone conversation in which Mr. Plesco overheard Ms. Wilhelm intentionally delay the handling of a legislative affair, was brought to Captain Simmers' attention by Mr. Plesco. At the time, Captain Simmers was Ms. Wilhelm's supervisor and it was in that capacity Captain Simmers counseled Ms. Wilhelm. Captain Simmers stated: "During the counseling session Barb blew up, yelling at me. After that she stopped talking to me and set up a network to by-pass me. She stopped talking to everyone. To this day we don't talk. On an official basis, I talk to her, other than that, nothing." Shortly after this incident, Ms. Wilhelm requested to work directly under the Major and it was approved, minimizing the Captain's responsibilities even more. He added Ms. Wilhelm is now permitted to change her schedule around as she pleases and Major Morris sets a double standard by permitting her to do so. Captain Simmers further reinforced the existence of a lack of trust within the Office by stating: "Both of them (referring to Major Morris and Ms. Wilhelm) constantly set booby traps. One day I came in the Office and found blinds on the floor. I asked Ms. Wilhelm when and who will put them up because people were tripping over them. She said she didn't know, so I called maintenance and had them come up and put up the blinds. After Ron's was completed, an outside contractor came in to put them up. This was arranged by Barb and paid for. She knew all about it."

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 6

Captain Simmers further expanded on the state of affairs within the Office by stating: "Major Morris lacks loyalty to this administration. He has tried to undermine it several times. Barb is the same and Ron can verify this. Ron is treated terribly. Major thinks Ron and I are spies…I am treated worse than a Trooper."

He is aware Major Morris questions his competency and ability, but feels his competency is not the issue, rather it is personal. He alleges he is the subject of harassing, disparate treatment in an attempt to get him to leave the Office because he is not liked or trusted there. He added he is intentionally excluded from information shared in the Office to present him in a bad light and support the allegation of incompetence. He feels all hostile activity in the Office is directed at him because he is loyal to the Department while Major Morris and Ms. Wilhelm are not. However, Captain Simmers did praise Major Morris and Ms. Wilhelm when describing their work performance. According to the Captain, both the Major and Ms. Wilhelm are highly intellectual, hard working individuals who are extremely competent in fulfilling the requirements of their current positions. He describes himself as an exemplary employee.

Barbara A. Wilhelm has worked in the Office since January 1998. She serves as an assistant to Major Morris. Currently classified as a Legislative Specialist 2, she deals with all aspects of legislative affairs as well as assisting with the day to day inner-office duties. These duties, according to her job description, include providing "guidance to Assistant Legislative Liaison regarding modern office methods and techniques, to include, use of the personal computer, use of software, related peripherals; preparation of formal and informal correspondence, contents of correspondence, and interpretation of office operations." During her interview she made it abundantly clear she views Captain Simmers as an incompetent, lazy individual who tries to dodge what little responsibility is assigned to him. When asked whether she believes a clerk is needed in the LLO she replied: "Definitely not. A $75,000 a year position is already not being utilized." At one point, when asked how the efficiency of the Office could be improved, she replied: "Have Captain Simmers removed." This answer came after she was specifically requested not to include issues concerning Captain Simmers. The question was posed to her again and she replied Major Morris lacks management skills. She also stated: "I need to know what the Major is doing at all times or where he is. When he is not here the place shuts down. There is total dysfunctional breakdown. Major does things I don't know about. " Ms. Wilhelm pointed out Office guidelines do not exist on how the LLO should function. She commented: "State Police is very behind the rest of the agencies. I bring a whole new world to this Office."

It was Ms. Wilhelm's recollection that information has not been deliberately withheld from anyone in the Office. She also stated staff meetings are held every Monday and Major Morris "keeps everybody briefed on what is going on", a contradiction to her earlier claims as well as the Major's and Mr. Plesco's. Ms. Wilhelm related Major Morris updates the

00012

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 7

monthly calendar of events every two to three days to reflect the latest changes and he also prints addendums to the same. Currently, monthly calendars of upcoming events are printed up to and including December 1999.

Ms. Wilhelm is tasked with conducting analysis of pending legislation, previously the responsibility of the Bureau of Research and Development (R&D). Analysis is conducted to review applicability, need, feasibility, and impact of legislation as it pertains to the Department. This is accomplished by accessing a copy of proposed House and Senate Bills, forwarding them to appropriate Bureaus for comments, analyzing their comments, and forwarding recommendations appropriately. Past practice was to have R&D review and analyze legislation after it was passed. Currently, the Department has become proactive. This is the result of increased participation in legislative activity at the Capitol, improved access to information via the Internet and Commonwealth Computer Network, and the addition of an analyst to the Office.

Additional duties for Ms. Wilhelm include clerical support by typing correspondence and maintaining files, responding to calls from legislators on constituent issues, and assisting in preparation of the Legislative Affairs Office Weekly Report. She is highly motivated, very proficient at her assigned duties, and strives to improve her job performance. However, she has little tolerance for inefficiency, incompetence, or poor job performance. Ms. Wilhelm alleges Captain Simmers is incompetent for the job of Assistant Legislative Liaison and his duties have been limited by Major Morris to accommodate his lack of ability. Also, she claims he takes advantage of the absence of Major Morris and shirks what few duties he has, creating substantial additional work for her. Allegations of harassment against Captain Simmers are currently under investigation by the Internal Affairs Division.

Ronald E. Plesco, Jr., Executive Policy Specialist 2, was assigned to the LLO by Governor Ridge. Mr. Plesco has worked in the Office since January of 1997 and is supervised by Major Morris, Commissioner Evanko, and the Governor's Policy Office. His main function is to provide substantive assistance in review, composition and interpretation of legislation, and applying it for Department use. He also tracks significant current issues that impact the Department, such as the Pennsylvania Instant Check System (PICS). He related the Office is greatly improved in regards to accomplishments and services they provide to the Department and citizenry, however, the internal strife is negatively impacting their growth. He cites a lack of communication as the most significant factor, reporting that each does not know what the other is doing, and little effort is made to share information. He also related the LLO still operates but efficiency could be increased. Mr. Plesco shared Captain Simmers' views on the LLO personnel not being aware of each others' duties and assigned activities. He also provided unsolicited comments on Captain Simmers being "kept in the dark on purpose by Major Morris." While scheduled weekly staff meetings are not held, he believed, if conducted on a regular basis, the meetings would help the efficiency of

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 8

the Office. Mr. Plesco's recollection is that only four or five meetings have been held this year, although they appear on the monthly calendar for every Monday. He added they also have a significant need for clerical support. Mr. Plesco stated: "We need a clerk bad. I don't have time for dealing with filing issues, and the situation with the telephone is bad."

Mr. Plesco added, Ms. Wilhelm has tried to "undermine" him and his work a couple of times, resulting in contacts between the two being reduced to written correspondence only. Mr. Plesco stated: "Barb withholds information on purpose to make me look bad. She makes the credibility of LLO suffer. The Major knows but lets it go on because she delivers for him and he doesn't like Captain Simmers." He cited the following examples: he was working on a project which Ms. Wilhelm knew he was working on and one day he overheard Ms. Wilhelm telling someone on the telephone, in regards to the project, no one in the Office was working on it; another day he overheard Ms. Wilhelm talking on the telephone about a legislative affair which needed immediate attention and she related it would have to wait until next week. These occurred around May of 1998. He informed Captain Simmers, who was Ms. Wilhelm's supervisor at the time, of the two examples. Captain Simmers then counseled her. Mr. Plesco added she apparently blew up when counseled and things have not been the same since. According to Mr. Plesco, the efficiency of LLO depends on the "situation" between Ms. Wilhelm and Captain Simmers.

Major Morris was questioned regarding the propriety of contacting several legislators to evaluate the service provided by the Office. He agreed with the effort and suggested contact by telephone. Additionally he provided the following names for interviews, which were conducted via telephone:

Kathleen Eakin, Secretary for Legislative Affairs, Governor's Office, was contacted and informed she is very happy with the Pennsylvania State Police, Legislative Liaison Office. She added they are very responsive and Major Morris has done an incredible job on the Hill and there is a lot of good feedback on him. She related she does not deal too much with others from the Office. She went on to say, " the proof is in what you hear from the legislators and they are very impressed." In the past the State Police was slow responding, but she does not have to worry about that now. Additionally, she commented on the Pennsylvania State Police LLO being one of the best, if not the best, of all the agencies she deals with.

Anne Mentzer, Deputy Secretary for Legislative Affairs, was contacted and stated: "Major Morris does an excellent job. He is one of the best Legislative Liaisons we have ever had." He is respected by the members of the General Assembly, is very good at reporting his contacts with legislators, his reports are punctual, and he promptly responds to issues when needed, usually the same day or within one day. She described his overall performance

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 9

as excellent and related she always tries to work directly with him, "Director to Director"; therefore, she has not had much contact with the rest of the Office staff.

Mary Woolley, Governor's Policy Office, was contacted and related she has daily contact with Major Morris. Her comments about Major Morris and the Office concur with those of Anne Mentzer, stressing how well respected he is downtown. She spoke positively on his abilities in problem solving and creating unity when dealing with special interest groups, describing him as a real "team player". She related he is the most efficient, proactive State Police Liaison to date. Ms. Woolley reported she prefers to deal with Major Morris exclusively, stating that the remainder of the Office staff is responsive and courteous but none have the depth and good judgement of Major Morris.

Three legislators' offices were contacted regarding the LLO and all the responses were very positive. They all commented how things have improved since Major Morris became the Legislative Liaison for the Department. Utmost is professionalism and the quick response to various questions. They also related the Department LLO is right at the top in comparison with the other Commonwealth agencies.

In September 1998, the LLO sent a survey to all the Senators and Representatives to determine the level of satisfaction with the Office; approximately fifty percent responded. The majority of the responses were favorable and Office staff addressed each complaint personally.

## REVIEW CONCLUSIONS

Of utmost concern is the need for increased personal communication, absent intentional shunning or other improvised impediment, between all LLO personnel. The inherent nature of the legislative liaison process requires cooperation, impartial attitudes, sharing of diversified opinion and acceptance of constructive criticism, all of which are almost non-existent in the prevailing atmosphere.

A Clerk Typist would be beneficial to the Legislative Liaison Office. However, current workload may not support full-time assignment. The additional help could field the various telephone calls, handle requests for Criminal History Information, do filing, and assist with typing.

Personal and professional conflicts between Ms. Wilhelm and Captain Simmers create a hostile work environment negatively impacting the efficiency of the Office. It appears the internal strife has not been addressed properly since it began in the spring of 1998. Supervisory files do not contain documentation of incompetence or poor performance by Captain Simmers or the conduct of Ms. Wilhelm. Relationships must improve within the

Systems and Process Review – Legislative Liaison Office
September 13-20, 1999
Page 10

Office, as the situation will only worsen and affect the service to which legislators have grown accustomed.

The current physical location of the LLO is excellent.

The review indicates although the Office is currently functioning at a favorable level, improving inner-office communication would enhance efficiency and effectiveness. Office staff meetings should be held at least on a weekly basis.

| Pennsylvania State Police | Comment Summary Report | Date: 10/7/1999 |
|---|---|---|
| Bureau of Professional Responsibility | Year: 1999    Location: 5006 | Page: 1 |

**Responsibility:**    Task #: 98    **Description:** PURGING    Follow Up:    Yes

**Regulation:**    AR 1-3    82.1.2    OM 7-5
CALEA Standard

**Description:**    PURGING IN CONFORMANCE WITH AR 1-3. FOR LCE, REFER TO OM 7-5, APPENDAGE T.

**Comments:**    PURGING SCHEDULES NEED TO BE ESTABLISHED FOR OFFICE FILES.

---

**Responsibility:**    Task #: 677    **Description:** PERMANENT FIREARMS SCORING RECORD    Follow Up:    Yes

**Regulation:**    FR 9-2    33.1.6
CALEA Standard

**Description:**    THE RECORD MAINTAINED BY TROOP/BUREAU IN A SECURE BINDER LABELED "PERMANENT FIREARMS SCORING RECORD"

**Comments:**    CURRENT FIREARMS SCORES WERE NOT ON FILE FOR MAJOR MORRIS AND CAPTAIN SIMMERS.

---

**Responsibility:**    Task #: 678    **Description:** PERSONNEL ROSTER FILE    Follow Up:    Yes

**Regulation:**    AR 1-1

**Description:**    BEING MAINTAINED.

**Comments:**    ROSTER NOT UPDATED TO INCLUDE CHANGE OF CLASSIFICATION TO LEGISLATIVE SPECIALIST 2 FOR MS. WILHELM.

---

**Responsibility:**    Task #: 683    **Description:** OFFICIAL PERSONNEL FOLDER    Follow Up:    Yes

**Regulation:**    AR 4-8

**Description:**    FILES SEPARATED INTO 2 SECTIONS, PERMANENT INFORMATION TO THE FRONT, AND TEMPORARY INFORMATION TO THE BACK. APPLIES TO TROOP/BUREAU FILE ALSO.

**Comments:**    FILES NOT SEPARATED INTO TEMPORARY AND PERMANENT SECTIONS. FILE FOR MAJOR MORRIS CONTAINED OUTDATED EPR'S, RECORD OF ABSENCE (FORM C336L) AND REQUESTS FOR LEAVE (STD-330) THAT NEED PURGED. FILES FOR CAPTAIN SIMMERS HAD OUTDATED RECORDS OF ABSENCE (FORM C336L) AND REQUESTS FOR LEAVE (STD-330) THAT NEED PURGED. MEDICAL FILE NOT SEPARATED AND LABELED AS SUCH. PERSONNEL FILE FOR MS. WILHELM IS LABELED SUPERVISORY FILE. A SECOND PORTION OF THAT FILE WAS MARKED "CLOSED" AND CONTAINED OUTDATED ITEMS THAT NEED PURGED.

---

**Responsibility:**    Task #: 42    **Description:** SICK LEAVE    Follow Up:    No

**Regulation:**    AR 4-5    22.2.1
CALEA Standard

**Description:**    3 OR MORE CONSECUTIVE LEAVE DAYS REQUIRES A DOCTOR'S EXCUSE.

**Comments:**    IN COMPLIANCE.

---

**Responsibility:**    Task #: 156    **Description:** AMERICANS WITH DISABILITIES ACT, ETC.    Follow Up:    No

**Regulation:**    AR 1-1

**Description:**    COMPLIANCE WITH AMERICANS WITH DISABILITIES ACT AND RELATED MANDATES.

**Comments:**    IN COMPLIANCE.

| Pennsylvania State Police | Comment Summary Report | Date: 10/7/1999 |
| Bureau of Professional Responsibility | Year: 1999   Location: 5006 | Page: 2 |

---

**Responsibility:**      **Task #:** 114      **Description:** <u>RULES OF CONDUCT FOR EMPLOYEES</u>     **Follow Up:**   Yes

**Regulation:**       AR 4-6                  26.1.1
                                  CALEA Standard

**Description:**      EMPLOYEES ' (INCLUDING ENFORCEMENT OFFICERS) COPIES OF AR 4-6, AR 4-9, AND FR 5-4 ARE UP TO DATE.

**Comments:**       MS. WILHELM DID NOT HAVE A PERSONAL COPY OF AR 4-6, AR 4-9 AND FR 5-4.  SHE REPORTED SHE USES THE LIBRARY COPY IF NEEDED.

---

**Responsibility:**      **Task #:** 115      **Description:** <u>SUPERVISORY FILE</u>                      **Follow Up:**   Yes

**Regulation:**       AR 4-22

**Description:**      SUPERVISORS MAINTAINING NOTES ON EACH OF THEIR SUBORDINATES, BOTH POSITIVE AND NEGATIVE.  USUALLY RETAINED FOR 1 YEAR.  NOTES KEPT CONFIDENTIAL.

**Comments:**       SUPERVISORY FILE CONTAINED RECORD OF ABSENCE, FORM Ç336L (NOT FILLED IN) WHICH SHOULD BE IN HER PERSONNEL FILE INSTEAD.

---

**Responsibility:**      **Task #:** 116      **Description:** <u>PERFORMANCE EVALUATION</u>           **Follow Up:**   Yes

**Regulation:**       AR 4-22                  35.1.7
                                    CALEA Standard

**Description:**      EACH FACTOR RATED "OUTSTANDING," "NEEDS IMPROVEMENT," AND "UNSATISFACTORY" SHALL BE DOCUMENTED IN THE "COMMENTS" SECTION.

**Comments:**       NO CURRENT EPR'S WERE LOCATED FOR CAPTAIN SIMMERS IN EITHER SUPERVISORY OR PERSONNEL FILES.  A CURRENT EPR WAS LOCATED FOR MS. WILHELM IN HER PERSONNEL FILE BUT NOT HER SUPERVISORY FILE.

---

**Responsibility:**      **Task #:** 117      **Description:** <u>JOB DESCRIPTION</u>                     **Follow Up:**   Yes

**Regulation:**       AR 4-22

**Description:**      JOB DESCRIPTION RETAINED IN THE SUPERVISORY FILE. SUPERVISOR REVIEWS JOB DESCRIPTION WITH RATEE AT TIME OF PERFORMANCE EVALUATION REVIEW.

**Comments:**       NO CURRENT JOB DESCRIPTION WAS LOCATED FOR CAPTAIN SIMMERS IN HIS PERSONNEL FILE.

---

**Responsibility:**      **Task #:** 169      **Description:** <u>STAFF MEETINGS</u>                    **Follow Up:**   Yes

**Regulation:**       AR 5-9                   12.1.4
                                    CALEA Standard

**Description:**      PERIODIC STAFF MEETINGS CONDUCTED.

**Comments:**       STAFF MEETINGS ARE SCHEDULED WEEKLY, HOWEVER, ON REPORT OF OFFICE PERSONEL, ONLY FOUR OR FIVE HAVE BEEN HELD YEAR TO DATE.

| Pennsylvania State Police | Comment Summary Report | Date: 10/7/1999 |
|---|---|---|
| Bureau of Professional Responsibility | Year: 1999   Location: 5006 | Page: 3 |

---

**Responsibility:** S      **Task #:** 95      **Description:** <u>DIRECTIVES FILES</u>      **Follow Up:** Yes

**Regulation:** OM 7-3

12.2.2
CALEA Standard

**Description:** MAINTENANCE OF DIRECTIVES FILES.

**Comments:** OFFICE COPY OF THE ADMINISTRATION REGULATIONS (AR) IS MISSING THE FOLLOWING DIRECTIVE ANNOTATIONS:  AR 1-1 – SPECIAL ORDER (S.O.) 98-64; AR 1-3 – S.O. 99-25; AR 4-3 – S.O. 98-32; AR 4-4 – S.O. 97-170, S.O. 97-171, S.O. 97-172, S.O. 98-6, S.O. 98-17, AND S.O. 98-52; AR 4-9 – S.O. 95-82; AR 4-25 – S.O. 98-22; AR 5-2 – CLEAN MESSAGE XPSP41-0001; AR 8-2 – S.O. 98-102 AND CLEAN MESSAGE XPAT31-00001.  OFFICE COPY OF THE OPERATIONS MANUAL (OM) IS MISSING THE FOLLOWING DIRECTIVE ANNOTATIONS: OM 7-2 – S.O. 98-64, S.O. 98-147, CLEAN MESSAGE PRR221-00614, S.O. 95-92, S.O. 97-72, S.O.96-45, S.O. 97-54; OM 7-9 – S.O. 99-56; OM 7-10 – S.O. 99-26; OM 7-13 – S.O. 97-133; OM 7-17 – S.O. 97-78 AND S.O. 97-151. S.O. 97-15 IS MISSING CLEAN MESSAGE XPS41-0005 ANNOTATION.  OM 7-2 CHANGE NUMBERS 76-106 NEED PURGED.

---

**Responsibility:** S      **Task #:** 96      **Description:** <u>BASIC FILING</u>      **Follow Up:** No

**Regulation:** OM 7-3

**Description:** SUBSTITUTION CHARGE OUT CARDS MUST BE USED, REASONABLE CHARGE OUT PERIOD; PROPER LABELING OF FILES; FILES ARE MANAGEABLE, 3-5" WORKING SPACE IN DRAWER

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S      **Task #:** 99      **Description:** <u>BASIC FILING</u>      **Follow Up:** Yes

**Regulation:** OM 7-3

**Description:** PROPER LABELING

**Comments:** THE OFFICE FILING CABINETS AND DRAWERS DO NOT HAVE ANY OUTSIDE LABELS IDENTIFYING THEIR CONTENTS. HOWEVER, FOLDERS INSIDE THESE DRAWERS ARE WELL LABELED AND HAVE A PROFESSIONAL APPEARANCE.

---

**Responsibility:** S      **Task #:** 102      **Description:** <u>FILES</u>      **Follow Up:** No

**Regulation:** AR 1-1

**Description:** BEING MAINTAINED IN ACCORDANCE WITH REGULATIONS.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S      **Task #:** 103      **Description:** <u>CORRESPONDENCE & DIRECTIVES</u>      **Follow Up:** No

**Regulation:** AR 1-1

**Description:** BEING MAINTAINED IN ACCORDANCE W/REGULATIONS.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S      **Task #:** 1072      **Description:** <u>GOALS AND OBJECTIVES</u>      **Follow Up:** No

**Description:** ARE THE SELF-ASSESSMENTS BEING COMPLETED AS REQUIRED.

**Comments:** IN COMPLIANCE.



| | | |
|---|---|---|
| **Pennsylvania State Police** | **Comment Summary Report** | **Date:** 10/7/1999 |
| **Bureau of Professional Responsibility** | **Year: 1999   Location: 5006** | **Page:** 4 |

---

**Responsibility:** S    **Task #:** 80    **Description:** <u>COMPENSATORY HOLIDAY TIME</u>    **Follow Up:** No

**Regulation:** AR 4-5    22.2.1
CALEA Standard

**Description:** TIME IS SCHEDULED WITHIN 90 DAYS.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S    **Task #:** 82    **Description:** <u>REQUEST FOR LEAVE</u>    **Follow Up:** No

**Regulation:** COR 12/23/96

**Description:** EMPLOYES ARE REQUIRED TO COMPLETE ALL PORTIONS OF THE FORM.  MEMBERS ARE NOT REQUIRED TO FILL OUT "LEAVE BALANCE" BLOCK.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S    **Task #:** 106    **Description:** <u>DIRECTIVES DISTRIBUTION</u>    **Follow Up:** No

**Regulation:** AR 1-2

**Description:** ORGANIZATIONAL SEGMENTS RECEIVING APPROPRIATE MANUALS, SPECIAL ORDERS, FLYERS, ETC.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S    **Task #:** 138    **Description:** <u>OFFICIAL ID CARDS</u>    **Follow Up:** N

**Regulation:** AR 3-4

**Description:** WORN BY PERSONNEL AT PERMANENT DUTY LOCATION WHEN IN CONTACT WITH PUBLIC

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S    **Task #:** 139    **Description:** <u>PA TURNPIKE CHARGE CARDS</u>    **Follow Up:** N

**Regulation:** FR 5-1

**Description:** STRICT ACCOUNTABILITY OF CARDS.

**Comments:** IN COMPLIANCE.

---

**Responsibility:** S    **Task #:** 140    **Description:** <u>SMOKING POLICY</u>    **Follow Up:**

**Regulation:** SO 89-25

**Description:** SMOKING IS NOT PERMITTED IN COMPUTER FACILITIES/RECORDS, SUPPLIES.

**Comments:** IN COMPLIANCE.

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**        September 13, 1999

**SUBJECT:**     Review of the Legislative Affairs Office

**TO:**          Lieutenant William A. Horgas
                 Commander
                 Systems and Process Review Division, Central Section
                 Bureau of Professional Responsibility

**FROM:**        Barbara A. Wilhelm
                 Legislative Specialist 2
                 Legislative Affairs Office

1.    The purpose of the memorandum is to request a confidential meeting with you and Major Richard D. A. Morris, Director, Legislative Affairs Office, upon the return of Major Morris to the office, and when convenient to both parties.

2.    I am asking for this meeting to bring to your attention matters which involve an enlisted employee within the Legislative Affairs Office.

3.    The matters include but are not limited to the following: gross incompetence, computer illiterate, work hours abuse, absence without submitting leave, use of unearned compensatory time, shirking from responsibility, misuse of state vehicle, failure to perform as a supervisor, temporary assignment to higher rank and failing to meet the minimum experience and training, shifting the burden of responsibility for executing or failing to execute an assignment, improper handling of service weapon, and creating a hostile/harassing work environment.

4.    Additionally, I would like to suggest the review of long distance toll records regarding the routine use of the Centrex line.

5.    Finally, I would like to address the employees alleged physical limitations and the use of the Commissioner's exercise room as a potential liability for the Department and potential Workers' Compensation matter.

6.    Please inform me as to when it would be convenient to discuss these matters.



Conley
DEPOSITION
EXHIBIT
3  3-20-08 AW

Morris  11

1960

November 3, 1999

Review of Legislative Liaison Office

Deputy Commissioner of Administration

Major Hawthorne N. Conley
Director, Bureau of Professional Responsibility

REFERENCE: (a) Verbal orders from the Deputy Commissioner of Administration on October 12, 1999, to meet with Major Virginia L. Smith-Elliott, Equal Employment Opportunity Office, and Barbara L. Christie, Chief Counsel, in order to discuss existing problems within the Legislative Liaison Office.

CLOSURES: (1) Subject-To-From correspondence dated September 13, 1999, to Lieutenant William A. Horgas, Commander, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility, from Barbara A. Wilhelm, Legislative Specialist 2, Legislative Affairs Office, relative the Subject.

(2) Personnel Investigation IAD-1999-663, dated September 15, 1999.

(3) Bureau of Professional Responsibility, Systems and Process Review Division Executive Summary, dated 10/7/99, relative Subject.

(4) Job Description for Captain Michael D. Simmers.

(5) Administrative Regulation 1-1.03, A.2., Legislative Liaison Office.

1.    On Wednesday, October 13, 1999, and Tuesday, October 19, 1999, Major Virginia Smith-Elliott, Chief Counsel Barbara Christie, and I met to discuss the review of the Legislative Liaison Office. Enclosures (1) through (5) were independently reviewed before our meeting. We specifically sought to ensure issues listed in paragraph 3 of Enclosure (1) had been addressed.



Conley
DEPOSITION
EXHIBIT  Au
2  3-20-02
PENGAD 1-800-631-6989

1596

Review of Legislative Liaison Office
Page 2
November 3, 1999

     2.    It was our conclusion that inasmuch as the witness was uncooperative, providing merely insufficient and nonspecific information, the Pennsylvania State Police have exhausted all reasonable avenues of inquiry.   It was noted though Ms. Wilhelm trusted the Department to evaluate her job when she desired professional advancement, her obvious distrust of the State Police to handle her complaint properly impeded the investigation and narrowed investigative parameters.  It is our recommendation that no further action be taken.

     3.    Consequently, our meetings concluded the Executive Office should continue on its current course of direction – keeping vigil over the well-being of the Pennsylvania State Police.

Chief Counsel
EEOC
BPR FILE

STD-501X (9-86)

**COMMONWEALTH OF PENNSYLVANIA**

**DATE:** January 25, 1999

**SUBJECT:** Classification Review –
Barbara A. Wilhelm, Legislative Specialist 1

**TO:** Legislative Liaison

**FROM:** Linda Bonney, Director *Linda Bonney*
Bureau of Personnel

**REFERENCE:** (a)  Correspondence to Director, Bureau of Personnel, from Captain Michael D. Simmers dated October 19, 1998, relative to Subject.

1.  In response to the request contained in Reference (a), the Office of Administration has approved the reclassification of Mr. Barbara Wilhelm's position as Legislative Specialist 2.

2.  Please advise the above employe of this classification decision and that she will receive correspondence from this office regarding her promotion upon completion of associated personnel transactions.

3.  Questions regarding this matter may be addressed to Stan Burkholder at 772-1283.

SLB/slb
cc:  File



Burkholder
DEPOSITION
EXHIBIT
3-20-0?

**COMMONWEALTH OF PENNSYLVANIA**
**OFFICE OF ADMINISTRATION**
January 14, 1999

**SUBJECT:** Classification Review
Barbara A. Wilhelm, Legislative Specialist 1

**TO:** Linda M. Bonney
Personnel Director
Pennsylvania State Police

**FROM:** Charles T. Sciotto *Charles V Sciotto*
Deputy Secretary for Employe Relations

The Office of Administration has reviewed your request to reclassify Barbara A. Wilhelm's Legislative Specialist 1 position to the Legislative Specialist 2 class, and has discussed this request with staff in the Governor's Secretary for Legislative Affairs Office.

You may use this correspondence as authorization to reclassify Ms. Wilhelm's position to the Legislative Specialist 2 class effective October 15, 1998 and place her salary at $42,797 Annually, Step 7 of Pay Range 8. Please use OA Control Number 99-0027 when processing this transaction. Ms. Wilhelm's salary will be increased to $43,756 Annually with the processing of her January, 1999 longevity increment.

Please contact Ralph Winters, Chief of Classification and Pay should you have any questions regarding this personnel action.

cc: Secretary Paese
Honorable Dennis M. Walsh
File

1732

STD-501X (9-88)

Commonwealth of Pennsylvania

**Date:**     January 11, 1999

**Subject:**     Classification Review -
Barbara A. Wilhelm, Legislative Specialist 1

**To:**     Ralph Winters, Chief
Classification and Pay Division
Office of Administration

**From:**     Linda M. Bonney, Director     *Linda Bonney*
Bureau of Personnel
Pennsylvania State Police

We are requesting approval to reclassify Barbara Wilhelm's position
from Legislative Specialist 1 to 2.

Enclosed is a copy of the evaluation report and job description to
assist in making a classification determination.

Questions regarding this matter may be addressed to Stan
Burkholder at 772-1283.

APPROVAL /SIGNATURE_____DATE_____

OA CONTROL NUMBER_____

SLB/slb
cc:     Legislative Liaison

1733

## EVALUATION REPORT

### Preliminary Information

Position Location:                         Legislative Liaison Office
Incumbent:                                 Barbara A. Wilhelm
Social Security Number:                    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
Employe Number:                            111045
Position Number:                           247008
Date Request Received:                     October 15, 1998
Date Audit Conducted:                      December 8, 1998
Current Classification:                    Legislative Specialist 1
Recommended Classification:                Legislative Specialist 2
Analyst:                                   Stan Burkholder
Effective Date:                            October 15, 1998


ICS Input: _____        Date: ____1-25-99_____

                    Initials                              Input Date


MAPPER Input: _____       Date: ____1-25-99_____

                    Initials                              Input Date


### Background

As requested in the employe-initiated position reclassification request, a desk audit was conducted in the form of a personal interview with the incumbent.  A follow-on interview was conducted with Major Richard Morris, the Department's Legislative Liaison and the incumbent's immediate supervisor, to obtain supervisory input regarding this position.


### Organization

The are four positions in the Legislative Liaison Office; a State Police Major, a State Police Captain, an Executive Policy Specialist 2 and a Legislative Specialist 1.  The Major reports directly to the Commissioner.


### Duties

Responds to telephonic and written inquiries from members of the General Assembly. Response will be in written and verbal form and may necessitate information gathering interviews with Departmental personnel to develop an understanding of the program or

1734

issue that is to be responded to.

This position receives proposed legislation that might impact Department operations. Incumbent conducts initial review to determine program area(s) within Department that will be impacted by legislation. Seeks clarification of legislative intent through sponsoring legislator's office, when necessary, so that that information can be passed to Bureaus/program areas to aid in the analysis phase of the review. Forwards legislation to appropriate Bureaus and Offices for review and comment. Receives and reviews comments from each program area within the Department and interacts with senior Bureau management when conflicting information, opinions and positions are received. Incumbent then develops an official response to the proposed legislation by compiling and merging program area comments/concerns into a Department position paper. In the absence of specific position recommendations from program area representatives, draws conclusions from provided information and develops the Department's position statement. Interacts with counterparts in other agency Legislative Liaison Offices to address/compare agency concerns when proposed legislation affects more than our Department. Information obtained from these offices is documented for future reference and is considered when developing the Department's position on the legislation.

Incumbent is involved in a wide range of activities involving all organizational entities and, at times, those of other agencies as well. An example of this is her recent involvement with representatives from the Board of Pardons and the Attorney General's Office regarding issues that developed when queries of the Pennsylvania Instant Check System resulted in handgun purchase denials. She has been instrumental in coordinating activity between the agencies in an effort to effectively apprise citizens of their rights and methods to follow in petitioning the Governor for a pardon of past criminal offenses and for appealing gun purchase denials.

Develops new and revises existing departmental directives relative to Legislative Liaison Office operations/procedures, drafts news articles on newly enacted legislation and prepares articles for publication in the Department's newsletter, The Communicator.

Incumbent assisted the Legislative Liaison in developing a survey to be completed by members of the General Assembly that addressed such issues as office performance in responding to their needs and whether they desired one-on-one meetings with the Department's Legislative Liaison to address specific program/policy issues. Incumbent then drafted generic and individual correspondence to members who responded to the survey. The individual correspondence was a cooperative effort between the incumbent and Legislative Liaison since it was tailored to address specific issues raised by the legislator in the survey response. Incumbent also developed a questionnaire that was distributed to all State Police Legislative Affairs Offices nationwide and several similar offices in Canada to gather information which ultimately resulted in the publication of a State Law Enforcement Legislative Directory.

Prepares computerized slide presentations and detailed manuscripts for training,

conferences and legislative committee hearings. Interviews Department personnel to gather information for manuscript preparation and to gather items for use in the slide presentation.

Records significant accomplishments of office staff as they occur and prepares annual report of these accomplishments.

Utilizes various types of office equipment in carrying out assigned tasks. Has developed numerous PC databases relating to legislative issues dealt with by office staff.

Efforts are underway to connect to the computer system used by the General Assembly to track legislation from the proposal to the final adoption phases. Incumbent will track those bills which impact the Department and keep senior level management advised of the status thereof.

## Analysis

I have thoroughly reviewed the specifications for the Legislative Aide, Legislative Specialist 1 and Legislative Specialist 2 classes. I am recommending that this position be reclassified as Legislative Specialist 2. The primary reason for this recommendation is the complexity of issues handled by the incumbent and the independent manner in which she carries out assigned and assumed tasks.

The 2 level class calls for an employe to function as the chief staff assistant to the Legislative Liaison. This position is performing in that capacity. The organization chart reflects a State Police Captain serving in that capacity, however, due to various circumstances which cannot be addressed here, the incumbent has been and will continue to perform in this capacity.

Activity associated with drafting of bills for the Department has been delegated to the Executive Policy Specialist 2 position by the Legislative Liaison since this position works for the Legislative Liaison and due to the fact that the incumbent is an attorney and is familiar with the process.

The complexity of issues that this position deals with is the other allocation factor that caused me to recommend reclassification of this position. The incumbent is involved in every phase of legislation review and, most importantly, develops and finalizes the bill analysis for the Department which includes determining and documenting the Department's position relative to the legislative proposal. Proposals cover the full range of law enforcement issues, involve many Bureaus and Offices and, at times, result in interaction with other agency legislative affairs offices.

For the reasons identified above, I believe that this position falls within the scope and meets the overall concept of the Legislative Specialist 2 class.

1736

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:           December 20, 1998

SUBJECT:        Addendum to Employee Initiated Position Reclassification

TO:             Stanley Burkholder
                Personnel Analyst 3
                Classification and Organizational Development Section
                Bureau of Personnel

FROM:           Barbara A. Wilhelm  *B.A. Wilhelm*
                Legislative Specialist 1
                Legislative Affairs Office

1.      This correspondence is based on the recent discussion and review of my classification and your request for pertinent information to be brought to your attention regarding the position.

2.      As requested, a second job description (submitted 12/11/98) reflecting the recent organizational reporting changes in the office, signed by the Director, Legislative Affairs Office, was forwarded for your review. As a direct result of the organizational reporting changes within the Legislative Affairs Office, I am requesting that a Classification Survey of the Legislative Affairs Office be conducted to better recognize the actual duties and responsibilities of each position within the office, prior to arriving at a recommendation for my position.

3.      Additionally, I am bringing to your attention that the (Captain) Assistant Legislative Liaison, Legislative Affairs Office has been communicating that the Commissioner is making the Legislative Specialist position an Administrative Officer 1, pay grade 6 and then will move it up to a pay grade 7. In that the Governor's Management Directive addressing Processing of Reclassification Actions mandates all agencies under the Governor's jurisdiction to conduct, fair, thorough, technically competent and timely review of requests, I can only assume that these communications are malicious and serve no legitimate purpose. This information is being brought to your attention for appropriate action by the Bureau of Personnel and/or as deemed necessary, the Bureau of Professional Responsibility.

cc:     Major Richard D. A. Morris, Director, Legislative Affairs Office

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:              October 15, 1998

SUBJECT:           Employee Initiated Position Reclassification
                   Reporting Relationship Function

TO:                Linda M. Bonney
                   Director
                   Bureau of Personnel

FROM:              Barbara A. Wilhelm *BAW* .
                   Legislative Specialist 1
                   Legislative Affairs Office

ENCLOSURE (1)      Current Job Description / Essential Job Functions / ADA  — *removed; unsigned / dup*

        1.       Attached is the employee initiated position reclassification and
request for a reporting relationship review that was forwarded to Major Richard
D. A. Morris, Director, Legislative Affairs Office, on Monday, October 5, 1998.

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:          October 15, 1998

SUBJECT:       Employee Initiated Position Reclassification
               Reporting Relationship Function

TO:            Linda M. Bonney
               Director
               Bureau of Personnel

FROM:          Barbara A. Wilhelm *BAW*.
               Legislative Specialist 1
               Legislative Affairs Office

ENCLOSURE (1)  Current Job Description / Essential Job Functions / ADA  *— reviewed; unsigned / dup*

    1.     Attached is the employee initiated position reclassification and request for a reporting relationship review that was forwarded to Major Richard D. A. Morris, Director, Legislative Affairs Office, on Monday, October 5, 1998.

1738

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:            October 5, 1998

SUBJECT:         Employee Initiated Position Reclassification
                 Reporting Relationship Function

TO:              Major Richard D. A. Morris
                 Legislative Liaison
                 Legislative Affairs Office

FROM:            Barbara A. Wilhelm *B. A. Wilhelm*
                 Legislative Specialist 1
                 Legislative Affairs Office

ENCLOSURE (1)    Current Job Description / Essential Job Functions/ADA

    1.    The purpose of this correspondence is to request a review of my position classification. As required, enclosed is my complete and current position description and the Identification of Essential Job Functions/ADA.

    2.    Additionally, I am requesting a review of my reporting relationship within the Legislative Affairs Office as assignments and special projects are routinely presented by the (Legislative Liaison), Director, Legislative Affairs Office.

    3.    The request for an upward reclassification is based on the increased level, complexity, and diversity of work duties and responsibilities that are being performed, to include the deadlines required to be met. The request for a review of my reporting relationship function is based on how my work is being assigned and how my work is being reviewed.

1739

TD-501, 2-86

2094600 10

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

2nd Endorsement

**DATE:**            October 19, 1998

**SUBJECT:**         Employee Initiated Position Reclassification
                     Reporting Relationship Function

**TO:**              Director, Bureau of Personnel

**FROM:**            Captain Michael D. Simmers *MDS*
                     Acting Director
                     Legislative Affairs Office

**REFERENCE:**   (a)  Memorandum from Barbara A. Wilhelm, Legislative Specialist 1, Legislative
                      Affairs Office, dated October 19, 1998, and attachments, regarding Subject.

**ENCLOSURE:**   (1)  Reference (a).

1.       Enclosure (1) is being forwarded for your review in compliance
         with AR 4-10, Employe Position Classification.

TD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

1st Endorsement

| | |
|---|---|
| **DATE:** | October 19, 1998 |
| **SUBJECT:** | Employee Initiated Position Reclassification<br>Reporting Relationship Function |
| **TO:** | Major Richard D. A. Morris<br>Director<br>Legislative Affairs Office |
| **FROM:** | Captain Michael D. Simmers *MDS*<br>Assistant Legislative Liaison<br>Legislative Affairs Office |
| **REFERENCE:** | (a)   Memorandum from Barbara A. Wilhelm, Legislative Specialist 1, Legislative Affairs Office, dated October 19, 1998, regarding Subject. |
| **ENCLOSURE:** | (1)   Reference (a). |

1.   I have thoroughly reviewed Enclosure (1). The information contained in the Job Description appears to be an accurate account of this individual's duties over the past six months.

2.   Enclosure (1) is being forwarded to you for endorsement and further processing.

1741

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**            October 19, 1998

**SUBJECT:**         Employee Initiated Position Reclassification
                     Reporting Relationship Function

**TO:**              Captain Michael D. Simmers
                     Assistant Legislative Liaison
                     Legislative Affairs Office

**FROM:**            Barbara A. Wilhelm
                     Legislative Specialist 1
                     Legislative Affairs Office

**ENCLOSURE:**   (1)    Current Job Description / Essential Job Functions / ADA

**REFERENCE:**   (a)    AR 4-10, Employee Position Classification

   1.     Enclosed is a current job description, essential job functions
/ ADA, and related correspondence for appropriate endorsement in compliance
with Administrative Regulation 4-10, Employee Position Classification, Section
10.04 (B).

cc:    Major Richard D. A. Morris, Director, Legislative Affairs Office
       Linda M. Bonney, Director, Bureau of Personnel

1742

**Employee Initiated Position Reclassification**
**Reporting Relationship Function**

**October 19, 1998**

    1.     The purpose of this correspondence is to request a review of my position classification. As required, enclosed are my complete and current position description and the Identification of Essential Job Functions/ADA.

    2.     Additionally, I am requesting a review of my reporting relationship within the Legislative Affairs Office.

    3.     The request for an upward reclassification is based on the increased level, complexity, and diversity of work duties and responsibilities that are being performed, to include the deadlines that are required to be met.

    4.     The request for a review of my reporting relationship function is based on how my work is being assigned and how my work is being reviewed. Assignments and special projects are routinely presented by the (Legislative Liaison), Director, Legislative Affairs Office.

1743

FD.-370  REV. 8-83

## JOB DESCRIPTION

| 1. NAME OF EMPLOYE (LAST NAME FIRST) | 2. SOCIAL SECURITY NUMBER | 3. REQUEST INITIATED BY |
|---|---|---|
| Wilhelm, Barbara Ann | 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 | ☒ EMPLOYE ☐ AGENCY ☐ OFFICE OF ADMINISTRATION |

| DEPARTMENT | BUREAU | DIVISION | HEADQUARTERS |
|---|---|---|---|
| State Police | Executive & Administrative Offices | Legislative Affairs Office | Harrisburg |

| PRESENT CLASS TITLE | POSITION NUMBER |
|---|---|
| Legislative Specialist 1 | |

| REGULAR SCHEDULE OR HOURS OF WORK | | | | | | | | WORK IS |
|---|---|---|---|---|---|---|---|---|
| DAY → | MON | TUES | WED | THURS | FRI | SAT | SUN | ☒ FULL-TIME   ☐ PART-TIME      ☒ PERMANENT   ☐ TEMPORARY |
| FROM | 8:00 a.m. | | | | | | | LENGTH OF LUNCH PERIOD: 30 minutes |
| TO | | | | | 4:00 p.m. | | | TOTAL HOURS PER WEEK: 37.5 |

EXPLAIN ROTATION OF SHIFTS (IF ANY)

Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional paper (8½ x 11) as you need.

**35%**   1.   As staff assistant to the Legislative Liaison, assists members of the General Assembly, their staff, and general citizenry by responding to a broad range of requests for information. Information includes interpretation of department policy, programs, and practices; resolving constituent issues; responding to sensitive issues; referring of internal investigations; researching, reviewing, and interpreting Pennsylvania Statute and Case Law. Assistance also includes providing information regarding functions and operations within other Agencies, Departments, Boards, and Commissions. Requests are entered into the Legislative Liaison Weekly Report and, as necessary, responded to telephonically and by prepared correspondence under my signature, signature of Legislative Liaison, or Commissioner.

**10%**   2.   Consults with and conducts interviews of key department personnel to develop an understanding of existing and newly developed program operations within the Department and for the purpose of preparing formal reports and informal correspondence under my signature, signature of Legislative Liaison or Commissioner.

**15%**   3.   Analyzes proposed legislation, seeks clarification of legislative intent telephonically or through written correspondence and compiles, reviews, and evaluates comments from department program and administrative personnel. Interacts with those personnel when conflicting opinions and information are received, includes draft legislation and prepares position papers for the Legislative Liaison or Commissioner's signature before providing same to the Governor's Legislative Office and/or members of the General Assembly. Contacts other Legislative Affairs Office in governmental agencies, and members of select interest groups to discuss and establish position on proposed legislation and related matters.

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

_Barbara A. Wilhelm_                                        10/19/98
SIGNATURE OF EMPLOYE                                               DATE

1744

8. Describe how you are supervised by te... how your work is assigned and how your superviso... ...ews your work.

> Legislative issues, projects, and special assignments are routinely presented by the (Legislative Liaison), Director Legislative Affairs Office and upon completion reviewed by the (Legisaltive Liaison), Director, Legislative Affiars Office.  Work is performed with a high degree of initiative and independence.

9. Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles.  If you are not a supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.

_____Total number subordinates reporting to you

10. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. If you are not a supervisor, your supervisor must complete this part for all employes shown above.

11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR:  Review your subordinate's statements.  You may make any comments or include any information you feel is appropriate or would be helpful.  Use additional paper if needed.

EMPLOYE'S IMMEDIATE
SUPERVISOR'S SIGNATURE _____

CLASS
TITLE_____

DATE_____

➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ⬅

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE

|DATE

1744c

## JOB DESCRIPTION

5%    4.    Receives and performs initial review of proposed legislation, determines affected department program and administrative personnel. Prepares correspondence for signature of Legislative Liaison and forwards proposed legislation to Bureau's and Office's via correspondence for either formal or informal review and input regarding the fiscal program, or legal impact on department implementation. Distributes copies of enacted legislation to affected Bureaus and Offices.

10%    5.    Prepares and performs special projects: Reviews, updates, and drafts department directives relating to procedures within Legislative Affairs Office. Directives include testimony procedures, bill analysis procedures (formal and informal), administrative orders and legislative proposals. Prepares news articles on newly enacted legislation and special articles for publication in *The Communicator*. Prepares written surveys for response by PA General Assembly and State Police agencies nationwide and in Canada. Analyzes survey results and prepares general and tailored responses based on comments, concerns, or requests for information. Survey responses are categorized and compiled into PA State Police Legislative Directory for nationwide distribution and annual update. Prepares computerized slide presentations for training, conferences, and legislative events. Slides consist of photographs, charts, graphs, and statistical data. Composes detailed manuscript to support slide presentation by researching relevant material and conducting interviews of department personnel. Develops Department Operations Manual for use in Legislative Affairs Office and for distribution to members of the General Assembly for the purpose of identifying key programs, operations, procedures and related forms. Compiles and records significant accomplishments of the Legislative Affairs Office for submission and possible publication in the Department Annual Report. Researches software for development of Legislative News Bulletin and for composing articles of newsworthy legislative information.

5%    6.    Responsible for the automation of office material: Establishes and maintains database identifying Acts passed in 1998, that are relevant to Department operations; database identifying Public Hearings attended and participated by Department personnel; database identifying Legislative Bill Analysis performed in 1998; database identifying historical, Legislative Bill Analysis performed, prior to 1998; database of distribution of House Bills, Senate Bills and Acts disseminated to Bureaus and Offices within the Department; database identifying Hot Files relating to sponsors of Bills, committee status, voting process and other pertinent issues.

## JOB DESCRIPTION

5%     7.     Responds telephonically and by prepared correspondence to written and verbal requests for information from department personnel regarding pending and enacted legislation.

5%     8.     Uses various types of office equipment such as personal computer, printer, scanner, zip drive, application software, internet, electronic mail, multi-media projector, copier, and facsimile machine.

5%     9.     Provides guidance to Assistant Legislative Liaison regarding modern office methods and techniques, to include, use of the personal computer, use of software, related peripherals; preparation of formal and informal correspondence, contents of correspondence, and interpretation of office operations.

5%     10.     Performs other related duties as assigned.

1746

Employee Initiated Position Reclassification                    October 19, 1998
Reporting Relationship Function


### ADDENDUM TO JOB DESCRIPTION


**\* Reference Paragraph 1, 3, and 5 of the Job Description**

It is to be noted that the percentages assigned to these work duties will vary significantly based on two factors. Factor number one is based on whether the General Assembly is in session and factor number two is based on whether the (Legislative Liaison), Director, Legislative Affairs Office is in attendance at the work site. This will be expounded on in greater detail during the audit interview.

**\*Reference Paragraph 8 of the Job Description**

The assignment of a percentage to these duties was difficult, because the majority of my duties and assignments mandate expertise in the use of a personal computer and related peripherals to produce professional work products and provide for proper record maintenance.


Page 7 of 8

1747

## IDENTIFICATION OF ESSENTIAL JOB FUNCTIONS/ADA

**Employee Name:**     BARBARA ANN WILHELM

**Classification:**

**Essential Job Functions:**

1.   Assists members of the General Assembly, their staff, and general citizenry by responding telephonically or in writing to a broad range of requests for information, which includes, policy, programs and practices of the Department, other Agencies, Departments, Boards, and Commissions, and researching and interpreting Pennsylvania Statute and Case Law.

2.   Consults with and interviews department personnel to prepare formal and informal correspondence under my signature, signature of Legislative Liaison, or Commissioner

3.   Conducts analysis of proposed legislation.  Seeks clarification of legislative intent telephonically or through written correspondence. Prepares position papers for the Legislative Liaison or Commissioner's review and signature.

4.   Reviews and forwards relevant  proposed legislation to Bureau or Office via correspondence for review and input.  Distributes enacted legislation.

5.   Performs diversity of special projects, which includes compilation of information, analysis of data, originating and composing work products, and use of software's.

6.   Responsible for automation of office material which includes maintenance of databases relating to proposed legislation, enacted legislation, and public hearings.

7.   Proficient in the use of personal computer and related peripherals.

8.   Communicates clearly and concisely.  Produces professional work products.

_____          ___10/20/98___
**Supervisor or Manager Signature**          **Date**

Page 8 of 8

1748

**Employee Initiated Position Reclassification**          October 19, 1998
**Reporting Relationship Function**

      1.      The purpose of this correspondence is to request a review of my position classification.  As required, enclosed are my complete and current position description and the Identification of Essential Job Functions/ADA.

      2.      Additionally, I am requesting a review of my reporting relationship within the Legislative Affairs Office.

      3.      The request for an upward reclassification is based on the increased level, complexity, and diversity of work duties and responsibilities that are being performed, to include the deadlines that are required to be met.

      4.      The request for a review of my reporting relationship function is based on how my work is being assigned and how my work is being reviewed. Assignments and special projects are routinely presented by the (Legislative Liaison), Director, Legislative Affairs Office.

*doesn't the Captain assign and review any work?*

*Major - dits I'm not addressing reporting relationship. Whether they are peers is a matter under your cognizance.*

Page 2 of 8

1749

**WILHELM, BARBARA A**

| | |
|---|---|
| **From:** | BONNEY, LINDA M |
| **Sent:** | Wednesday, January 19, 2000 3:10 PM |
| **To:** | WILHELM, BARBARA A |
| **Subject:** | RE: Filling of Director Position |

I have not discussed this with LtC. Coury, but I will tell you, Barbara, that my guess is they will put a Major in the job and not accept bids from anyone. The reason I say this is that this has historically been L-1 bargaining unit work, including the most recent Legislative Liaison, and the Labor Board has taken the position that work belongs to the bargaining unit of the former incumbent. The alternative is to <u>bargain</u> with the PSTA to put a civilian in the job. I don't see the union giving up this Major slot.

This is all conjecture, because I don't know what is in the Commissioner's mind. I really haven't heard anything.

Never-the-less, for your information, when my job was open, I submitted my resume with a cover letter, letter the Deputy of Admin know I was interested. I also sent a copy of my resume to the OA to Mr. Sciotto.

> -----Original Message-----
> **From:** WILHELM, BARBARA A
> **Sent:** Wednesday, January 19, 2000 2:59 PM
> **To:** BONNEY, LINDA M
> **Subject:** Filling of Director Position
>
> Linda:
>
> I have gotten several calls from employees in addition to being stopped in the hallway by individuals interested in applying for the Pennsylvania State Police, Director, Legislative Affairs Office position. For my information also, what is the procedure your are requiring applicants to follow when applying for this position.
>
> Thanks for your help.
>
> Barbara.



OFFICE OF ADMINISTRATION
BUREAU OF PERSONNEL
JANUARY 25, 1996
REVISED MARCH 3, 2000

## TRANSACTION CODES AND SPECIAL FACTORS
## EMPLOYEE/POSITION & EMPLOYMENT HISTORY UPDATE PROCESSING SYSTEMS

**CODE**          **TRANSLATION**

001100          APPOINTMENT

(795)

    *AA          APPOINTMENT ABOVE MINIMUM
    *AC          HOURLY RATE - PREVIOUS POSITION
    AD          COMMONWEALTH ANNUITANT
    AE          FURLOUGH RIGHTS EXPIRES
796    AN          MOVE UNDER THE GOVERNOR'S JURISDICTION
    AO          CIVIL SERVICE REINSTATEMENT
    AP          PRIOR COMMONWEALTH SERVICE
    AQ          FURLOUGHEE MADE WHOLE
        * ONE IS MANDATORY FOR APPTS ABOVE MINIMUM

001200          RE-EMPLOY-ADJUDICATION

    *AA          APPOINTMENT ABOVE MINIMUM
    *AC          HOURLY RATE - PREVIOUS POSITION
    AF          UNION ARBITRATION
    AG          GRIEVANCE
    AH          CIVIL SERVICE COMMISSION ORDER
    AI          COURT ORDER
    AJ          PA HUMAN RELATIONS COMMISSION ORDER
    AQ          FURLOUGHEE MADE WHOLE
        * ONE IS MANDATORY FOR APPTS ABOVE MINIMUM

001300          RE-EMPLOY - PLACE, RECALL, PREFERENCE

    *AA          APPOINTMENT ABOVE MINIMUM
    *AC          HOURLY RATE - PREVIOUS POSITION
    AK          FURLOUGH PLACEMENT
    AL          FURLOUGH RECALL

DEPOSITION
EXHIBIT
Polek
PENGAD-Bayonne, N. J.
3-20-0

| CODE | TRANSLATION |
|---|---|

|  |  |
|---|---|
| AM | FURLOUGH PREFERENCE LIST |
| AQ | FURLOUGHEE MADE WHOLE |
| AR | FURLOUGH - OPTIONAL LIST |
|  | *ONE IS MANDATORY FOR APPTS ABOVE MINIMUM |

**001108**

**001208**    CANCELLATION OF AN APPOINTMENT

**001308**

| AH | CIVIL SERVICE COMMISSION ORDER |
|---|---|
| BA | WITH NOTICE |
| BF | FAILURE TO QUALIFY - CIVIL SERVICE |
| BG | FAILURE/LOSS OF JOB QUALIFICATIONS |
| FTR | FAILED TO REPORT FOR EMPLOYMENT |

**002100**    VOLUNTARY RESIGNATION

| BA | WITH NOTICE |
|---|---|
| BB | WITHOUT NOTICE |
| BC | IN LIEU OF FURLOUGH |
| BCR | COMPROMISE AND RELEASE NEGOTIATED |
| BE | ABANDONMENT |
| BS | MOVE NOT UNDER THE GOVERNOR'S JURISDICTION |
| BU | IN LIEU OF REMOVAL |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

**002200**    DISMISSAL/REMOVAL

| AH | CIVIL SERVICE COMMISSION ORDER |
|---|---|
| BD | DURING PROBATIONARY PERIOD |
| BE | ABANDONMENT |
| BF | FAILURE TO QUALIFY - CIVIL SERVICE |
| BG | FAILURE/LOSS OF JOB QUALIFICATIONS |
| BH | DEFAULT - PHEAA LOAN |
| BI | COURT MARTIAL |
| BPR | WORK - RELATED INJURY CANNOT RETURN FULL DUTY |
| BW | UNSATISFACTORY PERFORMANCE |
| BWA | UNSATISFACTORY PERFORMANCE-ATTENDANCE/DEPENDABILITY |

| CODE | TRANSLATION |
|------|-------------|

|   | BX | UNSPECIFIED |
|   | BY | CRIMINAL CHARGES/CONDUCT |
|   | UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

**002300**    FURLOUGH

|   | BJ | LACK OF WORK |
|   | BK | LACK OF FUNDS |
|   | OOR | OTHER OPERATIONAL REASONS |
|   | UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

**002400**    COMPLETE SPECIFIC EMPLOYMENT PERIOD

|   | BA | WITH NOTICE |
|   | BB | WITHOUT NOTICE |
|   | UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

**002500**    DEATH

|   | BL | NON - WORK RELATED |
|   | BM | WORK RELATED - LINE OF DUTY |
|   | BN | WORK RELATED - NOT LINE OF DUTY |
|   | UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

**002600**    RETIREMENT

|   | BC | IN LIEU OF FURLOUGH |
|   | BCR | COMPROMISE AND RELEASE NEGOTIATED |
|   | BO | AGE |
|   | BP | WORK RELATED DISABILITY |
|   | BPR | WORK - RELATED INJURY CANNOT RETURN FULL DUTY |
|   | BQ | YEARS OF SERVICE |
|   | BR | SPECIAL LEGISLATION |
|   | BRD | ACT 1994 - 29-30 YEARS ANY AGE |
|   | BT | NON-WORK RELATED DISABILITY |
|   | BU | IN LIEU OF REMOVAL |
|   | UP | TRANSACTION PROCESS INITIATED LATE – VARIOUS REASONS |

\* AT LEAST ONE SPECIAL FACTOR CODE MUST BE PRESENT FOR ALL SEPARATION

| CODE | | TRANSLATION |
|------|------|------------|
| 002108 | AF | UNION ARBITRATION |
| 002208 | AG | GRIEVANCE |
| 002308 | AH | CIVIL SERVICE COMMISSION ORDER |
| 002408 | AI | COURT ORDER |
| 002508 | AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| 002608 | AK | FURLOUGH PLACEMENT |
| | AL | FURLOUGH RECALL |
| | AM | FURLOUGH PREFERENCE LIST |
| | AO | CIVIL SERVICE REINSTATEMENT |
| | AQ | FURLOUGHEE MADE WHOLE |
| | BSA | BACKPAY SETTLEMENTS/GRIEVANCE AWARDS |
| | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

| 003100/004100 | | TRANSFER BETWEEN DEPARTMENTS AND PROMOTION |
|------|------|------------|
| | AF | UNION ARBITRATION |
| | AG | GRIEVANCE |
| | AH | CIVIL SERVICE COMMISSION ORDER |
| | AI | COURT ORDER |
| | AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| | AQ | FURLOUGHEE MADE WHOLE |
| | CA | REASSIGN WITH CIVIL SERVICE STATUS |
| | CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| | CC | PROMOTION LIST |
| | CD | EMPLOYMENT LIST |
| | CE | END OF TRAINING WITHOUT EXAMINATION |
| | CF | MERITORIOUS SERVICE WITHOUT EXAMINATION |
| | CG | PROMOTION VIA DEMOTION WITHOUT EXAMINATION |
| | CH | REINSTATEMENT |
| | CK | VIA PLACEMENT DUE TO FURLOUGH |
| | CL | TO VACANCY |
| | CO | NOT UNDER GOVERNOR'S JURISDICTION |
| | CP | VOLUNTARY |
| | CQ | INVOLUNTARY |
| | CR | VOLUNTARY DUE TO FURLOUGH |
| | CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| | *CZP* | PROMOTION PAY INCREASE EXCEEDS PAY RULES |
| | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

4

| CODE | TRANSLATION |
|------|-------------|

**003100/004200**    TRANSFER BETWEEN DEPARTMENTS AND DEMOTION

| | |
|------|------|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CH | REINSTATEMENT |
| CK | VIA PLACEMENT DUE TO FURLOUGH |
| CL | TO VACANCY |
| CO | NOT UNDER GOVERNOR'S JURISDICTION |
| CP | VOLUNTARY |
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| CT | SECTION 99.42 CIVIL SERVICE RULES |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003100/004300**    TRANSFER BETWEEN DEPARTMENTS AND REASSIGNMENT - DIFFERENT CLASS BUT SAME MAXIMUM PAY RATE

| | |
|------|------|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CH | REINSTATEMENT |
| CK | VIA PLACEMENT DUE TO FURLOUGH |
| CL | TO VACANCY |
| CO | NOT UNDER GOVERNOR'S JURISDICTION |
| CP | VOLUNTARY |

| **CODE** | **TRANSLATION** |
|---|---|
| | |

|  | |
|---|---|
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003100/004990**      TRANSFER BETWEEN DEPARTMENTS AND REASSIGNMENT - SAME CLASS

| | |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CK | VIA PLACEMENT DUE TO FURLOUGH |
| CL | TO VACANCY |
| CO | NOT UNDER GOVERNOR'S JURISDICTION |
| CP | VOLUNTARY |
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| CZR | REASSIGNMENT SAME PAY SCHEDULE CHANGE TO STEP |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003200/004100**      TRANSFER BETWEEN ORGANIZATIONS, SAME DEPARTMENT AND PROMOTION

| | |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CC | PROMOTION LIST |
| CD | EMPLOYMENT LIST |

| **CODE** | | **TRANSLATION** |
|---|---|---|
| | CE | END OF TRAINING WITHOUT EXAMINATION |
| | CF | MERITORIOUS SERVICE WITHOUT EXAM |
| | CG | PROMOTION VIA DEMOTION WITHOUT EXAM |
| | CH | REINSTATEMENT |
| | CJ | VIA BUMP DUE TO FURLOUGH |
| | CK | VIA PLACEMENT DUE TO FURLOUGH |
| | CL | TO VACANCY |
| | CP | VOLUNTARY |
| | CQ | INVOLUNTARY |
| | CR | VOLUNTARY DUE TO FURLOUGH |
| | CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| | *CZP* | PROMOTION PAY INCREASE EXCEEDS PAY RULES |
| | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

003200/004200    TRANSFER BETWEEN ORGANIZATIONS IN SAME DEPARTMENT AND DEMOTION

| | AF | UNION ARBITRATION |
|---|---|---|
| | AG | GRIEVANCE |
| | AH | CIVIL SERVICE COMMISSION ORDER |
| | AI | COURT ORDER |
| | AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| | AQ | FURLOUGHEE MADE WHOLE |
| | CA | REASSIGN WITH CIVIL SERVICE STATUS |
| | CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| | CD | EMPLOYMENT LIST |
| | CH | REINSTATEMENT |
| | CJ | VIA BUMP DUE TO FURLOUGH |
| | CK | VIA PLACEMENT DUE TO FURLOUGH |
| | CL | TO VACANCY |
| | CM | VIA RECALL |
| | CP | VOLUNTARY |
| | CQ | INVOLUNTARY |
| | CR | VOLUNTARY DUE TO FURLOUGH |
| | CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| | CT | SECTION 99.42 CIVIL SERVICE RULES |
| | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

| CODE | TRANSLATION |
|------|-------------|
| **003200/004300** | TRANSFER BETWEEN ORGANIZATIONS IN SAME DEPARTMENT AND REASSIGNMENT-DIFFERENT CLASS BUT SAME MAXIMUM PAY RATE |

AF   UNION ARBITRATION
AG   GRIEVANCE
AH   CIVIL SERVICE COMMISSION ORDER
AI   COURT ORDER
AJ   PA HUMAN RELATIONS COMMISSION ORDER
AQ   FURLOUGHEE MADE WHOLE
CA   REASSIGN WITH CIVIL SERVICE STATUS
CB   GRANTED CIVIL SERVICE LEAVE OF ABSENCE
CD   EMPLOYMENT LIST
CH   REINSTATEMENT
CJ   VIA BUMP DUE TO FURLOUGH
CK   VIA PLACEMENT DUE TO FURLOUGH
CL    TO VACANCY
CM   VIA RECALL
CP   VOLUNTARY
CQ   INVOLUNTARY
CR   VOLUNTARY DUE TO FURLOUGH
CS   AFTER FURLOUGH/CONTRACT OF CS RULES
*GNP*   LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

| CODE | TRANSLATION |
|------|-------------|
| **003200/004990** | TRANSFER BETWEEN ORGANIZATIONS IN SAME DEPARTMENT AND REASSIGNMENT - SAME CLASS |

AF   UNION ARBITRATION
AG   GRIEVANCE
AH   CIVIL SERVICE COMMISSION ORDER
AI   COURT ORDER
AJ   PA HUMAN RELATIONS COMMISSION ORDER
AQ   FURLOUGHEE MADE WHOLE
CA   REASSIGN WITH CIVIL SERVICE STATUS
CB   GRANTED CIVIL SERVICE LEAVE OF ABSENCE
CD   EMPLOYMENT LIST
CJ   VIA BUMP DUE TO FURLOUGH
CK   VIA PLACEMENT DUE TO FURLOUGH
CL   TO VACANCY
CM   VIA RECALL
CP   VOLUNTARY

| CODE | TRANSLATION |
|------|-------------|

|     |     |
|-----|-----|
| CQ  | INVOLUNTARY |
| CR  | VOLUNTARY DUE TO FURLOUGH |
| CS  | AFTER FURLOUGH/CONTRACT OR CS RULES |
| CZ  | MANAGEMENT EMPLOYEE TEMP TO HIGHER LEVEL WITHIN GRADE DEPT 011 ONLY |
| CZR | REASSIGNMENT SAME PAY SCHEDULE CHANGE TO PAY STEP |
| PR  | DEPARTMENT RE-ORGANIZATION |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003300/004100**  TRANSFER BETWEEN FUNCTIONS, SAME DEPARTMENT OR ORGANIZATION AND PROMOTION

|     |     |
|-----|-----|
| AF  | UNION ARBITRATION |
| AG  | GRIEVANCE |
| AH  | CIVIL SERVICE COMMISSION ORDER |
| AI  | COURT ORDER |
| AJ  | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ  | FURLOUGHEE MADE WHOLE |
| CA  | REASSIGN WITH CIVIL SERVICE STATUS |
| CB  | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CC  | PROMOTION LIST |
| CD  | EMPLOYMENT LIST |
| CE  | END OF TRAINING WITHOUT EXAMINATION |
| CF  | MERITORIOUS SERVICE WITHOUT EXAM |
| CG  | PROMOTION VIA DEMOTION WITHOUT EXAM |
| CH  | REINSTATEMENT |
| CI  | VIA RECLASS |
| CJ  | VIA BUMP DUE TO FURLOUGH |
| CK  | VIA PLACEMENT DUE TO FURLOUGH |
| CL  | TO VACANCY |
| CP  | VOLUNTARY |
| CQ  | INVOLUNTARY |
| CR  | VOLUNTARY DUE TO FURLOUGH |
| CS  | AFTER FURLOUGH/CONTRACT OR CS RULES |
| *CZP* | PROMOTION PAY INCREASE EXCEEDS PAY RULES |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

| CODE | TRANSLATION |
|------|-------------|

**003300/004200**     TRANSFER BETWEEN FUNCTIONS IN SAME DEPARTMENT OR ORGANIZATION AND DEMOTION

| | |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CH | REINSTATEMENT |
| CI | VIA RECLASS |
| CJ | VIA BUMP DUE TO FURLOUGH |
| CK | VIA PLACEMENT DUE TO FURLOUGH |
| CL | TO VACANCY |
| CM | VIA RECALL |
| CP | VOLUNTARY |
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| CT | SECTION 99.42 CIVIL SERVICE RULES |
| *GNP* | *LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T* |

**003300/004300**     TRANSFER BETWEEN FUNCTIONS IN SAME DEPARTMENT OR ORGANIZATION AND REASSIGNMENT-DIFFERENT CLASS BUT SAME MAXIMUM PAY RATE

| | |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CH | REINSTATEMENT |
| CI | VIA RECLASS |

| CODE | TRANSLATION |
|------|-------------|

|  | CJ | VIA BUMP DUE TO FURLOUGH |
|--|----|--------------------------|
|  | CK | VIA PLACEMENT DUE TO FURLOUGH |
|  | CL | TO VACANCY |
|  | CM | VIA RECALL |
|  | CP | VOLUNTARY |
|  | CQ | INVOLUNTARY |
|  | CR | VOLUNTARY DUE TO FURLOUGH |
|  | CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
|  | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003300/004990**   TRANSFER BETWEEN FUNCTIONS IN SAME DEPARTMENT OR ORGANIZATION AND REASSIGNMENT - SAME CLASS

|  | AF | UNION ARBITRATION |
|--|----|-------------------|
|  | AG | GRIEVANCE |
|  | AH | CIVIL SERVICE COMMISSION ORDER |
|  | AI | COURT ORDER |
|  | AJ | PA HUMAN RELATIONS COMMISSION ORDER |
|  | AQ | FURLOUGHEE MADE WHOLE |
|  | CA | REASSIGN WITH CIVIL SERVICE STATUS |
|  | CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
|  | CD | EMPLOYMENT LIST |
|  | CJ | VIA BUMP DUE TO FURLOUGH |
|  | CK | VIA PLACEMENT DUE TO FURLOUGH |
|  | CL | TO VACANCY |
|  | CM | VIA RECALL |
|  | CP | VOLUNTARY |
|  | CQ | INVOLUNTARY |
|  | CR | VOLUNTARY DUE TO FURLOUGH |
|  | CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
|  | CZR | REASSIGNMENT SAME PAY SCHEDULE CHANGE TO PAY STEP |
|  | *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003990/004100**   TRANSFER - NO CHANGE IN DEPARTMENT, ORGANIZATION OR FUNCTION AND PROMOTION

|  | AF | UNION ARBITRATION |
|--|----|-------------------|
|  | AG | GRIEVANCE |
|  | AH | CIVIL SERVICE COMMISSION ORDER |
|  | AI | COURT ORDER |

11

| CODE | TRANSLATION |
|------|-------------|

|     |                                                    |
|-----|----------------------------------------------------|
| AJ  | PA HUMAN RELATIONS COMMISSION ORDER               |
| AQ  | FURLOUGHEE MADE WHOLE                              |
| CA  | REASSIGN WITH SERVICE STATUS                       |
| CB  | GRANTED CIVIL SERVICE LEAVE OF ABSENCE             |
| CC  | PROMOTION LIST                                     |
| CD  | EMPLOYMENT LIST                                    |
| CE  | END OF TRAINING WITHOUT EXAMINATION               |
| CF  | MERITORIOUS SERVICE WITHOUT EXAM                   |
| CG  | PROMOTION VIA DEMOTION WITHOUT EXAM               |
| CH  | REINSTATEMENT                                      |
| CI  | VIA RECLASS                                        |
| CK  | VIA PLACEMENT DUE TO FURLOUGH                      |
| CL  | TO VACANCY                                         |
| CN  | IN ACCORDANCE WITH EXEC BOARD AMENDMENT           |
| CP  | VOLUNTARY                                          |
| CQ  | INVOLUNTARY                                        |
| CR  | VOLUNTARY DUE TO FURLOUGH                          |
| CS  | AFTER FURLOUGH/CONTRACT OR CS RULES               |
| *CZP* | PROMOTION PAY INCREASE EXCEEDS PAY RULES         |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

)

**003990/004200**    TRANSFER WITH NO CHANGE IN DEPARTMENT, ORGANIZATION OR FUNCTION AND DEMOTION

|     |                                          |
|-----|------------------------------------------|
| AF  | UNION ARBITRATION                        |
| AG  | GRIEVANCE                                |
| AH  | CIVIL SERVICE COMMISSION ORDER           |
| AI  | COURT ORDER                              |
| AJ  | PA HUMAN RELATIONS COMMISSION ORDER      |
| AQ  | FURLOUGHEE MADE WHOLE                     |
| CA  | REASSIGN WITH CIVIL SERVICE STATUS       |
| CB  | GRANTED CIVIL SERVICE LEAVE OF ABSENCE   |
| CD  | EMPLOYMENT LIST                          |
| CH  | REINSTATEMENT                            |
| CI  | VIA RECLASS                              |
| CJ  | VIA BUMP DUE TO FURLOUGH                 |
| CK  | VIA PLACEMENT DUE TO FURLOUGH            |
| CL  | TO VACANCY                               |
| CM  | VIA RECALL                               |
| CN  | IN ACCORDANCE WITH EXEC BOARD AMENDMENT  |

)

12

| **CODE** | **TRANSLATION** |
|---|---|

|   |   |
|---|---|
| CP | VOLUNTARY |
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| CT | SECTION 99.42 CIVIL SERVICE RULES |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003990/004300**   TRANSFER WITH NO CHANGE IN DEPARTMENT, ORGANIZATION OR FUNCTION AND REASSIGNMENT - DIFFERENT CLASS BUT SAME MAXIMUM PAY RATE

|   |   |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| AQ | FURLOUGHEE MADE WHOLE |
| CA | REASSIGN WITH CIVIL SERVICE STATUS |
| CB | GRANTED CIVIL SERVICE LEAVE OF ABSENCE |
| CD | EMPLOYMENT LIST |
| CH | REINSTATEMENT |
| CI | VIA RECLASS |
| CJ | VIA BUMP DUE TO FURLOUGH |
| CK | VIA PLACEMENT DUE TO FURLOUGH |
| CL | TO VACANCY |
| CM | VIA RECALL |
| CN | IN ACCORDANCE WITH EXEC BOARD AMENDMENT |
| CP | VOLUNTARY |
| CQ | INVOLUNTARY |
| CR | VOLUNTARY DUE TO FURLOUGH |
| CS | AFTER FURLOUGH/CONTRACT OR CS RULES |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

**003990/004990**   TRANSFER WITH NO CHANGE IN DEPARTMENT, ORGANIZATION OR FUNCTION AND REASSIGNMENT - SAME CLASS

|   |   |
|---|---|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |

**CODE**                      **TRANSLATION**

        AJ    PA HUMAN RELATIONS COMMISSION ORDER
        AQ   FURLOUGH MADE WHOLE
        CA   REASSIGN WITH CIVIL SERVICE STATUS
        CB   GRANTED CIVIL SERVICE LEAVE OF ABSENCE
        CD   EMPLOYMENT LIST
        CJ    VIA BUMP DUE TO FURLOUGH
        CK   VIA PLACEMENT DUE TO FURLOUGH
        CL    TO VACANCY
        CM   VIA RECALL
        CN   IN ACCORDANCE WITH EXEC BOARD AMENDMENT
        CP   VOLUNTARY
        CQ   INVOLUNTARY
        CR   VOLUNTARY DUE TO FURLOUGH
        CS   AFTER FURLOUGH/CONTRACT OR CS RULES
        CZ   MANAGEMENT EMPLOYEE TEMP TO HIGHER LEVEL WITHIN GRADE
                DEPT 011 ONLY
        CZR  REASSIGNMENT SAME PAY SCHEDULE CHANGE TO PAY STEP
        *GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**005100**     ANNUAL INCREMENT

        DR   MERIT INCREASE FOR PERFORMANCE
        *GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**005200**     EXCEPTIONAL INCREMENT

        *GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**005300**     GENERAL PAY INCREASE, CONTRACTUAL PAY INCREASE
            OR EXECUTIVE BOARD AMENDMENT

        DJ    GENERAL PAY INCREASE
        DK   CONTRACT PAY INCREASE
        DL    COST OF LIVING INCREASE
        DM   EXECUTIVE BOARD AMENDMENT
        *GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**005400**     ACADEMIC ATTAINMENT

| CODE | TRANSLATION |
|------|-------------|
| **005500** | LONGEVITY INCREASE |
| | *GNP* LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |
| **005600** | SELECTIVE TRAINEE INCREASE |
| **005800** | OTHER CHANGES AFFECTING PAY |

| | |
|------|-------------|
| DD | PAY DECREASE |
| DE | PAY DECREASE - DISCIPLINE |
| DF | SALARY ADJUST/ORIG TRANSACTION INCORRECT |
| DG | SPECIAL SALARY INCREASE |
| DQ | CASH REWARD FOR PERFORMANCE |
| DV | 15 YEAR SERVICE BONUS (DEPT 011 ONLY) |
| DBA | ADJUST PAY - LIGHT DUTY ACT 534 |
| DBB | ADJUST PAY - LIGHT DUTY HEART & LUNG |
| DBC | ADJUST PAY - RECURRENCE ACT 534 |
| DBD | ADJUST PAY - RECURRENCE HEART & LUNG |
| DBE | SET, CHG, OR REMOVE SALARY FREEZE DATE |
| DPB | BEGIN SUPERVISOR'S DIFFERENTIAL PAY |
| DPE | END SUPERVISOR'S DIFFERENTIAL PAY |
| DJA | HIGHWAY AGILITY PROGRAM DEPT 008 ONLY |
| DJC | REAL ESTATE CERTIFICATION PROGRAM |
| DJD | QUARTERLY CASH PAYMENT EB99-111 DEPT 011 ONLY |
| GQ | PAY METHOD |
| GR | PAY OPTION |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

| CODE | TRANSLATION | EARNINGS TYPE CODE |
|------|-------------|--------------------|
| **005900** | SUPPLEMENTAL BI-WEEKLY EARNINGS | |
| DZB | PHYSICIAN WEIGHTED SALARY | 152 |
| DZC | RETENTION SALARY - CORR | 155 |
| DZD | RETENTION SALARY - PEMA | 156 |
| DZE | BIWEEKLY OVERTIME-5%RATE (DEPT. 014) | 430 |
| DZF | BIWEEKLY OVERTIME PREMIUM | 431 |
| DZI | FACULTY SUMMER SABBATICAL SALARY | 157 |
| HOP | HOME OFFICE PAYMENT | 741 |
| MAP | MEAL ALLOWANCE PAYMENT | 740 |

| CODE | | TRANSLATION | |
|------|--|-------------|--|

**005910**     SUPPLEMENTAL ONE - TIME EARNINGS

| | | |
|--|--|--|
| DJA | HIGHWAY AGILITY PROGRAM (DEPT 008 ONLY) | 701 |
| DJB | BONUS PAYMENTS (DEPT 012 & 038) | 714 |
| DJC | REAL ESTATE CERTIFICATION PROGRAM | 701 |
| DJD | QUARTERLY CASH PAYMENT EB99-111 (DEPT 011 ONLY) | 701 |
| DJJ | GPI CASH PAYMENTS | 700 |
| DJK | CASH PAYMENT FOR LONGEVITY INCREASE | 701 |
| DZ | STRESS PAYMENT | 706 |
| DZA | MANAGEMENT BONUS | 707 |
| DZJ | EMERGENCY RESPONSE PAY (DEPT. 035 ONLY) | 708 |
| DZK | HEALTH QUALITY EXAMINERS SMQT CERTIFICATION PAYMENT (DEPT. 007 ONLY) | 721 |
| DZL | INCENTIVE PAYMENT (DEPT.012) OR INVESTMENT PAYMENT (DEPT. 072) | 552 |
| DZN | INCENTIVE PAYMENT | 705 |
| DZP | MUN POL OFF TRN (DEPT. 038) | 716 |
| DZW | ACT 632/534 BEN PAYMENT (DEPT. 011, 016, 021, 025) | 722 |
| DZS | DEP COMM STAFF ASST (DEPT 011) | 530 |

**006010**     BEGIN MILITARY LWOP

| | |
|--|--|
| HI | LWOP WITH BENEFITS |
| HJ | LWOP WITHOUT BENEFITS |
| | *ONE SPECIAL FACTOR CODE MUST BE PRESENT |
| BSA | BACKPAY SETTLEMENTS/GRIEVANCE AWARDS |

**006020**     RETURN FROM MILITARY LWOP

| | |
|--|--|
| BSA | BACKPAY SETTLEMENTS/GRIEVANCE AWARDS |
| *GM* | ANNUAL INCREMENT DATE |
| *GN* | LONGEVITY DATE |
| *GNP* | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |

| CODE | TRANSLATION |
|------|-------------|
| **006050** | BEGIN LEAVE WITHOUT PAY WITHOUT BENEFITS |

        IW    WORK-RELATED INJURY LEAVE WITHOUT PAY WITHOUT BENEFITS
        OR   OTHER REASONS, LEAVE WITHOUT PAY
        PW   PARENTAL LEAVE WITHOUT PAY WITHOUT BENEFITS
        SW   SICK LEAVE WITHOUT PAY WITHOUT BENEFITS
            * ONE SPECIAL FACTOR CODE MUST BE PRESENT
        BSA  BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006060**    RETURN FROM LEAVE WITHOUT PAY WITHOUT BENEFITS

        IW    WORK-RELATED INJURY LEAVE WITHOUT PAY WITHOUT BENEFITS
        OR   OTHER REASONS, LEAVE WITHOUT PAY
        PW   PARENTAL LEAVE WITHOUT PAY WITHOUT BENEFITS
        SW   SICK LEAVE WITHOUT PAY WITHOUT BENEFITS
            * ONE SPECIAL FACTOR CODE MUST BE PRESENT
        BSA  BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
        *GM*  ANNUAL INCREMENT DATE
        *GN*  LONGEVITY DATE
        *GNP* LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006070**    BEGIN ABSENCE WITHOUT LEAVE (UNAUTHORIZED)

        BSA  BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006080**    RETURN FROM ABSENCE WITHOUT LEAVE (UNAUTHORIZED)
        BSA  BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
        *GM*  ANNUAL INCREMENT DATE
        *GN*  LONGEVITY DATE
        *GNP* LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006090**    BEGIN SUSPENSION  *– Use w/ benefits for short-term or if paid during any part of the PP; use w/out for long-term where a full PP is not paid.*

        HI    WITHOUT PAY WITH BENEFITS
        HJ    WITHOUT PAY WITHOUT BENEFITS
            * ONE SPECIAL FACTOR CODE MUST BE PRESENT
        BSA  BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

| **CODE** | **TRANSLATION** |
|---|---|

**006100**     RETURN FROM SUSPENSION

      BSA    BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
      *GM*     ANNUAL INCREMENT DATE
      *GN*     LONGEVITY DATE
      *GNP*   LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006130**     BEGIN SABBATICAL LEAVE WITH PAY

**006140**     RETURN FROM SABBATICAL LEAVE WITH PAY

**006150**     BEGIN WORK RELATED INJURY

      PIL     PAID INJURY LEAVE
      WDL   WORK-RELATED DISABILITY LEAVE
            * ONE SPECIAL FACTOR CODE MUST BE PRESENT
      BSA    BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006160**     RETURN FROM WORK RELATED INJURY

      BSA    BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
      *GNP*   LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006210**     BEGIN LEAVE WITHOUT PAY WITH BENEFITS

      FCL    FAMILY CARE LEAVE WITHOUT PAY WITH BENEFITS
      OR     OTHER REASONS, LEAVE WITHOUT PAY
      IO      WORK-RELATED INJURY LEAVE WITHOUT PAY WITH BENEFITS
      PO     PARENTAL LEAVE WITHOUT PAY WITH BENEFITS
      SO     SICK LEAVE WITHOUT PAY WITH BENEFITS
            * ONE SPECIAL FACTOR CODE MUST BE PRESENT
      BSA    BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006220**     RETURN FROM LEAVE WITHOUT PAY WITH BENEFITS

      FCL    FAMILY CARE LEAVE WITHOUT PAY WITH BENEFITS
      OR     OTHER REASONS, LEAVE WITHOUT PAY
      IO      WORK-RELATED INJURY LEAVE WITHOUT PAY WITH BENEFITS
      PO     PARENTAL LEAVE WITHOUT PAY WITH BENEFITS
      SO     SICK LEAVE WITHOUT PAY WITH BENEFITS

18

| CODE | TRANSLATION |
|------|-------------|

        * ONE SPECIAL FACTOR CODE MUST BE PRESENT

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
*GM*  ANNUAL INCREMENT DATE
*GN*  LONGEVITY DATE
*GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006230**  BEGIN ACT 534/632 WORK RELATED DISABILITY LEAVE

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006240**  RETURN FROM ACT 534/632 WORK RELATED DISABILITY LEAVE

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
*GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006270**  BEGIN CYCLICAL LWOP WITH BENEFITS

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

**006280**  RETURN FROM CYCLICAL LWOP WITH BENEFITS

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS
*GM*  ANNUAL INCREMENT DATE
*GN*  LONGEVITY DATE
*GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006330**  BEGIN MEDICAL LWOP WITH BENEFITS (DEPT. 003 ONLY)

**006340**  RETURN MEDICAL LWOP WITH BENEFITS (DEPT. 003 ONLY)

     *GM*  ANNUAL INCREMENT DATE
*GN*  LONGEVITY DATE
*GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T

**006520**  BEGIN HEART & LUNG WORK RELATED DISABILITY LEAVE

     BSA BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

| **CODE** | | **TRANSLATION** |
|---|---|---|
| 006530 | | RETURN FROM HEART & LUNG WORK RELATED DISABILITY LEAVE |
| | BSA | BACKPAY SETTLEMENTS/GRIEVANCE AWARDS |
| | GNP | LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T |
| 007000 | | PERSONAL DATA CHANGES |
| | FB | BIRTHDATE |
| | FC | CURRENT SERVICE DATE |
| | FD | EMPLOYE NAME |
| | FE | EMPLOYE ADDRESS |
| | FF | ORIGINAL HIRE DATE |
| | FH | SEX |
| | FI | SOCIAL SECURITY NUMBER |
| | FJ | HANDICAP |
| | FK | MILITARY SERVICE STATUS |
| | FL | RACE |
| | FM | TENURE STATUS |
| | FN | RESIDENCE CODE |
| | FO | VOTING CODE |
| | FP | LOCAL WAGE TAX PREFERENCE CODE |
| | FQ | ANNUITANT INDICATOR |
| | FR | FURLOUGHEE STATUS INDICATOR |
| | FS | FURLOUGHEE REFUSED RECALL, MADE WHOLE |
| | FT | ADVANCE EIC STATUS CODE |
| | FU | SOCIAL SECURITY PRIOR EMPLOYER DATA |
| | FV | FURLOUGH REFUSED RECALL, NOT MADE WHOLE |
| 008000 | | EMPLOYMENT CONDITION CHANGES |
| | GA | TYPE SERVICE |
| | GB | TYPE SERVICE STATUS |
| | GD | EMPLOYMENT CONDITION |
| | GE | EMPLOYMENT DURATION |
| | GF | EMPLOYMENT END DATE |
| | GG | REHIRE DATE |
| | GH | WORK WEEK SCHEDULE CHANGE |
| | GI | REGULAR HOURS OVERRIDE |
| | GJ | WORK WEEK SCHEDULE DAYS OFF |
| | GK | SHIFT |

20

| CODE | TRANSLATION |
|------|-------------|

*GL*  MEAL PERIOD
*GM*  ANNUAL INCREMENT DATE
*GN*  LONGEVITY DATE
*GO*  TRAINEE INCREMENT DATE
*GS*  ANTICIPATED END UNPAID STATUS DATE
*GT*  CHECK DISTRIBUTION CODE
GV  EMERGENCY APPT. - REINSTATE FORMER STATUS
GCA  CORRECT TYPE SERVICE STATUS END DATE; OR
GCB  COMPLETE TYPE SERVICE STATUS END DATE; OR
GCC  REDUCE TYPE SERVICE STATUS END DATE; OR
GCD  EXTEND TYPE SERVICE STATUS END DATE
DZH  FACULTY SABBATICAL SALARY (DEPT. 016 AND DEPT. 013 ONLY)
*GNP*  LONGEVITY DATE NOT PROSPECTIVE – PAY SCHED S & T
NCP  NO CASH PAYMENT – PAY SCHED S & T – LONGEVITY DATE CHANGED
NLP  NO LONGEVITY PAYMENT -PAY SCHED S & T –LONGEVITY DATE CHANGED

**009000**  POSITION CREATION

*OA*  NO ACTION ALLOWED ON POSITION
*GC*  SET REGULAR HOURS TO 80 OR CHANGE TO REG HOURS
PC  SEASONAL
PD  CREATED BY ABOLISHING ANOTHER
PE  NOT PART OF COMPLEMENT
PF  CREATED AS A RESULT OF REBUDGET
PG  EXEMPT FROM CLASSIFIED SERVICE
PL  RE - CREATION OF ABOLISHED POSITION
*FLS*  FAIR LABOR STANDARD ACT OVRD

**009020**  POSITION ABOLISHMENT

BJ  LACK OF WORK
BK  LACK OF FUNDS
PC  SEASONAL
PJ  ABOLISH AS A RESULT OF REORGANIZATION
PK  ABOLISH AS A RESULT OF REBUDGET

21

| CODE | TRANSLATION |
|------|-------------|

**009030**  CHANGE IN DEPARTMENT, ORGANIZATION OR CLASS

| | |
|-----|-----|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| CN | IN ACCORDANCE WITH EXEC BOARD AMENDMENT (903 ALONE OR 903 WITH 399/410, 420, 430, OR 499) |
| *GC* | SET REGULAR HOURS TO 80 OR CHANGE TO REG HOURS |
| *OA* | NO ACTION ALLOWED ON POSITION |
| PE | NOT PART OF COMPLEMENT |
| PG | EXEMPT FROM CLASSIFIED SERVICE |
| PR | DEPARTMENT REORGANIZATION (903 ALONE OR 903 WITH 320/499) |
| *FLS* | FAIR LABOR STANDARD ACT OVRD |

**009040**  CHANGE TO OTHER POSITION CHARACTERISTICS

| | |
|-----|-----|
| AF | UNION ARBITRATION |
| AG | GRIEVANCE |
| AH | CIVIL SERVICE COMMISSION ORDER |
| AI | COURT ORDER |
| AJ | PA HUMAN RELATIONS COMMISSION ORDER |
| CN | IN ACCORDANCE WITH EXEC BOARD AMENDMENT |
| *GC* | SET REGULAR HOURS TO 80 OR CHANGE TO REG HOURS |
| *OA* | NO ACTION ALLOWED ON POSITION |
| PG | EXEMPT FROM CLASSIFIED SERVICE |
| *FLS* | FAIR LABOR STANDARD ACT OVRD |

**009050**  CHANGE TO POSITION AGENCY ELECTIVES

**010000**  BENEFIT OR DEPENDENT CHANGE

| | |
|-----|-----|
| *HA* | MEDICAL/HOSPITALIZATION |
| *HB* | HEALTH & WELFARE |
| *HC* | RETIREMENT |
| *HD* | GROUP LIFE INSURANCE |
| *HE* | DEPENDENT DATE |
| MOE | MED/HOSPITAL ANNUAL OPEN ENROLLMENT |

| CODE | TRANSLATION |
|------|-------------|
| 011000 | PAYROLL DEDUCTION CHANGE |

*IA*     PAYROLL TAX DEDUCTION
*IB*     VOLUNTARY DEDUCTION
*DDO*   DIRECT DEPOSIT OVERRIDE

| 012000 | CHANGE TO EMPLOYE AGENCY ELECTIVE |
| 013000 | PERFORMANCE |
| 014000 | TRAINING |
| 015000 | CENTRAL USER ELECTIVE CHANGE |
| 016000 | ALTERNATIVE DISCIPLINARY INCIDENT |

DIF    DISCIPLINARY INCIDENT - 1ST OCCURRENCE
DIS    DISCIPLINARY INCIDENT - 2ND OCCURRENCE
BSA   BACKPAY SETTLEMENTS/GRIEVANCE AWARDS

| 019000 | EMPLOYE REIMBURSEMENT CHANGE |
| 020000 | LEAVE PAYMENT - INACTIVE EMPLOYE |

BC     IN LIEU OF FURLOUGH
BCR   COMPROMISE AND RELEASE NEGOTIATED
BJ      LACK OF WORK
BK     LACK OF FUNDS
BL      NON WORK RELATED
BM    WORK RELATED - LINE OF DUTY
BN     WORK RELATED - NOT IN LINE OF DUTY
BO     AGE
BP     WORK RELATED DISABILITY
BQ     YEARS OF SERVICE
BR     SPECIAL LEGISLATION
BT      NON WORK RELATED DISABILITY
BU     IN LIEU OF DISMISSAL
BPR   WORK RELATED INJURY RETURN FULL DUTY
BRD   ACT 1994 - 29 - 30 YEARS, ANY AGE
       *AT LEAST ONE SPECIAL FACTOR CODE MUST BE PRESENT ON ALL

| CODE | TRANSLATION |
|------|-------------|
| | LEAVE PAYMENTS |
| 030000 | HISTORICAL DOCUMENTATION/REMARKS ACTION |
| 050000 | WORK RELATED DISABILITY PAY ADJUSTMENT |
| 051000 | FINAL PAY PROCESSING - TERMINATED EMPLOYE |
| 052000 | SABBATICAL LEAVE PAY ADJUSTMENT |
| 053000 | NON CASH COMPENSATION |
| 054000 | OVERPAYMENT ADJUSTMENT |
| 055000 | EARNINGS OVERRIDE ADJUSTMENT |
| 056000 | SURVIVOR DATA CHANGE |
| | BZ    SURVIVOR DATA CHANGE |

24

COMMONWEALTH OF PENNSYLVANIA
STD-330    REV. 8-82

## JOB DESCRIPTION

| 1. NAME OF EMPLOYE (LAST NAME FIRST) | 2. SOCIAL SECURITY NUMBER | 3. REQUEST INITIATED BY |
|---|---|---|
| Plesco, Ronald E. Jr. | 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 | ☐ EMPLOYE  ☒ AGENCY  ☐ OFFICE OF ADMINISTRATION |

| DEPARTMENT | BUREAU | DIVISION | HEADQUARTERS |
|---|---|---|---|
| PA State Police | Executive and Administrative Offices | | Harrisburg |

| 5. PRESENT CLASS TITLE | POSITION NUMBER |
|---|---|
| Legislative Liaison 2 | 5000-07242-107228 |

**6. REGULAR SCHEDULE OR HOURS OF WORK**

| DAY→ | | MON | TUES | WED | THURS | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|---|
| HOURS | FROM | 8:15 | 8:15 | 8:15 | 8:15 | 8:15 | | |
| | TO | 4:15 | 4:15 | 4:15 | 4:15 | 4:15 | | |

WORK IS: ☒ FULL-TIME  ☐ PART-TIME  ☒ PERMANENT  ☐ TEMPORARY

LENGTH OF LUNCH PERIOD: 1/2 hour

TOTAL HOURS PER WEEK: 37.50

EXPLAIN ROTATION OF SHIFTS (IF ANY)

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional paper (8½ x 11) as you need.

This position encompasses the areas of Legislative Affairs and Policy. By their very nature these two areas overlap. The following is a brief description of responsibilities for this position.

**50%**

1. Legislative Affairs:

Responsible for planning, organizing and coordinating an integrated program of legislative review, development and advocacy. Work is done in cooperation and consultation with the State Police Commissioner and the Governor's Offices of Legislative Affairs, Policy and Chief Counsel.

Responsible for gathering and analysis of legislative data from within the State Police and the General Assembly; coordinating the development of proposed legislation; recommending and advising the State Police Commissioner on legislative strategies; providing information to the General Assembly on proposed legislation; in conjunction with the Legislative Liaison, representing the State Police at legislative committee meetings and hearings and advocating for the passage or defeat of proposed legislation.

**50%**

2. Policy:

Works with the State Police Commissioner and the Governor's Policy Office to determine critical policy issues. Work involves management of the study of program and legislative mandates. In addition, at the direction of the State Police Commissioner, work may involve review and evaluation of existing and proposed agency policies and programs to ensure consistency with the goals of the State Police Commissioner and Governor.

2015

EXHIBIT
Bonney 2
1-30-02 SB

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

SIGNATURE OF EMPLOYE

DATE: 9-24-96

**8. Describe how you are supervised by telling how your work is assigned and how your supervisor reviews your work.**

Legislative and policy issues are received for review, research and analysis.  The Department's position on issues is sometimes known in advance; other times determined at the conclusion of my analysis.  Review of work is done through conferences and reports.

**9. Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles.  If you are not a supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.**

### SEE ATTACHED SHEET

_____8_____ Total number subordinates reporting to you

**9. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised.  If you are not a supervisor, your supervisor must complete this part for all employes shown above.**

Establishes overall objectives and reviews for quality and timely completion.  Day-to-day guidance and consultation occur with subordinates on questions and problems as they arise.  The working environment is basically informal and encourages consultation and discussion.

**11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR:** Review your subordinate's statements.  You may make any comments or include any information you feel is appropriate or would be helpful.  Use additional paper if needed.

EMPLOYE'S IMMEDIATE SUPERVISOR'S SIGNATURE: _Lt. Col. Dan K Cox_  CLASS TITLE: _Deputy Commissioner_  DATE: _9/25/95_

**➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ➡**

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE _____  DATE _____

```
                        COMMISSIONER
                       COLONEL EVANKO
```

Executive Secretary 1
Bonnie Lapinas

Deputy Commissioner of Administration
Lt. Colonel Coury

| | | | | | | |
|---|---|---|---|---|---|---|
| Heritage Affairs | Affirmative Action | Member Assistance | Bureau of Personnel | Training & Education | BPR | Legislative |
| Major Garcia | Major Smith–Ellett | Corporal Gilhooley | Wayne Dowling | Major Regan | Major Amos | Liaison 2 |
| | | | | | | Ronald Plesco |

2017

AR 4-22
4/10/96

# IDENTIFICATION OF ESSENTIAL JOB FUNCTIONS/ADA

**Employe Name:** Ronald Plesco

**Classification:** Legislative Liaison 2

**Essential Job Functions:**

1. Gathering and analyses of legislative data from within the Department and the General Assembly.

2. Coordinating the development of proposed legislation.

3. Recommending and advising the Commissioner on legislative strategies.

4. Representing the Department at legislative committee meetings and hearings and advocating for the passage or defeat of proposed legislation.

5. Managing studies involving program and legislative mandates. Review and evaluation of existing and proposed agency policies and programs.

6. Ability to analyze legislation, programs and policies and arrive at a reasonable, logical conclusion.

7. Ability to effectively communicate orally and in writing.

_____          9-25-96
**Supervisor or Manager Signature**              **Date**

III-5

2018

1                   IN THE UNITED STATES DISTRICT COURT
2                FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    BARBARA A. WILHELM,
                         PLAINTIFF              :
4                                               :
                     VS                         :    NO.  1:CV-01-1057
5                                               :
     COMMONWEALTH OF PENNSYLVANIA,              :
6    PENNSYLVANIA STATE POLICE, COLONEL         :
     PAUL J. EVANKO, COMMISSIONER,              :
7    LIEUTENANT COLONEL THOMAS K. COURY         :
     CAPTAIN MICHAEL D. SIMMERS,                :
8                         DEFENDANTS            :

9

10              DEPOSITION OF:  REBECCA BALSBAUGH

11              TAKEN BY:       PLAINTIFF

12              BEFORE:         VIRGINIA LORIA, RPR
                                NOTARY PUBLIC

13
                DATE:           MARCH 21, 2002, 9:50 A.M.
14
                PLACE:          PENNSYLVANIA STATE POLICE
15                              1800 ELMERTON AVENUE
                                HARRISBURG, PENNSYLVANIA
16
     APPEARANCES:
17
          LAW OFFICE OF NATHAN C. PRINGLE, JR.
18        BY: NATHAN C. PRINGLE, JR., ESQUIRE

19                   FOR - PLAINTIFF

20        OFFICE OF ATTORNEY GENERAL
          BY: SUSAN J. FORNEY, CHIEF DEPUTY ATTORNEY GENERAL
21
                     FOR - DEFENDANTS
22
     ALSO PRESENT:
23
          BARBARA A. WILHELM
24        MICHAEL D. SIMMERS

25

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TABLE OF CONTENTS

WITNESS

| FOR PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rebecca Balsbaugh | 3 | 23 | 26 | 29 |

| BALSBAUGH EXHIBIT NO. | MARKED |
|---|---|
| 1 - Document | 22 |

(Exhibit withdrawn.)

3

STIPULATION

      It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved to the time of trial.

      REBECCA BALSBAUGH, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MR. PRINGLE:

    Q      Ms. Balsbaugh, my name is Nathan Pringle, I'm an attorney representing Barbara Wilhelm in the federal lawsuit filed against the State Police and some named defendants.

      I'm going to ask you some questions regarding the case and the court reporter is going to record my questions and record your answers. Have you ever been deposed before?

    A      No.

    Q      What I would like you to do, I'm going to ask you questions.  I would like you to listen to the question carefully and if you don't understand the question, let me know. You can ask me to repeat the question or clarify the

4

1    question, but I want you to answer the question only when

2    you're prepared to answer the question.

3            I also want you to ask me to repeat the

4    question if you can't hear what I say, if it's not clear, if

5    my question is confusing.  And also if -- at some point

6    later on in the deposition -- if you have answered a

7    question, thought about it some more and you wanted to

8    clarify one of the answers you have previously given, I

9    would like you to clarify any of those answers. Are you

10    willing to do that?

11        A        Yes.

12        Q        Thank you. Can you tell us what your current

13    position is.

14        A        I'm the administrative officer in the

15    Commissioner's office, executive administrative offices.

16        Q        How long have you been in that position?

17        A        Four years.

18        Q        Four years?

19        A        Uh-huh.

20        Q        Since?

21        A        Since I took that position in --  I have to

22    think when my last child was born -- 1988 it would have

23    been actually -- I was off on maternity leave in 1988 --

24    I'm sorry, 1998.

25        Q        My math is bad too.

5

```
 1       A         I'm sorry, 1998.

 2       Q         What was your position before that?

 3       A         I was an executive secretary to the Deputy

 4   Commissioner of Operations.

 5       Q         Who was?

 6       A         At that time it was Lieutenant Colonel

 7   Westcott.

 8       Q         Where you worked, was that in close proximity

 9   to Miss Spigelmyer?

10                 MS. FORNEY: For what period?

11   BY MR. PRINGLE:

12       Q         When you worked for the commissioner.

13       A         Do you mean deputy commissioner?

14       Q         Deputy commissioner, I'm sorry.

15       A         When I worked for Lieutenant Colonel Westcott,

16   I was down the hall from her.

17       Q         And in your current position?

18       A         In my current position as administrative

19   officer, I was right beside of her.

20       Q         You sat right beside her for the last four

21   years?

22       A         Yes, we have two cubicles and there is a

23   divider in between.

24       Q         How long did you work for Lieutenant Colonel

25   Westcott?
```

6

1      A        I was actually the deputy commissioner's

2   secretary for -- I went up there I think because that was

3   right after my first child was born -- he was born in 1987.

4   So in January of 1988, I started up in the commissioner's

5   office as the deputy commissioner's secretary.

6                So from 1988 until 1997, I was one of the

7   deputy -- the deputy commissioner of operations' secretary.

8   There were a couple deputy commissioners in between there.

9      Q        Have you ever been the victim of sexual

10  harassment at the Pennsylvania State Police?

11     A        No.  May I take that back?

12     Q        Yes, you may.

13     A        Yes, I have been.

14     Q        When was that?

15     A        I'm not exactly sure of the year anymore.

16              MS. FORNEY: Do you have an approximate time

17  frame that you can give?

18     A        It was when Colonel Walp was commissioner.

19              MS. FORNEY: Was it when you worked in the

20  executive offices?

21     A        Yes.

22              MS. FORNEY: Was Colonel Walp the commissioner?

23     A        Yes.  I'm not exactly sure of the year.

24  BY MR. PRINGLE:

25     Q        What was the nature of the sexual harassment?

7

```
1       A       You mean as far as what happened?

2       Q       What happened, yes.

3       A       There was a gentleman in the office who --

4  you want me to say exactly what he did, what caused the...

5       Q       What did he do?

6       A       Touched my behind.  I have to clarify

7  something.  My mind -- when you asked me that -- I wasn't

8  expecting a question like that, I'm sorry.  It was actually

9  when Colonel Evanko was commissioner because Colonel

10 Westcott was deputy and the gentleman was not in our office

11 at the time.

12      Q       You don't remember the exact year, do you know

13 what year it was, but was it before 1998?

14      A       Yes.

15      Q       Was it before 1997?

16      A       Yes.

17      Q       You're not sure if it was 1995 or 1996?

18      A       No, I honestly can't remember the year, I'm

19 sorry.

20      Q       Was Colonel Evanko aware of this incident?

21      A       Yes, he was made aware of that.

22      Q       How was he made aware of it?

23      A       His secretary had mentioned something to him.

24      Q       Who is his secretary?

25      A       Eleanor Speece at the time.
```

8

1    Q        Who committed that act?

2    A        A gentleman by the name of Paul Woodring.

3    Q        What was his position at the time?

4    A        I think at the at the time he was director of

5    the Bureau of Professional Responsibility.

6    Q        Do you know whether the matter was

7    investigated?

8    A        Yes, it was.

9    Q        After the investigation, do you know whether

10   or not -- was it Major Woodring?

11   A        Major Woodring, yes.

12   Q        Was Major Woodring disciplined?

13   A        He was actually taken out of the bureau he was

14   in and given --  he became the area five commander of the

15   Turnpike.  So as far as position changing, I don't know to

16   what degree discipline --  he was taken out the building

17   here at the time.

18   Q        Do you know whether or not that was a

19   promotion?

20   A        No, sir, it was not a promotion.

21   Q        It was a lateral move?

22   A        Yes, they moved him.

23   Q        It was not a demotion?

24   A        No.  His rank stayed the same, anyway.

25   Q        His rank stayed the same. Do you have any

1    information -- did anybody ever tell you that he was

2    disciplined as a result of this action?

3         A        Colonel March had talked to me -- as far as

4    discipline, you mean. . .

5         Q        As far as discipline --

6         A        Like received any time off?

7         Q        Any time off, yes.

8         A        That I'm not aware of.  I don't think he was.

9         Q        No one came to you and said he was suspended?

10        A        No.

11        Q        No one came to you and said he was given a

12   written reprimand?

13        A        I can't quite recall if Colonel March told me

14   that or not, but then I don't know.

15        Q        You know his employment was not terminated?

16        A        No, it was not.

17        Q        And he did not lose rank?

18        A        No, he did not.

19        Q        What was he placed in charge of?

20        A        The area five command, which was out at the

21   Turnpike.

22        Q        I'm going to show you a document that has been

23   already been labelled. How did Ms. Speece find out about

24   this incident?

25        A        Which incident?

1        Q        The sexual harassment.

2        A        I was upset after it happened and I went back

3    to her.  And I said, you're not going to believe what just

4    happened.  So I had said something to her.

5        Q        You didn't file a formal complaint?

6        A        No, actually, when I had said something to

7    Ellie, she had mentioned something to Colonel Evanko and

8    that's where it had gone from there.

9        Q        How do you know she spoke to Colonel Evanko?

10       A        Because after I had come back from lunch that

11   day she approached me and she said she hoped that I didn't

12   mind, but she had mentioned something to Colonel Evanko and

13   that he was going to be talking to me about it.

14       Q        Did he talk to you about it?

15       A        Yes, he did, he along with Colonel Westcott.

16   He had called me in his office.

17       Q        What did you discuss?

18       A        They said that was not acceptable behavior.  I

19   was upset at the time -- I'm upset now, excuse me -- and

20   that they were going to check into it is what they were

21   going to do.

22              MR. PRINGLE: If you need a break, we can take

23   a break.

24              MS. FORNEY: Do you want to take a minute?

25       A        Yes.

```
 1                  (Recess.)
 2    BY MR. PRINGLE:
 3        Q        Are you okay?
 4        A        Yes, I'm sorry.
 5        Q        Don't be sorry, that's okay. I say to you, I'm
 6    not comfortable asking you these questions, but I have ask
 7    these questions. Why are you upset about this?
 8        A        I guess it's just something I kind of wanted
 9    to put in the past.  I know -- I guess I was afraid that
10    when people would hear about it, my reputation would kind of
11    not sound so good.
12        Q        Were you upset because nothing happened to
13    Major Woodring?
14        A        I can't say that I was really upset that
15    nothing really happened to him.  As long as I didn't have to
16    necessarily be in contact with him anymore, that was fine.
17    Just the whole thing, because nothing like that had ever
18    happened to me before, so I really didn't know how to handle
19    it. It was just bothersome, I guess, just upset me, that's
20    all.
21        Q        Did you ask for somebody to take some action
22    against Major Woodring?
23        A        As far as?
24        Q        Did you ask anybody to take any kind of
25    disciplinary action against Major Woodring?
```

1    A        Not that I can remember.  I did not, no.

2    Q        Do you remember why you didn't ask for that?

3    A        I just -- like I said, again, as long as I

4    didn't have to have any contact with him, and probably

5    because, too, I went through the investigation which, like I

6    said, I have never been through anything like that before.

7    And I just didn't really want to have to go through anything

8    further as far as --  I don't want to say necessarily more

9    people knowing, but I just kind of wanted to put it behind

10   me.

11   Q        Do you remember having any discussions with

12   Ms. Spigelmyer concerning Barbara Wilhelm?

13   A        Like pertaining to anything in particular?

14   Q        Pertaining to her mental health.

15   A        You mean that I thought something or. . .

16   Q        Yes, that you thought something, that you saw

17   something, that Ms. Spigelmyer saw something or that Ms.

18   Spigelmyer said something?

19   A        The only thing I might have said to Sandy is I

20   know at times when Barbara would come into the office and we

21   would say something to her, she didn't answer us. So we

22   might have thought something was wrong.  But not to the

23   point --  not that I recall saying that she was mentally

24   ill, if that's what you're asking me.

25   Q        Do you remember having any discussions with

1    Captain Simmers regarding Barbara Wilhelm?

2        A        No, I can't recall that, no.

3        Q        Do you remember Ms. Spiglemyer responding to

4    you with respect to a discussion about Ms. Wilhelm's mental

5    health?

6        A        I don't want to speculate, because I can't

7    recall.

8        Q        Let me show you a document that has been

9    labeled Morris Exhibit 13. I would like you to take a look

10   at that, please. Let me know when you finish reading it.

11       A        Okay, I've have finished reading it.

12       Q        Do you recall the events described in that

13   document?

14       A        I recall speaking with Alice, not necessarily

15   asking everything that was mentioned here in paragraph two,

16   but I recall speaking with Alice about your client.

17       Q        What did you say to Alice?

18       A        I questioned Alice as to -- I said that -- I

19   probably questioned her about Ms. Wilhelm  because when she

20   would come into our office, we would say something to her

21   and she did not answer.

22                And I said we were concerned and it might have

23   been Sandy -- according to this it apparently was -- that

24   we were concerned because when she would come in she would

25   not answer us when we would talk to her.

1          And we were just concerned that something was

2     going on and didn't understand why she could not talk to us

3     but yet could seem to be out in the hallway talking with

4     other people laughing and having a good time.  We didn't

5     know if we did something and she would not respond to us

6     when she came in.  So I just questioned Alice if she knew if

7     something was wrong.  That's what I recall.

8          Q          Did you have a discussion with Captain Simmers

9     about Barbara Wilhelm?

10         A          I don't recall having that conversation with

11    Captain Simmers.

12         Q          Do you recall having any conversation with

13    Captain Simmers about Barbara Wilhelm?

14         A          No, I can't recall any.

15         Q          Do you recall any conversation with Ronald

16    Plesco about Barbara Wilhelm?

17         A          No.

18         Q          Did you discuss Barbara Wilhelm's behavior

19    with Colonel Evanko?

20         A          No, I did not.

21         Q          Did you discuss Ms. Wilhelm's behavior with

22    Lieutenant Colonel Coury?

23         A          No, I did not.

24         Q          Did you have any discussions with Colonel

25    Evanko or Lieutenant Colonel Coury about Barbara Wilhelm?

15

1      A       No, I did not.

2      Q       Based on your observations, did it appear that

3 Captain Simmers was a friend of Lieutenant Colonel Coury?

4      A       You mean observations in the office?

5      Q       Yes.

6      A       He would talk to Colonel Coury like the rest

7 of us.  I consider myself a friend also.  So I would say,

8 yes, I consider him a friend of Colonel Coury.

9      Q       Did you consider them to have a friendship

10 closer than a work relationship?

11      A       Could you like clarify that?

12      Q       There are people in an office where you are

13 friendly with people that you work with.

14      A       Right.

15      Q       And there are people that you work with who

16 you have a relationship beyond a workplace relationship and

17 you have a closer relationship --  closer friendship is what

18 I'm talking about.  Did you observe that the nature of the

19 friendship between Lieutenant Colonel Coury and Captain

20 Simmers was a friendship closer than a normal and regular

21 workplace friendship?

22      A       Do you mean like with conversations they had

23 or. . .

24      Q       I'm not --

25      A       I can't quite understand.

1   Q        I'm got getting to that yet -- and I'm glad

2   you're asking for clarification.  I think you are

3   anticipating my other question, how do you know.  I'm asking

4   you:  Was it your opinion that they appeared to be close

5   friends?

6   A        Possibly, yes.

7   Q        Why do you say possibly?

8   A        I consider myself close friends with some

9   people in there too.  And sometimes you might just say

10  things to them, have conversations maybe that --  not all

11  the time, but like I said, and hear some conversations maybe

12  before they would go into an office that would tend to make

13  you think that, yes, maybe they are friends also maybe

14  outside of here, in addition to just the business friendship

15  that they have.

16  Q        When you say you were friends with Lieutenant

17  Colonel Coury, would you say that you were just business

18  friends or would you -- as you described it -- or would

19  you say you were closer, that you had a relationship outside

20  the workplace?

21  A        No, I wouldn't say I had a relationship closer

22  like outside the workplace.

23  Q        I think you used the word business.

24  A        I had more of a business relationship.

25  Q        In describing the nature of the relationship

1   that you observed with respect to Lieutenant Colonel Coury

2   and Captain Simmers, would you describe that as a business

3   friendship or something more than a business friendship?

4        A        In here in the office, I would say more of a

5   business relationship friendship.

6        Q        Just the business?

7        A        There might have been times, it might have

8   been a little more to the personal side.  But for the most

9   that I have seen, I would say more of a business friendship.

10        Q        Did you have any observation regarding the

11   friendship, if any, between Captain Simmers and Colonel

12   Evanko?

13        A        Sometimes too like in joking or jovial type

14   things like that.  But for the most type, I would say more

15   so also on a business relationship friendship.

16        Q        How often would you see Captain Simmers in

17   your work area?  I'm specifically talking about the time

18   period in which Captain Simmers was the assistant director

19   for legislative affairs.

20        A        I can't necessarily give you a number.  I know

21   he would be over sometimes if we had questions.  But then

22   depending like where I sit -- where I sat --  where I sit

23   now and where I sat then, unless you're really paying

24   attention to who is coming in and out, I wouldn't see him,

25   you know what I mean.  I wouldn't be able to tell you

1    exactly how many times.  I have no idea.

2        Q        Did he visit on a daily basis?

3        A        If he had questions, he would be over, yes.

4    But I can't again tell you if -- I didn't have anything

5    marked down because I wasn't keeping track.

6        Q        I understand that and I told you earlier that

7    I would like you to answer my question and then explain.

8    The way you answered, that was a little confusing to me.

9        A        I'm sorry.

10       Q        Do you remember whether or not Captain Simmers

11   visited on a daily basis?

12       A        I would say, yes, he probably did.

13       Q        When he visited on a daily basis, would he

14   come in more than one time per day?

15       A        There were times, yes, I would say that he

16   might have done that.

17       Q        We are talking about with respect to the

18   visit, we are talking about the time period in which Captain

19   Simmers was working in the legislative affairs office.

20       A        Yes.

21       Q        Did you ever know what the subject of the

22   discussions were?

23       A        No.

24       Q        Did you ever notice that Captain Simmers came

25   over just to visit, not for business purposes?

1     A      I can't recall that.

2     Q      We are talking about visiting Lieutenant

3 Colonel Coury, correct?

4     A      Yes.  I can't recall him just coming to visit

5 for the sake of just being there.

6     Q      Do you know what the subject of any

7 discussions were?

8     A      No, I do not.

9     Q      Did Captain Simmers like to joke with you?

10    A      Yes.

11    Q      Did you ever hear Captain Simmers make any

12 remarks that -- sexual kind of remarks, flirtatious or

13 sexual kind of remarks?

14    A      Toward?

15    Q      Toward any of the women in the office?

16    A      Yes.

17    Q      What were the nature of those comments?

18    A      I can't recall exactly what.  I know they were

19 in like a joking-type atmosphere.  But I can't recall

20 exactly what they were.

21    Q      Did he direct any of those comments toward

22 you?

23    A      He could have, I can't recall that either.

24    Q      This is something he did on a regular basis?

25    A      He jokes on a regular basis.

1      Q        Did he make these kind of comments on a
2  regular basis?
3      A        I won't say regular basis, no.
4      Q        Did you or anyone in the office discuss the
5  kind of sexual flirtatious remarks that Captain Simmers
6  made?
7      A        Would you explain?
8      Q        Did you make comments, let's say, Captain
9  Simmers came in and made a joke that had sexual connotations
10 to it and you left the office. Were there times when you and
11 some other women -- or some other men and women -- might
12 have discussed the appropriateness of the jokes?
13     A        I can't recall doing that with anybody.
14     Q        Do you remember whether or not you found any
15 of the jokes or statements made by Captain Simmers that were
16 flirtatious or sexual, did you ever find any of that
17 offensive, personally?
18     A        I didn't.
19     Q        Do you know whether anybody in the office
20 found those statements offensive?
21     A        No one said anything to me.
22     Q        Did he ever flirt with you, Captain Simmers?
23     A        Yes.
24     Q        What was your reaction to his flirting?
25     A        That also was done --  I took it in a

1    joking-type atmosphere.

2        Q        It was not offensive to you?

3        A        No.

4        Q        Did you observe him flirting with other women

5    in the office?

6        A        Tell me exactly -- like flirting, how do you

7    mean just... Just being there, having conversations with us

8    and maybe (Indicating) I have no idea exactly what. . .

9        Q        You're saying you don't know when somebody is

10   flirting with you?

11       A        I do, but some people have different terms.

12       Q        I'm asking you what you thought.

13       A        I would say, yes, he flirted then with us in

14   the office.

15       Q        He flirted with you and other women in the

16   office?

17       A        Yes.

18       Q        Did you know Lieutenant Colonel Coury was

19   interested in antiques?

20       A        Yes.

21       Q        How do you know that?

22       A        He had mentioned that to me in one

23   conversation.

24       Q        What did he say?

25       A        Just that I knew he bought them, he would buy

22

1    antiques, he and Major Regan would fix them, they would buy

2    them and fix them and sell them, from what I understand.

3         Q          Do you know whether or not Captain Simmers

4    participated in that buying and fixing and selling?

5         A          I can't recall.

6         Q          Do you have any knowledge of whether or not

7    Captain Simmers and Lieutenant Colonel Coury at any time

8    lived together?

9         A          No, that I do not know.

10        Q          In May of 2000, Barbara Wilhelm was

11   dismissed.   Were you aware of that?

12        A          After it happened I was an aware.

13        Q          You didn't have any advance notice of it?

14        A          No.

15                   (Document marked as Balsbaugh Exhibit Number

16   1.)

17   BY MR. PRINGLE:

18        Q          I have a document in front of you labeled

19   Balsbaugh 1.  But before I get to that, I want to ask you a

20   few questions. Do you have any -- in terms of doing your

21   day-to-day work -- do you deal with records of absence?

22        A          I do not, no.

23        Q          Do you deal with leaves of absence?

24        A          No, I do not.

25        Q          Requests for leaves of absence?

1     A        The only one I have to check is our

2     receptionist because I supervise her.

3     Q        Did you ever have a responsibility of dealing

4     with records of absence?

5     A        No, I never did. No.

6              MR. PRINGLE: Off the record.

7              (Discussion held off the record.)

8              MR. PRINGLE: I'm going to withdraw that

9     exhibit.

10    BY MR. PRINGLE:

11    Q        Do you know who is the custodian for the

12    records of absence for the legislative affairs office, who

13    handles their leaves of absence records?

14    A        I think they still submit their leave slips,

15    once they are signed, over to our receptionist for her to

16    mark them on the time and attendance records.

17             I know some people fill their own in, submit

18    them over to our receptionist.  And personnel actually is

19    the one that inputs all the ones for executive and

20    administrative offices.  We do not input the leave.

21             MR. PRINGLE: I have no further questions.

22

23                     CROSS-EXAMINATION

24

25    BY MS. FORNEY:

24

1      Q        Ms. Balsbaugh, I'm sorry, I'm going to have to

2  ask you some questions about the incident with Major

3  Woodring.  During your testimony I think you mentioned that

4  Colonel March had a conversation with you after the event

5  that you described happened. Do you remember that

6  conversation?

7      A        I remember bits and pieces.

8      Q        Would you tell me what bits and pieces you

9  remember?

10     A        I remember him questioning if I had wanted to

11 have him -- or wanted to take any further -- charge him.

12 And I had said that I had not wanted to. I knew that he was

13 in -- really not to have any contact either like with me

14 that I wouldn't have to run into him.

15     Q        Meaning Major Woodring?

16     A        Major Woodring.

17     Q        Do you remember anything else about the

18 conversation with Colonel March?

19     A        No, I can't really recall.

20     Q        You mentioned that you went through an

21 investigation. What did you mean by that?

22     A        After talking with Colonel Evanko and Colonel

23 Westcott, they said that they would have an investigation

24 done on this incident.  And Major Doutt was the one actually

25 assigned to do the investigation.  And she had interviewed

1     me.  And that's the investigation that was done.

2        Q       Was there anything that bothered you about the

3     investigation or that upset you about the investigation?

4        A       As far as -- I don't quite understand.

5        Q       The way it was conducted?

6        A       No, no. She --  they felt that having a woman

7     do the investigation with me would put me at a little more

8     at ease, if you want to say, rather than have a man do the

9     investigation.  That's why they had chosen her.

10        Q       How do you know that?

11        A       I think Colonel Westcott was the one that had

12     mentioned that to me that they would have Major Doutt do

13     that so I would feel a little more comfortable speaking with

14     her.

15        Q       During your testimony I think you said you

16     went through an investigation and you didn't want to go

17     through more or something like. My question to you is:  Was

18     there anything about the investigation that caused you not

19     to want to go through this?

20        A       Not really. I guess my thing was I just didn't

21     want to put myself --  the investigation was not bad the way

22     it was handled, but it was just kind of embarrassing to me

23     to have --

24        Q       Take your time.

25        A       To have something like that happen.  And I

1  guess that's why I just kind of wanted to just forget about

2  it.

3  Q        I'm not going to ask you any more questions

4  about that. In your testimony there was some discussion

5  about flirting and the definition of flirting.  Can you tell

6  me what you mean by flirting, what do you consider flirting?

7  A        It's kind of like -- I don't know how to

8  explain how I feel about that.  I guess joking around,

9  coming up and tapping you on the shoulder.  I just think

10  it's the joking around part and the conversation, I guess

11  that you have with someone. Different things that might be

12  said.  Mostly, I take it joking around coming up, you know,

13  (Indicating.) tapping you on the arm or things like that

14            MS. FORNEY: I don't have any more questions.

15

16                    REDIRECT EXAMINATION

17

18  BY MR. PRINGLE:

19  Q        Let's talk about the flirting first. You're

20  not saying merely joking around -- everybody that jokes

21  around is flirting with you?

22  A        No.

23  Q        You're saying the context of the conversation

24  is sort of sexual?

25  A        I guess, yes.

1    Q        That was a question.

2    A        Yes.

3    Q        When you say that Captain Simmers was

4  flirting, even though you accepted it as a joke, the content

5  of the joke --  the content of the touching that he might do

6  while he tells the joke was -- you understood to be sexual

7  in nature, is that correct?

8    A        The touching, I wouldn't take as sexual.

9  Maybe some of the joking.

10    Q        Let's talk about the flirting.  You mentioned

11  that people -- when you use the word flirting that someone

12  might touch you while they are flirting.  I understood that

13  you did not necessarily mean that they grabbed you in an

14  inappropriate manner?

15    A        Right.

16    Q        But the context of the joke -- in the context

17  of the joke -- which would be of a sexual nature and there

18  might be some touching -- not necessarily inappropriate

19  touching -- he might touch you on the shoulder, as you

20  said, but you understood all of that to be somewhat of a

21  sexual nature, is that correct?

22    A        Not all of it.

23    Q        What did you understand to be of a sexual

24  nature?

25    A        I would say some of the joking was.  But some

1 people just -- I would say some of the joking, yes, I would

2 take as sexual in nature and the flirting.

3     Q        We are talking about the behavior of Captain

4 Simmers?

5     A        Yes.

6     Q        I don't want you to describe the actual

7 incident, but I want to know what your reactions to it was,

8 the incident where Major Woodring grabbed you. Was this a

9 very serious matter to you, was it not a big deal to you?

10     A        The reason it was a big deal to me was because

11 prior to that he would come up and touch my clothing and his

12 thing was, this is nice material, what is that made out of.

13         And he did it repeatedly and it was really

14 starting to bother me.  So when that happened that day that

15 he touched my behind, I had had enough of it because prior

16 to that I had told him he'd better knock it off or he was

17 going to get in trouble. That's why I think that bothered me

18 so much because I was done with it.

19     Q        The prior touching you understood to be in a

20 sexual context?

21     A        No, his prior touching was bothering me.  It

22 was touching my clothing.  And, like I said, I just didn't

23 like it and I had told him he'd better stop.

24     Q        The touching you on that day, per se, was not

25 bothersome to you?

29

```
1        A        You mean Major Woodring?

2        Q        Yes.

3        A        Yes it was.

4        Q        I'm just asking that day?

5                 MS. FORNEY: What day are we talking about?

6    BY MR. PRINGLE:

7        Q        The day he grabbed you is the day I'm talking

8    about.

9        A        Yes, it had bothered me.

10       Q        If there had been no prior touching with him

11   grabbing you where he grabbed you, would that have been a

12   serious matter to you?

13       A        Yes, it would have bothered me even if he had

14   not been doing that prior to.

15       Q        On the day that that happened were you very

16   upset, were you slightly upset or not upset at all?

17       A        I was very upset.

18       Q        You're still upset about it?

19       A        Yes, yes, I am.

20                MR. PRINGLE: I have no further questions

21

22                    RECROSS-EXAMINATION

23

24   BY MS. FORNEY:

25       Q        I'm afraid I have one, but it's about
```

30

1    flirting.  Did you sometimes flirt back with Captain

2    Simmers?

3        A        Yes, I did.

4        Q        From your observation and your definition of

5    flirting, did you notice other women in the office flirting

6    back?

7        A        Yes.

8                 MS. FORNEY: I'm done.

9                 (The deposition was concluded at 10.47.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF PENNSYLVANIA    :
                                :  ss
 2    COUNTY OF DAUPHIN         :
 3
 4
 5              I, Virginia Loria, a Reporter Notary-Public,
 6    authorized to administer oaths within and for the
 7    Commonwealth of Pennsylvania and take depositions in the
 8    trial of causes, do hereby certify that the foregoing is the
 9    testimony of REBECCA BALSBAUGH.
10              I further certify that before the taking of
11    said deposition, the witness was duly sworn; that the
12    questions and answers were taken down stenographically by
13    the said reporter Virginia Loria, a Reporter Notary-Public,
14    approved and agreed to, and afterwards reduced to
15    typewriting under the direction of the said Reporter.
16              I further certify that the proceedings and
17    evidence contained fully and accurately in the notes by me
18    on the within deposition, and that this copy is a correct
19    transcript of the same.
20              In testimony whereof, I have hereunto
21    subscribed my hand this 5th day of April 2002.
22
23
24                              Virginia Loria, RPR
25    My commission expires:
      May 17, 2003
```

Tuesday, June 13, 2000
2:00 P.M.

**PA Human Relations Commission Use Only**

Docket No. _____

EEOC No. _____

Social Security No _____ / _____ / _____

PHRC can investigate complaints of discrimination based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization.

# IN-11 FORM  UNEQUAL PAY QUESTIONNAIRE

### Questionnaire on the incident you are complaining about.

Rev. 11-94

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name  BARBARA A. WILHELM

Address  1941 CLARKS VALLEY ROAD

City  DAUPHIN          State  PA      ZIP Code  17018

County  DAUPHIN    Telephone No. H (717) 921-8085  W (   )   N/A

May we call you at work?   Yes _____   No  N/A

Caution:   Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint. Bring pay stubs. W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name  PENNSYLVANIA STATE POLICE

Address  1800 ELMERTON AVENUE

City  HARRISBURG          State  PA      ZIP Code  17110

Type of Business  PUBLIC SERVICE / LAW ENFORCEMENT

County  DAUPHIN      Telephone No. (717) 783-5533

Number of employees who work at the organization named above. Please check one.

Less than 4 _____   15 to 100 _____   201 to 500 _____   Unknown _____

4 to 14 _____   101 to 200 _____   501 plus  X

**IN-11 FORM**          **Unequal Pay Questionnaire**          **(page 3)**

4.  List your relevant, previous experience and education.

Served as Police Bureau Director, Served as Operations Administrator Experienced in use of Computers for Research and Investigative. Worked with all Agencies under the Governor and Several Commissions.

5.  List all of the duties and responsibilities of your job that you can recall, and submit the company's written job description, if you have it.

Point of contact for General Assembly, Analytical work, Computer Automation of Material, Special computer projects Research, Review and interpret of Statute / Proposed Legislation

6.  List every other person who is doing the same job that you are doing, even if his/her job title is different and receives less pay than you do.  (Use the Continuation Page if needed.)

Name _____

Job Title/Dept. _____ **CLASS** _____

Date of Hire _____ Pay _____

Name _____

Job Title/Dept. _____ **CLASS** _____

Date of Hire _____ Pay _____

Name _____

Job Title/Dept. _____ **CLASS** _____

Date of Hire _____ Pay _____

7.  Is there a salary range for this job?

Yes  X       No _____

7a.  How many shifts are there? _____ N/A _____

7b.  Does the pay rate differ for each shift?

Yes _____   No  N/A

**IN-11 FORM**          **Unequal Pay Questionnaire**          **(page 5)**

12.  Are there any other factors or considerations, (for example: annual and merit increases, job seniority, etc.), that are considered in determining the pay scale of your job or the jobs of others in your company. Please explain.

_The Asst. Legislative Liaison position follows the_
_Legislative Liaison 3 classification (A3 Bargaining Unit Pay Grade_
_The Leg. Specialist 2 position is (A-3 Bargaining Unit Pay Grade 8)_

13.  Concerning your present job, have you ever received an award, special compliment, oral or written commendation for your performance? If so, please explain.

_I have received both verbal and_
_written compliments for duties performed._

14.  Specify what reprimands, warnings, probations or disciplines you received while on your present job. If such actions were in writing, please attach copies.

_N/A_

15.  Is there a union contract or document which tells how much employees are to be paid?

Yes ___X___          No _____

If so, please submit a copy of this union contract or document, if you have it.

16.  Did you talk to any company officials (including your supervisor) or any union officials (including you shop steward or committee person) about your receiving lower pay for equal work?

Yes ___X___          No _____

If you did, please list the name and title of each person you talked to, when you talked to him/her and what you and the person said to each other. BE SURE TO STATE THE REASONS YOU WERE GIVEN EXPLAINING YOUR LOWER RATE OF PAY.

Name _STANLEY BORKHOLDER_     Title _Personnel Analyst 3_

What was said? _Discussed my employee initiated reclassification_
_and duties being performed. (As staff Assistant to Leg. Liaison._

**IN-11 FORM**          **Unequal Pay Questionnaire**          **(page 7)**

22.    Have you filed a complaint about this matter with any other commission or agency?

Yes _____          No _X_

If so, please specify the commission or agency and the date you filed, to the best of your recollection.

Commission or Agency ___N / A_____

Date Complaint Filed _____N / A_____

Docket Number, If Known _____

23.    Have you taken any court action regarding this matter?

Yes _____          No _X_

If so, please specify in what court and the date you filed, to the best of your recollection.

Name of Court ___N / A_____

Date Action Filed ___N / A_____

City _____ County _____


If there are other facts you feel should be considered, record these on the last page of the questionnaire (Continuation Page).

## CONTINUATION PAGE

For use if additional pages are needed to answer any question(s). Indicate the question number that is being answered before each response below.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Tuesday, June 13, 2000, 2:00 p.m.                          Continuation Page
**Wilhelm, Barbara Ann**                   IN - 15 Form Harassment  Questionnaire

**I was harassed and treated differently by co-workers because of being a female. My co-workers were Captain Michael D. Simmers (male), Assistant Legislative Liaison and Ronald E. Plesco (male), Executive Policy Specialist 2.**

**Because of being a female, I was expected to perform duties outside of my job description.   The same expectations were not made of co-worker male employees.**

**December 20, 1998, I submitted memorandum to Stanley Burkholder, Personnel Analyst 3  addressing harassing communications being made by Captain Michael D. Simmers, Assistant Legislative Liaison regarding my position.  No response by the Department.**

**May 18, 1999, memorandum addressing harassment by co-workers.**

**May 24, 1999, I submitted correspondence on employee ethics.  No response by the Department.**

**June 21, 1999, I submitted correspondence to Corporal Garret L. Rain, Bureau of Professional Responsibility addressing harassment by Captain Michael D. Simmers, Assistant Legislative Liaison.  No response by Department.  The matter was never resolved.**

**July 12, 1999, Letter of correspondence addressing harassment, Re: the locking of my Interior Office Door. No response by the Department.**

**July 19, 1999, Letter of correspondence addressing the lack of accountability of male co-workers and the expectation that I should be responsible for knowing their whereabouts when individual are looking for them. I discussed this matter on several occasions with Major Morris prior to submitting the correspondence. I received no response by the Department.  The matter was never resolved.**

**September 13, 1999, Memorandum to the Bureau of Professional Responsibility during an "Inspection" of the Office addressing the hostile/harassing work environment.  I received no response from the Department.  The matter was never resolved.**

1

December 31, 1999,    Letter of correspondence addressing the unknown whereabouts of Ronald E. Plesco, Jr., Executive Policy Specialist 2 and Plesco's harassing response after being located.    I received no response by the Department.

January 3, 2000, Memorandum addressing the Systems and Process Review Division Report "Inspection" as informed by Major Morris, "I need to know that the Review was about me".    I received no response by the Department.    The matter was never resolved.

February 28, 2000, Electronic Mail prepared by Ronald E. Plesco, Jr., statement of a harassing nature.

February 29, 2000, all Legislative staff were required to attend a mandatory Conflict Resolution Session with Mr. Tom Moriarty, Director of Heath and Emergency Services, Shippensburg University.    When responding to my concerns regarding Legislative Office operations and the inability of Captain Simmers to perform the job and his shirking of duties on me, Moriarty did not communicate in a fair or impartial manner, rather he spoke demeaning to me and stated "I should not expect police officers to be academic". After explaining to Mr. Moriarty that Captain Simmers was incapable of accessing legislative material from the computer he responded, "that is why I was brought into the Office". Also, Mr. Moriarty continually reflected on the Commissioner having asked him to be here and do this for him.
I was informed by two Majors in the Department that Moriarty is a "buddy" of Lt. Colonel Tom Coury, Deputy Commissioner of Administration.

March 14, 2000, Memorandum from Major Ralph M. Periandi, Director Bureau of Criminal Investigation addressing the results of a Personnel Investigation filed on my behalf by Major Morris.  The Department failed to explain to me just what was investigated and provided no contact person for related questions.

Witnesses:

1.    Major James B. Hazen, Area I Headquarters, Troop H
8000 Bretz Drive
Harrisburg, Pennsylvania  17112
(717) 671-7520

Major Hazen will be able to provide information regarding Mr. Moriarty. Also, Major Hazen had informed me that Mr. Moriarty was a "buddy" of Lt. Colonel Thomas K. Coury, Deputy Commissioner of Administration.

2

2.     Major R. Dane Merryman, Director, Bureau of Research and Development
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110
(717) 783-9772

Major Merryman had informed me that Mr. Moriarty was a "buddy" of Lt. Colonel
Thomas K. Coury, Deputy Commissioner of Administration.


3.     Captain Darrell G. Ober, Director, Administration Division, Bureau of Liquor
Control Enforcement
3655 Vartan Way
Harrisburg, Pennsylvania  17110
(717) 540-7410

Captain Ober previously held the position of Director, Internal Affairs Division,
Bureau of Professional Responsibility.
Captain Ober can explain that it is not standard policy for the Department to
handle the March 14, 2000, correspondence to me in the manner in which it was
done. The correspondence was from Major Ralph M. Periandi, Director Bureau of
Criminal Investigation addressing the results of a Personnel Investigation filed on
my behalf by Major Morris.  The Department failed to explain to me just what was
investigated and provided no contact person for related questions.

3

Tuesday, June 13, 2000
2:00 P.M.

**PA Human Relations Commission Use Only**

| Docket No. _____ |
| EEOC No. _____ |
| Social Security No. _____ / _____ / _____ |

PHRC can investigate complaints of discrimination based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization.

# IN-15 FORM    HARASSMENT QUESTIONNAIRE
### Questionnaire on the incident you are complaining about.

Rev. 11-94

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name **BARBARA   A.   WILHELM**

Address **1941 CLARKS  VALLEY  ROAD**

City **DAUPHIN**                    State **PA**  ZIP Code **17018**

County **DAUPHIN**  Telephone No. H **(717) 921-8085**  W **( )   N/A**

May we call you at work?    Yes _____    No **N/A**

**Caution:**    Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint. Bring pay stubs, W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name **PENNSYLVANIA   STATE  POLICE.**

Address **1800  ELMERTON  AVENUE**

City **HARRISBURG**                    State **PA**  ZIP Code **17110**

Type of Business **PUBLIC SERVICE / LAW ENFORCEMENT**

County **DAUPHIN**    Telephone No. **(717) 783-5533**

Number of employees who work at the organization named above. Please check one.

Less than 4 _____    15 to 100 _____    201 to 500 _____    Unknown _____

4 to 14 _____    101 to 200 _____    501 plus **X**

**IN-15 FORM**          **Harassment Questionnaire**          **(page 3)**

4.    How is this person harassing you?  Please explain.

HARASSMENT IS VERBAL AND OPERATIONAL.  DUTIES REQUIRED TO
be LEARNED AND performed by SIMMERS (WHITE MALE) ARE SHIRKED
ON ME.  SIMMERS IAS ROUTINELY UNACCOUNTABLE REGARDING LEAVE USAGE
CREATING A DOUBLE STANDARD.

5.    How do the actions taken by the harasser against you differ from the actions your employer or your
co-workers normally would have taken in similar circumstances.

HARASSER, SIMMERS ACTIONS AGAINST ME OCCURRED IN
RESPONSE to the COMPLAINTS MADE TO COL. PAUL EVANKO, THE
BUREAU OF PERSONNEL AND BUREAU OF PROFESSIONAL RESPONSIBILITY.

6.    Did you complain to management about the harassment?

Yes    X          No _____

If yes, who was this person?

Name Col. PAUL J. EVANKO          **CLASS**    WHITE MALE

Title/Dept. Commissioner

6a.    What action was taken by management?

NONE.    No response to correspondence.

6b.    As a result of going to management with your complaint, did your work situation improve or get
worse?

Better _____          Worse    X

Please explain.  Col. PAUL EVANKO (WHITE MALE)  RETALIATED AGAINST
MY COMPLAINTS by Dismissing me.

7.    Are you a union member?

Yes _____          No    X

If yes, what is the name of your union?

**IN-15 FORM**             **Harassment Questionnaire**        **(page 5)**

If so, please specify in what court and the date you filed, to the best of your recollection.

Name of Court _____ N/A _____

Date Action Filed _____

City _____ County _____

If there are other facts you feel should be considered, record these on the last page of the questionnaire (Continuation Page).

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.

Barbara a. Willlm                 05/09/2000
_____    _____
Signature                            Date

1941 Chorks VAlhey Road
_____
Address

Dauphin PA 17018 (717) 921-8085
_____    _____
City, State and ZIP Code             Telephone Number

Tuesday, June 13, 2000, 2:00 p.m.
**Wilhelm, Barbara Ann**

Continuation Page
**IN - 14 Form Retaliation Questionnaire**

**The respondent retaliated against me by discharging me from the position of Legislative Specialist 2, Legislative Affairs Office, Pennsylvania State Police.**

**On Monday, May 1, 2000, at approximately 9:00 a.m. I was asked by Captain Jeffrey B. Miller, Director, Legislative Affairs Office to go with him to the Bureau of Personnel and meet with Linda M. Bonney, Director, Bureau of Personnel. At that time Linda Bonney informed me she had a letter of dismissal for me and by order of the Commissioner, the Department no longer needed my position.**

**The letter I received states I am dismissed effective the end of the business day. I was followed to my desk by a Bureau of Personnel employee for immediate collection of photo identification card and benefit cards. I collected my personal items and was escorted out of the building. I asked to remain the full day to get items organized and better brief the Director who was asking questions of me as I was collecting my items. I was informed that I had to leave now.**

**To my knowledge no individual previously employed by the respondent was given a dismissal letter due to "reorganization" and was escorted out of the building on the same day or intentionally not formally notified by the Department and given an opportunity to transfer to another position.**

**I believe that the reason given by the employer for the discharge was deceptive and instead done as retaliation to the correspondence that I sent which addressed the discrimination and harassment being received of which the Department continually failed to respond.**

*Tuesday, June 13, 2000*
*2:00 p.m.*

**PA Human Relations Commission Use Only**

Docket No. _____

EEOC No. _____

Social Security No. _____

PHRC can investigate complaints of discrimination based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization.

# IN-14 FORM   RETALIATION QUESTIONNAIRE
## Questionnaire on the incident you are complaining about.
Rev. 11-94

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name   BARBARA A. WILHELM

Address   1941 CLARKS VALLEY ROAD

City   DAUPHIN                State   PA    ZIP Code   17018

County   DAUPHIN   Telephone No. H (717) 921-8085   W: N/A

May we call you at work?   Yes _____   No   N/A

**Caution:**    Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint. Bring pay stubs, W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name   PENNSYLVANIA STATE POLICE

Address   1800 ELMERTON AVENUE

City   HARRISBURG                State   PA    ZIP Code   17110

Type of Business   PUBLIC SERVICE / LAW ENFORCEMENT

County   DAUPHIN   Telephone No. (717) 783-5533

Number of employees who work at the organization named above. Please check one.

Less than 4 _____     15 to 100 _____     201 to 500 _____     Unknown _____

4 to 14 _____     101 to 200 _____     501 plus   X

**IN-14 FORM**          **Retaliation Questionnaire**          **(page 3)**

3b.    Do you charge you were discriminated against because you cooperated in a complaint filed by another employee?

Yes _____    No  X

4.    What is the name of the person who filed a complaint in that investigation?

_____ N / A _____

4a.    What was the docket number of this person's complaint, if known?

Docket #  N / A

5.    Do you charge you were discriminated against because you opposed a discriminatory practice, but you did not file a complaint with the Commission?

Yes  X    No _____

5a.    What was the practice you opposed? _____

_____

5b.    When did you engage in opposition to a discriminatory practice?

JANUARY 3, 2000, MEMORANDUM DISCRIMINATORY PRACTICE COMPENSATION LEA

Describe exactly what you did to demonstrate opposition to this discrimination.

FORWARDED MEMORANDUM to COL PAUL J. EVANKO, COMMISSIONER (WHITE MALE) AND MAJOR VIRGINIA L. SMITH-ELLIOTT, EEO ON COMPENSATION LEAVE AND ASSIGNMENTS NOT BEING EQUITABLY DISTRIBUTED,

6.    What was the date of retaliation? MAY 1, 2000

7.    Describe in detail what action was taken against you. (Give name, **CLASS** of person(s) taking the action, each date the action was taken and what the action was.)

COLONEL PAUL J. EVANKO, COMMISSIONER (WHITE MALE) DISMISSED ME ON MAY 1, 2000.

_____

_____

_____

**IN-14 FORM**          **Retaliation Questionnaire**          **(page 5)**

When and What did this person do? _____

_____

What action was taken? _____

_____

Did those who were treated more favorably, refrain from opposing discriminatory practice?

Yes  _____          No  _____


Name _____

Job Title _____ CLASS _____

When and What did this person do? _____

_____

What action was taken? _____

_____

Did those who were treated more favorably, refrain from opposing discriminatory practice?

Yes  _____          No  _____


Name _____

Job Title _____ CLASS _____

When and What did this person do? _____

_____

What action was taken? _____

_____

Did those who were treated more favorably, refrain from opposing discriminatory practice?

Yes  _____          No  _____

**IN-14 FORM**            **Retaliation Questionnaire**          **(page 7)**

If yes, what kind of action has been taken and against which employees?

Employee _____

Action Taken _____

_____

Employee _____

Action Taken _____

_____

17.    Are you a union member?

Yes _____        No ___X___

If yes, what is the name of your union?

_____ N / A _____

Address _____

_____

Telephone Number __(     )_____   Business Agent _____

18.    Did you file a grievance regarding the above problem?

Yes _____        No ___X___

If so, attach a copy of the grievance.  Explain what step your grievance in now in.  Give both step number and letter, and the name and title of the union official dealing with your grievance.

_____

_____

_____

_____

19.    Are you a civil service employee?

Yes _____        No ___X___

## CONTINUATION PAGE

For use if additional pages are needed to answer any question(s).  Indicate the question number that is being answered before each response below.

Tuesday, June 13, 2000, 2:00 p.m.
Wilhelm, Barbara Ann

Continuation Page
IN - 11 Form Unequal Pay Questionnaire

That Colonel Paul J. Evanko, (male) Commissioner, Pennsylvania State Police was aware of and condoned the practice of discrimination of Unequal Pay based on my sex.

That Colonel Paul J. Evanko with intent to deny me an opportunity for Equal Pay repeatedly failed to respond to correspondence that I prepared which addressed this inequity. Specifically, that I as a Legislative Specialist 2 ($48,000) was performing duties at a higher level and with significantly more responsibility and required skills than that of Captain Simmers, (male) Assistant Legislative Liaison ($80,000) while not being equitably compensated. Also, in the absence of the Director, Major Morris, I was performing Director related duties. Upon the retirement of Major Morris on January 7th, I performed a substantial amount of the Director duties without being equitably compensated, until the date of my dismissal.

I submitted correspondence on several dates that specifically addressed the issue of inequity; however, in each instance the Department failed to respond. The correspondence was dated December 20, 1998, June 21, 1999, September 13, 1999, and January 3, 2000. Also, no action was taken to resolve the matter.

On January 12, 1998, I was appointed to the position of Legislative Specialist 1, Pay Range 7, A3 Bargaining Unit, Management in the Pennsylvania State Police Legislative Office. The position of Legislative Specialist was a newly created position in the Department.

Prior to my appointment, State Police enlisted staff members represented under the L1 Bargaining Unit performed many of the duties and responsibilities identified in my job description. Specifically, the Director, Major Morris, the Assistant Legislative Liaison, Captain Simmers and enlisted members within the State Police, Bureau of Research and Development, performed these duties.

Upon my appointment to the State Police Legislative Office, I began performing duties that had previously been performed by enlisted staff members, in addition to sharing duties that were being performed by enlisted staff members. In both instances, enlisted staff members were making a significantly higher salary.

I initially reported to the Assistant Legislative Liaison, Captain Michael D. Simmers. Captain Simmers reported to the Director, Legislative Liaison Major Richard D. A. Morris. Ronald E. Plesco, Executive Policy Specialist 2 reported to Major Morris. Major Morris reported to Colonel Paul J. Evanko, Commissioner.

1

October 15, 1998, I initiated an Employee Position Reclassification and request for a Reporting Relationship Change (to report directly to Major Morris, Director rather than Captain Simmers, Assistant Legislative Liaison). During this time, Major Morris stated to me that the Governor's Office commented as to why the Legislative Specialist position that had just been created, is already being reclassified. Major Morris stated to me that he informed the Governor's Office that he has a Captain that can't do anything.

December 20, 1998, I forwarded a memorandum to Stanley Burkholder, Personnel Analyst 3, Bureau of Personnel, State Police, based on his request that pertinent information be brought to his attention regarding the position of Legislative Specialist. Specifically, the memorandum requested a Classification Survey of all positions within the Legislative Office. I never received an official response to this memorandum.

Note: Major Morris stated to me when I submitted the memorandum to Stanley Burkholder, "you know the Commissioner will not do it, it would be too embarrassing to him with Simmers".

My reclassification was approved by the Department and Office of Administration and the Legislative Specialist 2 Specifications provides that the position is the "chief staff assistant to the agency Legislative Liaison".

January 25, 1999, my Job Description signed by Major Morris states Legislative Specialist 2 *provides guidance to the Assistant Legislative Liaison regarding modern office methods and techniques, to include, use of the personal computer, use of software, related peripherals; preparation of formal and informal correspondence, contents of correspondence, and interpretation of office operations.*

June 21, 1999, I prepared correspondence that was reviewed with Corporal Garret L. Rain, Internal Affairs Division, Central Section, Bureau of Professional Responsibility, State Police. The correspondence reiterates the I am routinely performing duties that are to be performed by the Assistant Legislative Liaison and again a Classification survey was requested. I never received an official response to this correspondence.

September 13, 1999, I forwarded and discussed correspondence with Lieutenant William A. Horgas, Commander, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility, State Police. Also in attendance were Sergeant Janet A. McNeal and Major Morris. I reiterated that I was routinely performing duties that are to be performed by the Assistant Legislative Liaison. Additionally, I reviewed the Class Specification of Legislative Liaison 3 and brought to their attention that the Assistant Legislative Liaison, Captain Simmers did not meet the required knowledge, skills and abilities. Major Morris had previously informed Complainant the Assistant Legislative Liaison position was

2

covered by the Legislative Liaison 3 specifications. I never received an official response to this correspondence.

January 7, 2000, Major Morris retires as Office Director and Colonel Evanko announces Captain Simmers, Assistant Legislative Liaison to be paid out-of-class as the Acting Director.  Because Captain Simmers does not have the necessary skills to perform the duties and responsibilities of the Director position, I am assigned many of the duties and responsibilities previously handled by the Office Director with no pay adjustment.

From January 7, 2000 – April 1, 2000, there is no titled Asst. Legislative position in the Office. Captain Simmers, Assistant Legislative Liaison is being paid out-of-class as the Director until March 17th. The new Assistant Legislative Liaison is not selected until April 1, 2000.  During that time, I am performing Director duties and Assistant Legislative Liaison duties with no pay adjustment.

March 3, 2000, I begin to provide on-the-job training to the newly selected Office Director, Captain Jeffrey B. Miller (male) and continue performing many of the duties and responsibilities previously handled by the Director position with no pay adjustment.  Also, I am not given an opportunity to apply for the Director position.

April 1, 2000, I begin to provide on-the-job training to the newly selected Assistant Legislative Liaison, Sergeant William J. McHale (male) with no pay adjustment.  Also, I was not given an opportunity to apply for the Assistant Legislative Liaison position.

Witnesses:

1. Major Richard D. A. Morris, former Director, Legislative Affairs Office, (Retired)
   130 Cambridge Drive Hershey, Pennsylvania 17033
   Home Telephone:  (717) 533-3493.

   Major Morris will be able to provide information and statements regarding the following:

-Colonel Paul J. Evanko, Commissioner was aware of the discriminatory treatment and supported the selective preferential treatment of Captain Simmers, specifically resulting in Captain Simmers not being required to develop the necessary skills to perform the duties and responsibilities of the Assistant Legislative Liaison position thus allowing Captain Simmers to shirk his responsibilities on me.

-That in the absence of Major Morris due to vacation leave, training conferences, etc… Captain Simmers, Asst. Legislative Liaison, by order of the Commissioner

3

was paid out-of-class as the Director; however, Captain Simmers was incapable of performing the duties and as a result, I performed many of the duties with no pay adjustment.

-In September 1999, the State Police Systems and Process Review Division, Central Section, Bureau of Professional Responsibility, conducted an "Inspection" of the Legislative Affairs Office. As a result, an Executive Summary Report was prepared regarding the results of the "Inspection". The Executive Summary Report dated October 7, 1999 was available for review by Major Morris prior to his retirement on January 7, 2000, the report was not made available for me to read until January 12, 2000. (The Commissioner asked that staff not make a photocopy of the report.)
When interviewed during the "Inspection", Major Morris had reported the following: that Captain Simmers did delegate a large portion of his work to me; that my position was overworked and I could not focus on my duties because of performing other duties; that he (Major Morris) could manage the Legislative Office with just me as the only staff member; and that he refused to prepare an Annual Employee Performance Evaluation on Captain Simmers.

-That Major Morris did prepare an Annual Employee Performance Evaluation on me. I was rated as "Outstanding" and reflected as a "vital and valued part of Office operations".

   2. **Stanley Burkholder, Personnel Analyst 3, Bureau of Personnel**
      **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
      **Office Telephone:  (717) 772-1283**

-Stanley Burkholder is a witness to the reclassification of which I forwarded correspondence to his attention, which was never responded to by the Department.

   3. **Captain Jeffrey B. Miller, Director, Legislative Affairs Office**
      **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
      **Office Telephone:  (717) 787-1426**

-Captain Miller is a witness to me providing on-the-job training to him and Sgt. William J. McHale, the newly selected Assistant Legislative Liaison with no pay adjustment.

   4. **Sergeant William J. McHale, Asst. Legislative Liaison, Legislative Affairs Office**
      **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
      **Office Telephone:  (717) 783-5566**

-Sgt. McHale is a witness to me providing on-the-job training to him and Captain Miller, newly selected Director to the Legislative Affairs Office with no pay adjustment.

5. Corporal Garret L. Rain, Internal Affairs Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4209

-Cpl. Rain is a witness to the June 21, 1999, correspondence to which the Department never responded.

-That discussion ensued during my meeting with Cpl. Rain, regarding Department not knowing where to place Captain Simmers, Assistant Legislative Liaison since enlisted members cannot be demoted.

6. Lieutenant William A. Horgas, Commander, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4213

-Lt. Horgas is a witness to the correspondence presented to him dated September 13, 1999, of which the Department never responded.

7. Sergeant Janet A. McNeal, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4215

-Sgt. McNeal is a witness to the correspondence presented to Lt. Horgas dated September 13, 1999, of which the Department never responded.

Tuesday, June 13, 2000, 2:00 p.m.                    Continuation Page
**Wilhelm, Barbara Ann**          IN - 8 Form Non-Promotion/Transfer Questionnaire

**That Colonel Paul J. Evanko, (male) Commissioner, Pennsylvania State Police was aware of and supported sexual discrimination against me by not responding to my correspondence dated December 20, 1998, June 21, 1999, September 13, 1999, and January 3, 2000, that the Legislative Specialist position was performing at a higher level with more responsibility than Captain Michael D. Simmers, (male), Assistant Legislative Liaison.  Also, no action was taken to resolve the matter.**

**Additionally, Colonel Paul J. Evanko, Commissioner was aware of and supported sexual discrimination against me by not giving me an opportunity to apply for the vacant Assistant Legislative Liaison position, for which I was the best qualified.**

**October 19, 1998, I was reclassified to a Legislative Specialist 2 position.  The Legislative Specialist 2 Class Specification provides that the position is the "chief staff assistant to the agency Legislative Liaison".**

**January 25, 1999, my Job Description was signed by Major Morris the job description provides that the Legislative Specialist 2 *provides guidance to the Assistant Legislative Liaison regarding modern office methods and techniques, to include, use of the personal computer, use of software, related peripherals; preparation of formal and informal correspondence, contents of correspondence, and interpretation of office operations.***

**Upon my appointment to the State Police Legislative Office, I began performing duties that had previously been performed by enlisted staff members, in addition to sharing duties that were being performed by enlisted staff members.**

**February 29, 2000, Captain Jeffrey B. Miller (male), newly appointed Director to the Legislative Affairs Office informed me that he told the Commissioner that he wants someone in the Assistant Legislative Liaison position that is capable of doing an analysis and using a computer. Captain Miller added that he thought, "The three of us would make a good team".**

**March 3, 2000, I begin providing on-the-job training to the newly selected Office Director, Captain Miller and continued performing many of the duties and responsibilities previously handled by the Director position.  Also, I was not given an opportunity to apply for the Director position.**

In addition to performing the Assistant Legislative Liaison duties, I also performed many of the duties that were the responsibility of the Director position when the Director, Major Morris was absent from the Office. Upon the retirement of Major Morris, my Director duties increased. Also, I continued to perform many of the Director duties after Captain Miller filled the Director position.

March 14, 2000, I met with Barbara L. Christie, Chief Counsel to discuss my interest in applying for the position of Assistant Legislative Liaison. My interest was based on the fact that I was already performing the duties of the Assistant Legislative Liaison, because Captain Simmers did not possess the required knowledge, skills, and abilities for to perform the duties of the position.

From the date of my appointment on January 12, 1998, until the dismissal date, May 1, 2000, I performed the duties of Assistant Legislative Liaison, due to Captain Simmers, Assistant Legislative Liaison not having the required skills to meet the Class Specifications of Legislative Liaison 3. According to Major Morris, Director, Legislative Affairs Office the Assistant Legislative Liaison position followed the Legislative Liaison 3 Class Specifications.

April 1, 2000, by the authority of Colonel Paul J. Evanko, Commissioner, Sgt. William J. McHale (male) was transferred to the Legislative Affairs Office to the position of Assistant Legislative Liaison. Sgt. William J. McHale was transferred out of the Bureau of Drug Law, from the position of Section Supervisor, Area VI Tactical Narcotic Team to the Legislative Affairs Office having no legislative related experience.

April 1, 2000, I begin providing on-the-job training to the newly selected Assistant Legislative Liaison, Sergeant William J. McHale I am requested by Captain Miller to train Sgt. McHale the way that I trained him and that he needs to know how to do everything that I do.


## Witnesses:


1. Major Richard D. A. Morris, former Director, Legislative Affairs Office, (Retired)
   130 Cambridge Drive Hershey, Pennsylvania 17033
   Home Telephone: (717) 533-3493.

   Major Morris will be able to provide information and statements regarding the following:

-Major Morris did not want Captain Simmers as the Assistant Legislative Liaison but was forced by Colonel Paul J. Evanko, Commissioner to take the employee as a staff member.

-Colonel Paul J. Evanko, Commissioner was aware of the discriminatory treatment and supported the selective preferential treatment of Captain Simmers, specifically resulting in Captain Simmers not being required to develop the necessary skills to perform the duties and responsibilities of the Assistant Legislative Liaison position thus allowing Captain Simmers to shirk his responsibilities on me.

-In September 1999, the State Police Systems and Process Review Division, Central Section, Bureau of Professional Responsibility, conducted an "Inspection" of the Legislative Affairs Office. As a result, an Executive Summary Report was prepared regarding the results of the "Inspection". The Executive Summary Report dated October 7, 1999 was available for review by Major Morris prior to his retirement on January 7, 2000,  The report was not made available for me to read until January 12, 2000.  (The Commissioner asked that staff not make a photocopy of the report.)
When interviewed during the "Inspection", Major Morris had reported the following: that Captain Simmers did delegate a large portion of his work to me; that my position was overworked and I could not focus on my duties because of performing other duties; that he (Major Morris) could manage the Legislative Office with just me as the only staff member; and that he refused to prepare an Annual Employee Performance Evaluation on Captain Simmers.

-Major Morris was unable to distribute meaningful assignments equitably among staff due to the lack of skills of Captain Simmers, Assistant Legislative Liaison.

-That Major Morris did prepare an Annual Employee Performance Evaluation on me. I was rated as "Outstanding" and reflected as a "vital and valued part of Office operations".


   2.  Stanley Burkholder, Personnel Analyst 3, Bureau of Personnel
      1800 Elmerton Avenue Harrisburg, Pennsylvania 17110
      Office Telephone:  (717) 772-1283

-Stanley Burkholder will be able to provide information regarding my reclassification and related correspondence dated December 20, 1998, that was forwarded to his attention, and was never responded to by the Department.

   3.  Captain Jeffrey B. Miller, Director, Legislative Affairs Office
      1800 Elmerton Avenue Harrisburg, Pennsylvania 17110
      Office Telephone:  (717) 787-1426

-Captain Miller is a witness to me providing on-the-job training to him and Sgt. William J. McHale, the newly selected Assistant Legislative Liaison.

4. Sergeant William J. McHale, Asst. Legislative Liaison, Legislative Affairs Office
   1800 Elmerton Avenue Harrisburg, Pennsylvania 17110
   Office Telephone: (717) 783-5566

-Sgt. McHale is a witness to me providing on-the-job training to him and Captain Miller, the newly selected Director to the Legislative Affairs Office.

-Sgt. McHale statement to me that he did not apply for the position of Assistant Legislative Liaison.

5. Corporal Garret L. Rain, Internal Affairs Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4209

-Cpl. Rain is a witness to the June 21, 1999, correspondence to which the Department never responded.

-That discussion ensued during my meeting with Cpl. Rain, regarding Department not knowing where to place Captain Simmers, Assistant Legislative Liaison since enlisted members cannot be demoted.

6. Lieutenant William A. Horgas, Commander, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4213

-Lt. Horgas is a witness to the correspondence presented to him dated September 13, 1999, of which the Department never responded.

7. Sergeant Janet A. McNeal, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility
   7820 Allentown Boulevard Harrisburg, Pennsylvania 17112
   Office Telephone: (717) 657-4215

-Sgt. McNeal is a witness to the correspondence presented to Lt. Horgas dated September 13, 1999, of which the Department never responded.

June 24, 1999, the Complainant submitted correspondence to Lt. Colonel Thomas K. Coury (male), Deputy Commissioner of Administration, for application to the Position of Department Disciplinary Officer.  On June 30, 1999, Complainant received correspondence from Col. Coury stating the position is considered a PSTA bargaining unit position.  The position was filled by Captain Robert B. Titler (male).

Tuesday, June 13, 2000, 2:00 p.m.                          Continuation Page
**Wilhelm, Barbara Ann**                    **IN - 5 Form Discharge Questionnaire**

**My discharge from the position of Legislative Specialist 2, Legislative Affairs Office, Pennsylvania State Police by Colonel Paul J. Evanko, (male) Commissioner, Pennsylvania State Police was sexual discrimination and retaliation.**

**On Monday, May 1, 2000, at approximately 9:00 a.m. I was asked by Captain Jeffrey B. Miller, Director, Legislative Affairs Office to go with him to the Bureau of Personnel and meet with Linda M. Bonney, Director, Bureau of Personnel. At that time Linda Bonney informed me she had a letter of dismissal for me and by order of the Commissioner, the Department no longer needed my position.**

**The letter I received states I am dismissed effective the end of the business day. I was followed to my desk by a Bureau of Personnel employee for immediate collection of photo identification card and benefit cards. I collected my personal items and was escorted out of the building. I asked to remain the full day to get items organized and better brief the Director who was asking questions of me as I was collecting my items. I was informed that I had to leave now.**

**To my knowledge no individual previously employed by the respondent was given a dismissal letter due to "reorganization" and was escorted out of the building on the same day or intentionally not formally notified by the Department and given an opportunity to transfer to another position.**

**I believe that the reason given by the employer for the discharge was deceptive and instead done as retaliation to the correspondence that I sent which addressed the discrimination and harassment being received of which the Department continually failed to respond.**

Tuesday, June 13, 2000
2:00 p.m.

**PA Human Relations Commission Use Only**

Docket No. _____

EEOC No. _____

Social Security No. _____ / _____ / _____

PHRC can investigate complaints of discrimination based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization.

# IN-5 FORM   DISCHARGE QUESTIONNAIRE

## Questionnaire on the incident you are complaining about.

Rev. 11-94

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name   BARBARA A. WILHELM

Address   1941 CLARKS VALLEY ROAD

City   DAUPHIN                    State   PA    ZIP Code   17018

County   DAUPHIN    Telephone No. H (717) 921-8085   W ( )   N/A

May we call you at work?    Yes _____    No   N/A

Caution:    Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint. Bring pay stubs, W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name   PENNSYLVANIA STATE POLICE.

Address   1800 ELMERTON AVENUE

City   HARRISBURG                 State   PA    ZIP Code   17110

Type of Business   PUBLIC SERVICE / LAW ENFORCEMENT

County   DAUPHIN    Telephone No.   (717) 783-5533

Number of employees who work at the organization named above. Please check one.

Less than 4 _____    15 to 100 _____    201 to 500 _____    Unknown _____

4 to 14 _____    101 to 200 _____    501 plus   X

**IN-5 FORM**          **Discharge Questionnaire**          **(page 3)**

4.      What was the date of your discharge? __MAY 1, 2000__

4a.     Were you a probationary employee when you were discharged?    Yes _____    No _X_

5.      Who recommended this discharge? _Colonel PAUL J. EVANKO, Commissioner of P_

        What is his/her job title and **CLASS (Race, Sex, Age, etc.)** _STATE POLICE Commissioner_

        _White / MALE /_

5a.     Who informed you of your discharge? _LINDA M. BONNEY_

        What is his/her job title and **CLASS (Race, Sex, Age, etc.)** _DIRECTOR, BUREAU OF PERSONNEL, P_

        _White / FEMALE /_

6.      What reasons were you given for his discharge? _REORGANIZATION OF the_
        _LegislAtive Affairs office._

        **Please submit a copy of any letters or notices from the company concerning this discharge.**

7.      What explanation for your performance or conduct did you give the employer? _N/A_

8.      To your knowledge, did the employer conduct any investigation which took into account your explanation.
                Yes _____    No _N/A_

        Explain, as best as you can, when the investigation occurred, the name(s) of the individuals who investigated the incident for the employer and any details you can.

**IN-5 FORM**　　　　　**Discharge Questionnaire**　　　（page 5）

13.　If the employer gave a reason for your discharge/demotion, can you name any employee who did the same thing or something worse who was not discharged/demoted?

Name _____ Class _____

Job/Dept. _____

What did the person do? _____

_____

_____

What discipline was given? _____

_____

14.　Has anyone else been treated the same as you?　Yes _____　No ✗
If so:

Name _____ Class _____

15.　If the reason given by your employer for your termination was related to reorganization for economic reasons, what is your objection to your employer's rationale?

_____

_____

16.　If the employer gave a reason for your termination related to reorganization, can you name any employee(s) who you felt should have been terminated before you?

(White Male) Name CAPTAIN Michael D. SIMERS　Class Asst Leg. LIAISON

Job/Dept. Leg. AFFAIRS OFFICE

Why should this person have been terminated before you? Employee SIMMERS did NOT possess the REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES of the position.

17.　Are you a union member?　Yes _____　No ✗　If so:

What is the name of your union? _____

Address? _____

City, State and ZIP Code? _____

Telephone Number? ( ____ ) _____ Business Agent (Rep.) _____

## CONTINUATION PAGE

For use if additional pages are needed to answer any question(s).  Indicate the question number that is being answered before each response below.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Tuesday, June 13, 2000, 2:00 p.m.
**Wilhelm, Barbara Ann**

Continuation Page
**IN - 00 Form Witness Information**

**Witnesses:**

1. **Major Richard D. A. Morris, former Director, Legislative Affairs Office, (Retired)**
   **130 Cambridge Drive Hershey, Pennsylvania 17033**
   **Home Telephone: (717) 533-3493.**

**Major Morris will be able to provide information and statements regarding the following:**

-Colonel Paul J. Evanko, Commissioner was aware of the discriminatory treatment and supported the selective preferential treatment of Captain Simmers, specifically resulting in Captain Simmers not being required to develop the necessary skills to perform the duties and responsibilities of the Assistant Legislative Liaison position thus allowing Captain Simmers to shirk his responsibilities on me.

-That in the absence of Major Morris due to vacation leave, training conferences, etc… Captain Simmers, Asst. Legislative Liaison, by order of the Commissioner was paid out-of-class as the Director; however, Captain Simmers was incapable of performing the duties and as a result, I performed many of the duties with no pay adjustment.

-In September 1999, the State Police Systems and Process Review Division, Central Section, Bureau of Professional Responsibility, conducted an "Inspection" of the Legislative Affairs Office. As a result, an Executive Summary Report was prepared regarding the results of the "Inspection". The Executive Summary Report dated October 7, 1999 was available for review by Major Morris prior to his retirement on January 7, 2000, the report was not made available for me to read until January 12, 2000.  (The Commissioner asked that staff not make a photocopy of the report.)
When interviewed during the "Inspection", Major Morris had reported the following: that Captain Simmers did delegate a large portion of his work to me; that my position was overworked and I could not focus on my duties because of performing other duties; that he (Major Morris) could manage the Legislative Office with just me as the only staff member; and that he refused to prepare an Annual Employee Performance Evaluation on Captain Simmers.

-That Major Morris did prepare an Annual Employee Performance Evaluation on me. I was rated as "Outstanding" and reflected as a "vital and valued part of Office operations".

2. **Stanley Burkholder, Personnel Analyst 3, Bureau of Personnel**
   **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
   **Office Telephone: (717) 772-1283**

-Stanley Burkholder is a witness to the reclassification of which I forwarded correspondence to his attention, which was never responded to by the Department.

3. **Captain Jeffrey B. Miller, Director, Legislative Affairs Office**
   **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
   **Office Telephone: (717) 787-1426**

-Captain Miller is a witness to me providing on-the-job training to him and Sgt. William J. McHale, the newly selected Assistant Legislative Liaison with no pay adjustment.

4. **Sergeant William J. McHale, Asst. Legislative Liaison, Legislative Affairs Office**
   **1800 Elmerton Avenue Harrisburg, Pennsylvania 17110**
   **Office Telephone: (717) 783-5566**

-Sgt. McHale is a witness to me providing on-the-job training to him and Captain Miller, newly selected Director to the Legislative Affairs Office with no pay adjustment.

5. **Corporal Garret L. Rain, Internal Affairs Division, Central Section, Bureau of Professional Responsibility**
   **7820 Allentown Boulevard Harrisburg, Pennsylvania 17112**
   **Office Telephone: (717) 657-4209**

-Cpl. Rain is a witness to the June 21, 1999, correspondence to which the Department never responded.

-That discussion ensued during my meeting with Cpl. Rain, regarding Department not knowing where to place Captain Simmers, Assistant Legislative Liaison since enlisted members cannot be demoted.

6. **Lieutenant William A. Horgas, Commander, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility**
   **7820 Allentown Boulevard Harrisburg, Pennsylvania 17112**
   **Office Telephone: (717) 657-4213**

-Lt. Horgas is a witness to the correspondence presented to him dated September 13, 1999, of which the Department never responded.

7. **Sergeant Janet A. McNeal, Systems and Process Review Division, Central Section, Bureau of Professional Responsibility**
   **7820 Allentown Boulevard Harrisburg, Pennsylvania 17112**
   **Office Telephone:  (717) 657-4215**

-Sgt. McNeal is a witness to the correspondence presented to Lt. Horgas dated September 13, 1999, of which the Department never responded.

Tuesday, June ●, 2000
2:00 p.m.

**PA Human Relations Commission Use Only**

Docket No. _____

EEOC No. _____

Social Security No. _____ / _____ / _____

PHRC can investigate complaints of discrimination based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization.

# IN-8 FORM NON-PROMOTION/TRANSFER QUESTIONNAIRE
## Questionnaire on the incident you are complaining about.

Rev. 11-94

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name BARBARA A WILHELM

Address 1941 CLARKS VALLEY ROAD

City DAUPHIN                  State PA    ZIP Code 17018

County DAUPHIN    Telephone No. H (717) 921-8085 W ( ) N/A

May we call you at work? Yes _____ No N/A

**Caution:**    Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint. Bring pay stubs, W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name PENNSYLVANIA STATE POLICE

Address 1800 ELMERTON AVENUE

City HARRISBURG                  State PA    ZIP Code 17110

Type of Business PUBLIC SERVICE / LAW ENFORCEMENT

County DAUPHIN    Telephone No. (717) 783-5533

Number of employees who work at the organization named above. Please check one.

Less than 4 _____    15 to 100 _____    201 to 500 _____    Unknown _____

4 to 14 _____    101 to 200 _____    501 plus __X__

**IN-8 FORM**        **Non-Promotion/Transfer Questionnaire**        **(page 3)**

5.    How did you apply?

_____ Letter                    _____ Bid Sheet

_____ Application               _____ Asking your Supervisor

__X__ Other, please explain. MARCH 2000, MET WITH
BARBARA CHRISTIE, CHIEF COUNSEL TO DISCUSS MY INTEREST
IN APPLYING FOR THE POSITION.

If you applied in writing and still have a copy of your application, please return it with this questionnaire.

6.    Was there more than one opening for the job?

Yes _____        No __X__

7.    What was your understanding of the requirements of each job for which you applied?

WAS NOT GIVEN OPPORTUNITY TO APPLY.

8.    If applicable, under what conditions and requirements can one transfer?  Please cite any applicable sections of the union contract or civil service procedures, and provide us with a copy of the section cited if you are able.

I WAS ALREADY PERFORMING THE DUTIES OF THE ASST.
LEG. LIAISON.  JOB DESCRIPTION SAYS " STAFF ASSISTANT TO
LEG. LIAISON ".

9.    Is there a written job description?  Please provide a copy if you are able.

LEGISLATIVE LIAISON 3  SPECIFICATIONS WERE
FOLLOWED ACCORDING TO MAYOR MORRIS.

10.    Were you interviewed?        Yes _____        No __X__

If so, describe the person(s) if the name(s) is not known. _____

_____

_____

Date of Interview _____        Job Title _____

**IN-8 FORM**      Non-Promotion/Transfer Questionnaire      (page 5)

If yes, what was the result? _____

_____

17. How were you notified that you were not selected or granted transfer? (Verbal, by letter, at the job, etc.). Describe and furnish the date of notice. _____N/A_____

_____

_____

18. What reasons were given to you for not being selected? ___NONE.___

_____

_____

19. What is your answer to the reason(s) given you for not being selected for the promotion or transfer? (If what was said was not true, explain what was inaccurate. If the reason was not a misstatement of facts, explain what it is that leads you to think it was not the real reason.) _____

_____

_____

_____

_____

20. Do you know who made the final decision not to promote or transfer you?

Yes __X__      No _____

Name _Colonel Paul J. Evanko_      Job Title _Commissioner_

CLASS _White Male._      Unit/Department _State Police._

21. Who received the job(s) for which you applied? If you do not know the person's full name, tell us whatever you can about the person that would help to identify him/her.

a.  Name _Sergeant William J. McHale_

CLASS _White Male_      Job Title _Asst. Leg. Liaison_

b.  Name _____

CLASS _____      Job Title _____

c.  Name _____

CLASS _____      Job Title _____

**IN-8 FORM**          Non-Promotion/Transfer Questionnaire          (page 7)

## PLEASE ANSWER QUESTIONS 25, 26 AND 27

## IF THEY ARE APPLICABLE TO YOUR SITUATION.

25.   How often were you evaluated by your employer? _Annual Performance Evaluation_

Who evaluated you the last time?

Name _Major Richard D.A. Morris, (Retired)_

Job Title _Director, Legislative Affairs Office_

Unit/Department _Pennsylvania State Police, Executive Offices._

CLASS _(White Male)_

26.   What was your evaluation rating?

Above Average __X__     Satisfactory _____     Unsatisfactory _____     Other _____

If Other, please explain. _____

_____

27.   Have you ever received warnings about violations of company rules or poor performance?

Yes _____     No __X__

If yes, please describe the warning/s. _____ N/A _____

_____

_____

Who gave the warning/s to you? _____ N/A _____

When were you given the warning/s? _____ N/A _____

Where they in writing?   Yes _____     No _____

What was the warning/s for? _____ N/A _____

_____

_____

**IN-8 FORM**      Non-Promotion/Transfer Questionnaire      (page 9)

30.   Have you previously been denied a transfer or promotion by the same employer?

Yes    X          No  _____

If yes, please give the dates for all earlier rejections.

June 1999. Submitted paperwork to Lt. Col. Coory (white

For position of Disciplinary Officer.

Who else applied for these earlier transfers or promotions?

Name _____  CLASS _____

Name _____  CLASS _____

Who was selected for these earlier transfers or promotions?

Name Captain Robert B. Titler _____  CLASS White Male

Name _____  CLASS _____

31.   Are you a union member?

Yes  _____     No  X

If yes, what is the name of your union?

_____ N/A _____

Address _____

Telephone Number __(____)_____  Business Agent _____

32.   Did you file a grievance regarding the above problem?

Yes  _____     No  X

If so, attach a copy of the grievance.  Explain what step your grievance is now in.  Give both step number and letter, and the name and title of the union official dealing with your grievance.

N/A _____

_____

_____

_____

**IN-8 FORM**          **Non-Promotion/Transfer Questionnaire**          **(page 11)**

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.

_Barbara A. Wood_                   05/09/2000
                Signature                                              Date

_1941 Clarks Valley Road_
                Address

_Dauphin PA   17018_          (717) 921-8085
        City, State and ZIP Code                    Telephone Number

# MANAGEMENT DIRECTIVE

**505.7 Amended**
**Revision No. 1**
Number

### COMMONWEALTH OF PENNSYLVANIA
### GOVERNOR'S OFFICE

Subject:

**Personnel Rules**

By Direction Of:

*Thomas G. Paese* (signature)

Thomas G. Paese, Secretary of Administration

Date:

**April 26, 1999**

---

Chapter 5.26 of the *Personnel Rules* states that service with an independent agency is to be used to establish a longevity date for employees who transfer from an independent agency to an agency under the Governor's jurisdiction with a break in service of less than **15 days.** This has been changed to read **less than six months.**

Please annotate a change to **Chapter 5.26, page 24,** last line, as follows:

. . . "less than 15 days."

to

. . . **"less than six months."**

This change will be reflected as a revision to the existing page of the *Personnel Rules* located on the Commonwealth's Intranet at:

**btb.state.pa.us**



EXHIBIT
Evanko 3
22702 SB

# MANAGEMENT DIRECTIVE

**505.7 Amended**
Number

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE

Subject:

**Personnel Rules**

By Direction Of:

*Thomas G. Paese*

Thomas G. Paese, Secretary of Administration

Date:

**February 24, 1998**

---

The *Personnel Rules* are issued by the Office of Administration and provide guidelines on Commonwealth personnel policies and procedures. This directive is to ensure Commonwealth personnel programs are administered consistently and in accordance with established requirements. In cases where a provision of an approved labor agreement is inconsistent with this directive, the labor agreement provision takes precedence. When a policy or rule of this directive requires further direction, refer to the Directives Management System. The *Personnel Rules* are to be used by all agencies under the Governor's jurisdiction.

The Independent Regulatory Review Commission (IRRC) approved a regulation to delete the remaining chapters of the *Personnel Rules, Chapter 23, General Provisions,* and *Chapter 30, Subchapter B, Leave With Pay,* from the *Pennsylvania Code.* All other chapters were rescinded by a previous resolution. Consequently, all future changes to the *Personnel Rules* regarding leave with pay will be approved by the Executive Board and published through the Directives Management System.

Since the *Personnel Rules* are no longer a regulation, all chapters have been renumbered. The former chapter numbers are listed on the revised Table of Contents after the chapter titles. All section numbers have been changed but marginal dots on the Table of Contents are listed only where titles have changed or new material has been added.

This amendment updates information on existing policies and procedures and incorporates changes to newly-numbered Chapters 1, 2, 3, 5, 8, 9, 11, 12, 13, 18, and 19.

Chapter 20, Commercial Driver's License Drug and Alcohol Testing and Licensing Program, has been added. Additionally, the following sections have been added:

(1) Sections 8.81 – 8.83, Paid Injury Leave.

(2) Sections 8.151 and 8.152, Injury Leave Without Pay.

(3) Section 13.33, Nepotism.

Marginal dots indicate newly-added or revised text.

This directive supersedes Management Directive 505.7 dated February 8, 1996, and Revision No. 1 dated August 2, 1996.

---

Distribution:    F

# TABLE OF CONTENTS

## CHAPTER 1.  DEFINITIONS (Formerly Chapter 23)

1.1.    Definitions. ................................................................................................................................. 1

## CHAPTER 2.  ORGANIZATION FOR PERSONNEL ADMINISTRATION (Formerly Chapter 24)

2.1.    Secretary of Administration. ................................................................................. 9
2.2.    Deputy Secretary for Employe Relations. ........................................................... 9
2.3.    Director of Personnel. ............................................................................................ 10
2.4.    Director of Labor Relations. ................................................................................. 11
2.5.    Director of Equal Employment Opportunity. ...................................................... 11
2.6.    Bureau of State Employment. ............................................................................... 12
2.7.    State Civil Service Commission. ........................................................................... 12
2.8.    Agency Heads. ......................................................................................................... 12
2.9.    Agency Personnel Officers. ................................................................................... 13
2.10.   Agency Managers and Supervisors. ...................................................................... 14

## CHAPTER 3.  EQUAL EMPLOYMENT OPPORTUNITY (Formerly Chapter 25)

3.1.    Equal Employment Opportunity Policy and Plans. ............................................. 15
3.2.    Disability-Related Policy and Program. ............................................................... 16

## CHAPTER 4.  LABOR RELATIONS (Formerly Chapter 26)

4.1.    Separability. ............................................................................................................ 17
4.2.    Employe Rights. ...................................................................................................... 17
4.3.    Act 111. ................................................................................................................... 17
4.4.    Discrimination Prohibited. .................................................................................... 17

## CHAPTER 5.  COMPENSATION (Formerly Chapter 27)

### Subchapter A.  PAY

PAY PLAN AND RULES. ................................................................................................. 20

5.1.    Legal Basis for Establishing the Pay Plan. ......................................................... 20
5.2.    Maintenance of Pay Plan. ...................................................................................... 20
5.3.    Other Pay Rates Authorized by Executive Board. .............................................. 20
5.4.    Pay Rules. ................................................................................................................ 20
5.5.    Exceptions to the Pay Rules. ................................................................................. 21

ENTRANCE AND REEMPLOYMENT PAY.

5.11.   Entrance and Reemployment Pay Matrix. ............................................................ 21
5.12.   Entrance Pay. .......................................................................................................... 21
5.13.   Reemployment From Resignation. ......................................................................... 22
5.14.   Reemployment From Furlough. .............................................................................. 22

**ANNUAL PERFORMANCE/INCREMENT DATES AND PAY INCREMENTS.** ............................................ 22

5.21.   Annual Performance/Increment Dates and Pay Increments. ........................................ 22
5.22.   Longevity Dates. ............................................................................ 23
5.23.   Effect of Military Leave on Annual Performance/Increment Dates and
        Longevity Dates. ............................................................................ 23
5.24.   Effect of Leave Without Pay on Annual Performance/Increment and
        Longevity Dates. ............................................................................ 23
5.25.   Effects of Termination and Reemployment on Annual Performance/Increment
        Dates and Longevity Dates. .................................................................. 23
5.26.   Effects of Service With an Independent Agency or With Another Branch of
        Government on Longevity Dates. .............................................................. 24
5.27.   Exceptional Pay Increases. .................................................................. 24


**PROMOTIONS, DEMOTIONS, AND    TRANSFERS/REASSIGNMENTS.** ........................................ 24

5.31.   Promotions. ................................................................................. 24
5.32.   Demotions. .................................................................................. 25
5.33.   Transfers. .................................................................................. 26


**WORKING OUT OF CLASS.** ........................................................................ 26

5.41.   Acting Head of Agency. ...................................................................... 26
5.42.   Temporary Reassignment. ..................................................................... 26


**CLASSIFICATION AND PAY AMENDMENTS.** ........................................................... 27

5.61.   Amendment to the Position Classification and Pay Plans. ..................................... 27


**OVERTIME.** .................................................................................... 27

5.71.   Applicability. .............................................................................. 27
5.72.   Computation of Overtime Hours. .............................................................. 27
5.73.   Approval of Overtime Work. .................................................................. 28
5.74.   Approval of Pay for Overtime Work. .......................................................... 28
5.75.   Overtime Rate of Pay. ....................................................................... 28
5.76.   Compensatory Time in Lieu of Overtime Pay. .................................................. 29


**EXTRA PAY.** ................................................................................... 29

5.81.   Dual Employment. ............................................................................ 29
5.82.   Shift Differential. ......................................................................... 29


**RESTITUTION OF OVERPAYMENTS.** ................................................................. 30

5.91.   Restitution of Overpayments. ................................................................ 30


**SUBSISTENCE OR MAINTENANCE.** .................................................................. 30

5.99.   Subsistence or Maintenance. ................................................................. 30

## Subchapter B.  BENEFITS

BENEFITS  ADMINISTRATION. ........................................................................ 33

5.101.  Benefits Policies. .................................................................................. 33
5.102.  Agency Responsibilities. ......................................................................... 33


HEALTH  INSURANCE. ................................................................................... 33

5.111.  Active Employe Health Insurance. ............................................................. 33
5.112.  Retired Employe Health Insurance. ............................................................ 34


HEALTH AND WELFARE TRUST FUNDS. ............................................................. 34

5.121.  General. .............................................................................................. 34
5.122.  Agency Responsibilities. ......................................................................... 34


LIFE  INSURANCE. ....................................................................................... 35

5.131.  General. .............................................................................................. 35
5.132.  Agency Responsibilities ........................................................................... 35


WORK-RELATED INJURY AND DISEASE. ............................................................. 35

5.141.  General. .............................................................................................. 35
5.142.  Workers' Compensation. .......................................................................... 35
5.143.  Paid and Unpaid Injury Leave. .................................................................. 36


UNEMPLOYMENT  COMPENSATION. ................................................................... 36

5.151.  General. .............................................................................................. 36
5.152.  Eligibility. ........................................................................................... 36
5.153.  Benefits. ............................................................................................. 36
5.154.  Appeal. ............................................................................................... 36
5.155.  Cost Containment. ................................................................................. 36


LIABILITY  COVERAGE. .................................................................................. 37

5.161.  General. .............................................................................................. 37
5.162.  Eligibility. ........................................................................................... 37
5.163.  Amount of Coverage. .............................................................................. 37
5.164.  Premiums. ........................................................................................... 37


RETIREMENT. .............................................................................................. 37

5.171.  General. .............................................................................................. 37


FAMILY CARE ACCOUNT PROGRAM. .................................................................. 37

5.181.  General. .............................................................................................. 37

CREDIT UNIONS. ................................................................................................................ 37

5.191.    General. ............................................................................................................... 37
5.192.    Authorized Credit Union Defined. ................................................................... 38
5.193.    Payroll Deduction Authorization. ..................................................................... 38


BLOOD DONOR PLANS. ...................................................................................................... 38

5.201.    General. ............................................................................................................... 38


DIRECT DEPOSIT OF PAY. ................................................................................................ 38

5.211.    General. ............................................................................................................... 38


DEFERRED COMPENSATION. ........................................................................................... 38

5.221.    General. ............................................................................................................... 38
5.222.    Responsibility. .................................................................................................... 38


EMPLOYE RECOGNITION. .................................................................................................. 39

5.231.    General. ............................................................................................................... 39

## CHAPTER 6.  POSITION CLASSIFICATION (Formerly Chapter 28)

6.1.    Position Classification Plan. ................................................................................ 40
6.2.    Class Standards. .................................................................................................... 40
6.3.    Amendment of the Position Classification Plan. .............................................. 40
6.4.    Classification of Positions. ................................................................................... 41
6.5.    Position Reviews and Maintenance of Job Descriptions. ............................... 41

## CHAPTER 7.  RECRUITMENT, APPLICATION, AND APPOINTMENT (Formerly Chapter 29)

### Subchapter A.  RECRUITMENT

7.1.    Purpose and Policy. ............................................................................................. 42
7.2.    Organizational Responsibilities. ......................................................................... 42

### Subchapter B.  APPLICATION AND APPOINTMENT

7.11.    General Requirements for Commonwealth Service. ....................................... 43
7.12.    Rejection of Applicants. ..................................................................................... 43
7.13.    Non-Civil Service Applications and Appointments. ....................................... 44
7.14.    Civil Service Applications and Appointments. ............................................... 44
7.15.    Reappointment of Annuitants. .......................................................................... 44
7.16.    Persons Having Adverse Interest. .................................................................... 44
7.17.    Identification, Employment, and Education Verification Checks. ............... 44
7.18.    Immigration, Reform, and Control Act (IRCA). ........................................... 44



# CHAPTER 8.  ATTENDANCE, HOLIDAYS, AND LEAVE (Formerly Chapter 30)

## Subchapter A.  ATTENDANCE AND HOLIDAYS

| | | |
|---|---|---|
| 8.1. | Office Hours. | 46 |
| 8.2. | Hours in Workweek. | 46 |
| 8.3. | Workday of Employes. | 47 |
| 8.4. | Labor Law. | 47 |
| 8.5. | Meal Periods and Rest Periods. | 47 |
| 8.6. | Alternate Work Schedule. | 48 |
| 8.7. | Office Closings. | 49 |
| 8.8. | Paid Holidays. | 49 |
| 8.9. | Special Holidays. | 49 |

## Subchapter B.  LEAVE WITH PAY

| | | |
|---|---|---|
| HOLIDAYS. | | 53 |
| 8.10. | Holidays. | 53 |
| | | |
| ANNUAL LEAVE. | | 54 |
| 8.11. | General. | 54 |
| 8.12. | Annual Leave Entitlement. | 55 |
| 8.13. | Periods Where Leave Service Credit is Earned. | 55 |
| 8.14. | Anticipated Annual Leave. | 56 |
| 8.15. | Transfer of Annual Leave Credits. | 56 |
| 8.16. | Scheduling and Carryover of Annual Leave. | 57 |
| 8.17. | Agency Heads and Members of Departmental Boards and Commissions – Annual Leave. | 57 |
| | | |
| SICK LEAVE. | | 58 |
| 8.21. | General. | 58 |
| 8.22. | Sick Leave Entitlement. | 58 |
| 8.23. | Reasons for Sick Leave. | 58 |
| 8.24. | Approval. | 59 |
| 8.25. | Anticipated Sick Leave. | 59 |
| 8.26. | Transfer of and Payment for Earned Unused Sick Leave. | 60 |
| 8.27. | Carryover. | 61 |
| 8.28. | Reemployment Within 12 Months. | 61 |
| 8.29. | Special Extension. | 61 |
| 8.30. | Agency Heads and Members of Departmental Boards and Commissions – Sick Leave. | 62 |
| | | |
| PERSONAL LEAVE. | | 63 |
| 8.31. | General. | 63 |
| 8.32. | Personal Leave Entitlement. | 63 |
| 8.33. | Anticipated Personal Leave. | 64 |
| 8.34. | Transfer of Personal Leave Credits. | 64 |
| 8.35. | Scheduling and Carryover of Personal Leave. | 64 |
| 8.36. | Agency Heads and Members of Departmental Boards and Commissions – Personal Leave. | 65 |

**ADMINISTRATIVE LEAVE.** ........................................................................................................... 65

   8.41.    Reasons for Administrative Leave. ......................................................................... 65


**CIVIL LEAVE.** ........................................................................................................................... 66

   8.51.    General. .................................................................................................................. 66
   8.52.    Jury Duty, Court, and Administrative Hearing Attendance. ................................... 66
   8.53.    Firefighting, Emergency Medical Technician, Emergency Management, Civil Air
           Patrol and Red Cross. ........................................................................................... 67


**EDUCATIONAL LEAVE WITH PAY.** .............................................................................................. 67

   8.61.    General. .................................................................................................................. 67


**MILITARY LEAVE WITH PAY.** ..................................................................................................... 68

   8.71.    Military Reserve. .................................................................................................... 68
   8.72.    Pennsylvania National Guard. ............................................................................... 68


• **PAID INJURY LEAVE.** ............................................................................................................ 69

•   8.81.    General. .................................................................................................................. 69
•   8.82.    Eligibility for Paid Injury Leave. ............................................................................ 69
•   8.83.    Paid Injury Leave Benefits. .................................................................................... 69


### Subchapter C.  LEAVE WITHOUT PAY

**PARENTAL LEAVE.** .................................................................................................................... 73

   8.101.   General. .................................................................................................................. 73
   8.102.   Granting and Approval of Leave. ........................................................................... 73
   8.103.   Reemployment. ...................................................................................................... 73
   8.104.   Annual, Personal, and Sick Leave. ........................................................................ 73
   8.105.   Guidelines. ............................................................................................................. 74


**FAMILY CARE LEAVE.** ............................................................................................................... 74

   8.111.   General. .................................................................................................................. 74
   8.112.   Granting and Approval of Leave. ........................................................................... 75
   8.113.   Reemployment. ...................................................................................................... 75
   8.114.   Annual and Personal Leave. .................................................................................. 75
   8.115.   Guidelines. ............................................................................................................. 75


**SICK LEAVE WITHOUT PAY.** ..................................................................................................... 75

   8.121.   General. .................................................................................................................. 75
   8.122.   Granting and Approval of Leave. ........................................................................... 76
   8.123.   Reemployment. ...................................................................................................... 76
   8.124.   Annual, Personal, and Sick Leave. ........................................................................ 76
   8.125.   Guidelines. ............................................................................................................. 76

MILITARY LEAVE WITHOUT PAY. ................................................................................ 77

| | | |
|---|---|---|
| 8.131. | General. | 77 |
| 8.132. | Granting, Duration, and Expiration. | 77 |
| 8.133. | Reemployment. | 78 |
| 8.134. | Retirement Rights. | 78 |
| 8.135. | Loss of Benefits. | 78 |
| 8.136. | Annual, Sick, and Personal Leave. | 78 |
| 8.137. | Physical Examination. | 78 |
| 8.138. | Guidelines for Benefits Continuation. | 78 |

REGULAR LEAVE WITHOUT PAY. ................................................................................ 79

| | | |
|---|---|---|
| 8.141. | Non-Civil Service Employes. | 79 |
| 8.142. | Civil Service Employes. | 79 |

INJURY LEAVE WITHOUT PAY. ................................................................................ 79

| | | |
|---|---|---|
| 8.151. | General. | 79 |
| 8.152. | Eligibility for Injury Leave Without Pay. | 79 |

MISCELLANEOUS LEAVE PROVISIONS. ....................................................................... 80

| | | |
|---|---|---|
| 8.161. | Agency Written Leave Management Policies. | 80 |
| 8.162. | Records and Reports. | 80 |
| 8.163. | Absence Without Leave. | 80 |
| 8.164. | Resignation Following Leave Without Pay. | 80 |

## CHAPTER 9.   EMPLOYE PERFORMANCE EVALUATION (Formerly Chapter 31)

### Subchapter A.  PERFORMANCE EVALUATION

| | | |
|---|---|---|
| 9.1. | Objectives. | 81 |
| 9.2. | Performance Evaluation Systems. | 82 |
| 9.3. | Standards of Performance. | 82 |
| 9.4. | Raters. | 82 |
| 9.5. | Performance Evaluation Review. | 83 |
| 9.6. | Training and Development Needs. | 83 |
| 9.7. | Evaluations Tied to Furloughs. | 83 |

### Subchapter B.  PROBATIONARY PERIODS

| | | |
|---|---|---|
| 9.11. | Probationary Employes. | 84 |
| 9.12. | Granting of Employment Status. | 84 |
| 9.13. | Extension of Probationary Periods. | 85 |

## CHAPTER 10.  SENIOR MANAGEMENT SERVICE (Formerly Chapter 32)

10.1.    Senior Management Service Defined. ............................................................................... 86
10.2.    Assignment of Positions. ............................................................................... 86
10.3.    Criteria For Assignment of Positions. ............................................................................... 87
10.4.    Leaves of Absence For Classified Service Employes. ............................................................................... 87
10.5.    Removal of Employes. ............................................................................... 87
10.6.    Classification of Positions. ............................................................................... 87
10.7.    Compensation of Employes. ............................................................................... 88
10.8.    Audit of Positions. ............................................................................... 88
10.9.    Effects of Classified Service Furloughs While On Leave of Absence. ............................................................................... 88

## CHAPTER 11.  EMPLOYE TRAINING AND DEVELOPMENT (Formerly Chapter 33)

GENERAL  PROVISIONS. ............................................................................... 89

11.1.    General. ............................................................................... 89
11.2.    Policy. ............................................................................... 89


ORGANIZATIONAL  RESPONSIBILITIES. ............................................................................... 89

11.11.    Office of Administration. ............................................................................... 89
11.12.    Agencies. ............................................................................... 90

## CHAPTER 12.  PROMOTION, TRANSFER, AND DEMOTION (Formerly Chapter 35)

12.1.    Promotion. ............................................................................... 92
12.2.    Transfer. ............................................................................... 92
12.3.    Demotion. ............................................................................... 93
12.4.    Temporary  Reassignment. ............................................................................... 93
12.5.    Civil Service Employes ............................................................................... 93

## CHAPTER 13.  CONDUCT, EMPLOYE DISCIPLINE, CONFLICT OF INTEREST, AND PROHIBITED ACTIVITIES
### (Formerly Chapter 36)

GENERAL STANDARDS OF CONDUCT. ............................................................................... 95

13.1.    Personal  Conduct. ............................................................................... 95
13.2.    Unlawful or Illegal Conduct. ............................................................................... 95


EMPLOYE  DISCIPLINE. ............................................................................... 95

13.11.    Nature of Discipline. ............................................................................... 95
13.12.    Degree of Discipline. ............................................................................... 95
13.13.    Investigation. ............................................................................... 95
13.14.    Notice to Employe. ............................................................................... 95
13.15.    Timeliness. ............................................................................... 95

CONFLICT OF INTEREST. .......................................................................................................... 96

|       |                                                | 96 |
|-------|------------------------------------------------|----|
| 13.21. | Adverse Pecuniary Interest. ................. | 96 |
| 13.22. | Representing Others Before the Commonwealth. | 96 |
| 13.23. | Gifts and Favors. .............................. | 96 |
| 13.24. | Misuse of Information. ....................... | 96 |
| 13.25. | Dual Employment. ............................ | 96 |
| 13.26. | Supplementary Employment. ............... | 97 |
| 13.27. | Financial Disclosure. ....................... | 97 |
| 13.28. | Enforcement. .................................. | 97 |

PROHIBITED ACTIVITIES. ......................................................................................................... 97

|       |                                | 97 |
|-------|--------------------------------|----|
| 13.31. | Civil Service Employes. ...... | 97 |
| 13.32. | Discrimination. ................ | 97 |
| 13.33. | Nepotism. ...................... | 97 |

## CHAPTER 14.   SEPARATION (Formerly Chapter 37)

| 14.1. | Non-Civil Service Resignation. .............. | 98 |
|-------|-----------------------------------------------|----|
| 14.2. | Non-Civil Service Separation or Furlough. ... | 98 |
| 14.3. | Civil Service Separation or Furlough. ........ | 98 |
| 14.4. | Retirement. .................................... | 98 |
| 14.5. | Resignation in Lieu of Discharge. ........... | 98 |
| 14.6. | Exit Information Program. .................... | 99 |

## CHAPTER 15.   INTEGRATED PERSONNEL/PAYROLL SYSTEM (Formerly Chapter 38)

| 15.1. | General. ......................... | 100 |
|-------|---------------------------------|-----|
| 15.2. | Responsibility. ................. | 100 |
| 15.3. | Security. ........................ | 100 |
| 15.4. | Timeliness. ..................... | 101 |
| 15.5. | Data Retention. ................ | 101 |
| 15.6. | Complement Control. .......... | 101 |
| 15.7. | System Training ............... | 101 |

## CHAPTER 16.   PERSONNEL MANAGEMENT REVIEW (Formerly Chapter 39)

| 16.1. | General. .......................... | 102 |
|-------|----------------------------------|-----|
| 16.2. | Policy and Procedures. ......... | 102 |

## CHAPTER 17.   SMOKING IN COMMONWEALTH BUILDINGS AND FACILITIES
### (Formerly Chapter 40)

| 17.1. | General. .......................... | 103 |
|-------|----------------------------------|-----|
| 17.2. | Policy. ........................... | 103 |

## CHAPTER 18.  STATE EMPLOYE ASSISTANCE PROGRAM (SEAP) (Formerly Chapter 41)

18.1.    General. ............................................................................................................... 104
18.2.    Administration. ................................................................................................... 104

## CHAPTER 19.  COMMONWEALTH SUBSTANCE ABUSE POLICY (Formerly Chapter 42)

19.1.    General. ............................................................................................................... 105
19.2.    Administration. ................................................................................................... 105

## CHAPTER 20.  COMMERCIAL DRIVER'S LICENSE DRUG AND ALCOHOL TESTING AND LICENSING PROGRAM

20.1.    General. ............................................................................................................... 106
20.2.    Alcohol and Controlled Substances Regulations/Testing. ............................. 106
20.3.    Driver's Licensing Regulations. ....................................................................... 106
20.4.    Administration. ................................................................................................... 107

# CHAPTER 1.  DEFINITIONS

**Sec.**

**1.1.   Definitions.**

**1.1.   Definitions.**  The following words and terms, when used in this directive, have the following •
meanings unless the context clearly indicates otherwise:

*Absence without leave.*  Unauthorized absence from work.

*Act 111.*  Legislation, effective June 24, 1968, authorizing collective bargaining between police
officers and firefighters and their public employers and providing for compulsory arbitration to resolve
bargaining impasses in lieu of the right to strike.

*Act 195.*  Legislation, effective October 1970, establishing rights of public employes to organize and
bargain collectively through selected representatives; providing mediation and fact-finding for collective
bargaining impasses; defining the scope of collective bargaining; and permitting strikes under limited
conditions.

*Active pay status.*  The condition during which an employe is eligible for pay.

*Administrative Code.*  The Administrative Code of 1929 (71 P.S. §§51–720.13).

*Agency.*  An administrative department, board, commission, or other agency.

*Agency head.*  An official who is accountable for the operation of an agency or is appointed by the
Governor as Secretary of Administration, Secretary of the Budget, or a member of the Governor's senior
staff.

*Alternate work schedule (AWS).*  An agency and Office of Administration approved work schedule •
that permits employes to work preestablished additional hours (beyond the regular 7.5 or 8.0 hours per •
day) on certain workdays during a cycle period (e.g., week, pay period, month) in order to accumulate a
preestablished day or part of a day off during that cycle. •

*Annual performance/increment date.*  The annual performance/increment date of an employe
shall be one year from the date of appointment.  Thereafter, the annual performance/increment date
shall be one year from the month of the most recently scheduled annual (not probationary) performance
evaluation or, for those employes eligible for annual increments, one year from the month of the most
recent annual increment.  Previously, this term was known as the "anniversary date."

*Appointment.*  The hiring of a person to perform designated duties in a Commonwealth agency in •
exchange for compensation.  It does not refer to employes who transferred from other state agencies, or •
individuals who are compensated through a contractual agreement. •

*At-will employment relationship.*  The right reserved by the Commonwealth, subject only to the
express terms of any applicable labor agreement or statute, to terminate an individual's employment at
any time for any reason or no reason except as prohibited by law.



**Benefits.** Services or goods given to a person by his or her employer or money given indirectly to a person by his or her employer. The term includes but is not limited to:

(I) Health insurance.

(II) Life insurance.

(III) Other insurances.

(Iv) State's share to retirement and social security.

(v) Health and welfare contributions.

**Break in employment.** A voluntary or involuntary interruption in an individual's employment status with the Commonwealth. A break in employment may be caused by such events as retirement, resignation, furlough, or involuntary separation. The term does not include leaves without pay of any kind, legal strike absences, suspensions, or transfers regardless of their duration.

**Civil Service positions.** Those positions which are included in the definition of the classified service under *Article 1, Section 3(d)* of the *Civil Service Act (71 P.S. §741.1 et seq.).*

**Class.** A group of positions sufficiently similar with respect to duties and responsibilities so that the same title and code, including parenthetical title and code, may be used to describe all positions included in the group and so that the positions may be treated alike for recruitment, selection, pay, and other personnel purposes.

**Class standard (or class specification).** A written description of a class which defines and describes representative duties and responsibilities and sets forth the experience and training which provides the knowledge, skills, and abilities essential to the performance of the work of the class.

**Classification.** The assignment of a position to one of the classes in the classification plan.

**Collective Bargaining Agreement.** A formal agreement between the Commonwealth and an employe organization that establishes an equitable procedure for the resolution of differences between labor and management and establishes rates of pay, hours of work, and other conditions of employment.

**Commercial Drivers License Drug and Alcohol Testing and Licensing Program (CDL).** A program that requires employes whose job duties include operation of commercial motor vehicles to comply with federal regulations which require drug and alcohol testing.

**Compensation.** Pay and benefits granted directly or indirectly to employes.

**Condition of Continued Employment (COCE).** Occurs when an employe is required to successfully participate in counseling/treatment for personal problems through the State Employe Assistance Program (SEAP). A COCE must receive approval from the agency, Office of Administration, and union if the employe is covered by a collective bargaining agreement or memorandum of understanding.

**Confidential employe.** An individual who is employed in a central personnel agency or in the personnel office of an operating agency and has access to information subject to use by the Commonwealth in collective bargaining, or works in close continuing relationship with individuals associated with collective bargaining on behalf of an agency of the Commonwealth.

**Continuously scheduled employe.** An employe who is expected to be in an active pay status every pay period.

**Demotion.** Movement of an employe in a class to another class assigned to a pay range with a lower minimum hourly rate. The actual minimum hourly rate of the pay range assigned to a class shall be used to determine if an action is a demotion, even in those cases where an above minimum hiring rate has been approved for the class.

**Disability.** When this term is used relative to the *Americans With Disabilities Act,* it is defined as a physical or mental impairment that substantially limits or is regarded as limiting one or more major life activities of an individual.

**Discrimination.** Unequal treatment of a protected class of persons or the consequence of an action, policy, or practice resulting in unequal treatment of a particular protected class. Discrimination may involve a single act or it may involve a continuing policy or practice.

**Dismissal.** The involuntary termination of employment for reasons other than lack of funds or work.

**Dual employment.** The hiring of an employe already on a payroll or on contract with the Commonwealth, whether in a different agency, on a separate payroll or contract, or in a separate position in the same agency.

**Employe.** A person who has been hired by an agency subject to *The Administrative Code of 1929 (71 P.S. §§51–732)* and whose employment has not yet been terminated.

**Equal Employment Opportunity.** A system of employment practices within an employing organization under which individuals are not excluded from any participation, advancement or benefits because of their race, color, religious creed, ancestry, union membership, age, sex, sexual orientation, national origin, AIDS or HIV status, or disability.

**Essential functions.** Those functions of a position that an employe must be able to perform unaided or with the assistance of a reasonable accommodation.

**Evaluation period.** The period of time since the last regular scheduled performance evaluation took place.

**Excluded positions.** All positions in the following categories are excluded from the provisions of this directive unless explicitly provided otherwise:

    (I)   Officers and all other positions of state agencies not under the Governor's jurisdiction.

    (II)  Members of boards and commissions and heads of departments appointed by the Governor.

    (III) Patient employes and inmate help at state institutions.

    (Iv)  Crew leaders and crew members of the Pennsylvania Conservation Corps.

**Exempt employe.** An employe in a position or a classification that has been identified as being exempt from the overtime provisions of the *Fair Labor Standards Act.*

**First-level supervisor.** An employe who functions as a supervisor in the lowest level of supervision not supervising other supervisors.

**Flex-time.** An agency and Office of Administration approved work schedule wherein employes work five days per week, 7.5 or 8.0 hours per day, but may vary their beginning and ending work times on a daily basis around preestablished core hours.

**Full-time employe.** An employe who is expected to be in an active pay status 75 or 80 hours every pay period, depending upon the pay schedule, and all agency heads. The use of this term does not change or alter in any way the at-will employment relationship between the Commonwealth and its employes.

**Furlough.** The removal of an employe from his or her position due to lack of work or funds or for other operational reasons.

**Furloughee.** An employe who is removed from his or her position because of lack of work or funds or for other operational reasons and who meets one of the following criteria:

    (I)  Is on a furlough recall list as prescribed in the *Civil Service Act* or the appropriate labor agreement.

    (II)  If not subject to the recall provisions of a labor agreement, has been furloughed within the past 36 months.

**Inactive pay status.** The condition during which an employe is not eligible for pay.

**Integrated Personnel/Payroll System (IPPS).** Formerly known as the Personnel Management System and as the Commonwealth Payroll System. An integrated computerized data system where the personnel and payroll records of each employe and position in state government are maintained.

**Interim evaluation.** An evaluation which takes place between regular scheduled evaluations.

**Intermittently scheduled employe.** An employe who is expected not to be in an active pay status every pay period.

**Irregular work hours.** Uncertain number or times of work hours from pay period to pay period.

**Leave.** Absence from work, with or without compensation, for an authorized purpose.

**Limited term position.** A position that has a specified date of expiration, regardless of duration.

**Longevity date.** The month and year an employe, paid in accordance with the Standard Pay Schedule or another schedule based on the Standard Pay Schedule, becomes eligible for a longevity increment.

**Management level employe.** An individual who is involved directly in the determination of policy or who responsibly directs the implementation of policy. The term includes all employes above the first level of supervision.

**Meet and discuss.** The obligation of the Commonwealth to meet at reasonable times and discuss recommendations submitted by representatives of Commonwealth employes, provided that any decisions or determinations on matters so discussed shall remain with the Commonwealth and be deemed final on any issue or issues raised.

**Memorandum of Understanding.** A nonbinding understanding between the Commonwealth and an employe organization which represents first level supervisory employes that establishes an equitable procedure for the resolution of differences between labor and management and establishes rates of pay, hours of work, and other conditions of employment.

**Non-Civil Service positions.** Those positions in agencies under the Governor's jurisdiction other than Civil Service positions.

**Nonexempt employe.** An employe in a position or a classification which has been determined to be eligible for overtime under the provisions of the *Fair Labor Standards Act*.

**Oral reprimand.** To warn an employe orally that some action or lack of action or performance on the employe's part is unacceptable and that repetition will result in further disciplinary action.

**Overall evaluation.** An average performance rating consistent with all individual factor ratings.

**Overtime work.** Work performed by an employe in excess of a regular full-time work schedule.

**Part-time employe.** An employe who is expected to be in an active pay status fewer than 75 or 80 hours in a pay period, depending upon the pay schedule. The use of this term does not change or alter in any way the at-will employment relationship between the Commonwealth and its employes.

**Pay.** Money given directly to a person by his or her employer for services rendered. The term includes but is not limited to salaries, wages, overtime, shift differential, call time, standby time, bonuses, and money in lieu of benefits.

**Pay Plan.** The plan set forth in *Manual M525.2, Commonwealth Pay Plan*, which provides an appropriate pay schedule and pay rate for each class in the position classification plan.

**Per diem employe.** An employe who occupies a per diem position.

**Per diem position.** An authorized and individually identified group of duties and responsibilities assigned or delegated by competent authority requiring the full-time or part-time employment of one person for which the pay is based on a daily rate.

**Performance evaluation.** A periodic review and rating by the supervisor of how much, how well, and the manner in which an employe performed the duties and carried out the responsibilities of the position occupied during the evaluation period in accordance with performance standards and expectations.

**Performance factor.** An individual element of performance, such as communication or work results, which contributes to overall performance.

**Performance objective or expectation.** A statement of the most important work that can and should be accomplished within a specified time period in terms that are measurable.

**Performance standard.** A statement of how much, how well, and in what manner a particular task is to be done.

**Permanent employe.** An employe who is hired with the expectation of being in an active pay status for more than 12 consecutive months or who is hired with the expectation of being in an active pay status from 9 to 12 consecutive months inclusive and with the expectation of working on an annually recurring basis. The use of this term does not change or alter in any way the at-will employment relationship between the Commonwealth and its employes.

**Permanent position.** A position created without a position expiration date.

**Position.** An authorized and individually identified group of duties and responsibilities assigned or delegated by competent authority requiring the full-time or part-time employment of at least one person.

**Position classification plan.**  A plan consisting of a schedule of class titles arranged according to series of classes and occupational services as approved by the Executive Board on July 13, 1956, together with such amendments and revisions that are approved by the Executive Board.  The plan also consists of a class standard for each class.

**Promotion.**  Movement of an employe in a class to another class assigned to a pay range with a higher minimum hourly rate.  The actual minimum hourly rate of the pay range assigned to a class shall be used to determine if an action is a promotion, even in those cases where an above minimum hiring rate has been approved for the class.

**Rater.**  The immediate supervisor or a supervisor who is familiar with the work performance of employes and prepares the performance evaluation.

**Reasonable accommodation.**  Any modification or adjustment to a job, an employment practice, or the work environment that makes it possible for an individual with a disability to perform the essential functions of the job or receive equal benefits and privileges of employment.

**Reassignment.**  The movement of an employe from a position in a class to another position or classification assigned to a pay range with the same minimum hourly rate.  The actual minimum hourly rate of the pay ranges involved shall be used even in those cases where an above minimum hiring rate has been approved for a class.

**Reclassification.**  The reassignment of a position from one class to a different class to recognize a change in duties and responsibilities, to correct an error in the original assignment, or to be assigned to a new or revised and more appropriate classification.

      **(i)**  **Upward reclassification of a position.**  The movement of a position to a class assigned to a pay range with a higher minimum hourly rate.

      **(ii)**  **Downward reclassification of a position.**  The movement of a position to a class assigned to a pay range with a lower minimum hourly rate.

      **(iii)**  **Lateral reclassification of a position.**  The movement of a position to a pay range with the same minimum hourly rate.

For the purpose of determining whether an action is an upward, downward, or lateral reclassification, the actual minimum hourly rate of the pay ranges involved shall be used even in those cases where an above minimum hiring rate has been approved for a class or in those cases where the range is truncated.

**Recruitment.**  Active and aggressive efforts by the Commonwealth to locate and attract qualified applicants for employment in Commonwealth service.

**Regular work hours.**  The number and times of work hours are predictable from pay period to pay period.

**Resignation.**  The voluntary termination of employment.

**Retirement.**  The termination of employment followed by a continuing relationship with the State Employees' Retirement System based on eligibility criteria for certain benefits as stated in *71 Pa. C.S. Part XXV* (relating to retirement for state employes and officers).

**Reviewing officer.**  The individual, normally the rater's immediate supervisor, who reviews a performance evaluation.



*Salaried employe.* An employe who is paid for a regularly scheduled number of hours for a biweekly pay period.

*Salaried position.* An authorized and individually identified group of duties and responsibilities assigned or delegated by competent authority that require the full-time or part-time employment of at least one person on a regular scheduled basis for a period of time exceeding six months and is charged against the salaried complement for budgetary control purposes.

*Staggered work schedule.* An agency approved work schedule consisting of multiple five days per week, 7.5 or 8.0 hours per day work shifts (five out of seven days schedule), with various specified beginning work times and corresponding ending work times from which employes may be assigned or may request. Although different starting/ending times are available, the employe's starting/ending time does not vary from day to day.

*Standard work schedule.* A work schedule generally consisting of a single five days per week, 7.5 or 8.0 hours per day work shift (five out of seven days schedule), which conforms to the official operating hours of the agency as approved by the Executive Board. However, as permitted by contract, a standard work schedule also may consist of any 10 days in a preestablished 14 day schedule.

*State Employe Assistance Program (SEAP).* An evaluation and referral program servicing Commonwealth employes and their family members who may be experiencing problems with alcohol, drugs, and with emotional, family, financial, marital, or other personal problems.

*State Employe Assistance Program Central Coordinating Office (SEAP-CCO).* A private non-government agency that is under contract to provide and coordinate the delivery and coordination of SEAP evaluation and referral services.

*State Employe Assistance Program (SEAP) Coordinator.* A Commonwealth management employe, usually working in a personnel related position, who is responsible for the implementation of SEAP within the workplace.

*Supervisor.* An individual who has authority to appoint, assign, promote, transfer, suspend, dismiss, evaluate, reward, or discipline other employes; who has responsibility to direct other employes or adjust their complaints or grievances; or who can, to a substantial degree, effectively recommend such action or carry out such decisions, provided that the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment.

*Suspension.* The temporary termination of employment for disciplinary or investigative reasons.

*Temporary employe.* An employe who is hired with the expectation of being in an active pay status for less than 9 consecutive months or who is hired with the expectation of being in an active pay status from 9 to 12 consecutive months inclusive and without the expectation of working on an annually recurring basis. The use of this term does not change or alter in any way the at-will employment relationship between the Commonwealth and its employes.

*Temporary position.* A position created with a position expiration date.

*Terminate.* To end an agreement that provides compensation for a person's time by either the employe or employer.

*Termination.* A break in employment of more than 14 calendar days. The effective date of termination shall be the date the initial break in employment occurred.

*Transactions.* All actions affecting changes in the status of personnel or positions.



*Transfer.*  The movement of an employe from the jurisdiction of one appointing authority to another appointing authority.  A transfer may occur in conjunction with a reassignment, promotion, or demotion.

- *Turnover rate.*  The number of voluntary resignations and transfers out presented as a percent of
- the average number of active employes during a one year period.  Retirement should be calculated
- separately; all turnover rate information should be reported similar to the Governor's annual work force
- report.

*Underutilization.*  The condition of having fewer members of a specific race/sex group in a particular EEO occupational code than would reasonably be expected by their availability in the labor force.

*Wage employe.*  An employe who is paid on an hourly basis and whose hours must be reported each pay period.

*Wage position.*  An authorized and individually identified group of duties and responsibilities assigned or delegated by competent authority that require the full-time or part-time employment of one person on either:

    (I)  A regular schedule for a limited duration of time.

    (II)  An intermittent or irregular schedule without regard to the duration of the term of employment.

Wage positions are charged against the wage complement for budgetary control purposes.

*Written reprimand.*  To warn an employe, in writing, that some action or lack of action or performance on the employe's part is unacceptable and that repetition will result in further disciplinary action.

## CHAPTER 2. ORGANIZATION FOR PERSONNEL ADMINISTRATION

Sec.

2.1.    Secretary of Administration.
2.2.    Deputy Secretary for Employe Relations.
2.3.    Director of Personnel.
2.4.    Director of Labor Relations.
2.5.    Director of Equal Employment Opportunity.
2.6.    Bureau of State Employment.
2.7.    State Civil Service Commission.
2.8.    Agency Heads.
2.9.    Agency Personnel Officers
2.10.   Agency Managers and Supervisors.

### 2.1. Secretary of Administration.

The Secretary of Administration shall:

(1) Establish and maintain policies, rules, and regulations necessary for an effective and efficient system of personnel administration in conformity with all applicable federal and state equal employment and anti-discrimination laws and regulations.

(2) Integrate the personnel function into the broad management policy direction that is provided to agencies under the Governor's jurisdiction.

(3) Recommend to the Executive Board amendments to the Position Classification Plan needed to reflect changes in the nature and scope of work of positions in the Commonwealth service.

(4) Recommend to the Executive Board amendments to the Pay Plan and benefit programs needed to reflect changes in economic conditions and other factors affecting the recruitment and retention of competent employes.

(5) Establish policy and guidelines for the negotiation of statewide labor agreements.

(6) Authorize exceptions to the *Personnel Rules* where the application of the rules provides unreasonable results or where necessary in the resolution of disputes.

### 2.2. Deputy Secretary for Employe Relations.

The Deputy Secretary for Employe Relations shall:

(1) Coordinate the Commonwealth's human resource program and the various elements of the central personnel function.

(2) Coordinate a comprehensive management approach to collective bargaining.

(3) Ensure that the Commonwealth's human resource program and the central personnel function are responsive to the program goals and objectives of the Governor and the agencies under the Governor's jurisdiction.

(4) Establish policies, rules, and regulations that will result in a well planned, effective, and productive workforce and that will promote and maintain equity within the workforce.

## 2.3. Director of Personnel.

The Director of Personnel shall serve as head of the Bureau of Personnel, Office of Administration, and shall be responsible to the Deputy Secretary for Employe Relations. The Director shall:

(1) Conduct research and make surveys and forecasts needed to keep the Secretary of Administration continuously informed on the status of personnel management and administration in the Commonwealth.

(2) Maintain a continuous review of personnel policies and practices in the Commonwealth service and recommend to the Secretary of Administration necessary legislative or executive action to improve those policies and practices.

(3) Review the personnel management and administration activities of the operating agencies, recommend improvements, and monitor their implementation.

(4) Direct all staff work required in the preparation of amendments to and the maintenance of the position classification and pay plans and benefit programs.

(5) Maintain a record of all employes and positions in the Commonwealth service and develop adequate standards for the establishment and maintenance of personnel records in the operating agencies.

(6) Provide leadership to agencies in the application of sound principles of human resource management in matters of supervision, discipline, employe productivity and effectiveness, and work motivation.

(7) Assist agencies in developing systematic training programs for the purpose of improving employe performance and organizational effectiveness.

(8) Encourage and cooperate with administrative officials, employes, and employe organizations in developing employe health, recreation, and welfare programs which improve organizational productivity.

(9) Provide staff support and input for central labor relations bargaining activities in the Commonwealth service.

(10) Provide leadership to agencies in the application of workforce analysis and planning, in determining needs for staffing major program, occupational, or problem areas and in controlling complement levels.

(11) Assist agencies in organizing, staffing, and developing comprehensive personnel management programs.

(12) In cooperation with the Director of Labor Relations, provide direction and assistance to state agencies in the administration and implementation of labor agreements, including the administration of classification grievance procedures under such agreements.

(13) Provide guidance to agencies in the setting of work standards.

(14)   Coordinate the implementation of provisions of equal employment opportunity in all areas of personnel administration.

(15)   Provide leadership to agencies in the application of job safety such as the Right-to-Know and HIV/AIDS programs.

(16)   Coordinate the operation of the State Employe Assistance Program and the Commonwealth's Substance Abuse Program.

(17)   Respond to, develop, and implement new personnel and human resource initiatives based on direction from the Governor and federal or state law or regulation and on information received from monitoring and evaluating Commonwealth personnel management and administration.

## 2.4.   Director of Labor Relations.

The Director of Labor Relations shall serve as head of the Bureau of Labor Relations and shall be responsible to the Deputy Secretary for Employe Relations.   In addition, the Director shall:

(1)   Plan and direct all labor relations activities for the Commonwealth as the employer under the *Public Employe Relations Act of 1970* as it applies to employes under the Governor's jurisdiction, and under the *Policemen's and Firemen's Collective Bargaining Act of 1968*.

(2)   Determine the Commonwealth's position on the appropriateness of collective bargaining units proposed in petitions for election or certification submitted by state employe organizations.

(3)   Represent the Commonwealth at hearings of the Pennsylvania Labor Relations Board concerning election or certification petitions, unfair practice charges, and related labor relations matters.

(4)   Direct the negotiation of statewide labor agreements and discussions over memorandums of understanding with representatives of certified employe organizations; oversee and coordinate the negotiation of agreements on local issues in individual agencies and institutions.

(5)   In cooperation with the Bureau of Personnel, provide direction and assistance to state agencies in the interpretation, administration, and implementation of labor agreements, including the administration of grievance procedures under such agreements.

(6)   In cooperation with the Bureau of Personnel, provide staff resources for labor relations training of supervisory and management personnel.

(7)   Provide leadership in the development of labor relations policies in state agencies aimed at achieving effective working relationships between employes and management.

## 2.5.   Director of Equal Employment Opportunity.

The Director of Equal Employment Opportunity shall serve as head of the Bureau of Equal Employment Opportunity, Office of Administration, and shall be responsible to the Deputy Secretary for Employe Relations.   In addition, the Director shall:

(1)   Encourage and promote programs directed at ending discrimination against any employe or applicant for employment because of race, color, religious creed, ancestry, union membership, age, sex, sexual orientation, national origin, AIDS or HIV status, or disability.

(2)   Formulate Commonwealth-wide equal employment opportunity proposals for approval by the Secretary of Administration.

(3)   Review agency equal employment opportunity plans for consistency with Commonwealth policies.

(4)   Design and implement auditing and reporting systems to measure effectiveness of the Commonwealth's equal employment opportunity programs.

(5)   Supervise and oversee the Commonwealth-wide equal employment opportunity programs.

(6)   Work closely with the Bureau of Personnel, Bureau of Labor Relations, and state agencies to ensure that employment is free from discrimination.

## 2.6.  Bureau of State Employment.

The Director of the Bureau of State Employment shall be responsible to the Deputy Secretary for Employe Relations and shall:

(1)   Supervise the Temporary Clerical Pool (TCP) program, providing centralized temporary clerical staffing services to state agencies located in the capitol complex and surrounding areas.

(2)   Administer the TCP so that it acts as a recruiting resource for filling permanent clerical positions.

(3)   Recruit applicants for Commonwealth employment.

(4)   Test, when appropriate, and evaluate and investigate applicants for Non-Civil Service positions.

(5)   Refer qualified applicants to agency heads for consideration for appointment to Non-Civil Service positions.

(6)   Maintain a record of Non-Civil Service employes and positions in the Commonwealth service.

(7)   Coordinate placement of furloughees in accordance with labor agreements.

## 2.7.  State Civil Service Commission.

The State Civil Service Commission was established and is governed by the provisions of the *Civil Service Act (71 P.S. §741.1 et seq)*.  The Commission has the responsibility for administering the merit system of the Commonwealth in all agencies under the Governor's jurisdiction.  The services provided by the Commission, through its Executive Director, shall include those specified in *Title 4, Pennsylvania Code, Part IV*, including the recruitment and certification of eligible job candidates for Civil Service positions and the hearing of appeals by individuals employed in positions covered by Civil Service.

## 2.8.  Agency Heads.

It shall be the responsibility of agency heads, their subordinates, and agency personnel officers to implement within their agency the personnel policies and rules of the Governor, the Executive Board, the Secretary of Administration, and the State Civil Service Commission.  In addition to these responsibilities, agency heads shall:

(1)   Develop the organizational structure and exercise the powers and perform the duties by law vested in and imposed upon the agency.

(2)   Inform and advise the Secretary of Administration on personnel matters.

(3)   Ensure the establishment of auditing and reporting systems to measure the effectiveness of equal employment opportunity programs.

(4)   Ensure the implementation within their agency of directives and other publications and direction issued through the Directives Management System and the Secretary of Administration.

(5)   Ensure that their agency complies with policy, standards, reporting systems, and proce-dures issued by the Secretary of Administration for personnel management and administration, labor relations and equal employment opportunity.

(6)   Implement new human resource and personnel program initiatives set forth by the Secre-tary of Administration.

**2.9.  Agency Personnel Officers.**

It shall be the responsibility of agency personnel officers to implement and administer personnel policies, rules, and programs in their agency.  Personnel officers are responsible for implementing and administering, monitoring, advising on, and encouraging compliance with mandates from the Governor, Executive Board, Secretary of Administration, Deputy Secretary for Employe Relations, Director of Personnel, and State Civil Service Commission.  Agency personnel officers also are responsible for monitoring, advising, and encouraging managers and supervisors in their agency in the personnel man-agement responsibilities inherent in those jobs.  Agency personnel officers shall:

(1)   Develop and administer personnel programs that meet the needs of the agency and contribute to their agency completing its missions.

(2)   Advise their agency head on policies, procedures, and actions necessary to maintain a sound personnel program and advise on adequate staffing levels for agency activities.

(3)   Advise managers and supervisors on how the Commonwealth's personnel system may best be used to accomplish agency goals and objectives.

(4)   Ensure agency compliance with policy, standards, reporting systems, and procedures issued by the Secretary of Administration for personnel management and administration, labor relations, and equal employment opportunity.

(5)   Implement Commonwealth policy and agency personnel program initiatives.

(6)   Regularly communicate with representatives from the Office of Administration on personnel policy and program issues.

(7)   Maintain records and reporting systems on agency employes and the agency personnel program.

(8)   Initiate steps to enhance agency organizational effectiveness through improvements to agency human resources.

(9)   Administer and implement appropriate labor agreements and maintain effective communi-cation with employe organizations.

## 2.10.  Agency Managers and Supervisors.

It shall be the responsibility of agency managers and supervisors to effectively carry out the personnel management responsibilities inherent in their positions.  Personnel management responsibilities found in managerial and supervisory positions include:

(1)  Effectively utilizing employes to successfully carry out the agency's missions.

(2)  Using the workforce efficiently and productively by defining assignments, training and developing staff, establishing performance standards, and measuring performance.

(3)  Motivating employes to produce at their fullest potential by assigning meaningful work projects, practicing effective leadership, and providing recognition for achievement.

(4)  Setting an example for employes by demonstrating competence, professionalism, ethical behavior, and responsiveness to others in the agency, the Commonwealth, and the public.

(5)  Monitoring and measuring employe performance and job-related activities.

(6)  Working with individual employes and with organized employe groups that represent them in a fair and equitable manner.

## CHAPTER 3.  EQUAL EMPLOYMENT OPPORTUNITY

Sec.

**3.1.    Equal Employment Opportunity Policy and Plans.**
**3.2.    Disability-Related Policy and Program.**

### 3.1.    Equal Employment Opportunity Policy and Plans.

   **(a)**  As required by *Executive Order, 1996-9, Equal Employment Opportunity,* agencies shall not discriminate against any employe or applicant for employment because of race, color, religious creed, ancestry, union membership, age, sex, sexual orientation, national origin, AIDS or HIV status, or disability.  Every effort is to be exerted to end discrimination and to develop steps to include members of minority groups and women at every level of employment, including recruitment, selection, appointment, promotion, training, delegation and decision-making.  Management personnel are to participate in equal employment opportunity planning, implementation, and monitoring.

   **(b)**  Heads of departments and agencies shall ensure that the agency's commitment to equal employment opportunity is clearly transmitted to all agency managers, supervisors, and employes so that adequate support is given to staff who are responsible for implementing the agency's equal employment opportunity program.

   **(c)**  Agency equal employment opportunity staff shall monitor all aspects of the personnel management system which have an impact on equal employment.  They are to act as consultants to agency management in identifying problem areas and appropriate solutions.

   **(d)**  Each agency shall analyze its workforce for underutilization of minorities and women using methodology established by the Office of Administration.  Objectives shall be established for increasing the employment opportunities of minorities and women at all job levels where they are not proportionately employed in comparison to their availability in the labor force.  Objectives are to be accompanied by detailed action plans for their achievement.

   **(e)**  Internal tracking systems are required to monitor personnel transactions and training opportunities offered to employes.  Annual monitoring reports will be used to assess percentage and programmatic achievements made by the agencies.

   **(f)**  Each agency under the Governor's jurisdiction shall issue a sexual harassment policy statement in compliance with *Executive Order 1996-14, Prohibition of Sexual Harassment in the Commonwealth.*  The Bureau of Equal Employment Opportunity shall ensure that a systematic review of agency policies and programs is in place to address issues of sexual harassment, including:

      **(1)**  Effective strategies to discourage and prevent sexual harassment.

      **(2)**  An effective complaint mechanism for resolution of sexual harassment complaints.  (Reference *Executive Order 1996-14* and *Management Directive 410.10, Guidelines for Investigating and Resolving Discrimination Complaints.*)

   **(g)**  The Bureau of Equal Employment Opportunity is responsible for providing technical assistance to state agencies in all equal employment opportunity areas.  This includes, but is not limited to, developing training manuals, providing orientation and training to new equal employment opportunity staff, and planning/providing individual and group training sessions to ensure implementation of the equal employment opportunity program.

- (h)  Discrimination complaints are to be investigated by the agency's equal employment opportunity staff.  All complaints of discrimination shall be handled in accordance with procedures stated in *Manual M410.3 and Management Directives 410.10, 205.25, and 205.26.*

- **3.2.  Disability-Related Policy and Program.**

- (a)  The Commonwealth's overall policy for implementing disability-related policy, including the *Americans With Disabilities Act, the Rehabilitation Act,* and the *Pennsylvania Human Relations Act,* is established by *Executive Order 1996-11, Disability-Related Policy.* These Acts and the policy of the Commonwealth make it unlawful to:

  (1)  Discriminate against a qualified person with a disability because of the disability of the individual, in regards to all aspects of employment, and the provision of services, programs and activities.

  (2)  Fail to provide a reasonable accommodation to an otherwise qualified individual with a disability who is an applicant, employe, or a person participating in the agency's services, programs, or activities.

- (b)  Each agency is to assign a disability services coordinator.  Personnel offices are to respond to requests for accommodation from job applicants and employes.  Equal opportunity staff are to conduct complaint investigations.  (Reference *Executive Order 1996-11* and *Management Directives 410.10, 205.25 and 205.26.*)

# CHAPTER  4.  LABOR  RELATIONS

Sec.

4.1.    Separability.
4.2.    Employe  Rights.
4.3.    Act  111.
4.4.    Discrimination  Prohibited.


## 4.1.  Separability.

(a)  In the event that a provision of a labor agreement or arbitration award is found to be inconsistent with existing state or federal statutes or ordinances, the provisions of such statutes or ordinances shall prevail.

(b)  In those cases where the Executive Board has adopted the provisions of a labor agreement or an arbitration award, and certain provisions thereof are inconsistent with these rules, those provisions shall take precedence insofar as they apply to the employes encompassed by the agreement or award.


## 4.2.  Employe  Rights.

(a)  In accordance with the *Public Employe Relations Act of July 23, 1970, Act 195, (43 P.S. §1101.101),* Commonwealth employes, except first-level supervisors, management level employes, and confidential employes, shall have the right to organize or join employe organizations for the purpose of collective bargaining.  Employes shall also have the right to refrain from any or all such activities except as may be required pursuant to Fair Share provisions of applicable labor agreements.

(b)  First-level supervisors may not engage in collective bargaining but may organize for the purpose of meeting with Commonwealth officials to discuss matters deemed bargainable for public employes covered by paragraph (a) of this section.  Any decisions or determinations made by the Commonwealth on matters so discussed shall be deemed final.


## 4.3.  Act  111.

Certain Commonwealth employes shall have the right to organize or join an employe organization for the purpose of collective bargaining pursuant to *Act 111 of June 24, 1968, (43 P.S. §217.1 et seq.)* and rulings of the Pennsylvania Labor Relations Board.  Appropriate agencies will be notified of the classifications deemed to be covered by *Act 111.*


## 4.4.  Discrimination  Prohibited.

No agency supervisor or management official shall, in any way, interfere with the statutory right of an employe to organize or join an employe organization or discriminate against any employe who is a member of an employe organization.

# CHAPTER   5.   COMPENSATION

| Subchapter. | Sec. |
|---|---|
| A. PAY | 5.1 |
| B. BENEFITS | 5.101 |

## Subchapter   A.   PAY

### PAY PLAN AND RULES.

Sec.

5.1.    Legal Basis for Establishing the Pay Plan.
5.2.    Maintenance of Pay Plan.
5.3.    Other Pay Rates Authorized by Executive Board.
5.4.    Pay Rules.
5.5.    Exceptions to the Pay Rules.

### ENTRANCE AND REEMPLOYMENT PAY.

5.11.    Entrance and Reemployment Pay Matrix.
5.12.    Entrance Pay.
5.13.    Reemployment From Resignation.
5.14.    Reemployment From Furlough.

### ANNUAL PERFORMANCE/INCREMENT DATES AND PAY INCREMENTS.

5.21.    Annual Performance/Increment Dates and Pay Increments.
5.22.    Longevity Dates.
5.23.    Effect of Military Leave on Annual Performance/Increment Dates and Longevity Dates.
5.24.    Effect of Leave Without Pay on Annual Performance/Increment and Longevity Dates.
5.25.    Effects of Termination and Reemployment on Annual Performance/Increment Dates and Longevity Dates.
5.26.    Effects of Service With an Independent Agency or With Another Branch of Government on Longevity Dates.
5.27.    Exceptional Pay Increases.

### PROMOTIONS, DEMOTIONS, AND        TRANSFERS/REASSIGNMENTS.

5.31.    Promotions.
5.32.    Demotions.
5.33.    Transfers.

**WORKING OUT OF CLASS.**

5.41.   Acting Head of Agency.
5.42.   Temporary Reassignment.

**CLASSIFICATION AND PAY AMENDMENTS.**

5.61.   Amendment to the Position Classification and Pay Plans.

**OVERTIME.**

5.71.   Applicability.
5.72.   Computation of Overtime Hours.
5.73.   Approval of Overtime Work.
5.74.   Approval of Pay for Overtime Work.
5.75.   Overtime Rate of Pay.
5.76.   Compensatory Time in Lieu of Overtime Pay.

**EXTRA PAY.**

5.81.   Dual Employment.
5.82.   Shift Differential.

**RESTITUTION OF OVERPAYMENTS.**

5.91.   Restitution of Overpayments.

**SUBSISTENCE OR MAINTENANCE.**

5.99.   Subsistence or Maintenance.

## PAY PLAN AND RULES.

### 5.1.  Legal Basis for Establishing the Pay Plan.

Pursuant to *Section 709(a) of The Administrative Code of 1929, (71 P.S. §249(a))*, the Pay Plan constitutes the official plan for paying all officers and employes of agencies under the Governor's jurisdiction except those officers and employes whose pay is fixed by law, those who are paid according to other pay rates authorized by the Executive Board, and those officials whose titles and rates of pay are approved by the Governor in accordance with *Section 211 of The Administrative Code of 1929 (71 P.S. §71)*.

### 5.2.  Maintenance of Pay Plan.

The Director of Personnel shall make appropriate studies and recommend to the Secretary of Administration amendments to the Pay Plan that are necessary for its maintenance, within the financial resources of the Commonwealth, on a current and equitable basis.  Classes shall be assigned pay rates in the Pay Plan on the basis of the following factors:

(1)   The relationship of the class to other classes in the Pay Plan.

(2)   The duties and responsibilities of positions in the class.

(3)   The ability of the Commonwealth to recruit and retain qualified employes in the class.

(4)   Prevailing rates for similar employment in the private sector and other public jurisdictions.

(5)   Cost of living factors.

(6)   Other factors as may be deemed appropriate.

### 5.3.  Other Pay Rates Authorized by Executive Board.

The Executive Board may approve other pay rates if a pay range in one of the Pay Plan schedules is not appropriate.

### 5.4.  Pay Rules.

Pursuant to *Section 709 of The Administrative Code of 1929 (71 P.S. §249)*, this subchapter constitutes the official rules for paying all officers and employes in agencies under the Governor's jurisdiction.  If the terms of a labor agreement approved by the Executive Board conflict with the pay rules, the terms of the labor agreement shall apply to the employes covered by that agreement.  The Secretary of Administration may issue further explanations of the implementation of this subchapter through the Directives Management System.  Where application of the pay rules involves discretion, care must be exercised to ensure that state and federal statutes relating to discrimination based on nonmerit factors are not violated.

### 5.5.  Exceptions to the Pay Rules.

This subchapter governs those circumstances that normally occur in pay administration.  Should unusual circumstances arise which give unreasonable results when applying this subchapter, agencies are to contact the Office of Administration, Bureau of Personnel.  Normally, exceptions will not be granted for employes covered by labor agreements except where application of this subchapter would give windfall pay increases or absurd results that were not intended by the parties to the labor agreement.  Exceptions to this subchapter, when granted, shall be in writing by the Secretary of Administration.

## ENTRANCE AND REEMPLOYMENT PAY.

### 5.11.  Entrance and Reemployment Pay Matrix.

| Has the employe been previously employed by an agency under the Governor's jurisdiction? | Is the reemployment a result of a furlough? | Will the furloughee be reemployed to a class with a higher minimum hourly rate? | Will the furloughee be reemployed to a class with a lower minimum hourly rate? | Refer to this Sub-chapter. |
|---|---|---|---|---|
| No------------------> | --------------------------------------------------------------------> | | | 5.12 |
| | No----------> | --------------------------------------------------> | | 5.13 |
| | | Yes----------------> | ----------------------> | 5.14(3) |
| Yes--------------------> | Yes----------> | No-----------------> | Yes-------------> | 5.14(2) |
| | | | No--------------> | 5.14(1) |

### 5.12.  Entrance Pay.

(a)  The entrance pay of employes shall normally be the minimum step of the pay range prescribed for the classification.  An appointment at a step above the minimum may be made when the action is justified by difficulty in recruiting qualified applicants, by a candidate's outstanding qualifications, or by the requirement for specialized training.

(b)  Agency heads are delegated the authority to set salaries within the limits prescribed by *Management Directive 520.9, Appointments Above the Minimum,* on appointments to Civil Service and Non-Civil Service positions at a salary above the minimum for management classifications except those used for centralized staff positions functioning in press, policy, legislative liaison, and legal offices.

(c) Appointments above the minimum for which the authority has not been delegated to agency heads shall have the prior approval of the Office of Administration, Bureau of Personnel. Requests for those appointments must be supported by a statement of justification, including documentation of the applicant's prior earnings. If the entrance pay for a class is stipulated by a collective bargaining agreement or memorandum of understanding, approved by the Executive Board, the term of the agreement or memorandum shall take precedence over the entrance pay rules in this section. When an employe is reemployed, Section 5.13 or Section 5.14 may apply.

### 5.13. Reemployment From Resignation.

If an individual was previously employed by any Commonwealth agency, the individual may be appointed, at the agency head's discretion, at the last hourly rate received in the last position if it does not exceed the maximum rate of the class to which he or she is reemployed. Provided, however, that if the class to which the employe is appointed would be considered a demotion from the class in which the employe was previously employed, then the rate must be adjusted downward consistent with the policies on demotion contained in Section 5.32. If the last hourly rate falls between two pay rates in the assigned range, the employe may be reemployed at the next higher hourly rate. Agency heads are to take into consideration such things as applicability of previous employment, pay relationships with other employes, difficulty of recruitment, and agency budget when using this rule. An employe's longevity date shall be set under Section 5.25.

### 5.14. Reemployment From Furlough.

When reemploying a furloughee, the following shall apply:

(1) **Reemployed to the same class or a class with the same minimum hourly rate.** The employe shall be placed at the rate specified in the pay range for the longevity step held at the time of furlough. The longevity date shall be adjusted under Section 5.25.

(2) **Reemployed to a class with a lower minimum hourly rate.** This shall be considered a demotion from the pay range and longevity step held at the time of furlough. The longevity date shall be adjusted under Section 5.25.

(3) **Reemployed to a class with a higher minimum hourly rate.** This shall be considered a promotion from the pay range and longevity step held at the time of furlough. The longevity date shall be adjusted under Section 5.5.

## ANNUAL PERFORMANCE/INCREMENT DATES AND PAY INCREMENTS.

### 5.21. Annual Performance/Increment Dates and Pay Increments.

Annual performance/increment dates shall be used to determine the dates of the employes' annual performance evaluations for those employes rated on an annual performance/increment date cycle and, for employes covered by certain labor agreements, the effective dates of their annual pay increments. When a performance evaluation is completed or a pay increment is granted, the annual performance/increment date shall be changed to one year from the month in which the regular evaluation was scheduled or increment occurred. The effective date of a pay increment shall be the first day of the first full pay period in the annual performance/increment date month.

**5.22. Longevity Dates.**

Longevity dates shall determine the effective dates of employes' longevity increments. Beginning January 1995, each employe who is below the maximum step of their pay range and has been employed continuously by the Commonwealth since January 31 of the previous year, will be eligible for a one step longevity increase on the first day of the first full pay period each January. Longevity increments for management employes may be rescinded with the written approval of the Office of Administration for reasons of performance or discipline. The longevity date of a management employe whose longevity increment has been rescinded shall be January of the following year. Sections 5.22 through 5.26 shall apply to all salaried and wage employes who are paid in accordance with the Commonwealth's standard pay schedule or other pay schedules based on the standard pay schedule. If these provisions conflict with a labor agreement, reference should be made to Section 5.4.

**5.23. Effect of Military Leave on Annual Performance/Increment Dates and Longevity Dates.**

Military leave without pay shall be construed as continuous service and, therefore, shall not change annual performance/increment or longevity dates. An employe who has returned from military leave shall be granted annual and/or longevity increments under Sections 5.21 and 5.22. An employe who has returned from military leave shall be given a rate of pay which reflects the general pay increases that were granted during his or her absence.

**5.24. Effect of Suspension or Leave Without Pay on Annual Performance/Increment and Longevity Dates.**

(a) Except as noted in subsection (b), suspension or leave without pay, except military leave, will affect the annual performance/increment date and longevity date as follows:

(1) Suspension or leave without pay for a continuous period of less than 28 calendar days will not change the annual performance/increment date or longevity date of an employe.

(2) Suspension or leave without pay for a continuous period of 28 calendar days or more will extend the annual performance/increment date and longevity date in the following manner.

(i) Divide the number of days of suspension or leave without pay by 28.

(ii) Add a number of months equal to the number obtained in (i), ignoring fractional remainders to the employe's annual performance/increment date and longevity date.

(b) Suspension or leave without pay will not affect longevity dates for employes paid on the Standard Pay Schedule (Schedule S), Physicians and Related Occupations Standard Pay Schedule (Schedule T), and Corrections Management Pay Schedule ( Schedule I).

**5.25. Effects of Termination and Reemployment on Annual Performance/Increment Dates and Longevity Dates.**

(a) Except as noted in subsections (b) and (c), the annual performance/increment date and longevity date of an individual terminated from Commonwealth service and subsequently reemployed shall be established consistent with the provisions for a newly-hired employe. See Sections 5.21 and 5.22.

**(b)** The longevity date of an employe who terminated with at least one year of continuous service since the employe's most recent appointment and  who is reemployed within six months from the date of termination or furlough shall be the first January following the employe's reemployment.   The longevity date for an employe who meets these conditions and who is reemployed in January, on or before the effective date of the longevity increment,  shall be the January of the employe's reemployment.

**(c)** Subsection (a) shall not apply to employes who transfer without a break in employment or to employes with less than a 15 calendar day break in service.

## 5.26.   Effects of Service With an Independent Agency or With Another Branch of Government on Longevity Dates.

Service with an independent agency or with the legislature or judiciary shall be used for the purpose of establishing the longevity date if an employe of an independent agency, the legislature, or the judiciary transfers employment to an agency under the Governor's jurisdiction with a break in service of less than six months.

## 5.27.   Exceptional Pay Increases.

This section pertaining to exceptional pay increases applies only to management, confidential, and other employes not covered by a labor agreement.

**(1)** The granting of more than one longevity increment in any 12-month period shall be limited to employes who have rendered service to the Commonwealth beyond that expected in the discharge of their assigned duties and responsibilities.   Requests for exceptional pay increases shall be supported by complete written justification.   Requests to grant exceptional pay increases for reasons other than performance alone shall be considered if warranted by special circumstances.

**(2)** All exceptional pay increases require the approval of the Secretary of Administration.

**(3)** Exceptional pay increases may consist of one or two longevity steps and will not affect an employe's longevity date.

**(4)** Only one exceptional pay increase may be approved for an employe in any 12-month period.

**(5)** Exceptional pay increases that effect a salary greater than the maximum of the pay range may not be granted.

## PROMOTIONS, DEMOTIONS, AND  TRANSFERS/REASSIGNMENTS.

## 5.31.   Promotions.

**(a)** Unless specified otherwise in a labor agreement, an employe promoted between two classifications on the standard pay schedule or other schedules which have been restructured in a manner consistent with the standard pay schedule shall be promoted in the following manner.

**(1)** An employe promoted into a nonmanagement classification shall be placed at the rate in the higher pay range that is four steps higher, per pay range promoted, than the employee's current rate; or, the minimum of the pay range,  whichever is greater.

(2)   Agency heads may promote an employe into a management level classification to any step in the pay range that provides an increase of up to, but no more than four steps for each pay range the employe is promoted.

(b)   An employe promoted into a nonmanagement classification and between two classifications on a nonstandard pay schedule or on two dissimilar pay schedules shall be promoted according to the following procedure.

(1)   The minimum hourly rate of the pay range assigned to the new class shall be divided by the minimum hourly rate of the pay range assigned to the current class.  The minimum hourly rate of the pay range assigned to the class shall be used even in those cases where an above minimum hiring rate has been approved for the class.  Subtract one from the result of the division.  Multiply the result of the subtraction by 0.67.  Add one to the result of the multiplication.

(2)   The employe's current hourly rate shall be multiplied by the answer obtained from (1) and the answer shall be rounded to the nearest cent.

(3)   The employe shall be placed at the hourly rate in the new pay range which is closest to but no less than the rate calculated in (2).

(c)   An employe promoted into a management level classification, or between two classifications on a nonstandard pay schedule, or on two dissimilar pay schedules, shall be promoted using the method described in (b) above within the limits prescribed in (a)(2).

(d)   When determining an employe's pay in the pay range assigned to the new class, a rate of pay not printed for the appropriate pay range on the applicable pay schedule shall not be assigned.

(e)   An employe previously demoted, furloughed, or terminated shall not receive upon promotion a pay rate greater than that which the employe would have received had the employe not been demoted, furloughed, or terminated.

(f)   If unusual circumstances arise which are not covered by this section or if unreasonable results occur when applying this section, refer to Section 5.5.

**5.32.   Demotions.**

(a)   Unless specified otherwise in a labor agreement, an employe demoted between two classifications on the standard pay schedule, or other schedules which have been restructured in a manner consistent with the standard pay schedule, shall be placed at the rate in the lower pay range which is four steps lower, per pay range demoted, than the employe's current rate; or, the maximum of the pay range, whichever is the lesser.

(b)   An employe demoted between two classifications on a nonstandard pay schedule or on two dissimilar pay schedules shall be demoted according to the following procedure.

(1)   The minimum hourly rate of the pay range assigned to the current class shall be divided by the minimum hourly rate of the pay range assigned to the new class.  The minimum hourly rate of the pay range assigned to the class shall be used even in those cases where an above minimum hiring rate has been approved for the class.  Subtract one from the result of the division.  Multiply the result of the subtraction by 0.67.  Add one to the result of the multiplication.

(2)   The employe's current hourly rate shall be divided by the answer obtained from (1) and the answer shall be rounded to the nearest cent.

(3)   The employe shall be placed at the hourly rate in the new pay range which is closest to, but no greater than, the rate calculated in (2).

(c)   If an employe is demoted as a result of a downward reclassification of position, the employe shall be demoted to a rate of pay in the new pay range that is closest to but no greater than the employe's current hourly rate.   If the employe's current hourly rate exceeds the maximum of the new pay range, the employe's hourly rate shall not be changed.

(d)   An employe previously promoted to a management classification may be placed at the pay step in the lower pay range at which the employe would have been had the employe not been promoted.

(e)   When assigning an employe to a pay rate in the new pay range, a rate of pay not printed for the appropriate pay range on the applicable pay schedule shall not be used.

## 5.33.  Transfers.

If there is an hourly rate of pay in the pay range to which the employe is being transferred that is identical to the employe's current hourly rate of pay, then the employe shall be placed at that rate.   If the employe's current hourly rate exceeds the maximum of the pay range to which the employe is being transferred, then the employe's hourly rate shall not be changed.   If there is not an identical hourly rate and the employe's current hourly rate is below the maximum of the pay range to which the employe is being transferred, then the employe shall be placed at the next higher hourly rate in the pay range assigned to the employe's new position.   When assigning an employe to a pay rate in the new pay range, a rate of pay not printed for the appropriate pay range on the applicable pay schedule shall not be used.

## WORKING OUT OF CLASS.

### 5.41.  Acting Head of Agency.

In accordance with the *Act of July 25, 1917, P.L. 1201 (No. 415), as amended (71 P.S. §§764 and 765),* when a vacancy occurs in the position of an agency head and the duties of the position are performed by a deputy or other person on an acting basis for a period of one calendar month or more, such deputy or other person shall be paid an amount over and above his or her regular salary, which shall equalize it with the salary of the agency head during the time served in an acting capacity.   If the salary of such deputy or other person is greater than the salary prescribed for the agency head, the salary of such deputy or other person shall not be reduced while performing the duties and responsibilities of the agency head.

### 5.42.  Temporary   Reassignment.

If an employe is temporarily assigned to work in a position in a higher classification, extra payment, if any, shall be made in accordance with *Management Directive 525.4, Temporary Assignment in Higher Classification.*

**CLASSIFICATION AND PAY AMENDMENTS.**

**5.61.  Amendment to the Position Classification and Pay Plans.**

An upward revision of a pay range for a class without a substantial change in the duties and responsibilities for that classification shall not be treated as a promotion under the Personnel Rules. Affected employes will be placed in the higher pay range at the rate of pay which is closest to but not less than their current rate of pay.

An upward revision of a pay range for a class with a substantial change in duties and responsibilities for that classification shall be treated as a promotion under the Personnel Rules.  Affected employes will be placed at the appropriate step for the revised pay range.

A downward revision of a pay range for a class shall result in the employes being assigned to a rate of pay within the revised pay range which is closest to but not more than their current rate of pay.

**OVERTIME.**

**5.71.  Applicability.**

In accordance with *Section 709(a) of The Administrative Code of 1929, (71 P.S. §249(a))*, the provisions of Sections 5.72 – 5.75 shall govern the pay for overtime work performed by employes.  If the terms of a labor agreement approved by the Executive Board conflict with the provisions of Sections 5.72 – 5.75, the terms of the labor agreement shall apply to employes covered by that agreement.  If the labor agreement is silent on this subject, the provisions of Sections 5.72 – 5.75 shall apply to employes covered by that agreement when authorized in writing by the Secretary of Administration.  If the provisions of Sections 5.72 – 5.75 conflict with the federal *Fair Labor Standards Act,* the requirements of the act shall apply to employes covered by the act.

**5.72.  Computation of Overtime Hours.**

(a)  The following items shall be regarded as hours worked for the purpose of computing overtime:

(1)  Hours worked.

(2)  Rest periods.

(3)  Paid holidays, or any nonworkday scheduled in lieu of a holiday.

(4)  Annual leave.

(5)  Compensatory time, to be regarded as hours worked during the work period in which it is taken.

(6)  Holiday leave earned as a result of working on a paid holiday, to be regarded as hours worked during the work period in which it is taken.

(7)  Personal leave.

(8)  Sick leave.

(9)  Civil leave.

(b)  There shall be no duplication or pyramiding of overtime pay for the same hours worked.

**5.73.  Approval of Overtime Work.**

(a)  *Nonexempt employes.*  Scheduled or emergency overtime work shall be approved by the agency head or designee consistent with rules established by the agency head.  Employes may not schedule themselves for overtime work without prior approval for the work from the agency head or designee.

(b)  *Exempt employes.*  Scheduled or emergency overtime work shall be approved by the agency head or designee consistent with rules established by the agency head.  Employes who schedule their own work may not be compensated for overtime work.  An employe who directs a bureau or an equivalent or higher organization shall not be compensated for overtime work.  Institution heads, executive directors of county assistance offices, regional environmental protection directors, and highway district engineers are examples of positions equivalent to a bureau director.  The Secretary of Administration shall make the final determination on which positions are equivalent to bureau directors.

**5.74.  Approval of Pay for Overtime Work.**

(a)  *Nonexempt employes.*  Approval by the agency head or designee to perform overtime work also constitutes approval to pay for the overtime work.

(b)  *Exempt employes.*  Agency heads are not obligated to compensate exempt employes for overtime work, except where specified by a labor agreement.  Exempt employes shall not normally be paid for overtime work.  If, however, agency heads wish to compensate exempt employes, compensatory time should be used as a first consideration.  If it is not feasible to grant compensatory time, reference shall be made to *Management Directive 525.15, Overtime,* for provisions for authorizing pay for overtime work.  In those cases where labor agreements specify that exempt employes may be paid straight-time overtime pay, approval by the agency head or designee to perform the overtime work also constitutes approval to pay for the overtime work.

**5.75.  Overtime Rate of Pay.**

(a)  *Nonexempt employes.*

(1)  **Rule.**  Nonexempt employes shall receive their straight-time hourly rate up to 40 hours in a workweek of seven consecutive days and 1-1/2 their hourly rate for work in excess of 40 hours in a workweek of seven consecutive days.

(2)  **Exceptions.**

(I)  Hospitals and institutions engaged in the care of the sick, aged, mentally ill, or disabled may choose, in lieu of a seven day workweek, a work period of 14 consecutive days.  The time-and-one-half rate shall then apply to work in excess of eight hours in any workday or 80 hours in the 14-day work period.

(II)  Employes engaged in firefighting or law enforcement activities including correctional officers but excluding all other personnel at correctional institutions may also be paid in accordance with the eight or 80-rule described in subparagraph (2)(i).

(b)  *Exempt employes.*  When approved in accordance with *Management Directive 525.15,* exempt employes may receive their straight-time hourly rate for specified overtime work.

**5.76.  Compensatory Time in Lieu of Overtime Pay.**

(a)  *Nonexempt employes.*  Nonexempt employes may be granted compensatory time in lieu of overtime pay, one hour for each hour of pay earned, i.e., if payment would be made at the time-and-one-half rate, compensatory time would be granted at the same rate.  For nonexempt employes, maximum accrual of compensatory time hours in lieu of overtime is 240 hours.

(b)  *Exempt employes.*  Exempt employes may be granted compensatory time, one hour for each hour of overtime worked.

(c)  *Union-covered employes.*  For most union-covered employes, compensatory time must be granted within 90 calendar days succeeding the date on which the overtime is worked.  If the leave is not scheduled within the 90 day period, the employe must be compensated at the appropriate rate of pay in lieu of paid time off.

(d)  *Transfer or termination.*  Compensatory time not taken before a transfer to another agency or termination from Commonwealth service shall lapse.  Employes covered by labor agreements that provide for payment in lieu of compensatory time that is not granted within a fixed time period or employes deemed exempt from the overtime provisions of the FLSA shall be paid for any compensatory time that would lapse.  Payment is made at the employe's rate of pay upon transfer or termination.


**EXTRA PAY.**

**5.81.  Dual   Employment.**

(a)  Any administrative department, independent administrative board or commission, or departmental administrative board or commission wishing to employ the services of a person already on a payroll or on contract with the Commonwealth should first attempt to secure the services in accordance with *§501 of The Administrative Code of 1929.*  When the primary and secondary employment are within the same agency, compensatory time in accordance with Section 5.76 should be granted.  When compensatory time is not possible and extra pay is required to secure the services of an employe, *Section 215* of the *Administrative Code* requires Executive Board approval before the services are rendered.  The rendering of such services shall not conflict with the services for which an employe is already being paid and must clearly be outside the employe's normal duties and responsibilities.  Dual employment generally should not be considered when the total compensable hours from both the primary and secondary employment would exceed 40 hours in a workweek.  *Management Directive 525.11, Dual Employment,* contains instructions for requesting and processing dual employment.

(b)  Dual employment duties shall be classified in accordance with Section 6.3.  If an appropriate class does not exist in the position classification plan, agencies may request Executive Board approval of special rates of pay or the Secretary of Administration shall recommend to the Executive Board reasonable and equitable rates of pay not elsewhere established by the Board.

**5.82.  Shift  Differential.**

(a)  With prior approval of the Secretary of Administration, a shift differential that has been authorized by the Executive Board may be paid to an employe whose regular shift of 7-1/2 or 8 hours begins before 6:00 a.m. or at or after 12:00 p.m. provided the shift is worked.

(b)  An employe who works overtime immediately before or immediately after his or her regular shift may be paid the shift differential for each hour worked provided the employe is authorized to receive shift differential for the regular shift.

**RESTITUTION   OF   OVERPAYMENTS.**

**5.91.   Restitution   of   Overpayments.**

Restitution shall be required for overpayments of salaries, wages, or employe benefits in accordance with *Management Directive 315.8, Restitution of Overpayments.*   Restitution for salary or wage overpayments cannot be waived.

**SUBSISTENCE   OR   MAINTENANCE.**

**5.99.   Subsistence   or   Maintenance.**

Pay and benefits shall be deemed to provide full compensation for services rendered to the Commonwealth by an employe.   Lodging, meals, and other maintenance or subsistence provided for Commonwealth employes at Commonwealth institutions or at other facilities shall be paid for by employes on the basis of their cost to the Commonwealth and in accordance with the schedule of charges approved by the Executive Board in *Management Directive 315.14, Charges for State Employes Residing or Subsisting in Commonwealth Facilities.*

Subchapter   B.   BENEFITS

**BENEFITS   ADMINISTRATION.**

Sec.

5.101.   Benefits   Policies.
5.102.   Agency   Responsibilities.


**HEALTH   INSURANCE.**

5.111.   Active Employe Health Insurance.
5.112.   Retired Employe Health Insurance.


**HEALTH AND WELFARE TRUST FUNDS.**

5.121.   General.
5.122.   Agency   Responsibilities.


**LIFE   INSURANCE.**

5.131.   General.
5.132.   Agency   Responsibilities


**WORK-RELATED INJURY AND DISEASE.**

5.141.   General.
5.142.   Workers'   Compensation.
5.143.   Paid and Unpaid Injury Leave.


**UNEMPLOYMENT   COMPENSATION.**

5.151.   General.
5.152.   Eligibility.
5.153.   Benefits.
5.154.   Appeal.
5.155.   Cost   Containment.


**LIABILITY   COVERAGE.**

5.161.   General.
5.162.   Eligibility.
5.163.   Amount of Coverage.
5.164.   Premiums.

31

**RETIREMENT.**

5.171.   General.


**FAMILY CARE ACCOUNT PROGRAM.**

5.181.   General.


**CREDIT UNIONS.**

5.191.   General.
5.192.   Authorized Credit Union Defined.
5.193.   Payroll Deduction Authorization.


**BLOOD DONOR PLANS.**

5.201.   General.


**DIRECT DEPOSIT OF PAY.**

5.211.   General.


**DEFERRED COMPENSATION.**

5.221.   General.
5.222.   Responsibility.


**EMPLOYE RECOGNITION.**

5.231.   General.

**BENEFITS    ADMINISTRATION.**

**5.101.  Benefits   Policies.**

Commonwealth employes receive benefits as specified in collective bargaining agreements, as authorized by the Executive Board, or as mandated by legislation.  Benefits may be provided and administered by a variety of organizations; responsibilities for determining policies on eligibility and benefit levels are described below under the individual benefit categories.  The Bureau of Personnel, Office of Administration, is responsible for coordinating benefits policy for agencies under the Governor's jurisdiction.

**5.102.  Agency    Responsibilities.**

(a)  Agency personnel officers are responsible for benefits administration.  Agencies are to ensure that all newly-hired employes are given a formal orientation which is to include counseling concerning their eligibility for benefits.  Information regarding benefits is to be made available to employes on an ongoing basis.

(b)  Agency personnel staff are to cooperate with and support the benefit providers as needed in their administration of employe benefits.

**HEALTH   INSURANCE.**

**5.111.  Active  Employe  Health  Insurance.**

(a)  The health insurance program for active Commonwealth employes is provided by the Pennsylvania Employees Benefit Trust Fund (PEBTF).  Contributions are paid to the PEBTF by the Commonwealth and subscribers in accordance with applicable labor agreements, agreements between the Commonwealth and the PEBTF, and guidelines published in *Management Directives*.  The Board of Trustees of the PEBTF has authority over eligibility for benefits and for the level of benefits provided.  The PEBTF is responsible for contracting with health insurance carriers or for self-insuring the various coverage options available; for maintaining eligibility files; and for writing and printing the *Summary Plan Description* and the *PEBTF Administrative Manual*.

(b)  Agency personnel staff are responsible for processing initial enrollment forms in order to generate benefit coverage for employes and their dependents and for maintaining current copies of such forms in employes' personnel folders.  Agencies must process the appropriate transactions on the Commonwealth's Personnel/Payroll System to ensure that eligibility records for benefits are current.  Written descriptions of benefits are to be stocked by personnel offices and provided to newly-eligible employes and other employes as necessary.  Personnel offices should contact the PEBTF regarding employe eligibility or claim payment issues if employe attempts at resolution have been unsuccessful.  (Reference *Management Directive 530.28, Pennsylvania Employees Benefit Trust Fund (PEBTF)*, *Management Directives* in the 530 series, the *PEBTF Summary Plan Description*, and the *PEBTF Administrative Manual*.)

**5.112.  Retired Employe Health Insurance.**

(a)  The health insurance program for retired Commonwealth employes is known as the Retired Employes Health Program (REHP) and is administered through the Pennsylvania Employees Benefit Trust Fund (PEBTF) on behalf of the Office of Administration.  Contributions are paid to the PEBTF by the Commonwealth and subscribers in accordance with agreements between the Commonwealth and the PEBTF and guidelines published in *Management Directives.*  The Executive Board has authority over eligibility for benefits and for the level of benefits provided.  The Office of Administration is responsible for writing, printing, and distributing the *REHP Benefit Handbook.*  The PEBTF is responsible for contracting with health insurance carriers or for self-insuring the various coverage options available and for maintaining eligibility files.

(b)  The State Employes' Retirement System (SERS) is responsible for processing initial enrollment forms for retirees and for providing eligibility data for retirees to the PEBTF.  Agencies must process the appropriate retirement transactions on the Commonwealth's Personnel/Payroll System to ensure that coverage for retiring employes who qualify for the REHP is properly continued.  (Reference *Management Directive 315.16, Payment of Annuitant Medical Hospital Benefits, Management Directives* in the 530 series, and the *REHP Benefit Handbook.*)

## HEALTH AND WELFARE TRUST FUNDS.

**5.121.  General.**

Supplemental Benefits are provided to management, nonrepresented, and employes in most other bargaining units by the Supplemental Benefits Division of the Pennsylvania Employees Benefit Trust Fund (SBD).   In addition, a few Health and Welfare Trust Funds (Funds) provide supplemental health insurance benefits to employes in certain bargaining units.  Contributions are paid to Funds by the Commonwealth in accordance with applicable labor agreements, agreements between the Commonwealth and the Funds, and guidelines published in *Management Directives.*  The Board of Managers of the SBD (or the Board of Trustees for other Funds) has authority over eligibility for benefits and for the level of benefits provided.  The Funds are responsible for contracting with health insurance carriers or for self-insuring the various coverage options available, and for maintaining eligibility records for supplemental benefits.

**5.122.  Agency    Responsibilities.**

Agency personnel staff are responsible for processing initial enrollment forms to generate benefit coverage for employes and their dependents and for maintaining current copies of such forms in employes' personnel folders.  Agencies must process the appropriate transactions on the Commonwealth's Personnel/Payroll System to ensure that eligibility records for benefits are current.  Personnel offices should contact the appropriate fund office regarding employe eligibility or claim payment issues if employe attempts at resolution have been unsuccessful.

## LIFE INSURANCE.

### 5.131. General.

The Commonwealth group life insurance program pays death benefits to beneficiaries of eligible employes deceased through any cause, subject to the limitations of the policy in force between the Commonwealth and the insurance carrier. Supplemental death benefits are available to beneficiaries of employes in eligible employe units who are deceased as a result of work-related accidents. The Commonwealth pays the entire premium for eligible employes in an active pay status including various leaves with benefits. Policy on eligibility is determined by the Office of Administration and the Department of General Services, subject to the *State Employees Group Life Insurance Law (71 P.S. Sec. 780.1 et seq.).* Details on benefits, eligibility, and financing are published through the Directives Management System. (Reference *M530.3, Group Life Insurance Program Administrative Manual.*)

### 5.132. Agency Responsibilities.

Agency personnel staff are responsible for processing beneficiary designation forms in order to generate benefit coverage for employes and their dependents and for maintaining current copies of such forms in employes' personnel folders. Agencies must process the appropriate transactions on the Commonwealth's Personnel/Payroll System to ensure that eligibility records for benefits are current. Agencies are to maintain stocks of the "Group Life Insurance Certificate" and the "Group Life Insurance Summary Sheet," and provide them to newly-eligible employes. (Reference *Management Directives* in the 530 series and *Manual M530.3.*)

## WORK-RELATED INJURY AND DISEASE.

### 5.141. General.

An employe who sustains an incapacitating work-related injury on or after July 1, 1996, as determined by a decision issued through the operation of the Workers' Compensation Program, shall receive workers' compensation indemnity benefits in accordance with the *Workers' Compensation Act (77 P.S. §§1–1041.4)* and paid or unpaid injury leave in accordance with Commonwealth programs. (Reference *M530.2, Workers' Compensation/Work Related Disability Leave Administrative Manual.*)

### 5.142. Workers' Compensation.

(a) An employe who sustains an injury or disease that may be work-related shall report such incident immediately. The supervisor shall complete and submit the report form that must be filed with the agency's third party claims administrator to validate the claim. The agency's third party claims administrator determines the eligibility for benefits under the *Workers' Compensation Act (77 P.S. §§1 – 1023).*

(b) Agencies are responsible for cost containment efforts to minimize workers' compensation losses. Loss prevention (safety) programs should be operational in each agency. Cost containment practices applicable when incidents occur, whether injury results or not, include: prompt injury reporting and medical treatment, investigation of the cause of the incident, remedial and/or preventive actions to eliminate the cause, medical cost management by the third party claims administrator in coordination with agencies, modified duty programs to return partially incapacitated employes to work, and regular supervisory contact with employes who have incapacities who cannot work.

5.143.  **Paid and Unpaid Injury Leave.**

Paid and unpaid injury leaves are leaves of absence with benefits available to an employe receiving workers' compensation indemnity benefits related to Commonwealth employment in accordance with Sections 8.81 – 8.83 and Sections 8.151 and 8.152.

## UNEMPLOYMENT    COMPENSATION.

5.151.  **General.**

The *Unemployment Compensation Law* provides protection against loss of earnings when employes, through no fault of their own, become unemployed.  (Reference *Management Directive 530.22, Unemployment Compensation, Noncovered Employment – "Major Nontenured Policymaking or Advisory Positions"* and *Manual M530.9, Unemployment Compensation Insurance.*)

5.152.  **Eligibility.**

(a)  All separated employes and employes whose work hours are reduced are eligible to make application for unemployment compensation at their local Office of Employment Security.

(b)  The Office of Employment Security makes the determination on eligibility for benefits based on:

(1)  Definitions of covered employment as stated in the *Unemployment Compensation Law.*

(2)  Character of separation.

(3)  Amount of wages earned under covered employment.

5.153.  **Benefits.**

Both eligibility and the amount of benefits are determined by the Office of Employment Security in accordance with the *Unemployment Compensation Law.*

5.154.  **Appeal.**

A separated employe and the employer have the right to appeal decisions made by the Office of Employment Security within statutorily authorized guidelines.

5.155.  **Cost  Containment.**

(a)  Each agency's unemployment compensation coordinator should work within the personnel office to ensure that those involved in employment and termination decisions understand the UC ramifications especially when temporary positions are being created.

(b)  Supervisors should be instructed on what they can do to contain UC costs:  hiring only qualified employes; terminating as soon as possible new employes who are not passing the probationary period; properly documenting any and all disciplinary actions; and giving consideration to employe requests for reasonable accommodations (not necessarily related to disabilities), the lack of which could force the employe to resign.

(c)  Part-time and temporary employes should be employed in such a manner as to minimize the exposure to UC liability.

**LIABILITY    COVERAGE.**

**5.161.    General.**

Automobile and public liability coverage protect Commonwealth employes against negligence claims which may arise out of the performance of their duties as Commonwealth employes, subject to the conditions of policies in force between the Commonwealth and insurance carriers or to the conditions established under any self-insurance program.

**5.162.    Eligibility.**

All paid employes and unpaid board and commission members and volunteers are covered.

**5.163.    Amount  of  Coverage.**

The amount of coverage is the amount, within limits determined by the Executive Board, currently in force through either commercial insurance or self-insurance.

**5.164.    Premiums.**

The Commonwealth pays the entire premium for this coverage.


**RETIREMENT.**

**5.171.    General.**

The *State Employes' Retirement Code of 1974 as amended (71 Pa. C.S. §5101 et seq.)* and the *Public School Employes' Retirement Code as amended (24 P.S. §3101 et seq.)* contain eligibility requirements for membership in and benefits from the retirement systems.  (Reference *Management Directives* in the 570 series.


**FAMILY  CARE  ACCOUNT  PROGRAM.**

**5.181.    General.**

The Commonwealth's Family Care Account Program (FCAP) provides employes with the opportunity, through payroll deductions, to use pre-tax income to pay for family care expenses that are incurred to enable them to work.  This program allows employes to pay for expenses incurred for eligible employment-related care for children, disabled elder parents, and other dependents with salary exempt from federal income and social security taxes.  (Reference *Management Directive 505.28, Family Care Account Program.*)


**CREDIT  UNIONS.**

**5.191.    General.**

Payroll deductions are available to employes who wish to participate in an authorized credit union.  (Reference *Management Directive 315.7, Employe Payroll Deductions for Credit Unions.*)

**5.192.   Authorized Credit Union Defined.**

An authorized credit union is one that is duly chartered under state or federal statutes and that participates in the Commonwealth's payroll deduction program. Guidelines for the payroll deduction program shall be published through the Directives Management System.

**5.193.   Payroll Deduction Authorization.**

(a)   The Secretary of the Budget shall establish rules, procedures, and forms necessary to effect credit union payroll deductions.

(b)   Payroll deduction authorization forms for credit union purposes must be executed by and between the employe and an official of the authorized credit union.


**BLOOD DONOR PLANS.**

**5.201.   General.**

An agency head may make blood donor plans available to employes in the area where those employes work. (Reference *Management Directive 530.21, Paid Leave for Blood Donation.*)


**DIRECT DEPOSIT OF PAY.**

**5.211.   General.**

Direct deposit of pay is available to employes who authorize the Commonwealth to automatically deposit their biweekly net pay to personal checking or savings accounts at the financial institutions of their choice. Procedures and guidelines regarding the direct deposit of pay program shall be published through the Directives Management System. (Reference *Management Directive 315.17, Direct Deposit of Pay Procedures.*)


**DEFERRED    COMPENSATION.**

**5.221.   General.**

Employes have the option of participating in the Commonwealth's Deferred Compensation Program in order to supplement pension benefits. Under this program, employes pay no federal income tax on contributions into the program. Funds are not taxable until they are withdrawn from the program, usually at retirement.

**5.222.   Responsibility.**

The State Employes' Retirement System is charged by law with administering the program.

**EMPLOYE   RECOGNITION.**

**5.231.   General.**

Employe recognition programs are an effective and low-cost method for stimulating employe motivation and productivity.  Each agency shall maintain a program to recognize employes for outstanding service or accomplishment.  Guidelines established by the Secretary of Administration regarding employe recognition are published through the Directives Management System.  (Reference *Management Directive 505.23, Employe Recognition Programs.*)

# CHAPTER 6. POSITION CLASSIFICATION

Sec.

6.1.    Position Classification Plan.
6.2.    Class Standards.
6.3.    Amendment of the Position Classification Plan.
6.4.    Classification of Positions.
6.5.    Position Reviews and Maintenance of Job Descriptions.


## 6.1. Position Classification Plan.

In accordance with *Section 709(a) of The Administrative Code of 1929 (71 P.S. §249(a))*, the position classification plan shall constitute the official plan for classifying all positions occupied by officers and employes of agencies under the Governor's jurisdiction, except those officers and employes whose pay is fixed by law, those who are classified and paid according to special standards authorized by the Executive Board, and agency employes and members of the staff of the Governor whose titles and rates of pay are approved by the Governor.

## 6.2. Class Standards.

The Director of Personnel will, after consulting with the agencies affected, the examinations staff of the State Civil Service Commission and, where appropriate, after meeting collective bargaining agreement obligations, prepare a written standard for each new class added to the position classification plan and submit it to the Executive Board, through the Secretary of Administration, for approval. The Director of Personnel may, after appropriate consultations, revise class standards unless, in his or her judgment, the revisions are sufficiently substantive to require Executive Board approval. Procedures for developing and validating class standards are contained in *Management Directive 520.7, Development and Validation of Classification Standards.*

## 6.3. Amendment of the Position Classification Plan.

(a) *Agency heads.* Whenever, in the opinion of agency heads, it is necessary to establish, revise, or abolish classes in order to reflect properly the duties and responsibilities of positions under their control, they shall submit to the Director of Personnel appropriate functional statements, organizational changes, and position descriptions. The Director of Personnel shall direct a review and investigation and, if it is found that an amendment to the plan is desirable, recommendations for the creation, revision, or abolishment of classes shall be prepared and submitted to the Secretary of Administration.

(b) *Director of Personnel.* The Director of Personnel may, at any time, review any or all positions under the Governor's jurisdiction and, when necessary and after meeting appropriate collective bargaining agreement obligations, prepare and submit recommendations for amending the position classification plan to the Secretary of Administration. The establishment of effective dates for changes to the position classification and pay plan will be in accordance with the policies set forth in *Management Directive 520.8, Pay Action Effective Dates for Changes to Position Classifications and the Classification Plan.*

### 6.4. Classification of Positions.

(a)   The Director of Personnel will allocate all positions to appropriate classes in the position classification plan.   Classification authority may be delegated to agency heads, but the Director of Personnel is responsible for directing a post audit of agency classification decisions to ensure adherence to classification standards.   Post audit policies and procedures are published in *Management Directive 520.4, Position Classification Post-Audits.*   Classification authority in an agency may not be delegated below the agency personnel officer without approval of the Office of Administration, Director of Personnel.

(b)   The Director of Personnel will review the position classification plan periodically to ascertain if it accurately reflects existing conditions in the Commonwealth service.

(c)   Employes may request a review of their classification through procedures published through the Directives Management System.

(d)   The establishment of effective dates for position classification changes will be in accordance with Management Directive 520.8, or in the case of classification grievances, the provisions of the collective bargaining agreement will apply.

### 6.5. Position Reviews and Maintenance of Job Descriptions.

(a)   Agency personnel officers who have decentralized classification authority should review 25 percent of their agency's positions on an annual basis.

(b)   Agency personnel officers are to maintain current job descriptions for all positions and ensure that essential functions are identified for all jobs.   These essential functions are to be in writing and appended to each job description.

(c)   The Director of Personnel shall direct the review of agency position reviews and job description maintenance to ensure compliance with the policies set forth in (a) and (b).

# CHAPTER 7. RECRUITMENT, APPLICATION, AND APPOINTMENT

Subchapter                                                                    Sec.

A. RECRUITMENT ........................................................................................................ 7.1
B. APPLICATION AND APPOINTMENT ....................................................................... 7.11

## Subchapter A. RECRUITMENT

Sec.

7.1.    Purpose and Policy.
7.2.    Organizational   Responsibilities.

### 7.1.  Purpose and Policy.

(a)  It shall be the policy of the Commonwealth to establish and maintain active recruitment practices designed to meet equal opportunity employment standards and attract sufficient qualified applicants to meet the needs of the service on a continuous basis.

(b)  Agencies shall emphasize good public relations as an aid to effective recruitment.

### 7.2.  Organizational   Responsibilities.

(a)  *Bureau of State Employment.*  The Bureau of State Employment shall maintain an effective program for recruitment and evaluation to ensure a supply of qualified applicants for Non-Civil Service employment.  The bureau shall maintain the Temporary Clerical Pool as a source of clerical and support staffing assistance to agencies and as a source of job candidates for permanent clerical positions.

(b)  *State Civil Service Commission.*  The State Civil Service Commission shall establish and maintain a program for effective recruitment and evaluation to ensure an adequate supply of qualified applicants for Civil Service examination in accordance with *4 Pa. Code, Chapter 95.*

(c)  *Director of Personnel.*  The Director of Personnel shall assist the Bureau of State Employment, Commonwealth agencies, and the State Civil Service Commission, in cooperation with the Bureau of Equal Employment Opportunity to establish equal opportunity employment standards relating to recruitment.

(d)  *Operating agencies.*  Agency heads, through their personnel officers, shall be responsible for maintaining effective recruitment programs to augment the programs of the Bureau of State Employment and the State Civil Service Commission.  They are also responsible for conducting identification, employment, and education verification checks.  (Reference *Management Directive 515.15, Identification, Employment, and Education Verification Checks.*)

(e)  *Employment related state agencies.*  The employment service of the Office of Employment Security, the Board of Probation and Parole, the Office of Vocational Rehabilitation, and other clientele related state agencies shall be used to contribute to effective recruitment.

Subchapter B.  APPLICATION AND APPOINTMENT

Sec.

7.11.   General Requirements for Commonwealth Service.
7.12.   Rejection of Applicants.
7.13.   Non-Civil Service Applications and Appointments.
7.14.   Civil Service Applications and Appointments.
7.15.   Reappointment of Annuitants.
7.16.   Persons Having Adverse Interest.
7.17.   Identification, Employment, and Education Verification Checks.
7.18.   Immigration, Reform, and Control Act (IRCA).

7.11.   General Requirements for Commonwealth Service.

Applicants for positions in the Commonwealth service shall meet the established minimum experience and training requirements of the positions for which they are applying.  In addition, the following general requirements shall apply to all applications:

(1)  **Pennsylvania residence.**  For Non-Civil Service positions, guidelines developed by the Secretary of Administration shall apply.  For Civil Service, refer to *4 Pa. Code §95.2(a)* and *Management Directive 580.18, Pennsylvania Residency and United States Citizenship Requirements for the Classified Service.*

(2)  **Age.**  Male and female minors under the age of 18, except those 17 years of age who are high school graduates, are subject to the provisions of the *Child Labor Law (43 P.S. §41 et seq.)* and shall have an employment certificate issued by their local school district.  In addition, minors who are 17 years of age and not high school graduates but who have been declared to have reached their academic potential by the chief administrator of their school district shall not need employment certificates.  However, verification of the status of these minors shall be obtained by contacting the school districts in which such minors reside while attending school.

7.12.   Rejection of Applicants.

Applicants will be rejected for failure to meet the requirements listed in Section 7.11.  In addition, applicants may be rejected if they:

(1)  Are physically or mentally unable, with or without reasonable accommodation, to perform the essential functions of the positions to which they seek appointment.

(2)  Are habituated to the intemperate use of alcoholic beverages or the use of harmful drugs.

(3)  Have been convicted of a crime, although conviction of a crime in and of itself is not a bar to employment; each case will be evaluated to determine the relationship between the offense and the duties and responsibilities of the positions to which they seek employment.

(4)  Have been dismissed from public service or other employment for delinquency or misconduct.

(5)  Have made false statements of material facts with respect to gaining Commonwealth employment.

(6)  Have an unsatisfactory past employment record, when such record may affect expected job performance in the position they seek.

### 7.13.  Non-Civil Service Applications and Appointments.

(a)  *Forms.*  Applications for Non-Civil Service employment shall be completed on forms provided by and filed with the Bureau of State Employment.

(b)  *False information.*  If investigation of statements made on an employment application discloses that an applicant has given false information, the application may be rejected and, if already employed, the individual may be subject to dismissal.

(c)  *Procedures.*  Appointments to Non-Civil Service positions shall be made according to procedures established by the Bureau of State Employment.

### 7.14.  Civil Service Applications and Appointments.

Applications for and appointments to Civil Service positions shall be made in accordance with *4 Pa. Code, Chapters 95 and 97.*

### 7.15.  Reappointment of Annuitants.

In accordance with the *State Employes' Retirement Code of 1974 (Act 31 of March 1, 1974), as amended by Act 1991-23,* when in the judgment of an agency head, an emergency creates an increase in the workload such as there is serious impairment of service to the public, an annuitant may, with the approval of the Governor, be returned to Commonwealth service for a period not to exceed 95 workdays in any fiscal year without loss of annuity.  Such employment shall be in accordance with procedures established by the State Civil Service Commission for Civil Service employment and the Bureau of State Employment for Non-Civil Service employment.  The limitation of 95 days' employment shall not apply to an annuitant who may perform services for the Commonwealth as an independent contractor.

### 7.16.  Persons Having Adverse Interest.

(a)  In accordance with the *State Adverse Interest Act (71 P.S. §776.1 et seq.)* no person having an adverse interest in a contract with a Commonwealth agency shall be appointed by the agency until the adverse interest has been wholly divested.

(b)  In addition, the provisions of *Sections 13.21 – 13.27* of this directive shall be followed.

### 7.17.  Identification, Employment, and Education Verification Checks.

(a)  Agencies are required to conduct identification, employment, and education verification checks on final candidates selected for initial state employment.

(b)  Agencies must obtain three references and verify the candidate's identification, employment, and education.

### 7.18.  Immigration, Reform, and Control Act (IRCA).

The *Immigration, Reform, and Control Act (IRCA) of 1986* makes it unlawful to hire, recruit, or refer for a fee unauthorized aliens.

(a)  In order to meet IRCA requirements, appointing agencies must verify the candidate's identity and authorization to work in the United States.

**(b)** All employes and appointing agencies must complete Form I-9, Employment Eligibility Verification, within three days of employment and provide acceptable documentation within 21 days of hire.

**(c)** Acceptable documentation as outlined on Form I-9 must be supplied by the applicant to support identity and employment eligibility.

**(d)** Documents containing expiration dates of aliens lawfully admitted and authorized by the Immigration and Naturalization Service (INS) to work in the United States should be copied and maintained in a separate IRCA tickler file. Agencies must notify employes prior to the expiration date of employment ineligibility and terminate an employe unless the employe produces documentation to support the extension by the INS of the employe's employment eligibility.

**(e)** Form I-9 must be retained in the employe's official personnel history file indefinitely after date of hire. (Reference *Management Directive 515.15, Identification, Employment, and Education Verification Checks.*)

CHAPTER    8.    ATTENDANCE, HOLIDAYS, AND    LEAVE

Subchapter                                                                                                                Sec.

A.  ATTENDANCE  AND  HOLIDAYS. ................................................................................................ 8.1
B.  LEAVE  WITH  PAY ........................................................................................................................ 8.11
C.  LEAVE  WITHOUT  PAY .................................................................................................................. 8.101

### Subchapter A.  ATTENDANCE  AND  HOLIDAYS

Sec.

8.1.    Office  Hours.
8.2.    Hours  in  Workweek.
8.3.    Workday  of  Employes.
8.4.    Labor  Law.
8.5.    Meal  Periods  and  Rest  Periods.
8.6.    Alternate  Work  Schedule.
8.7.    Office  Closings.
8.8.    Paid  Holidays.
8.9.    Special  Holidays.

#### 8.1.  Office  Hours.

The administrative offices of the Commonwealth shall open and close as prescribed by the Executive Board.

#### 8.2.  Hours  in  Workweek.

(a)  The number of hours a full-time employe is to regularly work each week shall be determined by the head of the employing department, board, commission, or council consistent with the public interest and operational requirements of the agency.  In no case shall the full-time hours be less than 37.5.

(b)  Employes whose regular workweek exceeds 37.5 hours may, subject to approval by the Secretary of Administration, be paid in accordance with pay schedules which are proportionately higher than the pay schedules for employes whose regular workweek is 37.5 hours, provided that the greater number of hours in the regular workweek is a result of compelling circumstances, such as those instances where uninterrupted 24 hour work is required and relief for lunch periods is impractical.

#### 8.3.  Workday  of  Employes.

(a)  The hours at which the workday of a full-time employe in an administrative office in an agency begin and end shall correspond to the official hours designated for that agency by the Executive Board.  Exceptions to this rule may be approved by the agency head in individual cases or may be agreed to through meet and discuss with the employe representative, with the concurrence of the Secretary of Administration, consistent with the public interest and the operational requirements of the agency.

(b) The workday or shift of a person in an employment situation which involves irregular, intermittent, employe controlled, contractor or vendor controlled, or continuous operations as in an institution, shall be determined by the agency head, consistent with the public interest and the operational requirements of the agency.

(c) The workweek of a part-time employe shall be determined by the agency head, consistent with the public interest and operational requirements of the agency.

## 8.4. Labor Law.

The work hours of minors employed in any Commonwealth agency shall conform to the provisions of the *Child Labor Law (43 P.S. §41 et seq.)*.

## 8.5. Meal Periods and Rest Periods.

(a) All employes shall be granted a meal period which shall fall within the third to fifth hours of their work shift unless otherwise approved by the employer.

(b) If an employe is required to work more than two hours beyond regular quitting time, the employe will be allowed a meal period at the end of the initial two hour period or sooner. In addition, the employe will be allowed a meal period for each four hours worked beyond each meal period.

(c) Full-time employes shall receive a 15 minute paid rest period during each one-half workday (shift).

(d) Part-time employes shall be granted a 15 minute paid rest period during each 3-3/4 hour work period.

## 8.6. Alternate Work Schedule.

(a) In accordance with established collective bargaining agreements and memoranda of understanding, agencies may establish work schedules, including flex-time schedules for operational units. An alternate work schedule will be approved only when it will result in an improvement in operational efficiency and/or client service, except when the alternate work schedule is required for an individual as a reasonable accommodation pursuant to the *Americans With Disabilities Act*. Under no circumstance should alternate work schedules:

    (1) Increase operational costs.

    (2) Increase current complement.

    (3) Affect the Commonwealth's ability to meet accreditation and certification criteria.

    (4) Adversely impact the efficiency of affected operations or standards of service.

    (5) Contain an unreasonable number of work schedules.

(b) All alternate work schedule proposals must have prior approval from the agency and the Office of Administration before final agreement can be reached with the union or before any commitments can be made to the affected employes.

(c) If any adverse impact occurs or if the alternate work schedule does not increase operational efficiency and/or client service, management can discontinue the alternate work schedule with not less than 15 days notice or immediately for emergencies.

**(d)** Employe participation in an alternate work schedule will be on a voluntary basis, except in those cases for management or supervisory level employes where necessity requires the use of the alternate work schedule.

**(e)** Employe participation in an alternate work schedule must not result in the Commonwealth providing additional employment benefits to the participants.

**(f)** All alternate work schedules must be continuously monitored by local management. A written evaluation, in accordance with preestablished criteria, must be completed after six months for newly implemented alternate work schedules and annually thereafter, and approved by the agency and the Office of Administration to continue the AWS.

**(g)** Staggered work schedules are not considered alternate work schedules or flex time schedules and may be approved at the agency level to accommodate individual employes for education, transportation, family care, or other approved reasons.

**8.7. Office Closings.**

**(a)** *Office closings for entire workday (shift).*

**(1)** Office closings for an entire workday may be authorized for reasons such as hazardous road conditions, extreme heat, other emergency conditions which could result in undue harm to employes, and other reasons as determined by the Secretary of Administration.

**(2)** Office closings for an entire workday are not special holidays.

**(3)** Employes who are authorized to not report for work because of an office closing for an entire workday shall not have their compensation reduced. Employes required to work during the period when an office closing for an entire workday has been authorized shall be treated in accordance with guidelines established through the Directives Management System. (Reference *Management Directive 530.17, Partial and Full-Day Closings of State Offices.*)

**(4)** Employes on a paid leave status during the period when an office closing for an entire workday is authorized will be charged with leave as though the offices were not closed. In the case of an office closing for an entire workday which is announced prior to the actual day of closing, an employe may cancel an approved request for leave if done so before the end of the employe's full scheduled workday or work shift immediately preceding the entire workday closing.

**(5)** The Secretary of Administration is responsible for authorizing office closings for an entire workday for employes under the Governor's jurisdiction in the Harrisburg area and in those state office buildings designated in *Management Directive 530.17.*

**(6)** Agencies with field offices or institutions, other than those in the state office buildings designated in *Management Directive 530.17*, may authorize the heads of field offices or institutions to grant office closings for an entire workday for hazardous road conditions or any other emergency condition which could result in undue harm to employes.

**(b)** *Partial day closings.*

**(1)** A partial day closing is the authorized closing of offices for part of a day and the authorized absence of nonessential employes from work for the reasons indicated under (b)(2). Partial day closings are not special holidays.

(2)  A partial day closing may be authorized for reasons such as hazardous road conditions, extreme heat, other emergency conditions which could result in undue harm to employes, and other reasons as determined by the Secretary of Administration.

(3)  Employes who are released from work because of a partial day closing shall not have their compensation reduced.  Employes required to work during the period when a partial day closing has been authorized shall be treated in accordance with guidelines established through the Directives Management System.  (Reference *Management Directive 530.17.*)

(4)  Employes on a paid leave status on a day when a partial day closing is authorized will be charged with leave as though no partial day closing occurred.  In the case of a partial day closing which is announced prior to the actual day of closing, an employe may cancel an approved request for leave if done so before the end of the employe's full scheduled workday or work shift immediately preceding the partial day closing.

(5)  The Secretary of Administration is responsible for authorizing a partial day closing for employes in agencies under the Governor's jurisdiction in the Harrisburg area and in the state office buildings designated in *Management Directive 530.17.*

(6)  Agencies with field offices or institutions, other than those in the state office buildings designated in *Management Directive 530.17,* may authorize the heads of field offices or institutions to grant a partial day closing for employes for hazardous road conditions or any other emergency conditions which could result in undue harm to employes.

## 8.8.  Paid Holidays.

Permanent full-time employes shall receive leave with compensation for the following holidays, except as provided in appropriate labor agreements (reference Section 8.10):

| Paid Holiday | Date |
| --- | --- |
| New Year's Day | January 1 |
| Dr. Martin Luther King, Jr. Day | Third Monday in January |
| President's Day | Third Monday in February |
| Memorial Day | Last Monday in May |
| Independence Day | July 4 |
| Labor Day | First Monday in September |
| Columbus Day | Second Monday in October |
| Veterans Day | November 11 |
| Thanksgiving Day | Fourth Thursday in November |
| Day after Thanksgiving | Day after Thanksgiving |
| Christmas Day | December 25 |

## 8.9.  Special Holidays.

(a)  Special holidays may be declared by the Governor for employes under the Governor's jurisdiction.  Such special holidays may represent a full day or part of a day.

(b)  All permanent employes who are required to work on the day on which such holiday hours occur shall receive time off with pay for all hours worked up to the number of hours in the employe's normal work shift if a full holiday is declared or up to a pro rata share of the normal work shift if a partial holiday is declared.  The employer may elect the option of paying the employe's regular hourly rate of pay in lieu of such equivalent time off with pay.

(c) Special holidays are not early dismissals or office closings for entire workdays.

(d) Eligible employes in shifts affected by a special holiday shall be treated in accordance with Section 8.10 except as stipulated in subsection (c) and except that employes required to work on a special holiday shall receive their appropriate rate of pay for that day and not the premium holiday pay outlined under Section 8.10(l).

## Subchapter B.   LEAVE WITH PAY

**HOLIDAYS.**

Sec.

8.10.   Holidays.

**ANNUAL   LEAVE.**

8.11.   General.
8.12.   Annual Leave Entitlement.
8.13.   Periods Where Leave Service Credit is Earned.
8.14.   Anticipated Annual Leave.
8.15.   Transfer of Annual Leave Credits.
8.16.   Scheduling and Carryover of Annual Leave.
8.17.   Agency Heads and Members of Departmental Boards and Commissions — Annual Leave.

**SICK   LEAVE.**

8.21.   General.
8.22.   Sick Leave Entitlement.
8.23.   Reasons for Sick Leave.
8.24.   Approval.
8.25.   Anticipated Sick Leave.
8.26.   Transfer of and Payment for Earned Unused Sick Leave.
8.27.   Carryover.
8.28.   Reemployment Within 12 Months.
8.29.   Special Extension.
8.30.   Agency Heads and Members of Departmental Boards and Commissions — Sick Leave.

**PERSONAL   LEAVE.**

8.31.   General.
8.32.   Personal Leave Entitlement.
8.33.   Anticipated Personal Leave.
8.34.   Transfer of Personal Leave Credits.
8.35.   Scheduling and Carryover of Personal Leave.
8.36.   Agency Heads and Members of Departmental Boards and Commissions — Personal Leave.

**ADMINISTRATIVE   LEAVE.**

8.41.   Reasons for Administrative Leave.

CIVIL LEAVE.

8.51.   General.
8.52.   Jury Duty, Court, and Administrative Hearing Attendance.
8.53.   Firefighting, Emergency Medical Technician, Emergency Management, Civil Air Patrol and
        Red Cross.

EDUCATIONAL LEAVE WITH PAY.

8.61.   General.

MILITARY LEAVE WITH PAY.

8.71.   Military Reserve.
8.72.   Pennsylvania National Guard.

- PAID INJURY LEAVE.

- 8.81.   General.
- 8.82.   Eligibility for Paid Injury Leave.
- 8.83.   Paid Injury Leave Benefits.

# HOLIDAYS.

### 8.10.  Holidays.

(a)  A permanent full-time employe will receive leave with compensation for days determined by the Executive Board to be holidays.

(b)  A permanent part-time employe will receive leave with compensation based upon the employe's regular hours worked for days determined by the Executive Board to be holidays.

(c)  Compensation for a holiday will be the employe's regular compensation in effect for the employe's regular classification, subject to conditions established by the Secretary of Administration and published through the Directives Management System relating to temporary assignment in higher classification.

(d)  For an employe on a normal Monday through Friday workweek:  if a holiday falls on Sunday, the immediately following Monday shall be observed as the holiday; if a holiday falls on Saturday, the immediately preceding Friday shall be observed as the holiday.  For other employes, the holiday shall be deemed to fall on the day on which the holiday occurs.

(e)  A permanent employe, except one who is retiring, is eligible for a holiday if the employe was scheduled to be in an active pay status on the day the holiday was to be observed and if the employe was in an active pay status on the last half of the employe's scheduled workday immediately before and the first half of the employe's scheduled workday immediately after the holiday.

(f)  A permanent employe who is retiring is eligible for a holiday if the employe was scheduled to be in an active pay status on the day the holiday was to be observed and if the employe was in an active pay status on the last half of the employe's scheduled workday immediately before the holiday.

(g)  If a holiday is observed while a permanent employe is on an approved paid leave, excluding Work-Related Disability Leave, Act 632/534 Leave, Heart and Lung Act Leave, and any leave without pay, that day is considered a holiday and may not be charged against the approved leave.

(h)  A permanent employe hired after the beginning of a calendar year or terminated before the end of a calendar year is entitled to one day of paid leave on or in lieu of each of the holidays which occur during the employment period that year.

(i)  Holiday leave is granted on the dates determined by the Executive Board to be holidays or as shown in subsection (d), subject to management's responsibility to maintain efficient operations.  An employe required to work on a holiday will receive holiday leave at a later date.  If a request for leave is received before or within 45 days after the holiday is worked, holiday leave will, subject to managements' responsibility to maintain efficient operations, be scheduled and granted as requested by the employe, before the holiday or within the 90 calendar-day period succeeding the holiday.  If the holiday leave has not been taken within 90 calendar days of its observance, the employe is paid at the employe's regular rate of pay in lieu of paid time off.

(j)  A permanent employe working other than a regular Monday through Friday schedule is guaranteed the number of days off with pay equal to the number of paid holidays received by employes working a Monday through Friday schedule, subject to the same entitlement requirements.

(k)  When an employe's work shift overlaps the calendar day, the first shift of the employe in which 50 percent or more of the time occurs on the applicable holiday is considered in the holiday period, and the holiday period shall end 24 hours after the commencement of that shift.

53

(l)    If a permanent employe works on days determined by the Executive Board to be holidays, except the day after Thanksgiving, the employe is paid as follows:

|  | Permanent Employes Except Exempt Management | Permanent Exempt Management Employes |
|---|---|---|
| For time during the regularly scheduled shift. | Regular hourly rate for hours not worked; 1-1/2 times the regular hourly rate for hours worked; holiday leave for hours worked. | Regular hourly rate for hours worked or not worked; holiday leave for hours worked. |
| For time worked outside the regularly scheduled shift. | One and one-half times the regular hourly rate for hours worked; holiday leave for hours worked. | Regular hourly rate for hours worked; holiday leave for hours worked. |

(m)    If a permanent employe works on the day after Thanksgiving, the employe shall be compensated at the employe's regular hourly rate of pay for the hours worked on this holiday.  The employe shall receive paid time off for the hours worked on the day after Thanksgiving up to a full shift.  If the time is worked during the employe's regularly scheduled shift, the paid time off shall be in lieu of holiday pay for that time.  Paid time off for time worked outside of the employe's regularly scheduled shift may not be in lieu of the holiday pay.

(n)    Holiday leave earned on a holiday may not exceed the number of hours in a regularly scheduled shift.  An employe is not entitled to duplicate holiday payment or to the pyramiding of premium pay for the same hours worked.

(o)    Holiday leave for time worked outside an employe's regularly scheduled shift may not be in lieu of the employe's regular pay for the holiday.  An employe is not entitled to duplicate holiday payment or to the pyramiding of premium pay for the same hours worked.

(p)    A permanent employe who terminates Commonwealth employment will be paid in a lump sum at the employe's regular rate of pay for unused holiday leave accumulated up to the time of termination.

## ANNUAL LEAVE.

### 8.11.  General.

(a)    Annual (vacation) leave is time away from the job with compensation to which an employe becomes entitled based on leave service credit as defined in Section 8.13 (relating to credited periods of service).

(b)    The rate of compensation for annual leave is an employe's regular compensation in effect for the employe's regular classification, subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignment in higher classifications.

(c)    For purposes of earning, accruing, and using annual leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

## 8.12. Annual Leave Entitlement.

(a)    An employe is entitled to use annual leave after 30 days of service with the employer in accordance with leave service credit as follows:

| Leave Service Credit and Rate of Accumulation (Includes all periods of Commonwealth service in which leave service credit was earned) | Maximum Annual Leave Entitlement Per Year | |
|---|---|---|
| Up to 3 years:<br>3.85% of all regular hours paid | 37.5 hour workweek:<br>40 hour workweek: | 75 hours (10 days)<br>80 hours (10 days) |
| Over 3 years to 15 years inclusive:<br>5.77% of all regular hours paid | 37.5 hour workweek:<br>40 hour workweek: | 112.5 hours (15 days)<br>120 hours (15 days) |
| Over 15 years to 25 years inclusive:<br>7.70% of all regular hours paid | 37.5 hour workweek:<br>40 hour workweek: | 150 hours (20 days)<br>160 hours (20 days) |
| Over 25 years:<br>10% of all regular hours paid | 37.5 hour workweek:<br>40 hour workweek: | 195 hours (26 days)<br>208 hours (26 days) |

(b)    An employe appointed on a temporary basis may not earn or use annual leave until the employe has been paid for 750 regular hours by the end of the last full pay period in a calendar year. Earned, unused annual leave will be carried over to the next calendar year and will be immediately available for use.  Annual leave is subject to payment at termination.  This provision does not apply to a furloughed employe who, during the recall period, returns in a temporary capacity.

(c)    Regular hours paid for the purpose of annual leave earning include all hours paid except overtime, standby time, call-time, and full-time out-service training.

## 8.13. Periods Where Leave Service Credit Is Earned.

(a)    An employe shall be credited with a year of service for each 26 pay periods completed in an active pay status provided the position was leave service credit eligible and a minimum of one hour was paid in each pay period.  It includes employment in the executive, legislative, and judicial branches of Commonwealth government.

(b)    Leave service credit shall also include military leaves without pay and work-related disability leave.  Service in another public jurisdiction and military service prior to Commonwealth employment shall not be credited.

(c)    Service with the executive, legislative, or judicial branch of the Commonwealth government shall be included for the purpose of establishing the hire date if an employe transfers to a Commonwealth agency provided that any break in service does not exceed 14 calendar days.

### 8.14.  Anticipated Annual Leave.

(a)    Annual leave to which a permanent employe shall become entitled during the calendar year may be granted at the discretion of the agency head before it is actually earned.  Employes appointed on a temporary basis shall not be permitted to anticipate annual leave.  In no case shall annual leave be anticipated beyond the end of the calendar year.  If, because of an extended leave without pay due to illness or injury, an employe earned less annual and sick leave during the calendar year than the anticipated entitlement, the deficit may be carried over and charged against the annual and sick leave entitlements of the following year, provided the number of hours carried over does not exceed 1/2 of the employe's total annual and sick leave entitlement which could be earned in the following calendar year.  An employe who anticipated annual leave and is not entitled to such anticipation shall have such improperly anticipated annual leave changed to leave without pay.  An employe who anticipates annual leave and is subsequently separated from Commonwealth service shall reimburse the Commonwealth for those hours of annual leave taken but not earned.  The agency involved shall make diligent efforts to collect for any unearned leave.  If the account is determined uncollectible, it shall be referred to the Attorney General.

(b)    In the event of the death of an employe, any anticipated annual leave shall be treated as earned approved leave.

### 8.15.  Transfer of Annual Leave Credits.

(a)    An employe who transfers from a position in one Commonwealth agency to a position in another Commonwealth agency will be credited in the gaining agency for unused annual leave earned before the transfer occurred if the losing agency meets one of the following conditions:

(1)    Is subject to the regulatory authority of the Executive Board regarding paid leave under *Section 709(e)* of *The Administrative Code of 1929 (71 P.S. §249(e))*.

(2)    Participates in the automated time and attendance system administered by the Office of Administration.

(3)    Has a reciprocal leave agreement filed with the Office of Administration for the transfer of annual leave.

(b)    An employe who terminates Commonwealth employment, transfers to either the legislative or judicial branch of government, or transfers to another agency which does not meet any of the criteria described in subsection (a)(1), (2), or (3) will be paid in a lump sum by the losing agency for unused annual leave earned before the transfer or termination occurred.

(c)    The following provisions govern freezing of annual leave:

(1)    An employe who is furloughed and is not employed in another position within 14 calendar days of the effective date of the furlough will receive a lump sum payment for earned, unused annual leave unless the employe requests in writing before the end of the 14 calendar days to freeze earned, unused annual leave.

(2)    An employe may subsequently change a decision to freeze the earned, unused annual leave by submitting a written request for a lump sum payment for the annual leave.  Payment will be made within 35 days of the date on which the request is received by the employer and will be at the rate of pay in effect on the last date of employment prior to the date of furlough.

(3)    If the employe is reemployed during the furlough recall period, annual leave which was frozen shall be reinstated. However, if payment was made for annual leave, the employe may not buy it back if the employe is reemployed. If the employe is not reemployed before the expiration of the furlough recall period, the employe will be paid off in lump sum for frozen earned, unused annual leave at the rate of pay in effect on the last date of employment before the date of furlough.

## 8.16.  Scheduling and Carryover of Annual Leave.

(a)    An agency head shall schedule the work of employes to enable the employes to use the annual leave to which they become entitled during the year. Annual leave shall be granted at times determined by the agency head to be consistent with the provision of full service to the public and with the best interest of the agency. Employes shall be encouraged to use annual leave during the year in which it is earned. If an employe is required to work during a scheduled vacation period and is unable to reschedule the vacation during the calendar year, the calendar year shall be extended for seven pay periods for rescheduling purposes. If an employe terminates employment before the expiration of the rescheduling period, earned, unused annual leave shall be paid in accordance with Section 8.15(b) (relating to transfer of annual leave credits).

(b)    An employe on injury leave who has been unable to take earned annual leave resulting in an excess carryover at the end of the calendar year is authorized a seven pay period extension upon return from injury leave.

(c)    Unused annual leave shall be carried over from one calendar year to the next. The amount carried over may not exceed 45 days – 337.5 hours for a 37.5-hour week or 360 hours for a 40-hour week.

(d)    If, at the end of a calendar year, or extended calendar year under subsection (a) or (b) the amount of annual leave an employe has earned and accumulated exceeds the amount which may be carried over, sick leave taken by the employe during the calendar year may be charged against annual leave up to the amount of accrued annual leave which exceeds the carryover limits and which would otherwise lapse.

## 8.17.  Agency Heads and Members of Departmental Boards and Commissions – Annual Leave.

(a)    An agency head or member of a departmental board or commission may not earn or use annual leave. Vacation time is neither recorded nor charged. However, service as an agency head or member of a departmental board or commission counts as credited service under Section 8.13 (relating to credited periods of service).

(b)    An agency head or member of a departmental board or commission who, immediately prior to appointment as an agency head or member of a departmental board or commission, was an employe of the Commonwealth receiving annual leave under this subpart will have unused annual leave frozen at the time of appointment to the position as agency head or member of a departmental board or commission.

(c)    An agency head or member of a departmental board or commission who retires, terminates Commonwealth employment, transfers to either the legislative or judicial branch of government, or transfers to an agency that does not meet any of the criteria described in Section 8.15(a) will be paid in a lump sum by the losing agency for unused annual leave frozen under subsection (b). The lump sum will be calculated using the pay rate in effect on the date of transfer or termination for that step of the pay range currently assigned to the class the individual occupied immediately before becoming an agency head or member of a departmental board or commission.

(d)   If, after serving as an agency head or member of a departmental board or commission, an individual reverts to a position not as an agency head or member of a departmental board or commission without a break in service, the amount of annual leave frozen under subsection (b) will be restored to the employe's leave account.

## SICK LEAVE.

### 8.21.  General.

(a)   Sick leave is time away from the job with compensation when an employe becomes too ill to work or must be absent for valid sick-related reasons as identified in Section 8.23 (relating to reasons for sick leave).

(b)   The rate of compensation for sick leave is an employe's regular compensation in effect for the employe's regular classification subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignments in higher classifications.

(c)   For purposes of earning, accruing, and using sick leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

### 8.22.  Sick Leave Entitlement.

(a)   An employe shall be entitled to use sick leave after 30 days of service with the employer.  Sick leave entitlement is as follows:

| Length of Workweek | Maximum Sick Leave Entitlement Per Year | Rate of Accumulation |
|---|---|---|
| 37.5 hours | 97.5 hours | 5% of regular hours paid |
| 40 hours | 104 hours | |

(b)   An employe appointed on a temporary basis may not earn or use sick leave until the employe has been paid for 750 regular hours by the end of the last full pay period in each calendar year.  Earned, unused sick leave will be carried over to the next calendar year and will be immediately available for use.  This provision does not apply to a furloughed employe who, during the recall period, returns in a temporary capacity.

(c)   Regular hours paid for the purpose of sick leave earning include all hours paid except overtime, standby time, call-time, and full-time out-service training.

### 8.23.  Reasons for Sick Leave.

Sick leave shall be granted when an employe is required to be absent from work for one of the following reasons:

(1)   Illness of the employe.

(2)   Death, as follows:

(i)   Death of a spouse, parent, stepparent, child or stepchild of the employe, for which a maximum of five days may be granted per occurrence.

(ii)    Death of a brother, sister, uncle, aunt, grandparent, stepgrandparent, grandchild, stepgrandchild, son-in-law, daughter-in-law, brother-in-law, sister-in-law, parent-in-law, grandparent-in-law, or any relative residing in the employe's household, for which a maximum of three days may be granted per occurrence.

(3)    Contact with or exposure to contagious disease rendering the presence of the employe hazardous to fellow employes.

(4)    Necessary medical or dental appointments for the employe or the employe's immediate family, as defined in paragraph (5), that cannot be scheduled during nonwork hours and that meet one of the following criteria:

(i)    The immediate family member is physically unable to drive a vehicle or is otherwise unable to reach the medical facility without the employe's absence.

(ii)    The illness of the immediate family member requires the employe's personal attendance.

(5)    Illness of a member of the employe's immediate family which requires the employe's personal attendance and absence from work not to exceed five days in a calendar year. Immediate family is defined as the following persons:  husband, wife, child, stepchild, parent, brother, or sister of the employe.

## 8.24.   Approval.

(a)    Proof of illness in the form of a certificate from a physician, other licensed practitioner or Christian Science practitioner is required in the following instances:

(1)    A reason under Section 8.23(1), (3), (4) or (5) (relating to reasons for sick leave), if an employe is absent for three or more consecutive workdays.

(2)    Illness occurs during the annual or personal leave of an employe.

(3)    The employer has reason to believe that the employe is abusing sick leave privileges.

(b)    An employe shall be held to strict accountability for the statements made by him concerning sick leave.  A misrepresentation shall subject the employe to disciplinary action.

## 8.25.   Anticipated Sick Leave.

(a)    Sick leave to which a permanent employe shall become entitled during the calendar year may be granted at the discretion of the agency head before it is actually earned.  Employes appointed on a temporary basis shall not be permitted to anticipate sick leave.  In no case shall sick leave be anticipated beyond the end of the calendar year.  If, because of an extended illness or injury, an employe earned less sick and annual leave during the calendar year than the anticipated entitlement, the deficit may be carried over and charged against the sick and annual leave which could be earned the following calendar year, provided that the number of hours carried over does not exceed 1/2 of the employe's total annual and sick leave entitlement which could be earned in the following calendar year.  An employe who anticipates sick leave and is not entitled to such anticipation shall have such improperly anticipated sick leave changed to leave without pay.  An employe who anticipates sick leave and is subsequently separated from Commonwealth service shall reimburse the Commonwealth for those hours of sick leave taken but not earned.  The agency involved shall make diligent efforts to collect for any unearned leave.  If the account is determined uncollectible, it shall be referred to the Attorney General.

**(b)** In the event of the death of an employe, any anticipated sick leave shall be treated as earned approved leave.

**8.26. Transfer of and Payment for Earned Unused Sick Leave.**

**(a)** An employe who transfers from a position in one Commonwealth agency to a position in another Commonwealth agency will be credited in the gaining agency for unused sick leave earned before the transfer occurred if the losing agency meets one of the following conditions:

**(1)** Is subject to the regulatory authority of the Executive Board regarding paid leave under *Section 709(e)* of *The Administrative Code of 1929 (71 P.S. §249(e)).*

**(2)** Participates in the automated time and attendance system administered by the Office of Administration.

**(3)** Has a reciprocal leave agreement filed with the Office of Administration for the transfer of sick leave.

**(b)** An employe who terminates Commonwealth employment, transfers to either the legislative or judicial branch of government, or transfers to another agency which does not meet any of the criteria described in subsection (a)(1), (2), or (3) may not be paid for unused sick leave.

**(c)** Payment for earned, unused sick leave is as follows:

**(1)** Permanent management level employes and permanent employes in units A5, B5, and S5 will receive payment according to the schedule in paragraph (2) upon:

**(I)** Superannuation retirement with at least five years of credited service under the State or Public School Employes' Retirement Systems.

**(II)** Disability retirement under the State or Public School Employes' Retirement Systems.

**(III)** Other retirement with at least 25 years of credited service under the State or Public School Employes' Retirement Systems.

**(Iv)** Death prior to retirement or separation after seven years of credited service under the State or Public School Employes' Retirement Systems except as provided in paragraph (3).

**(2)** Payment shall be according to the following schedule:

| Days Available At Retirement Or Death | Percentage Buy-Out | Maximum Days |
|---|---|---|
| 0 - 100 | 30% | 30 |
| 101 - 200 | 40% | 80 |
| 201 - 300 | 50% | 150 |
| 300 + (in last year of employment) | 100% of days over 300 | 13 |

(3)    In the event of a work-related death of an employe, 100 percent of the employe's earned, unused sick leave shall be paid unless the surviving spouse or minor children are entitled to benefits under *Section 1* of the *Act of June 24, 1976 (P.L. 424, No. 101) (53 P.S. §891)*, in which case 30 percent of the employe's earned, unused sick leave to a maximum of 90 days shall be paid.

(4)    Payment will not be made for part days of earned, unused sick leave.  The portion of unused sick leave paid upon retirement will not add to the credited service of the retiring employe nor to the retirement-covered compensation of the employe.

## 8.27.  Carryover.

Unused sick leave shall be carried over from one calendar year to the next.  The amount carried over may not exceed 300 days, i.e., 2,250 hours for a 37.5-hour week or 2,400 hours for a 40-hour week.

## 8.28.  Reemployment Within 12 Months.

(a)    An individual who is reemployed by a Commonwealth agency within 12 months following termination from another Commonwealth agency will be credited with earned unused sick leave from the previous Commonwealth employment if the previous agency met one of the criteria described in Section 8.26(a) (relating to transfer of and payment for earned unused sick leave).

(b)    A furloughee who is terminated and subsequently reemployed or recalled from furlough prior to the expiration of the furloughee's recall rights by a Commonwealth agency will be credited with unused sick leave earned up to the date of termination if the previous agency met one of the criteria described in Section 8.26(a).

(c)    An employe who received payment for earned, unused sick leave at retirement under Section 8.26(c) (relating to transfer of and payment of earned unused sick leave) may not be credited with earned, unused sick leave from the previous Commonwealth employment upon reemployment as set forth in subsection (a) or (b).

## 8.29.  Special Extension.

(a)    *Initial entitlement.*

(1)    The head of an agency may consider special extension of sick leave for an employe who:

(i)    Is a permanent employe.

(ii)    Has at least one year of credited service.

(iii)    Has used all earned annual and sick leave.

(iv)    Has used all annual and sick leave that could be anticipated in the current calendar year.

(v)    Can substantiate the illness or injury by a certificate from a physician, other licensed practitioner or a Christian Science practitioner.

(vi)    Is expected to return to duty.

(2)    Initial entitlements for full-time employes are:

| Credited Service | Maximum Initial Entitlement | |
|---|---|---|
| | 37.5-Hour Week | 40-Hour Week |
| 1 year and over, but under 2 years | 37.5 hours – 5 days | 40 hours – 5 days |
| 2 years and over, but under 5 years | 75 hours – 10 days | 80 hours – 10 days |
| 5 years and over, but under 10 years | 112.5 hours – 15 days | 120 hours – 15 days |
| 10 years and over | 150 hours – 20 days | 160 hours – 20 days |

(3)    Initial entitlements for part-time employes are proportionately less than that provided for full-time employes.

(4)    If a period of absence due to employe illness or injury spans two calendar years, the portion of the absence that falls in the second calendar year is considered as an initial entitlement for the second calendar year.

(5)    An approved initial entitlement for special extension of sick leave is not payable for the period after an employe's termination or death.

(6)    One copy of an approved initial entitlement shall be sent to the Bureau of Personnel, Office of Administration.

(7)    The Office of Administration will conduct an annual audit of the initial entitlements approved by agency heads during the preceding year.  Failure to comply with this subsection shall result in the adjustment by approving agencies of individual initial entitlements not in compliance.

(b)    *Requests beyond initial entitlement.*  Requests beyond initial entitlement shall comply with the following:

(1)    Upon request of the head of an agency, the Executive Board will consider special extension of sick leave beyond the initial entitlement for an employe who:

(I)    Meets the requirements of subsection (a).

(II)    Has a clearly established case of severe hardship.

(2)    Documentation used by agency heads to determine severe hardship will be submitted with the request to the Executive Board.

(3)    An approved request beyond initial entitlement for special extension of sick leave is not payable for the period after an employe's termination or death.

**8.30.  Agency Heads and Members of Departmental Boards and Commissions – Sick Leave.**

(a)    An agency head or member of a departmental board or commission may not earn or use sick leave.  Time absent for reasons of illness is neither recorded nor charged.

(b)   An agency head or member of a departmental board or commission who, immediately prior to appointment as an agency head or member of a departmental board or commission, was an employe of the Commonwealth receiving sick leave under this subpart will have unused sick leave frozen at the time of appointment to the position as agency head or member of a departmental board or commission.

(c)   An agency head or member of a departmental board or commission who retires from Commonwealth employment will receive payment for the amount of sick leave frozen under subsection (b), under Section 8.26(c) (relating to transfer of and payment of earned unused sick leave).   The sick leave payment will be calculated using the pay rate in effect on the date of termination for that step of the pay range currently assigned to the class the individual occupied immediately before becoming an agency head or member of a departmental board or commission.

(d)   An agency head or member of a departmental board or commission who terminates Commonwealth employment, transfers to either the legislative or judicial branch of government or transfers to an agency that does not meet any of the criteria in Section 8.26(a) will not be paid for unused sick leave frozen under subsection (b).

(e)   If, after serving as an agency head or member of a departmental board or commission, an individual reverts to a position not as an agency head or member of a departmental board or commission without a break in service, the amount of sick leave frozen under subsection (b) will be restored to the employe's leave account.

## PERSONAL   LEAVE.

### 8.31.   General.

(a)   Personal leave is time away from the job with compensation for reasons of a personal nature.   An employe will not be required to divulge the reason for the leave request as a condition of receiving personal leave.

(b)   The rate of compensation for personal leave is an employe's regular compensation in effect for the employe's regular classification, subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignment in higher classifications.

(c)   For purposes of earning, accruing, and using personal leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

### 8.32.  Personal  Leave  Entitlement.

(a)   Permanent full-time employes are eligible for personal leave days as follows:

(1)   One paid personal leave day shall be earned in the employe's first calendar year of employment.   An employe shall be in an active pay status for at least 150 hours (37.5 hour workweek) or 160 hours (40 hour workweek) during the calendar year to qualify for the paid personal leave.

(2)   One paid personal leave day per one-half calendar year shall be earned in the employe's second calendar year of employment.   An employe shall be in an active pay status for at least 150 hours (37.5 hour workweek) or 160 hours (40 hour workweek) during the one-half calendar year to qualify for the paid personal leave.

(3)   One paid personal leave day per calendar quarter shall be earned in the employe's third and subsequent years of employment. An employe shall be in an active pay status for at least 150 hours (37.5 hour workweek) or 160 hours (40 hour workweek) during the quarter to qualify for that quarter's entitlement.

(b)   A permanent part-time employe who is in an active pay status the prorated amount of hours in subsection (a)(1), (2), or (3), shall receive personal leave days on a pro rata basis to the nearest half day.

### 8.33.  Anticipated Personal Leave.

(a)   Personal leave to which an employe may become entitled during a calendar year may be granted at the discretion of the agency head before it is actually earned. An employe who anticipates personal leave and is subsequently separated from Commonwealth service shall reimburse the Commonwealth for those days of personal leave taken but not earned. Such personal leave shall be charged against any earned but unused annual leave the employe may have upon separation. The agency involved shall make diligent efforts to collect for unearned leave. If the account is determined uncollectible, it shall be referred to the Attorney General.

(b)   In the event of the death of an employe, any anticipated personal leave shall be treated as earned approved leave.

### 8.34.  Transfer of Personal Leave Credits.

(a)   An employe who transfers from a position in one Commonwealth agency to a position in another Commonwealth agency will be credited in the gaining agency for unused personal leave earned before the transfer occurred if the losing agency meets one of the following conditions:

(1)   Is subject to the regulatory authority of the Executive Board regarding paid leave, *Section 709(e)* of *The Administrative Code of 1929 (71 P.S. §249(e))*.

(2)   Participates in the automated time and attendance system administered by the Office of Administration.

(3)   Has a reciprocal leave agreement filed with the Office of Administration for the transfer of personal leave.

(b)   An employe who terminates Commonwealth employment, transfers to either the legislative or judicial branch of government, or transfers to another agency which does not meet any of the criteria described in subsection (a)(1), (2), or (3) will be paid in a lump sum by the losing agency for earned unused personal leave.

### 8.35.  Scheduling and Carryover of Personal Leave.

(a)   Personal leave shall be scheduled and granted for periods of time requested by an employe subject to the agency's responsibility to maintain efficient operations.

(b)   If an employe is required to work during a scheduled personal leave period and is unable to reschedule the personal leave during the calendar year or if an employe on injury leave is unable to take personal leave, the calendar year shall be extended seven pay periods for rescheduling purposes. In the case of an employe on injury leave, the seven pay period extension will begin upon return from injury leave. An employe who terminates employment prior to expiration of the rescheduling period shall be paid for earned unused personal leave under Section 8.34(b) (relating to transfer of personal leave credits).

(c)    Unused personal leave may not be carried over from one calendar year to the next, except as provided in subsection (b).

**8.36.  Agency Heads and Members of Departmental Boards and Commissions – Personal Leave.**

(a)    An agency head or a member of a departmental board or commission may not earn or use personal leave.  Personal days off are neither recorded nor charged.

(b)    An agency head or member of a departmental board or commission who, immediately prior to appointment as an agency head or member of a departmental board or commission, was an employe of the Commonwealth receiving personal leave in accordance with this subpart will have unused personal leave frozen at the time of appointment to the position as agency head or member of a departmental board or commission.

(c)    An agency head or member of a departmental board or commission who retires, terminates Commonwealth employment, transfers to either the legislative or judicial branch of the government, or transfers to an agency that does not meet any of the criteria described in Section 8.34(a) (relating to transfer of personal leave credits) will be paid in a lump sum by the losing agency for unused personal leave frozen under subsection (b).  The lump sum will be calculated using the pay rate in effect on the date of transfer or termination for that step of the pay range currently assigned to the class the individual occupied immediately before becoming an agency head or member of a departmental board or commission.

(d)    If, after serving as an agency head or member of a departmental board or commission, an individual reverts to a position not as an agency head or member of a departmental board or commission without a break in service, the amount of personal leave frozen under subsection (b) will be restored to the employe's leave account.


## ADMINISTRATIVE    LEAVE.

**8.41.  Reasons for Administrative Leave.**

(a)    Administrative leave is time away from work with compensation for the following purposes, if proper notice is given to the agency and the leave has been approved by the agency head:

(1)    To vote or serve as a watcher at a labor elections site.

(2)    To take a State Civil Service examination when it is not being given during the employe's nonworking time.  Leave for this purpose is allowed on one occasion during each 1/2 calendar year for a permanent employe and may not exceed the lesser of the normal shift or the time required to travel to and from the examination site and to take the examination.

(3)    To take a physical examination for entering the armed forces.

(4)    To compete in international and world championships as specified in *Management Directive 530.10* (relating to administrative leave to compete in International World Championships), to a maximum of 30 workdays per calendar year.

(5)    To donate blood, to a maximum of four hours per calendar year, subject to conditions established by the Secretary of Administration through the Directives Management System relating to paid leave for donating blood.

**(b)**    The Secretary of Administration may authorize the use of administrative leave for other reasons.  When the reasons for additional administrative leave have general applicability, they will be published through the Directives Management System.

**(c)**    For purposes of entitlement and use of administrative leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

**CIVIL LEAVE.**

**8.51.  General.**

**(a)**    Civil leave is time away from the job for jury duty, court attendance, firefighting duties, emergency medical technician duties, Civil Air Patrol activities, emergency management rescue work or Red Cross disaster relief work.

**(b)**    The rate of compensation for civil leave is an employe's regular compensation in effect for the employe's regular classification, subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignment in higher classifications.

**8.52.  Jury Duty, Court and Administrative Hearing Attendance.**

**(a)**    A permanent employe who fulfills civic duties as a juror or witness in court proceedings and has not volunteered for jury duty and is called for jury duty or is not a party in a civil or criminal court proceeding but is subpoenaed as a witness to attend court proceedings, shall be granted civil leave while attending court.

**(1)**    Civil leave shall be granted for the period of time (including reasonable travel time) when the employe's regularly scheduled work is in conflict with the required court attendance time.  An employe shall be eligible to receive a maximum of one day's pay at the employe's regular straight time rate (one full shift) for each day of required court attendance.

**(2)**    If an employe works a second or third shift and the employe's hours of work are not in conflict with the required court attendance time, the employe shall be granted civil leave equal to the required court attendance time plus reasonable travel time up to a full shift for each day of the required court attendance during the employe's regular shift either immediately preceding or subsequent to the court appearance.

**(b)**    Approval of civil leave to attend court for the reasons in subsection (a) shall be obtained in advance from the agency head.

**(c)**    An employe required to attend court for the reasons in subsection (a) shall, insofar as practical, perform normal duties before court convenes or after it adjourns.

**(d)**    The term court used in this section includes only the following:

**(1)**    Minor Judiciary Court.

**(2)**    Courts of Common Pleas.

**(3)**    Commonwealth Court.

**(4)**    United States District Court.

**(e)**    A permanent employe who is subpoenaed as a witness or who is a party in the following administrative hearings shall be granted civil leave while attending the hearings:

    **(1)**    Unemployment Compensation Board of Review Referee.

    **(2)**    Workers' Compensation Judge.

    **(3)**    Workers' Compensation Appeal Board.

**(f)**    A permanent employe who is subpoenaed as a witness in the following administrative hearings shall be granted civil leave while attending the hearings:

    **(1)**    State Civil Service Commission.

    **(2)**    Human Relations Commission.

**(g)**    Evidence of the duty in the form of a subpoena or other written notification shall be presented to the employe's immediate supervisor as far in advance as practicable.

**8.53.  Firefighting, Emergency Medical Technician, Emergency Management, Civil Air Patrol, and Red Cross.**

**(a)**    Permanent employes, while performing firefighting duties, emergency medical technician duties, Civil Air Patrol activities, or emergency management rescue work during a fire, flood, hurricane, or other disaster may be granted civil leave.  Certified Red Cross disaster relief volunteers may also be granted civil leave to perform disaster relief work for the Red Cross during a state of emergency declared by the Governor.

**(b)**    Volunteer participation in firefighting activities, emergency medical technician activities, Civil Air Patrol activities, emergency management rescue work or disaster relief work for the Red Cross shall require the prior approval of the agency head.  Employes absent from work for reasons under subsection (a) shall be required to obtain a written statement from the fire company, forest unit, emergency management unit, Red Cross, or other organization with which they served certifying as to their activities during the period of absence.

## EDUCATIONAL LEAVE WITH PAY.

**8.61.  General.**

**(a)**    Educational leave is time away from the job with compensation for the purpose of attending out-service training.

**(b)**    An employe may be authorized by the agency head or designee to use educational leave with pay for purposes of part-time out-service training, not to exceed 20 days per calendar year, under *Management Directive 535.3, Out-Service Training.*

**(c)**    Educational leave for full-time out-service training may be granted by the Secretary of Administration only for a permanent employe with 2 or more years of service when management sees a need for an employe to pursue full-time courses of study which are related to present or future job assignments and which can be expected to improve the employe's value to the Commonwealth.  Policies regarding out-service training are contained in Management Directive 535.3.

(d)    For purposes of entitlement and use of educational leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

## MILITARY LEAVE WITH PAY.

### 8.71.  Military Reserve.

(a)    Under *Section 1* of the *Act of July 12, 1935 (P.L. 677, No. 255) (65 P.S. §114)*, a permanent employe of the Commonwealth who is a member of Reserve Components of the Armed Forces of the United States is entitled to military leave with compensation for all types of training duty ordered or authorized by the Armed Forces of the United States.  Such training duty may either be active or inactive duty training and shall include, but is not limited to the following:

(1)    Annual active duty for training.

(2)    Attendance at service schools.

(3)    Basic training.

(4)    Short tours of active duty for special projects.

(5)    Attendance at military conferences and participation in a command post exercise or maneuver which is separate from annual active duty for training or inactive duty training.

(b)    For military training duty as provided under subsection (a), the maximum military leave with compensation shall be 15 working days per calendar year.

(c)    The rate of compensation for military leave is the employe's regular compensation for the employe's regular classification, subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignments in higher classifications.

(d)    For purposes of entitlement and use of military leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

### 8.72.  Pennsylvania National Guard.

(a)    Under *51 Pa. C.S. §4102* (relating to leaves of absence for certain government employes) a permanent employe of the Commonwealth who is a member of the Pennsylvania National Guard is entitled to military leave with compensation for all types of training duty (active and inactive) or other military duty ordered or authorized by the Armed Forces of the United States.  Such duty shall include, but is not limited to the following:

(1)    Annual active duty for training.

(2)    Attendance at service schools.

(3)    Basic training.

(4)    Short tours of active duty for special projects.

(5)    Attendance at military conferences and participation in a command post exercise or maneuver which is separate from annual active duty for training or inactive duty training.

(6)    Other military duty.

(b)    For military training duty or other military duty as provided in subsection (a), the maximum military leave with compensation is 15 working days per calendar year.

(c)    Military leave with compensation shall also be granted to a member of the Pennsylvania National Guard on a working day during which, as a member of the Pennsylvania National Guard, the member is engaged in the active service of the Commonwealth as ordered by the Governor.

(d)    The rate of compensation for military leave is the employe's regular compensation for the employe's regular classification, subject to conditions established by the Secretary of Administration through the Directives Management System relating to temporary assignment in higher classifications.

(e)    For purposes of entitlement and use of military leave, the calendar year shall begin with the first full pay period in January and continue through the end of the pay period in which December 31 falls.

## PAID INJURY LEAVE.

### 8.81.  General.

(a)    Paid injury leave is a leave of absence for which accrued sick, annual, or personal leave is used, at the employe's option, to supplement the indemnity benefits paid under the *Pennsylvania Workers Compensation Act.*

(b)    The provisions of Sections 8.81, 8.82, and 8.83 shall be consistent with the *Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.* and leave granted in accordance with these sections shall be designated as leave under the provisions of the Act.

### 8.82.  Eligibility for Paid Injury Leave.

(a)    An employe who sustains an incapacitating work-related injury on or after July 1, 1996, as determined by a decision issued through the operation of the Workers' Compensation Program, is eligible to elect to use paid injury leave.  Eligibility ends when eligibility under the Workers' Compensation Program ends or when the supplement ends as provided in Section 8.83.

(b)    Paid injury leave is not applicable to certain employes of the departments of Public Welfare, Corrections, State Police, General Services, Education, Liquor Control Board, Board of Probation and Parole, and the Office of Attorney General whose injuries are within the scope of either the *Act of December 8, 1959 (P.L. 1718, No. 632) (61 P.S. §§951 and 952),* referred to as *Act 632/534,* or the *Act of June 28, 1935 (P.L. 477, No.193) (53 P.S. §§637 and 638),* referred to as the *"Heart and Lung" Act.*

### 8.83.  Paid Injury Leave Benefits.

(a)    An employe will be charged one full day of accrued leave for each day of paid injury leave.  While on paid injury leave, an employe will be paid an amount equal to full pay reduced by an amount that yields a net pay, including workers' compensation and Social Security Disability Benefits, that is equal to the employe's net pay immediately prior to the injury.  Net pay is defined as gross pay minus federal, state, and local withholding taxes, unemployment compensation taxes, Social Security, and retirement contributions.  Paid injury leave is payable for the duration of accrued leave provided no unpaid injury leave is used.  If both paid and unpaid injury leave are used, paid injury leave is payable

- for an aggregate of 12 months or for the duration of the disability, whichever is less.  The aggregate of
- 12 months may not extend beyond three years from the date of injury.  Paid injury leave benefits are
- subject to conditions established by the Secretary of Administration through the Directives Management
- System.


- (b)    Regardless of other provisions in this section, compliance with the FMLA must be ensured.
- Therefore, employes who have been employed at least 12 months (total employment, even if the employ-
- ment was not continuous) and have been paid at least 1,250 hours (includes regular and overtime hours
- paid, but excludes holidays and other paid time off) during the previous 12 month period are entitled to use
- accumulated leave in order to receive paid injury leave for a period of up to 12 weeks (minus any injury leave
- or any other FMLA qualifying leave used within the last 12 months) in a rolling 12 month period.

Subchapter  C.  LEAVE  WITHOUT  PAY

PARENTAL    LEAVE.

Sec.

8.101.  General.
8.102.  Granting and Approval of Leave.
8.103.  Reemployment.
8.104.  Annual, Personal, and  Sick  Leave.
8.105.  Guidelines.

FAMILY  CARE  LEAVE.

8.111.  General.
8.112.  Granting and Approval of Leave.
8.113.  Reemployment.
8.114.  Annual and Personal Leave.
8.115.  Guidelines.

SICK  LEAVE  WITHOUT  PAY.

8.121.  General.
8.122.  Granting and Approval of Leave.
8.123.  Reemployment.
8.124.  Annual, Personal, and  Sick  Leave.
8.125.  Guidelines.

MILITARY  LEAVE  WITHOUT  PAY.

8.131.  General.
8.132.  Granting, Duration, and    Expiration.
8.133.  Reemployment.
8.134.  Retirement  Rights.
8.135.  Loss of Benefits.
8.136.  Annual, Sick, and  Personal  Leave.
8.137.  Physical   Examination.
8.138.  Guidelines  for  Benefits  Continuation.

**REGULAR  LEAVE  WITHOUT  PAY.**

8.141.  Non-Civil  Service  Employes.
8.142.  Civil  Service  Employes.

• **INJURY  LEAVE  WITHOUT  PAY.**

• 8.151.  General.
• 8.152.  Eligibility  for  Injury  Leave  Without  Pay.

**MISCELLANEOUS   LEAVE   PROVISIONS.**

8.161.  Agency  Written  Leave  Management  Policies.
8.162.  Records  and  Reports.
8.163.  Absence  Without  Leave.
8.164.  Resignation  Following  Leave  Without  Pay.

**PARENTAL    LEAVE.**

**8.101.    General.**

(a)    Permanent employes of the Commonwealth who become parents through childbirth, formal adoption, or foster care placement shall be granted parental leave upon request.

(b)    The provisions of Sections 8.101 through 8.105 shall be consistent with the *Pennsylvania Human Relations Act, 43 P.S. §951 et seq.* and the *Family and Medical Leave Act of 29 U.S.C. §2601 et seq.* Leave granted in accordance with Section 8.102 shall be designated as leave under the provisions of the *Family and Medical Leave Act.*

**8.102.    Granting  and  Approval  of  Leave.**

(a)    Employes shall submit written notification to their immediate supervisor stating the anticipated duration of the leave at least two weeks in advance, if circumstances permit.   Such leave shall be granted for a period of time not to exceed six months.

(b)    At the discretion of the agency head, leave may be approved on an intermittent or reduced-time basis in increments as small as one quarter of an hour.

(c)    Upon the request of the employe and at the discretion of the agency head, parental leaves may be extended for a period not to exceed six months.   In no case shall the total amount of leave exceed 12 months.   During the extension period, intermittent or reduced-time leave shall not be granted.

(d)    Parental leave shall begin whenever requested; however, it may not be used prior to the date of birth, custody, or placement, except when required for adoption or placement to proceed.

(e)    No unpaid parental leave shall be granted beyond one year from the date of birth or of assuming custody of an adoptive or foster child.

(f)    In no case shall employes be required to leave prior to childbirth unless they can no longer satisfactorily perform the duties of their positions.

(g)    While employes are on parental leave, the duties of their positions shall either be performed by remaining staff and their positions kept vacant or they shall be performed by substitute employes.

**8.103.    Reemployment.**

(a)    Employes shall have the right to return to the same position in the same classification held before going on parental leave or to an equivalent position with regard to pay and skill.

(b)    Failure to return to work following the termination of parental leave without pay shall be deemed a resignation effective on the first day after such termination.

**8.104.    Annual, Personal, and  Sick  Leave.**

(a)    Employes are entitled, but not required, to use accrued sick leave for the period that they are unable to work as certified by a physician.   Paid leave shall not be included when calculating the six month entitlement.

(b)    Employes are entitled, but not required, to use accrued annual and personal leave before, during, after, or instead of parental leave without pay provided the leave would qualify as parental leave without pay.   Paid leave shall not be included when calculating the six month entitlement.

73

(c)   Paid leave may not be anticipated during parental leave without pay.

(d)   Unused leave shall be carried over until return.

(e)   Employes shall not accrue leave while on parental leave without pay.

### 8.105.  Guidelines.

Guidelines established by the Secretary of Administration regarding parental leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.2, Sick Leave Without Pay, Parental Leave Without Pay, and Family Care Leave Without Pay.*)  Guidelines established by the Secretary of Administration regarding state-paid benefits while on parental leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.4, State Paid Benefits While on Sick, Parental, or Family Care Leave Without Pay.*)

## FAMILY  CARE  LEAVE.

### 8.111.  General.

(a)   Permanent employes of the Commonwealth with at least one year of leave service credit shall be granted family care leave without pay for the purposes of attending to the medical needs of a spouse, parent, child, or other person qualifying as a dependent under IRS eligibility criteria.  The one year of service will include all periods of Commonwealth service provided the employe has worked at least 1,250 hours within the last 12 months.

(b)   For the purposes of family care leave without pay, the following definitions shall apply.

(1)   Parent shall be defined as a biological parent or an individual who stood as a parent (in loco parentis) to the employe when the employe was a child.

(2)   Child shall be defined as a biological child, adopted child, foster child, stepchild, a legal ward, or a child of a person standing as a parent (in loco parentis).  A child must be under age 18 or 18 years or older and incapable of self-care because of mental or physical disability.

(c)   The provisions of Sections 8.111 through 8.115 shall be consistent with the *Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.*  Leave granted in accordance with Section 8.112 shall be designated as leave under the provisions of the *Family and Medical Leave Act.*

### 8.112.  Granting and Approval of Leave.

(a)   Employes shall submit written notification to their immediate supervisor stating the name and relationship of the individual to be cared for and the anticipated duration of the leave.  The employe shall also provide documentation from a physician, other licensed practitioner, or Christian Science practitioner stating that due to the family member's illness or disability, care is needed from the employe or care needs to be  arranged by the employe, the date that the illness began, and its anticipated duration.  The notification and documentation shall be submitted at least two weeks in advance, if circumstances permit.

(b)   Family care leave shall be granted for a period of time not to exceed 12 weeks in a calendar year (from the first full pay period in January continuing through the end of the pay period in which December 31 falls).  The 12 week entitlement may not be extended.

(c)  Family care leave may be taken one day at a time if necessary.  Leave shall be approved for periods less than one day at a time, in increments as small as one quarter of an hour on an intermittent or reduced-time basis, when medically necessary and due to a serious health condition as defined in the *Family and Medical Leave Act of 1993*.

(d)  Health insurance, supplemental benefits, and group life insurance will continue while employes are on family care leave.

## 8.113.  Reemployment.

(a)  Employes shall have the right to return to the same position in the same classification held before going on family care leave or to an equivalent position with regard to pay and skill.

(b)  Failure to return to work following the termination of family care leave without pay shall be deemed a resignation effective on the first day after such termination.

## 8.114.  Annual and Personal Leave.

(a)  Employes are entitled, but not required, to use accrued annual and personal leave before, during, after, or instead of family care leave without pay provided the leave would qualify as family care leave without pay.  Paid leave is not to be included when calculating the 12 week entitlement.

(b)  Unused leave shall be carried over until return.

(c)  Employes shall not accrue leave while on family care leave without pay.

## 8.115.  Guidelines.

Guidelines established by the Secretary of Administration regarding family care leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.2, Sick Leave Without Pay, Parental Leave Without Pay, and Family Care Leave Without Pay.*)  Guidelines established by the Secretary of Administration regarding state-paid benefits while on family care leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.4, State Paid Benefits While on Sick, Parental, or Family Care Leave Without Pay.*)

## SICK LEAVE WITHOUT PAY.

## 8.121.  General.

(a)  Permanent employes of the Commonwealth shall be granted sick leave without pay when the employe's own illness or disability prevents him or her from working or when the employe was in contact with or exposed to a contagious disease which renders his or her presence hazardous to others in the workplace.

(b)  Sick leave without pay may not be used for work-related injuries.

(c)  The provisions of Sections 8.121 through 8.125 shall be consistent with the *Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.*  Leave granted in accordance with Section 8.122 shall be designated as leave under the provisions of the *Family and Medical Leave Act.*

**8.122.  Granting and Approval of Leave.**

(a)  Employes shall submit written notification to their immediate supervisor with proof of illness or disability in the form of a certificate from a physician, other licensed practitioner, or Christian Science practitioner.  This documentation shall state a prognosis and expected date of return and, if the circumstances permit, shall be submitted in advance.

(b)  Sick leave without pay shall be granted for a period of time of at least two consecutive weeks but not more than six months.  If the illness or disability is due to a serious health condition, as defined in the *Family and Medical Leave Act of 1993,* leave shall be granted for periods of less than two consecutive weeks.

(c)  If requested and properly documented as medically necessary due to a serious health condition, as defined in the *Family and Medical Leave Act of 1993,* leave shall be approved on an intermittent or reduced-time basis in increments as small as one quarter of an hour.

(d)  Upon request of the employe, an extension of up to an additional six months of leave without pay shall be granted if the employe provides proof of continuing illness or disability.  During the extension period, intermittent or reduced-time leave shall not be granted.

(e)  The agency head is not required to grant subsequent requests unless six months in an active pay status have elapsed from the last date of leave in the initial entitlement described in (b).

(f)  Sick leave without pay for Civil Service employes is subject to the provisions contained in Section 8.142(b) or §807.1 of the *Civil Service Act.*

**8.123.  Reemployment.**

(a)  Before the expiration or at the expiration of the initial sick leave without pay entitlement as described in Section 8.122(b), employes shall have the right to return to a position in the same or equivalent classification within the agency.

(b)  Before the expiration or at the expiration of the extended sick leave without pay entitlement as described in Section 8.122(d), employes shall have the right to return to a vacant position that the employe is qualified for and the agency intends to fill.

(c)  Failure to return to work following the termination of sick leave without pay shall be deemed a resignation effective on the first day after such termination.

**8.124.  Annual, Personal, and Sick Leave.**

Employes are entitled, but not required, to use accrued annual, personal, and sick leave before, during, after, or instead of sick leave without pay provided the leave would qualify as sick leave without pay.  Paid leave is not to be included when calculating the six-month entitlement.

**8.125.  Guidelines.**

Guidelines established by the Secretary of Administration regarding sick leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.2, Sick Leave Without Pay, Parental Leave Without Pay, and Family Care Leave Without Pay.*)  Guidelines established by the Secretary of Administration regarding state paid benefits while on sick leave without pay are published through the Directives Management System.  (Reference *Management Directive 530.4, State Paid Benefits While on Sick, Parental, or Family Care Leave Without Pay.*)

## MILITARY LEAVE WITHOUT PAY.

### 8.131.   General.

(a)   Employes of the Commonwealth who leave their jobs for the performance of duty, voluntarily or involuntarily, in any branch of the Armed Forces of the United States, any of its Reserve components, any of its National Guard components, or the commissioned corps of the Public Health Service for the purpose of training or service must be granted military leave without pay.  The provisions of Sections 8.131 through 8.136 are consistent with *Chapter 43, Part III,* of *Title 38 United States Code* and *Military Code, 51 Pa. C.S. §7301 et seq.*

(b)   Employes who are on military leave without pay shall have their duties performed either by remaining employes and their positions kept vacant or by temporary substitutes.

### 8.132.   Granting, Duration, and   Expiration.

(a)   Military leave without pay must be granted for the following military service:

(1)   For all active duty (including full-time National Guard duty).

(2)   For initial active duty for training.

(3)   For other active or inactive military training duty.  Employes who volunteer for additional duty not required as part of routine training shall provide four weeks notice if possible to their immediate supervisor prior to the commencement of such duty.

(b)   Military leave without pay is available for five years plus any involuntary service during wartime or national emergency.  The five years is cumulative throughout employment with the Commonwealth.

(c)   Military leave without pay shall expire:

(1)   For periods of more than 180 days, no more than 90 days after the completion of the service.

(2)   For periods of service of more than 30 days but less than 181 days, no more than 14 days after the completion of the service.

(3)   For periods of service that were less than 31 days, the first full regularly scheduled work period following the period of service or up to eight hours after an opportunity to return from the place of service to the employe's home.

(4)   For periods of hospitalization or convalescence from illness or injury incurred during the period of service, up to two years after the period of service or when recovered, whichever occurs sooner.

(5)   For circumstances beyond an employe's control, the above periods may be extended upon demonstration of such circumstance.

### 8.133. Reemployment.

Employes have the right to return to employment at the time of or prior to the expiration of military leave upon notifying the agency head of the desire and availability to return to Commonwealth service, provided the following are met:

      (1)   The employe is capable of performing the essential functions of the position.

      (2)   For temporary employes, the temporary position has not yet expired.

      (3)   For periods of service delineated in Section 8.132(c)(1) and (4), written application for reemployment is provided to the agency head.

### 8.134. Retirement Rights.

Employes who are granted military leaves may, under conditions provided in the *Military Code (51 P.S. §7306)* and *Chapter 43, Part III, of Title 38 United States Code*, and in accordance with procedures prescribed by the State Employes' Retirement System and the Public School Employes Retirement System, choose either to continue or discontinue making regular payments into their retirement accounts.

### 8.135. Loss of Benefits.

Employes who are separated from the service under an other-than-honorable-conditions, bad conduct, or dishonorable discharge shall not be entitled to any of the benefits of Sections 8.131 through 8.136 except such vested rights as they may have acquired thereto by virtue of payments into retirement accounts.

### 8.136. Annual, Sick, and Personal Leave.

Employes who are granted military leaves for active duty may be paid for annual and personal leave, or may have annual and personal leave frozen. Sick leave earned and not used at the time of entry into the Armed Forces will be available to employes upon return to work. Employes shall not earn annual, sick, or personal leave while on military leave without pay.

### 8.137. Physical Examination.

Employes shall be granted one day of administrative leave with pay to take any physical examination required in connection with entering the Armed Forces. An extension of such paid leave, not to exceed two additional days, may be approved by the agency if the employe certifies in writing that more than one day is required to complete the examination.

### 8.138. Guidelines for Benefits Continuation.

Guidelines established by the Secretary of Administration regarding state-paid benefits while on military leave without pay and continuation of state-provided benefits at employes' expense are published through the Directives Management System. (Reference *Management Directive 530.26, Benefit Entitlements for Employes on Military Leave.*)

**REGULAR LEAVE WITHOUT PAY.**

**8.141.  Non-Civil Service Employes.**

(a)  Leave without pay may be granted to Non-Civil Service employes for such purposes and for such periods of time as may be authorized by agency heads.  Employes shall not be required to use accumulated sick or annual leave prior to commencement of a leave without pay.  Employes may return to employment within the agency from which the leave without pay was granted at the discretion of the agency head.

(b)  When an employe, granted a leave without pay, is covered by a labor agreement or an arbitration award adopted by the Executive Board, those provisions take precedence.

**8.142.  Civil Service Employes.**

(a)  Leave without pay may be granted to Civil Service employes by agency heads in accordance with *4 Pa. Code, Chapter 101*, and *§807.1* of the *Civil Service Act of August 5, 1941, P.L. 752 as amended*.  Employes shall not be required to use accumulated sick or annual leave prior to commencement of a leave without pay.  Employes may return to employment within the agency from which the leave without pay was granted, subject to the provisions of *4 Pa. Code, Chapter 101*, and *§807.1* of the *Civil Service Act.*

(b)  The provisions of labor agreements with respect to leaves of absence without pay may be applied to Civil Service employes when they are not in conflict with *4 Pa. Code, Chapter 101*, or *§807.1* of the *Civil Service Act.*

**INJURY LEAVE WITHOUT PAY.**

**8.151.  General.**

(a)  Injury leave without pay with benefits is a leave of absence available to employes who sustain a work-related injury and either have no accrued leave available or elect not to use accrued sick, annual, or personal leave to supplement workers' compensation benefits.

(b)  The provisions of Sections 8.141 and 8.142 shall be consistent with the *Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.* and leave granted in accordance with these sections shall be designated as leave under the provisions of the Act.

**8.152.  Eligibility for Injury Leave Without Pay.**

(a)  An employe who sustains an incapacitating work-related injury, as determined by a decision issued through the operation of the Workers' Compensation Program, is eligible to elect injury leave without pay with benefits.  Injury leave without pay with benefits, either alone or in combination with paid injury leave, is available for an aggregate of 12 months or for the duration of the disability, whichever is less.  The aggregate of 12 months may not extend beyond three years from the date of injury.  For employes with continuing disability, the time between the end of injury leave without pay with benefits and the date that is three years from the date of injury shall be leave without pay without benefits.  Injury leave without pay is subject to conditions established by the Secretary of Administration through the Directives Management System.

(b)  Regardless of other provisions in this section, compliance with the FMLA must be ensured. Therefore, employes who have been employed at least 12 months (total employment, even if the employment was not continuous) and have been paid at least 1,250 hours (includes regular and overtime hours paid, but excludes holidays and other paid time off) during the previous 12 month period are entitled to a period of up to 12 weeks injury leave without pay (minus any injury leave or any other FMLA qualifying leave used within the last 12 months) in a rolling 12 month period.

(c)  Injury leave without pay is not applicable to certain employes of the Departments of Public Welfare, Corrections, State Police, General Services, Education, Liquor Control Board, Board of Probation and Parole, and the Office of Attorney General whose injuries are within the scope of either the *Act of December 8, 1959 (P.L. 1718, No.632) (61 P.S. §§951 and 952),* referred to as *Act 632/534,* or the *Act of June 28, 1935 (P.L. 477, No.193) (53 P.S. §§637 and 638),* referred to as the *"Heart and Lung" Act.*

## MISCELLANEOUS  LEAVE  PROVISIONS.

### 8.161.  Agency Written Leave Management Policies.

Each agency shall maintain written leave management policies and procedures for areas that are not specifically addressed in the *Personnel Rules,* the collective bargaining agreements, leave-related Management Directives, or in *Manual M530.7, Leave and Holiday Programs.*  Such policies or practices should include:  employe call off procedures due to illness or emergency; notice requirements, if any, for use of non-emergency leave; information to help supervisors identify potential sick leave misuse; leave related disciplinary information; leave auditing information; and other related areas based on each agency's needs.

### 8.162.  Records  and  Reports.

(a)  Each department and agency shall maintain appropriate records of leave entitlements and usage and shall prepare such reports as the Secretary of Administration deems necessary to ensure proper leave administration.

(b)  Supervisors and timekeepers must ensure that all time not worked is properly accounted for and all leave is correctly recorded and entered through the Commonwealth's automated Time and Attendance Reporting System.

### 8.163.  Absence Without Leave.

An employe who is absent from work without authorization shall be considered absent without leave and shall receive no compensation for the period of absence.

### 8.164.  Resignation Following Leave Without Pay.

A failure to report for work following the termination of a leave without pay shall subject the employe to termination action effective on the first day after the last day of leave without pay.

CHAPTER  9.  EMPLOYE  PERFORMANCE  EVALUATION

Subchapter.                                                                                        Sec.

A.  PERFORMANCE    EVALUATION ..................................................................................... 9.1
B.  PROBATIONARY    PERIODS ....................................................................................... 9.11

Subchapter  A.  PERFORMANCE  EVALUATION

Sec.

9.1.     Objectives.
9.2.     Performance  Evaluation  Systems.
9.3.     Standards  of  Performance.
9.4.     Raters.
9.5.     Performance  Evaluation  Reviews.
9.6.     Training  and  Development  Needs.
9.7.     Evaluations  Tied  to  Furloughs.

9.1.  Objectives.

(a)   Performance evaluation is a continuous process involving the establishment of job expecta-
tions, performance standards, observation, evaluation, discussion, constructive criticism, assistance, and
recognition.  It is the duty of every supervisor to be aware of the level of performance of employes under
his or her supervision.  Encouragement and assistance will be given to employes to improve substan-
dard performance and recognition will be given to employes whose performance exceeds the expecta-
tions and standards of the position.

(b)   The main objectives of the performance evaluation systems are to:

(1)   Improve performance.

(2)   Identify important standards and expectations of a position.

(3)   Determine the manner in which duties have been performed and responsibilities carried out
and provide employes with that information.

(4)   Help employes achieve a higher level of efficiency and effectiveness in the organization
through regular supervisory evaluation of their performance.

(5)   Identify employes who demonstrate a capability for work at a higher level.

(6)   Identify employes whose performance can be improved through training.

(7)   Identify employes whose performance cannot be improved to meet acceptable standards
for their position.

**9.2.   Performance  Evaluation  Systems.**

(a)   The primary performance evaluation system covering the majority of employes is the Employe Performance Review System (EPR), Form 363L.  This system is used for all employes under the Governor's jurisdiction, including management, supervisory, and rank and file.  The only exceptions are cabinet officials, Liquor Control Board State Store personnel, and Department of Education teachers in the D4 bargaining unit.

(b)   The State Store Appraisal System, Form PLCB 1678, is used to assess performance of Pennsylvania Liquor Control Board State Store personnel.

(c)   Form DEBE 333 is used to assess teachers in the D4 bargaining unit.

(d)   All systems require employes to be rated annually.  At least biannual progress reviews are required for both the EPR and PLCB systems.  Agency heads can determine one annual rating cycle for the agency or different rating cycles for organizational units within the agency.

**9.3.   Standards  of  Performance.**

(a)   Raters, regardless of performance evaluation system used, are responsible for establishing qualitative and quantitative expectations related to jobs, discussing the expectations with employes, and rating the performance of employes with respect to those standards.  As duty assignments change, performance standards must be reevaluated for their applicability.

(b)   Standards and job expectations can be conveyed to employes orally or in writing and in any format that facilitates mutual understanding of the standards and job expectations.  However, the method chosen must be consistently applied to all employes in a supervisory unit.   In addition, an agency head or designee can determine the method for the agency or organizational segments of the agency.

(c)   Personnel offices will ensure that raters are trained in the setting of performance standards and job expectations and in the administration of performance evaluations.  They shall also assist managers and supervisors in developing performance standards and job expectations, as necessary.

(d)   The relative importance of the performance factors and standards upon which evaluations will be made shall be identified and communicated to employes.

(e)   All supervisors are to be evaluated on their compliance with the timely and effective administration of the evaluation process for employes under their supervision.

**9.4.   Raters.**

(a)   Ratings and progress reviews shall be completed on a timely basis by supervisors familiar with the work performance of employes.  Generally, this is the immediate supervisor.  However, the person who completes and signs a performance evaluation form as the rater of an employe should not be a member of the same collective bargaining or meet and discuss unit as that of the employe being rated.

(b)   The reviewing officer normally shall be the rater's immediate supervisor.  The reviewing officer is responsible for ensuring that performance standards are consistently applied to positions of a similar nature and standards are consistent with agency standards and work expectations.

### 9.5. Performance Evaluation Review.

If an employe is dissatisfied with a performance evaluation, the employe may request the opportunity to discuss it with the reviewing officer. Further reviews within the agency may occur but the agency's decision is final. Classified service employes may appeal alleged discrimination to the State Civil Service Commission pursuant to §951(b) of the *Civil Service Act.*

### 9.6. Training and Development Needs.

After performance expectations/standards are established, the rater and employe should discuss the employe's training and development needs as they relate to the achievement of the employe's expectations/standards. When employes are rated, the rater and the employe again should discuss training and development that has been completed and needs for the upcoming rating period.

### 9.7. Evaluations Tied to Furloughs.

When a reduction in work force is necessary, the last regular performance evaluation shall be used in accordance with requirements described in *4 Pa. Code §101.1* (relating to furlough) or the provisions of the appropriate labor agreement and *Management Directives 580.17, Performance Evaluation to Determine Order of Furlough for Classified Service Employes* and *580.20, Classified Service Furlough and Reemployment.*

# CHAPTER 11.  EMPLOYE TRAINING AND DEVELOPMENT

**GENERAL    PROVISIONS.**

**Sec.**

**11.1.    General.**
**11.2.    Policy.**

**ORGANIZATIONAL    RESPONSIBILITIES.**

**11.11.  Office of Administration.**
**11.12.  Agencies.**


**GENERAL    PROVISIONS.**

**11.1.    General.**

(a)  The success that the Commonwealth has in meeting the needs of its citizens is determined largely by the knowledge, skills, and abilities of state employes.  To meet these needs, state agencies are responsible for developing policies and programs to support continuous learning and development.

(b)  The Commonwealth will provide training and on-the-job development opportunities to help employes maintain relevant knowledge and skills for successful job performance and accomplishment of agency goals.

(c)  Employes also have a role in their development.  Because of limited training resources, the Commonwealth can meet only the most critical training needs.  To stay competitive in their field, employes are encouraged to invest in their future by committing their own personal resources to this effort.

**11.2.    Policy.**

(a)  The Office of Administration is responsible for developing policies and programs to support continuous work force learning and development.

(b)  Agency heads are responsible for the training and development of employes in their respective agencies.  They shall provide active leadership to ensure that work force learning goals are tied to the agency's mission and that sufficient funds, staff, and other resources are provided to accomplish this effort.


**ORGANIZATIONAL    RESPONSIBILITIES.**

**11.11.  Office of Administration.**

The Director of Personnel shall:

(1)  Establish policies, procedures, and guidelines to support continuous work force learning and development.

(2)   Conduct or provide for the delivery of interagency management training supportive of the Commonwealth's strategic direction.

(3)   Monitor agency training operations and provide assistance in meeting standards of training policies, procedures, and guidelines.

(4)   Coordinate interagency sharing of employe training activities, resources, and programs to maximize training opportunities for Commonwealth employes.

(5)   Provide consultative assistance to agencies in organization development and organizational effectiveness.

(6)   Provide consultation in training administration and curriculum development.

(7)   Assess effectiveness of training programs in helping organizations achieve their goals.

(8)   Provide approval and direction for an agency's use of out-service and in-service training to meet organizational and employe learning needs.

(9)   Review and assess the quality of employe development programs including internships and traineeships.

(10)   Coordinate the planning and implementation for training programs with an interagency application where interagency cooperation would yield cost benefits.

**11.12.   Agencies.**

(a)   *General.*  The agency training function is responsible for establishing, directing, monitoring, and evaluating training and development programs.  These efforts should anticipate, identify, and meet the training and development needs of the workforce in such a way that the investment of resources returns a proportionate measure of benefit to the agency and the Commonwealth.  (Reference *Management Directive 535.1, Employe Training and Development.)*

(b)   *Agencies will:*

(1)   Develop an agency training policy consistent with Commonwealth policy and with the agency's strategic organizational goals.  (Reference *Management Directive 535.1.)*

(2)   Define how the training function can help the organization achieve its mission and goals through the effective use of its human resources.

(3)   Assign agency personnel responsibility for training administration and identify resources to meet agency training program goals.

(4)   Assess the training needs of the agency workforce essential to attainment of agency goals and objectives.  (Reference *Management Directive 535.7, Annual Agency Training Plans.)*

(5)   Develop an Annual Training Plan to meet organizational, group, and individual training needs using internal resources to the greatest extent possible.  Agencies should also identify training needs generated from changes in programs or technology that are best met through more cost efficient in-service training methods.  The Annual Training Plan should meet standards established by the Office of Administration.  (Reference *Management Directive 535.7.)*

(6)   Develop or make available core training programs in these areas:

    (I)   New employe orientation within the first six months of hire.

    (II)   Supervisory training for newly-assigned supervisors within the first six months of a new assignment to include an overview of management and labor relations.

    (III)   Agency-specific technical training.

    (iv)   Executive/management development curriculum to support organizational goals.

(7)   Evaluate the efficiency and effectiveness of the agency training program on a continuous basis.  (Reference *Management Directive 535.7.*)

(8)   Maintain accurate and current records of all training activities including employe records, agency statistical data, and training costs.  (Reference *Management Directive 535.7.*)

(9)   Ensure that out-service training requests are applied to essential organizational needs that cannot be furnished by Commonwealth training resources or in-service training provisions.

    (I)   Out-service training requests which involve travel out of the contiguous 48 states require approval by the Office of Administration.  Post-audits of decentralized out service training records will be conducted by the Office of Administration.

    (II)   College credit courses to attain or complete academic degrees or to provide career change or advancement are the responsibility of the employe.  (Reference *Management Directive 535.3.*)

(10)   Provide quality training and financial support, as needed, to prepare Pennsylvania Management Interns for careers in Pennsylvania state government.

(11)   Provide employes in internships and trainee positions with comprehensive training programs to acquire the knowledge, skills, and abilities to satisfactorily meet performance standards. (Reference *Management Directives 535.4, Use of State Work Program and Public Services Trainee Classes,* and 535.5, *Use of Trainee Classes in the Classified Service.*)

(12)   Ensure that all agency training is done in a nondiscriminatory manner consistent with Commonwealth equal employment opportunity policy and the *Americans With Disabilities Act.*

CHAPTER    12.   PROMOTION, TRANSFER, AND    DEMOTION

Sec.

12.1.    Promotion.
12.2.    Transfer.
12.3.    Demotion.
12.4.    Temporary    Reassignment.
12.5.    Civil  Service  Employes

## 12.1.  Promotion.

(a)  Employes considered for promotion must possess the established qualifications for the classification.  The selection process shall conform with provisions of the *Civil Service Act*, the agency's equal employment opportunity program, the *Americans With Disabilities Act*, and labor agreements, as appropriate.  (Reference *Management Directive 205.25, Disability-Related Employment Policy*.)

(b)  A promotion can occur either as a result of moving an employe into a higher level vacant position or as a result of an upward reclassification of the employe's existing position.  A promotion shall not take place solely to increase the pay of an employe.

(c)  The salary of an employe who is promoted shall be set in accordance with Section 5.31.

(d)  The promotion of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Non-Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, and the Bureau of State Employment.  The promotion of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, the State Civil Service Commission and shall be in accordance with *Section 99.22* of the *Civil Service Rules*.  The losing agency will receive notice of no less than two weeks unless a shorter period is agreed to.

## 12.2.  Transfer.

(a)  An agency head may, in accordance with the agency's equal employment opportunity program, the *Americans With Disabilities Act*, and with procedures established by the Office of Administration, the State Civil Service Commission, and applicable labor agreements, transfer an employe under his or her jurisdiction from one position to another position in the same class or reassign an employe under his or her jurisdiction from one position to another in a class having the same minimum hourly rate, whichever applies, provided that the employe possesses the minimum qualifications for the position.

(b)  The effect of the transfer on the salary of an employe shall be in accordance with Section 5.33.

(c)  The transfer of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Non-Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, and the Bureau of State Employment and must be consistent with any contractual seniority provisions.  The transfer of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, and, if there is another simultaneous action, such as a promotion or demotion, the State Civil Service Commission and must be consistent with any contractual seniority provisions and *Section 99.22* of the *Civil Service Rules*.  The effective date of the transfer will be negotiable between the losing and gaining agency heads.  In no case shall the

losing agency delay a transfer more than 60 calendar days. The amount of delay will depend upon whether the transfer endangers the health and safety of the workforce or the public and the necessity of the employe completing projects or assignments. This will vary with the organizational location, level of responsibility, and specialized duties, if any, of each individual.

   **(d)**   Subsection (c) does not apply when there is a reorganization of functions from one agency to another and employes are transferred with no change in classification.

## 12.3. Demotion.

   **(a)**   An agency head may, in accordance with the agency's equal employment opportunity program, *The Americans With Disabilities Act,* and with procedures established by the Office of Administration, the State Civil Service Commission, and applicable labor agreements, demote an employe to any position for which the employe qualifies.

   **(b)**   The salary of a demoted employe shall be set in accordance with Section 5.32.

   **(c)**   The demotion of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Non-Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, and the Bureau of State Employment. The demotion of an employe from either a Civil Service or a Non-Civil Service position in an agency to a Civil Service position in another agency shall require the prior approval and consent of the employe, the gaining agency head, and the State Civil Service Commission. The losing agency will receive adequate notice of no less than two weeks unless a shorter period is agreed to.

## 12.4. Temporary   Reassignment.

   An agency head may assign an employe to a position in a higher or lower class in accordance with Section 5.42. In making such assignments, consideration should be given to the agency's equal employment opportunity program, where appropriate. (Reference *Management Directive 525.4, Temporary Assignment in Higher Classification.*)

## 12.5. Civil Service Employes.

   Provisions governing the transfer, promotion, and demotion of Civil Service employes are prescribed in *4 Pa. Code, Chapters 96, 97, and 99.*

# CHAPTER 13. CONDUCT, EMPLOYE DISCIPLINE, CONFLICT OF INTEREST, AND PROHIBITED ACTIVITIES

## GENERAL STANDARDS OF CONDUCT.

Sec.

13.1.   Personal Conduct.
13.2.   Unlawful or Illegal Conduct.

## EMPLOYE DISCIPLINE.

13.11.  Nature of Discipline.
13.12.  Degree of Discipline.
13.13.  Investigation.
13.14.  Notice to Employe.
13.15.  Timeliness.

## CONFLICT OF INTEREST.

13.21.  Adverse Pecuniary Interest.
13.22.  Representing Others Before the Commonwealth.
13.23.  Gifts and Favors.
13.24.  Misuse of Information.
13.25.  Dual Employment.
13.26.  Supplementary Employment.
13.27.  Financial Disclosure.
13.28.  Enforcement.

## PROHIBITED ACTIVITIES.

13.31.  Civil Service Employes.
13.32.  Discrimination.
13.33.  Nepotism.

## GENERAL STANDARDS OF CONDUCT.

### 13.1.   Personal Conduct.

(a)  No employe of the Commonwealth shall engage in scandalous or disgraceful conduct on or off duty which may bring the service of the Commonwealth into disrepute.  Violations of this nature or violations of the Commonwealth's *Personnel Rules* may result in disciplinary action.

(b)  Agencies, with the approval of the Secretary of Administration, may establish standards of conduct deemed necessary for the effective operation of that agency.  These standards shall be communicated to employes and the consequences of violations made known.  An employe may be expected to be aware without such notice that certain conduct such as insubordination, coming to work in an unfit condition, theft of property of the Commonwealth or others in the workplace, and fighting are serious offenses that will subject the employe to immediate discipline.

### 13.2.   Unlawful or Illegal Conduct.

Perpetrators of any illegal or unlawful act committed on state government premises will be referred to the proper authorities for prosecution in accordance with the law.  Employes under prosecution may be suspended pending further action.

## EMPLOYE   DISCIPLINE.

### 13.11.  Nature of Discipline.

Employe disciplinary actions are to be corrective and, where appropriate, progressive in nature and designed to encourage the employe to conform to established standards of performance or conduct, except in those instances where the actions of the employe are not conducive to rehabilitation or make continued employment with the Commonwealth clearly unacceptable.

### 13.12.  Degree of Discipline.

The discipline to be imposed should be determined on an individual basis, taking into account such factors as the seriousness of the offense and the record of the employe's service with the Commonwealth.  An employe's work record may provide a basis for differentiating in the degree of discipline imposed for like or similar offenses.

### 13.13.  Investigation.

A thorough and objective investigation of facts and circumstances surrounding an incident giving rise to discipline shall be conducted prior to the imposition of discipline.

### 13.14.  Notice to Employe.

Prior to the imposition of discipline, an employe shall be advised of the specifics of the alleged offense and given an opportunity to explain his or her actions.

### 13.15.  Timeliness.

Discipline is to be imposed within a reasonable time of the event or management's knowledge thereof, giving rise to the discipline.

## CONFLICT OF INTEREST.

### 13.21. Adverse Pecuniary Interest.

No employe shall engage directly or indirectly in a personal business transaction or private arrangement for personal profit which accrues from or is based upon his or her official position or authority. An employe who participates in the negotiation of contracts, the settlement of any claims or charges in any contracts, the making of loans, the granting of subsidies, the fixing of rates, or the issuance of valuable permits or certificates to, with, or for any entity shall not have, directly or indirectly, any financial or personal interest in that entity. The scope of this provision shall include but shall not be limited to the provisions of the *State Adverse Interest Act, Act of July 19, 1957, (P.L. 1017, No. 451) (71 P.S. §776.1 et seq.).*

### 13.22. Representing Others Before the Commonwealth.

In accordance with the *State Adverse Interest Act,* no employe shall represent or act as agent for any private interest, whether for compensation or not, in any transaction in which the state has a direct and substantial interest and which could reasonably be expected to result in a conflict between a private interest of the employe and his or her official state responsibility.

### 13.23. Gifts and Favors.

Employes and the families of employes shall not, directly or indirectly, solicit, accept or agree to accept any gift of money or goods, loans, or services for personal benefit under any circumstances which would influence the manner in which employes perform their work, make their decisions, or otherwise perform their duties.

### 13.24. Misuse of Information.

No employe shall, for his or her own personal gain or for the gain of others, use any information not available to the public at large or divulge confidential information in advance of the time prescribed for its authorized release; nor shall any employe receive compensation for consultation which substantially draws upon official ideas or data which has not been disclosed to the public.

### 13.25. Dual Employment.

An employe of any agency may also work for any other agency under the Governor's jurisdiction provided that:

(1) Such additional state employment does not, as determined by the agency head, conflict with the employe's regular hours of work or otherwise affect his or her efficiency or effectiveness as an employe.

(2) Such employment cannot reasonably be expected to influence the employe in the discharge of official duties. (Reference *Management Directive 525.11, Dual Employment.*)

### 13.26. Supplementary Employment.

No employe shall engage in or accept private or other public employment or render services for private or other public interests unless such employment or service is approved in advance by the agency head to which the employe is assigned. Supplementary employment may be undertaken only when not in conflict with conditions of employment promulgated by the Executive Board and, if applicable, the State Civil Service Commission; conditions of employment established by the employing Commonwealth

agency; or other applicable laws, rules, or regulations. (Reference *Executive Order 1980-18, Code of Conduct; Management Directives 205.10, Financial Disclosures Required by Act 1978-170, as amended by Act 1989-9, State Ethics Act,* and *515.18, Supplementary Employment; State Adverse Interest Act, Act of July 19, 1957, (P.L. 1017, No. 451) (71 P.S. §776.1 et seq.);* and *the Act of October 4, 1978, as amended by Act 1989-9, (P.L. 883, No. 170) (65 P.S. §§401 – 413),* known as the *Public Official and Employee Ethics Law.*)

### 13.27.   Financial   Disclosure.

No public employe or public official shall have financial interests which present a conflict or the appearance of a conflict with the public trust.  All public employes and public officials are required to file a statement of financial interests under the *Public Official and Employee Ethics Law* and the *Code of Conduct* by May 1 of each year for the preceding calendar year.  (Reference *Executive Order 1980-18* and *the Act of October 4, 1978, as amended by Act 1989-9, (P.L. 883, No. 170) (65 P.S. §§401 – 413), Public Official and Employee Ethics Law.*)

### 13.28.   Enforcement.

Any employe who violates the provisions listed herein shall be subject to immediate dismissal or other disciplinary action by the appointing authority.  Nothing herein shall abridge the remedies of employes under the *Civil Service Act* or under applicable collective bargaining agreements.

## PROHIBITED   ACTIVITIES.

### 13.31.   Civil Service Employes.

Provisions relating to activities for Civil Service employes are contained in *4 Pa. Code, Chapter 103.*

### 13.32.   Discrimination.

No agency shall, in any personnel action, including recruitment, appointment, promotion, training or separation, discriminate against any person because of race, color, religious creed, ancestry, union membership, age, sex, sexual orientation, national origin, AIDS or HIV status, or disability.  Agency heads shall regularly review their personnel practices and procedures to ensure the absence of discrimination.

### 13.33.   Nepotism.

An employe or official shall not exercise direct and immediate supervisory authority over a family member.

# CHAPTER   14.   SEPARATION

Sec.

14.1.    Non-Civil  Service  Resignation.
14.2.    Non-Civil  Service  Separation  or  Furlough.
14.3.    Civil  Service  Separation  or  Furlough.
14.4.    Retirement.
14.5.    Resignation  in  Lieu  of  Discharge.
14.6.    Exit  Information  Program.

## 14.1.   Non-Civil   Service   Resignation.

(a)   *Resignation.*   In order to resign in good standing, an employe shall give the agency at least 14 calendar days prior notice, in writing, unless unable to do so because of extenuating circumstances. Failure to comply with this requirement shall be entered in the personnel record of the employe and may bar the employe from future employment by the Commonwealth.

(b)   *Abandonment of Employment.*   Absence without approved leave for five or more consecutive workdays may, at the discretion of an agency head, be interpreted as abandonment of employment and be considered to be a resignation.

## 14.2.   Non-Civil   Service   Separation   or   Furlough.

An agency may separate a Non-Civil Service management level employe in accordance with policies and procedures established by the Governor's Office.   Separations or furloughs of Non-Civil Service employes covered by labor agreements must be in accordance with the provisions of the appropriate agreement.

## 14.3.   Civil   Service   Separation   or   Furlough.

Conditions and procedures under which a person may be separated or furloughed from Civil Service employment shall be those established in *4 Pa. Code, Chapter 101,* and applicable labor agreements.

## 14.4.   Retirement.

Eligibility requirements for retirement shall be those contained in the *State Employes' Retirement Code of 1974 (Act 31 of March 1, 1974)* and the *Public School Employes Retirement Code (24 P.S. §3101 et seq.*).   Each agency shall ensure that employes are made aware of preretirement counseling programs that are available from the State Employes' Retirement System and the Public School Employes Retirement System.

## 14.5.   Resignation   in   Lieu   of   Discharge.

Agencies should exercise caution when considering an offer of resignation in lieu of discharge, when an employe has been notified of an impending discharge and seeks to avoid it by resigning. Resignations in lieu of discharge should be considered only in rare instances as a last resort and only after consultation with staff of the Office of Administration.   In those cases resulting from an investigation by the Inspector General's Office, no settlements or compromises should be reached without the concurrence of the Inspector General.   When a resignation in lieu of discharge occurs, agencies must use the specific computer transaction code identifying the action.

### 14.6.  Exit Information Program.

(a)  Agencies are to implement selectively an exit information program to identify factors why employes resign or transfer out of the agency as a measure of monitoring employe turnover.  The information gathered should be used to address employment practices to result in a higher rate of employe retention.  The exit information program may include one or more measures, such as exit interviews, an exit questionnaire, and other appropriate measures.  Participation in the program by employes who are separating or transferring should be on a voluntary basis, although participation should be encouraged.  Agencies can assess employes who retire early (prior to normal retirement age or length of service) to determine the reason(s) why.  Retirement data should not be included in the total turnover rate, but as a separate statistic.

(b)  Turnover information that is collected may be analyzed and evaluated on a general agency basis, or for specific turnover problems, such as:  instances of unusually high turnover by occupational groupings, "difficult to fill" classifications, designated key program areas or geographical areas where turnover is a problem, age or length of service groupings, and by minority and/or female employes when turnover rates are high enough to negatively affect the success of equal opportunity programs.  Summary reports should be prepared periodically and provided to the agency head for appropriate action.

(c)  If it is determined that valuable employes are leaving their jobs due to work-related reasons, agencies should make attempts to retain those employes.  Agencies may consider measures such as developing employes to fill higher level jobs that occur as a result of retirements and assessing employe perceptions of employment factors that may affect their decision to leave their job.

(d)  Agencies are **not** required to have an exit information program, particularly if their rate of voluntary employe turnover is acceptable and does not diminish the agency's ability to carry out its mission.

## CHAPTER 15. INTEGRATED PERSONNEL/PAYROLL SYSTEM

**Sec.**

**15.1.** General.
**15.2.** Responsibility.
**15.3.** Security.
**15.4.** Timeliness.
**15.5.** Data retention.
**15.6.** Complement Control.
**15.7.** System Training

### 15.1. General.

(a) The Integrated Personnel/Payroll System (IPPS) is recognized as the official record of employment of Commonwealth employes for agencies under the Governor's jurisdiction and the official payroll authorizing agent for those employes to the State Treasurer.

(b) To the extent practicable, the system monitors compliance with major employment policies set by federal and state legislation, collective bargaining agreements, and the *Personnel Rules* set by the Office of Administration.

### 15.2. Responsibility.

(a) The Secretary of Administration determines the applications supported by the system.

(b) The Bureau of Personnel, through its divisions, establishes the requirements of those applications and monitors compliance from the operating agencies.

(c) Agency heads initiate the activity to maintain employment records of the work force and authorize proper compensation to agency employes.

### 15.3. Security.

(a) Access to the system must be obtained on an individual basis and is subject to the employes' need to know to be able to perform their jobs.

(b) Employes with access to the system may divulge information only as permitted in *Management Directive 505.18, Maintenance, Access, and Release of Employe Information.*

(c) Employes must protect their method of access to the system from being known to anyone else.

### 15.4. Timeliness.

(a) Personnel actions are to be input to the IPPS upon receipt by the agency personnel office. To be timely, personnel transactions must be input, approved and updated to the IPPS by the last day of the pay period in which the action is effective. Payroll processing occurs on Monday or Tuesday following the pay period ending date.

(b) Electronic approval of personnel transactions is timely when the approval/disapproval is made within two workdays of receipt by the approving authority. To be timely, all approving authorities must approve the transaction by the last day of the pay period in which the action is effective.

(c) Biweekly time and attendance activity may be input to the IPPS beginning on the last day of the pay period. To be timely, this input must be completed by the first pay processing date for the pay period in which the activity occurred.

(d) When actions are timely, the results of these actions will be reflected on the Employe Statement for the regular pay date of the pay period in which the action was effective. When actions are not timely, the results will be reflected on the Employe Statement of a subsequent pay period, and will include a salary claim or retroactive payment to cover the period missed by the untimely processing.

(e) Accuracy and timely processing is imperative when processing separations. When separation activity is processed in accordance with paragraphs (a), (b), and (c) employes will receive final payment of overtime, shift differential and other compensation entitlements on the regular pay date for the pay period in which the employe terminated. Final agency approval of the leave payoff transaction must be made within 15 days of the termination.

## 15.5. Data Retention.

(a) Supporting documentation for transactions processed through the system must be retained as stipulated by *Management Directive 505.18, Maintenance, Access, and Release of Employe Information.*

(b) Employment data maintained within the system must be retained for at least a period of seven years past the employe's latest termination date and until the employe's 75th birthday or date of death.

(c) Position data maintained within the system must be retained at least three years past the position abolish date.

(d) Biweekly time and attendance data collected within the system must be retained at least for the current and one prior calendar year.

## 15.6. Complement Control.

(a) For salaried positions, the system shall enforce the authorized complement levels set at the appropriation level by the Secretary of Administration and the Secretary of the Budget as prescribed by *Management Directive 505.4, Salaried Complement Control.*

(b) For wage positions, the system shall enforce the authorized complement level set at the appropriation level by the Secretary of Administration as prescribed by *Management Directive 505.20, Wage Complement Management and Control.*

(c) Agency heads may elect to have the system monitor authorized complement levels for both wage and salaried positions at the organization level within the appropriation limits set in this section.

## 15.7. System Training.

(a) Divisions in the Bureau of Personnel shall provide training on the use of this system to the operating agencies.

(b) Agency heads shall ensure that appropriate personnel are trained to meet the operational requirements of the system.

# CHAPTER 16. PERSONNEL MANAGEMENT REVIEW

Sec.

16.1.    General.
16.2.    Policy and Procedures.

## 16.1.    General.

(a)    The Secretary of Administration, through the Bureau of Personnel, operates an ongoing Personnel Management Review activity, periodically reviewing and evaluating the administration and management of personnel programs operating in agencies under the Governor's jurisdiction.    Reviews will include, as appropriate, communication with affected agency management staff, an examination of agency records, on-site interviews with agency staff, oral and written reports stating findings and recommendations, and a planning and follow-up process to ensure that recommendations are implemented.

(b)    The purpose of Personnel Management Reviews is to identify both problems and effective programs and activities in current personnel administration and management in the Commonwealth. Personnel Management Reviews initiate necessary changes and reenforce effective performance so that the personnel system is responsive to program needs and is operating in accordance with established Commonwealth policy.    The review process concentrates on whether Commonwealth-wide and agency personnel system objectives are being fulfilled in operating personnel activities.    The conduct of these reviews shall be in accordance with established written guidelines.    (Reference *Manual M505.2, Personnel Management Review*.)

## 16.2.    Policy and Procedures.

(a)    Personnel Management Reviews may be directed at a review and evaluation of a specific agency or facility personnel office, a specific personnel process or activity across agency lines, or other personnel or human resource system issues as identified by the Director of Personnel.

(b)    Personnel Management Reviews focus on both personnel administration, carried out primarily through the agency personnel office, and personnel management, inherent in the responsibilities of managers and supervisors.

(c)    Personnel Management Reviews often will utilize employe questionnaires and employe interviews to identify or substantiate findings.    Arrangements for such questionnaires and interviews will be made by staff of the Office of Administration with affected agency managers and personnel staff.

(d)    Staff conducting Personnel Management Reviews will have access to Official Personnel Folders, written correspondence, and other records which provide insight into or form the basis of sound personnel administration.

## CHAPTER 17. SMOKING IN COMMONWEALTH BUILDINGS AND FACILITIES

Sec.

17.1.  General.
17.2.  Policy.

### 17.1.  General.

The Commonwealth promotes a safe and healthful environment for employes and the public in Commonwealth buildings and facilities by reducing health risks associated with exposure to environmental tobacco smoke while working to minimize the inconvenience to individuals who smoke.

### 17.2.  Policy.

(a)  It is the policy of the Commonwealth to comply with the provisions of the *Act of December 21, 1988, (P.L. 1315, No. 168) (35 P.S. §§1230.1–1235.1)* known as the *Clean Indoor Air Law* and to respect the interests of both the nonsmoker and smoker. When these interests conflict, steps must be taken to protect the interests of the nonsmoker.

(b)  Smoking is prohibited in Commonwealth buildings and facilities as provided below:

(1)  Confined areas of general access.

(2)  Conference rooms and classrooms.

(3)  Cafeterias, dining areas, employe lounges, and waiting rooms, except in designated smoking sections where there is adequate ventilation.

(4)  Commonwealth vehicles, unless there are no objections from other occupants.

(5)  Anywhere combustible fumes collect, i.e., garage and storage facilities or where an occupational safety or health hazard  may exist.

(6)  Computer facilities, copy rooms, mailrooms or other areas where sensitive equipment or where records/supplies would be exposed to hazard from fire, ash, or smoke.

(c)  Where possible, smoking areas are to be designated that are convenient, adequately ventilated and operationally feasible.

(d)  Each agency is to provide employes with information about the smoking policy and smoking cessation programs and include this information in appropriate supervisory and management training programs.

(e)  Designated smoking and nonsmoking areas are to be posted in each building and facility.

(f)  Management shall have the final responsibility to limit involuntary exposure of nonsmokers to tobacco smoke including prohibition of smoking in work areas. However, this policy does not impair or diminish any contractual agreement, collective bargaining agreement, collective bargaining rights, or collective bargaining procedures. (Reference *Management Directive 205.19, Smoking in Commonwealth Buildings and Facilities.*)

## CHAPTER 18. STATE EMPLOYE ASSISTANCE PROGRAM (SEAP)

Sec.

18.1.    **General.**
18.2.    **Administration.**


18.1.    **General.**

(a)  The State Employe Assistance Program (SEAP) is designed to assist employes and their family members in accessing a wide range of human services before personal problems affect job performance and require disciplinary action.  SEAP provides an integrated approach to evaluation, referral, precertification, case management, and follow-up services for employes experiencing drug, alcohol, emotional, family, marital, or other personal problems.  SEAP also provides information, education, training, critical incident stress debriefing sessions, and consultation to all segments of the workforce.

(b)  SEAP is based on the performance based intervention model which promotes early, voluntary use of the program before performance is affected.  In cases where performance is below standard and discipline is being considered, specific steps should be taken at each level of discipline to encourage the employe to use SEAP.  If an employe violates the Commonwealth Substance Abuse Policy, or poses a threat to self or others, or is subject to termination, the agency may require an employe to participate in SEAP as a Condition of Continued Employment (COCE).  All COCEs must be approved by the agency, the Office of Administration-SEAP staff, and union, when appropriate.  The performance based intervention model preserves the employe's rights to privacy and discourages the supervisor from diagnosing an employe's personal problem.  The SEAP program coordinates services with the employe, union, treatment provider, and, as necessary, the health insurance carrier.

(c)  SEAP also provides on-site assistance to agencies that have experienced a traumatic event such as death, suicide, or violence in the workplace.  These services are coordinated by the agency or field SEAP Coordinator and the Office of Administration-SEAP staff, and involve bringing in a professional that specializes in trauma/debriefing to address staff issues.

(d)  Employes should be made aware of the SEAP program at every step in the disciplinary process.

18.2.    **Administration.**

Each agency and larger agency field facilities shall have a designated trained SEAP coordinator responsible for the implementation of SEAP in the workplace including the delivery of training, consultation, and troubleshooting.  Supervisors are required to undergo a comprehensive training program and union stewards are encouraged to participate in this training.  Employes must attend a shorter training session on SEAP.  The agency coordinator works with all segments of the workforce and serves as the liaison between the workplace, the designated statewide SEAP contract service provider, and Office of Administration-SEAP staff.  (Reference *Executive Order 1996-10, State Employe Assistance Program; Management Directive 505.22, State Employe Assistance Program;* and *Manual M505.3, State Employe Assistance Program* Supervisor's Guide.)

## CHAPTER 19.  COMMONWEALTH SUBSTANCE ABUSE POLICY

Sec.

19.1.    **General.**
19.2.    **Administration.**

### 19.1.  General.

(a)  The Commonwealth has developed and implemented a comprehensive policy to address the problem of alcohol and other drugs in the work place.  This policy meets and exceeds the requirements set forth in the federal *Drug-Free Workplace Act of 1988.*  The Commonwealth's policy is based on the belief that to have a drug-free workplace, education, training, early intervention and treatment, and a firm policy are essential in order to achieve the objective.

(b)  Key components of the policy include:

(1)  Commonwealth employes are prohibited from the unlawful manufacture, distribution, dispensation, possession, or use of alcohol or the controlled substances while on duty or in any Commonwealth workplace.

(2)  Any employe determined to be unfit either while on duty, or in any Commonwealth workplace, as a result of alcohol or other controlled substances shall be subject to appropriate disciplinary action.

(3)  Any employe convicted of violating a controlled substance statute must report, in writing, the conviction to his or her supervisor within five days.

(4)  Any employe convicted of a drug abuse violation, and not terminated, must participate in the State Employe Assistance Program as a Condition of Continued Employment.

(5)  Any employe suspected of having a problem with alcohol or other controlled drugs shall be referred to the State Employe Assistance Program (SEAP).

(6)  Employes must complete an education and training program on the Commonwealth Substance Abuse Policy, the dangers of substance abuse, and the availability of counseling and rehabilitation through SEAP.

### 19.2.  Administration.

Agencies are required to annually post the Commonwealth Substance Abuse Policy and if they are recipients of federal grants or contracts, agencies must submit to the respective federal agency the certification of a drug-free workplace.  (Reference *Executive Order 1996-13, Commonwealth of Pennsylvania's Policy on Substance Abuse in the Workplace; Management Directive 505.25, Substance Abuse in the Workplace;* and *Manual M505.3, State Employe Assistance Program* Supervisor's Guide.)

# CHAPTER 20. COMMERCIAL DRIVER'S LICENSE DRUG AND ALCOHOL TESTING AND LICENSING PROGRAM

Sec.

20.1.   General.
20.2.   Alcohol and Controlled Substances Regulations/Testing.
20.3.   Driver's Licensing Regulations
20.4.   Administration.

## 20.1.   General.

Consistent with the *Omnibus Transportation Employe Testing Act,* employes who operate commercial motor vehicles are required to be tested for the use of controlled substances and alcohol. Employes whose job duties require them to operate a commercial motor vehicle and possess a commercial driver's license (CDL), even on an infrequent basis, are subject to the CDL driver's licensing and drug and alcohol regulations.

## 20.2.   Alcohol and Controlled Substances Regulations/Testing.

(a)  The following alcohol and controlled substance testing is required:  random, reasonable suspicion, post-accident, return-to-duty, follow-up, and pre-employment for controlled substances only.

(b)  CDL employes shall not perform safety-sensitive duties when using, possessing, or after having tested positive for any controlled substance unless under the instructions of a physician who has advised the employe that the substance will not impair his or her ability to safely operate a commercial motor vehicle.

(c)  CDL employes shall not perform safety sensitive duties when using or possessing alcohol, or after testing positive for alcohol with an alcohol concentration level of 0.02 or greater.

(d)  CDL employes shall not perform safety-sensitve duties if they refuse to take either a controlled substance or alcohol test.

(e)  CDL employes who have tested positive for drugs or with an alcohol test result of 0.04 or greater shall not perform safety sensitive duties until the employe has been evaluated by a substance abuse professional, has been certified by SEAP to return to safety-sensitive duties, and has passed a return to duty drug/alcohol test.

(f)  All CDL covered employes are to receive informaton/educational material regarding the policies and requirements of the CDL drug and alcohol testing program before being assigned safety sensitive duties.

(g)  All supervisors of CDL covered employes and all supervisory/management staff involved in making reasonable suspicion determinations are to receive the required CDL supervisory training before requiring an employe to be tested on the basis of reasonable suspicion.

## 20.3.   Driver's Licensing Regulations.

(a)  Pre-employment background checks are required of applicants for CDL covered positions consistent with the Federal Motor Carrier Regulations.

(b)  CDL employes may not possess more than one state's driver's license or operate a commercial motor vehicle if the employe's driver's license is suspended, revoked, or canceled.

(c)  CDL employes, if convicted of a motor vehicle moving violation other than a parking violation, must notify their supervisor of the conviction or forfeiture of bond or collateral within 30 days of the convicton.

(d)  CDL employes must provide an annual certification listing any motor vehicle moving violations, except parking violations, for which the employe was convicted or forfeited bond or collateral or certify that no such violations occurred.

**20.4.  Administration.**

Agencies with CDL covered employes are to administer the CDL drug and alcohol testing and licensing program consistent with procedures outlined in applicable Management Directives and federal regulations.  (Reference *Management Directive 505.29, Commercial Driver License Drug and Alcohol Testing and Licensing Program, Management Directive 505.22, State Employe Assistance Program,* and *Federal Motor Carrier Safety Regulations, Title 49, Parts 40, 325, 382, 383, 385-387, 390-397, 399.*)

## Subchapter B. PROBATIONARY PERIODS

Sec.

9.11.    Probationary  Employes.
9.12.    Granting of Employment Status.
9.13.    Extension of Probationary Periods.


### 9.11.  Probationary  Employes.

(a)  Civil Service employes are required to serve a probationary period when they are hired or promoted.  The length of the probationary period varies depending upon the classification.  The majority of probationary periods are six months (180 days) but in no case more than 18 months (545 days), except for trainees where the maximum is 24 months (730 days).  Probationary periods are to be prorated for part-time positions according to the number of hours in the employe's workweek; regular status shall be attained after satisfactory completion of 975 hours.

An employe's probationary period shall be adjusted for periods of leave without pay and disability leave.  Satisfactory periods of employment in emergency, qualifier, or temporary status may be credited toward completion of the subsequent probationary period in the same class provided the service is unbroken/continuous.

(b)  *Non-Civil Service, Union Represented Employes.*  Non-Civil Service employes who are represented by a union serve a probationary period consistent with the terms of applicable collective bargaining agreements or memoranda of understanding.

(c)  *Civil Service, Union Represented Employes.*  Civil Service employes who are represented by a union serve two probationary periods concurrently; one under the *Civil Service Act* and one under the collective bargaining agreement or memorandum of understanding.

(d)  *Non-Civil Service, Non-Union Represented Employes.*  Non-Civil Service employes who are not covered by a collective bargaining agreement or memorandum of understanding **do not serve a** probationary period.  The State Police Cadets are to be evaluated consistent with departmental procedures which mandate an 18 month probationary period.

### 9.12.  Granting of Employment Status.

(a)  *Civil Service Employes.*  Supervisors of Civil Service probationary employes must complete a performance evaluation for the employe and indicate that regular status is recommended in order for regular Civil Service status to be granted.  The appointing authority must notify the employe, in writing, that performance has been satisfactory at least 10 workdays prior to the expiration of the employe's probationary period and take official action to grant regular status.  A copy of such notice must be provided to the State Civil Service Commission.  Failure to officially notify the employe that regular status has been granted will result in continuation of the probationary period up to 18 months for all classifications with the exception of training classes, which will have a maximum probationary period of 24 months.

(b)  *Non-Civil Service, Union Represented Employes.*  Prior to the completion of the established probationary periods, raters of Non-Civil Service, union represented employes must complete a performance evaluation indicating that the employe's performance is satisfactory or unsatisfactory.  Failure to initiate action to terminate the employe or extend the probationary period consistent with applicable union agreements or memoranda of understanding will result in regular employment status for the employe.

(c) *Non-Civil Service, Non-Union Represented Employes.*  The granting of regular employment status does not apply to Non-Civil Service employes who are not covered by a regular bargaining agreement or memorandum of understanding.

### 9.13.  Extension of Probationary Periods.

(a)  Extensions of Civil Service probationary periods may be granted at the discretion of the agency when employes are not performing satisfactorily or when more time is needed to adequately evaluate the employe's performance because of a supervisory change, reassignment, transfer, or similar action during the probationary period.  An  extension notice must be received by the employe at least one day prior to the expiration of the probationary period.  A copy of such notice must be submitted simultaneously to the State Civil Service Commission.

(b)  Extensions of probationary periods for union represented employes (Non-Civil Service and Civil Service alike) require concurrence of the appropriate union.  (Reference *Management Directives 540.7, Employe Performance Review; 580.8 Classified Service Probationary Periods; 580.17, Performance Evaluations to Determine Order of Furlough for Classified Service Employes; 580.19, Promotion in the Classified Service Without Examination; and 580.20, Classified Service Furlough and Reemployment.*  See also *Sections 603 and 804 of the Civil Service Act* and *4 Pa. Code §§97.31* through *97.39, 99.13, 99.14, 99.24,* and *101.32.*  See also wording contained in appropriate collective bargaining agreements and memoranda of understanding.)

# CHAPTER 10.  SENIOR MANAGEMENT SERVICE

Sec.

10.1.    Senior Management Service Defined.
10.2.    Assignment of Positions.
10.3.    Criteria For Assignment of Positions.
10.4.    Leaves of Absence For Classified Service Employes.
10.5.    Removal of Employes.
10.6.    Classification of Positions.
10.7.    Compensation of Employes.
10.8.    Audit of Positions.
10.9.    Effects of Classified Service Furloughs While On Leave of Absence.

## 10.1.  Senior Management Service Defined.

The Senior Management Service is comprised of positions in the Commonwealth unclassified service which have broad policy participation and management responsibility.  Bureau Directors, some Division Chiefs, Regional and District Office Managers, and comparable level positions which meet the criteria defined in Section 10.3 may be assigned to the Senior Management Service.

## 10.2.  Assignment of Positions.

(a)  The Secretary of Administration is responsible for conducting an ongoing review of positions based on the criteria outlined in Section 10.3.  The Secretary will make appropriate recommendations to the Executive Board regarding assignment of positions to the Senior Management Service.

(b)  Positions will be added to or deleted from the Senior Management Service by action of the Executive Board.  Before a Civil Service position can be added to the Senior Management Service, the position must be exempted by the State Civil Service Commission under *Section 3(c)(1)* of the *Civil Service Act.*

(c)  The Senior Management Service shall not include deputies, press officers, legislative liaisons, executive and special assistants, and other positions which serve in a direct staff capacity to an agency head.

## 10.3.  Criteria For Assignment of Positions.

Criteria for assignment of positions to Senior Management Service include the following:

(1)  Whether the position description reflects a role in policy formulation and participation in policy decision-making.

(2)  Whether the pay range reflects the policy responsibilities of the position.

(3)  Whether the lines of authority and reporting sequence stemming from the position reflect policy responsibilities of the position.

(4)  The degree of impact the program of which the position is a part has on the agency or the Commonwealth.

(5) The degree of administrative discretion the position exercises in carrying out overall departmental policy and in formulating and approving policy.

(6) Whether the responsiveness and accountability of the position is paramount to achievement of an agency head's goals and objectives.

### 10.4. Leaves of Absence For Classified Service Employes.

When an employe in the classified service is selected for a position in the Senior Management Service, the employe shall be granted a leave of absence from Civil Service status in accordance with §807.1 of the *Civil Service Act (71 P.S. §§741.1 – 741.1005)* and *4 Pa. Code §101.62(b).*

### 10.5. Removal of Employes.

(a) Incumbents of positions in the Senior Management Service shall serve at the pleasure of the agency head.

(b) Classified service employes who enter Senior Management Service positions shall, in addition to the return rights granted under the *Civil Service Act* and *Rules*, have retreat rights to a position not below the last pay range, pay, and Civil Service status held in the classified service prior to the leave of absence. Retreat rights can be exercised at the initiation of the employe or the agency and in those instances where Senior Management Service positions either cease to exist or no longer meet the criteria for inclusion in the Senior Management Service because of an agency reorganization.

(c) The retreat rights of a classified service employe to a Civil Service position (see subsection (b) of this section) shall be the obligation of the same agency which selected the employe for the position in the Senior Management Service except in those cases where a Senior Management Service position has been transferred from one agency to another, in which case the gaining agency shall bear the obligation. Should a comparable position not exist at the time of return to the classified service, the agency shall establish a position not below the employe's pay range and Civil Service status prior to entering the Senior Management Service. The employe's rate of pay will be set at the rate it would have been had he or she not been placed in a Senior Management Service position. The principle of retreat rights is to ensure that an employe who has retreat rights is neither advantaged nor disadvantaged by virtue of having entered the Senior Management Service.

(d) The right of return of classified service employes who are being removed from Senior Management Service positions shall be absolute except in the case of malfeasance in office or other grievous act which in the public interest preclude return to Civil Service status.

### 10.6. Classification of Positions.

Classification of positions in the Senior Management Service shall be accomplished in accordance with the rules and regulations of the Executive Board and such other policies and rules as the Secretary of Administration may prescribe.

### 10.7. Compensation of Employes.

Compensation (pay and benefits) of employes in the Senior Management Service shall be in accordance with the rules and regulations of the Executive Board and such other policies and rules as the Secretary of Administration may prescribe.

**10.8.  Audit of Positions.**

(a)  The Secretary of Administration will periodically review all positions assigned to the Senior Management Service to determine their continued eligibility for inclusion in the Senior Management Service.

(b)  Audits will be conducted in accordance with procedures prescribed by the Secretary of Administration.

(c)  The Secretary of Administration, with approval of the Executive Board, may add positions to the Senior Management Service.

**10.9.  Effects of Classified Service Furloughs While On Leave of Absence.**

When furloughs occur in the Civil Service classification and furlough unit from which a Senior Management Service employe is on a leave of absence, such employe shall not be counted as part of the furlough unit.  Agencies will, however, calculate the effect, if any, the furlough would have had on the Senior Management Service employe and adjust his or her status accordingly so that, upon return from leave of absence, his or her status would be no different than if he or she had been in the classified service position continuously.