ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA A. WILHELM,
        **Plaintiff**

    v.             :       NO. 1:CV-01-1057

                    :       (JUDGE RAMBO)

COMMONWEALTH OF PA.;
PENNSYLVANIA STATE POLICE;
COLONEL PAUL J. EVANKO,
COMMISSIONER; LIEUTENANT
COLONEL THOMAS K. COURY; and
CAPTAIN MICHAEL. D. SIMMERS,
        **Defendants**

FILED
HARRISBURG, PA

JUN 0 3 2002

MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

**DOCUMENT IN SUPPORT OF
DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
ALL EVIDENCE RELATING TO  1993 ALLEGATIONS OF
SEXUAL HARASSMENT AGAINST DEFENDANT SIMMERS**

Respectfully submitted,

D. MICHAEL FISHER
Attorney General

BY:  SUSAN J. FORNEY
Chief Deputy Attorney General
I.D. No. 27744

Office of Attorney General
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-9831

DATED: June 3, 2002

*Arb. Notebook*

---

In the Matter of the Arbitration between:    )
                                             )
    The Commonwealth of Pennsylvania         )    Opinion of the
        (The State Police)                   )    Impartial Arbitrator
                                             )    Stanley J. Schwartz
            and                              )
                                             )    Grievance:
    The Pennsylvania State Troopers          )    Michael Simmers
    Association (PSTA)                        )
                                             )
    Case No.: State Police #94-04-271        )
             PSTA HQ-99                       )
                                             )

---

RECEIVED
JAN 23 1995
STATE POLICE

        This case has been submitted to arbitration in accordance
with Article 28, Grievance Procedure, of the agreement between
the parties dated July 1, 1992 to June 30, 1995.  The undersigned
was chosen impartial arbitrator by the parties.  Hearings
concerning this matter were held before the arbitrator at PSTA
Headquarters, Harrisburg, Pennsylvania on April 8, 1994 from
11 a.m. until 3:25 p.m.; May 15, 1994 from 9 a.m. until
1:15 p.m.; June 23, 1994 from 9 a.m. until 10:46 a.m.; and
August 15, 1994 from 9 a.m. until 1:40 p.m.  At those times, both
parties were afforded full opportunity to examine and cross
examine witnesses, submit evidence and present arguments in
support of their respective positions.  The parties submitted
post-hearing briefs, and the hearing record was declared closed
effective October 31, 1994.


Appearances:

        For the Commonwealth:

        Michael C. Barrett, Esq.            Assistant Counsel

        For PSTA:

        Gary M. Lightman, Esq.              PSTA Solicitor

Witnesses:

        For the Commonwealth:

        Margaret Weldon Britton            Fingerprint Technician

        Julia Cavrich                      Fingerprint Technician

        Harry Colestock                    Spouse

713

| | |
|---|---|
| Sandra Cox Colestock | Clerk 3 |
| Wilhemina Kamarer | Clerical Supv. 2 |
| Lavanda Myers | Fingerprint Technician |
| Anne F. Otto | |

For PSTA:

| | |
|---|---|
| Cpl. William J. McHale | BPR Investigator |
| Captain Michael D. Simmers | Grievant |

In Attendance:

For the Commonwealth:

| | |
|---|---|
| Brad Christ | Dept. Labor Relations Coordinator |
| Major Thomas K. Coury | Former DDO |
| David Ganal | Law Clerk |
| Thomas J. LaCrosse | Alt. Disc. Officer |
| Major Dane Merryman | Dir. of Bureau of Rec. |
| Donna J. Paule | Pers. Analyst |
| Captain Ernest R. Spittler | |
| Lt. Larry Williams | Asst. DDO |
| Major Thomas J. Williams | DDO |

For PSTA:

| | |
|---|---|
| Paul T. McCommons | President, PSTA |
| Dianne Shephard | Attorney |

The Issue:

Was there just cause for discipline to be imposed against Captain Simmers? If not, what shall be the remedy?

2

714

Background:

I usually summarize in detail the facts of a case in the background section. However, after four hearings and considering a transcript of 577 pages, this is not possible, and it would be counterproductive to do so.

Important to this case is a summary of Captain Simmers' work record with the State Police (see Volume 4 of the transcript at pages 10-38). He has been a member of the State Police since April 13, 1967, a period of 27 years. He graduated from the State Police Academy as a Trooper and has risen over the years through the ranks to Captain. His promotion to captain occurred in 1991. During that period of time, he had established an exemplary record[1] with very few disciplinary actions and excellent performance ratings until the incidents occurred leading to this arbitration case.[2]

Captain Simmers had a series of assignments over the years, including Patrol Trooper, Patrol Supervisor, Instructor at the State Police Academy, as well as various administrative assignments. However, for the ten years before his assignment to R & I, he was involved in undercover work for various offices, including the office of the Attorney General, where he was involved personally or supervised a number of covert, statewide operations involving the undercover, statewide strike force for narcotics and including a number of similar assignments. All of these assignments involved far different operating modes than that required for the R & I Division. After he was promoted to Captain in 1991 and assigned to the Bureau of Liquor Control Enforcement as Director of Operations, and after some ten years working in undercover operations, Simmers requested another job "suitable" for him. He testified he wanted a different assignment than those he had had for the then past ten years.

In early January, 1992, he was transferred to the position of Director of the Division of Records and Identification Services (R & I). This division is one of the largest in the State Police, consisting mostly of civilian personnel. The complement was 120 employees with approximately 100 of them women. He testified without dispute by the Commonwealth that he

---

[1] He has two disciplinary actions in his record. See Volume 4 at pages 34-37. He had a five-day suspension in 1971 involving a game violation and a non-disciplinary counseling (no date given). This was not refuted by the Commonwealth.

[2] He contended that he received an excellent review during his tenure at the Division of Records and Identification Services (R & I) from Majors Amos and Merryman. This, too, was not disputed by the Commonwealth.

was told that R & I was a troubled division, that there had been constant friction between management and the union and that the Captains before him had allowed the Lieutenant (Lt. Hanula in this case) to supervise the operation of the entire division without becoming involved with the employees. Simmers found a division where employees were in turmoil, constantly bickering. Morale was low, there were a number of employees who abused sick leave, and union relations were poor.

What is important to note here is that Captain Simmers immediately assumed the supervision of the day-to-day operations of the division, including insisting that he was the person involved directly in the chain of command, and not Lt. Hanula (who was quite disturbed by this), and that Simmers would make the personnel and operating decisions involved in directing R & I. He also began a policy of making the rounds of the division each day greeting personnel, and, from his point of view, at least showing a great deal of interest not only in the workers but in the supervisors as well.[3] He did this to the point that some of the employees remarked that he was trying too hard to be one of them. He also began making appointments of acting supervisors and other changes in the organization that proved to be quite disturbing and quite threatening to employees, some of whom appear to have been ensconced in their positions for many years.

Rather than settling down the division, Captain Simmers, though he intended to finally place R & I on a much better footing, contributed to more turmoil, continued low morale and further conflict among the employees. This included the enlisted personnel as well. There is no question that he threatened and upset employees with the contemplation of the changes he proposed to make and the discipline he imposed because of attendance abuse, including several of the employees who complained against him. Further, he was blunt and outspoken concerning problems, the performance of employees and including the language he used, which also brought complaints by the threatened employees. He also appeared to favor certain people who were appointed to supervisory positions, whatever the reason.[4] He was an outsider who came in to change things, and the employees and enlisted personnel resisted and banded against him. It is against this background that this entire case must be considered.

_____

[3] Simmers testified that as a result of this policy, morale increased immediately and considerably.

[4] McHale's report is replete with such accusations and, in some ways, more so than complaints concerning sexual harassment.

I am not going to repeat here the testimony and the allegations of the complainants nor Simmers' rebuttal. I have included a recitation of the charges brought against him in the DAR (Joint Exhibit 8). I refer also to PSTA Exhibit 4 concerning the BPR investigation as well as the four volume transcript containing the testimony presented in this case and also Captain Simmers' letter of August 9, 1993 to Cpl. McHale (a part of PSTA Exhibit 6).

Apparently, upon receiving Joint Exhibit 4, Captain Simmers filed Grievance No. HQ-99 (Joint Exhibit 2) dated December 29, 1993.

The Grievance (Joint Exhibit 2):

1.   On 11/18/93, I received a Disciplinary Action Report from the Director, Bureau of Records and Information, Major R. Dane Merryman.

2.   On 12-06/93, I received a notice to be court-martialed from the Department Disciplinary Officer, Major Thomas F. Williams.

3.   On 12/29/93, I received a Disciplinary Action Letter from the Department Disciplinary Officer, Major Thomas F. Williams, charging me with:

|  |  |
|---|---|
| FR 1-1.35 | Discrimination or Harassment |
| FR 1-1.02 | Unbecoming Conduct |
| FR 1-1.03 | Conformance to Laws |
| FR 1-2.02 | Performance of Duty |

The adjudicated penalty selected by the Commissioner is a demotion in rank from Captain to Lieutenant and a 45-day suspension without pay.

Additionally, I have already received an involuntary transfer from the Bureau of Records and Information Services to the Bureau of Emergency and Special Operations.

I deny violating the above-mentioned FR Regulations; however, I am assuming there were some violations of Regulations.

The penalty is too excessive and without just cause.

Remedy Requested by PSTA:

1.   Rescind all proposed disciplinary action as well as that already imposed, involuntary transfer.

2.   Refund any future lost monies and/or reimburse any future expenses.

5

717

<u>Contentions of the Parties</u>:

I have presented here only a short summary.  Please see the briefs submitted by the parties for a full description of their arguments concerning the issues involved in this case.

<u>The Commonwealth</u>:

The Commonwealth argued that the conduct involved here violated FR 1-1.35, Discrimination or Harassment; FR 1-1.02, Unbecoming Conduct; FR 1-1.03, Conformance to Laws; and FR 2-2.02, Performance of Duty.  The Commonwealth contended that there is no real dispute regarding the first three allegations contained in the brief because Captain Simmers admitted to those acts, although he explained each.

Regarding the remaining five allegations, the Commonwealth contended that it is safe to say that Cox Colestock, Weldon Britton and Otto testified in support of those allegations and that Simmers testified that those events did not occur.  He also tried to impeach the testimony of those witnesses and ascribe other motivation for their testimony.  However, the Commonwealth argued, these efforts nevertheless fail to obscure the truth.

The Commonwealth contended that from the demeanor of the witnesses, it is apparent that they testified truthfully about events they found difficult and embarrassing, and it is clear the witnesses told the truth.  The Commonwealth also argued that the motives, as ascribed to them for allegedly fabricating these events, simply do not make sense.  That there are motives to fabricate the allegations stretches credibility beyond the realm of logic and belief.

The Commonwealth also contended that much time was wasted in futile attempts to discredit their testimony with the contents of Cpl. McHale's investigative summaries.  The Commonwealth maintained that these were not statements but interpretive summaries.  They were not verbatim tapes or transcriptions and were not reviewed and adopted by the witnesses.  They were not shown the documents nor did they have the opportunity to review and correct them.  The Commonwealth argued that none of the witnesses had their testimony contradicted in any material fashion by this technique.  The Commonwealth also contended that not once was it shown that the witnesses' summarized interviews reflected any inconsistency regarding the allegations, rather only about minor extraneous matters rather than any major inconsistency.

While Captain Simmers denied serious misconduct in each of these situations, he corroborated the details of each event as testified to by all of the witnesses.  The Commonwealth argued

6

718

that the most telling is the fact that two events were corroborated by two independent witnesses.  Further, Mrs. Colestock's husband was present and overheard Captain Simmers' remarks to her.  Myers' testimony completely contradicts Simmers' denial and corroborates Britton's version of the events.

PSTA made much in its closing of the Department's failure to call the DDO or present evidence of similar cases.  The Commonwealth argued that it is the position of the Department that neither is appropriate or necessary.

The Commonwealth argued that the evidence overwhelmingly demonstrates that just cause exists for the Department's actions. The case cited demonstrates that the assertion that there must be a comparison with other disciplinary actions in order to justify this one is wrong.  The absence of a similar case cannot constitute a bar to the imposition of appropriate discipline.

PSTA:

I must point out that the PSTA brief is much too detailed to even attempt to summarize.

This brief argues that while four separate regulations are cited, the real charge seems to be sexual harassment.  It also discusses each of the regulations the Commonwealth contended were violated, arguing that none of them were violated.

PSTA argued that Captain Simmers' conduct did not rise to the level, nor meet the definition, of sexual harassment, and therefore, there is no just cause for the discipline imposed. The brief considered each of the incidents and argued against them, citing the testimony of the complainants and Captain Simmers.

PSTA argued that the ultimate issue the arbitrator must decide is whether or not the testimony presented by the Commonwealth's witnesses proves Captain Simmers engaged in the type of conduct that constitutes sexual harassment as defined by State Police Special Order No. 90-159.  This issue can only be decided by a determination concerning the credibility of the witnesses, as witness testimony is the Commonwealth's only evidence.  Exactly what prompted these accusations is unclear, but it is apparent that each woman had some motivation for bringing these allegations against Simmers.

PSTA argued that a careful review of the accusations against Captain Simmers in conjunction with a reading of the Supreme Court's criteria in the <u>Harris v. Forklift Systems, Inc.</u>

7

decision[5] for finding sexual harassment clearly demonstrates that Captain Simmers' conduct does not rise to the level of sexual harassment. PSTA maintained that, even if these witnesses are telling the truth, although doubtful, at most, the conduct described consisted of "mere offensive utterances" and was not of the type that unreasonably interfered with the women's work performance. PSTA argued that the Commonwealth has not met its burden in proving otherwise by the evidence presented at the hearing. Therefore, PSTA contended, the arbitrator should find that Captain Simmers did not engage in sexual harassment and, thus, has violated no departmental regulations or laws.

PSTA also argued that because the accusations against Captain Simmers, even if true, do not constitute sexual harassment, no violations of any departmental regulations have occurred. PSTA maintained that he did not violate FR 1-1.35, and in the light of the failure of the Commonwealth to sustain its burden of proof, this charge should be dismissed.

The charge concerning violation of FR 1-1.03, Conformance to Laws, apparently alludes to violating sexual discrimination laws, and PSTA also argued that this charge, too, should be dismissed.

PSTA contended that FR 1-2.02, Performance of Duty, was brought because the Department feels that Captain Simmers violated rules and regulations of the Department. PSTA argued further that only if there is a basis for finding a violation of any rule or regulation will this charge apply. PSTA maintained that because there is no basis for finding a violation, this charge, too, should be dismissed.

PSTA argued that the final charge, violation of FR 1-1.02, Unbecoming Conduct, has not been proven by the Commonwealth. PSTA contended that in order to prove this charge, the Commonwealth must prove the conduct, in fact, occurred and that it was conduct of the type that would cause the public to lose respect for the State Police. PSTA argued further that such a charge is sustainable only when there has been some showing that the conduct is the type to destroy public respect for Pennsylvania State Police Officers and/or confidence in the Department.[6] PSTA contended that the Commonwealth presented no evidence that would sustain this charge. PSTA contended further that numerous court cases have held, if the public has not been made aware of such allegations, no showing is made that the alleged conduct is of the type that would destroy public respect or confidence. PSTA argued that the Commonwealth clearly has not

---

[5] 114 S.CT. 367 (1993)

[6] Emphasis is that of the writer of the PSTA brief.

8

720

met its burden of proving that this regulations has been violated, and therefore, this charge must be dismissed.

PSTA also argued that if the arbitrator finds just cause for discipline, it is within the purview and authority of the arbitrator to modify discipline if he or she feels that the discipline imposed is excessive or inappropriate to the charges. PSTA contended that it was incumbent upon the Commonwealth to submit evidence on the issue of the appropriateness of the discipline at least by submitting the testimony of the DDO. PSTA argued that the failure of the Commonwealth to do so indicates that it cannot justify the discipline imposed.

PSTA argued that it is important to note that there is nothing in the collective bargaining agreement that would prohibit the arbitrator from modifying the level of discipline imposed, and arbitrators have been doing this for years. PSTA maintained that the prevailing view appears to be that an arbitrator may do so to safeguard the interests of the employee by making sure that the discipline is equitable and fair and to ensure that the employer has not acted arbitrarily, capriciously or unfairly, and in fact, this is the precise purpose and function of the arbitration process. In regard to the fact that the Commonwealth failed to submit evidence concerning the issue of appropriateness of the discipline, PSTA submitted Arbitrator Wolf's Award in the Simonitis case in support of its position where he found that the Department's own regulations require the DDO to speak to the issue of the discipline. In this case, the absence of the DDO is significant, and PSTA contended that, as a result, the discipline against Captain Simmers should be rescinded.

Finally, PSTA argued that the charges against Captain Simmers should be dismissed and the suspension rescinded together with reimbursement for any monies lost as a result of the improper suspension. PSTA also argued that, in addition, his involuntary transfer should be rescinded, and he should be returned to his former position and rank.

Discussion and Opinion:

This case is a very difficult case because it concerns the career of a 27-year State Police Officer who, until he was appointed to the position of Director of the Division of Records and Identification Services (R & I), had compiled an exemplary record and performed excellently in all of his assignments. He appears to have been considered an outstanding Officer who had given important service to the State Police. I must also point out to the parties that one of the difficulties involved in this case is that it appears to be a ground breaking case in that the Commonwealth did not present evidence of previous disciplinary actions concerning sexual harassment. However, I must discuss

9

several important aspects of this case before I rule concerning the grievance at issue here.

First, I am not convinced, despite his exemplary service, that Captain Simmers was qualified to command or to direct R & I. I am persuaded that, to the contrary, he was not qualified. This is a key aspect of this case. Unfortunately, there is a tendency in many large organizations, including military-type organizations, to consider that any successful Officer can perform in any capacity and do anything involving command and supervision.

There is no question that R & I was in bad shape. There was a great deal of dissention, turmoil, a number of cliques, possibly racism, bad union relations, jealousy and, it appears, a great deal of chaos. The McHale investigative report (<u>PSTA Exhibit 4</u>) clearly shows this as did the testimony at the hearings. The civilians were predominantly women, and it appears that the enlisted personnel who supervised played favorites, just as Simmers is accused of doing[7], also a key problem here. According to his testimony, Simmers was given this assignment to correct the problems involved with this division. It is obvious from the testimony of the complainants and from the investigative report (<u>PSTA Exhibit 4</u>) that there were a variety of "agendas" involved in the R & I situation, and Simmers exacerbated them considerably, thus interfering with his mission to correct the problems.

I am persuaded that Simmers' superiors never really examined his background when he was transferred to R & I to ascertain whether he had the necessary management skills to supervise and command successfully a division comprised of a large number of diverse civilians and, especially, one in as bad a shape as this one appeared to be.

The answer, if one examines his background which is detailed in his testimony recorded in Volume 4 of the transcript, would be that he had spent the last ten-plus years in undercover work or in supervisory undercover work, a far different milieu than he found in R & I when he arrived. He testified that the reason he wanted a transfer was because he wanted a change from undercover work. Up until his transfer, Simmers' supervisory experience concerned patrol supervision, possibly of some administrative work and, of course, his undercover work. It does not appear from his testimony that he was ever involved in the direction and administration of a major division consisting of a large number of people performing many different functions similar to a large division of a private sector company with a great many diverse

---

[7] Although apparently he "favored" different people than those favored by the supervisors he inherited.

10

employees. The supervisory work he had performed really concerned operations that were tough, macho and obviously in a climate that was much rougher than the climate at R & I. It is clear that Simmers did not have the supervisory experience involving large groups of civilians when he arrived at R & I.

I am also persuaded that not only did he not have the supervisory experience, but that he did not have the managerial skills necessary to accomplish the goals involved here and that he could not succeed. I am persuaded as well that he operated in the same manner as he had in undercover work with one exception, which I will discuss below. According to his testimony, which was not disputed, he was transferred to this position to correct the problems. His supervisors must share the blame for exposing this previously excellent career Officer to this failure. They placed him in a "can't win" situation insofar as he was concerned. The symptoms of Simmers' lack of ability to handle R & I were clearly apparent within R & I soon after he assumed command, and his superior officers did not see or understand those symptoms.

Second, I am persuaded that Simmers was partially responsible, possibly inadvertently, for his failure in supervising and administering this division. It is clear, again from the testimony and the investigative report, that enlisted and officer personnel reporting to him and the rank and file employees saw to his failure. However, his major failure involved his attempts to be "one of the guys" at the same time that he was attempting to discipline employees and reorganize the division. This is the major reason for his failure. In his testimony, he was proud of the fact that he had been able to learn the names of all 120 people. He was proud of the fact that he was able to greet everyone every morning, joke and banter with them while calling them by their first names. There were comments in the investigative report that he tried too hard to be this friendly and to change the climate (my word) of the organization. All he succeeded in doing was to contribute to the turmoil, especially as his plans for reorganization and his judgements concerning specific employees became known. There is no question that in an organization such as this one, long entrenched, threatened employees will find a way to defend themselves and, if possible, to attack the source of that threat. Anyone who has had to supervise such a group of employees, especially when the supervisor must accomplish change as well as discipline employees following a fairly lax administration, knows that one cannot be friends with them nor even come near fraternizing with such a group of employees personally. From a management point of view, he had to keep away from them just as his predecessors had. As it turned out, his predecessors were far wiser than he.

11

723

Finally, there was a statement in the DAR which was quite disturbing from a due process point of view.  It did not appear in the disciplinary memorandum (<u>Joint Exhibit 4</u>) of December 27, 1993.  This statement is as follows:

> Nineteen additional allegations describe behavior representing inappropriate and offensive conduct. Strong internal consistency exists in virtually all the allegations.  Although these additional allegations are not sustained because they are not corroborated, they are credible and they further demonstrate a pattern of behavior which represents sexual harassment and a hostile work environment.

I have not given weight to this paragraph because, in the words of the Department, the nineteen additional charges alleged here were not sustained because they were not corroborated.  Due process and fairness requires that in a serious situation such as this one, where a person's career is so seriously threatened, only corroborated incidents are admissible.  Such uncorroborated incidents cannot be used to "further demonstrate a pattern of behavior which represents sexual harassment and a hostile work environment."  He cannot be subject to that without credible evidence being presented.  The statements in <u>PSTA Exhibit 4</u> are not conclusive of that.  Therefore, I am going to consider only the eight incidents contained in the DAR (<u>Joint Exhibit 3</u>) and the violations of the FRs contained in paragraph one of the disciplinary memorandum of December 27, 1992 (<u>Joint Exhibit 4</u>).

I shall first consider the three incidents Simmers has acknowledged as having occurred as reported.  Among these three, I shall first consider paragraph (h) of the charges contained in the DAR involving the use of the word "fuck" at an open staff meeting attended by both men and women.  I have concluded that this charge cannot be involved in a general charge of sexual harassment.  Despite its connotation, this term used as Simmers used it at that staff meeting (and, incidentally, probably throughout his tenure in R & I and his career) is not sexual, nor can it be considered harassment.  This type of profane language is euphemistically known as "shop talk."  It is clear from the testimony of both the complainants and Simmers, as well as the evidence submitted, that, except for a few people, almost everyone, both male and female, in the division uses such "shop talk."  I must point out that the use of "shop talk" by both men and women in our society is so prevalent and so public that, obviously, it has changed forever our language mores.  While no sexual connotation can be read into the use of such language, its use at an open staff meeting attended by both sexes was inappropriate and cannot be condoned as professional behavior.

12

Further, while I also find that the use of such language by Simmers to indicate his dissatisfaction with the group is not really relevant to a charge of sexual harassment, it is an indication of his lack of understanding of what it took to command a division such as this one. He admittedly lost his temper, but clearly, he testified that he thought the use of such language was the right way to communicate with civilian division workers. It was inappropriate and unprofessional no matter the gender composition of his "audience." While both genders do use such language today, it was naive of him to think that he could use the same approach in R & I as he would have used in the tough, macho environment of undercover work. This is just an indication of his naivete with respect to supervising such an operation. It is also an indication of his lack of qualification for this assignment and his lack of management skills. I have concluded that the use of such language was inappropriate and unprofessional behavior on the part of a commissioned officer of the State Police.

Next, I shall consider the so-called "choke hold" incident (paragraph (f) of the DAR) described by Margaret Weldon Britton. This incident also indicates the naivete of Simmers in imagining that he could become friends with the employees of this division and, at the same time, discipline them, reorganize the division, in some cases to the detriment of these same employees. This incident has been listed as sexual harassment. Yet, it is clear from both Weldon Britton's and Simmers' testimony that this could not be classified as a "sexual harassment" incident. She testified that there was nothing sexual about it (as he did) and that she would classify it as "physical assault." Simmers denied that it was a "choke" hold, but he admitted to touching her, but not in a sexual manner. According to his testimony, he was attempting to get her attention. He contended that the repartee was banter and in jest. (To some degree, she confirmed this.) He also contended that her statement to Erdman and his (Simmers') retort, "he can't do anything for you," was in jest. While as indicated earlier, this incident is another example of Simmers naivete with respect to his expectation of being friends with his employees, it is clearly another indication of his unprofessional and inappropriate behavior as a director/supervisor for a major division. This position requires much more dignified behavior than any position he had had previously. If he wanted to succeed in reorganizing this division, he had to be much more aloof than he was.

The third of the incidents Simmers had acknowledged was the "slut" incidents (paragraph (a) of the DAR). Kamarer contended that he called her "slut" at least four times, but she could only recall two of them. Simmers contended long before this hearing that it was only two times (see PSTA Exhibit 6). Based upon the testimony, I shall only consider the two occasions Mrs. Kamarer clearly remembered and that Captain Simmers acknowledged he did

as she claimed.  He contended she called him a "whoremonger -
just like the other staties."  He felt that this was in jest, and
he maintained that he responded in jest by saying, "look at the
old slut calling me a whoremonger."  He admitted that he entered
Cpl. Crumel's office later and, in what he felt was a joking
manner, called her a "slut" once again.  While Mrs. Kamarer
denied making the "whoremonger" remark, I have accepted Simmers
explanation of why he called her "slut" and the fact that he
considered it in jest.  However, even if one accepts the first
incident as Simmers described it,[8] the second of itself, though
precipitated by the first, was unprofessional and inexcusable.
As a matter of fact, the first was also unprofessional conduct
and inexcusable despite what she said.  However, I find that both
do not belong in the category of sexual harassment.  The obvious
implications of the so-called banter (and she admitted to
participating at first) did not concern any personal sexual
implications on either person's part.  While two such incidents
do not make a harassment of Mrs. Kamarer, Captain Simmers
exercised extremely poor judgement in these situations, and they
overshadow anything Mrs. Kamarer may have said because Simmers
was the Director of the division and should have maintained his
dignity.  I find that, once again, his lack of supervisory and
managerial experience in handling civilian employees caused him
to be unprofessional and inappropriate in his remarks.

     I shall now consider the five remaining allegations.  Here
we are dealing with a very complicated and sensitive problem.
The complainants testified that these allegations were true, and
the parties contended that this case turned upon the credibility
of the witnesses.  Ordinarily, I would agree; however, the
conditions in this division and the level of turmoil and chaos,
including the attempts by the enlisted personnel and some of the
civilian supervisors, to encourage the employees to complain
against Simmers (see PSTA Exhibit 4) indicate that I must look at
credibility in a much different light.  I do not intend to
deprecate the witnesses, but there was a great deal of confusion
on the part of some of them concerning dates, events and
interpretation of events to the point where some of them were
unwilling to even acknowledge when Simmers became Division
Director.  They contended Simmers said and did certain things,
and he denied them both in his testimony and in his letter of
August 9, 1993 to McHale.  The breast-grabbing rumor encouraged
by Trooper Vittor (see PSTA Exhibit 4) and denied by Weldon
Britton in her testimony is an indication of the rumors bandied
about the division and the varied and vicious agendas resulting
from Simmers activities involving the reorganization of the
division and his disturbance of long ensconced people who
possibly may not have been among the best of employees.  Even the

---

     [8] Despite her denial of having said "whoremonger," I am
persuaded she did use that word in that situation.

14

726

lemon squares incident which he explained differently than the Commonwealth's witnesses appears to have been blown far out of proportion, and even the two witnesses tended to minimize its importance in their testimony.  The relevant fact here is that the last five allegations taken together, even if for the sake of argument they had occurred, do not rise to the level of sexual harassment or the creation of a hostile work environment.  If they actually occurred, they indicate a man who was insensitive to his environment, who talked too much about his plans, among other things, and one who made himself the "target" by attempting to be everyone's friend.  It is clear that by the time he had had the opportunity to discipline people, and the knowledge of the proposed reorganization of the division had gotten around from his own talk and through rumors, he upset and disturbed people considerably with respect to their status and security.  It must be remembered that this was happening apparently after all of those years when the administration of the division was low key and nonintrusive.  This caused even more turmoil and chaos.  Some of the witnesses appear to have been disciplined by Simmers while others were or would have been affected by his personnel decisions.  Almost all were resentful of those purported decisions.  I am persuaded by the testimony, the evidence and by the foregoing discussion and analysis that, if these incidents occurred, they do not rise to the level of sexual harassment or the creation of a hostile work environment.

In Harris v. Forklift Systems, Inc.[9], The U.S. Supreme Court laid down the factors to be considered in a hostile work environment situation.  The court said that the relevant factors to be considered in a hostile work environment are:

1.    The frequency of discriminating conduct.

2.    The severity of the conduct.

3.    Whether the conduct was physically threatening or humiliating or a mere offensive utterance.

4.    Whether the conduct unreasonably interfered with the victim's work performance.

5.    Psychological harm to the victim.

It is clear from the testimony of the complainants that the frequency and severity of the conduct, if it occurred, was not at the Fork Lift or Lehman[10] (a 1993 case illustrating egregious

---

[9] 114 S.CT. 367 (1993)

[10] Lehman v. Toys 'R' Us, Inc. (Supreme Court of New Jersey), 132 N.J. 587, 626 A. 2d (1993).

15

727

conduct on the part of a supervisor) levels.  His conduct, if it occurred, was not threatening, possibly humiliating, which I find more at the level of offensive utterance than sexual harassment.[11]  I find that the testimony indicated that the alleged conduct, if it occurred, did not unreasonably interfere with any of the complainants' work performance.  I also find there has been no contention of psychological harm as being a factor here.

I find that the eight incidents described in the DAR dated November 17, 1993 are the only allegations that may be considered in this arbitration case.  I also find that paragraphs (a), (f) and (h) are not allegations of sexual harassment or hostile work environment.

I find further that the allegations contained in paragraphs (b), (c), (d), (e) and (g) of the DAR do not rise to the level of sexual harassment or the creation of a hostile work environment.

Accordingly, I find that Simmers did not violate FR 1-1.35, Discrimination or Harassment, as charged in the DAR and the disciplinary memorandum at issue here.  I find further that Simmers did not violate FR 1-1.03, Conformance to Law.  It is obvious that this charge stems from the charge involving FR 1-1.35.  The PHRC/EEOC guidelines (attached to the PSTA brief)[12] are similar to the guidelines laid down by the Supreme Court in Harris v. Forklift, Inc., and my analysis above covers the guidelines as well.

I must also consider the charges with respect to FR 1-1.02, Unbecoming Conduct, and FR 1-2.02, Performance of Duty.  There has been, in the past, some controversy involving the interpretation of a regulation like FR 1-1.02.  The disputes center around whether a Police Officer is in violation of such a regulation where the public is not involved.  There have been several court cases concerning this.  I do not believe that the issue in this case really involves that interpretation, and I decline to rule on that aspect.  There is no question that members must not conduct themselves in a manner unbecoming to a Police Officer.  I find that Simmers did not violate FR 1-1.02.  However, I find that he did violate, as charged, FR 1-2.02, Performance of Duty.  Simmers' transgression in this case

---

[11] Despite Myers' testimony (see V-2, pages 143-160) concerning paragraph (e) of the DAR (Joint Exhibit 3), I have accepted Simmers' statement in his memorandum to Major Merryman dated December 1, 1993, paragraph 1, subparagraph (e) (PSTA Exhibit 6).

[12] Human Relations Commission Guidelines on Sexual Harassment, as published in PA Bulletin, Vol. 11, No. 5, Jan., 1981.

16

involves the fact that he must be held responsible for the proper performance of all of the duties assigned to him as Director of R & I, and further, he must be held responsible for his failure in administering the division and for not correcting the deficiencies he was placed there to achieve because of his own failures as a manager and a supervisor. He also admitted at page 8 of his memorandum to Cpl. McHale dated August 9, 1993 that his actions were a violation of the Department's rules and regulations. I also find that his inappropriate and unprofessional behavior with respect to paragraphs (a), (f) and (h) contained in the DAR are also violations of FR 1-2.02.

Therefore, I find that the Commonwealth did not have just cause for charging the grievant with violations of FR 1-1.35, FR 1-1.02 and FR 1-1.03. I find that the Commonwealth had just cause for charging the grievant with violation of FR 1-2.02, Performance of Duty.

Accordingly, the grievance is upheld in part and denied in part.

Accordingly, I find, with respect to the disciplinary actions imposed upon the grievant, that based upon the testimony and the evidence presented to me, the Commonwealth did not have cause to demote the grievant. Further, I find that there is no evidence in this record concerning the appropriateness of the imposition of such drastic discipline when compared to similar cases. I direct that the grievant's 25 plus years of exemplary service (at the time of his appointment) must be taken into consideration in this situation and that he be given credit for that exemplary service. Further, it is clear that his superiors transferred him to a position for which he was not qualified by experience, background and temperament, and they, too, must bear a part of the responsibility for his failure. I, therefore, direct the department to rescind the demotion of the grievant ordered in paragraph 4 of the memorandum issued December 27, 1993 (<u>Joint Exhibit 4</u>).

Next, I find that the department had cause for issuing a warning and imposing a suspension on the grievant for violation of FR 1-2.02. However, the 45-day suspension imposed was based upon the allegations contained in the DAR and the charges of violating four FRs. I have found that he was not guilty of sexual harassment or creating a hostile work environment and that he violated only one FR (FR 1-2.02). I find, therefore, that a 45-day suspension represents a level of discipline that is too harsh and drastic a disciplinary action when considering the extent of his transgressions. Accordingly, I am reducing that suspension to an appropriate level to fit the extent of his transgressions. Therefore, I direct the Department to reduce the suspension from 45 days to ten days and to place a warning in his personnel records reflecting this Award.

17

Last, I find that the department had cause for transferring the grievant from his assignment as Director of the Division of Records and Identification Services. I am aware of Captain Simmers' fervent plea at the end of the last hearing concerning his return to finish the work he had begun at R & I. This is just one more indication of his naivete with respect to his managerial skills, his ability to handle people and his lack of understanding concerning what happened to him when he attempted to manage this division. It is clear that he should not return to this assignment. Such a return would not be to the benefit of the division nor of any advantage to Captain Simmers.

## Award:

Based upon the testimony at the hearing, a consideration of the exhibits, the arguments of the advocates at the hearings and in their briefs and the foregoing discussion and analysis, the arbitrator finds that:

1. The eight incidents ((a) through (h)) described in the DAR dated November 17, 1993 (Joint Exhibit 3) are the only allegations that may be considered in this arbitration.

2. Paragraphs (a), (f) and (h) in the DAR dated November 17, 1993 are not allegations of sexual harassment or the creation of a hostile work environment.

3. The allegations contained in paragraphs (b), (c), (d), (e) and (g) do not rise to the level of sexual harassment or the creation of a hostile work environment.

4. The grievant did not violate FR 1-1.35, FR 1-1.02 or FR 1-1.03.

5. The grievant did violate FR 1-2.02.

6. The Department did not have cause to demote the grievant.

7. The Department had cause to warn and suspend the grievant but that the 45-day suspension was too harsh an imposition of discipline considering the transgressions involved in finding No. 5 above.

8. The Department had cause to transfer the grievant.

Accordingly, the grievance is upheld in part and denied in part.

18

730

The Department is directed to:

1.  Rescind the DAR issued on November 17, 1993 and the
    memorandum issued December 27, 1993 and expunge them from
    the personnel records of the grievant.

2.  Rescind the demotion imposed upon the grievant in
    paragraph 4 of the memorandum dated December 27, 1993 and
    restore him to the rank of Captain retroactive to that date.

3.  Rescind the 45-day suspension imposed upon the grievant by
    paragraph 4 of the memorandum of December 27, 1993 and
    substitute instead a ten-day suspension and a warning
    concerning his violation of FR 1-2.02.  These shall be
    placed in his personnel records.

4.  If the grievant has suffered any monetary loss beyond a
    ten-day suspension, he shall be made whole retroactively.


_____        1-19-95
Stanley J. Schwartz                     Date
Arbitrator

19

## CERTIFICATE OF SERVICE

I, **SUSAN J. FORNEY,** Chief Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on June 3, 2002, I caused to be served a copy of the foregoing document entitled **Document in Support of Defendants' Motion in Limine to Exclude All Evidence Relating to 1993 Allegations of Sexual Harassment Against Defendant Simmers,** by depositing same in the United States Mail, first class, postage prepaid, in Harrisburg, Pennsylvania, upon the following:

**Nathan C. Pringle, Jr., Esquire
3601 North Progress Avenue, Suite 200
Harrisburg, PA 17110**

**SUSAN J. FORNEY
Chief Deputy Attorney General
I.D. No. 27744**