IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBRA A. WILHELM,                    :      CIVIL NO.1:CV-01-1057

    Plaintiff                          :

    v.                                 :

COMMONWEALTH OF                       :
PENNSYLVANIA; COLONEL PAUL
J. EVANKO, COMMISSIONER;              :
COLONEL THOMAS J. COURY;
and CAPTAIN MICHAEL D.                :
SIMMERS,                              :

    Defendants                         :



FILED
JUN 2 8 2002
PER _____
HARRISBURG, PA   DEPUTY CLERK

## M E M O R A N D U M

Before the court are the parties' cross motions for summary judgment. The parties have briefed the issues, and the motions are ripe for disposition.

I.       __Background__

Plaintiff, Barbra A. Wilhelm, filed this suit alleging violations of the following statutory mandates: (1) the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (Count I); (2) the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e (Counts III and V); (3) the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 955 (Counts II, IV, and VI); and (4) the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 *et seq.* (Count VII). Plaintiff's cause of action arises out of her employment with the Pennsylvania State Police. Defendants in this action include: (1) the Commonwealth of Pennsylvania;[1]  (2) the Pennsylvania State Police

---

[1]Although the complaint lists the Commonwealth of Pennsylvania as a Defendant, nowhere does the complaint set forth grounds for the Commonwealth's liability. It appears that the Commonwealth's liability is limited to the PSP's liability. Therefore, the court will apply each of its
(continued...)

("PSP"); (3) PSP Commissioner Colonel Paul Evanko; (4) Lieutenant Colonel Thomas Coury, and (5) Captain Michael D. Simmers. The following facts are undisputed unless otherwise noted.

### A.    PSP Office of Legislative Affairs

Plaintiff was employed by the PSP as a legislative specialist in the PSP Office of Legislative Affairs ("the Office") from January 1998 until May 1, 2000. Plaintiff functioned as the staff assistant to Major Richard Morris, Director of the Office.  For the first year of Plaintiff's employment, Captain Michael D. Simmers, Assistant Legislative Liaison, directly supervised her.  Except for a brief period of a few weeks, the Office did not have any clerical support staff during Plaintiff's tenure.

At the time Plaintiff began working in the Office, Ronald Plesco had been employed there since 1996.  Plesco, a former assistant district attorney, made recommendations to the Pennsylvania Governor's Office regarding the Administration's position on legislation affecting the PSP.  Plesco also reported to Commissioner Evanko and Major Morris and was responsible for briefing legislators and providing testimony at legislative hearings on behalf of the PSP. Additionally, Plesco drafted PSP regulations.  In particular, Plesco drafted the PSP regulations establishing PSP protocol for use of the Instant Check System, which provides required criminal record checks of potential firearms purchasers.

As previously stated, when Plaintiff began working for the Office, Captain Simmers was her immediate supervisor.  Later, however, Major Morris

---

[1](...continued)
rulings with respect to the PSP to the Commonwealth as well.

directly supervised her. Although there is some dispute as to the extent of Plaintiff's work responsibilities and autonomy, it is undisputed that one of Plaintiff's primary duties was performing legislative analysis. Plaintiff reviewed proposed legislation and, after collecting input from various branches of the PSP, submitted a document evaluating how proposed legislation impacted the PSP. Plaintiff presented the legislative analysis to Major Morris. Commissioner Evanko and Major Morris ultimately decided what positions the PSP would take on legislation, ensuring that the position was consistent with the Governor's views. Plaintiff, in conjunction with Major Morris, also prepared responses to inquiries made by members of the General Assembly. They submitted the prepared responses to Commissioner Evanko who reviewed them before sending them back to the inquiring member. Plaintiff's position did not require that she testify at legislative hearings. Plaintiff contends that she drafted department directives and administrative orders. (Wilhelm Depo. Ex. 1 at p. 000244.) Defendants, however, contend that Plaintiff's position did not involve developing or drafting PSP regulations. (Wilhelm Depo. at 26-29.)

Although a former police officer, Plaintiff was never a uniformed member of the PSP. In contrast, both Major Morris and Captain Simmers were uniformed members of PSP at all times relevant to this litigation. Uniformed members of the PSP are sworn law enforcement officers who are required to take appropriate police action whether on or off duty. These actions include: making arrests; serving warrants; and responding in cases of emergency, civil disorder, and disasters. Uniformed members are also required to carry a pistol and ammunition with them at all times when in public. The PSP also requires that uniformed members be mentally and physically fit.

3

**B.**    <u>**Plaintiff's Internal Complaints**</u>

In July of 1998, Plaintiff orally complained to Major R. Dane Merryman about Captain Simmers and Ronald Plesco. Major Merryman is the Director of the PSP Bureau of Professional Responsibility, which oversees investigations of uniformed members accused of misconduct. Plaintiff accused Captain Simmers of creating a difficult work environment. She also alleged that he did not have the requisite skills to successfully execute his duties and was not held accountable for abusing other emoluments. Specifically, she accused Captain Simmers of: taking unauthorized leave; disregarding working hours; and misusing his state vehicle privileges. Plaintiff also accused Plesco of taking excessive leave. Major Merryman informed Plaintiff that if she filed a complaint, the Bureau of Professional Responsibility would investigate the matter. Plaintiff did not file any complaint until September of 1999 when she sent a memorandum to Lieutenant William Horgas, as discussed below. *Infra* at pp. 5-6.

In the interim, Major Morris submitted a complaint to the Bureau of Professional Responsibility, accusing Captain Simmers of making comments and taking action with the intent to undermine Plaintiff's qualifications and abilities.[2] The complaint, filed in June of 1999, stated that Plaintiff did not wish for the complaint to go forward and that she would not talk to any Bureau personnel or the Equal Employment Opportunity Office about the issue. Plaintiff, however, spoke with Corporal Rain, who investigated the matter on behalf of the Bureau of Professional Responsibility. During that discussion, Plaintiff questioned Captain

---

[2]Plaintiff disputes that Major Morris filed a complaint. However, she acknowledges all other pertinent facts concerning the investigation. (Pl. Resp. to Def.'s Stat. of Mat. Facts at ¶ 101-06.)

4

Simmers's competence.  Corporal Rain explained to Plaintiff that he would be unable to investigate competency issues.  Defendants contend that competency issues are handled by the employee's supervisor.  (Def. Stat. Mat. Facts at ¶ 107.) Plaintiff, however, contends that the Bureau of Professional Responsibility is empowered to undertake such investigations.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 107.)[3]  Regardless, Plaintiff described Captain Simmers's comments that she found offensive, including comments that Commissioner Evanko was reclassifying her position and that she would be removed from the Office.  Corporal Rain requested information regarding Captain Simmers's work misconduct, but Plaintiff refused to provide that information.

As previously stated, Plaintiff later sent a memorandum on September 13, 1999 to Lieutenant Horgas, a staff member of the Bureau of Professional Responsibility.  In that letter, Plaintiff requested a private audience with Major Morris and Lieutenant Horgas to discuss a variety of issues, including Plaintiff's ongoing tension with Captain Simmers.  At that meeting, Plaintiff accused Captain Simmers of harassing her, although the harassment did not refer to gender.  At the conclusion of the meeting, Lieutenant Horgas indicated that the matter could be more properly addressed by another division of the Bureau of Professional Responsibility – the Internal Affairs Division.  Defendants allege that Plaintiff never submitted a complaint to the Internal Affairs Division.  (Def. Stat. Mat. Facts at ¶ 120.)  Plaintiff, however, contends that the memorandum to Lieutenant Horgas

---

[3]In her response to Defendant's Statement of Material Facts, Plaintiff cites a "Hickes Dep." for the proposition that the Bureau could investigate competency issues.  The court has scoured all exhibits that the parties submitted in support of their positions.  Yet, nowhere did the court encounter this exhibit.

constituted a complaint submitted for investigation by any and all divisions of the Bureau of Professional Responsibility, including the Internal Affairs Division.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 120.)

On January 3, 2000, Plaintiff sent Major Morris a memorandum complaining of disparate treatment due to her gender.  Specifically, Plaintiff accused her male counterparts, both uniformed and civilian, of taking unauthorized paid leave.  When the men abused these privileges, they were not held accountable, according to Plaintiff.  In response, Commissioner Evanko directed that Plaintiff's complaint concerning leave abuse be forwarded for investigation to the Director of the Bureau of Professional Responsibility, the PSP Office of Chief Counsel and the PSP's Equal Opportunity Officer.

## C.    The Selection of Major Morris's Successor

In January of 2000, Major Morris retired.  Traditionally, vacancies in the Office were not posted.  Instead, candidates would informally notify the Commissioner of their interest.  About two weeks after Major Morris's retirement, Plaintiff expressed an interest in the position to Linda Bonney, PSP Personnel Director.  Ms. Bonney responded by sending Plaintiff an email.  The entire body of that communication is set out below:

> I have not discussed this with LtC. Coury, but I will tell you, Barbara, that my guess is they will put a Major in the job and not accept bids from anyone.  The reason I say this is that this has historically been L-1 bargaining unit work, including the most recent Legislative Liaison, and the Labor Board has taken the position that work belongs to the bargaining unit of the former incumbent.  The alternative is to <u>bargain</u> with the PSTA to put a civilian in the job.  I don't see the union giving up this Major slot. . . . This is all conjecture, because I don't know what is in the Commissioner's mind.  I really haven't heard anything. . . . Never-the-less, for your information, when my job was open, I submitted my resume with a cover letter, [letting] the Deputy of Amin [sic]

6

> know I was interested. I also sent a copy of my resume to the OA
> to Mr. Sciotto.

(Wilhelm Depo. Ex. 7 (emphasis in original).) "L-1 bargaining unit" refers to the portion of the collective bargaining agreement between the PSP and Pennsylvania State Troopers Association ("PSTA") which governs uniformed PSP positions for the ranks of Trooper through Major.

Defendants contend that, other than her brief communication with Ms. Bonney, Plaintiff never submitted anything to the PSP indicating her interest in the position left vacant by Major Morris's retirement. (Def. Stat. Mat. Facts at ¶ 130.) Plaintiff, on the other hand, contends that she did not submit her resume to the Deputy Commissioner because she expected Ms. Bonney to get more information for her. Ms. Bonney never provided Plaintiff with such information. However, Ms. Bonney also indicated in her deposition that even had Plaintiff applied for the position, her application would not have been considered. (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 130; Bonney Depo. at 62-63.)

Commissioner Evanko subsequently identified several candidates for the position. He only considered uniformed members of the PSP as appropriate candidates because he believed that the uniformed members would be more effective in representing the PSP to the members of the Pennsylvania General Assembly. Additionally, although there is no statutory or regulatory requirement that the position be filled with a PSP L-1 bargaining unit member, the PSTA filed unfair labor charges against the PSP whenever the PSP attempted to place civilians in positions previously held by uniformed members. Rather than face such a charge, Commissioner Evanko just assumed that the position should be filled by a uniformed member. He then submitted his list of qualified candidates, all uniformed

members, to the Governor's Office.  In the end, Captain Jeffrey B. Miller was selected as Major Morris's successor.

### D.   Selection of Captain Simmers's Successor

After Captain Miller took over as the Director of the Office, he authorized Captain Simmers's transfer to another PSP unit.  Eventually, Captain Miller selected Sergeant William McHale to replace Captain Simmers.  The entire process that yielded this result, however, is in dispute.

Defendants contend that in filling the vacancy created by Captain Simmers's departure, the PSP utilized the same method that it employed when selecting Major Morris's successor.  However, in replacing Captain Simmers, Captain Miller made the final determination, and the Commissioner concurred with his choice.  Sergeant McHale, though, was the only candidate that Captain Miller interviewed.  Defendants contend that neither Captain Miller nor Commissioner Evanko was aware that Plaintiff had an interest in the position.  (Def. Stat. Mat. Facts at ¶ 139.)  Plaintiff, however, avers that she contacted Barbra Christie in the PSP Office of General Counsel to get information concerning the position. Therefore, according to Plaintiff, Commissioner Evanko must have been aware of her interest.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 139.)

### E.   Plaintiff's Dismissal

At some point – although the parties dispute exactly when this occurred – the Office became acutely aware that it lacked sufficient clerical personnel.  That is, no person in the Office performed purely clerical tasks as their primary duty. Plaintiff avers that as early as April 1999, the Office planned to hire someone to serve in a purely clerical position under Plaintiff's direct supervision.  (Complaint at

8

¶¶ 100, 101.)  However, the PSP took no affirmative steps to hire clerical staff until after Plaintiff filed her complaint with the Bureau of Professional Responsibility on September 13, 1999.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 145(b).)

Defendants version of the facts differs significantly.  According to Captain Miller, when he started as Director of the Office, Commissioner Evanko informed him that he would be making several personnel changes in the Office. Specifically, he indicated that Captain Simmers and Ron Plesco would be transferred out of the Office.  At that time, however, Commissioner Evanko did not indicate that there would be a change in Plaintiff's job status.  Two months later, Captain Miller apprised Commissioner Evanko of two things: (1) that he needed someone to perform purely clerical tasks more than he needed an extra legislative assistant; and (2) that Plaintiff was having trouble communicating and participating with other members of the Office.  Based on these conclusions, Captain Miller recommended to Commissioner Evanko that he convert Plaintiff's position into a purely clerical position.  (Miller Depo. 61-64.)  The Commissioner agreed with Captain Miller's recommendation and ordered Lieutenant Colonel Thomas Coury, Deputy Commissioner in charge of the Bureau of Personnel, to implement the decision.  (Coury Depo. at 5-6; 21-22.)

According to Defendants, Lieutenant Colonel Coury instructed Ms. Bonney to attempt to place Plaintiff in another position if possible.  Plaintiff was an at-will employee with no rights under the Civil Service Law or the PSP collective bargaining agreement.  Therefore, Ms. Bonney concluded that if there was no vacancy for which Plaintiff was qualified, the PSP would have to dismiss Plaintiff. No other appropriate positions were available.  (Def. Stat. Mat. Facts at ¶¶ 153-55.)

Accordingly, Ms. Bonney informed Plaintiff on May 1, 2000 that she had been terminated.

## II.        **Legal Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in her complaint. Instead, she must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element

10

essential to that party's case and on which that party will bear the burden at trial." *Id.*

### III.      Discussion

#### A.      42 U.S.C. § 2000e

In Counts III and V of her complaint, Plaintiff asserts that Defendants violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* Specifically, in Count III, Plaintiff accuses Defendants PSP, Commissioner Evanko, and Lieutenant Colonel Coury of disparate treatment due to Plaintiff's gender. In Count V, Plaintiff accuses all Defendants of discriminatory discharge and retaliation.

Title VII cases are governed by the familiar burden shifting analysis promulgated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This analysis first requires that the plaintiff establish a prima facie case of discrimination. *Id.* Once the plaintiff establishes the prima facie case, the employer must articulate some legitimate non-discriminatory reason for its action. *Id.* If the employer offers some evidence of such a justification, the plaintiff must demonstrate that the stated reason for plaintiff's rejection was a pretext for discrimination. *Id.* at 804.

#### 1.      Liability of the Individual Defendants

The individual Defendants – Commissioner Evanko, Lieutenant Colonel Coury, and Captain Simmers – move for summary judgment on Plaintiff's claims in Counts III and V. Specifically, the individual Defendants contend that Title VII does not impose liability on individuals. The individual Defendants are

11

correct. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) (concluding "that Congress did not intend to hold individual employees liable under Title VII"). Accordingly, the court will grant summary judgment in favor of the individual Defendants as to Counts III and V of Plaintiff's complaint.

### 2.  **Failure to Promote**

In Count III, Plaintiff claims that the PSP is liable under Title VII for not promoting Plaintiff to the position of Director of the Office when Major Morris retired, and for not promoting Plaintiff to the position of Assistant Legislative Liaison when the PSP transferred Captain Simmers out of the Office. Defendants concede, for purposes of this argument, that Plaintiff can establish a prima facie case of gender based discrimination.

Instead, Defendants contend that they have presented evidence establishing several legitimate non-discriminatory reasons for not promoting Plaintiff. First, Plaintiff did not express an interest in the position. Second, even if Plaintiff had expressed such an interest, she would not have been considered because Commissioner Evanko wanted to hire a uniformed member of the PSP to replace Major Morris. Third, even if Commissioner Evanko would have considered non-uniformed members for the position, he still would have chosen Captain Miller over Plaintiff because he was more qualified. Fourth, even if Captain Miller had known that Plaintiff was interested in filling the vacancy left by Captain Simmers's transfer, he would still have chosen Sergeant McHale over Plaintiff because, once again, he was more qualified.

As to the appointment of Captain Miller, Defendants contend that Commissioner Evanko wished to have a uniformed member of the PSP serve as the

new director because he felt that having uniformed members testify at legislative hearings brought more credibility to the PSP's dealings with the General Assembly. Moreover, Commissioner Evanko's credibility analysis was based, at least in part, on the uniformed members' knowledge of PSP operations. Because Plaintiff had never been a uniformed member of the PSP, she would not have this level of expertise. For this reason, Commissioner Evanko would not have seriously considered Plaintiff for the position. (Evanko Depo. at 110-11.)

Similarly, with respect to the hiring of Sergeant McHale, Captain Miller merely opined that Sergeant McHale was the most qualified candidate for the position. Captain Miller was looking for someone who was a uniformed member and had experience both in the field and in some of the various PSP bureaus. Sergeant McHale had over sixteen years of experience with the PSP at the time he was appointed to replace Captain Simmers. During that period, Sergeant McHale served as a trooper and supervisor in the field. Additionally, he had previously held positions in the Internal Affairs Division of the Bureau of Professional Responsibility and in the Bureau of Drug Enforcement. Moreover, according to Defendants, Sergeant McHale possessed the requisite communication skills that Plaintiff lacked. (Def. Resp. to Pl.'s Interogs. at 10.)

The court finds this evidence sufficient to satisfy Defendants' burden of production as to its reasons for not promoting Plaintiff into either the Director or Assistant Legislative Liaison positions. The burden now shifts to Plaintiff to demonstrate that Defendants' proffered justifications are merely pretexts for discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). At this point, a plaintiff may defeat a motion for summary judgment by pointing "to

13

some evidence, direct or circumstantial, from which a fact-finder would reasonably
either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe
that an invidious discriminatory reason was more likely than not a motivating or
determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764
(3d Cir. 1994); *accord Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d
Cir. 1999). At this stage, a plaintiff cannot simply assert that the defendant's
proffered reason is insincere. Instead, she must point to some inconsistencies or
contradictions in the defendant's reason that would indicate that it was not only
wrong, but that it was "so plainly wrong that it cannot have been the employer's real
reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d. Cir. 1997).

   Plaintiff contends that the following accusations give rise to a finding
of pretext: (1) there was no requirement under law that the PSP fill the vacant
positions with uniformed members; (2) Ronald Plesco, a non-uniformed member of
the PSP, temporarily performed Captain Simmers's job during the period in which
the PSP looked for his replacement; (3) Plaintiff performed Captain Simmers's
duties while he was in the Office; and (4) Commissioner Evanko does not feel that
women should fill high ranking positions in the PSP.

   The court finds that these allegations are insufficient to support a
finding of pretext. Defendants have acknowledged that there was no requirement
under law that they fill the vacant positions with uniformed members. Instead,
Commissioner Evanko stated that he had a preference for uniformed members
because they have a high level of credibility with members of the General
Assembly. Additionally, Commissioner Evanko never insisted that there was such a
requirement under law. Rather, he simply stated that the PSTA would file charges

14

against the PSP if it failed to replace Major Morris and Captain Simmers with uniformed members.

Likewise, the fact that Ronald Plesco, a non-uniformed member, briefly performed Captain Simmers's job while the PSP searched for a uniformed member to replace Captain Simmers does not, as Plaintiff contends, support a finding that Commissioner Evanko's preference for uniformed members was a pretext for gender discrimination. Once the PSP transferred Captain Simmers, there were only two legislative analysts left in the office – Plesco and Plaintiff – neither of whom were uniformed members. In the end, a uniformed member, Sergeant McHale, permanently replaced Captain Simmers. Had Plesco been permanently promoted to the position of Assistant Legislative Liaison or had a non-uniformed male been appointed instead of Sergeant McHale, then perhaps Plaintiff could make a valid argument. The undisputed facts indicate that this did not occur. Plaintiff, therefore, cannot reasonably argue that Plesco's brief tenure as interim Assistant Legislative Liaison supports a finding that the PSP discriminated against Plaintiff based on her gender.

As to the Plaintiff's remaining arguments, she offers little to no evidence that would support such conclusions. Although the evidence indicates that Captain Simmers poorly executed his job, the court fails to see how this fact makes it more likely that Commissioner Evanko lied when stating that he preferred to replace Captain Simmers and Major Morris with uniformed members. Likewise, Plaintiff would have the court twist the deposition testimony of Lieutenant Coury and Commissioner Evanko to conclude that "the Commissioner did not want any women, including qualified enlisted women, considered for the position." (Pl. Br. in

15

Opp. Def. Mot. for Sum. J. at 16.)  None of the evidence that Plaintiff points to supports such a blunderbuss accusation.[4]

Defendants have articulated legitimate non-discriminatory reasons for not promoting Plaintiff to fill vacancies left by the departures of Major Morris and Captain Simmers.  Plaintiff has failed to present evidence from which a reasonable fact-finder could conclude that Defendants' proffered reasons were a pretext for gender discrimination.  Accordingly, the court will grant summary judgment in favor of Defendants on Count III of Plaintiff's complaint.[5]

### 3.    **Plaintiff's Discharge**

In addition to the claim for failure to promote, Count V alleges that the PSP terminated Plaintiff's employment based on her gender and in retaliation for complaining to the Bureau of Professional Responsibility.  These allegations amount

---

[4]Additionally, Plaintiff points to the deposition testimony of Rebecca Balsbaugh alleging that Paul Woodring, Director of the Bureau of Professional Responsibility at the time, sexually harassed her.  Defendant Evanko was the PSP Commissioner when this alleged event took place.  According to Plaintiff, this "is the best evidence of Colonel Evanko's true disposition toward women."  (Pl. Br. in Opp. Def. Mot. for Sum. J. at 16.)  The court fails to see the relevance of an event that involved neither Defendants nor Plaintiff in this action.  The fact that the alleged event took place during Defendant Evanko's tenure as PSP Commissioner does not, alone, support a finding that Defendants' proffered reasons for not promoting Plaintiff were a pretext for gender discrimination.

[5]In her brief in support of summary judgment, Plaintiff also briefly contends that she was discriminated against in the terms of her employment because she was forced to do clerical tasks that her male counterparts did not have to do.  To the extent that Plaintiff seeks to assert a claim of hostile work environment, Plaintiff failed to assert this in her complaint.  Furthermore, she fails to provide any legal support for such a finding.  Therefore, the court need not address the merits of such a claim.  *Cf. Pennsylvania Dept. of Pub. Welfare v. United States HHS*, 101 F.3d 939, 945 (3d Cir. 1996) (noting that passing references, unaccompanied by substantive argument, will not suffice to bring an issue before the court); *United States v. Callwood*, 66 F.3d 1110, 1115 n.6 (10th Cir. 1995) ("A litigant who mentions a point in passing but fails to press it 'by supporting it with pertinent authority . . . forfeits the point.' " (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)); *Mueller v. CBS*, 200 F.R.D. 227, 234 (W.D. Pa. 2001) (holding that the court will not do the lawyers' work for them and a lawyer who fails to press a point forfeits the point).

to two different violations under Title VII – discriminatory discharge and retaliation. The court will address these issues separately.

a.    Discriminatory Discharge

Defendants acknowledge that Plaintiff's evidence is sufficient to establish a prima facie case of gender discrimination. However, they contend that they have articulated legitimate non-discriminatory reasons for terminating Plaintiff's employment. That is, Captain Miller determined that he needed clerical help more than he needed an extra legislative analyst, and Plaintiff had trouble communicating openly with other members of the Office. Captain Miller concluded that the Office would be better served if he replaced Plaintiff with a person serving in a purely clerical capacity because Plaintiff indicated on numerous occasions that she did not wish to do such work. Commissioner Evanko concurred with Captain Miller's determination and forwarded the matter to Lieutenant Colonel Coury. He, in turn, forwarded the matter to Ms. Bonney who determined that due to Plaintiff's status as an at-will employee, she would have to be terminated unless another position was available for which Plaintiff would be qualified. Although Ms. Bonney inquired about other positions, no appropriate vacancies existed. Accordingly, the PSP discharged Plaintiff. Once again, the court finds that this satisfies Defendants' burden of production and shifts the burden back on Plaintiff to point to evidence establishing pretext. *See St. Mary's Honor Ctr.*, 509 U.S. at 515.

In support of a finding of pretext, Plaintiff argues that "[t]he entire so-called reorganization is suspect." (Pl. Br. in Opp. Def. Mot. for Sum. J. at 17.) Specifically, Plaintiff contends that Defendants' reasons are disingenuous because:

17

(1) there is no record that Plaintiff performed her job poorly; and (2) the PSP indicated in its employment records that it terminated Plaintiff.[6]

This evidence, however, is insufficient to create a genuine question of material fact as to pretext. Defendants do not claim that she performed her job poorly. Rather, Captain Miller felt that between himself and Plesco, he had enough help to fulfill the Office's responsibilities as to policy and legislative analysis.[7] Furthermore, it is undisputed that the Office was in sore need of additional clerical help, and Plaintiff had made it clear to her supervisors that she was unwilling to perform such work. Therefore, she was unqualified, or at least unwilling, to fill the clerical position. Plaintiff has also failed to present evidence that the person who ultimately filled the clerical position was a male. Given these circumstances, no reasonable fact-finder could conclude that Defendants' proffered reasons were pretexts for gender discrimination.

    b.    Retaliation

Plaintiff also contends that she was terminated in retaliation for having engaged in conduct protected under Title VII. Namely, she alleges that the PSP discharged her because she filed internal complaints against Plesco and Captain Simmers, charging her superiors with disparate treatment. Title VII prohibits an employer from "discriminat[ing] against an[ ] . . . employee[ ] . . . because [s]he has

---

[6]Plaintiff also argues that although the PSP planned to reorganize the Office for some time, it took no action until after Plaintiff filed a complaint with Lieutenant Horgas on September 13, 1999. That evidence, however, is not relevant to the accusation that Defendants dismissed Plaintiff because she is a woman. Because such evidence is relevant as to whether Defendants terminated Plaintiff in retaliation for engaging in protected activity, the court will consider the matter when addressing Plaintiff's claim of retaliatory discharge. *See infra* at Part III.A.3.b.

[7]Plaintiff does not argue that Plesco should have been terminated instead of her, nor does she argue that she was qualified to perform the clerical job.

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e)-3(a). To establish a prima facie claim of Title VII retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and (3) that a causal link exists between the protected activity and the employer's adverse action. *Weston v. Commonwealth*, 251 F.3d 420, 430 (3d Cir. 2001); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000); *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). Defendants contend that Plaintiff cannot establish a causal link between Plaintiff's complaints and her dismissal. Alternatively, Defendants apparently contend that there is no evidence indicating that its proffered reasons for dismissing Plaintiff, see *infra* at Part III.A.3.a, are a pretext for discrimination.

Plaintiff contends that the following events constitute protected activity: (1) Plaintiff's oral complaint to Major Merryman in July of 1998; (2) Plaintiff's discussion with Corporal Rain in June 1999; (3) Plaintiff's memo to Lieutenant Horgas, dated September 13, 1999, regarding Captain Simmers's harassment; and (4) Plaintiff's memo to Major Morris, dated January 3, 2000, regarding the disparate treatment as to unauthorized leave. It is undisputed that Plaintiff was terminated on May 1, 2000 – almost four months to the day after her last complaint.

In determining whether there is a sufficient causal connection between protected activity and an adverse employment decision to support an allegation of retaliation, "each case must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell*, 206 F.3d at 279 n.5. However, much of the

19

Third Circuit precedent on this topic focuses on the temporal proximity between the plaintiff's protected conduct and the adverse employment decision.[8]  Only where the temporal proximity is extraordinarily suggestive will the timing of an adverse employment decision, alone, be sufficient to raise an inference of retaliation. However, in *Farrell*, the Third Circuit clarified that this is not the only manner of proving a causal link.  206 F.3d at 283-84 ("[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation . . . a plaintiff may rely on a broad array of evidence.")

In this case, the temporal proximity between Plaintiff's final complaint and her termination is approximately four months.  Alone, this would be insufficient.  *Cf. Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that a difference of two days is sufficient to establish a causal connection).  Yet, the timing does suggest some degree of connection.  *But cf. Williams v. Pennsylvania State Police*, 108 F. Supp.2d 460, 466 (E.D. Pa. 2000) (holding that the passing of over a year between protected activity and adverse employment decision "undermines plaintiff's effort to establish causation").  Plaintiff also points out that she internally complained about disparate treatment several times and that no action was ever taken to remedy the situation.  Although the PSP intended to add a clerical position to the Office, it did not take any action in this respect until after Plaintiff complained to her superiors about desperate treatment.  Plaintiff also points out that even though her position was eliminated, the PSP indicated, in its personnel files, that it had terminated Plaintiff.  Moreover, both Plaintiff and Captain Morris

---

[8]Neither party disputes that Plaintiff engaged in protected activity.  Therefore, the court will not address that issue.

20

indicated that Commissioner Evanko and Captain Simmers had a very close relationship, and Captain Simmers was the primary target of Plaintiff's complaints. (Morris Depo. at 76-78.)

Drawing inferences in favor of Plaintiff, a reasonable jury could conclude that Commissioner Evanko made the decision to eliminate Plaintiff's position not because the Office an administrative clerk, but because he was sick of Plaintiff's complaints against his good friend, Captain Simmers. Although the Office needed a clerical worker, this coincidence may have provided Commissioner Evanko with the opportunity to remove a pesky employee who was drawing attention to perceived male favoritism. Therefore, there is a material issue of fact as to the causal relationship between Plaintiff's protected activities and her termination. Likewise, this evidence is sufficient to create an issue of fact as to whether Defendants' proffered reason for terminating Plaintiff is a pretext for retaliation. Accordingly, the court will deny Defendants motion for summary judgment as to Plaintiff's claim of retaliatory discharge in Count V.

### B.    The Equal Pay Act

In Count I of Plaintiff's complaint, she asserts that the PSP violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying her less than Plesco and Captain Simmers for performing the same duties. Defendants move for summary judgment as to this claim. In *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000), the Third Circuit succinctly set out the burden shifting analysis to be applied in such cases:

> Unlike . . . Title VII claims, claims based upon the Equal Pay Act . . . do not follow the three-step burden-shifting framework of *McDonnell Douglas*; rather, they follow a two-step burden-shifting paradigm. The plaintiff must first establish a prima facie

21

> case by demonstrating that employees of the opposite sex were
> paid differently for performing 'equal work' – work of
> substantially equal skill, effort and responsibility, under similar
> working conditions . . . The burden of *persuasion* then shifts to the
> *employer* to demonstrate the applicability of one of the four
> affirmative defenses specified in the Act. . . . Because the
> employer bears the burden of proof at trial, in order to prevail at
> the summary judgment stage, the employer must prove at least one
> affirmative defense so clearly that no rational jury could find to
> the contrary.

*Id.* at 107 (citations and quotations omitted) (emphasis in original).

Defendants argue, however, that the court need not analyze Defendants'

burden because Plaintiff has failed to provide evidence establishing her prima facie

case. It is undisputed that the PSP paid Plaintiff less than Captain Simmers and

Plesco. Defendants contend, however, that Captain Simmers had significantly more

responsibility than Plaintiff due to his status as a uniformed member of the PSP and

that Plesco's position required more skill than Plaintiff possessed. Therefore,

Plaintiff did not perform "equal work" as contemplated by the Equal Pay Act.

As *Stanziale* indicates, Plaintiff must prove, as part of her prima facie

case, that she performed work which was "of substantially equal skill, effort and

responsibility, under similar working conditions." *Id.* " 'Skill' includes an

assessment of such factors as experience, training, education and ability. . . .

'Responsibility' concerns the degree of accountability required in performing a job."

*Welde v. Tetley, Inc.*, 864 F. Supp. 440, 442 (M.D. Pa. 1994) (citing 29 C.F.R. §§

1620.15 and 1620.17). Along with effort, Plaintiff must establish both of these

conditions as part of her prima facie case. *Id.* (citing 29 C.F.R. § 1620.14(a)).

Applying this standard, it is clear that Plaintiff cannot prove that she

performed the same job as either Captain Simmers or Plesco. In support of her

claim, Plaintiff proffers several exhibits that persuasively support her contention

22

that, essentially, she performed Captain Simmer's job. There is an abundance of evidence in this case suggesting that Captain Simmers was not adequately executing his responsibilities in the Office and that Plaintiff was forced to pick up the slack. However, it is beyond dispute that Captain Simmers was a uniformed member of the PSP and Plaintiff was not. It is also undisputed that uniformed members have significantly more law enforcement duties than non-uniformed personnel. The court lays those responsibilities out in some detail in the statement of undisputed facts. *Supra* at Part I.A. at p. 3. Therefore, it need not discuss them here except to state that those additional responsibilities indicate that Captain Simmers and Plaintiff did not have the same job responsibilities. Thus, Plaintiff has failed to establish the prima facie case as to Captain Simmers.

Likewise, Plaintiff's position did not involve the same skill or responsibility as Plesco's. A significant portion of Plesco's duties involved not only performing legislative analysis, but also drafting policy on behalf of the Administration. In executing all of these responsibilities, Plesco employed his legal training as an attorney and experience as an assistant district attorney. Plesco reported directly to Commissioner Evanko and the Governor's Office. Plesco also testified, while accompanied by uniformed members, before the General Assembly as part of his job responsibilities. Plaintiff, on the other hand, reported to either Captain Simmers or Major Morris, and her most important job duty was performing legislative analysis. Plaintiff contends that Plesco did not possess superior skills because, although Plaintiff is not an attorney, she had ample legal training when she was a police officer. While legal training is a foundation of good police work, it is not the focus of a police officer's job. The fact that Plaintiff received some legal

23

training as a police officer does not endow her with the same skills that Plesco possessed. Given these undisputed facts, no reasonable jury could concur with Plaintiff's contention that she performed the same work as Plesco.

Because Plaintiff did not perform the same job as either Plesco or Captain Simmers, she has not established a prima facie case that Defendants violated the EPA. Therefore, Defendants are entitled to summary judgment on Count I.

### C.    Plaintiff's PHRA Claims

Plaintiff also makes several claims pursuant to the PHRA, 43 Pa. Cons. Stat. § 955. It appears that these claims parallel Plaintiff's federal claims in Counts I, III, and V. The standards for evaluating claims for violation of the PHRA are identical to those employed in a Title VII action. *Goosby v. Johnson & Johnson Med. Inc.*, 228 F.3d 313, 317 n. 3 (3d Cir. 2000). Also, the operative facts are identical in both the federal and PHRA claims. Because the court has already held that it will grant summary judgment in favor of Defendants on Plaintiff's claims in Counts I, III, and Plaintiff's claim of discriminatory discharge in Count V, the court will grant Defendants summary judgment on Counts II, IV, and the portion of Count VI that alleges discriminatory discharge. Although Defendants did not specifically move for summary judgment on such grounds, in the interest of judicial economy, the court will not entertain claims at trial that it has already recognized as deficient. Defendants also move for summary judgment on Plaintiff's remaining PHRA claim for alleged retaliatory discharge, arguing: (1) the claim against the PSP is barred by Eleventh Amendment sovereign immunity; and (2) Plaintiff failed to exhaust her administrative remedies against Defendants Evanko, Coury, and Simmers.

At a minimum, Eleventh Amendment sovereign immunity stands for two propositions: "first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (internal quotations omitted).[9] Thus, the Eleventh Amendment "prohibits federal courts from entertaining suits by private parties against States and their agencies." *Alabama v. Pugh*, 438 U.S. 781, 791 (1978). The Eleventh Amendment's bar extends to suits against departments or agencies of the state having no existence apart from the state. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). The PSP is such a department and is, therefore, protected from suit by the Eleventh Amendment. *See Durham v. United States*, 9 F. Supp.2d 503, 506 (M.D. Pa. 1998).

Under certain limited circumstances, the Eleventh Amendment does not bar federal courts from entertaining suits against States or their instrumentalities. First, suit is permitted where the State has expressly waived its immunity. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985). Second, sovereign immunity does not apply if Congress validly abrogates it through its enforcement powers pursuant to the Fourteenth Amendment. *Seminole Tribe*, 517 U.S. at 57-73. Third, Eleventh Amendment immunity is inapplicable where state officers are sued in their official capacities for prospective injunctive or declaratory relief to end

---

[9]The Eleventh Amendment provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state." Although by its terms the Amendment only applies to actions against a state by citizens of another state, it has long been interpreted to prohibit suits in federal court against a state by the defendant state's own citizens as well. *Hans v. State of Louisiana*, 134 U.S. 1, 18 (1890).

continuing or ongoing violations of federal law. *Ex Parte Young*, 209 U.S. 123 (1908).

In this case, Plaintiff has brought suit against a department of the Commonwealth of Pennsylvania, thus invoking its sovereign immunity. Plaintiff does not contend that the Commonwealth has waived its immunity, nor could they. Pennsylvania has expressly reserved its power to invoke sovereign immunity. 42 Pa. Cons. Stat. § 8521(b) (2001). Because Plaintiff's PHRA claim arises under state law, obviously, she cannot claim that Congress validly abrogated Pennsylvania's sovereign immunity here. Additionally, Plaintiff's claim against the PSP does not implicate *Ex Parte Young*. Accordingly, the court will dismiss the claim in Count VI against the PSP for retaliatory discharge. *Accord Williams v. Pennsylvania State Police*, 108 F. Supp.2d 460, 465 (E.D. Pa. 2000) ("Thus, a plaintiff may never pursue a PHRA claim against Pennsylvania or its agencies in federal court.").

Unlike Title VII, individual liability under the PHRA may be imposed on supervisors who have the power to aid and abet an employer with such unlawful discriminatory practices. *See* 43 Pa. Cons. Stat. § 955(e); *Dici v. Commonwealth*, 91 F.3d 542, 552-53 (3d Cir. 1996). Therefore, unless sovereign immunity applies, the individual Defendants may be held liable under the PHRA. Although the individual Defendants do not argue that they are entitled to Eleventh Amendment immunity, it is a question of subject matter jurisdiction, and the court will address the issue *sua sponte*.[10]

---

[10] "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3).

26

Because a suit against a state officer in his official capacity is effectively a suit against the state itself, thus implicating the Eleventh Amendment, only prospective injunctive relief is available against such defendants. *Edelman v. Jordan*, 415 U.S. 651, 664-68 (1974). Furthermore, this relief is limited to situations where there is an ongoing violation of federal law. *Longoria v. New Jersey*, 168 F. Supp.2d 308, 318 (D.N.J. 2001) (citing *B.H. Papasan v. Allain*, 478 U.S. 265, 278 (1986) (holding that the *Ex Parte Young* exception to state's sovereign immunity applies only where violation of federal law is ongoing, not where federal law was violated only in the past) and *Milliken v. Bradley*, 433 U.S. 267, 289-90 (1977) (same)).

In Count VI, Plaintiff states a claim for a violation of state law that occurred completely in the past. Therefore, no relief, either injunctive or monetary, is available against the individual Defendants in this situation. *Accord Cory v. White*, 457 U.S. 85, 89-91 (1982) (holding that agencies of the state and state officials sued in their official capacities are similarly immune under the Eleventh Amendment when the state is the real party in interest). Because the court lacks subject matter jurisdiction over Plaintiff's claim in Count VI, the court will dismiss that Count. Therefore, the court need not reach the merits of Defendants' claim that Plaintiff failed to exhaust her administrative remedies.

### D.    The Pennsylvania Whistleblower Statute

Finally, Defendants move for summary judgment on Plaintiff's claim in Count VII for violation of the Pennsylvania Whistleblower Statute, 43 Pa. Cons.

Stat. § 1423.[11] Defendants contend that Plaintiff filed that claim well beyond the 180 day statute of limitations established in the Whistleblower Statute. *See* 43 Pa. Cons. Stat. § 1424(a). Plaintiff, in contrast, contends that the claim was brought within the statute of limitations because that period was tolled by the discovery rule.

Under Pennsylvania law, it is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform herself of the facts and circumstances upon which the right of recovery is based and to initiate suit within the prescribed period. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1042 (Pa. 1992). Therefore, the statute of limitations begins to run as soon as a right to institute and maintain suit arises. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983). In some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of diligence, reasonably discover that she has been injured. In such cases, the statute of limitations does not begin to run at the instant the right to institute suit attaches. Instead, the discovery rule applies. This judicially created device tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that she has been injured and that her injury has been caused by another party's conduct. *Pearce v. Salvation Army*, 674 A.2d 1123, 1125 (Pa. Super. Ct. 1996).

---

[11]The Whistleblower statute states, in relevant part, that:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee . . . makes a good faith report or is about to report, verbally or in writing, to the employer . . . an instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(A).

In this case, it is undisputed that Plaintiff was dismissed on May 1, 2000 and did not bring this action until June 14, 2001. This fell well beyond the 180 day limitations period. Additionally, Plaintiff in her deposition indicated that, at the time she was dismissed, she thought that the PSP was firing her for making complaints concerning Captain Simmers's job performance, a violation of the Whistleblower Statute. (Wilhelm Depo. at 179.) Therefore, Plaintiff knew, at the time the PSP terminated her, that she had suffered an injury implicating her legal rights. Plaintiff, however, argues that because she did not learn until March 2001 that the PSP listed her dismissal as a termination in her personnel file, the statute of limitations should be tolled until that date. However, the discovery rule only requires that Plaintiff knew that she suffered some type of injury, not that she fully comprehended the extent of the injury or its exact legal implications.

The PSP discharged Plaintiff on May 1, 2000. By her own admission, Plaintiff believed on that date that her rights had been violated. Therefore, the statute of limitations began to run on that date, and Plaintiff failed to file suit for violation of the Whistleblower Statute within the applicable statute of limitations. Therefore, the court will grant summary judgment in favor of Defendants on Count VII of Plaintiff's complaint.

## IV.        Conclusion

In accordance with the foregoing discussion, the court finds that Defendants' motion for summary judgment should be granted in part and denied in part. The motion will be granted as to all claims except Plaintiff's claim against the PSP in Count V for retaliatory discharge. Additionally, the court will dismiss, for

lack of subject matter jurisdiction, the claims in Counts II, IV, and VI against the individual Defendants. The sole issue remaining for trial is Plaintiff's Title VII claim against the PSP for retaliatory discharge. Additionally, the court will deny Plaintiff's motion for summary judgment. An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

Dated: June  28, 2002.