IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,                    :
       Plaintiff            :
                       :
        v.                   : 01-CV-1057
COMMONWEALTH OF PA, et al.,         :
       Defendants           :

**FILED**
HARRISBURG, PA

JAN 0 8 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TESTIMONY OF JOHN BROWN AND HAWTHORNE CONLEY

BEFORE:   HON. SYLVIA H. RAMBO, Judge

DATE:     September 9, 2002

PLACE:    Courtroom Number Three
          Federal Building
          Harrisburg, Pennsylvania

COUNSEL PRESENT:
NATHAN C. PRINGLE, JR., Esquire
    For - Plaintiff

SUSAN J. FORNEY, Esquire
    For - Defendant

Vicki L. Fox, RMR
Official Reporter

2

| I N D E X Plaintiff's Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| 2.   John Brown | | | | |
| By Mr. Pringle | 4 | -- | 19,34 | -- |
| By Ms. Forney | -- | 18 | -- | 32 |
| | | | | |
| 3.   Hawthorne Nathaniel Conley | | | | |
| By Mr. Pringle | 35 | -- | 43 | -- |
| By Ms. Forney | -- | 43 | -- | -- |

3

E X H I B I T S

| Plaintiff Exhibits | Introduced | Admitted |
|---|---|---|
| 22.  Barbara A. Wilhelm to Bureau of Professional Responsibility on survey. | 23 | -- |
| 24.  Barbara A. Wilhelm to Rain, referral letter. | 18 | -- |
| 25.  Bureau of Professional Responsibility notes Rain investigation. | 9 | -- |
| 39.  Conley to Coury review of memo to Horgas. | 37 | -- |

4

Brown - Direct

1    MR. PRINGLE:  I would like to call Lieutenant John

2  Brown.

3

4    JOHN BROWN, called as a witness, being duly sworn,

5  testified as follows:

6    THE CLERK:  Would you please state your name,

7  please?

8  A    John Richard Brown.

9    THE CLERK:  Thank you.

10    DIRECT EXAMINATION

11  BY MR. PRINGLE:

12  Q    Lieutenant Brown, are you under subpoena?

13  A    Yes, sir.

14  Q    What is your current position?

15  A    I am currently the Director of Internal Affairs for the

16  State Police, and I hold the rank of Captain.

17  Q    I am sorry for calling you Lieutenant.  What was your

18  position in June of 1999?

19  A    I was the Acting Director of the Internal Affairs

20  Division performing the duties of a Captain.  My particular

21  Captain had transferred out so I was the Central Section

22  Commander.  I was in charge of the Investigation Unit here in

23  Harrisburg.  And up on my Captain's transfer -- temporary

24  transfer, I was placed in the position of acting, performing

25  his duties for an extended period of time.

5

Brown - Direct

1    Q     What was that period of time?

2    A     It actually began April 26th of 1999.

3    Q     Do you have a copy of Plaintiff Exhibit 55 there?

4    A     Yes, sir.

5    Q     I would like you to take that and tell me whether or

6    not the person identified as received by on this document

7    Lieutenant John R. Brown; is you?

8    A     That is me.  That's correct.

9    Q     By received by, that indicates that you received this

10   complaint?

11   A     Yes, sir, that date, the date received is the date I

12   received it from then Major Richard Morris.

13   Q     Do you remember what the maximum adjudication date was

14   for this complaint?

15   A     I think the -- my recollection of that was it would

16   have been around October 14th or October 15th of 1999.

17   Q     Did you see the report that was completed related to

18   this investigation?

19   A     Yes, sir, did.

20   Q     Did you receive other memorandum related to this

21   investigation?

22   A     Which other memorandum, sir?

23   Q     I am showing you Plaintiff Exhibit 56.

24   A     Yes, I do recall seeing this memorandum.

25   Q     By looking at that memorandum, would it refresh your

6

Brown - Direct

1   recollection as to the maximum adjudication date?

2   A      The maximum adjudication date listed on there is

3   10/5/99.

4   Q      Do you have any reason to believe that is inaccurate?

5   A      I know that is not the hard count of the maximum

6   adjudication date.

7   Q      What does that mean?

8   A      From the time the complaint is received in the Internal

9   Affairs Division, we have 90 working days by contract to

10  investigate and have the investigation adjudicated.  Whenever

11  we send out investigations for adjudication, we put a maximum

12  date on there, but there is a built in buffer of time.

13         Sometimes Troop Commanders or Bureau Directors

14  have other responsibilities.  And if they overlook something,

15  oh, let me call Internal Affairs and see how much extra time

16  I might here have on this thing.

17         So what we will do is we have a built in anywhere

18  from seven to ten days in most cases at the end here.  If

19  this was the actual end of the adjudication period, it would

20  have that hard count listed next to it.

21  Q      That document is dated.  What is the date on that

22  document?

23  A      The one you just showed me there, sir?

24  Q      Yes.

25  A      I don't recall the date on there.

7

Brown - Direct

Q      I am sorry.  I will give it to you again.

A      This here particular memorandum is January 6th of 2000.

Q      Can you show me on that document where it says the hard count?

A      The hard count is not listed on there.

Q      Why isn't the hard count listed?

A      Because we didn't put the hard count on there.  This was for the adjudicator.  Actually, this is not the routing slip that went to Major Morris.

       I mean this thing was initially sent out in September of 1999.

Q      What was sent out in September of '99?

A      The report, sir, for adjudication.

Q      Is that what the hard count was?

A      I don't recall if the hard count was listed on there. I don't think it was.  Let me put it that way.

Q      How would the adjudicator know when the maximum adjudication date was?

A      Looking at this, if it had 10/5/1999 on there if he had concerns with that, he could have contacted our Bureau.  We could have given him a hard count on that.

Q      Would it be appropriate for him to contact Lieutenant Coury, your superior?

A      He is in my chain of command as a superior, but my direct superior at that time was Major Hawthorne N. Conley.

8

Brown - Direct

1    He was a Major.

2          All he had to do was contact Major Conley who

3    would have had me or one of my subordinates check the data

4    base and recount those days to see the actual end of the

5    adjudication period.

6    Q     If I look at that document, how would I know that that

7    is not the hard count date?

8    A     The only way is you would have to call our Bureau.   In

9    the adjudicator's mind, they see that and think they have to

10   get it done by then.   A second check, they can always contact

11   and say can you check that again, is that the right date?

12   Q     So if you wanted to make it clear to the adjudicator

13   what the real date was you could have put it on that

14   complaint; isn't that true?

15   A     It could have been put on the routing slip.   We could

16   have had hard count on there.   If we were like three days

17   away from the 14th or something, we would have put on there

18   hard count.   There was some extra time built in just as a

19   safety measure.   The report wasn't that long.

20   Q     Who was the head of the Bureau of Professional

21   Responsibility during that time?

22   A     During that time, Major Hawthorne N. Conley.

23   Q     Who was his direct report superior?

24   A     That would have been Lieutenant Colonel Thomas K.

25   Coury, who was the Deputy Commissioner of Administration.

9

Brown - Direct

1   Q    How involved was Lieutenant Coury -- Lieutenant Colonel

2   Coury in this investigation?

3   A    To my knowledge, he wasn't really involved at all.

4            (Bureau of Professional Responsibility notes, Rain

5   investigator was introduced as Plaintiff Exhibit 25.)

6            THE COURT:  We are losing time, Mr. Pringle.

7            MR. PRINGLE:  Sorry, Your Honor.  May I approach

8   the witness, please?

9            THE COURT:  Yes.

10  BY MR. PRINGLE:

11  Q    I am now showing you Plaintiff Exhibit 25.  Can you

12  identify that, please?

13  A    Yes.  It is an internal sort of -- it is not an

14  official State Police memorandum, but it's a memorandum form

15  that we come up with inside the Internal Affairs Division to

16  send notes to one another, that sort of thing.

17  Q    Is your handwriting on that document?

18  A    Yes, sir.

19  Q    Where is your handwriting?

20  A    My handwriting is -- the date is mine.  The initials is

21  mine.  Placed in the pending file note is mine.  And the

22  actual message to the notes that are wrote on the front and

23  back are mine.

24  Q    Would you read that message, please?

25  A    Lieutenant Colonel Coury called at 08:25 hours.  He

10

Brown - Direct

1   wants us to discuss whether or not Captain Simmers should be

2   notified a complaint was made against him.  He wants our

3   opinion.  I believe we should move forward to some degree.  I

4   think if we dismiss totally, we could be setting ourselves up

5   to look bad if there is litigation.  We don't know.  We may

6   be scrutinized by an outside agent we go speak.  We could do

7   this as a limited for now.

8   Q      Are there any other signatures on this or

9   acknowledgments of receipt on this document?

10  A      We are just talking about this front sheet; right?

11  Q      Yes.

12  A      There is an acknowledgment from I recognize the

13  initials of that being my Major, Hawthorne N. Conley.

14  Q      What does it say beside his name?

15  A      I spoke with Colonel Coury and advised Simmers must be

16  told.  And then his initials.

17  Q      Okay.  What is the date of this memo?

18  A      The date I wrote was July 20th of '99.

19  Q      So based on this document, Lieutenant Colonel Coury

20  actually was very much involved in this case?

21  A      No, he wasn't involved in any strategies.  The

22  investigator had already done interviews in the Legislative

23  Affairs Office.  We were getting to the point where we didn't

24  have any information -- specific information from Ms. Wilhelm

25  to go out and look at.

11

Brown - Direct

1    It come to a point where we have to tell this man
2    or bring him in or interview him.   That is kind of where we
3    were, sir.
4    Q    Why were you concerned about scrutiny from an outside
5    agency?
6    A    Ms. Wilhelm, I never spoke to her directly.   According
7    to my investigator and the information that he did have, she
8    had said she was going to an outside agency to file a
9    complaint, and that there was going to be some outside entity
10   looking at the State Police.
11   I wanted to make sure that we had all the
12   information that we could in case there was some type of
13   outside inquiry made, that we could share information and
14   assist.
15   Q    Why wouldn't you just contact Captain Simmers?
16   A    He was contacted.
17   Q    Why did you have to make a big deal out of contacting
18   Captain Simmers; why didn't you just do it?
19   A    He was contacted.
20   Q    Why was this memo drafted?
21   A    Just my notes for recall.   That's all.
22   Q    Lieutenant Colonel Coury called at 8:25 hours, and he
23   wants us to discuss whether or not to contact Captain
24   Simmers?
25   A    The thing is what you have got to keep -- one of the

12

Brown - Direct

1  things that happens sometimes in internal investigations, a

2  person may find out through other means that they are being

3  investigated.  We certainly want to be the ones to inform

4  them of that at the appropriate time rather than they hear it

5  from someone outside saying is it true that say Inspector

6  General or Attorney General or whoever is looking at me.  And

7  then you are sitting there. You had this information for

8  several months.

9           I think at that time we had it for over two and a

10 half months.  Early on, Lieutenant Colonel Coury and Colonel

11 Evanko were somewhat aware of this -- of a problem there.

12 And Captain Simmers didn't have no knowledge of this to my

13 knowledge.

14 Q    Why didn't you contact Captain Simmers?

15 A    We did.

16 Q    Why did you have to discuss whether you would do it if

17 it is appropriate to do it?  You had it for two months.  Why

18 didn't you just do it?  Why did you have to work -- why did

19 Lieutenant Colonel Coury worry about this?

20           Why were you -- why was this an issue that you had

21 to make a memorandum about this?

22           MS. FORNEY:  Object to the question, Your Honor.

23           THE COURT:  I think he is asking the question why

24 wasn't Simmers advised immediately upon the investigation.

25 Is that it?

13

Brown - Direct

1  MR. PRINGLE:  Yes, Your Honor.

2  A    The way we do things is the most important thing is the

3  complaint sheet that was brought to my attention had no

4  specific information.  There was no people to contact.  There

5  was no places to go visit.  There was no one outside of that

6  Legislative Affairs Office that was noted.

7         If they talked about misuse of a state vehicle or

8  something like that, where was that?  When?  Is there a

9  witness outside the agency we could talk to?  None of that

10 information was provided.

11        I was hoping that when Corporal Rain, now Sergeant

12 Rain, interviewed Ms. Wilhelm, he would obtain that specific

13 information, give us something to dig our teeth into to

14 investigate.  That never occurred.

15        At some point in time, we wanted to get her

16 information before we approached then Captain Simmers and

17 interviewed him.  It would be only prudent and reasonable to

18 have information.  We didn't have it, and we took our chances

19 interviewing him.  And we actually had gotten more

20 information than we ever got from Ms. Wilhelm on the matter.

21 BY MR. PRINGLE:

22 Q    You got the complaint on June 6th.  Why didn't you talk

23 with him during that week or the following week or the week

24 after that?

25 A    That is a -- normally in any complainant investigation,

14

Brown - Direct

1    you interview the complainant.  That is what we attempted to

2    do for over two months.

3    Q     Did she indicate to you that she was not going to

4    cooperate?

5    A     To my recollection, she was not going to give us any

6    specific information because she was under the Whistle-Blower

7    Protection Act or something like that.  She was imposing her

8     -- invoking her rights to that.  And she was not confident

9    that we could investigate it.  She wanted to go outside of

10   the Pennsylvania State Police.

11   Q     So she told you that when, between the first or second

12   week?

13   A     She never told me that.

14   Q     She told the investigator?

15   A     Right.  It kind of got back to me that way.

16   Q     Within the first one or two weeks, you already knew

17   that.  Why did you wait two months to contact Captain

18   Simmers?

19   A     Actually what happened was there was an interview set

20   up with Ms. Wilhelm.  They met.  Nothing became -- there was

21   no formal interview done.  And then the meeting was over.

22   Corporal Rain at the time said they were going to meet again

23   to discuss things.

24          I think this stretched out for more than just a

25   week or two.  I think it stretched out for a month and a half

15

Brown - Direct

1    to two months.  And eventually, there was a letter that Ms.

2    Wilhelm provided that I ended up seeing about the

3    Whistle-Blower Protection Act.

4              I think there was three or four contacts with her,

5    and nothing became of it.  But in the interim, Corporal Rain

6    did do some interviews on the case.

7    Q    Turning to the second page of this document --

8    A    55?

9    Q    I'm sorry.  The second page of 25, your initials on

10   line three Lieutenant John R. Brown, are these your initials?

11   A    Yes, sir.

12   Q    What does that indicate?

13   A    The message?

14   Q    Your initials.

15   A    It just means that I am the author of the note.

16   Q    Okay.  When was it dated?

17   A    June 6th of '99.

18   Q    And what is your message?  Can you read that, please?

19   A    My message was checked off to Corporal Garret Rain, the

20   investigator.  I said on there see me about Barb Wilhelm

21   before you go to Hazleton.

22   Q    At this point in time, had Corporal Rain spoken with

23   Ms. Wilhelm?

24   A    I think he had reached out to her at that time, but

25   there was no formal interview conducted.

16

Brown - Direct

1  Q      If you were conducting the interview according to

2  established procedure, why were you concerned about an

3  outside agency scrutinizing your procedure?

4  A      I wasn't so much concerned about an outside agency more

5  so than the potential of any type of harassment allegation

6  resulting in some type of civil litigation.

7  Q      Excuse me.  I didn't understand that answer.

8  A      What I mean is, sir, any time there is a complaint of

9  discrimination, harassment, physical abuse, to say those

10  three, the big ones, there is a high potential for liability

11  by the Department.

12          Part of my function as Director of Internal

13  Affairs is to work with the Office of Chief Counsel to

14  prepare an investigation so in case there is a lawsuit, that

15  the Department knows all of the facts so they can properly

16  defend the action.

17  Q      How early did you know that Ms. Wilhelm was not going

18  to provide you with the information that you requested, how

19  early in your investigation?

20  A      I am not a hundred percent sure.  I just know that

21  Corporal Rain had contacted her I think it was maybe three

22  occasions -- I think around three occasions.  And each time

23  he came back and said we didn't get no information.

24          So I am thinking that stretched out over three,

25  four, five weeks maybe.

17

Brown - Direct

1    THE COURT:  Wouldn't these questions be more

2   appropriate to Rain than this man?

3   BY MR. PRINGLE:

4   Q    I believe to your left there is a chart.  It is

5   Plaintiff Exhibit 1?

6   A    Yes, sir.

7   Q    Can you tell me where you fit in on that chart at that

8   time?

9   A    Okay.  If I may, Bureau of Professional Responsibility,

10  Internal Affairs Division is the division under the Bureau

11  Director.

12  Q    And where was the position of Major Hawthorne at that

13  time?

14  A    Major Hawthorne Conley, he was the Bureau Director in

15  charge of the entire bureau which has two divisions

16  underneath his supervision.

17  Q    I apologize.  His name is Hawthorne Conley, not Major

18  Hawthorne.  Can you tell us with respect to that chart where

19  Lieutenant Colonel Coury is?

20  A    Lieutenant Colonel Thomas K. Coury is the Deputy

21  Commissioner of Administration under the Commissioner.

22             MR. PRINGLE:  I have no further questions.

23             THE COURT:  Cross.

24             MS. FORNEY:  Thank you, Your Honor.

25

18

Brown - Cross

CROSS EXAMINATION

BY MS. FORNEY:

1  Q     Captain Brown, I am handing you a document which has

4  been marked Plaintiff Exhibit 24.  Is this a document that

5  was received by Corporal Rain?

6  A     Yes, ma'am, it was.

7  Q     Does this refresh your recollection at all with regard

8  to the time frame of when your Bureau became aware that Ms.

9  Wilhelm was not going to be providing information regarding

10 the complaint?

11 A     Yes, ma'am.

12 Q     And when was that?

13 A     This was the -- this correspondence was dated July 14th

14 of 1999, and I viewed this as the final I am not giving you

15 information type of correspondence.

16 Q     Now you were shown a document by plaintiff's counsel

17 Plaintiff Exhibit 25.  Do you still that have?

18 A     Yes, ma'am.

19 Q     I believe you were asked about the date of that

20 document.  My recollection is you said June 6th of '99.  Is

21 that correct?

22 A     Exhibit 25, no, that would have been July 20th of '99.

23 I think what you heard was the date I received the complaint.

24 Q     I beg your pardon.  The second page of that document.

25 A     That would be July 6th of 1999, yes.

19

Brown - Redirect

1    Q    And that is the document where you wrote the note

2    asking the investigator to see you about Ms. Wilhelm?

3    A    Yes, ma'am.

4             MS. FORNEY:  I have no other questions, Your

5    Honor.

6             THE COURT:  Any redirect?

7             MR. PRINGLE:  Yes, Your Honor.

8                   REDIRECT EXAMINATION

9    BY MR. PRINGLE:

10   Q    You say that was in July, July 14th, around the time

11   that you finally recognized that this was -- that Ms. Wilhelm

12   was not going to provide you with any additional information?

13   A    According to the correspondence that Corporal Rain

14   provided me, it indicated that there was a complaint.  We

15   would be provided for an impartial review outside the State

16   government.

17             After three or four -- three times I think it was

18   we tried to get information, on this particular date, I knew

19   she wasn't giving us anything.

20   Q    Let me ask you to look at Plaintiff Exhibit 25 again.

21   A    Yes, sir.

22   Q    It doesn't look like you initiated anything of this.

23   It looks like you were told by your superior officer to get

24   on top of this?

25   A    No.  That didn't occur, sir.

20

Brown - Redirect

1    Q      Lieutenant Colonel Coury called you.  You didn't call

2    Lieutenant Colonel Coury.  You didn't initiate a call to

3    Captain Simmers.  Lieutenant Colonel Coury called; isn't that

4    true?

5    A      Lieutenant Colonel Coury called me.  And according to

6    my note, he wanted us -- meaning me and my Major -- to

7    discuss whether Captain Simmers should be notified that a

8    complaint had been made against him.

9    Q      So what I am saying is:  As of the 14th, you knew that

10   Ms. Wilhelm wasn't going to provide you with any additional

11   information?

12   A      That's correct.

13   Q      But it wasn't you, it was Lieutenant Colonel Coury who

14   was more concerned about this?

15          MS. FORNEY:  Objection, Your Honor.

16          THE COURT:  Calls for a conclusion.

17   BY MR. PRINGLE:

18   Q      Isn't the purpose -- isn't the substance of this

19   memorandum that Lieutenant Colonel Coury was concerned that

20   there needed to be some discussion about Captain Simmers?

21          MS. FORNEY:  Again, I object, Your Honor.

22          THE COURT:  Sustained.

23   BY MR. PRINGLE:

24   Q      Did Lieutenant Colonel Coury initiate the call which is

25   the subject of this memorandum?

21

Brown - Redirect

A     Yes.   According to my note, yes, he called me.

Q     And based on your testimony, you recognized as of July 14th that Ms. Wilhelm would not be providing additional information, and was it your position that Internal Affairs needed to contact Captain Simmers as soon as possible?

A     Not as soon as possible.   We had some time to finish up whatever interviews that Colonel Rain, whatever information he was gathering during the investigation.   There was other people he interviewed.

      And then it comes to the point where okay, now we interview Captain Simmers, give him an opportunity to tell his side of the story.

Q     I am kind of confused.   You said that the reason why you didn't contact Captain Simmers was that Barbara Wilhelm was the hold up, and then you said that you thought it was important to get to Captain Simmers.   And now you are saying it wasn't really an emergency to get to Captain Simmers.

      MS. FORNEY:   Objection to the question.

      THE COURT:   Sustained.   Rephrase the question.

BY MR. PRINGLE:

Q     Given that -- at the point at which you knew that Barbara Wilhelm would not provide you with any additional information, did you believe it was important to contact Captain Simmers?

A     At some point during the investigation, you have to

22

Brown - Redirect

1    reach out and interview the subject.  This was an

2    administrative matter within the State Police.  And there was

3    a complaint we were trying to either prove or disprove.

4            And when it comes down to it, at some point in

5    time, that individual needs to be interviewed.  And that was

6    done.

7    Q    When was it done?

8    A    To my recollection, it would have been around -- on or

9    about August 23rd, 25th, in there, of '99.

10   Q    So it wasn't urgent that you talk with him in July?

11   A    The complaint was received June 7th.  Talking to him a

12   month later, there was no emergency.  We were more concerned

13   about getting facts from Ms. Wilhelm.

14   Q    Did you get any information from Ms. Wilhelm during

15   this investigation?

16   A    The only thing that I recall us getting is what was

17   provided to her Bureau Director.  She didn't provide us with

18   any specific information that I can recall during that time

19   period.

20   Q    Did Corporal Rain tell you everything that she gave

21   him?

22   A    Corporal Rain gave me updates from time to time, not

23   all the details.  But when he was done with the

24   investigation, I got to read the report.  There is where I

25   got to see all the details.

Brown - Redirect

1    I don't recall any specific dates, locations,

2    documentation, anything of that nature to support an abuse of

3    Captain Simmers' position as far as work hours or time or

4    anything like that.

5    MR. PRINGLE:  Permission to approach the witness,

6    Your Honor?

7    THE COURT:  Yes.

8    (Barbara Wilhelm to Bureau of Professional

9    Responsibility on Survey was introduced as Plaintiff Exhibit

10    22.)

11    BY MR. PRINGLE:

12    Q    I am showing you now Plaintiff Exhibit 22.  Have you

13    had a chance to look at Plaintiff Exhibit 22?

14    A    I remember seeing this document before, yes, sir.

15    Q    Doesn't this document indicate -- what is the date on

16    the document?

17    A    June 21st, 1999.

18    Q    Who is it from?

19    A    From Barbara Wilhelm to Bureau of Professional

20    Responsibility, Internal Affairs Division.

21    Q    During this period of time, it would have been given to

22    Corporal Rain?

23    A    Yes.

24    Q    If fact, Corporal Rain did have the document at this

25    time information from Ms. Wilhelm?

Brown - Redirect

1   A   I believe he would have had this document.  I am not a

2   hundred percent sure, but I believe he would have had this.

3   Q   The contents of this document included what issues?

4   A   It says the purpose of this correspondence is to

5   request a classification survey of the Legislative Affairs

6   Office based on information being provided that Captain

7   Michael Simmers, Assistant Legislative Liaison, is not

8   performing the kind and level of work that is required, in

9   addition to not possessing the required knowledge, skills and

10  abilities for the position.

11  Q   It indicates that there are some enclosures.  Do you

12  remember seeing any of the enclosures?

13  A   I can't say without looking -- I am not a hundred

14  percent sure if I saw those enclosures or not.  I can't tell

15  if these are Ms. Wilhelm's job description or Captain

16  Simmers' job description.

17  Q   If she provided him with information and included those

18  enclosures, would that be part of the investigative report?

19  A   He would make any information provided by the person we

20  interviewed or given to us a part of the report.

21  Q   Do you still have the investigative report there?  I

22  believe that is Plaintiff Exhibit 56.

23  A   Yes, sir.  It is sitting here.

24  Q   I would like you to take a look at that and see if you

25  see any of those enclosures included, whether you see in this

25

Brown - Redirect

1    document any of the enclosures included?

2              THE COURT:  It is going to take him a good half

3    hour to go through this.

4              MR. PRINGLE:  I can help him, Your Honor.  May I

5    approach the witness, Your Honor?

6              THE COURT:  Yes.

7              MR. PRINGLE:  I need to check my copy.  Sorry.

8    BY MR. PRINGLE:

9    Q     At the bottom of that exhibit, there are four to six

10   digits.  I would like you to turn to 231.

11   A     Okay.  Attachment four.

12             MS. FORNEY:  Excuse me, counsel.  What page are

13   you referring the witness to?

14             MR. PRINGLE:  00231.

15   BY MR. PRINGLE:

16   Q     Did you see the document dated June 21st?

17   A     Yes, sir; I do.

18   Q     That would indicate that Ms. Wilhelm provided that to

19   Corporal Rain during this investigation?

20   A     Yes.  I assume that's where you got it.  It was from

21   her contact.

22   Q     Do you know?

23   A     I am not a hundred percent sure.

24   Q     But that was included in the report?

25   A     Correct.

26

Brown - Redirect

1    Q    Do you see any of the enclosures there?

2    A    Okay.  The first one, the job description?

3    Q    Yes.

4    A    I do see a job description for Ms. Wilhelm, yes, I do.

5    Q    The next enclosure is current employe performance

6    review; was that included?

7    A    There is an employe performance review from March of

8    '98 to March of '99 attached to the letter.

9    Q    And for what employe?

10   A    For Barbara A. Wilhelm.

11   Q    The next item is employe initiated position

12   reclassification.  Is that included?

13          THE COURT:  Page two or three?

14   A    Page two?  I am missing something here.  Okay.  Here is

15   one.  Employe initiated position reclassification dated

16   October 19, 1998, is that the one you are talking about,

17   sir?

18   BY MR. PRINGLE:

19   Q    Is that the one included in the report?

20   A    Right.

21   Q    It is related to which employe?

22   A    Barbara A. Wilhelm.  It is actually addressed to

23   Captain Simmers from Ms. Wilhelm.

24   Q    And the next item as an enclosure is an addendum to

25   employe initiated position reclassification.  Is that

27

Brown - Redirect

1    included in the report?

2    A       Yes, sir.  That is dated December 20th, 1998.

3    Q       Did you have any discussion with Corporal Rain

4    regarding the reasons why she provided any of that

5    information?

6    A       I have a recollection we discussed that Ms. Wilhelm may

7    have misunderstood the process.  Job reclassification surveys

8    are not done by the Internal Affairs Division.  We

9    investigate allegations of misconduct and/or if there's

10   certain types of investigation we do by regulation, physical

11   force, legal interventions, those sort of things.

12              I think she believed that it was our job to help

13   in this reclassification.  That is the job for our Bureau of

14   Personnel, which is now our Bureau of Human Resources and

15   Management.

16   Q       Did Corporal Rain discuss with you why she included

17   those documents?

18   A       I don't remember.  I can't recall if he came and said

19   this is why she gave them to me.  I know he indicated that

20   these documents were given, and it had nothing to do with

21   what he was investigating.  That is my recollection of that,

22   sir.

23   Q       Was he investigating discrimination issues, sex

24   discrimination issues?

25   A       No.  It was job harassment is how it was classified,

28

Brown - Redirect

1   that the Captain had undermined her ability to perform her

2   job or something to that effect.

3   Q     Does that report include allegations of gender

4   discrimination?

5   A     I don't remember specifically gender discrimination

6   being spelled out like that, no.  Not to my recollection.

7   Q     I would like you to turn to in that same report pages

8   as I said -- there are numbers at the bottom of the page.  I

9   think it is 00207.

10  A     Yes, sir.

11  Q     In the beginning paragraph, do you see in the first few

12  paragraphs do you see any references specifically to gender

13  discrimination in the paragraphs where Major Morris is

14  speaking?

15        THE COURT:  Do you have a paragraph that you are

16  referring to?

17        MR. PRINGLE:  Yes, Your Honor.

18  A     In the first paragraph?

19  BY MR. PRINGLE:

20  Q     I would like to direct your attention to the sentence

21  beginning if anything.

22        THE COURT:  Which paragraph?

23  BY MR. PRINGLE:

24  Q     It is the first paragraph.  It is a quarter at the top

25  -- it's sort of in the middle of the page.  I can point it

Brown - Redirect

1    out to him if that is okay.

2              THE COURT:  The fifth line down.

3    BY MR. PRINGLE:

4    Q      The fifth line down.

5    A      I am with you.  If anything?

6    Q      Could you read that, please?

7    A      That line says if anything, I might indicate perhaps

8    gender based.

9    Q      Can you continue reading, please?

10   A      And by saying that, I mean an issue of the fact that

11   she is the female in my office and has -- she has basic

12   computer skills.  Actually, more than basic computer skills,

13   knows how to file, knows how to do things.  Continue?

14   Q      Yes.

15   A      She is very, very good organizationally, squared away

16   the place with expertise, that there is this presumption I

17   believe that she is clerical as opposed to an individual who

18   has more training, more skill level as an analyst.

19   Q      Next sentence?

20   A      And I believe that is how she views the Captain as

21   treating her.  And she has then made comments that during the

22   past while we were still down in Chief Counsel's area

23   continuing through the current time, there have been

24   situations where the Captain would be having conversations

25   with individuals within earshot of Barbara, conversations

30

Brown - Redirect

1  that she believes were intended for her to hear --

2        THE COURT:  That is not finishing the sentence.

3  A    About possible transfers of her to another position, to

4  another place in the Department, being replaced by an

5  administrative assistant, general topics like that.

6  BY MR. PRINGLE:

7  Q    Let's turn to the next page which is 00208.

8  A    (Witness complies.)

9  Q    I refer you to the first paragraph.  Again, this is the

10  interview of Richard D.A. Morris.  Going down to the next to

11  the last sentence which begins I also notified, would you

12  read that, please?

13  A    Where are you at again, sir?

14  Q    It is on page 00208.

15        THE COURT:  What is the question on the floor?

16        MR. PRINGLE:  I am asking him to read it.

17        THE COURT:  It pertains to what question?

18        MR. PRINGLE:  It pertains to the question of

19  whether or not the complaint addresses issues of gender based

20  discrimination.

21        THE COURT:  Okay.

22  BY MR. PRINGLE:

23  Q    Could you read that sentence?

24  A    I didn't get where you are at.

25  Q    Next to the last sentence in the first paragraph, it

31

Brown - Redirect

1    starts with I also notified.

2    A    I also notified Major Smith-Elliot about the process

3    and spoke with Ms. Joanna Reynolds in Chief Counsel's Office

4    to make sure of the process.  It had been some time before

5    I'd been involved in a complaint of this nature.

6    Q    Who was Major Smith-Elliot?

7    A    Major Virginia Smith-Elliot at the time would have been

8    our Equal --  I think at that time may have held the title of

9    Affirmative Action Officer.  It eventually became Equal

10   Employment Opportunity Officer for the Department.

11   Q    What was her role in the Department?

12   A    Pretty much her role is to if there's allegations of

13   sexual harassment say, for instance, leering, those

14   inappropriate comments, a complaint can be made to her.  And

15   she has the training to evaluate those complaints to see

16   whether or not to handle them supervisorially is the way to

17   go or whether they need to be kicked into the formal

18   discipline system.

19              She kind of is the expert and the clearinghouse on

20   the proper handling of those types of complaints.  Of course

21   if it is a serious complaint where there is inappropriate

22   touching or something like that, then, you know, it would go

23   into the formal system.

24   Q    Major Smith-Elliot didn't only deal with sexual

25   harassment claims?

32

Brown - Recross

1    A    That's correct.

2    Q    She dealt with other claims?

3    A    Discrimination, sexual harassment.

4    Q    So it would be appropriate to address sex

5    discrimination claims to Major Smith-Elliot?

6    A    To bring it to her attention, that's correct.

7    Q    Show us on that organizational chart to your left where

8    her position was relative to Lieutenant Colonel Coury?

9    A    Okay.  At the time she would have been the Equal

10   Employment Opportunity Officer, she would have been under

11   Lieutenant Colonel -- Deputy Commissioner of Administration.

12   Right here on this chart is the direct report to Deputy

13   Commissioner of Administration.

14            MR. PRINGLE:  I have no further questions.

15            THE COURT:  Recross.

16                    RECROSS EXAMINATION

17   BY MS. FORNEY:

18   Q    Captain Brown, the comments that you were just asked to

19   read out of the Bureau of Professional Responsibility report,

20   who made those comments?

21   A    Major Richard Morris during his interview.

22   Q    Now do you have before you the June memorandum from

23   Mr. Wilhelm to the Bureau of Professional Responsibility?

24   A    The June 21st, '99 one, Exhibit 22?

25   Q    Yes.

Brown - Recross

1    A    Yes, ma'am; I have that.

2    Q    I would like you to tell me what the subject of that

3    memorandum is.

4    A    The subject of the memorandum is employe initiated

5    request for a classification survey of the Legislative

6    Affairs Office based on information provided regarding the

7    position of Assistant Legislative Liaison.

8    Q    I would like you to take a moment and look through that

9    memorandum.  I know it is a couple of pages.  After you have

10   had the opportunity to look through it, I want you to tell me

11   whether there is any reference to the word discrimination,

12   the phrase sex discrimination, the phrase harassment based on

13   sex or gender or anything of that sort in that report.

14   A    No, ma'am.  I don't see that anywhere in this

15   correspondence.

16   Q    Captain Brown, at the time Corporal Rain was assigned

17   to investigate the complaint that Major Morris made, was this

18   the only investigation that he was responsible for?

19   A    No, routinely the members assigned to Internal Affairs

20   may carry several investigations at one time.

21   Q    And that typically affects when they are able to

22   interview witnesses?

23   A    That's one thing.  And also the availability of the

24   witness.  If the witness is on vacation or like right now

25   with the War on Terrorism, a lot of our members are on

34

Brown - Redirect

1   military leave.  We cannot interview them until they get back

2   from their commitment.

3   Q    What was your understanding of the reason that Corporal

4   Rain did not receive information from Ms. Wilhelm regarding

5   the complaint?

6   A    That --

7           MR. PRINGLE:  Objection, Your Honor.

8           THE COURT:  It has been asked and answered.

9           MS. FORNEY:  No further questions, Your Honor.

10          THE COURT:  Redirect?

11                     REDIRECT EXAMINATION

12  BY MR. PRINGLE:

13  Q    Is it your position that you understand the reason why

14  Ms. Wilhelm presented these documents regarding

15  reclassification and the classification survey?

16  A    What I understand -- I know Corporal Rain mentioned

17  this to me.  The document I think speaks for itself that she

18   --

19  Q    Do you have an understanding of it?

20  A    Yes.

21  Q    Do you have a specific knowledge as to why she

22  presented this information?

23  A    No, I don't, sir.

24          MR. PRINGLE:  No further questions.

25          MS. FORNEY:  None, Your Honor.

35

Conley - Direct

1    THE COURT:  You may step down.  Next witness.

2    MR. PRINGLE:  Your Honor, I am prepared to present

3  the next witness.  Are we going to go through break?

4    THE COURT:  I will go to twelve-thirty.  Do you

5  have anybody here?

6    MR. PRINGLE:  We do.  I would like to call

7  Lieutenant Colonel Conley, Hawthorne Conley.

8

9    HAWTHORNE NATHANIEL CONLEY, called as a witness,

10  being duly sworn, testified as follows:

11

12    THE CLERK:  Would you state your name for the

13  record, please?

14  A    Hawthorne Nathaniel Conley.

15                 DIRECT EXAMINATION

16  BY MR. PRINGLE:

17  Q    I believe you will find at that desk Plaintiff Exhibit

18  13.

19    THE COURT:  Could we have for record his

20  position?

21    MR. PRINGLE:  I apologize, Your Honor.

22  BY MR. PRINGLE:

23  Q    Can you give us your position, Corporal?

24  A    I am currently the Deputy Commissioner of

25  Administration holding the rank of Lieutenant Colonel.

36

Conley - Direct

1    Q      What was your prior position?

2    A      I was formerly the Director of the Bureau of

3    Professional Responsibility holding the rank of Major.

4    Q      Just so the jury understands what your position is

5    relative to that chart, could you tell us what your position

6    was in 1999?

7    A      In 1999, I was the Director of the Bureau of

8    Professional Responsibility.  That would be located right

9    here.

10   Q      And who was in your direct command --

11   A      The Deputy Commissioner of Administration who would

12   have been Lieutenant Colonel Thomas K. Coury.

13   Q      Is that the position you currently hold now, the Deputy

14   Commissioner of Administration?

15   A      It is.

16   Q      You have in front of you I believe Plaintiff Exhibit

17   36?

18   A      Yes, I do.

19   Q      How are you familiar with this?

20   A      I have seen this document in the past.

21   Q      In what context did you see it?

22   A      I am not sure.

23   Q      You are not sure.  Did you ever do a report related to

24   this document?

25   A      Did I ever do a report relating to this document?

37

Conley - Direct

1    Q     Yes.

2    A     Not that I recall, sir.

3          (Conley to Coury review of memo to Horgas was

4    introduced as Plaintiff Exhibit 39.)

5    BY MR. PRINGLE:

6    Q     I am going to show you what has been labeled Plaintiff

7    Exhibit 39.  After looking at that document, does it refresh

8    your recollection as to whether you wrote any report or

9    document related to Plaintiff Exhibit 36?

10   A     Yes, it does.

11   Q     Can you identify that document Plaintiff Exhibit 39?

12   A     It is the subject of review of Legislative Liaison

13   Office.  It is to the Deputy Commissioner of Administration

14   from myself dated November 3rd, 1999.

15   Q     There is a paragraph titled Reference.  Would you read

16   that for me, please?

17   A     Reference:  (a) verbal orders from the Deputy

18   Commissioner of Administration on October 12th, 1999 to meet

19   with Major Virginia L. Smith-Elliot, Equal Employment

20   Opportunity Office and Barbara L. Christie, Chief Counsel in

21   order to discuss existing problems within the Legislative

22   Liaison Office.

23   Q     This is from you as the Director of the Bureau of

24   Professional Responsibility.  Who was the Deputy Commissioner

25   of Administration this was addressed to?

38

Conley - Direct

1    A    Lieutenant Colonel Coury.

2    Q    In that paragraph that you read, it says you got verbal

3    orders from the Deputy Commissioner of Administration.    That

4    is still Lieutenant Colonel Coury?

5    A    Yes.

6    Q    Did you follow these orders?

7    A    Yes.

8    Q    Was a meeting held involving Major Virginia L.

9    Smith-Elliot and Barbara Christie?

10    A    Yes.

11    Q    And can you tell me why each of them were called to the

12    meeting?

13    A    We were to review certain enclosures and determine all

14    of the aspects of the issues within the Legislative Liaison

15    Office having covered.

16    Q    Why was Barbara Christie involved?

17    A    She is Chief Counsel in the agency.    I didn't make the

18    determination to include her in that meeting.

19    Q    You didn't have any discussion with Lieutenant Colonel

20    Coury as to why you would have to talk with Barbara Christie?

21    A    That is not unusual.    I know that it involved a

22    complaint by Ms. Wilhelm and there was a potential for

23    litigation.    We wanted to make sure that we were covering our

24    bases, if you will, and that all aspects of the allegations

25    were being covered.

39

Conley - Direct

1    Q    And why was Major Virginia L. Smith-Elliot involved?

2    A    She was at that time the Office Director of the Equal

3    Employment Opportunity Office.  And in that position, she

4    reviews a number of things.  Some of those things would deal

5    with discrimination or allegations of discrimination.

6    Q    Including sex discrimination?

7    A    Sex discrimination as well.

8    Q    Did you report back to Colonel Coury as to the outcome

9    of that meeting?

10   A    Yes, sir.  That is this document here.

11   Q    Okay.  I am going to refer you again to Plaintiff

12   Exhibit 36.  Was that one of the items addressed during this

13   meeting?

14   A    Yes.

15   Q    Plaintiff Exhibit 36 is the complaint submitted by

16   Barbara Christie to Lieutenant Will Horgas on September 13th

17   by Barbara Wilhelm?

18   A    Yes, sir.

19         THE COURT:  We will take a break now until

20   one-thirty.

21         MR. PRINGLE:  Thank you.

22         THE COURT:  Court is in recess until one-thirty.

23         (A recess was taken.)

24

25

40

Conley - Direct

AFTERNOON SESSION

1

2      HAWTHORNE NATHANIEL COURY resumes the stand.

3          THE COURT:  Mr. Pringle?

4          MR. PRINGLE:  Thank you, Your Honor.

5              DIRECT EXAMINATION (continued)

6   BY MR. PRINGLE:

7   Q    Colonel Conley, I refer you now to an exhibit that I

8   think is at your desk.  That is Plaintiff Exhibit 25.

9   A    Yes, it is.

10  Q    Have you seen this document before?

11  A    Yes, I have.

12  Q    What is it?

13  A    It is the -- it is the internal routing slip we use

14  inside the Bureau of Professional Responsibility.

15  Q    What is the date on this?

16  A    07/20/99.

17  Q    July 20, '99.  There is some -- beside your name, there

18  are some notations.  Is that your handwriting?

19  A    Yes, it is.

20  Q    Would you read that, please?

21  A    I spoke with Colonel Coury and advised Simmers must be

22  told.

23  Q    And what did you have to advise Simmers of?

24  A    Of the complaint against him.

25  Q    Okay.  And did you -- was it you or was it Lieutenant

41

Conley - Direct

1    John Brown who was contacted by Colonel Coury?

2    A    I'm not sure.  But according to this memo, I spoke with

3    Coury also.

4    Q    Do you remember the discussion with Lieutenant Colonel

5    Coury?

6    A    I'm sorry.  I didn't hear you.

7    Q    Do you remember the discussion with Lieutenant Colonel

8    Coury?

9    A    No, I don't.

10    Q    I would like to go -- sorry for moving around so much.

11    I am going to Plaintiff Exhibit 39.  This is the document you

12    described as your memorandum.

13    A    Yes, sir.

14    Q    And this document has the -- indicates there was a

15    meeting held.  Can you tell us what date the meetings were

16    held?

17    A    October 13, 1999 and Tuesday, October -- I am sorry.

18    On Wednesday, October 13, 1999 and Tuesday, October 19, 1999.

19    Q    On those two occasions, were both Major Virginia

20    Smith-Elliot and Chief Counsel Barbara Christie present?

21    A    Yes.

22    Q    And you were present at both of those meetings?

23    A    Yes.

24    Q    How long did the meeting on October 13th, 1999 take?

25    A    I don't know.

42

Conley - Direct

1    Q    Over an hour, fifteen minutes, five minutes?

2    A    Generally an hour.

3    Q    About an hour.  How about the meeting on October 19th?

4    A    I would think somewhere in the same time period.

5    Q    After you received this complaint found in Plaintiff

6    Exhibit 36, which was the September 13th memo from Barbara

7    Christie to Lieutenant Horgas, did you or anyone from your

8    office or your division or bureau contact Barbara Wilhelm to

9    let her know that you received the complaint?

10   A    I'm sorry.  I don't understand your question, sir.

11   Q    At some point in time you received what has been

12   labeled Plaintiff Exhibit 36, which was the September 13th,

13   1999 memo from Barbara Wilhelm to Lieutenant Horgas outlining

14   the elements of her complaint?

15            THE COURT:  What is the question?

16   BY MR. PRINGLE:

17   Q    I am sorry.  The question is:  Did you give -- did you

18   give any kind of acknowledgment to Ms. Wilhelm that you

19   received this complaint?

20   A    In relation to Plaintiff Exhibit 36?

21   Q    Yes.

22   A    No, sir.  Not that I am aware of.

23   Q    Do you know whether or not Major Virginia Smith-Elliot

24   ever gave any kind of acknowledgment to Ms. Wilhelm that she

25   was aware of this complaint?

43

Conley - Cross, Redirect

1    A    I do not know.

2    Q    In your discussions on October 13th or October 19th,

3    did either of you discuss that you will be contacting Ms.

4    Wilhelm to discuss her complaint of September 13th?

5    A    No, sir.

6              MR. PRINGLE:  I have no further questions.

7              THE COURT:  Cross-examine.

8                   CROSS EXAMINATION

9    BY MS. FORNEY:

10   Q    Why didn't you contact Ms. Wilhelm about Plaintiff

11   Exhibit 36?

12   A    There is no need -- there would have been no need for

13   me to contact her.  This was a request from Ms. Wilhelm to

14   meet with Agent Morris and Lieutenant Horgas concerning a

15   complaint she had within that office.

16             MS. FORNEY:  No other questions, Your Honor.

17             THE COURT:  Redirect?

18             MR. PRINGLE:  Yes.

19                  REDIRECT EXAMINATION

20   BY MR. PRINGLE:

21   Q    You acknowledged that the September 13, 1999 document

22   was a complaint being made by Ms. Wilhelm; am I correct in

23   that understanding?

24   A    No, sir.  Reading directly she is requesting a meeting

25   to bring to Horgas' attention matters which involved an

44

Conley - Cross, Redirect

1    enlisted employe within the Legislative Affairs Office.  And

2    she goes on to talk about some items that's going on there.

3    But as I look at them on its face, I see my supervisory

4    issues.

5    Q    Misuse of state vehicle, you see that as a supervisory

6    issue?

7    A    It depends upon the circumstances, sir.

8    Q    Why were you meeting to discuss this?

9    A    We were meeting to review the IAD report, the job

10   description of Captain Simmers, the administrative

11   regulations relating to Legislative Liaison Office and other

12   issues to see if in fact the matters brought up in the IAD

13   11999633 had been addressed.

14   Q    When someone submits --

15        THE COURT:  You are going beyond the scope.  She

16   only asked one question.  I don't think it pertains to it.

17   BY MR. PRINGLE:

18   Q    Are you familiar with the regulations regarding

19   internal investigations?

20   A    Yes, sir.

21   Q    And isn't it true that those regulations required --

22        THE COURT:  Just a moment, counsel.  I am not

23   getting an objection, but you are going way beyond the scope

24   of her cross.

25        MR. PRINGLE:  No further questions.

45

Conley - Cross, Redirect

1    MS. FORNEY:  No questions, Your Honor.

2    THE COURT:  You may step down.  Is the Colonel

3  excused or is he under subpoena to you?

4    MS. FORNEY:  Your Honor, he is excused for today.

5    THE COURT:  Do you have any objection?

6    MR. PRINGLE:  No, Your Honor.

7    THE COURT:  You are excused, sir.

8  A    Thank you.

9    (Whereupon, the testimony of Hawthorne Conley was

10  concluded.)

11

12    I hereby certify that the proceedings and evidence

13  are contained fully and accurately in the notes taken by me

14  on the trial of the above cause, and that this copy is a

15  correct transcript of the same.

16

17    _____

18    Vicki L. Fox, RMR

19    Official Reporter

20

21    The foregoing certification of this transcript

22  does not apply to any reproduction by any means unless under

23  the direct control and/or supervision of the certifying

24  reporter.

25