109

1/10/0_

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,                     :
        Plaintiff            :
                       :
             v.          : 01-CV-1057
COMMONWEALTH OF PA, et al.,          :
        Defendants           :

FILED
HARRISBURG, PA

JAN 0 9 2003

MARY E. D'ANDREA, CLERK
Per_____

TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TESTIMONY OF JEFFREY MILLER AND PAUL EVANKO


        BEFORE:   HON. SYLVIA H. RAMBO, Judge

        DATE:     September 10, 2002

        PLACE:    Courtroom Number Three
                   Federal Building
                   Harrisburg, Pennsylvania

COUNSEL PRESENT:
NATHAN C. PRINGLE, JR., Esquire
    For - Plaintiff

SUSAN J. FORNEY, Esquire
    For - Defendant


                           Vicki L. Fox, RMR
                           Official Reporter

2

I N D E X

Defendants' Witnesses

|  |  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| 1. | Jeffrey Miller |  |  |  |  |
|  | By Ms. Forney | 4 | -- | 53 | -- |
|  | By Mr. Pringle | -- | 37 | -- | -- |
| 2. | Paul Evanko |  |  |  |  |
|  | By Ms. Forney | 56 | -- | -- | -- |
|  | By Mr. Pringle | -- | 66 | -- | -- |

3

| | Plaintiff's Exhibit | Introduced | Admitted |
|---|---|---|---|

<u>E X H I B I T S</u>

38.   Executive Summary System and          40          --
Process Review.

4

E X H I B I T S

| Defendant Exhibits | Introduced | Admitted |
|---|---|---|
| 18.  E-mail from Wilhelm to Miller regarding mess with telephones and response from Miller to Wilhelm. | 23 | -- |
| 20.  Memorandum from Evanko to Acting Director, Office of Legislative Affairs regarding Compensatory Leave. | 62 | -- |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

Miller - Direct

1          MS. FORNEY:  Defendants will call Major Jeffrey

2     Miller.

3          JEFFREY BRIAN MILLER, called as a witness, being

4     duly sworn, testified as follows:

5

6          THE CLERK:  Would you state your name, please?

7     A     May name is Jeffrey Brian Miller.

8                    DIRECT EXAMINATION

9     BY MS. FORNEY:

10    Q     Are you currently employed?

11    A     Yes, I am.

12    Q     What is your job?

13    A     I am hold the rank of Major with the Pennsylvania State

14    Police, and I currently perform as Director of Legislative

15    Affairs and Policy for the Department.

16    Q     How long have you been performing that position?

17    A     I have been in my position as Director of Legislative

18    Affairs, officially I was transferred March 18th, 2000.

19    Q     I believe you have mentioned a policy job that you are

20    doing as well?

21    A     Yes, currently --

22    Q     How long have you been doing that job?

23    A     I have been performing the dual role of Director of

24    Policy for the Department since Mr. Ron Plesco retired, and

25    that would have been for the last approximately four to five

Miller - Direct

6

1    months I have been doing both jobs.

2    Q    And how long have you been a member of the Pennsylvania

3    State Police?

4    A    I have been a member of the Pennsylvania State Police

5    for approximately a little over 18 years.

6    Q    Would you just briefly describe the jobs that you have

7    held within the State Police?

8    A    Yes, ma'am.  When I came on the job in 1984 and

9    graduated from the State Police Academy, I was assigned to

10   the Patrol Unit in Troop G, Bedford.  I also served at Troop

11   H Harrisburg and Troop H York.

12        I was promoted to Corporal in 1988, and I spent a

13   short time at the Troop T, Highspire before being transferred

14   to Troop J, Avondale.  After spending a little over two years

15   at Avondale, I was promoted to Sergeant in 1990.  I initially

16   went to Troop L Reading for a few months prior to being

17   selected for a specialized position in the Bureau of

18   Professional Responsibility conducting Internal Affairs

19   Division investigations.

20        After approximately over a year and a half in

21   Internal Affairs, I was selected to serve as the Philadelphia

22   Section Supervisor in the Bureau of Drug Law Enforcement

23   which supervised undercover officers in the City of

24   Philadelphia doing narcotics work.

25

7

Miller - Direct

1    After that, I was promoted to Lieutenant in 1993,

2    and I was assigned as the Criminal Investigation Section

3    Commander at Troop K Philadelphia.  After that, I was

4    transferred at my request to become a Station Commander at

5    Troop L, Schuylkill Haven.

6    In January of 1995, I was promoted to Captain by

7    the Commissioner, and I was assigned for a short time --

8    approximately five months -- as the Director of the

9    Transportation Division within our Bureau of Staff Services.

10    In June of 1995, I was assigned as the Commanding

11    Officer of Troop H in Harrisburg, a position I held for

12    approximately five years prior to coming over to the

13    Legislative Affairs Office.

14    Q    Now in the jobs that you have described, were there any

15    in which you supervised civilian employes?

16    A    Yes.

17    Q    And what jobs were those?

18    A    Well, pretty much in every job I had as a supervisor,

19    there was some supervision of civilian employes whether they

20    were dispatchers, whether they were clerk typists.

21    When I was Director of the Transportation

22    Division, I had also -- actually I was the only enlisted

23    person within the Bureau so I had all of the people that

24    reported to me were civilian employes, and they had various

25    functions, mid level auto mechanics, mechanic supervisors,

8

Miller - Direct

1   people that stocked parts, etcetera.

2           And when I was the Commanding Officer of Troop H,

3   I had a number of clerical people in my Troop office as well

4   as a management employe which was a Troop administrative

5   manager.

6   Q     Would you explain, please, how you were selected for

7   the position of Director of the Legislative Affairs Office?

8   A     Yes, ma'am.  In approximately February 1st -- on

9   approximately February 1st of 2000, Colonel Evanko, the

10  Commissioner, came down to my office.  At that time Troop H

11  was located on the first floor of Department Headquarters.

12          He came into my office and said he needed talk to

13  me about something.  He asked me to consider whether I would

14  consent to him putting my name in with the Governor's Office

15  for assignment selection as the Department's Director of

16  Legislative Affairs.  Again, that was on February 1st

17  approximately of the year 2000.

18  Q     Did you respond to his inquiry?

19  A     I asked him if it was okay to think about it for a

20  little while because I was not anticipating that.  So he

21  allowed me to do so.

22  Q     And did you take any steps to inform yourself about the

23  office while you were thinking about it?

24  A     Yes, I did.

25  Q     What did you do?

9

Miller - Direct

1    A    First, I talked to Major Joe Hazen, who was my direct

2    supervisor, the Area One Commander, because he had held that

3    position for approximately six years.  So I wanted to get his

4    understanding of what the position entailed and what he did

5    and his input because I valued his input.

6         I also reached out to the previous Director,

7    retired Major Rich Morris.  I also spoke with Ronald Plesco

8    briefly about the office.  And you know, I also spoke with

9    the Commissioner.  When he offered me the chance to think

10   about this, I asked him a few questions at that time and then

11   just kind of thought about it on my own.

12   Q    And what were the nature of the questions that you were

13   asking these people?

14   A    I just wanted to get a sense of how the office

15   operated, what kind of work was done, the staffing in the

16   office, that sort of thing.

17   Q    And did you then respond to Colonel Evanko's inquiry?

18   A    Yes, I did.

19   Q    What was your response?

20   A    I responded that I would be honored that he would

21   consider submitting my name to the Governor's Office.  That

22   was approximately February 3rd, approximately two to three

23   days later.

24   Q    What was the next step in the selection process?

25   A    The next step was that I was interviewed by the

10

Miller - Direct

1   Governor's Secretary for Legislative Affairs.  At the time,

2   it was Kathleen Eakin and also her Deputy Secretary Anne

3   Mentzer.

4           That interview took place I believe it was

5   somewhere in the neighborhood of February 15th of 2000.

6   Q     When did you hear that you had been selected for the

7   position?

8   A     Approximately nine days or so later, I believe around

9   February 24, I was called into the Commissioner's Office, and

10  he explained to me that the Governor's Office had selected

11  me, and he concurred in that selection, and that I had the

12  job.

13  Q     Did the Commissioner at any time share with you his

14  expectations for the operations of the Legislative Affairs

15  Office?

16  A     Yes, he did.

17  Q     Would you tell me what he shared with you?

18  A     Yes.  He charged me with going into the office and

19  developing a set of policy and procedures manuals for the

20  office because that had not been done in the past.  And he

21  wanted me to professionalize the office.  He wanted me to

22  review the systems process and review report that was done

23  recently of the office so that I would understand some of the

24  communications problems within the office and try to work to

25  get everyone moving in the same direction, to bring everyone

11

Miller - Direct

1    together so that we could be as effective as possible in

2    trying to communicate together in working with both

3    legislative affairs and policy.

4              Being that he had already taken some steps to

5    reorganize and had assigned Ron Plesco as Director of Policy,

6    he would not report directly to me.  But the Commissioner

7    told me that he wanted me to work very closely with Ron, hand

8    in hand was what he said, so we can ensure that both

9    legislative affairs and policy issues are worked on jointly.

10   Q    Did you review the systems process review report?

11   A    Yes, I did.

12   Q    And did reviewing that report give rise to any concerns

13   on your part about the operation of the office?

14   A    Yes, it did.

15   Q    Would you tell me what those concerns were?

16   A    Well, the main concern that I had after reviewing the

17   systems process and review report was the fact that the

18   report basically concluded that the office was operating in a

19   dysfunctional fashion, particularly in the area of

20   communications.

21             There were personality conflicts within the

22   office.  There were people who didn't speak to each other.

23   Information was being withheld in certain circumstances, not

24   flowing back and forth the way it should.  I was a little

25   concerned about that.

Miller - Direct

1        Also I noted in the report that there was no
2   clerical person assigned to the office.  That gave me some
3   concern from the perspective that I anticipated the need for
4   filing a lot of documents, creating documents, doing
5   correspondence.
6        THE COURT:  Slow down, please.
7   A    I'm sorry.  I was a little concerned that we did not
8   have that position -- a clerical position actually assigned
9   to the office.
10  BY MS. FORNEY:
11  Q    Now after you were selected for the position, did
12  anyone from the Governor's Office share their expectations
13  with you about how they wanted the office to run?
14  A    Yes, they did.
15  Q    Would you tell me what those expectations shared with
16  you were?
17  A    Both the Secretary of the Legislative Affairs Kathleen
18  Eakin and Anne Mentzer, Deputy Secretary, shared their
19  expectations that --
20        MR. PRINGLE:  Objection, Your Honor.  He is
21  preparing to testify to hearsay.
22        THE COURT:  It is hearsay.
23        MS. FORNEY:  Your Honor, I believe it goes to his
24  state of mind when he went into the office and explains why
25  he went about trying to accomplish what he did.

13

Miller - Direct

1       THE COURT:  Overrule the objection.

2   A     Both the Secretary for Legislative Affairs and the

3   Deputy Secretary Anne Mentzer --

4       THE COURT:  Please slow down.

5   A     Sorry.  Both the Secretary for Legislative Affairs and

6   Anne Mentzer, who is the Deputy Secretary at that time, both

7   met with me and gave me their expectations.

8           Some of what they told me was that they expected

9   -- they outlined some of the things that I would need to do

10  in working with the General Assembly on legislation in

11  working on their behalf -- on behalf of the administration

12  for the Governor in that I had a dual chain of command.

13          They explained that obviously I worked directly

14  for the Commissioner, but I also worked directly for the

15  Governor's Office.  They made it very clear to me that I

16  needed to work very closely with the Governor's Policy

17  Office.

18          In this case, Ron Plesco was the Director of

19  Policy for the Department, but Ron's chain of command on the

20  policy side was very much going to be involved in what I did

21  on the legislative affairs side.  So that we could make a

22  joint recommendation to the Governor on issues so that the

23  Governor's Office could decide which way they wanted to go on

24  a piece of legislation having input from both sides of the

25  fence.

14

Miller – Direct

Q     Could you explain the relationship between policy and
legislative affairs, please?

A     Yes, ma'am.  The relationship between policy and
legislative affairs is such that they are intertwined.  When
you look at any piece of legislation, there's always a policy
side as well.

      For example, if you look at an issue with a piece
of legislation perhaps on requiring a primary seat belt law,
there would be a legislative side to that in that there would
be language in a piece of legislation that would lay out how
they would achieve this end.

      The policy side to that would be that you could
have both sides of an argument here.  You could say if we had
a primary seat belt law, we would save lives.  We would save
injuries.  That's a good thing for Pennsylvania.  That's
where the Governor should be on it.

      At the same time, you could have an opposite
policy call that would say it is a freedom of choice issue.
If we impinge on people's rights to choose, then Big Brother
is in effect here, and we don't want to do that.

      So you have to iron out those differences of
opinion and those different policy calls so that at the end,
there is a unified approach presented to the Governor, and
the Governor can then decide what he or she wants to do with
it.

15

Miller - Direct

1  Q    What was your goal for the work of the Legislative

2  Affairs Office as it related to the Policy Office and the

3  State Police?

4  A    My role was to communicate every single day with Ron

5  Plesco who at that time was Director of Policy for the

6  Department on all the issues that we were working on jointly

7   -- Pennsylvania Instant Check System, the record of sale

8  data base, all kinds of different issues that would come to

9  the forefront.  Some would come to the forefront through the

10  media.  Others, there was legislation introduced.

11        There were groups that were pushing policy

12  concerns, how would we respond from a legislative side.  I

13  was working very closely with Mr. Plesco on developing our

14  recommended position that the Department should take, that

15  the Commissioner should adopt, and what he should relay to

16  the Governor's Office and what we should be relaying in our

17  meetings with the Governor's Office.

18  Q    Was your expectation of how members of the Legislative

19  Affairs Office, your staff, would interact with the Policy

20  Office?

21  A    My belief was that we had to all communicate openly.

22  There was no way that the office could function as the

23  Commissioner had charged me unless everyone was talking to

24  everybody else.

25

16

Miller - Direct

1        It didn't make any sense to me when I looked at

2   the systems process and review summary that we had people not

3   talking, just walking past each, other closing doors, keeping

4   to themselves to the point where it impeded the operation

5   according to the systems process and review report.

6        I thought that was something that was my first

7   area of concern that I needed to attack and get that changed

8   around.   I really was optimistic that I could go in there, a

9   fresh start, I knew that there had been some reorganization

10  with Mr. Plesco moving over as Director of Policy, that

11  Captain Simmers would no longer be there anymore.

12       THE COURT:  Slow down.

13  A     My apologies.

14       THE COURT:  I can do without the apologies if I

15  can just get you to slow down.  Take a breath now and then.

16       THE COURT:  Did you get it all, Vicki?

17       THE COURT REPORTER:  Yes, Judge.

18  A     I forget where I was.

19       (The court reporter reads the last sentence in the

20  witness' answer.)

21       THE COURT:  It is very, very important that she

22  get every word that is said in this courtroom.  So keep that

23  in mind.

24  A     Yes, Your Honor.  It was very important to me to make

25  certain that we had an environment that was conducive, that

Miller - Direct

1    people were working together.  I felt very optimistic.  I am

2    an optimist anyway, but I felt optimistic that with a new

3    fresh start that this could be achieved.

4    BY MS. FORNEY:

5    Q    Did you communicate those expectations and goals to

6    your staff?

7    A    Yes, I did.

8    Q    And at the time that you began your job in Legislative

9    Affairs, what was the staff that was in place?

10   A    At the time that I began -- and let me just clarify for

11   the record on or about the 24th of February 2000 when I was

12   informed by the Commissioner that I would be moving into that

13   role, I began to work in the Legislative Affairs Office.  But

14   I was also still the Commanding Officer of Troop H.

15           It wasn't until I think March 1st that I named an

16   Acting Commanding Officer for me at Troop H.  So I was kind

17   of doing more of my work in the Legislative Affairs Office

18   and less of it at Troop H, but I still had responsibility for

19   that command.

20   Q    Let me focus my question on the time you began working

21   in the Legislative Affairs Office as opposed to when you

22   officially became the Director.

23           When you began working in that office, what staff

24   was in place?

25   A    When I began working in that office, the staff that was

18

Miller - Direct

1    in place was Captain Michael Simmers was still in the office

2    as the Assistant Legislative Affairs Officer.  Ms. Barbara

3    Wilhelm was in the office as a Legislative Specialist.  And

4    Mr. Ronald Plesco was in the same suite of offices.  He

5    didn't report to me, but he worked with us from the Director

6    of Policy side.

7    Q    Now in your discussions with Colonel Evanko about the

8    Legislative Affairs Office, did you discuss staffing at all?

9    A    Yes, I did.

10   Q    And what did you discuss?

11   A    My initial discussions with the Commissioner were that

12   I felt after reviewing the systems process and review report,

13   as well as my own expectations of how I would want to set the

14   office up to achieve the things that he wanted me to achieve,

15   I felt that we needed to have some clerical support in some

16   fashion in that office.

17   Q    And did the Commissioner respond to your concerns?

18   A    Yes, he did.  He stated that he understood my position

19   and that he would look into the possibility of whether there

20   would be options available to either move a position perhaps

21   from the Bureau of Technology Services if there was an extra

22   clerk typist position, or perhaps the Office of

23   Administration would authorize us hiring or creating another

24   clerical position.  Or possibly we might be in a situation

25   where we would share clerical assistance from within the

19

Miller - Direct

1    front office, the executive and administrative offices.

2    Q    Now did Colonel Evanko ever come back to you with a

3    proposal for how to deal with your clerical concerns?

4    A    At one point, he stated that he had mentioned something

5    to Lieutenant Colonel Coury, since he was Deputy Commissioner

6    of Administration.  Lieutenant Colonel Coury would look into

7    whether there was a position that might be available, and I

8    should follow up with him.

9    Q    Did you follow up with Colonel Coury?

10   A    Yes, I did.

11   Q    What was the result of that?

12   A    Colonel Coury put me in touch with individuals within

13   our Bureau of Personnel, and I spoke to them.  And I later

14   learned that at that particular time, the Office of

15   Administration -- my understanding was the Office of

16   Administration --

17        MR. PRINGLE:  Objection, Your Honor.

18        THE COURT:  Sustained.

19   BY MS. FORNEY:

20   Q    Did you ever get a response from the people in the

21   Bureau of Personnel to your concern that a clerical position

22   be added?

23        MR. PRINGLE:  Objection, Your Honor, on the issue

24   of hearsay.  He is going to give us information as to the --

25        THE COURT:  Did he ever get any clerical help?

Miller - Direct

1   BY MS. FORNEY:

2   Q    Was a clerical position ever added to your office?

3   A    Yes.

4   Q    And was that position in addition to the staff that you

5   just described being in place?

6   A    No.

7   Q    Could you explain what you meant by your last answer?

8   Why was a clerical position placed in your office, but it was

9   not in addition to the other staff?

10  A    After Ms. Wilhelm left the Department, there was a

11  clerical position posted, a clerk typist position posted for

12  the office.  And it was subsequently filled.

13  Q    In the first month or so that you were working in the

14  Office of Legislative Affairs, did you have the opportunity

15  to observe Ms. Wilhelm's behavior within the office?

16  A    Yes, I did.

17  Q    And what were your observations within that first

18  month?

19  A    In the first month, my initial observation was she was

20  very energetic.  She seemed to be very bright, took a lot of

21  initiative to go in different directions on issues.  That was

22  my initial impression.

23  Q    Did that impression change as time went on?

24  A    Well, somewhat it did, yes.

25  Q    Could you explain what caused it to change?

Miller - Direct

1    A      About the week of April 3rd of 2000, sometime late in

2    that week, I began to observe -- that was the beginning of

3    when I saw some more erratic behavior on her part.

4    Q      Would you explain what you mean by erratic behavior?

5    A      I recall her coming to me during the latter portion of

6    that week, and she was very upset.  She said that a chair was

7    missing from the office.  I wasn't -- she caught my off guard

8    because I didn't know why she was upset.  She said there's a

9    chair missing from our office.  I said I was busy right then,

10   but I will look into it later and get back to her.

11   Q      Did you look into the issue of the chair?

12   A      Yes, I did.

13   Q      And what did you determine happened to the chair?

14   A      I found out that Captain Simmers had removed the chair

15   while she was present and informed her that he was

16   transferring the property sticker number for the fixed asset

17   inventory from the Legislative Affairs Office to his new

18   assignment in the Executive Administrative Offices with the

19   Deputy Commissioner.

20   Q      And after you discovered this, did you get back to Ms.

21   Wilhelm?

22   A      Yes, I did.

23   Q      Would you tell me what you did?

24   A      I met with Ms. Wilhelm.  I said, Barbara, in the

25   future, please give me all of the information.  I really

Miller - Direct

1    didn't feel that I should be running around trying to chase

2    this chair down when in fact had she just told me that

3    Captain Simmers took the chair, and it was a chair that was

4    purchased because he has a back problem, that I wouldn't have

5    had a problem with him taking the chair.  I kind of wasted

6    some time there.

7             I explained to her in the future, please let me

8    know everything that you know when you are telling me

9    something.  And if you have a question about something like

10   that, either ask Captain Simmers or ask me directly.

11   Q    Did Ms. Wilhelm respond --

12   A    No.

13   Q    -- to your comments?

14   A    No, she did not.

15   Q    She said nothing?

16   A    She said nothing.

17   Q    Did there come a time in the office when again Ms.

18   Wilhelm's behavior caused you some concern?

19   A    Yes.

20   Q    When did that occur?

21   A    The very next week, which would have been on April

22   10th, which was a Monday, in the year 2000.  I was out of the

23   office in the morning.  When I returned sometime in the early

24   afternoon, there was an e-mail message from Ms. Wilhelm to me

25   complaining that somebody had basically taken some efforts to

23

Miller - Direct

1   sabotage our voice mail system on the main line.

2          The e-mail didn't specify all that.  When I went

3   out to talk to her, she filled in the rest.  And basically

4   she told me that Ron Plesco had sabotaged the voice mail

5   system.

6          MR. PRINGLE:  Your Honor, objection, he is talking

7   about an e-mail.  And that is hearsay with respect to the

8   e-mail, the content of the that e-mail.

9          MS. FORNEY:  I believe his last comment had to do

10  with the conversation he had with the plaintiff which would

11  be an admission.

12         THE COURT:  If this is what the plaintiff told

13  him, I am going to permit it.  You may testify to what she

14  told you, not what someone told her she in turn related to

15  you.

16  A    Yes, Your Honor.  On April 10th, I discussed this issue

17  with Ms. Wilhelm.  She told me that Ronald Plesco had

18  sabotaged the voice mail line -- the main voice mail line,

19  the main number that comes into the office.

20         I told her that I would check into it, and I would

21  get back to her.

22         (E-mail from Wilhelm to Miller regarding mess with

23  telephones and response from Miller to Wilhelm was introduced

24  as Defendant Exhibit 18.)

25

Miller - Direct

1    BY MS. FORNEY:

2    Q    I am going to give you a document that is marked

3    Defendant Exhibit 18.  Is this the e-mail that you said you

4    received from Ms. Wilhelm?

5    A    Yes, ma'am.

6    Q    And the date of the e-mail from her is what?

7    A    The date of the e-mail from her to me is Monday, April

8    10th, 2000.

9    Q    What is the time?

10   A    9:23 AM.

11   Q    And the subject?

12   A    Mess with telephones.

13   Q    And would you read the test of the e-mail, please?

14   A    Yes, ma'am.  The e-mail says when I arrived this date,

15   the 783-5566 (optimail had been removed), I called Yvonne at

16   Communications and informed her that I could not get into the

17   messages on 783-5566. Yvonne checked paperwork for changes in

18   phone in the Legislative Affairs Office.  And it was in

19   writing that someone -- and someone is in bold capital

20   letters -- told the Communications Office to remove the

21   3-4466 optimail system.

22        Yvonne is presently working with Bell to clean

23   this mess up.  We have lost any messages received.  Since we

24   departed on Friday, they cannot recover them.  There is a

25   rush to get this addressed hopefully today.  Meanwhile, we

Miller - Direct

1    will have a mess with the legislators.

2    Q    Did you respond to the e-mail?

3    A    Yes, I did.

4    Q    Does that also appear on Defendant Exhibit 18?

5    A    Yes, it does.

6    Q    When did you respond to the e-mail?

7    A    Monday, April 10th, 2000 at 1:21 PM.

8    Q    Would you read your response?

9    A    My response states I do not know who would have told

10   them to remove this number.  I know that Ron is moving his

11   line, and Sergeant McHale is getting his established.  Please

12   advise when it is back on-line.

13   Q    Thank you.  Now you said you later talked to Ms.

14   Wilhelm about her message?

15   A    Yes, I did.

16   Q    And she told you what?

17   A    She told me that Ron Plesco sabotaged the voice mail

18   line.

19   Q    Did you respond to her?

20   A    I told her I would get back to her after I looked into

21   it.

22   Q    Did you look into it?

23   A    Yes, I did.

24   Q    What did you discover when you looked into it?

25   A    I discovered that Mr. Plesco was in the office on April

Miller - Direct

1    10th all morning.

2            MR. PRINGLE:  Objection, Your Honor.

3            THE COURT:  It would be hearsay.

4    BY MS. FORNEY:

5    Q    How did you conclude that Mr. Plesco was in the office?

6    A    When I arrived at the office that morning, Mr. Plesco

7    was working at his desk.  I told Mr. Plesco I had to run

8    downtown for some meetings.  He stated he would be --

9            MR. PRINGLE:  Objection.

10           THE COURT:  Sustained.

11   BY MS. FORNEY:

12   Q    Can you go ahead and give your answer without saying

13   what Mr. Plesco said?

14           THE COURT:  Unless his answer is dependent on what

15   Plesco told him.

16           MS. FORNEY:  I believe he said that he saw

17   Mr. Plesco in the office that morning.

18   A    That's correct.

19   BY MS. FORNEY:

20   Q    And you left to go someplace?

21   A    I left to go downtown for some meetings, yes.

22   Q    And when you returned?

23   A    When I returned, Mr. Plesco was in his office working

24   at his desk.

25   Q    What did you do to look into how the voice mail service

27

Miller - Direct

1    had been removed?

2    A    I asked Mr. Plesco if he had taken any action to affect

3    the operation of the main voice mail line.

4    Q    What was his response?

5              MR. PRINGLE:  Objection, Your Honor.

6              THE COURT:  This is hearsay.

7              MS. FORNEY:  Your Honor, it does go to his state

8    of mind when he was trying to deal with this problem in his

9    office.  It is not for the truth of the situation, but it is

10   for the information that Major Miller had at the time and

11   acted on.

12             MR. PRINGLE:  Your Honor, it is for the fact of

13   the truth of the matter asserted.  I assuming they are trying

14   to assert that Ms. Wilhelm's concern about the phone lines

15   was unfounded and that Ronald Plesco said something regarding

16   that.

17             I believe he is presenting that testimony to show

18   that whatever observations Ms. Wilhelm made were inaccurate.

19   I am assuming that.  I don't know where she is going with

20   this.

21             MS. FORNEY:  Your Honor, that is not the reason

22   for offering the evidence.  The reason for offering the

23   evidence is to explain actions that Major Miller took with

24   regard to Ms. Wilhelm, and he did it based on this

25   information that he had.  The issue is not whether the

Miller - Direct

1    information is correct or not.

2           THE COURT:  Overrule the objection.  You may

3    answer the question.

4    A     Yes, Your Honor.  After speaking with Mr. Plesco, I

5    learned that he was in fact in the office all morning, and

6    that Ms. Wilhelm had not approached him about any problems

7    with the phones.  In fact at that point, he had no idea that

8    there was a problem with the phone.

9           I asked him if he had taken any action

10   independently with the Communications Division to have

11   something changed with the main number.  He stated that he

12   had not.  He was in the process of moving his office from --

13   his previous office to another office next to mine within the

14   same suite of offices.

15          I also reviewed the paperwork that was provided

16   from the Communications Division, and it did not indicate

17   that there was any effort made on the part of Mr. Plesco to

18   do anything to the voice mail line at the main number.

19   BY MS. FORNEY:

20   Q     After you took these steps, did you speak with Ms.

21   Wilhelm again about the situation?

22   A     Yes, I did.

23   Q     Would you tell me what that conversation was, please?

24   A     I told Ms. Wilhelm that I looked into it and discovered

25   that Ron Plesco didn't have anything to do with the

Miller - Direct

1    functioning of the main line with the Communications Division

2    and that I wished she would have talked to him directly since

3    he was in the office with her all morning rather than holding

4    it until I came back.

5    Q    Did she respond to what you said?

6    A    She said it is not up for debate.  I talked to the

7    Communications Division, and he signed a work order.

8    Q    Did you have any further conversation with Ms. Wilhelm

9    at that point?

10   A    At that point, I didn't really have the chance to have

11   a more extensive conversation.  But I tried to show her that

12   her assertions didn't match with what I had learned.

13   Q    Did she accept that?

14   A    No.

15   Q    When did you next -- did you speak with Ms. Wilhelm

16   again about how she handled the situation with the voice

17   mail?

18   A    Yes, I did.

19   Q    When did that conversation take place in relation to

20   the one you just told us about?

21   A    The counseling session I had with Ms. Wilhelm was

22   Friday, April 14th.  She had been off sick Tuesday and

23   Wednesday, and I didn't have a chance on Thursday to meet

24   with her.  I met with her on Friday, the 14th of 2000, April

25   14th.

Miller - Direct

1   Q     Would you tell me what happened in that meeting?

2   A     At that meeting, I was alone in the office with her.

3   And I met with her and I told her Barbara, I am unhappy with

4   how you handled that whole situation on Monday involving the

5   voice mail system.  I explained my expectations that I want

6   the office to openly communicate.  Each individual person has

7   to talk to the other people.  That's the only way it is going

8   to work.

9          And this is an example in my mind of a situation

10  where one employe was present while the other employe had an

11  issue or problem that they didn't take the time to even

12  consult the other employe on.  I said this may seem like a

13  little issue, but you were very upset about it.  I think we

14  can diffuse these things by communicating more openly among

15  the office staff.

16         She was very defensive.

17  Q     What did she respond to you?

18  A     She said there are many things that have happened in

19  the past involving Captain Simmers and Ron Plesco.  And that

20  Major Morris had told her not to discuss anything of a

21  sensitive nature with either Captain Simmers or Ron Plesco,

22  and that Ron Plesco was not in good favor with the Governor's

23  Office.

24  Q     Did you respond to her remarks?

25  A     Well, I did.  I said Barbara, I know that there are

Miller - Direct

1    probably some things that happened in the past that I am not

2    aware of.  But I said my goal is to have a fresh start here.

3    And Captain Simmers is no longer going to be working in this

4    office, but I said it is critical that we communicate, ie. we

5    communicate with the Policy Office as well.  All of us have

6    to be working together.  Those are my expectations, and I

7    need you to do that for me.

8    Q    Did she have any response to those comments?

9    A    Yes.

10   Q    What was it?

11   A    She responded -- quote -- I would rather put a bullet

12   in my head than talk to Ron Plesco -- unquote.

13   Q    Did you say anything further to her?

14   A    Yes.  I said I didn't think that was an appropriate

15   response, and I expected more from her.  I reiterated again

16   that my expectations were that we needed to put the past

17   behind us.

18          If there were personality conflicts, I am

19   assessing blame here.  The blame could be on one side.  The

20   blame could be on the other side.  There could be people

21   sharing blame.  I didn't carry about that.

22          All I cared about was my job was to be the

23   Director of the Legislative Affairs Office.  I was committed

24   to the Commissioner that I would do everything in my power to

25   make sure that the dysfunctional communications of this

Miller - Direct

1    Office would cease, and we would all work together.

2    Q    How did you react to Ms. Wilhelm's comments in that

3    conversation?

4    A    I was taken aback by her comments.  I was not expecting

5    that type of a visceral response.

6    Q    When you say visceral response, what do you mean?

7    A    And I have been a Police Officer for a long time.  I

8    have interviewed a lot of people.  You get a sense when

9    somebody holds something very strongly as a belief.  I felt

10   that her response to me was communicating to me that under no

11   circumstances was she able to do this because of her own

12   strongly held beliefs.

13   Q    And when you say wasn't able to do this, what do you

14   mean?

15   A    Wasn't able to abide by my direction and my

16   expectations of open communications in the office,

17   particularly involving Mr. Plesco.

18   Q    Did you take any action after this conversation with

19   Ms. Wilhelm?

20   A    Yes.

21   Q    What was that?

22   A    I had the meeting with Ms. Wilhelm on Friday, April

23   14.  On Monday, the 17th of April, I drove out to the Academy

24   where I knew the Commissioner was involved in a training

25   course which was preparing for the Republican National

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD VIETH, et al.,          :
                Plaintiffs       :
                                 :
                v.               : NO. 1:CV-01-2439
THE COMMONWEALTH OF              :
PENNSYLVANIA,                    :
                Defendants       :


TRANSCRIPT OF PROCEEDINGS

REAPPORTIONMENT NONJURY TRIAL


VOLUME 2
(Pages 108 through 219.)

BEFORE:   HON. RICHARD L. NYGAARD, Judge
          HON. WILLIAM H. YOHN, JR., Judge
          HON. SYLVIA H. RAMBO, Judge
DATE:     March 11, 2002, afternoon session
PLACE:    Courtroom Number Three
          Federal Building
          Harrisburg, Pennsylvania

COUNSEL PRESENT:
PAUL M. SMITH, Esquire
BRUCE V. SPIVA, Esquire
DANIEL MACH, Esquire
ROBERT B. HOFFMAN, Esquire
     For - Plaintiffs

JOHN P. KRILL, Esquire
LINDA J. SHOREY, Esquire
MARSHA A. SAJER, Esquire
     For - Defendants Jubelirer & Ryan

J. BART DELONE, Esquire
     For  - Defendants Commonwealth of PA, Governor,
     Secretary and Commissioner Filling

                              Vicki L. Fox, RMR
                              Official Reporter

Miller - Direct

1   Convention.  I asked to meet with him there.

2   Q      Did you meet with the Commissioner?

3   A      Yes, I did.

4   Q      Would you tell me what happened in your meeting?

5   A      I met with the Commissioner, as well as Lieutenant

6   Colonel Coury who was also attending the same training

7   course.  I stood outside the Academy away from anybody else

8   and spoke directly to the Commissioner and Lieutenant Colonel

9   Coury.

10  Q      What did you say to them?

11  A      I told the Commissioner that, number one, I wanted to

12  reiterate that I felt that we needed clerical assistance in

13  this office for me to do what it was that he expected me to

14  do with the office.

15         Secondly, I told him that I need clerical

16  assistance in my opinion more than I need a Legislative

17  Specialist position given the fact that we were bringing on

18  Sergeant McHale as the Assistant Legislative Liaison to work

19  with me as another enlisted person.

20         Thirdly, I recounted for him the details of the

21  events in my discussions with Ms. Wilhelm from the previous

22  Friday.  I basically told him that she made it very clear to

23  me that she was under no circumstances willing to abide by

24  the expectations and the direction that I provided to her

25  about the communication in the office.

34

Miller - Direct

1        I felt at this point that she couldn't work in

2   that office, that there was no way that I could get around

3   the beliefs that she held so strongly that she could not

4   communicate with Mr. Plesco.  I felt that that would impede

5   the overall operations of the office.

6   Q     Did you make any recommendations to the Commissioner or

7   make any request of the Commissioner at that time?

8   A     I requested if there was any way possible for us to get

9   clerical support in the office, that we needed that as soon

10  as possible.  And secondly my recommendation was that Ms.

11  Wilhelm be removed from my office as soon as possible if the

12  Commissioner saw fit to do so.

13  Q     Did the Commissioner respond to your recommendation at

14  that time?

15  A     He told me that he understood what I was explaining to

16  him, and that he wanted to discuss the matter a little bit

17  further with Lieutenant Colonel Coury, and that he would be

18  back in touch with me.

19  Q     Now did there come a time when you learned that action

20  would be taken on your request?

21  A     Yes.

22  Q     Would you tell me how you learned that?

23  A     I learned of that on I believe it was Friday, April

24  28.  I believe it was in the afternoon after lunch sometime

25  on Friday April 28th.  I received I believe it was a

35

Miller - Direct

1    telephone call from Lieutenant Colonel Coury who if memory

2    served me correct was traveling in Rhode Island at that time.

3    Q     What information did he give you?

4    A     He told me that I was to speak with Ms. Linda Bonney,

5    who's the Director at the time of our Bureau of Personnel,

6    and that Ms. Wilhelm would be removed from my office and

7    dismissed from the Department effective the next business

8    day, which would have been Monday, May 1st.

9          He told me I was to speak with Ms. Bonney, and

10   that I would receive a telephone call on Monday morning from

11   her.  When I received that call, I was to bring Ms. Wilhelm

12   over to the Bureau of Personnel to meet with Ms. Bonney.

13   Q     After you received this information, did you take any

14   action?

15   A     Yes, I did.

16   Q     Would you tell me what you did?

17   A     First of all, I met with Ms. Bonney, and she was

18   already aware of the communication that I just explained.  So

19   I talked to her.  She told me that she would be providing a

20   person from the Bureau of Personnel on Monday morning to

21   accompany Ms. Wilhelm back so she can gather her things and

22   that she would be leaving as of the end of the meeting that

23   was going to be held with her.

24   Q     Did you take any steps to inform your -- strike that.

25   What was the staffing in the Legislative Affairs Office as of

36

Miller - Direct

1  the time you received the information about Ms. Wilhelm's

2  dismissal?

3  A    As of that day, April 28th, Ms. Wilhelm was working as

4  a Legislative Specialist.  I was in the office as Director.

5  Sergeant McHale was in the office as the Assistant Director.

6  And Ron Plesco was the Director of Policy for the Department.

7  Q    As I understand it, his office was within the same

8  suite as the Legislative Affairs Office?

9  A    Yes.  His office was directly next to mine.

10  Q    Did you take any steps to inform Mr. Plesco and

11  Sergeant McHale of what was going to be happening?

12  A    Yes, I did.

13  Q    Why did you do that?

14  A    I was concerned that when we received this call on

15  Monday there would be other calls coming in for service,

16  things that were going on.  I did not want them to

17  inadvertently say something that would be deemed

18  inappropriate or would possibly embarrass Ms. Wilhelm in any

19  way.

20          I wanted them to know that this was going to be

21  happening Monday morning and to just go about doing your

22  job.  I didn't want them to walk out in the middle of

23  something.  I wasn't sure how Ms. Wilhelm was going to react

24  to be quite honest with you.

25  Q    On the Monday -- the following Monday morning -- by the

37

Miller - Direct

1    way, do you recall what date that was?

2    A    That was May 1st, 2000.

3    Q    Were you in the office that morning?

4    A    Yes, I was.

5    Q    And did you notice anything unusual about Ms. Wilhelm's

6    office that morning?

7    A    No, I did not.

8    Q    Did you receive a call from Personnel?

9    A    Yes, I did.

10   Q    What did you do after you received that call?

11   A    I received a call from Ms. Linda Bonney, who's the

12   Director of the Bureau of Personnel.  It was approximately

13   9:00 or 9:15 in the morning.  She asked me to bring Ms.

14   Wilhelm over to the Bureau of Personnel.

15   Q    Did you accompany Ms. Wilhelm to the Bureau?

16   A    Yes.

17   Q    What did Ms. Bonney do when you arrived at the Bureau

18   of Personnel?

19   A    Ms. Bonney provided Ms. Wilhelm with a copy of a letter

20   outlining her dismissal from the Department and offered to

21   answer any questions she would have and told her that her

22   dismissal was effective on May 1st at the close of the day,

23   but that she would be asked to gather her things and that

24   someone would wait with her and escort her out.

25   Q    Is that what occurred?

38

Miller - Cross

1    A    Yes.

2         MS. FORNEY:  No further questions, Your Honor.

3         THE COURT:  Cross.

4              CROSS EXAMINATION

5    BY MR. PRINGLE:

6    Q    Major Miller, you indicated that you read the systems

7    and process review report and concluded that there were

8    problems with the office?

9    A    Yes, sir.

10   Q    You said you mentioned specifically that people outside

11   the policy -- I'm sorry -- people in the Governor's Policy

12   Office had a problem with the office?

13   A    I don't believe that's what I said, sir.

14   Q    What did you say about Kathleen Eakin?

15   A    Kathleen Eakin was the Secretary for Legislative

16   Affairs.  She, as well as Deputy Secretary Anne Mentzer,

17   instructed me that I was to work closely with policy, that I

18   wasn't supposed to go out and provide a position on a piece

19   of legislation without having vented with the Policy folks.

20   Q    Did the report indicate to you -- didn't the report

21   actually indicate to you that Ms. Eakin was very satisfied

22   with the practices and functioning of the Legislative Affairs

23   Office?

24   A    I believe the report --

25         MS. FORNEY:  I object, Your Honor.  He did not say

Miller - Cross

1    the contrary.

2            MR. PRINGLE:  I believe he did.  I believe his

3    testimony was that after reading the report, he was very

4    concerned with the operation of the Legislative Affairs

5    Office.  And he mentioned specifically Kathleen Eakin and

6    Anne Mentzer.

7            MS. FORNEY:  He did not mention he was criticizing

8    the office.

9            THE COURT:  He will have to explain what his

10   interpretation was.

11   BY MR. PRINGLE:

12   Q    What was your interpretation?

13   A    My interpretation just to clarify, sir -- sorry for any

14   confusion.  But the systems process and review report, the

15   findings of the report basically indicated that the office

16   was functioning in a dysfunctional manner from the

17   communications standpoint.  That was the biggest challenge

18   and hurdle facing the office.

19           People were not communicating.  People were

20   withholding information.  There was allegations back and

21   forth.

22           What I said about Secretary Eakin and Deputy

23   Secretary Mentzer was in a separate event -- they had many

24   meetings with me to discuss what my role would be because

25   again, remember, I also worked directly for them.

40

Miller - Cross

1    (Executive Summary System and Process Report was

2    introduced as Plaintiff Exhibit 38.)

3    BY MR. PRINGLE:

4    Q    Excuse me.  I didn't ask you that.  I am going to show

5    you Plaintiff Exhibit 38.  Can you identify what has been

6    labeled Plaintiff Exhibit 38?

7    A    Yes, sir.  This is the Systems and Process Review

8    Report involving the inspection of the Legislative Affairs

9    Office that was conducted September 13th through the 20th,

10   1999.

11   Q    I would like you to turn to the staff number 007 of the

12   exhibit.

13   A    Yes, sir.

14   Q    Can you tell us what The Caption is at the top?  Can

15   you read that for us, please?

16   A    Executive Summary?

17   Q    Yes.  And toward the middle of that page, there is a

18   section called Review Findings, is there not, a caption

19   saying Review Findings?

20   A    Yes, sir; I see it.

21   Q    In this section talking about Review Findings, I refer

22   you to page 00 -- stamped page 0014, which is also page eight

23   of the this document.  Do you have that?

24   A    Yes, sir.

25   Q    Toward the bottom, there is a paragraph that begins

41

Miller - Cross

1    Kathy Eakin?

2    A    Yes, sir.

3    Q    Do you see that?

4    A    Yes.

5    Q    Would you read that paragraph for us please?

6    A    It says Kathleen Eakin, Secretary of the Legislative

7    Affairs Governor's Office was contacted and informed she was

8    very happy with the Pennsylvania State Police Legislative

9    Liaison Office.  She added they are very responsive, and

10   Major Morris has done an incredible job on the Hill, and

11   there's a lot of good feedback on him.

12        She related she does not deal too much with others

13   from the Office.  She went on to say -- quote -- the proof is

14   in what you hear from the legislators, and they are very

15   impressed -- end quote.

16        In the past, the State Police was slow responding,

17   but she does not have to worry about that now.  Additionally,

18   she commented on the Pennsylvania State Police LLO being one

19   of the best, if not the best of all agencies she deals with.

20   Q    Would you read the next paragraph, please?

21   A    Yes, sir.  Anne Mentzer, Deputy Secretary for

22   Legislative Affairs, was contacted and stated -- quote --

23   Major Morris does an excellent job.  He is one of the best

24   Legislative Liaisons we have ever had -- end quote.  He is

25   respected by members of the General Assembly, is very good at

Miller - Cross

1    reporting his contacts with legislators.  His reports are

2    punctual, and he promptly responds to issues when needed,

3    usually the same day or within one day.

4            She described his overall performance as excellent

5    and related she always tries to work directly with him --

6    quote -- Director to Director -- end quote.  Therefore, she

7    has not had much contact with the rest of the office staff.

8    Q    Would you read the next paragraph, please?

9    A    Mary Wooley, Governor's Policy Office was contacted and

10   related she has had daily contact with Major Morris.  Her

11   comments about Major Morris and the Office concur with those

12   of Anne Mentzer stressing how well respected he is downtown.

13   She spoke positively on his abilities in problem solving and

14   creating unity when dealing with special interest groups

15   describing him as a real -- quote -- team player -- end

16   quote.

17           She related he is the most efficient, proactive

18   State Police liaison to date.  Ms. Wooley reported she

19   prefers to deal with Major Morris exclusively stating that

20   the remainder of the Office staff is responsive and

21   courteous, but none have the depth and good judgment of Major

22   Morris.

23   Q    The next section is captioned Review Conclusions.

24   Would you read the second paragraph, please?

25   A    Second paragraph:  A clerk typist would be beneficial

Miller - Cross

1  to the Legislative Liaison Office.  However, current work

2  load may not support full-time assignment.  The additional

3  help could field the various telephone calls, handle requests

4  for criminal history information, do filing and assist with

5  typing.

6  Q    I would like to discuss the time you met with

7  Commissioner Evanko and Lieutenant Colonel Coury at the

8  Academy.

9         Prior to that, had there been any discussions

10  between you and the Commissioner or you, the Commissioner and

11  Coury review -- Lieutenant Colonel Coury regarding

12  reorganizing the office?

13  A    Yes.

14  Q    When did that occur?

15  A    That occurred in one of the first meetings I had with

16  the Commissioner when he talked to me about the possibility

17  of me being -- my name being put in with the Governor's

18  Office for selection to the position.

19  Q    At that meeting, did you address the issue of clerical

20  help?

21  A    I can't remember if it was that first meeting.  The

22  Commissioner I know at that meeting said he was reorganizing

23  the office and making some changes in the office.

24         If it wasn't that meeting within a couple of days

25  of that in my asking some follow-up questions, I did ask him

44

Miller - Cross

1    about the clerical -- I brought the clerical issue up because

2    I saw that as a need.

3    Q    And what did you say to him?

4    A    I said that the way I foresee myself doing some of the

5    things that need to be done here, I dictate -- in the past in

6    the Troop, I dictated a lot of my correspondence just on to a

7    tape.  And it was more efficient for me to do it that way.

8    That was one of the things that I thought would save some

9    time.  If we had a clerical person that could type the --

10   transcribe the correspondence or the work product, that that

11   would be helpful.

12           In addition, I felt that there needs to be a clear

13   delineation in the office of someone whose responsibility it

14   is to file all the documentation.  There's reams of

15   documentation coming through that office.  I felt that that

16   was something that needed to be done.  Because right now, my

17   sense was that everyone was filing things.  And it made it

18   more difficult to find things when three or four people have

19   their hands into a certain filing system rather than having

20   one consistent filing system administered by someone who has

21   responsibility for that function.

22   Q    What was his response?

23   A    He said that he agreed that there probably was a need

24   for a clerical position in that office.  It was a question of

25   whether -- is it possible we could share one with the

Miller - Cross

1    executive administrative staff over in the front office, or

2    is there a possibility that there was another position within

3    the Department that could be moved up there, or possibly

4    Office of Administration may give us approval to create a new

5    clerk typist position for that office.

6    Q    Did you have any subsequent discussion with him about

7    the additional clerical staff?

8    A    I had some.  I don't know if I would call them

9    substantive discussions, but I had some discussions with him

10   on other issues.  When I had an opportunity to speak with

11   him, I tried to be as succinct as I can because he's very

12   busy.

13            I tried to run down some of the legislative issues

14   and also say I had some thoughts -- I mentioned that I don't

15   know what level we would be having a clerical person.  I

16   don't know if it would be a clerk typist position or

17   administrative assistant or what we might be able to do in

18   that function.  But we definitely in my opinion needed to do

19   something.  I became more convinced of that as time went on.

20   Q    And his response during this discussion was?

21   A    He really didn't say much.  He concurred that -- he

22   agreed with my assessment that perhaps that needed to be

23   looked at very closely.  I believe as I said earlier he

24   directed Colonel Coury to look into whether or not there

25   would be a position that could be moved over or something

46

Miller - Cross

1    like that could occur.

2    Q    You said he directed Colonel Coury to do that.  The

3    first time that he directed Colonel Coury to do that was

4    when?

5    A    I can't say for sure of the date, but I know in one of

6    the early discussions that I had with the Commissioner

7    regarding staffing in the office, he did mention to me that

8    he would ask Lieutenant Colonel Coury to look into that, and

9    I should follow up with Colonel Coury in a day or so.

10   Q    Did you follow up with Colonel Coury?

11   A    Yes, I did.

12   Q    What did you learn from that?

13   A    He told me to speak with I forget exactly who it was in

14   the Bureau of Personnel, and I did that.

15   Q    And what did you learn after you spoke with that

16   person?

17   A    I learned that at that point, the Office of

18   Administration was not going to permit us to create a new

19   clerical position.  Apparently, there was some sort of freeze

20   as I recall in clerical positions.  So we would have to

21   determine whether there was another position within the

22   agency, a clerk typist position somewhere in another Bureau

23   or Office or Division that could be moved over if we were

24   going to put somebody in there as a full-time person.

25   Q    When was this?

47

Miller - Cross

1    A    I don't remember exactly when it was.  But I would

2    estimate that sometime in the first -- I would say some time

3    in March.

4    Q    In March?

5    A    I believe that it would have been in March.  Because I

6    started there -- I was informed somewhere around February

7    24th.  On paper, I was there on March 18th, but I was

8    actually working in the office prior to that.

9             The time frame would most likely have been the

10   beginning portion of the month of March.  That's the best I

11   can do right now.

12   Q    When you were considering the position, you indicated

13   that you spoke with Ronald Plesco?

14   A    Yes.

15   Q    Did you know him before?

16   A    No.

17   Q    You said you spoke with Captain Simmers?

18   A    Yes.

19   Q    Who else did you speak with?

20   A    Retired Major Morris.

21   Q    Morris.

22   A    And also my immediate supervisor Major James Hazen, as

23   well as Ms. Wilhelm.

24   Q    You spoke with Ms. Wilhelm?

25   A    I spoke with Ms. Wilhelm.

Miller - Cross

1    Q    About taking the job?

2    A    No, not about taking the job.  About the office

3    operation.

4    Q    You talked to Ms. Wilhelm about the office operation?

5    A    Right.  That would have been right around when the

6    Commissioner informed me that I was -- that I had the job,

7    and I think that was the afternoon of February 24th, I think

8    the next day, I went into the office just to take a look

9    around because I really hadn't been in there before she was

10   there.  And I had time to talk to her.

11   Q    I am talking about before you took the job.

12   A    I am sorry.

13   Q    Before you took the job, you talked to Captain Simmers

14   and Ronald Plesco?

15   A    Captain Simmers, Ronald Plesco and retired Major

16   Morris, as well as Major Hazen.

17   Q    You mentioned an incident occurring -- I am referring

18   you to Defendant Exhibit 18.  This is the e-mail.

19   A    Yes.

20   Q    Did you talk with Yvonne mentioned in this document?

21   A    No.

22   Q    Were you aware that Ms. Wilhelm had filed several

23   complaints in the office?

24   A    I was aware that there was a Bureau of Professional

25   Responsibility investigation that was done with her as a

49

Miller - Cross

1   complainant I believe and Captain Simmers as the subject

2   sometime previous to that.

3   Q       Did you have discussions with anyone regarding the

4   other complaints filed by Ms. Wilhelm?

5   A       I'm sorry.  Which other complaints are we referring

6   to?

7   Q       Were you aware of any other complaints filed by Ms.

8   Wilhelm?

9   A       No.

10   Q       When was the position posted for the clerical position?

11   A       I believe it was posted sometime in the beginning of

12   May, May 5th or 7th or somewhere along those lines.

13   Q       And what was the process for hiring the clerical

14   person?  Describe that for me.

15   A       First, the position was posted by the Bureau of

16   Personnel, and I think the posting had to run about ten days

17   or so.  After that time, any interested parties or

18   applicants, their names would be sent over.

19               Then I would schedule interviews with each of the

20   applicants both within and outside of the Department and

21   conduct those interviews.

22   Q       Did you do that?

23   A       Yes, I did.

24   Q       How long did that take?

25   A       That took approximately a week to ten days to conduct

Miller - Cross

1    the interviews with the applicants.

2    Q    Then what happened?

3    A    After that, I recommended Ms. Harmony Ranck be hired in

4    our office for that position.

5    Q    When was she -- when was her first day?

6    A    I don't recall her first day, but it was probably

7    sometime in June.  I remember we had to work out a time.  She

8    was from within the Department.  She worked in our Bureau of

9    Records and Identification.

10        So we had to work out a time that would be okay

11   with where she was leaving so that they could still do the

12   work load, and yet she could be released to us to work in our

13   office.

14   Q    Is it fair to say mid June?

15   A    Somewhere in that neighborhood would probably be a fair

16   assessment.

17   Q    Did you have a discussion with Ms. Wilhelm about why

18   she was so upset?

19              THE COURT:  What time?

20   BY MR. PRINGLE:

21   Q    You said that around April 14th, you had a discussion

22   with her where she said she didn't want to talk to Ronald

23   Plesco.

24              Did you have a discussion with her regarding why

25   she didn't want to talk to Ronald Plesco?

51

Miller - Cross

1    A    She told me that -- I believe I testified to this, but

2    she told me that there were many things that occurred in the

3    past regarding her and Captain Simmers and Ron Plesco and

4    that her attorney would be handling that.

5    Q    Did she tell you that Ronald Plesco -- that she was

6    upset with Ronald Plesco specifically?

7    A    Well, other than she said I would rather put a bullet

8    in my head than talk to Ron Plesco.  So I knew she was upset

9    based on what she said.  She didn't give me any specifics.

10        My focus was trying to get her to let's move

11   beyond what happened in the past and try to move forward.

12   She was not willing to share with me specific information at

13   that point.

14   Q    She said to you I don't want to talk about that?

15   A    No, not in so many words.  Her words to me were there

16   are many things that happened in the past involving Captain

17   Simmers and Ron.  I'd rather put a bullet in my head than

18   talk to Ron Plesco, something along those lines.

19   Q    Did you ever check her performance evaluations before

20   or after that conversation?

21   A    No.  I know I didn't check them afterwards.  I may have

22   reviewed them as part of her supervisory file when I came

23   into the office.  In fact, I probably did do that.  But I

24   didn't review them after that for any reason.

25   Q    So you knew that she was regarded as an outstanding

Miller - Cross

1    employe?

2    A    I knew -- yes, I knew what her evaluations said.

3    Absolutely.

4    Q    And she had been helpful to you when you came into the

5    office?

6    A    Yes.

7    Q    And she communicated with you?

8    A    Yes.

9    Q    And when Sergeant McHale came into the office, when was

10   that?

11   A    Sergeant McHale was selected sometime in the beginning

12   of April, somewhere around April 3rd.  But, again, he was

13   working at that time in the Bureau of Drug Law Enforcement.

14   There was some lag time where he had to finish what he was

15   doing in Drug Law before he could come over to the

16   Legislative Affairs Office.

17   Q    I'm sorry.  I think it is on the record, but just so it

18   is clear, Sergeant McHale was hired as the new Assistant

19   Director?

20   A    That's correct.

21   Q    You said he was hired around the third of April?

22   A    Sometime around the very beginning of April.  He did

23   spend some time over there, but he wasn't there every single

24   day because he had to clean up some of the work that he was

25   still involved in with the Bureau of Drug Law Enforcement.

53

Miller - Redirect

1    Q    And he got along with Ms. Wilhelm?

2    A    Yes.

3    Q    Did she indicate that she would not communicate with

4    Mr. McHale, Sergeant McHale?

5    A    No.

6    Q    You said Colonel Coury.  Strike that.  At the time you

7    became Director, Ronald Plesco reported directly to the

8    Commissioner?

9    A    That's correct.

10   Q    For the entire time that you were the Director, Ronald

11   Plesco reported directly to the Commissioner?

12   A    Yes, sir.

13             MR. PRINGLE:  No further questions.

14             THE COURT:  Redirect?

15             MS. FORNEY:  Yes, Your Honor.

16                  REDIRECT EXAMINATION

17   BY MS. FORNEY:

18   Q    Major Miller, do you have Plaintiff Exhibit 38 before

19   you?

20   A    Yes, I do.

21   Q    I would like to direct your attention to page 00015.

22   A    I have it in front of me.

23   Q    And to the section labeled Review Conclusions.

24   A    Yes.

25   Q    This document is the Systems Process Review Report; is

54

Miller - Redirect

1    that correct?

2    A    That is correct.  It is a summary of the review that

3    they did in the office during that time period.

4    Q    All right.  And on page 15, the conclusions of that

5    review appear?

6    A    Yes, they do.

7    Q    I believe that you have already read into the record

8    the second paragraph of the Review Conclusions.  Would you

9    read the first paragraph?

10   A    Yes, ma'am.  Of utmost concern is the need for

11   increased personal communication absent intentional shunning,

12   or other improvised impediment between all LLO personnel.

13   The inherent nature of the legislative liaison process

14   requires cooperation, impartial attitudes, sharing of

15   diversified opinion and acceptance of constructive criticism,

16   all of which are almost nonexistent in the prevailing

17   atmosphere.

18   Q    Would you also read the third paragraph which I believe

19   continues on to the next page?

20   A    Yes, ma'am.  Personal and professional conflicts

21   between Ms. Wilhelm and Captain Simmers create a hostile work

22   environment negatively impacting the efficiency of the

23   office.  It appears the internal strife has not been

24   addressed properly since it began in the spring of 1998.

25            Supervisory files do not contain documentation of

Miller - Redirect

1   incompetence or poor performance by Captain Simmers or the

2   conduct of Ms. Wilhelm.  Relationships must improve within

3   the office as the situation will only worsen and affect the

4   service to which legislators have grown accustomed.

5   Q    Now you testified that you had some conversation with

6   the Commissioner about reorganizing the Legislative Affairs

7   Office early in your tenure there.

8         Can you tell me what reorganization the

9   Commissioner talked about?

10  A    Well, in one of the first meetings I had with him, he

11  said I'm reorganizing this office.  And one of the things I

12  am doing is I'm promoting Ronald Plesco to Director of

13  Policy.  He will be an independent.  He will be his own

14  office, but he will work hand in hand with you.  I want you

15  to work hand in hand with him.

16        He said another thing I am doing is I am going to

17  move Captain Simmers out of the Legislative Affairs Office

18  entirely so he won't be there anymore.  Those were the two

19  main things that he told me when he told me he had already

20  taken steps to reorganize the office.

21  Q    Did he mention Ms. Wilhelm when he was talking about

22  reorganization of the office?

23  A    No.

24  Q    Did he mention the Legislative Specialist position at

25  all when he talked about reorganizing the office?

56

Evanko - Direct

1  A    No.

2  Q    You testified that Harmony Ranck was hired to be a

3  clerical worker in your office?

4  A    Yes.

5  Q    Is she still employed in the office?

6  A    Yes, she is.

7  Q    Is Sergeant McHale still employed in the office?

8  A    Yes, but he has been promoted to Lieutenant.  But he

9  still remains in the assistant position.

10  Q    Excuse me.  Lieutenant McHale then.  Is a Legislative

11  Specialist employed within the office?

12  A    No.

13        MS. FORNEY:   No other questions, Your Honor.

14        THE COURT:  Recross?

15        MR. PRINGLE:  No, Your Honor.

16        THE COURT:  You may step down, sir.  I guess we

17  have ten minutes by that clock.  Do you have somebody here?

18        MS. FORNEY:  I do, Your Honor.  We could begin at

19  least with some preliminary questions if the Court wishes.

20        THE COURT:  Let's do that.

21        MS. FORNEY:  The defendants will Paul Evanko.

22

23        PAUL EVANKO, called as a witness, being duly

24  sworn, testified as follows:

25

57

Evanko - Direct

1    THE CLERK:  Would you state your name please?

2   A    Paul Evanko.

3                   DIRECT EXAMINATION

4   BY MS. FORNEY:

5   Q    Are you currently employed, sir?

6   A    Yes, ma'am.

7   Q    What is your job?

8   A    I am the Commissioner of the Pennsylvania State Police.

9   Q    How long have you been in that position?

10  A    I was appointed by Governor Tom Ridge on February 21st,

11  1995.

12  Q    Would you briefly outline -- strike that.  How long

13  have you been employed by the Pennsylvania State Police?

14  A    I have been a State Policeman for 32 years.

15  Q    Then I will emphasize briefly.  Would you briefly

16  describe the jobs that you have had with the State Police?

17  A    After the Academy, I was assigned as a Patrol.  I did

18  criminal investigative work.  I was assigned for about twelve

19  or 13 years as a Trooper, Corporal and Sergeant doing Troop H

20  organized crime and drug and vice and prostitution work.

21       I was promoted to Lieutenant and transferred to

22  Troop J Lancaster.  I was a Patrol Section Commander for a

23  year.  I was a Criminal Investigation Section Commander for a

24  year.

25

58

Evanko - Direct

1    I was promoted to Captain, and I ran the

2    Pennsylvania State Police Drug Enforcement operations in the

3    state for a couple of years.  I was promoted to Major, and I

4    ran the Bureau of Professional Responsibility Unit for about

5    eight months, after which I was assigned as the Director of

6    the Bureau of Criminal Investigation for approximately three

7    years.

8        About that time, I was appointed by Governor Ridge

9    to this position.

10   Q    Would you explain what your responsibilities are as

11   Commissioner of the State Police?

12   A    I exercise administrative command and fiscal authority

13   over the 5,800 personnel of the Department and a budget of in

14   excess of six hundred million dollars.

15   Q    The personnel that you mentioned, does that include

16   both uniformed members of the State Police and civilian

17   employes?

18   A    It includes all the personnel including our Troopers

19   and our non sworn personnel.

20   Q    Do you know approximately the breakdown between the

21   number of Troopers and the number of non sworn personnel?

22   A    There are approximately 4,200 Troopers, and the rest

23   would be non sworn personnel.

24        THE COURT:  What is the total personnel?

25   A    Approximately 5,800.

59

Evanko – Direct

1    THE COURT:   Thank you.

2    BY MS. FORNEY:

3    Q    In addition to your administrative responsibilities for

4    the State Police, do you serve on any other Boards or

5    Commissions?

6    A    I serve on a number of different policy boards and

7    advisory boards.  I am the Chairman of the Municipal Police

8    Officers Education and Training Commission.  That sets the

9    training standards for all municipal Police Officers in

10   Pennsylvania.

11        I am the Chair of the Board of Directors of the

12   federal government's National Guard Counter Drug Training

13   Program for northeast U.S. I serve as a member of the

14   Pennsylvania Commission on Crime and Delinquency.  I serve in

15   the Governor's New Security Advisory Council.  I serve in the

16   Emergency Management Agency Council.

17        I serve on the Institute for Emerging Military

18   Technologies for the Penn State Applied Research Laboratory.

19   There are probably a couple of others.

20   Q    I would like to direct your attention to the spring of

21   2000.  At that time, did the Office of Legislative Affairs

22   report directly to you?

23   A    Yes, ma'am.

24   Q    And was Jeffrey Miller the Director of the Office at

25   that time?

60

Evanko - Direct

1  A    Yes, ma'am.

2  Q    Now did there come a time in April of 2000 when I guess

3  Captain Miller approached you about making some staffing

4  changes in the Office of Legislative Affairs?

5  A    It was sometime shortly after his appointment as the

6  Director of the office.

7  Q    When you say shortly after, do you mean days after,

8  weeks after, a month after?

9  A    A few weeks.

10  Q    Weeks?

11  A    A few weeks.

12  Q    And what did Captain Miller say to you?

13  A    He approached me with a recommendation to reorganize

14  the office, and he wanted me to replace the Legislative

15  Liaison Specialist with a Clerk Typist position.

16  Q    Did he explain why he wanted to do that?

17  A    That he needed a clerk typist more than he needed a

18  Legislative Analyst.

19  Q    Did he give you any other explanation?

20  A    He also told me about the conversation he had with her

21  about putting a bullet in her head.

22  Q    Did you take any action based on his recommendation?

23  A    I authorized him to proceed with that.

24  Q    Did you give that authority to him?

25  A    I gave the authority to him and the Deputy Commissioner

61

Evanko - Direct

1    of Administration to fulfill it.

2    Q    Did you provide -- who was the Deputy Commissioner for

3    Administration?

4    A    Lieutenant Colonel Thomas Coury.

5    Q    And did you provide him with any instructions regarding

6    this reorganization?

7    A    Just to comply with the request.

8    Q    Did you instruct Colonel Coury to dismiss Ms. Wilhelm

9    from her position?

10   A    Not specifically.  Just to comply with the Major's

11   request.

12   Q    By Major, you mean?

13   A    Major Miller.

14   Q    Did you eventually learn that Ms. Wilhelm had been

15   dismissed?

16   A    Yes, ma'am.

17   Q    How did you learn that?

18   A    When the new clerk came on board.

19   Q    You did not have any further conversations that you can

20   recall with Colonel Coury about the reorganization of the

21   Legislative Affairs Office?

22   A    Not that I remember, no.

23            THE COURT:  This might be a good time to break

24   until 1:30.

25            (A recess was taken.)

Evanko - Direct

AFTERNOON SESSION

PAUL EVANKO resumes the stand.

DIRECT EXAMINATION (continued)

BY MS. FORNEY:

Q    Colonel Evanko, there are a number of exhibits before you.  Could you locate Plaintiff Exhibit 40, please?

A    Yes, ma'am.

Q    This is an exhibit that has been referred to previously in testimony.  It is dated January 3rd, 2000; is that correct?

A    Yes, it is.

Q    And it is regarding response to use of compensation leave?

A    Yes, ma'am.

Q    From Barbara Wilhelm to Major Richard Morris?

A    Yes, ma'am.

Q    On the second page, it shows yourself and Major Virginia Smith-Elliot copied in?

A    Yes, ma'am.

Q    Did you receive a copy of this memorandum?

A    Yes, I.

(Memorandum from Evanko to Acting Director, Office of Legislative Affairs regarding Compensatory Leave was introduced as Defendant Exhibit 20.)

63

Evanko - Direct

1    BY MS. FORNEY:

2    Q    Can you locate before you Defendant Exhibit 20?

3    A    Yes, ma'am.

4    Q    Could you identify this document for me?

5    A    This is the document that I directed in response to

6    Plaintiff Exhibit 40.

7    Q    What is the date of the document?

8    A    January 7, 2000.

9    Q    And what is the subject?

10   A    Compensatory leave.

11   Q    To whom is this document directed?

12   A    Acting Director of Legislative Affairs Office.

13   Q    Is it from yourself?

14   A    Yes, ma'am.

15   Q    What is the enclosure?

16   A    The enclosure is correspondence from Barbara A.

17   Wilhelm, Legislative Specialist 2, Legislative Affairs Office

18   to Major Richard D.A. Morris, Director of Legislative Affairs

19   Office dated January 3, 2000 regarding response to use of

20   compensation leave.

21   Q    Would you read the text of this document, please?

22   A    Paragraph one:  I received a copy of enclosure one from

23   Ms. Wilhelm.  Paragraph two:  Subsequent to her

24   correspondence, I'm reinforcing with you the following:

25   Subparagraph -  use of compensatory leave for enlisted

64

Evanko - Direct

1    members is not in accordance with the collective bargaining

2    agreement.

3             Second subparagraph.  Compensatory leave for

4    civilian management personnel should be limited to

5    extraordinary operational circumstances.  In other words,

6    personnel should not be permitted to start work early, work

7    through lunch break periods or remain after the normal

8    workday for the sole purpose of accumulating compensatory

9    leave.

10            Paragraph three.  Paragraph four of enclosure one

11   raises the issue of the existence of a possible

12   discriminatory act.  Therefore, you are directed to ensure

13   that the Director of the Bureau of Professional

14   Responsibility, Chief Counsel and Equal Opportunity Officer

15   are provided with a copy of enclosure one, and necessary

16   action is taken in accordance with Department rules,

17   regulations and existing policies and procedures.

18   Q    Now why did you direct this memorandum to the Acting

19   Director of the Legislative Affairs Office instead of to Ms.

20   Wilhelm?

21   A    Because he is the one that is responsible for the

22   management of that office.

23   Q    Now at the time of Ms. Wilhelm's dismissal, were you

24   aware of any other complaints about discrimination that she

25   made?

Evanko - Cross

1    A    No, ma'am.

2    Q    Did Major Morris report to you that Ms. Wilhelm had

3    made complaints of discrimination to him?

4    A    Not that I remember, no.

5    Q    Did Major Merryman report to you that Ms. Wilhelm had

6    made complaints of discrimination to him?

7    A    No, ma'am.

8    Q    Did Lieutenant Colonel Coury report to you that Ms.

9    Wilhelm had made any claims of discrimination?

10   A    No, ma'am.

11              MS. FORNEY:  No other questions, Your Honor.

12              THE COURT:  Cross.

13                     CROSS EXAMINATION

14   BY MR. PRINGLE:

15   Q    A few questions on cross.  Did you have meetings with

16   your staff on a regular basis?

17   A    Yes, sir.

18   Q    Who would those meetings -- who would come those

19   meetings?

20   A    I meet with my Senior Commanders, the Deputy

21   Commissioners as often as is necessary.  Sometimes several

22   times a day.  Office Directors, it would depend on the

23   circumstances.  Sometimes a couple times a day.  Sometimes

24   once a day.  It all depends what is going on in the

25   Department.

66

Evanko - Cross

1   Q      You were aware of the complaint filed by Major Morris

2   on behalf of Ms. Wilhelm; weren't you?

3   A      You would have to refresh my memory on what that is

4   about.

5   Q      Somewhere up there, you should have Plaintiff Exhibit

6   56.

7   A      Yes, sir.  I do.

8   Q      Does that refresh your recollection as to an

9   investigation conducted by the Internal Affairs Division

10  regarding a complaint filed by Major Morris?

11  A      I knew there had been an Internal Affairs investigation

12  against Captain Simmers, but I was not aware of who the

13  complainant was.

14  Q      Do you mean that you didn't remember who the

15  complainant was?

16  A      No.  I was not aware of who the complainant was.

17  Q      You never read the report?

18  A      No, sir; I did not.

19  Q      Didn't you order that the adjudication be reassigned?

20  A      Yes, I did.

21  Q      You ordered that the adjudication be reassigned, and

22  you never looked at the report?

23  A      That is correct.

24  Q      And you never heard about the report ever again?

25  A      I was told that the Internal Affairs investigation

Evanko - Cross

1    against Captain Simmers was unfounded.

2    Q    You were told that the investigation was unfounded, but

3    you never were told who filed the complaint?

4    A    That is correct.

5    Q    In any case, the adjudication date for that complaint

6    was 10/5/99?

7    A    I will take your word that that is what it was.

8    Q    You don't have to take my word for it.  Look at

9    Plaintiff Exhibit 56.

10   A    (Witness complies.)  Maximum adjudication date is

11   10/5/99.

12   Q    And what is this document?  What do you recognize this

13   document to be?

14   A    It is a --

15   Q    Just the first page.

16   A    The first page is a desk memorandum entitled Personnel

17   Investigation, and it is from the Director of the Bureau of

18   Professional Responsibility to originally the Director of

19   Patrol.  And that is crossed out and Criminal Investigation

20   in its place.

21        The Equal Employment Opportunity Office is listed

22   and signed off.  The Deputy Commissioner of Administration is

23   listed and signed off.  And the Director of the Bureau of

24   Professional Responsibility is listed and signed off.

25   Q    When does this document indicate that you reassigned

Evanko - Cross

1    the adjudication?

2    A    On January 5, 2000 this adjudication was reassigned by

3    direction of the Commissioner.

4    Q    These signatures indicate the people who were involved

5    in the review of this report?

6    A    Either the review or the processing of it.

7    Q    I am referring you now again to Plaintiff Exhibit 43.

8              THE COURT:  Plaintiff?

9              MR. PRINGLE:  Plaintiff Exhibit 43.  That was

10   presented to him?

11             MS. FORNEY:  No, it was not.

12             MR. PRINGLE:  Strike that then.

13   BY MR. PRINGLE:

14   Q    Approximately, when did you appoint Major Miller -- at

15   that time Captain Miller -- to the position of Director of

16   the Legislative Affairs Office?

17   A    March 18th, 2000.

18   Q    Is that when you first appointed him?  Didn't you first

19   appoint him in February?

20   A    No, I think I appointed him March 18th.

21   Q    Didn't you advise him that he was appointed as Director

22   sometime in February?

23   A    I think he was advised by the Governor's Office and

24   myself that his selection for that position had been

25   approved.  I think it was effective March 18th.

Evanko - Cross

1    Q      I know it was effective March 18th.  But the time you

2    told him was when?

3    A      Probably late February.

4             MR. PRINGLE:  No further questions.

5             THE COURT:  I have a question of the

6    Commissioner.  What does the language this adjudication was

7    reassigned, what does that mean?

8    A      It means that the original person to whom it was

9    assigned to be adjudicated failed to do so, and another

10   adjudicator had to be assigned to review the investigative

11   report and make a decision as to whether it would say founded

12   or unfounded.

13            THE COURT:  Thank you.  Redirect?

14            MS. FORNEY:  No, Your Honor.

15            THE COURT:  You may step down.

16   A      Thank you.

17            THE COURT:  Is the Commissioner excused?

18            MS. FORNEY:  Yes, Your Honor.

19            THE COURT:  You are excused.

20            (Whereupon, the testimony was concluded.)

21

22

23

24

25

70

1          I hereby certify that the proceedings and evidence

2     are contained fully and accurately in the notes taken by me

3     on the trial of the above cause, and that this copy is a

4     correct transcript of the same.

5

6

7                         Vicki L. Fox, RMR

8                         Official Reporter

9

10         The foregoing certification of this transcript

11    does not apply to any reproduction by any means unless under

12    the direct control and/or supervision of the certifying

13    reporter.

14

15

16

17

18

19

20

21

22

23

24

25