110

1/10/0'

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,                    :
          Plaintiff        :
                          :
                          :
           v.              : 01-CV-1057
COMMONWEALTH OF PA, et al.,         :
          Defendants        :

FILED
HARRISBURG, PA

JAN 0 6 2003

MARY E. D'ANDREA, CLE
Per _____

TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TESTIMONY OF THOMAS COURY


BEFORE:  HON. SYLVIA H. RAMBO, Judge

DATE:    September 10, 2002

PLACE:   Courtroom Number Three
           Federal Building
           Harrisburg, Pennsylvania

COUNSEL PRESENT:
NATHAN C. PRINGLE, JR., Esquire
    For - Plaintiff

SUSAN J. FORNEY, Esquire
    For - Defendant


Vicki L. Fox, RMR
Official Reporter

2

I N D E X

| Defendants' Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| 7.   Thomas Coury | | | | |
|      By Ms. Forney | 4 | -- | -- | -- |
|      By Mr. Pringle | -- | 20 | -- | -- |

3

E X H I B I T S

| Defendants Exhibit | Introduced | Admitted |
|---|---|---|
| 14.  Memorandum from Conley to Deputy Commissioner of Administration regarding Review of Legislative Affairs Office. | 15 | -- |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

Coury - Direct

1    MS. FORNEY:  Your Honor, the defendants call

2    Thomas Coury.

3

4    THOMAS COURY, called as a witness, being duly

5    sworn, testified as follows:

6

7    THE CLERK:  Would you state your name, please?

8    A    Thomas K. Coury.

9    THE CLERK:  Thank you.

10    DIRECT EXAMINATION

11    BY MS. FORNEY:

12    Q    Mr. Coury, sir, are you currently employed?

13    A    Yes, I am.

14    Q    What is your job?

15    A    I work for the Parsons Corporation in Pasadena,

16    California.  I am the Vice-President of Parsons Advanced

17    Technology.

18    Q    How long have you been in that position?

19    A    Since December of 2001.

20    Q    And what did you do before that?

21    A    I was the Deputy Commissioner of Operations for the

22    Pennsylvania State Police.

23    Q    Did you hold the rank of a Lieutenant Colonel in that

24    position?

25    A    Yes, I did.

5

Coury - Direct

Q     For how long did you hold that position?

A     From February of 1995 until December of 2001.  Actually January of 2002 because of my actual retirement date.  I was a Lieutenant Colonel for seven years.

Q     And in your position as Lieutenant Colonel, did you always hold the title of Deputy Commissioner for Staff?

A     I was never the Deputy Commissioner of Staff.

Q     I beg your pardon.

A     From February of 1995 until July of 2000, I was the Deputy Commissioner of Administration.  And from July of 2000 until my separation from the Department, I was the Deputy Commissioner of Operations.

Q     Thank you, sir.  Would you tell me what the Deputy Commissioner for Administration is responsible for briefly?

A     There's actually three Deputy Commissioners in the Department.  It is staff, operations and administration. Administration is involved in almost every aspect that deals with people.  That would be from hiring through until retirement or termination or separation.  So that would be the Bureau of Personnel, the Bureau of Training and Education, the Bureau of Professional Responsibility, the Members Assistance Office, Department Discipline.

Q     You mentioned within your responsibility was the Bureau of Personnel?

A     Yes, ma'am.  And I also left out the Equal Employment

6

Coury - Direct

1   Opportunity Office.

2   Q     I would like to direct your attention to the spring of

3   2000, specifically April of 2000.  Did you become aware that

4   the Office of Legislative Affairs was going to be

5   reorganized?

6   A     I don't recall the specific date or time, but, yes, I

7   am familiar with the SPR as we call it of Legislative

8   Affairs.

9   Q     I am not referring specifically to the SPR, but I am

10  referring to the reorganization --

11  A     Yes.

12  Q     -- of the Legislative Affairs Office specifically to

13  remove Ms. Wilhelm's position and replace it with a clerical

14  position.

15  A     I am familiar with that, yes, ma'am.

16  Q     Did you have any responsibilities in implementing that

17  reorganization?

18  A     My basic responsibility was to relay the information

19  from the Commissioner on what he wanted to do with that

20  Office to the Bureau of Personnel to make it happen.

21  Q     What information do you recall relaying from the

22  Commissioner to the Bureau of Personnel?

23  A     I recall -- and I don't recall in which order I learned

24  this, but I knew that the Commissioner's long term plan for

25  that office was he eventually wanted to downsize it from a

7

Coury - Direct

1  Major.  He didn't want a Major in that office.  He didn't

2  want a Captain in that office.  He wanted more like a Captain

3  and a Sergeant in that office.

4         He wanted to have the Policy Officer direct report

5  -- be a direct report to him.  And he also wanted to do away

6  with the legislative analyst position and have a clerical

7  position in that office was his ultimate goal.  I recall

8  relaying that information about the legislative analyst to

9  the Bureau of Personnel.

10 Q    Now do you recall whether the Commissioner -- when the

11 Commissioner formulated this plan?

12 A    It had been one of the longer term plans that I can

13 recall.  When I was the Deputy Commissioner, we often had

14 strategic planning sessions where he would lay out long term

15 goals and ideas that he had.  That was one of his longer term

16 goals.

17 Q    Do you remember whether the long term goal always

18 included the replacement of the legislative specialist

19 position?

20 A    I don't recall how far back that went.  But one of the

21 issues had been discussed in the more recent conversations

22 about the clerical position they needed.

23 Q    When you refer to more recent conversations, what do

24 you mean?

25 A    More toward early 2000.

Coury - Direct

1   Q     With whom was he having these conversations, with you

2   or was he having them with you and other people?

3   A     I only recall him having them with me.  There may have

4   been other people present.  I don't recall.

5   Q     Do you recall being present at all when Major -- now

6   Major Miller, then Captain Miller made a recommendation that

7   the legislative specialist position be removed from that

8   office and replaced with a clerical?

9   A     I don't recall Major Miller, then Captain Miller, being

10  present in a conversation with the Commissioner.  But I do

11  remember Captain Miller relaying that type of information to

12  me.  I don't know if the Commissioner was present or not.

13  Q     What did you do in -- what information did you relay to

14  the Personnel Bureau regarding the legislative specialist

15  position?

16  A     That that position was to be downgraded to a clerical

17  position, and that the legislative position, meaning Ms.

18  Wilhelm's position, they should handle it the way we

19  typically handle people who are being furloughed or their

20  position is being abolished.

21          When I refer to that, typically what we try to do

22  is to find another position within the agency that is

23  commensurate to the position that they are leaving.  If that

24  is not possible, to find a position that may not be at the

25  same level, but certainly has a salary safe provision to it.

9

Coury - Direct

1    Or we look to other state agencies to find similar, suitable

2    positions for the individuals.

3            In any instance, separation of the person from the

4    agency would be the last step.

5    Q    Whose responsibility was it to perform those steps?

6    A    The Director of the Bureau of Personnel.

7    Q    Did you take any other steps with regard to the

8    elimination of the legislative specialist position in that

9    office?

10   A    Not that I can recall, no.

11   Q    I would like to direct your attention now to 1999.

12   There has been testimony that there was an investigation of a

13   Captain Michael Simmers based on a complaint made by Major

14   Richard Morris.

15           Were you aware of that investigation?

16   A    Yes, I was.

17   Q    How did you become aware of that investigation?

18   A    Initially, I became aware of it when as I recall Mr.

19   Morris came to me, said he had a complaint from Ms. Wilhelm

20   regarding Captain Simmers.  I asked him the nature of the

21   complaint.

22           He said it was -- as I recall, he said it was a

23   harassment type complaint.  I inquired was it sexual

24   harassment, gender harassment, criminal harassment.  And he

25   told me he did not know the specific nature of the

10

Coury - Direct

1    complaint.

2            He looked to me for direction on how he should

3    proceed.

4    Q      Did you give him any direction?

5    A      Yes.  I told him that the process was pretty well

6    spelled out in Administrative Regulations 425, and either Ms.

7    Wilhelm as the complainant/victim should fill out what we

8    call a complainant processing worksheet to initiate an

9    investigation, or if she preferred not to, as her direct

10   supervisor and the person who has direct information from her

11   about the complaint should fill out a complaint processing

12   worksheet for her.

13   Q      Do you know whether that was done?

14   A      Major Morris completed the complaint and processing

15   worksheet.

16   Q      As Deputy Commissioner for Administration, what was

17   your role in the BPR process?

18   A      In the BPR process, in the Internal Affairs

19   investigation process more specifically, all of those

20   investigations will flow through the Office of the Deputy

21   Commissioner of Administration.

22           To the best of my recollection, we are probably

23   talking about some five hundred investigations a year.  The

24   role of that office is investigate allegations of misconduct,

25   wrongdoing or personnel complaints.  So it is difficult to

11

Coury - Direct

1    review all five hundred investigations.

2            But as a Deputy Commissioner of Investigations, I

3    typically reviewed and monitored the investigations of a more

4    serious nature.

5    Q    Did you monitor the investigation based on Major

6    Morris's complaint?

7    A    On a limited basis, yes.

8    Q    Why was that?

9    A    Because the initial allegation was one of harassment.

10   The Pennsylvania State Police takes allegations --

11   particularly internal allegations of sexual harassment,

12   gender harassment or criminal harassment very, very

13   seriously.  When you work within a group and you're in the

14   same company, particularly in a small office, you can find if

15   you've got an investigation going, if you have the

16   complainant in the same office and the alleged perpetrator in

17   the same office, having them both work together can have a

18   chilling effect on the investigation where one person doesn't

19   want to testify against the other or give statements.

20           There can be the perception of unfair or undo

21   treatment.  There can be a hostile work environment.  In my

22   five years as Deputy Commissioner of Administration, if I saw

23   cases that that could be occurring, I would typically

24   transfer one of the people temporarily out of that office

25   because of the chilling effect it could have on the

12

Coury - Direct

1    investigation.

2            Not knowing the nature of the harassment complaint

3    in this investigation, I did make inquiries to keep track of

4    what type of harassment complaint or allegation was this.

5    Q    Did you ever take any steps to transfer anyone out of

6    the Legislative Affairs Office pending the investigation?

7    A    No, I did not.

8    Q    Why was that?

9    A    I was never clear what the nature of the allegation

10   was.

11   Q    Did there come a time when you asked the Bureau of

12   Professional Responsibility whether Captain Simmers should be

13   interviewed in that investigation?

14   A    Yes.

15   Q    Why was that?

16   A    Because I think in this particular case, it was still

17   unclear, at least to me, what the nature of the allegation

18   really was -- what type of harassment it was or more details

19   of what was occurring.

20            More specifically, I think in any investigation to

21   be full and complete that the person that is alleged to be

22   the perpetrator should be interviewed at some point.  In some

23   investigations, it is the very first person you would

24   interview.  In other investigations depending upon the nature

25   of the investigation, they would be the last person to be

13

Coury - Direct

1    interviewed.

2           Typically, it is my belief that everybody is

3    eventually interviewed.

4    Q     Did you direct the Bureau to have Captain Simmers

5    interviewed?

6    A     No, I did not.

7    Q     What did you do?

8    A     I inquired I believe as to had he been interviewed, was

9    he going to be interviewed, something to that nature.

10   Q     While the investigation was pending and before Captain

11   Simmers was interviewed, did you have any communication with

12   Captain Simmers about the complaint?

13   A     Absolutely none, ma'am.

14   Q     Did you have any communication with him about the

15   investigation before he was interviewed?

16   A     Absolutely none.

17   Q     There has been some testimony in this case regarding a

18   management conflict session involving the Legislative Affairs

19   Office.  Are you familiar with that?

20   A     Yes, ma'am; I am.

21   Q     Can you tell me what the management conflict session

22   was?  What is that?

23   A     I have never actually taken part in one.

24          MR. PRINGLE:  I object, Your Honor.  If he hasn't

25   participated in one, how does he know what happens?

14

Coury - Direct

1    MS. FORNEY:  Let me rephrase my question, please.

2    BY MS. FORNEY:

3    Q    Did you have any role in causing that session to be

4    held?

5    A    Yes, ma'am; I did.

6    MR. PRINGLE:  Objection, Your Honor.  I am not

7    sure what the relevance of this line of questioning is.

8    THE COURT:  I think the plaintiff testified to

9    attending.

10    MR. PRINGLE:  She did testify to attending the

11    conference, but her own testimony is limited to her statement

12    as to who also attended.

13    THE COURT:  I am going to permit her to put some

14    background information on this.  Overruled.

15    MS. FORNEY:  I will try to be brief, Your Honor.

16    I am sorry.  I lost my last question.

17    (The question, "Did you have any role in causing

18    that session to be held," was read by the reporter.)

19    A    Yes, ma'am; I did.

20    BY MS. FORNEY:

21    Q    What was that role?

22    A    As I recall, I directed the Members Assistance Program

23    that they should conduct a counseling session with the Office

24    of Legislative Affairs.

25    Q    Why did you do that?

15

Coury - Direct

1    A    It seemed pretty clear to me from what I particularly

2    had read and heard that there was conflict in that office.

3    It was a very small office.  There was only a few people in

4    it.

5            They worked in close contact with each other

6    everyday, but yet there weren't getting along for some

7    reason.  I think as a senior manager within the agency to

8    know that and not to try to do something about it would be

9    wrong.

10           I think as a senior leader in the Department, it

11   was my obligation especially since Members Assistance came

12   under me and I was aware of these conflict resolution

13   opportunities that we should make some attempt to find out

14   what is the root cause of what is happening in this office

15   and how we can correct it.

16   Q    Could you locate Plaintiff Exhibit 36, please?

17   A    Was that Exhibit 36?

18   Q    Yes, 36.

19   A    They don't appear to be in any order here so it may

20   take me a minute.

21   Q    I apologize.  We lawyers make a mess of it.

22   A    Yes, I have it in front of me.

23           (Memorandum from Conley to Deputy Commissioner of

24   Administration regarding Review of Legislative Affairs Office

25   was introduced as Defendant Exhibit 14.)

Coury - Direct

1    BY MS. FORNEY:

2    Q     I am also going to hand you a document marked Defendant

3    Exhibit 14.   I would like you to take a look first at

4    Defendant Exhibit 14.

5              Is this a document that you received?

6    A     Yes, it is.

7    Q     Would you tell me the date of the document?

8    A     It is dated November 3rd, 1999.

9    Q     Who did you receive it from?

10   A     Major Hawthorne N. Conley.  He was the Director of the

11   Bureau of Professional Responsibility at that time.

12   Q     What is the subject?

13   A     The subject is:  Review of Legislative Liaison Office.

14   Q     Where it says reference one, would you read that

15   reference?

16   A     Verbal orders from the Deputy Commissioner of

17   Administration on October 12, 1999 to meet with Major

18   Virginia L. Smith-Elliot, Equal Employment Opportunity Office

19   and Barbara L. Christie, Chief Counsel, in order to discuss

20   existing problems within the Legislative Liaison Office.

21   Q     Did you order those individuals to meet?

22   A     Yes, I did.

23   Q     Why did you do that?

24   A     Well, certainly there was this ongoing discord within

25   the office, an Internal Affairs investigation of alleged

Coury - Direct

1    misconduct, and a review of that office that indicated

2    discord.

3    Q     When you say review of that office, are you referring

4    to a particular review?

5    A     It would be the Bureau of Professional Responsibility's

6    Systems and Process Review of the office.

7    Q     Please continue.

8    A     And there had been a letter from Ms. Wilhelm to

9    Lieutenant William Horgas where she had requested to sit down

10   with him and to discuss problems within that office.  Still

11   not having a good handle at my level on exactly what the

12   nature of these complaints were and what the specific

13   allegations were, and the fact that we had an Internal

14   Affairs investigation on Captain Simmers and we had done an

15   SPR review as we call it of the office, I asked the three of

16   those individuals to review everything we had done to make

17   sure that we had exhausted every possible avenue to answer

18   Ms. Wilhelm's complaint or to address whatever problems

19   seemed to exist there.

20   Q     Is Plaintiff Exhibit 36 the letter from Ms. Wilhelm to

21   Lieutenant Horgas that you referred to?

22   A     Yes, it is.

23   Q     And what information did you get -- strike that.  And

24   is this Defendant Exhibit 14 the response that you got from

25   Major Conley?

Coury - Direct

1    A    Yes, it is.

2    Q    Would you read paragraph one of the response, please?

3    A    On Wednesday, October 13, 1999 and Tuesday October 19,

4    1999, Major Virginia Smith-Elliot, Chief Counsel Barbara

5    Christie and I met to discuss the review of the Legislative

6    Liaison Office.  Enclosures one through five were

7    independently reviewed before our meeting.  We specifically

8    sought to ensure listed in paragraph three of enclosure one

9    had been addressed.

10   Q    Would you read paragraphs two and three, please?

11   A    Paragraph two:  It was our conclusion that inasmuch as

12   the witness was uncooperative providing nearly insufficient

13   and nonspecific information, the Pennsylvania State Police

14   have exhausted all reasonable avenues of inquiry.  It was

15   noted though Ms. Wilhelm trusted the Department to evaluate

16   her job when she desired professional advancement.  Her

17   obvious distrust of the State Police to handle her complaint

18   properly impeded the investigation and narrowed the

19   investigator's parameters.  It's our recommendation that no

20   further action be taken.

21          Paragraph three.  Consequently, our meetings

22   concluded.  The Executive Office should continue on its

23   current course of direction keeping vigil over the well-being

24   of the Pennsylvania State Police.

25   Q    Did you take any action as a result of receiving this?

19

Coury - Direct

1   A       To the best of my knowledge, no.  It required no

2   further action on my part.

3                   MS. FORNEY:  No further questions, Your Honor.

4                   THE COURT:  Cross-examine.

5                   MR. PRINGLE:  May we have a sidebar, Your Honor?

6                   THE COURT:  Yes.

7                   (The following discussion was had at sidebar:)

8                   MR. PRINGLE:  Before I ask him questions, I want

9   to make sure it is okay with you.  He raised issues -- he

10  made an assertion that the Department takes sexual harassment

11  claims very seriously.  I wanted to present evidence to

12  impeach him on that point.

13                  THE COURT:  With what?

14                  MR. PRINGLE:  There was an occasion during the

15  Evanko administration in which an individual was found to

16  have engaged in sexual harassment which Colonel Evanko was

17  aware of and Colonel Coury was also aware of, and that person

18  was not disciplined.

19                  THE COURT:  Okay.  Hold on.  We are not trying a

20  case within a case, and that is what is going to happen.

21                  MR. PRINGLE:  Excuse me?

22                  THE COURT:  I said we will not try a case within a

23  case.  That is what that is going to present.

24                  MR. PRINGLE:  That is why I asked.

25                  THE COURT:  Does he have to fly out tonight or

20

Coury - Cross

1    tomorrow or what?  Can we finish with him today?

2              MS. FORNEY:  I will inquire what his situation is,

3    Your Honor.

4              THE COURT:  I will do it myself.

5              (End of discussion at sidebar.)

6              THE COURT:  Are you flying out today or tomorrow?

7    A    I will be in town all week.

8              THE COURT:  Okay.

9              THE COURT:  Mr. Pringle?

10                       CROSS EXAMINATION

11   BY MR. PRINGLE:

12   Q    You described Colonel Evanko's long term plans to

13   reorganize the office.  I believe you said in early 2000, you

14   discussed those plans with him; is that accurate?

15   A    I was aware of his plans in early 2000.

16   Q    Were you aware of those plans in late 1999?

17   A    I could not say, sir.

18   Q    When you say early 2000, would that be January of 2000?

19   A    It would be the beginning of 2000.  I would not try to

20   put a month on it.

21   Q    January, February would be fair to say?

22   A    Again, I couldn't put a month on it.

23   Q    Do you know whether or not at the time you discussed

24   those plans in early 2000 then Captain Miller was appointed

25   as Director of the Legislative Affairs Office?

21

Coury - Cross

1    A    I don't recall, sir.

2    Q    Were you close friends with Captain Michael Simmers?

3    A    Yes, sir.

4    Q    And would you describe the nature of that friendship?

5    A    Captain Simmers and I have known each other probably

6    since 1980.  Both professionally and personally, we have been

7    friends.

8              MR. PRINGLE:  No further questions.

9              THE COURT:  Redirect?

10             MS. FORNEY:  No, Your Honor.

11             THE COURT:  You may step down.

12             (Whereupon, the testimony of Mr. Coury was

13   concluded.)

14

15

16             I hereby certify that the proceedings and evidence
     are contained fully and accurately in the notes taken by me
17   on the trial of the above cause, and that this copy is a
     correct transcript of the same.

18

19                                    Vicki L. Fox, RMR
                                      Official Reporter
20

21             The foregoing certification of this transcript
     does not apply to any reproduction by any means unless under
22   the direct control and/or supervision of the certifying
     reporter.

23

24

25