IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,                    :
          Plaintiff            :
                           :
             v.                :  01-CV-1057
COMMONWEALTH OF PA, et al.,         :
          Defendants           :

TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TESTIMONY OF ROBERT HICKES and MICHAEL SIMMERS

BEFORE:  HON. SYLVIA H. RAMBO, Judge

DATE:    September 9, 2002

PLACE:   Courtroom Number Three
         Federal Building
         Harrisburg, Pennsylvania

COUNSEL PRESENT:
NATHAN C. PRINGLE, JR., Esquire
    For - Plaintiff

SUSAN J. FORNEY, Esquire
    For - Defendants

Vicki L. Fox, RMR
Official Reporter

2

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **Plaintiff's Witnesses** | | | | |
| 4.    Robert Clair Hickes | | | | |
| By Mr. Pringle | 4 | -- | -- | -- |
| By Ms. Forney | -- | 14 | -- | -- |
| | | | | |
| 5.    Michael Simmers | | | | |
| By Mr. Pringle | 15 | -- | -- | -- |

3

1                          E X H I B I T S

2    Plaintiff Exhibits                    Introduced    Admitted

3    69.   Department Directive Internal        6           --

4    Investigation.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

Hickes - Direct

1      MR. PRINGLE:  Next, I would I like to call

2  Lieutenant Colonel Hickes.

3

4      ROBERT CLAIR HICKES, called as a witness, being

5  duly sworn, testified as follows:

6

7      THE CLERK:  Would you please state your name,

8  please?

9  A    Robert Clair Hickes.

10      THE CLERK:  Thank you.

11                     DIRECT EXAMINATION

12  BY MR. PRINGLE:

13  Q    Lieutenant Colonel Hickes, Colonel Hickes, are you

14  under subpoena here?

15  A    Yes, I am.

16  Q    Can you tell us what your position is currently?

17  A    I am the Deputy Commissioner of Staff for the

18  Pennsylvania State Police.

19  Q    Using that chart, would you show us where your position

20  would be?

21  A    My position is here.

22      THE COURT:  Here for the record is what block?

23  A    The block on the right-hand side as you face it.

24      THE COURT:  What is it labeled?

25  A    Deputy Commissioner of Staff.

5

Hickes - Direct

1       THE COURT:   Okay.

2   BY MR. PRINGLE:

3   Q       Could you tell us what previous positions you held

4   within the State Police?

5   A       Immediately prior to Deputy Commissioner of Staff, I

6   was the Director of the Bureau of Liquor Enforcement from

7   1995 until my appointment to the Deputy Commissioner of Staff

8   in October of 1998.

9           Prior to that, I was the Deputy Commissioner of

10  Operations from April of 1991 until February of 1995.  Prior

11  to that, I was the Director of the Bureau of Professional

12  Responsibility from 1998 to 1991.  I was Director of the

13  Bureau of Training and Education from 1997 until the end of

14  1997.

15          Prior to that, I was the Director of the

16  Communications Division within the Bureau of Technical

17  Services at the Department Headquarters.  And prior to that,

18  I had various field appointments either Station Commander or

19  Patrol Lieutenant, Staff Lieutenant, Supervisor and Trooper.

20  Q       Are you familiar with the rules governing the

21  acceptance and issuance of complaints within the Pennsylvania

22  State Police?

23  A       Generally speaking, yes.

24  Q       Are there regulations that govern this?

25  A       I believe Administrative Regulation 4-25 governs the

6

Hickes - Direct

1   Bureau of Professional Responsibility regulations.  It has

2   been some time since I reviewed that.

3               (Department Directive Internal Investigation was

4   introduced as Plaintiff Exhibit 69.)

5   BY MR. PRINGLE:

6   Q     I am going to present you with Plaintiff Exhibit 69.

7   Are you familiar with what has been labeled Exhibit 69?

8   A     This is Administrative Regulation 4-25.  The subject is

9   Internal Investigations.

10  Q     I believe you still have up there a document labeled

11  Plaintiff Exhibit 36.  That would be the September 13, 1999

12  memorandum from Barbara Wilhelm to Lieutenant William Horgas?

13  A     Yes.

14  Q     I would like you to take a look at that document,

15  please.

16  A     (Witness complies.)

17  Q     Tell me when you are finished reviewing it.

18  A     Okay.

19  Q     Having reviewed this document, would you recognize this

20   -- based on your experience being a Director of the Bureau

21  of Professional Responsibility and your knowledge of the

22  internal regulations governing this, would you recognize this

23  as a complaint?

24  A     There are issues raised particularly in paragraph three

25  that involve violations of Department rules and regulations

7

Hickes - Direct

1    so it could be construed as a complaint.

2    Q    And if it was presented to you as a complaint, would

3    you have any responsibilities to acknowledge receipt of the

4    complaint under the rules?

5         MS. FORNEY:  Object to the form of the question,

6    Your Honor.

7         THE COURT:  Rephrase it.

8    BY MR. PRINGLE:

9    Q    What are the requirements under the regulations

10   regarding the acknowledgment of receipt of a complaint?

11   A    I would have to review the regulations again.  I don't

12   know off the top of my head.

13   Q    I would like to refer you to page six -- I'm sorry --

14   page five of this document.  The paragraph is 25.08.  Tell us

15   what the title of that paragraph is.

16   A    25.08 is Duties and Responsibilities.

17   Q    Under (b), what specific responsibilities does it

18   address?

19   A    The Director of Bureau of Professional Responsibility

20   shall assign and coordinate all investigations.

21   Q    You don't have to read all of that.  I would like you

22   to turn to page six and go to paragraph five and read that,

23   please.

24   A    Furnish an acknowledgment of receipt in writing to the

25   complainant.  Refer to appendage three.

8

                              Hickes - Direct

1    Q       After reading that document, does that refresh your

2    recollection as to what the requirements are when a complaint

3    is received?

4    A       Yes.   The complainant would get an acknowledgment that

5    the complaint was received.

6    Q       Is that optional?

7    A       No.

8    Q       I believe you have up there a copy of a document

9    labeled Plaintiff Exhibit 40.

10   A       All right.

11   Q       I would like you to take a look at that and tell me

12   when you are finished reviewing it.

13   A       (Witness complies.)   Okay.

14   Q       After reviewing this document, if you had received this

15   as a part of the Bureau of Professional Responsibility, would

16   you recognize this document Plaintiff Exhibit 40, the January

17   3rd, 2000 letter from -- memorandum from Barbara Wilhelm to

18   Major Morris, would you recognize that as a complaint?

19   A       The document discusses use of compensatory leave for

20   enlisted personnel.   It makes an allegation or an implication

21   that there is disparate treatment.   There is the possibility

22   that a complaint is in this.

23           I really don't know from the text of this whether

24   there is or not, but I would clearly need more information.

25   Q       Had you received this and you took the position that

9

Hickes - Direct

1  you needed more information, what course of action would you

2  take to get that information?

3  A    Because it deals with the disparate treatment between

4  males and females, I would have gone to the Equal Employment

5  Opportunity Officer and presented that information to that

6  individual and allowed that person to make the foray back to

7  the individual who wrote the letter and then go on their

8  advice.

9  Q    So that you would have someone make contact with the

10 complainant?

11 A    Yes.

12 Q    When the Bureau of Professional Responsibility receives

13 a complaint, is there a legitimate reason for not

14 acknowledging the receipt of a complaint?

15 A    Not that I'm aware of.

16 Q    Let me ask you this:  In what form must the complaint

17 be made under the regulations, or is there a particular form

18 that a complaint has to be made in order to be acknowledged?

19 A    Again, I would have to review the entire regulation to

20 find out, but I believe that a complaint generally can be

21 made in any form by a citizen.

22       Complaints within the agency, it was I would say

23 preference or policy -- although it may not have been written

24  -- that those complaints should be written by the individual

25 who was lodging the complaint.

10

Hickes - Direct

1    Q    If I am a member -- if I am an employe of the

2    Pennsylvania State Police and I wanted to make a complaint,

3    could I do it orally?

4    A    We would have requested that that complaint be reduced

5    to writing and submitted that way.

6    Q    So that if I came to you with an oral complaint,

7    someone would direct me to put it in writing?

8    A    Correct.

9    Q    But the submission of that complaint orally is not the

10   stated problem?

11   A    It is a problem if it is orally for the purposes of BPR

12   investigations.  From my experience in the Bureau of

13   Professional Responsibility, particularly within the

14   Department, we wanted the individual who was lodging the

15   complaint to reduce that complaint to writing.

16   Q    But if I submitted a complaint to you and didn't do it

17   in writing, what would your directions to me be?

18   A    Someone would come back to you and said you have lodged

19   this complaint.  We don't know exactly what you are

20   complaining.  We want to see it in writing.  Would you reduce

21   it to writing?  Here is the appropriate form.

22   Q    Is it the investigator's responsibility to make sure

23   that the complaint is in the proper form?

24   A    Is it the investigator's responsibility?

25   Q    Yes.

11

Hickes - Direct

1  A    No.  Generally speaking, the investigator is assigned

2  to the investigation after the complaint has been received

3  and logged in and assigned to that person.  I don't believe

4  it is their responsibility to have the complainant change the

5  format on it.

6  Q    I am going to refer you to Plaintiff Exhibit 69, which

7  is the Internal Investigations Regulation.  I specifically

8  refer you directly to page eleven.

9         Can you tell us what it says at the top of the

10 page?

11 A    Investigator: Investigators shall --

12 Q    And there is a list of various things that the

13 investigator shall do?

14 A    Correct.

15 Q    And it runs over into page twelve?

16 A    Correct.

17 Q    And could you read paragraph twelve please on page

18 twelve?

19 A    When applicable, transcribe the complaint on the

20 complaint verification form SP 1-108, appendage twelve and

21 obtain the complainant's signature.

22 Q    Do you read that to mean that the investigator shall

23 make sure that the complaint is transcribed in the proper

24 form?

25 A    This aspect of Administrative Regulation 4-25 was

12

Hickes - Direct

1    enacted after I left the Bureau of Professional

2    Responsibility.  This isn't a complaint worksheet form that I

3    dealt with, which was an SP 3-101 I believe at the time.

4    This a complaint verification form that has been used for

5    both -- I am assuming both enlisted -- both employes and

6    non-employes of the Department to verify that the information

7    that they called in and complained about was in fact what

8    they complained about.

9             In fact, if it is a verbal complaint, reduce it to

10   writing I believe.

11   Q    I am sorry.  I missed the last part.

12   A    I believe this is the form that if someone calls in a

13   complaint, they are recontacted and have those individuals

14   reduce this to writing whether they are an employe of the

15   Department or not.  I believe that is what this refers to.

16   Q    That would be the investigator's responsibility?

17   A    That would be, yes, according to AR 4-25.

18   Q    Are you familiar with the term maximum adjudication

19   date?

20   A    Generally speaking, yes.

21   Q    What is your understanding of that?

22   A    Again, at some point after I left the Bureau of

23   Professional Responsibility, there was an agreement with the

24   Pennsylvania State Troopers Association that complaints

25   against members needed to be adjudicated within a date

13

Hickes - Direct

1    certain or a time certain.

2            If it was not adjudicated within that time frame,

3    opportunity to discipline in certain ways would pass.

4    Q    If the maximum adjudication date had passed, would they

5    be still able to complete the investigation or reach an

6    adjudication?  Was there any bar to them completing that?

7    A    Not that I am aware of, but I am not sure.

8    Q    The only bar would be that they could not take

9    disciplinary action against the employe?

10   A    I am not familiar enough to be able to say with

11   certainty what the dates are or what they can or cannot do.

12   Q    So we are clear on that -- so I am clear on your

13   answer, after the maximum adjudication date passed, are they

14   permitted to impose disciplinary action against the employe?

15   A    I believe that -- and I say this advisedly -- I would

16   have to check with chief counsel.  I believe that dismissal

17   is still an option.   But I think that short of dismissal, I

18   believe they are not allowed to discipline to certain

19   degrees.  But, again, I am not certain what the regulations

20   are on that.

21            MR. PRINGLE:  I have no further questions.

22            THE COURT:  Cross.

23            MS. FORNEY:  Thank you, Your Honor.

24

25

14

Hickes - Cross

CROSS EXAMINATION

1

BY MS. FORNEY:

2

Q    Lieutenant Hickes, you mentioned in your testimony the

3    Pennsylvania State Troopers Association.  What is that,

4    please?

5

A    The Pennsylvania State Troopers Association is the

6    bargaining unit that represents members of the Pennsylvania

7    State Police from the rank of Trooper through the rank of

8    Major for contract negotiations, arbitration and things along

9    those lines.

10

Q    Is discipline also a subject that is negotiated with

11   the Pennsylvania State Troopers Association?

12

A    Yes, it is.

13

         THE COURT:  Ms. Forney, can you move the

14   microphone closer to you, please?

15

         MS. FORNEY:  No further questions, Your Honor.

16

         THE COURT:  Redirect?

17

         MR. PRINGLE:  No redirect, Your Honor.

18

         THE COURT:  You may step down, sir.  Is Colonel

19   Hickes excused?

20

         MR. PRINGLE:  Yes, he is.

21

         MS. FORNEY:  Yes.

22

         THE COURT:  You are excused.

23

         MR. PRINGLE:  At this time, Your Honor,  I would

24   like to call Captain Michael Simmers.

25

15

Simmers - Direct

1   MICHAEL SIMMERS, called as a witness, being duly

2   sworn, testified as follows:

3

4   THE CLERK:  Would you state your name, please?

5   A   Michael Dennis Simmers.

DIRECT EXAMINATION

7   BY MR. PRINGLE:

8   Q   Are you under subpoena today, Captain Simmers?

9   A   Could you speak up, please?  I have a little hearing

10  deficit.  I apologize.

11  Q   Are you under subpoena today, Captain Simmers?  Are you

12  under subpoena today?

13  A   Am I?

14  Q   Under subpoena.

15  A   Yes, sir; I am.

16  Q   Were you ever a member of the Legislative Affairs

17  Office?

18  A   Yes, sir; I was.

19  Q   During what time period were you a member of the

20  Legislative Affairs Office -- on staff of the Legislative

21  Affairs Office?

22  A   That would have been 1997 through 2000 I believe, sir.

23  Q   During that period of time, were you a friend of

24  Lieutenant Colonel Thomas Coury?

25  A   Yes, sir; I was.

16

Simmers - Direct

1    Q    Would you describe for us -- well, tell us how long you

2    have been friends.

3    A    I have known Colonel Coury since approximately 1968

4    when we were Troopers stationed in the field.  I was at

5    Phillipsburg, and he was at Clearfield.  That is when I first

6    met him, sir.

7    Q    And you have been friends since then?

8    A    Yes, sir.  We have been stationed at various times in

9    our career together, sir.

10   Q    Do you socialize together outside of working hours?

11   A    On occasion.

12   Q    Can you describe how you socialize?

13   A    We would visit each other's homes periodically maybe

14   one or two times a year, our wives, along those lines.

15   Q    Did you travel together?

16   A    Pardon me?

17   Q    Did you travel together?

18   A    Travel together?  Not really, sir.

19   Q    Did you go to parties together?

20   A    Yes, sir.

21   Q    How often did that happen?

22   A    When there would be a special occasion or a retirement

23   function or something along those lines, we might attend it

24   together.

25   Q    Would you describe your friendship as good friends?

17

Simmers - Direct

1   A    Yes, sir.

2   Q    Were you friends with Colonel Paul Evanko?

3   A    Yes, sir.

4   Q    How long have you been friends with him?

5   A    I have known Colonel Evanko for approximately twenty

6   years I would say when we were first stationed together in

7   Troop H Harrisburg probably about 1982.

8   Q    I'm sorry.  I want to go backwards.  With respect to

9   Lieutenant Colonel Coury, are you still friends with him?

10  A    With Colonel Coury, yes, sir.

11  Q    And are you still friends with Colonel Evanko?

12  A    Yes, sir.

13  Q    Are you familiar with -- were you aware that Barbara

14  Wilhelm had filed some complaints against you?

15  A    When I was advised by Corporal Rain I believe it was, I

16  was advised by him over the phone, and then I was aware of

17  it.  Yes, sir.

18  Q    Did Corporal Rain advise you that he was told to

19  contact you by Lieutenant Colonel Coury or pursuant to

20  Lieutenant Colonel Coury's orders?

21  A    No, sir.

22  Q    Did you have any discussion with Lieutenant Colonel

23  Coury regarding any complaints made against you by Ms.

24  Wilhelm?

25  A    No, sir.

18

Simmers - Direct

1    Q    Are you familiar with the term -- does the term push

2    people's buttons, pushing people's buttons mean anything to

3    you?

4    A    Yes, sir.

5    Q    What does that mean to you?

6    A    It's basically a term when someone would want to get a

7    rise out of someone in a joking manner.

8    Q    Are you aware of any occasions when Ronald Plesco tried

9    to push Ms. Wilhelm's button?

10   A    Yes.

11   Q    Would you describe that for us, please?

12   A    I can't give you the exact date and time.  I know --

13            MS. FORNEY:  I object to this line of

14   questioning.  It is not relevant.

15            THE COURT:  Approach the bench.

16            (The following discussion was had at sidebar:)

17            THE COURT:  I have two questions.  How does he

18   know unless it's hearsay?  And the other one is:  What is the

19   relevance?

20            MR. PRINGLE:  He knows because he personally

21   observed the instance that he is going to describe.  It is

22   relevant because their position is that Barbara Wilhelm did

23   not communicate or -- I suspect that Major Miller will

24   testify that Barbara Wilhelm refused to communicate with

25   Ronald Plesco.  We are addressing the issue as to why she did

19

Simmers - Direct

1    not communicate with Ronald Plesco.

2              THE COURT:  Okay.  That is relevant.

3              (End of discussion at sidebar.)

4    BY MR. PRINGLE:

5    Q    Would you answer the question, please?

6    A    Regarding the pushing of buttons?

7    Q    Yes.

8    A    It was during a period of time when in the office -- in

9    the new office when I believe it involved --

10             THE COURT:  Wait a minute.  I think, first of all,

11   we better establish the basis for his knowledge to make sure

12   it is of his own personal knowledge and not hearsay.

13   BY MR. PRINGLE:

14   Q    How would you know whether or not Mr. Plesco pushed Ms.

15   Wilhelm's buttons?

16   A    It was involving --

17   Q    How would you know?  Did you observe it?  Did you hear

18   about it?

19   A    Through Mr. Plesco, yes, sir.

20   Q    You didn't personally observe it?  Did you personally

21   observe it?

22   A    I heard it.

23             THE COURT:  What do you mean you heard it?

24   A    I'm sorry, ma'am?

25             THE COURT:  Did you hear it as a result of someone

20

Simmers - Direct

1    telling you it happened, or did you personally hear it?

2    A      Ron Plesco and I had discussed it.

3             THE COURT:  It's hearsay.

4             MR. PRINGLE:  I have no further questions.

5             THE COURT:  Cross.

6             MS. FORNEY:  Nothing, Your Honor.

7             THE COURT:  You may step down.

8    A      Thank you.

9             (Whereupon, the proceedings requested to be

10   transcribed were concluded.)

11            I hereby certify that the proceedings and evidence

12   are contained fully and accurately in the notes taken by me

13   on the trial of the above cause, and that this copy is a

14   correct transcript of the same.

15

16                              _Vicki L. Fox_ RMR

17                              Vicki L. Fox, RMR

18                              Official Reporter

19

20            The foregoing certification of this transcript

21   does not apply to any reproduction by any means unless under

22   the direct control and/or supervision of the certifying

23   reporter.

24

25