(112)
1/29/0

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,                    :
          Plaintiff                 :
                                    :
              v.                    :  01-CV-1057
COMMONWEALTH OF PA, et al.,         :
          Defendants                :

**FILED**
HARRISBURG, PA

JAN 2 8 2003

MARY E. D'ANDREA, CLE
Per _____
          Deputy Clerk

TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TESTIMONY OF GARRET RAIN


BEFORE:  HON. SYLVIA H. RAMBO, Judge

DATE:    September 10, 2002

PLACE:   Courtroom Number Three
         Federal Building
         Harrisburg, Pennsylvania

COUNSEL PRESENT:
NATHAN C. PRINGLE, JR., Esquie
     For - Plaintiff

SUSAN J. FORNEY, Esquire
     For - Defendant



Vicki L. Fox, RMR
Official Reporter

2

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Defendant's Witnesses | | | | |
| 6. Garret Rain | | | | |
| By Ms. Forney | 3 | -- | -- | -- |
| By Mr. Pringle | -- | 23 | -- | -- |

3

Rain - Direct

1          MS. FORNEY:  Your Honor defendants call Garret

2    Rain.

3

4          GARRET RAIN, called as a witness, being duly

5    sworn, testified as follows:

6

7          THE CLERK:  Would you state your name, please?

8    A    Garret L. Rain.

9                    DIRECT EXAMINATION

10   BY MS. FORNEY:

11   Q    Sir, are you currently employed?

12   A    Yes, I am.

13   Q    I think I asked you whether you are currently

14   employed?

15   A    Yes, I am.  I am a member of the Pennsylvania State

16   Police.  I am a Sergeant with the Pennsylvania State Police

17   in Harrisburg.  And I currently supervise the Criminal

18   Investigative Section in Harrisburg, the local State Police

19   function.

20   Q    How long have you had that job?

21   A    It's going on about six months.

22   Q    Before that, what did you do?

23   A    I worked in our Bureau of Professional Responsibility,

24   Internal Affairs Division.  I conducted internal affairs

25   investigations, and I did that for about three and a half

4

Rain - Direct

1    years.

2    Q     In June of 1999, were you called upon to conduct an

3    investigation based on a complaint that Major Richard Morris

4    had submitted with regard to Captain Michael Simmers?

5    A     Yes, I did.

6    Q     And what upon receiving that assignment, would you tell

7    me how you went about investigating it?

8    A     Yes.  In our internal investigative process, to start

9    an investigation, one has to file a form.  As in government,

10   you always have to have a form to start anything.  One of the

11   forms, we have is a complaint worksheet.

12          Upon receipt of the complaint worksheet, my

13   supervisors determined that an investigation is warranted,

14   and they assigned me to do the investigation.

15          I took the preliminary information that was found

16   on that sheet and contacted the complainant, the person who

17   actually filed the worksheet on behalf of Ms. Wilhelm, which

18   was Major Morris.  And then I scheduled a date and time to

19   meet with Major Morris and to conduct an interview to find

20   out what information he had available that may be relative to

21   this matter.

22   Q     After you spoke with Major Morris, what was your next

23   step in the investigation?

24   A     The next step in the investigation was for me to try to

25   schedule an appointment and interview Ms. Wilhelm.  I did get

5

Rain - Direct

1    ahold of her, and we set up a preliminary time to get

2    together.  And we did meet.

3         If you are looking for specific dates, I

4    originally attempted -- we got ahold of her on June 10th.

5    Correction.  Strike that.  That would be June 15th.  We were

6    supposed to meet --

7         MR. PRINGLE:  Excuse me, Your Honor.  It looks

8    like he is reading from something.  I don't know what he is

9    reading from.

10        THE COURT:  Would you like to look at it?

11        MR. PRINGLE:  Yes, Your Honor.

12        MS. FORNEY:  May I just see it?

13   BY MS. FORNEY:

14   Q    You may use this to refresh your recollection, but it

15   is not appropriate to read from it.  All right.

16   A    Thank you.

17   Q    Why don't you identify the document that you are using

18   to refresh your recollection?

19   A    Certainly.  This is the General Investigation Report.

20   It is the report that I drafted as a result of conducting

21   this investigation and the attachments that I collected in

22   the course of conducting the investigation.

23   Q    I think you were telling me that you were trying to

24   contact Ms. Wilhelm in order to speak with her.

25        Would you continue to tell me how you went about

6

Rain - Direct

1    doing that?

2    A    Certainly.  I spoke with her I believe by telephone.

3    We made an appointment and were able to get together on it

4    would be June the 21st of 1999.  And we met over at the

5    Commonwealth Information Center.  It is a facility off of the

6    State Hospital grounds.  This was a location that Ms. Wilhelm

7    had chosen for the sake of privacy.

8         She arranged for the room -- the conference room

9    over there and scheduled for it.  And I met her there, and we

10   spoke.

11   Q    Do you recall what you talked about?

12   A    Yes.  I went there with the intent of conducting an

13   interview and actually tape recording the interview which was

14   our common protocol.  That don't work out that way.

15        She ended up handing me some paperwork having to

16   do with something for which I had been unfamiliar with.  She

17   filed paperwork asking for a job classification summary

18   review.  In essence, to have like a survey done of the work

19   office to see if everyone was doing tasks that were

20   appropriate for their job description and pay scale.

21        I explained that this is something that the

22   Internal Affairs Division doesn't handle.  That would be

23   something that would have to be funneled through the Bureau

24   of Personnel, now called the Bureau of Human Resources.

25        We conduct investigations into allegations of

7

Rain - Direct

1    criminal or administrative misconduct on the part of State

2    Police members.  In other words, did they commit any crimes,

3    did they break any rules within the Pennsylvania State Police

4    documents.

5    Q    There are a number of exhibits on the desk in front of

6    you.  Could you locate Plaintiff Exhibit 22?

7    A    Yes, I found Exhibit 22.

8    Q    This is a memo dated June 21, 1999 from Barbara Wilhelm

9    to the Bureau of Professional Responsibility; is that

10   correct?

11   A    That is correct.

12   Q    Is this the document that you just referred to that Ms.

13   Wilhelm gave to you at your first meeting?

14   A    Yes.  If I might just check the attachment list on my

15   report to make sure that this is the same one.  It appears to

16   be.  But we can see we have lots of documents.  Yes, this is

17   it.

18   Q    Did you have any other conversation that you can recall

19   of Ms. Wilhelm during this first meeting with her?

20   A    Yes.  We discussed the nature of investigations.  She

21   was questioning the confidentiality of how investigations

22   could be conducted.  And I explained to her that our

23   investigations are held confidential and that I speak to

24   people that I need to speak to, that I document information

25   that is given to me, and that is provided up through my chain

8

Rain - Direct

1   of command and then ultimately finds its way to the subject

2   of the investigation's supervisor.  And they are the ones

3   that make a determination of wrongdoing or not.

4   Q      During the course of this June meeting that you had

5   with Ms. Wilhelm, do you recall her saying anything to you

6   about sex discrimination?

7   A      No.

8   Q      Do you recall her saying anything to do you with being

9   treated differently because she was a woman?

10  A      No.  She made no such allegations.  Now she did

11  complain in the course of conversation about some

12  difficulties in the office.  And mostly, it had to do with

13  Captain Simmers not being able to necessarily work at the

14  same level of -- skill level as herself, and that he is not

15  competent for the job that he worked at.

16          General allegations of misuse of time.  In other

17  words, not necessarily -- taking maybe long lunches,

18  implications of those kinds of things.  She didn't provide me

19  with any specific information of specific wrongdoing, which I

20  very much tried to elicit from her on this occasion and other

21  occasions.

22  Q      When you refer to specific information, what kind of

23  information were you looking for?

24  A      Well, specific information had to do with this date and

25  time, I saw Captain Simmers do this, and it's wrong.  It is

9

Rain - Direct

1    in violation of State Police rules and regulations for that

2    to occur.

3            She would not provide me with any direct

4    information, any specific information of anything that he had

5    done that was inappropriate.  And I would elicit this

6    information from her, and she would decline to present it to

7    me.

8            From later meetings we had, she actually gave me a

9    document relating that she just didn't want anything done

10   basically at this time.

11   Q    So you were looking for her -- from her for this day he

12   did this, this day he did that, and when's, who's, what's

13   that sort of thing?

14   A    That's correct.  I was looking for the

15   complainant/victim to provide me with information that would

16   be necessary for me to conduct the investigation.  For any

17   criminal justice issue kind of thing to occur and to occur

18   well, it requires the cooperation of people involved in the

19   matter.

20           If the person who is the victim or the complainant

21   in this matter won't cooperate and provide information that

22   they only hold, it makes it very difficult for the

23   investigator to try to follow up on things that aren't given

24   to them.

25   Q    How did the June meeting with Ms. Wilhelm end?

Rain - Direct

1    A    I took the paperwork that she had given me, and we sort

2    of adjourned to schedule another date to get back together

3    and actually go through the nuances of her complaint.

4    Q    And at the end of the meeting in June, what did you

5    understand her complaint to be?

6    A    Basically having to do with inappropriate use of state

7    time, and she would have allegations of general harassment.

8    Q    Tell me what you mean by general harassment.

9    A    From conversations with Ms. Wilhelm, she would indicate

10   that things in her office had been moved or disturbed, that

11   she had gotten locked out of her office on a couple of

12   occasions, and she believed that Captain Simmers was

13   responsible for these things.

14   Q    Did you meet again with Ms. Wilhelm?

15   A    Yes, we did.  We had a couple of -- we had a little

16   difficulty getting back together again.  From refreshing my

17   recollection with the report here, on Wednesday, July 14th of

18   1999, we met again over at SEMIC.

19   Q    What do you recall about that meeting?

20   A    In that meeting, Ms. Wilhelm gave me another document

21   basically relating that she didn't want anything else done in

22   this matter, and that she's going to be referring this

23   investigation and her complaint to another government

24   entity.

25          I inquired for more specifics, which particular

Rain - Direct

1    government entity to whom are you going to refer this.  And

2    she refused to provide me with that information.  She

3    indicated that we or they were going to do it so I knew that

4    somebody else was involved.

5           I inquired as to whether she had an attorney.  She

6    related she did.  I asked for the name of her attorney

7    because I thought maybe I might be able to talk to her

8    attorney to see if it would be possible to gather the

9    information that would be necessary for me to address all of

10    her concerns in this matter.  She wouldn't provide me with

11    the name of her attorney either.

12    Q    There is an exhibit Plaintiff Exhibit 24 on the table.

13    Could you look for it?

14    A    Yes, I have that.

15    Q    Is this the document that Ms. Wilhelm provided to you

16    in your July meeting?

17    A    Yes, it is.

18    Q    How did the meeting in July end?

19    A    She was not willing to provide me additional

20    information, and we went our various ways.

21    Q    Now in this meeting, did she tell you that she was the

22    victim of sex discrimination?

23    A    No, she did not.

24    Q    Did she mention anything in this meeting about being

25    badly treated because she was a woman?

12

Rain - Direct

1   A      No, she did not.

2   Q      Did she make any comments about disparate treatment?

3   A      No, she did not.

4   Q      Do you recall any comments about preferential treatment

5   of men?

6   A      No, not from her.

7   Q      What did you do next in your investigation?

8   A      The next thing that I did is that I conducted an

9   interview with Captain Simmers.  That was on August 25th of

10  1999.

11  Q      Why was it that you interviewed Captain Simmers?

12  A      Because he is the subject of this investigation.  The

13  people who are generally best to talk to are the

14  complainant/victim and the person who is accused of the

15  wrongdoing.  Those are the ones who are primarily going to

16  hold the information.

17  Q      Was there any discussion about whether you should be

18  interviewing Captain Simmers that you participated in?

19  A      THE COURT:  Discussion with whom?

20  BY MS. FORNEY:

21  Q      Did he discuss the advisability of interviewing Captain

22  Simmers with anyone?

23  A      Did I?

24  Q      Yes.

25  A      Talk about it with anyone, whether it was appropriate?

13

Rain - Direct

1    Q    Yes.

2    A    No.  My Captain, Captain Brown, instructed me that

3    enough time had passed in this investigation and that I would

4    like you to interview Captain Simmers and schedule it

5    promptly.  And I did so.

6    Q    Did you do anything further after you spoke with

7    Captain Simmers?

8    A    Yes.  I also interviewed Ron Plesco, who was a coworker

9    in the office.  This particular office just had three people

10   in it.  So the amount of potential witnesses that would

11   actually see the goings on, what takes place in the office

12   rested with those three people -- correction, four people.

13   You would have Major Morris.  You had Barb Wilhelm.  You had

14   Captain Simmers, and you had Ron Plesco.

15        I went to Ron Plesco, who was the neutral odd man

16   out in this whole matter, and interviewed him.

17   Q    Was there any particular reason that you interviewed --

18   you didn't interview Ron Plesco until after you talked to

19   Captain Simmers?

20   A    No particular reason.

21   Q    Did you have any concern that interviewing Ron Plesco

22   after Captain Simmers might in any way compromise the

23   investigation?

24   A    No.  I didn't have that concern.

25   Q    Why is that?

14

Rain - Direct

1    A      I understand maybe some of the background.  There is

2    a general policy within our Department to interview the

3    subject of the investigation last.  That is not a hard and

4    fast rule.  It is somewhat of a principle.

5              There's times when it is strategically better to

6    interview the subject -- the accused person early in the

7    investigation or first.  In this particular case, he was sort

8    of in the middle.

9              When it comes to making that determination, some

10   things you're going to take into consideration.  Some things

11   you are going to take into consideration is what is the

12   possibility that the subject, the accused person, would be

13   able to influence or cause some pressure upon witnesses and

14   then they might be not be really interested in telling me the

15   whole story.

16             In this particular case, that wasn't a factor

17   because Ron Plesco, he had dual reporting responsibilities.

18   Yes, he was paid sort out of a general budget of the

19   Pennsylvania State Police, and he had a Pennsylvania State

20   Police civilian identification badge, but he also reported

21   directly to the Governor's Office.

22             If Captain Simmers would apply any pressure to --

23   excuse me -- to Mr. Ron Plesco, he could just easily give

24   word to the Governor that he is not being treated properly,

25   and word would come back from the Governor back to the

15

Rain - Direct

1    Colonel, and things would be taken care of.

2              I don't see Captain Simmers had any particular

3    power over Ron Plesco.  If it was anything, it would have

4    been the other way around.

5    Q    After you spoke with Mr. Plesco, did you do anything

6    else to pursue that investigation?

7    A    Yes.  If I may just refresh my recollection here.  One

8    of the other things on August 27, I reviewed Ms. Wilhelm's

9    personnel file held in the Bureau of Personnel and extracted

10   some information from there.

11             On September 10th while I was over -- correction.

12   I am jumping some things there.  I didn't find some of the

13   performance evaluations that I was looking for in that file.

14   I found out they were probably over in the Commissioner's

15   complex and got permission and went over on September 8th and

16   obtained copies of some documents I was looking for as

17   attachments to this investigation.

18             And then on September 10th, 1999, I encountered

19   Ms. Wilhelm out in the hall outside the Commissioner's

20   Complex on third floor of the Pennsylvania State Police

21   Department Headquarters building.

22   Q    Did you have a conversation about the investigation

23   with Ms. Wilhelm on September 10th?

24   A    Yes, I did.  I saw her in the hall.  There was a little

25   bit of chit-chat.  She then asked me to come into her office

16

                         Rain - Direct

1    which was just the next door down.

2           So I went in.  She said she had some documents for

3    me.  If I remember correctly, she gave me a pamphlet and some

4    information for an information source that really didn't have

5    anything to do with this investigation.  She just wanted to

6    share some potential information source with me.

7           And in the course of talking to her, she related

8    that Major Morris had been away on leave or had been out of

9    the office, and Captain Simmers was acting during that period

10   of time, and that she was having -- had been having fun or

11   having a ball with what had been going on.

12          She had been adding -- in this conversation, I

13   also -- we also talked about the status of her complaint.

14   She didn't file it, but it was filed on her behalf.  I told

15   her that I had been working on my investigative report, and

16   it should be submitted soon.

17          She replied that she had been working on her

18   paperwork also, and she just added six more pages to it.  I

19   just noted that it was sort of an unusual encounter.

20          MR. PRINGLE:  Objection.

21          THE COURT:  Sustained.

22   BY MS. FORNEY:

23   Q    You say you met with -- you ran into Ms. Wilhelm on

24   September 10th.  Did she offer you any information for use in

25   your investigation?

17

Rain - Direct

1    A    She indicated that while Major Morris was away and that

2    Captain Simmers was working is that he was leaving early and

3    putting in for comp. time.  In other words, he was not really

4    working full days, and that was some of the information she

5    provided, yes.

6    Q    And did you do anything with that information?

7    A    Yes.  At a later date.  I would have to look up the

8    date to give you the actual information.  It was on September

9    17th I spoke with Major Morris.  He had returned from being

10   off on leave.

11           I inquired if there was any indication that

12   Captain Simmers had been sluffing off on duties, that he had

13   been leaving early.  If any of these allegations that Ms.

14   Wilhelm had inferred, was there any substance to them.  He

15   related no.

16           MR. PRINGLE:  Objection.

17           THE COURT:  Sustained.

18   BY MS. FORNEY:

19   Q    Other than the information about Captain Simmers and

20   the comp. time, did Ms. Wilhelm offer you anything else in

21   terms of her complaints, her concerns?

22   A    No.

23   Q    How is it that you remember this encounter with Ms.

24   Wilhelm?

25   A    It was a little uncomfortable because I was just in the

18

Rain - Direct

1    office next door gathering up and picking up some documents

2    that were related to the investigation.  I encountered her

3    when I was coming out the door.  It was sort of memorable.

4           I also took notes of it right after the event

5    occurred because the conversation that she related to me I

6    thought was important, and I wanted to make sure to retain it

7    for my report.

8    Q    And when did you complete your report?

9    A    My report was submitted September 15th of 1999.

10          THE COURT:  September 15?

11   A    That's correct.

12   BY MS. FORNEY:

13   Q    You mentioned you had talked to Major Morris on the

14   17th?

15   A    Well, the only explanation I can give is the date on

16   the front of my report is not correct.  I may have to look at

17   some of the referral slips.  I certainly drafted the report

18   after I spoke to him.

19          I must have the wrong date on the front page of my

20   report.  It does say September 15th of 1999 on the front

21   page.  But I am working on the report.  It is a work in

22   progress.

23          MR. PRINGLE:  Objection.  There is no question.

24          THE COURT:  There is no question on the floor.

25

19

Rain - Direct

1    BY MS. FORNEY:

2    Q    Would you explain how it could be that the date on the

3    front of your report is incorrect?

4    A    I don't sit down at the end of the investigation and

5    type the report up.  I type the report up as I do things.

6    Now obviously, you don't in the format of a report if there

7    is one synopsis, the synopsis, which is on the front, you end

8    up doing last.  You are typing the details as you do the

9    report.

10            I have this in a word template.  And I just add

11   more information in when I get to the new information.  It

12   just keeps going on in the end.  The template is designed in

13   such a way that it has the date on it, and I must have failed

14   to update the date on the upper right-hand corner of the

15   report when I actually submitted it.

16   Q    Can you determine when you actually submitted it?

17   A    It would have had to have been after the 17th unless I

18   misspoke.  Let me double check that.  No, it was August -- I

19   hold on.  Now I am all confused.

20            No.  I clearly have September 17th as when I spoke

21   with Major Morris.

22   Q    Are you familiar with the relationship between the

23   Internal Affairs investigation and the disciplinary system of

24   the State Police?

25   A    I am not sure I understand the question.

20

Rain - Direct

Q     Do you understand -- let me rephrase the question.  It
is an important question.

Is there a relationship between Internal Affairs
investigations and discipline within the State Police?

A     There is a relationship, but I am not the cause.  An
allegation comes in.  A complaint is investigated.  The
investigation is documented on the report.  And then the
report is forwarded to a person called an adjudicator.

In this case, the adjudicator is normally like a
Troop Commander or a Bureau Director.  Those are the people
who are assigned the task of reading through the
investigative report and making a determination is there any
wrongdoing here.

There's three choices that they can give.  One is
it is an unfounded complaint.  There is no evidence
whatsoever in the adjudicator's opinion that this allegation,
what this member has been accused of happened.

You have a nonsustained which means you know, I
can't tell one way or the other.  And then you have a
sustained investigation, yes, I am convinced that what
happened happened.

Q     Is the adjudicator usually in the chain of command the
individual who is being investigated?

A     Yes.  It's normally the Bureau Director or Troop
Commander who is responsible for a complement of personnel.

21

Rain - Direct

1    But it is always going to be at least one rank level above

2    the person who is the subject of the investigation.  It is

3    always someone's boss.

4    Q    If an investigation is founded, what is the next step

5    in the process?

6    A    The next step in the process is a determination of what

7    kind of penalty could potentially be imposed.  Are they going

8    to issue a disciplinary action report?  In other words, are

9    we going to try to give someone a penalty such as suspending

10   them without pay, transferring them, demoting them, firing

11   them, those kinds of things.

12          That determination is made primarily by the

13   Disciplinary Officer.  And currently, that is Captain

14   Titler.  He makes those determinations as to what would be

15   the appropriate penalty.

16          Now the adjudicator has some input involved in

17   that process, but that's where the process -- where the

18   actual determination of what penalty to impose comes from is

19   from our DDO.

20   Q    Is there a further step after a penalty is determined?

21   A    Yes.  Let's say a member is suspended for fifteen days

22   without pay.  They can just accept it, or they could ask --

23   they could grieve it, which is the most common thing that

24   happens.

25

Rain - Direct

1        Technically, they could also ask for a

2   court-martial.  I've never heard of it actually occurring in

3   recent history.  They will normally request that an

4   arbitrator review the matter and make a determination of

5   whether or not they really did what they were accused to of

6   having done or whether or not the penalty that has been

7   imposed upon them is appropriate for the crime that they have

8   been alleged to have committed.  I didn't mean that crime

9   literally, but offense.

10  Q    Under the disciplinary system of the State Police, is

11  it possible for a disciplinary action report to issue and a

12  penalty be imposed without a Bureau of Professional

13  Responsibility investigation?

14  A    No.

15       THE COURT:  Is there any relevance to this line of

16  questioning?

17       MS. FORNEY:  I am about done with it, Your Honor.

18  There has been a lot of talk about adjudicators, about

19  discipline, about complaints, about doing things.  I simply

20  wanted to make the system that is in place clear to the

21  jury.

22       MS. FORNEY:  May the witness respond to the

23  question?

24       THE COURT:  Yes.

25  A    I sort of got lost in that.  Could you rephrase it,

Rain - Cross

1    please?

2    BY MS. FORNEY:

3    Q     I apologize.  In the State Police disciplinary system,

4    is it possible for discipline to be imposed without a Bureau

5    of Professional Responsibility investigation and

6    adjudication?

7    A     No, it is not.

8              MS. FORNEY:  No other questions.

9              THE COURT:  Cross-examine.

10                     CROSS EXAMINATION

11   BY MR. PRINGLE:

12   Q     When you spoke to Ms. Wilhelm the first time, didn't

13   she indicate to you that she was concerned about

14   confidentiality with respect to giving you information?

15   A     She expressed that as a concern, yes.  And I endeavored

16   to ensure her that it would remain confidential.

17   Q     Didn't you also endeavor to ensure her that you would

18   have to turn over information to your superiors?

19   A     Certainly.  I would have to submit the report, and my

20   boss would read the report, yes.

21   Q     And that might include Lieutenant Colonel Coury?

22   A     Yes.

23   Q     Did Lieutenant Colonel Coury get involved in this

24   investigation?

25   A     Not to my direct knowledge.

24

Rain - Cross

1    Q    What does that mean, not to your direct knowledge?  Do

2    you have any knowledge about him being involved?

3    A    In conversations with Captain Brown, there may have

4    been an occasion where he mentioned that Captain Coury --

5    Lieutenant Colonel Coury had made some inquiries.

6         And I believe there was also a buck slip memo that

7    I may have seen in the packet that showed that he had seen or

8    handled the packet at some point in time.

9    Q    How many investigations have you done prior to this?

10   A    As in any way, shape or form, or as an Internal Affairs

11   investigator?

12   Q    Internal Affairs investigator.

13   A    I believe I have been in the Internal Affairs Division

14   for about a year at this time.

15   Q    Prior to that --

16   A    A couple of dozen.

17   Q    A couple of dozen?

18   A    I was a criminal investigative supervisor for years

19   before that.

20   Q    I am asking about Internal Affairs.  A couple of dozen,

21   does that mean 12 or 24?

22   A    Between 12 and 24.  I don't have the exact number right

23   at hand.

24   Q    During the course of these investigations -- strike

25   that.  During your discussion with Major Morris, your

25

Rain - Cross

1   interview with Agent Morris, isn't it true that he did raise

2   issues about gender based discrimination?

3   A     He expressed concern that Ms. Wilhelm might possibly

4   raise those as complaints, yes, in particular having to do

5   with like not being able to have a car when other people had

6   a car.  I have also seen this on some documents that had been

7   written.  The other people in the office had a car, and she

8   didn't have a car.  That was an item of contention.

9   Q     He brought that to your attention, that issue?

10  A     I am not positive if he brought that matter to my

11  attention or if I am remembering that from other documents

12  that I have read.

13  Q     But you did have information regarding her concern

14  about not being discriminated against because she was a

15  woman, her not receiving a car and the men in the office

16  receiving a car?

17  A     Yes.

18  Q     Wasn't it also an issue in this investigation that she

19  believed she was being treated as a clerical person merely

20  because she was with a woman; weren't you aware of that?

21  A     I had heard, yes, that Major Morris would discuss --

22  and I believe that I got it from another source also that

23  Captain Simmers would provide her or give her typing, and

24  that she didn't believe that that was suitable for her

25  position.

26

Rain - Cross

1    That matter was looked into with other interviews

2    that I had done.

3    Q    But specifically, you understood that was a complaint

4    of sex discrimination; didn't you?

5    A    I understand that she was making that as a complaint.

6    If I may more accurately rephrase that.  That was an item

7    that she was unhappy about.  Whether it was an official

8    complaint, I don't know because she didn't make that

9    complaint to me.

10   Q    But you were aware that she was unhappy, and she was

11   expressing her unhappiness about the fact that she was

12   getting clerical work and that she believed that that was sex

13   discrimination?

14   A    I don't know that they are making the link there

15   between the sex discrimination and the clerical work.  The

16   two weren't combined.  I know that she was complaining that

17   she was sometimes asked to do typing -- particularly when he

18   worked for Captain Simmers when he was her boss.

19        I do not know that she then told people that she

20   believed it was sex or gender based discrimination.

21   Q    That is because you didn't talk to her?  She didn't

22   raise that as an issue with you is what you are saying?

23   A    No, she didn't raise it with me.

24   Q    Did Major Morris raise that issue when he did his

25   interview?

27

Rain - Cross

1   A    I don't believe he is linking the two together.

2   Q    Do you remember having a conversation during your

3   interview process with Major Morris in which specifically he

4   was addressing the issue of her complaining about having to

5   do the clerical work because she is a woman?

6   A    I believe he raised that, yes.

7   Q    You did hear that is what I am asking?

8   A    Yes.

9   Q    During your course of the conversation with your

10  interview with Major Morris, isn't it true you were aware

11  that in connection with the complaint he was filing with IAD,

12  he also notified the EEO office?

13  A    Yes.  I also spoke with Major Smith-Elliot about this

14  matter, too.

15  Q    So you talked with Major Smith-Elliot in connection

16  with this investigation?

17  A    I touched base with her early on in the investigation

18  to see what information she might have and to gain any

19  particular advice I might need in case it went down that

20  path.

21  Q    Did you talk to her after it did go down that path?

22  A    I don't believe it went down that path because she

23  didn't make an allegation of gender based discrimination.  I

24  am hearing this second hand information from other people

25  from what they think she said or she might do.

28

Rain - Cross

1      She never declared to me that she believed that

2   she was a victim of gender based discrimination.  I didn't go

3   down that path because it wasn't given to me as a complaint.

4   Q    I am a little confused here.  You said that when Major

5   Morris discussed this with you, he indicated to you that she

6   was unhappy.  He specifically indicated to you she was

7   unhappy that she was required to do filing because she was a

8   woman.

9      Are you saying that you did not take that as sex

10  based discrimination?

11  A    I didn't take that as something that then I would run

12  with as a singular focus of the investigation.

13  Q    You decided not to do anything with that, but you did

14  receive that information; isn't that true?

15  A    I gathered the information.  I documented the

16  information.  I object to the comment of being said that I

17  didn't do anything with it.  It wasn't hidden in any way,

18  happy or form.

19      The interviews were taped and transcribed.  It is

20  not normally typical for members of the Internal Affairs

21  Division to do the gender based discrimination

22  investigations.  They were done by Major Smith-Elliot at that

23  time who was our EEO person.  That person knew there was an

24  investigation going on.

25      If there was a path, part of it would have been --

29

Rain - Cross

1    most of it would have pursued by her.

2    Q    So you referred that part of it to her?

3    A    I can't say that I gave her a copy.  I believe she was

4    in the routing of the paperwork of the report.  Yes, she

5    would have seen everything that was in this.  I know that she

6    was on the routing slip.

7    Q    Do you remember Colonel Evanko coming up to you and

8    thanking you for doing this investigation?

9    A    Yes, I think I did believe I ran into him in the halls

10   of Commissioner's Complex one time.  I am not sure if it was

11   this investigation though.  I mean he did come over and

12   expressed appreciation for work done on an investigation.

13        Do I think it was this one?  Probably.  But I

14   can't say a hundred percent.

15   Q    Do you remember talking with me in the deposition?

16   A    Yes.

17   Q    And do you remember saying that in fact, it was this

18   investigation?

19   A    I could have.  It has been -- some time has passed

20   since the deposition also.

21        MR. PRINGLE:  May I approach the witness?

22        THE COURT:  Yes.

23   A    I am not hedging on the issue.  He could have easily

24   done so.  I can't say at this particular stage a hundred

25   percent.

30

Rain - Cross

1    Q      We will clear it up.  Page 31 of the deposition.  I

2    would like you to read page 31 of the deposition question and

3    answers down to there.

4    A      Certainly.

5    Q      From line seven until line 14.  Line 19.  I am sorry.

6    A      From 7 to 19?

7    Q      Yes.

8    A      (reading) QUESTION:  Thank you.  One more question.  Do

9    you know whether or not Lieutenant Colonel Coury received

10   information about this investigation?

11           MS. FORNEY:  At any particular point in time?

12   BY MR. PRINGLE:

13   Q      Well, during the normal investigative process and

14   adjudication.

15           ANSWER:  It would have been normal for him.  And

16   if I remember correctly, I think I saw him in the halls one

17   time, and he made a comment expressing appreciation on the

18   thoroughness of the investigation to me when I saw him.  But

19   I can't say a hundred percent it was the case.  I think it

20   was.  (end of reading)

21           If I might clarify a little bit, sir, I thought

22   you asked me Colonel Evanko just a few minutes ago.

23   BY MR. PRINGLE:

24   Q      I'm sorry.  But you do acknowledge that Colonel Coury

25   did thank you for this investigation?

31

Rain - Cross

1    A    Now I am not sure which one it was.  One of the

2    Colonels came over and expressed appreciation for an

3    investigation.  As I noted in the deposition, I also said I

4    wasn't still a hundred percent sure that it was this one.

5    That was line 19.

6              MR. PRINGLE:  I have no further questions.

7              THE COURT:  Redirect?

8              MS. FORNEY:  No, Your Honor.

9              THE COURT:  You may step down.

10             (Whereupon, the testimony of Garret Rain was

11    concluded.)

12             I hereby certify that the proceedings and evidence

13    are contained fully and accurately in the notes taken by me

14    on the trial of the above cause, and that this copy is a

15    correct transcript of the same.

16

17             _____

18             Vicki L. Fox, RMR

19             Official Reporter

20

21             The foregoing certification of this transcript

22    does not apply to any reproduction by any means unless under

23    the direct control and/or supervision of the certifying

24    reporter.

25