IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA WILHELM,            :
          Plaintiff          :
                             :
          v.                 : 01-CV-1057
COMMONWEALTH OF PA, et al.,  :
          Defendants         :

FILED
HARRISBURG, PA

FEB 1 4 2003

E. D'ANDREA, CLERK

TRANSCRIPT OF PROCEEDINGS

HEARING ON EQUITABLE RELIEF


BEFORE:    HON. SYLVIA H. RAMBO, Chief Judge

DATE:      January 31, 2003

PLACE:     Courtroom Number Three
           Federal Building
           Harrisburg, Pennsylvania

COUNSEL PRESENT:

NATHAN C. PRINGLE, JR., Esquire
     For - Plaintiff

SUSAN J. FORNEY, Esquire
     For - Defendants


Vicki L. Fox, RMR
Official Reporter

2

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **Plaintiff's Witnesses** | | | | |
| 1.   Barbara Wilhelm | | | | |
| By Mr. Pringle | 6 | --- | 40,73 | --- |
| By Ms. Forney | --- | 10 | --- | 59 |
| | | | | |
| 2.   Robert Murphy, as to qualifications | | | | |
| By Mr. Pringle | 75 | --- | 79 | --- |
| By Ms. Forney | --- | 79 | --- | --- |
| | | | | |
| Robert Murphy | | | | |
| By Mr. Pringle | 81 | --- | 117,123 | --- |
| By Ms. Forney | --- | 94 | --- | 121 |
| | | | | |
| **Defendant Witnesses** | | | | |
| 1.   Jeffrey Miller | | | | |
| By Ms. Forney | 124 | --- | --- | --- |
| By Mr. Pringle | --- | 135 | --- | --- |
| | | | | |
| 2.   Rose Polek | | | | |
| By Ms. Forney | 153 | --- | --- | --- |
| By Mr. Pringle | --- | 157 | --- | --- |
| | | | | |
| 3.   Oveta Johnston, as to qualifications | | | | |
| By Ms. Forney | 160 | --- | --- | --- |
| By Mr. Pringle | --- | 167 | --- | --- |
| | | | | |
| Oveta Johnston | | | | |
| By Ms. Forney | 174 | --- | 191 | --- |
| By Mr. Pringle | --- | 187 | --- | --- |
| | | | | |
| 4.   Leeann Ford | | | | |
| By Ms. Forney | 196 | --- | --- | --- |
| By Mr. Pringle | --- | 204 | --- | --- |
| | | | | |
| **Rebuttal Witness** | | | | |
| 1.   Barbara Wilhelm | | | | |
| By Mr. Pringle | 209 | --- | --- | --- |

3

1

2

E X H I B I T S

Plaintiff Exhibits                          Introduced    Admitted

3

1.  Narrative portions of Robert              77           --
Murphy's Expert Report.

4

4.  Graph created by Robert Murphy            82           93
of Projected Economic Damages.

5

6

5.  Summary Page of economic factors.         91           91

7

6.  Charts of Projected and unprojected       92           93
cash flows and net present value
calculations consisting of six pages total.

8

9

7.  Resume of Robert Murphy.                  120          121

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

E X H I B I T S

| Defendants Exhibits | Introduced | Admitted |
|---|---|---|
| 45. Plaintiff's Response to Defendants' Second Set of Interrogatories. | 60 | 208 |
| 46. Letter to Wilhelm from Leeann Ford, re: Notification of expiration of resume. | 16 | 208 |
| 47. Completed Personal Data Sheet. | 17 | 208 |
| 48. Wilhelm resume submitted to Bureau of State Employment. | 17 | 208 |
| 49. E-mail to Wilhelm from Rebecca Yearick: AO III position availability at PennDOT. | 21 | 208 |
| 50. Job Posting for PennDOT's AO III position. | 22 | 208 |
| 51. Letter to Wilhelm from Willie Burston, re: Revenue's AO III position availability. | 32 | 208 |
| 52. Job Description for Revenue's AO III position. | 32 | 208 |
| 53. US Department of Labor, Bureau of Labor Statistics Article"Average Annual Pay in Pennsylvania, 2000" | 32 | 209 |
| 54. US Dept. Of Labor, Bureau of Labor Statistics Article "National Compensation Survey" Occupational Wages in the United States, 2001". | 96 | 208 |
| 55. US Dept. Of Labor, Bureau of Labor Statistics Article "Employe Benefits in Private Industry, 2000". | 111 | 208 |
| 56. Printout:Employment History- Control Data. | 155 | 208 |
| 57. Simplified Flow Chart of the PA Civil Service Hiring Process. | 174 | 208 |
| 58. Wilhelm resume. | 180 | 208 |
| 59. Wilhelm resume submitted to CSC. | 180 | 208 |
| 60. Wilhelm Resume, Question #9. | 180 | 208 |

5

E X H I B I T S

| Defendants Exhibits | Introduced | Admitted |
|---|---|---|
| 61.   Commonwealth of PA's 37-1/2 Hour Standard Pay Schedule Effective 7/1/01. | 180 | 208 |
| 62-80 Job Class Specifications. | 181 | 208 |
| 81.   Chart: Classification Titles for Which Plaintiff Qualifies (open for exam) | 182 | 208 |
| 82.   Chart: Classification Titles for Which Plaintiff Qualifies (projected to open for exam). | 185 | 208 |
| 94.   Job Description for DOC's Information Specialist. | 130 | 208 |

6

Wilhelm - Direct

1      THE COURT:  Good morning.  Mr. Pringle?

2      MR. PRINGLE:  Good morning, Your Honor.  I am

3  prepared to call my first witness.

4      THE COURT:  Okay.  Pull the microphone closer.

5

6      BARBARA WILHELM, called as a witness, being duly

7  sworn, testified as follows:

8

9      THE COURT:  Go ahead.

10                DIRECT EXAMINATION

11  BY MR. PRINGLE:

12  Q    Ms. Wilhelm, do you remember testifying at the equity

13  hearing in October of 2002?

14  A    Yes, I do.

15  Q    And do you at this time wish to change anything that

16  you testified to at that hearing?

17  A    No, I do not.

18  Q    I have a few questions for you.  My first question is

19  one of the issues here is whether or not it is appropriate

20  for you to be reinstated or receive front pay.

21      My question to you is:  How do you feel about

22  returning to work for the Pennsylvania State Police?

23  A    On May 1, 2000, the Pennsylvania State Police changed

24  my entire life.  They called me into a personnel office,

25  issued me a derogatory letter indicating that I was dismissed

7

Wilhelm - Direct

1    due to a reorganization of an office.

2              I was returned back to my desk, watched at my desk

3    while I emptied my desk, escorted to my vehicle only to

4    subsequently find I was listed in a Personnel Management

5    Directive distributed throughout the entire state for

6    Pennsylvania State Police employes indicating that I was

7    dismissed.

8              Then I was listed in a personnel hiring code as

9    dismissed which resulted in going out to all the other hiring

10   managers in the state and throughout the Commonwealth and

11   state government indicating that I was dismissed.

12             I was not told that this was an improper coding or

13   that they didn't have another type of coding for it.  I had

14   to find it out myself by going to the Governor's Office.

15             Through the PHRC process and the entire civil

16   complaint process, at no time have the Pennsylvania State

17   Police made any effort to address this issue.  At least not

18   up until approximately 48 hours ago.

19             They have ruined my reputation.  They have ruined

20   by credibility.  To go into an agency like the Pennsylvania

21   State Police and try to work again, the new Governor has

22   placed the individual who was in the Legislative Office that

23   requested the Commissioner to remove me from the Legislative

24   Office which ultimately resulted in my dismissal.  Acting

25   Commissioner Jeffrey Miller now who is in charge of the

8

Wilhelm - Direct

1    Pennsylvania State Police per the new Governor is the same

2    person that because of his actions ultimately resulted in

3    this dismissal.

4              I don't trust the Pennsylvania State Police any

5    longer.  I could not go back to an agency like the

6    Pennsylvania State Police.  I feel that placing Acting

7    Commissioner Miller in that position has sent a very loud and

8    clear message to the females in the Pennsylvania State Police

9    and throughout the entire Commonwealth.

10   Q    If you were offered a position outside or were able to

11   obtain a position within state government but outside the

12   Pennsylvania State Police, how do you feel about taking such

13   a position?

14   A    I don't trust the Commonwealth of Pennsylvania.  There

15   was an opportunity throughout PHRC filing to resolve this.

16   There was an opportunity throughout the entire filing of the

17   complaint to resolve it.

18             This complaint went through General Counsel, the

19   same area that I was asked to work at prior to going to the

20   State Police.

21             MS. FORNEY: I object, Your Honor.  I don't believe

22   any foundation has been laid for the fact that this complaint

23   went through the Office of General Counsel.

24             THE COURT:  Sustain the objection.

25   A    The Commonwealth has had an opportunity to resolve this

9

Wilhelm - Direct

1   complaint over and over again but didn't want to do that.  I

2   don't trust that I could be put in a position that I would

3   not end up being involuntarily dismissed again due to another

4   type of -- quote -- bogus reorganization of the office.

5            I don't trust that I would not be alienated, that

6   I wouldn't be wearing the sex harassment scarlet letter in an

7   office somewhere being treated differently than the other

8   employes because I had to be politically placed there as a

9   result of what happened.

10           I don't know -- I don't know even how to perform

11  in an office anymore.  The State Police have taught me that

12  getting outstanding performance evaluations results in

13  dismissal.  They have taught me that working through lunch

14  periods, staying at completion of the workday results in

15  dismissal.  They have taught me that getting letters of

16  commendation and appreciation results in dismissal.  So I am

17  not sure if I would go to any other office in the

18  Commonwealth that I would understand exactly what is the

19  proper way to perform.

20           I don't trust the State Police.  I don't trust the

21  Commonwealth, and I no longer trust the Office of Attorney

22  General.

23           MR. PRINGLE:  No further questions.

24           THE COURT:  Cross-examine.

25

10

Wilhelm - Cross

CROSS EXAMINATION

BY MS. FORNEY:

Q    Ms. Wilhelm, before you were employed with the State Police, you had approximately an 18 year career with the Commonwealth; is that correct?

A    That's correct.

Q    And during that career, you were treated very well; were you not?

A    Yes, I was.

Q    You were employed by the Office of Inspector General?

A    Yes, I was.

Q    And in that office, you received promotions; did you not?

A    Yes, I did.

Q    You received commendations; did you not?

A    Yes, I did.

Q    And you were eventually placed in the position of Chief of Operations of that office; were you not?

A    Yes, I was.

Q    And you also worked in the Department of General Services?

A    Yes, I did.

Q    And you were treated very well there as well; were you not?

A    Yes, I was.

Wilhelm - Cross

1    Q      You were promoted?

2    A      Yes, I was.

3    Q      You were given supervisory responsibilities?

4    A      Yes, I was.

5    Q      And at one point, you were actually made an Acting

6    Bureau Director in that Department; were you not?

7    A      Yes, I was.

8    Q      And it was only when you went to the Pennsylvania State

9    Police that you feel that you were treated unfairly?

10   A      Yes, that's correct.

11   Q      Now, Ms. Wilhelm, isn't it true that when you filed

12   this action in Federal Court, one of the remedies you asked

13   for was reinstatement to your position?

14   A      That's correct.

15   Q      And in both the trial of this case and the prior

16   equitable hearing, you testified about the importance of the

17   benefits the Commonwealth provided to you; didn't you?

18   A      Yes, I did.

19   Q      That your health benefits were significant to you;

20   correct?

21   A      Correct.

22   Q      And Commonwealth retirement was significant to you?

23   A      Correct.

24   Q      Now, Ms. Wilhelm, at the prior hearing on equitable

25   relief and again at the jury trial that was held in this

12

Wilhelm - Cross

1    matter, you testified about your efforts to obtain employment

2    after your separation from the Pennsylvania State Police.

3    And you testified to your employment history as well I

4    believe.  Is that correct?

5    A    Yes.

6    Q    And if I recall correctly, you testified that during

7    your career with the Commonwealth, there was a point where

8    you did have a break in service around 1995; is that right?

9    A    That's correct.

10   Q    And at that point, you left Commonwealth service;

11   right?

12   A    Yes, I took a leave of absence.

13   Q    It was more than a leave of absence; was it not?  You

14   left your job?

15   A    I took a leave of absence.  I left my job, and they

16   froze my sick leave.

17   Q    But your job was not held open for you; was it?

18   A    No, that's correct.

19   Q    So in order to return to Commonwealth service, you had

20   to find another job?

21   A    That's correct.

22   Q    And you testified that during your break in service, a

23   man named Robert Berkoben with the Office of Administration

24   helped you to get information about vacancies in the

25   Commonwealth; is that right?

13

Wilhelm - Cross

1    A    He indicated to me that he had circulated my resume,

2    yes.

3    Q    You also testified that as a result of that, you did

4    receive information about vacancies in Commonwealth service?

5    A    Yes, I believe I did.

6    Q    And after your separation from the Pennsylvania State

7    Police, did you contact Mr. Berkoben for assistance in

8    locating other vacancies within the Commonwealth of

9    Pennsylvania?

10   A    Mr. Berkoben wouldn't have been my Personnel Officer.

11   The State Police would have been my Personnel Officer.

12   Q    But you did know Mr. Berkoben?

13   A    I knew Mr. Berkoben because he was the Personnel

14   Officer for the Governor's Office of Inspector General.

15   Linda Bonney, the person who dismissed me, was the Personnel

16   Officer for the Pennsylvania State Police.

17   Q    I understand.  But you knew Mr. Berkoben; correct?

18   A    Yes, I knew Mr. Berkoben.

19   Q    And Mr. Berkoben was still with the Commonwealth;

20   wasn't he?

21   A    I don't know if he was there then or not.

22   Q    Did you attempt to find out whether he was?

23   A    No.

24   Q    You made no attempt to see if Mr. Berkoben was

25   available and would be willing to help you identify vacancies

14

Wilhelm - Cross

1  in Commonwealth employment?

2  A    I have no reason to expect that Mr. Berkoben, the

3  Personnel Officer for the Inspector General's Office, would

4  do that.

5  Q    During your break in employment in 1995, you also

6  testified that a gentleman named John Contino, the Executive

7  Director of the State Ethics Commission, contacted you and

8  let you know that there was a job vacancy that you might be

9  interested in; is that correct?

10 A    Yes.

11 Q    And after your separation from employment with the

12 State Police, did you contact Mr. Contino to find out if he

13 knew of any job vacancies that you might be interested in?

14 A    I placed on my interrogatories, yes, that I did contact

15 the Ethics Commission actually several times and went online

16 to the PA Power Port where they list Ethics Commission and

17 list the appointments that are available.

18      I recall seeing that they had a Clerk Typist

19 position available.  I don't know that they had a lettering

20 number, whether it was I or II after it.  I remember seeing

21 that.

22 Q    Did you try to contact Mr. Contino himself?

23 A    I contacted the agency.  I didn't specifically ask for

24 Mr. Contino.

25 Q    I take it from your testimony that since the trial in

Wilhelm - Cross

1    this matter, you have not attempted to contact either

2    Mr. Berkoben or Mr. Contino to see if they are aware of

3    vacancies in the Commonwealth that you might be interested

4    in?

5    A    I'm sorry.  Can you repeat the question?

6    Q    Sure.  I take from it your testimony that since the

7    trial in this case, you have contacted neither Mr. Berkoben,

8    nor Mr. Contino to see if they were aware of any vacancies in

9    the Commonwealth that might be of interest to you?

10        MR. PRINGLE:  Objection.

11        THE COURT:  Overruled.  It goes to mitigation of

12   damages.

13        MR. PRINGLE:  But it goes -- there is no evidence

14   in the record that either -- there's no evidence in the

15   record that either of those gentlemen were state employes and

16   were in a position to be contacted.

17        THE COURT:  That doesn't respond to the question

18   though.  She was asked whether she contacted them.

19   A    I haven't seen or had contact with Mr. Berkoben for

20   probably maybe seven years since I left the Inspector

21   General's Office.

22        As far as Mr. Contino, I haven't had verbal

23   contact with him since -- that would be several years also.

24   BY MS. FORNEY:

25   Q    Now since the trial in this matter, you were contacted

Wilhelm - Cross

1    by the Bureau of State Employment; were you not?

2    A     An employe in the Bureau of State Employment contacted

3    me, a Leeann something.

4              THE COURT:  Do you know what date this is?

5              MS. FORNEY: I will establish that, Your Honor.

6              (Letter to Wilhelm from Leeann L. Ford re:

7    notification of expiration was introduced as Defendant

8    Exhibit 46.)

9    BY MS. FORNEY:

10   Q     I am handing you what has been marked Defendant Exhibit

11   46.  This is a letter from Leeann Ford, Executive Offices,

12   Office of Administration, Bureau of State Employment; is that

13   correct?

14   A     That's correct.

15   Q     And it is dated September 24, 2002?

16   A     That's correct.

17   Q     That was after the trial in this matter before the

18   jury?

19   A     It's after the trial, yes.

20   Q     And in this letter, Ms. Ford asks you to provide a

21   personal data sheet and a resume at your earliest

22   convenience; is that correct?

23   A     That's correct.

24   Q     And the letter also indicates that the Bureau of State

25   Employment is the central clearinghouse for resumes to be

17

Wilhelm - Cross

1    referred to Commonwealth agencies?

2    A     Yes.

3    Q     You were aware of that before you received this letter;

4    weren't you?

5    A     I was aware of that.  That is why I testified

6    previously that I sent one to them every six months.

7    Q     And in response to her request, you provided a personal

8    data sheet and resume; did you not?

9    A     I provided the data sheet and the resume.  I provided a

10   new data sheet that she had sent with the dates on and then a

11   resume that had been previously sent two months before this

12   letter, approximately two months.

13   Q     All right.  You did respond to what she requested?

14   A     Yes, I did.

15         (Completed Personal Data Sheet was introduced as

16   Defendant Exhibit 47.)

17   BY MS. FORNEY:

18   Q     I am going to hand you two exhibits Defendant Exhibit

19   47 and Defendant Exhibit 48.  Is Exhibit 47 the personal data

20   sheet that you mentioned?

21   A     Yes, it is.  It is dated 9-25-02.

22         (Wilhelm Resume submitted to Bureau of State

23   Employment was introduced as Plaintiff Exhibit 48.)

24   BY MS. FORNEY:

25   Q     All right.  And is Exhibit 48 the resume that you

18

Wilhelm - Cross

1  mentioned?

2  A     It appears to be.  When I sent them into the Bureau of

3  State Employment every six months, I sort of massage or

4  change the information around a little.  They define them as

5  scannable resumes.  Because I wasn't getting responses back

6    --

7  Q     Excuse me.  Is this the resume that you submitted?

8  A     It appears to be one of them that I submitted.

9  Q     One of the resumes that you submitted, fine.  So at

10 least at the time that you provided this information to Ms.

11 Ford, you were interested in Commonwealth employment; isn't

12 that right?

13 A     At the time that I submitted this, yes, I was

14 interested to see if any agency was going to respond back to

15 me.

16 Q     Now the personal data sheet that you submitted

17 indicates what county you were interested in employment in.

18 And that is Dauphin County; is that correct?

19 A     22, yes, Dauphin County.

20 Q     You did not include any of the counties surrounding

21 Dauphin County?

22 A     No.

23 Q     And when you were asked to indicate a minimum salary

24 that you would accept, you indicated $55,531.00?

25 A     Yes.  That was the number that was copied off of the --

19

Wilhelm - Cross

1   it would be an old salary number because I used the original

2   data sheet that went in before the July increase.  So this

3   would have been off by the across the board increase.

4           I didn't have possession of the new increase that

5   went into effect in July, but I had submitted one in June.

6           THE COURT:  Excuse me.  What was the question?

7           MS. FORNEY: The question was -- I think the

8   question was the minimum salary that she would take.

9           THE COURT:  Can you be responsive to that?

10  A     Yes, that was the minimum salary that I had available

11  to me at the time.

12  BY MS. FORNEY:

13  Q     So you were indicating to the Bureau of State

14  Employment that you were not interested in any jobs that paid

15  less than that minimum salary; is that correct?

16  A     Oh, yes.

17          THE COURT:  Yes, that's correct, you were not

18  interested in anything less?

19  A     Yes.

20          THE COURT:  Okay.

21  BY MS. FORNEY:

22  Q     I would like to direct your attention to Exhibit 48

23  which is your resume.  I assume when you prepared this

24  resume, it was your intent to accurately reflect the skills

25  and experience that you had accumulated in employment up to

20

Wilhelm - Cross

1    that point?

2    A    Yes.

3    Q    If we look at the third page of that resume, you

4    indicate under skills a variety of skills that you have

5    including management and supervisory skills; correct?

6    A    Correct.

7    Q    And preparation of executive reports, familiarity with

8    Commonwealth policies and procedures and manuals, record

9    review, analysis, interpretation of data and reports and so

10   forth?

11   A    Correct.

12   Q    Ms. Wilhelm of the -- strike that.  Previously we had

13   at least mentioned some of the prior positions that you had

14   with the Commonwealth.  Chief of Operations of the Office of

15   Inspector General was one.  Acting Director of the Bureau of

16   Police and Safety was one.  And, of course, we know that you

17   were a Legislative Specialist with the Pennsylvania State

18   Police.

19         Did you consider those positions senior management

20   positions?

21   A    The Acting Director for the Bureau of Police and Safety

22   as I said before was a special assignment.  I was still

23   employed by the Office of Inspector General.

24   Q    But the job that you were doing was a management

25   position certainly?

Wilhelm - Cross

1    A    That's correct.

2    Q    And you would consider a Bureau Director rather senior

3    in the Commonwealth's hierarchy; weren't you?

4    A    Yes.  It was on loan to a senior management.

5    Q    Isn't that also true of your Chief of Operations job?

6    A    Yes, the Chief of Operations did then report to the

7    Inspector General.

8    Q    And your Legislative Specialist II job?

9    A    Yes, that was classified as senior management.

10   Q    Now in October of 2002 after you had submitted your

11   information to the Bureau of State Employment, you received a

12   communication from Rebecca Yearick of the Department of

13   Transportation; did you not?

14   A    I received a phone call from her and then a subsequent

15   e-mail from her.  And then someone sent me a job posting in

16   the mail.

17             (E-mail to Wilhelm from Rebecca Yearick: AO III

18   position availability at PennDOT was introduced as Plaintiff

19   Exhibit 49.)

20   BY MS. FORNEY:

21   Q    All right.  I am giving you what has been marked

22   Defendant Exhibit 49.  Is this the e-mail that you received

23   from Ms. Yearick?

24   A    Yes, it is.

25   Q    That e-mail indicates she will send you some

22

Wilhelm - Cross

1   information about a job; correct?

2   A     Yes.  She indicates that she doesn't have the proper

3   job description that she was verbally discussing on the phone

4   and that she would see that I would get it mailed to me.

5   Q     All right.  And she also asks you to notify her if you

6   are interested in interviewing for that job; does she not?

7   A     The e-mail asks that, but the job posting says you are

8   supposed to contact I think it was an Erin somebody.

9   Q     Just a moment.  I'm talking about the e-mail now.

10  Didn't this e-mail say please call me no later than Monday to

11  let me know if you wish to interview for the AO III position?

12  A     Yes, the e-mail says that.

13         (Job Posting for PennDOT's AO III position was

14  introduced as Plaintiff Exhibit 50.)

15  BY MS. FORNEY:

16  Q     I am going to be hand a document which has been marked

17  Defendant Exhibit 50.  Is this the information on the job at

18  the Department of Transportation that you received?

19  A     Yes, this is the job posting that I received from the

20  Department of Transportation.

21  Q     And the job posting indicates that this is an

22  Administrative Officer III job; is that correct?

23  A     That's correct.

24  Q     In the Office of Communications and Customer Relations?

25  A     That's correct.

23

Wilhelm - Cross

1    Q      It is a permanent and full-time position?

2    A      It defines that as a permanent full-time.

3    Q      Position.  It indicates the salary range is from

4    $41,174.00 to $72,572.00?

5            THE COURT:  No, 62.

6    BY MS. FORNEY:

7    Q      I am sorry, $62,571.00.

8    A      That's correct.

9    Q      And that is within pay range eight?

10   A      That's correct.

11   Q      And that is the same pay range that you were in when

12   you separated from the State Police; is that correct?

13   A      Yes, that's correct.

14   Q      You did not interview for that job; is that correct?

15   A      That's correct.

16   Q      And you did not interview for this job because you

17   decided you weren't qualified for the job; isn't that right?

18   A      No, that is incorrect.

19   Q      You decided not to interview for this job because you

20   had -- because it was an at will position?

21   A      My communications with the contact person on there --

22   and, again, I think it is Ms. --

23            THE COURT:  What was the reason for not taking the

24   position?

25   A      My discussion with Ms. Soden, the person who was the

24

Wilhelm - Cross

1    contact person on the front of this form, and the contact

2    person on the back.  As she got the job description and

3    reviewed what the responsibilities were and indicated that it

4    involved budget and procurement.  And I didn't have budget

5    and procurement in my background.

6            In addition to a conversation with Jacob Simonton,

7    who was the Director of the Bureau of -- I am sorry -- the

8    Director of the Bureau of Personnel within the Department of

9    Transportation regarding that I was concerned that it was a

10   political turnover position.  And that was based on the first

11   person that called me.  I'm sorry; I am probably saying her

12   name wrong Yearick.

13           She indicated -- when I asked her how long would

14   this job last and she responded one day, six months, six

15   weeks, just -- one day, six days, six weeks or six months.

16   And I have already testified to that previously.

17           THE COURT:  Excuse me.  So the question was

18   whether she didn't take it because one, she wasn't qualified

19   or secondly, that it was an at will --

20           MS. FORNEY:  Correct.

21           THE COURT:  Your answer is yes?

22   A     It would be both.

23           MS. FORNEY: Okay.

24   BY MS. FORNEY:

25   Q     And your prior job with the State Police was an at will

Wilhelm - Cross

1   job; wasn't it?

2   A     That's correct.

3   Q     By the way, Ms. Wilhelm, you are not currently on any

4   employment lists under the Civil Service system; are you?

5   A     Not that I am aware of.

6   Q     And since the trial in this case, you haven't taken any

7   Civil Service tests; have you?

8   A     Yes, I have.

9   Q     What Civil Service tests have you taken since the trial

10  of this case?

11  A     Oh, since the trial in this case.  I'm sorry.  Not

12  since the trial date.

13  Q     And you have never taken a Civil Service test for an

14  Administrative Officer III position; have you?

15  A     No, I have not.

16  Q     Nor have you taken a test for any of the other

17  Administrative Officer positions in the Civil Service system?

18  A     No, I have not.

19  Q     And you haven't taken the Civil Service test for a

20  Human Resource Analyst position at any level; have you?

21  A     No, no.

22  Q     And you haven't taken a Civil Service test for a Human

23  Resources Management Trainee position either; have you?

24  A     No.

25  Q     But Civil Service employes are not at will; are they?

26

Wilhelm - Cross

1   A    No.

2   Q    So they do have some protection against arbitrary

3   termination; is that right?

4   A    There is some protection, yes.

5   Q    Now you mentioned that one of the reasons you did not

6   take this -- even go to an interview for this Department of

7   Transportation job was that it involved budget and

8   procurement?

9   A    Based on my conversation with the contact person, Ms.

10  Soden.

11  Q    And that is just one aspect of the job; is it not?

12  A    As I recall when we were reviewing it together

13  telephonically, she indicated I think it was twenty percent

14  of the job.

15  Q    Twenty percent of the job or the job involved 20

16  percent of budget?

17  A    I don't recall exactly what our conversation was, but

18  we spent some time on the phone discussing it.

19  Q    But your concern was budget?

20  A    Budget and procurement, right.

21  Q    Doesn't your resume Exhibit 48 indicate that when you

22  were the Acting Director of the Bureau of Police and Safety,

23  you prepare a fiscal budget?

24  A    No, it would not say that.  I was responsible --

25  Q    Excuse me.  Let me direct you to the second page of

27

Wilhelm - Cross

1    your resume under Acting Director of the Bureau of Police and

2    Safety.  The last bullet prepared fiscal budget; is that what

3    it says?

4    A      The budget would have been prepared when I came in

5    Acting.  I was responsible for the Administrative Office II

6    person that was responsible for preparing the budget.

7            I was responsible for preparing the Cabinet

8    Secretary because I was there during that time period for the

9    appropriations hearing regarding the budget.

10   Q      So you had some responsibility for the budget?

11   A      I wasn't responsible for the actual numbers.  It would

12   have been done, as well as the rebudget.  The extent would be

13   me discussing with the Cabinet Secretary to allow the General

14   Assembly to purchase things for the Bureau of Police and

15   Safety, which they did.

16   Q      Now the job at the Department of Transportation did

17   involve more than budget and procurement; didn't it?

18   A      I'm sorry?

19   Q      The job at the Department of Transportation did involve

20   more than budget and procurement; didn't it?

21   A      Yes, that's correct.

22   Q      And if we look at the third page of Exhibit 50 at the

23   bottom, it lays out essential functions of that job; correct?

24   A      That's correct.

25   Q      And those functions are understand and follow written

28

Wilhelm - Cross

1  and oral instructions.  You would consider yourself capable

2  of doing that; wouldn't you?

3  A    Yes.

4  Q    The next thing is read and analyze correspondence,

5  reports, contracts and research documents.  You consider

6  yourself capable of doing that; don't you?

7  A    Yes, I do.

8  Q    In fact, you have done it in several of your past jobs;

9  have you not?

10 A    That's correct.

11 Q    You analyzed legislation; is that correct?

12 A    That's correct.

13 Q    You prepared reports both as an Intelligence Analyst

14 for the State Police and as a Legislative Specialist?

15 A    That's correct.

16 Q    You did research in several of the prior jobs that you

17 have held?

18 A    That's correct.

19 Q    The next essential function is oral and written

20 communication with the general public, legislators, media,

21 departmental and other state agency personnel.

22         And you have done those things in other jobs that

23 you have held; haven't you?

24 A    Yes, that's correct.

25 Q    In fact, one of your functions as a Legislative

29

Wilhelm - Cross

1    Specialist was to respond to requests for information from
2    the public?
3    A       That's correct.
4    Q       And from legislators?
5    A       That's correct.
6    Q       And from members of other state agencies?
7    A       That's correct.
8    Q       When you were the Operations Head of the Inspector
9    General's Office, you had to coordinate with members of other
10   state agencies; did you not?
11   A       That's correct.
12   Q       You have been involved in training -- in providing
13   training, organizing training in the various jobs; haven't
14   you?
15   A       That's correct.
16   Q       And some of that training involved persons outside the
17   employment of the Commonwealth of Pennsylvania?
18   A       That's correct.
19   Q       In fact, you consider yourself pretty good at oral and
20   written communications; wouldn't you?
21   A       That's correct.
22   Q       Another one of the essential functions is to use a
23   writing device to prepare documents, forms and so forth.  And
24   you are certainly capable of doing that; aren't you?
25   A       That's correct.

Wilhelm - Cross

1    Q    Another function is maintaining a driver's license.

2    You do have a driver's license; don't you?

3    A    That's correct.

4    Q    Another function is to organize grand openings, media

5    briefings, events, public information meetings and

6    briefings.

7         You have organized public training sessions; have

8    you not?

9    A    Yes, I have.

10   Q    You have prepared computerized slide presentations for

11   large groups of people; have you not?

12   A    That's correct.

13   Q    You were involved even in preparing a news conference

14   at one point in your career; were you not?

15   A    That's correct.

16   Q    Another essential function of this job is utilizing

17   remote terminals to input and retrieve information.  You

18   consider yourself pretty capable with a computer; do you not?

19   A    Yes, I am.

20   Q    You are able to research and retrieve data with great

21   facility; aren't you?

22   A    That's correct.

23   Q    And in terms of the next function, the ability to work

24   alone in the field at remote locations, you certainly are

25   capable of working independently; aren't you?

31

Wilhelm - Cross

1    A    That's correct.

2    Q    In fact in a lot of your jobs, you were required to do

3    that?

4    A    That's correct.

5    Q    I assume that if a job required you to use safety

6    glasses, safety vests and things of that sort, you wouldn't

7    have a problem doing that; would you?

8    A    No.

9    Q    The final two functions using electronic data

10   processing equipment to prepare reports and using an adding

11   machine, you are perfectly capable of doing that; are you

12   not?

13   A    Yes.

14   Q    In this job with PennDOT, it was essentially an

15   administrative job; was it not?

16   A    I believe it was, yes.

17   Q    You have done administrative jobs before; haven't you?

18   A    Yes, I have.

19   Q    You have done them very well?

20   A    Yes.

21   Q    But nonetheless, you decided that you were not

22   qualified for this job; is that your testimony?

23   A    My testimony is it had budget and procurement in it,

24   and I was concerned about the fact that it was a political

25   turnover job.

32

Wilhelm - Cross

1    Q     Now, Ms. Wilhelm, in October of 2002, you also received

2    a communication from the Department of Revenue regarding a

3    job in the Bureau of Individual Taxes; is that correct?

4    A     That's correct.

5              (Letter to Wilhelm from Willie Burston re:

6    Revenue's AO III position availability was introduced as

7    Plaintiff Exhibit 51.)

8    BY MS. FORNEY:

9    Q     I am going to show you Defendant Exhibit 51 and

10   Defendant Exhibit 52.  With regard to Defendant Exhibit 51,

11   is this the letter that you received regarding the job in the

12   Department of Revenue?

13   A     Yes, it is.

14   Q     And it the dated October 22, 2002?

15   A     That's correct.

16   Q     And the letter indicates that there is an

17   Administrative Officer III position?

18   A     That's correct.

19   Q     With the Department?

20   A     That's correct.

21   Q     And it also says if you wish to schedule an interview,

22   you may contact the individual indicated?

23   A     That's correct.

24             (Job Description for Revenue's AO III position was

25   introduced as Plaintiff Exhibit 52.)

33

Wilhelm - Cross

1    BY MS. FORNEY:

2    Q    Now did you obtain information regarding the job?

3    A    Yes, I did.

4    Q    And is what you received Defendant Exhibit 52?

5    A    Yes, that's correct.

6    Q    And this job is also an Administrative Officer III job?

7    A    It is classified, yes, as an Administrative Officer

8    III.

9    Q    Was it your understanding that it was also a job paid

10   at pay range eight?

11   A    That's correct.

12   Q    And you elected not to interview for this job either?

13   A    That's correct.

14   Q    And you did not interview for this job because you did

15   not believe you had a background in taxes; is that it?

16   A    Yes.  It's a Chief of the Property Tax Rent Rebate

17   Division, Bureau of Individual Taxes.  I have never been a

18   tax examiner supervisor.  It requires you to supervise tax

19   examiner supervisors in addition to having knowledge of tax

20   information.  I have nothing like that on my resume.

21   Q    Let's take a look at the last page of Exhibit 50.  And

22   this page outlines the essential functions of this job.  Do

23   you see that?

24         MR. PRINGLE:  Did you say Exhibit 50?

25         THE COURT:  52.

34

Wilhelm - Cross

1          MS. FORNEY: I beg your pardon, 52.

2    BY MS. FORNEY:

3    Q       The first function is managing the PTRR Division which

4    I believe stands for Property Tax Rent Rebate Division; is

5    that right?

6    A       That's right.

7    Q       And it is comprised of part-time clerks, tax examiners,

8    clerk typists tax examiner supervisors.  You have held

9    managerial jobs in the past; have you not?

10   A       Yes.

11   Q       So the management part of the job would not be

12   difficult for you?

13   A       It would be very difficult.

14   Q       Just the managerial part.  I withdraw the question.

15   The job also requires you to supervise tax examiner

16   supervisors.  And you have supervised before; have you not?

17   A       I have never supervised a tax examiner supervisor.  No,

18   I have never done that.

19   Q       But you have done supervisory work?

20   A       I have been a general supervisor, yes.

21   Q       And as a general supervisors, you have had to approve

22   or disapprove leave requests?

23   A       That is a small minute function of being a supervisor.

24   Q       Nonetheless, it is a function of being a supervisor; is

25   it not?

35

Wilhelm - Cross

1    A    Yes, that's correct.

2    Q    And you have prepared and reviewed performance

3    evaluation reports before; haven't you?

4    A    Yes.  Annually, there is a performance evaluation

5    report that's due.

6    Q    And in the course of performing your other jobs, you

7    have had to write letters, memorandums and reports as we have

8    discussed; correct?

9    A    Assuming they are topics and information that I have

10   knowledge and understanding of, yes.

11   Q    Now the next essential job requirement is explaining

12   tax and collection related laws to taxpayers and/or their

13   representatives.  And you are saying I have no tax

14   background; is that right?

15   A    That's correct.

16   Q    In your job as a Legislative Specialist for the State

17   Police, you did have to do research into statutes and

18   regulations; didn't you?

19   A    That's correct.

20   Q    And you had to analyze; correct?

21   A    That's correct.

22   Q    And you had to review and interpret case law and

23   statutes; did you not?

24   A    That's correct.

25   Q    And sometimes, you had to do that with regard to

Wilhelm - Cross

1    statutes that you weren't familiar with; isn't that true?

2    A     There was information there that wasn't always directly

3    law enforcement.

4    Q     So you are capable of doing research, analyzing and

5    learning; aren't you?

6    A     Yes, I am.

7    Q     And you are probably capable, are you not, of doing

8    research, analyzing, and learning information about taxes and

9    tax law?

10   A     Not in the performance of a supervisor.

11   Q     That is something that is just beyond your ability you

12   are saying?

13   A     I am saying that when an individual is selected to run

14   an operation or command an operation, it would always be a

15   good idea that they know what they are doing, that they have

16   at least some knowledge of the operation, especially if you

17   are going to supervise tax examiner supervisors.

18              I just left an agency where I was carrying a

19   Captain who couldn't do the job, Ms. Forney.  I don't intend

20   on putting myself in a position where other individuals have

21   to carry me because I don't have the skills to do the job.

22   It was just a political dumping position.

23   Q     Ms. Wilhelm, I understand that's the conclusion that

24   you reached.  Before you reached that conclusion, did you

25   make any attempt to talk to the individuals who would

37

Wilhelm - Cross

1  supervise this Administrative Officer III position?

2  A     I spoke with the individual who was the contact person

3  that was on the form.  I believe I have wrote down at the

4  bottom a Sherry.  And there was another person there, a

5  Janet.

6         I spoke with two different people in the Bureau --

7  in the Department of Revenue in that particular area

8  regarding the position.

9  Q     And did you speak -- did you ask them who would be the

10  supervisor of this position?

11  A     I don't understand your question.  Ask them who would

12  be?  They are sending notices out to see who --

13  Q     Excuse me.  Did you ask who would supervise this

14  position, this Administrative Officer III position?

15  A     The type of person that would?

16  Q     Who?  The individual, the name.

17         THE COURT:  Are you asking who would supervise her

18  if she took the job?

19         MS. FORNEY: Yes.

20  BY MS. FORNEY:

21  Q     Did you attempt to find out who would supervise you if

22  you took the job?

23  A     Who would supervise me if I took the job?

24  Q     Yes.

25  A     No.

38

Wilhelm - Cross

1   Q       You didn't think that that would be worthwhile doing to

2   find out what would be expected in the job?

3   A       The purpose of sending the job description out is to

4   provide the individuals as to what is expected of them of the

5   job.  I would have no reason to call a person who is

6   responsible for supervising the person who is being sent this

7   information.

8   Q       Ms. Wilhelm, in the earlier hearing on equitable

9   relief, you testified regarding the medical benefits that you

10  received from the Commonwealth.  I believe that you also

11  testified that you are currently covered under your husband's

12  medical benefits; is that correct?

13  A       All of them as of this date except for Delta Dental.  I

14  got a termination for Delta Dental for some reason.  We are

15  working on that.

16  Q       That hasn't been resolved yet?

17  A       As of right now, I do not know that I have dental.

18  Q       All right.  Have you purchased any supplemental health

19  insurance since your separation?

20  A       No, I have not.

21  Q       Do you have any plan at this point to purchase

22  supplemental health insurance?

23  A       That would probably be based on --

24  Q       Do you currently have a plan to do that?

25  A       Do I currently right this minute?  No.

Wilhelm - Cross

1    Q    Ms. Wilhelm, while you were employed with the State

2    Police, you did apply for a position as Department

3    Disciplinary Officer; did you not?

4    A    That's correct.

5    Q    As I understand that position, that is the position

6    that reviews disciplinary actions against uniformed members

7    of the State Police and decides what precise discipline ought

8    to be imposed given the infraction?

9    A    That's correct.

10   Q    And you didn't have any prior experience with the

11   disciplinary system of the uniformed members of the State

12   Police; did you?

13   A    I had great experience in the disciplinary system

14   regarding the Governor's Office of Inspector General and

15   worked routinely with the Office of Labor Relations in the

16   Governor's Office regarding disciplinary action.  When you

17   are investigating an individual under the Governor's

18   jurisdiction and you are --

19   Q    Excuse me.  My question is:  Did you have prior

20   experience with the disciplinary system for uniformed members

21   of the State Police?

22   A    I had some exposure to it, yes.

23   Q    But you had not been involved in making decisions

24   within that system; had you?

25   A    Directly in the Pennsylvania State Police?

40

Wilhelm - Redirect

1    Q    Correct.

2    A    No.

3    Q    And you were never a uniformed member of the

4    Pennsylvania State Police either; were you?

5    A    Not in that particular law enforcement agency.

6    Q    And the Pennsylvania -- the uniformed members of the

7    Pennsylvania State Police have a collective bargaining

8    agreement which is different from the collective bargaining

9    agreement that governs other Commonwealth employes; doesn't

10   it?

11   A    It is not a hundred percent different.  The law

12   enforcement agency I was in also has a collective bargaining

13   unit, and they often all model off the Pennsylvania State

14   Police.

15   Q    But it is not the same?

16   A    It is not one hundred percent the same as the

17   Pennsylvania State Police law enforcement agency.

18            MS. FORNEY:  No other questions, Your Honor.

19            THE COURT:  Redirect?

20            MR. PRINGLE:  Thank you, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. PRINGLE:

23   Q    Ms. Wilhelm, let's go pack to this Disciplinary Officer

24   position.  Did you have any experience dealing with any kind

25   of uniformed law enforcement officers in terms of labor

41

Wilhelm - Redirect

1   relations?

2   A      Certainly.

3   Q      What would that experience be?

4   A      As the Acting Director for the Bureau of Police and

5   Safety, of course, I was responsible for working with labor

6   relations and personnel regarding the disciplinary action of

7   the law enforcement officers in the agency.

8   Q      Who are the law enforcement officers in that agency?

9   A      It would be Police Officers, Patrolmen, Corporals,

10  Sergeants and Lieutenants.

11  Q      And that would be the Capitol Police?

12  A      Bureau of Police and Safety, yes.

13  Q      Are you familiar with their contract?

14  A      I most certainly am familiar with their contract.  I

15  was responsible in working with the Commonwealth in

16  negotiating their collective bargaining unit contract.  Not

17  just as the Acting Director, but even when I went back from

18  being on loan from the Inspector General's Office and was

19  back in working in the Inspector General's Office, the

20  Governor's Office of Administration asked me to assist them

21  regarding the negotiation of the collective bargaining unit

22  even when there was a permanent Director in charge of the

23  Bureau.

24          So they pulled me in when I was the Acting

25  Director and when I wasn't the Acting Director.

42

Wilhelm - Redirect

1    Q    Did you ever have occasion to review the State Police

2    Troopers Association contract?

3    A    Of course, it was online.  And, of course, there would

4    be questions that you would receive in the Legislative Office

5    regarding that particular contract.  So yes, it was

6    available.

7              And as I recall, it was one of the duties I had to

8    bind it and put it in the common area -- in the common file

9    area.

10   Q    Was there something special -- based on your

11   information, is there something special about disciplinary

12   issues dealing with State Police Officers versus Capitol

13   Police Officers versus any other state employes?

14   A    No.  Your leadership and guidance comes from the

15   Governor's Office of Labor Relations.

16   Q    You indicated when you were testifying regarding the

17   position of Chief of the Property Tax Rent Rebate Division

18   that you did not believe you could supervise I believe they

19   are called tax examiner supervisors.

20             Why do you need experience as a tax examiner

21   supervisor to supervise a tax examiner supervisor?

22             MS. FORNEY: I object to the question, Your Honor.

23   I think he can ask why she believes that.  I don't think he

24   can ask why you need it since there has been no evidence

25   presented by the person who supervises these positions.

43

Wilhelm - Redirect

1    THE COURT:  Rephrase the question.

2  BY MR. PRINGLE:

3  Q    Why do you believe you needed experience as a tax

4  examiner supervisor to supervise tax examiner supervisors?

5  A    Because the tax examiner supervisor position is a

6  progressive position.  It's a Tax Examiner I, a Tax Examiner

7  II, a Tax Examiner III, Supervisor, etcetera in state

8  government.  These are individuals that worked their way up

9  to become supervisors and have great experience in the

10  operation.

11    MS. FORNEY:  Your Honor I object because I don't

12  think there has been any foundation laid for her knowledge.

13    THE COURT:  I want her to state why she believes

14  she could not do that position and needed a tax background.

15  A    I did discuss with the individuals I previously

16  mentioned -- and I have them handwritten at the bottom.

17  There is a Sherry and a Janet -- about the responsibility of

18  the Tax Examiner Supervisor.

19    And I pulled up the class specifications that

20  provide for the responsibilities and the duties of the Tax

21  Examiners I's, II's, III's, etcetera.  I did not feel that I

22  could supervise an individual that had worked their way up to

23  become a tax examiner supervisor when I never held any of

24  those kind of classifications and didn't have any familiarity

25  with the taxing laws, rules, regulations, things of that

44

Wilhelm - Redirect

1    nature.

2    BY MR. PRINGLE:

3    Q    When did you hear about this job?

4    A    The Department of Revenue position?

5    Q    Yes.

6    A    I heard about this after the winning of the trial.  It

7    was in October of 2002.

8    Q    Prior to that, you had no knowledge about this

9    position?

10   A    No.  None, whatsoever.

11   Q    Prior to that, no one had called you about this

12   position?

13   A    No.

14   Q    Do you know why they called you at the time that they

15   called you?

16   A    I don't know why I would have been called for a

17   Department of Revenue tax type position at all for any

18   reason.

19   Q    Had the Department of Revenue ever -- during the two

20   and a half years that you were seeking employment with the

21   Commonwealth, had the Tax Department of Revenue ever called

22   you before?

23   A    No, they did not.

24   Q    With any type of position?

25   A    No, they did not.

45

Wilhelm - Redirect

1    Q    I am going to refer you to Defendant Exhibit 50.  Are

2    you familiar with job postings?

3    A    Yes, I am.

4    Q    How are you familiar with job postings?

5    A    Well, as the Acting Bureau Director, I was responsible

6    for working with the Bureau of Personnel.  If there was a

7    position open, they would coordinate the job posting.

8            And as the Chief of Operations, I recall

9    developing a position that I was responsible for supervising

10   and worked with OA in developing job postings.

11   Q    How did job postings work?

12   A    The agency posts the job for a period of time, and it

13   allows an opportunity for individuals to respond to the

14   posting.

15   Q    So postings are usually set up for a limited period of

16   time?

17   A    I think it's five days.  I don't really recall any

18   more.

19   Q    The posting would tell you what the length of time was

20   for the posting; wouldn't it?

21   A    It should.

22   Q    I would like you to refer to the middle of the page

23   under the place where it says pay range, it says posting

24   length.  Would you read that, please?

25   A    It says posting length: 15 days.

46

Wilhelm - Redirect

1  Q    What are the posting dates for this particular

2  position?

3  A    They are May 6, 2002 through May 20, 2002.

4  Q    During that time May 6, 2002 through May 20, 2002, did

5  anyone from the Department of Transportation call you about

6  this position?

7  A    No, they did not.

8  Q    Did anyone prior to those dates call you about that

9  position?

10  A    No, they did not.

11  Q    When was the first time you heard about this position?

12         THE COURT:  I think it is asked and answered;

13  isn't it?  I am sorry.  That was the tax.  Go ahead.  Go

14  ahead.

15  A    I forgot the question.

16  BY MR. PRINGLE:

17  Q    When was the first time you heard about this position?

18  A    I became aware of this position, it was after the

19  trial.  And it was in this and Revenue were in with -- I was

20  notified within a period of approximately two or three days.

21  Q    Okay.

22  A    In October of 2002.

23  Q    I would like you to turn to the last page of this

24  document.  At the top of the document in that little

25  bracketed area, when is the last day job applications were to

47

Wilhelm - Redirect

1    be accepted for this job?

2    A    May 20, 2002.

3    Q    You said that you called people at the Department of

4    Transportation regarding this position?

5    A    Yes, I did.

6    Q    Did they indicate to you there actually was a position

7    available?

8    A    No.  What happened was I contacted Jacob Simonton, who

9    was the Director of the Bureau of Personnel for the

10   Department of Transportation based on communications from

11   yourself to me through defendant's counsel that there was

12   positions open in the Department of Transportation.  As I

13   recall, one in the Press Office and one in the Communications

14   Office.

15        I contacted Jacob Simonton directly, Personnel

16   Director, who said to me Barbara, I know nothing --

17        MS. FORNEY: Objection.

18        THE COURT:  Sustained.  Hearsay.

19        MR. PRINGLE:  Your Honor, this goes to why she did

20   or did not apply for a position or take an interview.  The

21   conversations that she had with Mr. Simonton relate to her

22   state of mind as to why she made the decision she made.

23        I think it is important as to whether or not she

24   made a reasonable decision to apply or not to apply for a

25   position.

48

Wilhelm - Redirect

1      MS. FORNEY: Your Honor --

2      MR. PRINGLE:  One other thing.  It goes to her

3   general disposition toward accepting offers from the

4   Commonwealth.  The basic case that the Commonwealth --  that

5   Ms. Wilhelm is stating in her testimony and we are presenting

6   here is that she generally did not trust the Commonwealth,

7   and that this suspicious circumstances -- the position being

8   open under suspicious circumstances would lead her -- would

9   influence whether or not she would apply for a position.

10      MS. FORNEY:  Your Honor, I don't believe that is

11   the question that was asked.  The question was asked did she

12   know whether there was a vacancy or not.  That led to this

13   question.

14      It doesn't sound to me like it was being offered

15   for what Mr. Pringle is suggesting.

16      MR. PRINGLE:  That is the only reason, Your

17   Honor.  I can rephrase the question.

18      THE COURT:  Let's hear the question.

19   BY MR. PRINGLE:

20   Q    The question would be:  Did you believe there was a

21   vacancy -- this position was vacant at the time that you

22   called?

23      MR. PRINGLE:  We are only concerned about her

24   state of mind, Your Honor.  We are not trying to assert if

25   there was or was not.  She did an investigation, and we are

49

Wilhelm - Redirect

1    asking what her response --

2              THE COURT:  Isn't the issue here whether there was

3    a vacancy, not whether she believed there was one?

4              MR. PRINGLE:  No, Your Honor.

5              THE COURT:  The issue is was there a vacancy in

6    this position for which she had an opportunity to apply.

7              MR. PRINGLE:  Well, arguably, that is part of it.

8              THE COURT:  That is the issue; isn't it?

9              MR. PRINGLE:  That is not the sole issue, Your

10   Honor.  There is an issue of whether or not there was a

11   vacancy.  Obviously, if there was no position --

12             THE COURT:  That is fine.

13             MR. PRINGLE:  -- there is no point in pursuing it.

14             THE COURT:  But if there was a vacancy.

15             MR. PRINGLE:  But the question was whether or not

16   she believed -- whether or not she had reason to believe

17   there was a vacancy.  If she has been told that there was no

18   vacancy or told that there was something suspicious about the

19   vacancy, that is something we believe is important for you to

20   hear to determine the reasonableness of her actions.

21             THE COURT:  I think we need to know whether her

22   inquiry showed that there was no vacancy.

23   BY MR. PRINGLE:

24   Q    My question to you is whether you determined there was

25   a vacancy or not?

50

Wilhelm - Redirect

1   A     My inquiry with Jacob Simonton, the Director of

2   Personnel for the Department of Transportation, was that

3   there was in fact no openings in communications and that he

4   did not even know that the Press Office even had any kind of

5   vacancy or opening.

6           And he indicated -- I'm sorry.  He indicated I'm

7   sorry.  I can't help you.  We didn't request any kind of list

8   from the Bureau of State Employment to fill any -- the two

9   vacancies -- the two job postings that you are referring to

10  Communications and the other one that you had communicated to

11  me was Press Office.

12  Q     Again, with respect to Defendant Exhibit 50 -- I'm

13  sorry.  I would like to refer you to Defendant Exhibit 48.

14  On the second page under the description of your service as

15  Acting Director of the Bureau of Police and Safety, it says

16  prepared fiscal budget and acted as fiscal advisor to the

17  Secretary of General Services.

18          You said you didn't prepare the budget.  Who

19  actually prepared the budget?

20  A     For the timelines, I was there for 11/89 to 5/90, it

21  would have been prepared by the Administrative Officer II in

22  the Bureau of Police and Safety.

23  Q     What did you mean when you said prepared fiscal budget

24  and acted as fiscal advisor to the Secretary of General

25  Services?

51

Wilhelm - Redirect

1  A    As the Acting Director, I would be responsible for

2  overseeing the person that is responsible for the budget.  In

3  addition as I previously testified, the Bureau is unique.

4  The budget can be subsidized by the Pennsylvania General

5  Assembly.

6      In the past, they have selected to do that.  So as

7  we monitor monies in the budget and it is being brought to my

8  attention we are short of monies, if in fact a member of the

9  Pennsylvania State General Assembly wants to purchase

10  something for the Bureau, they may do so.  Of course, I have

11  to keep the Cabinet Secretary advised as to what is going

12  on.

13      In addition to that, I was there during the time

14  period where they have what we call appropriations hearings

15  and would have to get the information from my Administrative

16  Officer II and provide it to the Cabinet Secretary for the

17  appropriations hearings if he has asked something specific

18  about the Bureau of Police and Safety.

19  Q    I now refer you to Defendant Exhibit 49.  Could you

20  tell us what you did when you received this e-mail or the

21  circumstances surrounding the receipt of the e-mail?

22  A    Well, when I received the e-mail, it indicated that

23  they didn't have the proper job description.  And that

24  concerned me because the individual had indicated that they

25  had been trying to fill this position, and I think she went

52

                    Wilhelm - Redirect

1    back as far as July of this year.

2              Yet, Jacob Simonton, as I just testified, said

3    there weren't any kind of positions.  There weren't any

4    openings.

5              So when the job posting came in the mail, I

6    contacted Jacob Simonton.

7              THE COURT:  What is the question, again?

8    BY MR. PRINGLE:

9    Q    I am asking if she received Defendant Exhibit 49.  I am

10   asking her what happened after she received it, Defendant

11   Exhibit 49, the e-mail?

12             THE COURT:  Can you be a little more specific as

13   to what happened?  What are you getting at?  We have been

14   going through a long explanation.  I don't know where we are

15   leading.

16             MR. PRINGLE:  I am asking her how she responded to

17   the e-mail.  What steps did she take to pursue or not pursue

18   this position.

19             THE COURT:  I don't think that is responsive to

20   the question.  Let's try again.

21   BY MR. PRINGLE:

22   Q    After you received this e-mail, what steps did you take

23   or not take with respect to notice of an AO III position

24   availability?

25   A    She indicates on here --

53

Wilhelm - Redirect

1    THE COURT:  What did you do?

2    A     I waited until the proper job posting came in the mail

3    because she indicated that this was -- what she was sending

4    me was not the proper job description.  So when the proper

5    job posting came in the mail -- and that was maybe five days

6    later -- I made telephonic contact with the Director of

7    Personnel Jacob Simonton regarding the position and her

8    statements to me regarding that it could last one day, six

9    days, six weeks, six months.

10         I also had contact with the person whose name was

11   on the job posting to contact Erin G. Soden, last page of

12   Defendant Exhibit 50, and reviewed with her that job posting

13   information that was provided.

14         Erin indicated to me --

15         THE COURT:  You are not asked about that.  You are

16   only asked what you did.

17   A     Okay.

18   BY MR. PRINGLE:

19   Q     After reviewing -- after discussing the job posting

20   with Ms. Soden, were you able to determine whether or not you

21   were qualified for this position?

22   A     We discussed the budget --

23         THE COURT:  It is either yes or no.

24   A     Yes, I was.

25

54

Wilhelm - Redirect

1    BY MR. PRINGLE:

2    Q      Why do you believe you were not qualified -- I am

3    sorry.  Did you believe you were qualified or not?

4    A      No, I did not.

5    Q      Why did you believe you were not qualified?

6    A      Based on the responsibilities of budgeting and

7    procurement.

8    Q      Do you know if Mr. Berkoben is still employed by the

9    Commonwealth?

10   A      I don't know.

11   Q      Do you know if Mr. Contino is still in his current

12   position?

13   A      No, I don't know.

14   Q      Prior to your dismissal by the Pennsylvania State

15   Police, were there ever occasions when you were notified of

16   openings or promotions or you were notified of vacancies in

17   other agencies?

18   A      Prior to my dismissal when I was employed in the State

19   Police?

20   Q      Yes.

21   A      Several individuals in the State Police had asked me if

22   I would work in their particular Bureaus or Divisions.

23   Q      During the period after your termination with the

24   Pennsylvania State Police, what steps did you take to secure

25   employment with the Commonwealth, other agencies?

55

Wilhelm - Redirect

1  A    Well, it was enter my scannable resume into the Bureau

2  of State Employment.

3            MS. FORNEY: Your Honor, I believe --

4            THE COURT:  This is not proper redirect I don't

5  believe.

6            MS. FORNEY: And I would also point out that this

7  was testified to in the prior hearing on equitable relief.

8            THE COURT:  Maybe you can bring her up-to-date.

9  BY MR. PRINGLE:

10  Q    Since the equitable hearing in October of 2002, did you

11  take -- have you taken any steps since that time to pursue

12  employment with the Commonwealth?

13  A    Since the equitable hearing, I believe I applied to

14  several more lobbying, government affairs in the private

15  sector.  I recall sending a resume out to some newspapers,

16  national --

17            MS. FORNEY: I object, Your Honor.  I question the

18  believe was steps to get employment with the Commonwealth.

19  A    I can't recall.

20            THE COURT:  Mr. Pringle, was your question

21  generally about employment or employment with the

22  Commonwealth?

23  BY MR. PRINGLE:

24  Q    My specific question related to state employment.

25  A    Regarding state employment, I took the defendant's

56

Wilhelm - Redirect

1    information that was provided by her expert witness Ms. Oveta

2    Johnston and contacted agencies regarding a list of positions

3    that her expert indicated that I would be -- have the skills

4    to do based on her evaluation of my resume.

5            I called those respective agencies that were

6    listed to see if there were any kind of position openings.

7            MS. FORNEY: I object, Your Honor, to this

8    testimony.  In discovery, we specifically requested

9    information regarding what Ms. Wilhelm had done to obtain

10   employment.  Specifically asked that she supplement prior

11   discovery responses.  We have not received this information

12   that she is now testifying to.

13           MR. PRINGLE:  Your Honor, she didn't actually

14   apply to any of these.  Her territory would not be that she

15   actually applied for any of these positions.

16           One of the things that came out in the deposition

17   was that there was no information -- Ms. Johnston identified

18   a number of positions.  I think Ms. Forney referred to a few

19   of those positions identified in the expert report.

20           When questioned during the deposition by me when I

21   asked Ms. Johnston during the deposition, I specifically

22   asked her whether or not she had any information regarding

23   vacancies for any of the positions that she identified.

24           THE COURT:  What deposition are we talking about,

25   when?

57

Wilhelm - Redirect

1    MR. PRINGLE:  The deposition of expert witness of

2   Oveta Johnston.  During that deposition, Ms. Johnston

3   testified that she was an expert in determining whether or

4   not Ms. Wilhelm was qualified to take the Civil Service test

5   for certain positions.

6        I asked her specifically whether or not she knew

7   anything about vacancies for any of these classifications for

8   which she believed Ms. Wilhelm was qualified to take the

9   Civil Service test.  I said do you know if there were any

10  actual openings in these positions?  She said no.

11       Subsequent to that, Ms. Wilhelm is here testifying

12  that she pursued those positions by determining -- she did

13  her own investigation as to whether or not there were

14  vacancies in the positions identified by Ms. Johnston.

15       THE COURT:  Ms. Forney's objection is that that

16  information should have been supplemented as an ongoing

17  response to the previous interrogatory.

18       MR. PRINGLE:  Your Honor, our understanding of

19  that interrogatory was she wanted to know what steps Ms.

20  Wilhelm took.

21       THE COURT:  Let's have the interrogatory read.

22       MS. FORNEY: Your Honor, the interrogatory -- and I

23  can provide it for the Court.  It is Defendant Exhibit 45,

24  page three.  Identify each person plaintiff contacted and

25  each person that contacted plaintiff about employment

58

Wilhelm - Redirect

1    opportunities since October of 2001.

2              THE COURT:  That is an ongoing response; correct?

3              MS. FORNEY:  Yes, Your Honor.  Since 2001.

4              MR. PRINGLE:  We interpreted that, Your Honor, as

5    her making application for a position or as in the case of

6    revenue and transportation situation.  She was notified that

7    there were vacancies in the various agencies.

8              THE COURT:  I think the question said what

9    contact.

10             MS. FORNEY:  Yes, Your Honor.  Identify each

11   person plaintiff contacted and each person that contacted

12   plaintiff about employment opportunities.

13             THE COURT:  I think the question was clear,

14   contacts.

15             MR. PRINGLE:  About employment opportunities, Your

16   Honor.  We interpret that as specific employment

17   opportunities.

18             MS. FORNEY: Your Honor --

19             THE COURT:  I sustain the objection.

20   BY MR. PRINGLE:

21   Q    Other than the Department of Revenue and the Department

22   of Transportation position we just discussed, have you

23   received any notices of openings by Commonwealth agencies?

24   A    No.

25             MR. PRINGLE:  No further questions.

59

Wilhelm - Recross

1      THE COURT:  Recross?

2                    RECROSS EXAMINATION

3  BY MS. FORNEY:

4  Q    Ms. Wilhelm, I am a little confused about your

5  testimony regarding your conversation with Mr. Simonton.  Is

6  it your testimony you had one conversation with him or more

7  than one?

8  A    I had two conversations with Jacob Simonton as I

9  recall.

10  Q    And that was with regard to the Administrative Officer

11  III position in the Department of Transportation; is that

12  right?

13  A    One conversation -- the first one was in reference to

14  any openings.  And that was in reference to some Press Office

15  position and a communications position where he indicated he

16  had no openings that he knew of, and he hadn't requested any

17  lists at all.

18  Q    All right.  You recall providing responses to

19  interrogatories in this case; do you not?

20  A    Yes, I do.

21                    THE COURT:  I don't want to interfere with your

22  cross-examination.  She said there were two conversations.

23  One was with the opening concerning the Press Officer and

24  communications.  What was the second one?

25  A    The second one with Jacob Simonton was regarding the

60

Wilhelm - Recross

1    job posting that I had received in the mail regarding the

2    communications position.  I was confused because I had been

3    first told --

4              THE COURT:  Is this the PennDOT one?

5    A    Yes.

6              THE COURT:  Okay.

7    A    Communications and customer services.  Just several

8    days before -- after I spoke with him, I was given a call by

9    that Ms. --

10             THE COURT:  I just wanted to know what they were.

11   A    Okay.

12   BY MS. FORNEY:

13   Q    You do recall providing interrogatory responses in this

14   case; is that right?

15   A    That's correct.

16             (Plaintiff's Response to Defendants' Second Set of

17   Interrogatories and Request for Production of Documents to

18   Plaintiff was introduced as Defendant Exhibit 45.)

19   BY MS. FORNEY:

20   Q    I am going to hand you what has been marked Defendant

21   Exhibit 45.  Are these interrogatory responses that you

22   provided to defendant?

23   A    That's correct.

24   Q    Would you go to page three, please?

25   A    (Witness complies.)

61

Wilhelm - Recross

1    Q    Is this the question that was previously discussed by

2    Mr. Pringle with the Court where I asked you to identify each

3    person plaintiff contacted and each person that contacted

4    plaintiff about employment opportunities?

5    A    That's correct.

6    Q    And your response to that question continues all the

7    way up to page nine; is that right?

8    A    That's correct.

9    Q    Would you look at page seven, please?

10   A    (Witness complies.)

11   Q    And would you look in about the middle of the page

12   where it says telephonic September 30, 2002?

13   A    That's correct.

14   Q    This is your summary of your conversation with -- your

15   first conversation with Mr. Simonton; is that right?

16   A    That's correct.

17   Q    Right.  And is there any reference in this description

18   of your conversation to a position in the Office of

19   Communications?

20   A    Yes.

21   Q    Oh, there is?

22   A    Yeah.  It says on September 30th, I spoke with Jacob

23   Simonton, Director of Bureau of Human Resources Department of

24   Transportation --

25              THE COURT:  Slow down.

62

Wilhelm - Recross

1    A    I'm sorry -- regarding an alleged position in the DOT

2    Press Office and the Office of Communications Customer

3    Relations as related to me by my counsel, etcetera,

4    etcetera.

5    BY MS. FORNEY:

6    Q    You are quite right.  And further on in this

7    description of the conversation, it says Simonton states he's

8    not aware of any position in the Press Office; correct?

9    A    Correct.

10   Q    And then it says and he has not sent any paperwork to

11   the Bureau of State Employment requesting a candidate list

12   for the other position; is that correct?

13   A    That's correct.

14   Q    He did not say the other position was not vacant; did

15   he?

16   A    He didn't say whether it was vacant or not.  He just

17   said they didn't request a list.

18   Q    Okay.  So that is fine.  Now I would like you to just

19   look at the rest of your answer and tell me whether there is

20   a second conversation with Mr. Simonton reflected?

21   A    In my listing here?

22   Q    Yes.

23   A    No.

24   Q    So you didn't recount your second conversation with

25   Mr. Simonton in your answers to interrogatories?

63

Wilhelm - Recross

1    A    I wasn't inquiring.  I was discussing the information

2    that was sent.

3    Q    About a job opportunity?

4    A    Yes.

5    Q    Nor did I put down in Department of Revenue the

6    conversations.  I may have had conversations with two or

7    three or four different people in the agencies to try to get

8    the information about what was going on.  I didn't list every

9    individual person that I spoke with.  I don't even remember

10   all of their names.  Sherry something.  Janet something.

11   Q    You do remember Mr. Simonton's name?

12   A    I do remember Mr. Simonton's name.

13   Q    And you do remember the conversation, but you didn't

14   disclose it; right?  You didn't disclose it in answer to this

15   interrogatory, the second conversation with Mr. Simonton; yes

16   or no?

17   A    Let me take a second to look at it.

18   Q    Certainly.

19   A    I do under Yearick indicate that she contradicts Jacob

20   Simonton's statement and contends that she has been trying to

21   fill the position since July of 2002 based on his statement

22   to me that he wasn't aware of any position.

23   Q    You spoke with Ms. Yearick after you spoke to

24   Mr. Simonton;  correct?

25   A    That is correct.

64

Wilhelm - Recross

1  Q      And Ms. Yearick was the Director of the Office of

2  Communications and Customer Relations where the

3  Administrative Officer III job was located; is that right?

4  A      That's correct.

5  Q      She said to you that she had been trying to fill the

6  job; is that right?

7  A      She indicates she has been trying to fill the position

8  since July of 2002.

9  Q      All right.  And subsequently, you talked to Erin Soden

10 in the Bureau of Human Resources for the Department of

11 Transportation, and she told you that the Department was

12 trying to fill the Administrative Officer III job; is that

13 right?

14 A      That's correct.   She claims since February of 2001.

15 Q      Now I would like to talk with you job postings.  And

16 you said you are familiar with job postings.  Isn't it true

17 that job postings are used to inform Commonwealth employes of

18 vacancies that exist within the Commonwealth?

19 A      Pardon?  I am sorry.

20 Q      Isn't it true that job postings are used to inform

21 employes of the Commonwealth about job vacancies within the

22 Commonwealth?

23 A      Yes, they are used for employes also.

24 Q      And this particular job posting indicates on the front

25 page under information, Exhibit 50, that this position is

65

Wilhelm - Recross

1  open to all Commonwealth employes; correct?

2  A    That's correct.

3  Q    And isn't it true that if a job posting does not

4  generate applications for a position, that an agency may

5  elect to go outside Commonwealth employes to recruit for that

6  position?

7         MR. PRINGLE:  Objection, Your Honor.  She can give

8  a general overview of what job postings do.  She has no

9  specific knowledge of this specific job posting which makes

10 her testimony entirely irrelevant.

11        THE COURT:  May I have the question again?

12        (Question referred to was read by the reporter.)

13        THE COURT:  I think in her position she can say

14 whether she can or cannot answer the question.  Can you

15 answer the question?

16 A    I don't know what Transportation did regarding this

17 particular job posting.

18 BY MS. FORNEY:

19 Q    That wasn't the question.  The question had to do with

20 job postings.  I believe you said you had some familiarity

21 with it -- with job postings?

22 A    I can't answer that question.

23 Q    You don't know?

24 A    I don't know what they did.

25 Q    I am not asking you --

66

Wilhelm - Recross

1          THE COURT:  It is not what they did.  From your

2    experience only, can you answer the question as to what would

3    happen?

4    A     No.

5    BY MS. FORNEY:

6    Q     Ms. Wilhelm, you testified that when you were the

7    Acting Bureau Director for the Capitol Police for the Bureau

8    of Safety, you did not prepare the budget; is that right?

9    A     I did not actually do the numbers, no.

10   Q     But you did supervise the person who did?

11   A     Yes.

12   Q     Is that right?  And you did that even though you had

13   never prepared a budget yourself; isn't that right?

14   A     Yes.

15          THE COURT:  Court is going to be in recess for ten

16   minutes.

17          THE CLERK:  Court is in recess.

18          (A recess was taken.)

19

20

21

22

23

24

25

67

Wilhelm - Recross

AFTER RECESS

BARBARA WILHELM resumes the stand.

RECROSS EXAMINATION (continued)

BY MS. FORNEY:

Q    Ms. Wilhelm, you testified that you hadn't received any information lately about the possibility of reemployment with the Commonwealth; is that right?

A    That's correct.

Q    But you did receive some information about the possibility of reemployment within the last week; did you not?

A    Within the last 24 hours, I believe it was.

MR. PRINGLE:  Objection, Your Honor.  She is about to discuss settlement discussions.

THE COURT:  It's inappropriate if it is part of a settlement.

MS. FORNEY: I do think that if the settlement involves an offer of reinstatement, it would be appropriate to hear.  I think it does go to the issue of mitigation, Your Honor.

MR. PRINGLE:  Your Honor, I don't believe any kind of settlement discussions are appropriate to discuss here. What is going to happen is we are going to get totally distracted from the purposes of this case.

THE COURT:  No.  I don't want to hear anything

68

Wilhelm - Recross

1    about any settlement other than if there has been an offer of

2    reinstatement only.  I may not even consider that.  There is

3    no jury here.

4           I will permit the question only with regard to the

5    question as to whether there has been an offer of

6    reinstatement and what it was -- I mean what the position

7    was.

8           MS. FORNEY: I understand, Your Honor.

9    BY MS. FORNEY:

10   Q    Ms. Wilhelm, did you receive an offer of reinstatement?

11          MR. PRINGLE:  Objection, Your Honor.

12          THE COURT:  I've made a ruling, Mr. Pringle.

13          MR. PRINGLE:  She can answer the question, but

14   there was -- she can answer the question.

15          THE COURT:  The question was: Was there an offer

16   of reinstatement?

17   A    There was an offer.  As I recall it was reinstatement,

18   no position to the best of my recollection.

19   BY MS. FORNEY:

20   Q    Did you subsequently receive information about a

21   position?

22   A    I can't recall.  I would have to refresh my memory.

23   Q    You have no recollection of receiving that information?

24   A    I just can't recall at this time from all the documents

25   I was reading to prepare for this.

69

Wilhelm - Recross

1      MR. PRINGLE:  Your Honor, this is where we are

2  going to have a problem.  She can answer the question.  She

3  has answered it.  She doesn't know about a specific

4  position.

5      THE COURT:  She can certainly present her with a

6  document to refresh her memory.  If it doesn't, it doesn't.

7  If it does, fine.  That's the only reason you are going to

8  present it is just to refresh her memory.

9      MS. FORNEY: Yes, Your Honor.

10      (Document handed to the witness.)

11  A    Yes, I recall this.

12  BY MS. FORNEY:

13  Q    And you were offered reinstatement in a position at the

14  same salary and benefits as if you had not been separated?

15      MR. PRINGLE:  Objection, Your Honor.

16      MS. FORNEY: I am asking --

17      THE COURT:  This is important.

18      MR. PRINGLE:  Is it important, Your Honor, but she

19  is confusing the witness.  She is showing one document and

20  showing another document that she showed me in another hand.

21      THE COURT:  Overrule the objection.

22  BY MS. FORNEY:

23  Q    Ms. Wilhelm, you were offered reinstatement to a

24  position with the same salary and benefits as though you had

25  never been separated from the State Police; is that right?

70

Wilhelm - Recross

1          MR. PRINGLE:  Objection, Your Honor.  That is not

2     what the document states.  She is misstating --

3          THE COURT:  She is not reading the document I

4     don't think.  She is asking her a question.  If the question

5     is wrong, then you can certainly clarify it.

6          MR. PRINGLE:  Thank you.

7     A     I don't believe I understood what it was.

8          THE COURT:  Now are you using the document now?

9          MS. FORNEY: I am allowing her to refresh her

10    recollection, Your Honor.

11         THE COURT:  Okay.

12    BY MS. FORNEY:

13    Q     Were you offered reinstatement to a position at the

14    same salary and benefits as if you had never separated from

15    the State Police?

16    A     That's what the document says.

17    Q     And the document also offered, did it not, that --

18         THE COURT:  Are you getting into other terms of

19    the proposed settlement agreement?

20         MS. FORNEY:  No, Your Honor.  It has to do with

21    reinstatement.

22         MR. PRINGLE:  Your Honor, the problem with the way

23    she is presenting this is that she is not giving the full

24    statement of what the reinstatement is.  She is not giving

25    you the full proposal.

71

Wilhelm - Recross

1        In order to appreciate Ms. Wilhelm's response, you

2   have to hear the entire proposal.  What is significant about

3   the entire proposal is that the proposal did not propose a

4   specific position.  It didn't say reinstatement to a position

5   as anything.  Just a promise to put her in a position with

6   equal pay and salary for six months.

7        THE COURT:  Is that correct?

8        MS. FORNEY:  No, Your Honor.  It was an offer to

9   place her -- not entirely correct.  It was an offer to place

10  her in a position at the same salary and benefits, that she

11  would be assigned work commensurate with her skills;

12  experience and abilities either with the State Police or with

13  another Commonwealth agency; and that within six months, she

14  would be placed in another Commonwealth position commensurate

15  with her skills and abilities at the same salary and benefits

16  as if she had not separated from the State Police.

17       MR. PRINGLE:  The point, Your Honor -- her point

18  is that no specific position for the the first six months is

19  identified and no specific position is identified in the

20  second six months, the remainder.

21       THE COURT:  Well, I will let you use those

22  questions on cross-examination.  That's it.  I would normally

23  not permit any further, but after she is done, I'm going to

24  let you reredirect on that issue only.

25       MR. PRINGLE:  Thank you, Your Honor.

72

Wilhelm - Recross

1    BY MS. FORNEY:

2    Q    Ms. Wilhelm, I am handing you a document which has been

3    marked Defendant Exhibit 94.  Have you ever seen that

4    before?

5            MR. PRINGLE:  Excuse me, Your Honor.  Just for the

6    record, I have never seen that document before today.

7            MS. FORNEY:  Your Honor, I faxed this document to

8    Mr. Pringle.

9            MR. PRINGLE:  When did you fax it to me?

10           MS. FORNEY: When I said I was going to.  I told

11    you I had another exhibit, and it was faxed when we talked

12    yesterday.

13           MR. PRINGLE:  Your Honor, the problem with faxing

14    a document, we had the same problem before.  It is an

15    uncertain method of communicating with me.  What I did -- the

16    way it works in my office --

17           THE COURT:  It's a lot faster than mail.

18           MR. PRINGLE:  At least, she could have told me

19    what the position was.

20           MS. FORNEY:  Mr. Pringle, I told you I was going

21    to fax you the document.  You were expecting a document from

22    me.

23           MR. PRINGLE:  The problem with sending it -- you

24    sent it to me what day?  Was it yesterday?

25

73

Wilhelm - Redirect

1        MS. FORNEY:  Whenever we discussed exhibits, and

2   you told me about some exhibits that you were going to be

3   presenting.

4        MR. PRINGLE:  Then that was yesterday.  Yesterday

5   afternoon, she said she was going to fax additional

6   documents.  Unfortunately, the way faxes are received in my

7   office, they go to a server.  Once the server receives the

8   documents, they then mail it to me specifically to my

9   desktop.

10       In this case, I notified the secretary that

11  e-mails would be -- faxes would be coming in.  I never got

12  this document.

13       My point is that Ms. Wilhelm cannot testify about

14  a document that I haven't seen and she --

15       THE COURT:  Sustain the objection.

16       MS. FORNEY:  Your Honor, my only question was had

17  she seen it before.  No other questions, Your Honor.

18       THE COURT:  I will permit you to question only

19  about the last offer of reinstatement.

20                    REDIRECT EXAMINATION

21  BY MR. PRINGLE:

22  Q    Ms. Wilhelm, with respect to the offer of reinstatement

23  described in the letter from Ms. Forney, did you read that

24  letter?

25  A    I did refresh myself on it briefly, yes.

74

Wilhelm - Redirect

1    Q      Did I hand the letter to you?

2    A      Yes.  I recall you handing it to me previously.

3    Q      And in that letter, did you see anywhere where there

4    was a specific offer for a specific position?

5    A      No.

6    Q      Was there any specific agency identified where this

7    position would be?  Did the letter identify the agency which

8    would employ you?

9    A      The first one was the agency of the Pennsylvania State

10   Police that dismissed me that is now run by the individual

11   who asked me to leave the Office that resulted in my

12   dismissal, who would also be responsible for the budget that

13   would be directly or indirectly provided to any other agency

14   to support that position if I were in another agency.

15          So what I saw there was control again by the

16   Pennsylvania State Police.

17   Q      Did that letter indicate after the six month period

18   whether or not there was a specific position available to

19   you?

20   A      No.

21          MR. PRINGLE:  No further questions, Your Honor.

22          MS. FORNEY: No other questions, Your Honor.

23          THE COURT:  You may step down.  Next witness.

24          MR. PRINGLE:  I would like to call Mr. Robert

25   Murphy, please.

75

Murphy - Direct as to Qualifications

1          ROBERT MURPHY, called as a witness, being duly

2    sworn, testified as follows:

3

4          THE CLERK:  Would you state your name for the

5    record, please?

6    A     Robert Murphy.

7          THE CLERK:  Thank you.

8          DIRECT EXAMINATION AS TO QUALIFICATIONS

9    BY MR. PRINGLE:

10   Q     Mr. Murphy, would you give us your current position?

11   A     I am a partner with the accounting firm of Boyer and

12   Ritter.

13   Q     Would you give us your educational background?

14   A     I have a BS in Business Administration from Indiana

15   University of Pennsylvania.  I graduated from there in 1980.

16   Q     And do you hold any licenses or certifications?

17   A     I am a certified public accountant and a certified

18   valuation analyst.

19   Q     Have long have you been a certified public accountant

20   and a certified valuation analyst?

21   A     I have been a CPA a little over twenty years.  I have

22   been a certified valuation analyst approximately for five

23   years.

24   Q     Have you ever had --

25          THE COURT:  Can we distinguish the difference in a

Murphy - Direct as to Qualifications

1    CPA, and what was the other one?

2    A    Certified valuation analyst.

3    BY MR. PRINGLE:

4    Q    What is the difference between the two?

5    A    A certified valuation analyst is a certification given

6    by the National Association of CVA's, which is a group that

7    perform business valuations.  CVA really deals with business

8    valuations.  And a certified public accountant is just that.

9              THE COURT:  Okay.

10   BY MR. PRINGLE:

11   Q    Have you ever had occasion to make determinations of

12   calculations of future lost earnings?

13   A    For damages?

14   Q    Yes.

15   A    Yes.

16   Q    On what occasions would they have been?

17   A    Are we talking about the immediate case here or prior

18   experience?

19   Q    Prior experience.

20   A    My prior experience would be in a situation of a

21   wrongful death action.

22   Q    Okay.  Have you ever testified in court before?

23   A    Yes.

24   Q    And you testified in court related to the lost future

25   earnings?

77

Murphy - Direct as to Qualifications

1    A    No.  The wrongful death action never went to trial.

2    Q    You were deposed in that matter?

3    A    I was not deposed.

4            (Narrative portions of Robert Murphy's Expert

5    Report was introduced as Plaintiff Exhibit 1.)

6            MR. PRINGLE:  At this time, we would like to

7    present the report -- your report which is labeled Plaintiff

8    Exhibit 1.  He has a copy of it.

9            THE COURT:  He can certainly rely on the report.

10   It is his testimony and not the report that is the best

11   evidence.

12           MR. PRINGLE:  I am using the report to assist in

13   his testimony.

14           THE COURT:  Why don't you ask him questions?  You

15   can certainly form questions from the report, but don't

16   relate what is in the report.  He is the one that has to give

17   the testimony.

18           MR. PRINGLE:  Your Honor, all I am going to ask

19   him to do is explain the report.

20           THE COURT:  No.  We don't do that this way, Mr.

21   Pringle.  You ask him questions.  He can refer to his report

22   in support of his answers.

23           MR. PRINGLE:  Okay.

24   BY MR. PRINGLE:

25   Q    Mr. Murphy, did you do any calculations in determining

78

Murphy - Direct as to Qualifications

1   future lost earnings in this matter?

2   A    Yes, I did.

3   Q    What was the basis of you -- what information did you

4   have to do your calculations and make your determinations?

5   A    The information included employe's salary statements,

6   social security statements from Ms. Wilhelm, the master

7   agreements from the Commonwealth of Pennsylvania, certain

8   statements of account from the Retirement System of the

9   Commonwealth of Pennsylvania, various correspondences from

10  the Commonwealth, the State Employes Retirement System Member

11  Handbook and the Employe Benefit Trust Summary Plan

12  Description.

13            THE COURT:  If you are now going to use him as an

14  expert, you need to proffer him and permit the Commonwealth

15  the opportunity to voir dire him on his qualifications.

16            MR. PRINGLE:  Your Honor, I would like to present

17  him as an expert witness.

18            THE COURT:  In what area?

19            MR. PRINGLE:  In the area of determining future

20  lost earnings.

21            THE COURT:  Do you wish to voir dire?

22            MS. FORNEY: Yes, Your Honor.

23

24

25

79

Murphy - Cross as to Qualifications, Redirect

CROSS EXAMINATION AS TO QUALIFICATIONS

BY MS. FORNEY:

Q    Mr. Murphy, I understand that you have only been
involved in calculating future lost earnings once before this
case; is that right?

A    That is true.

Q    And that was in a wrongful death action?

A    True.

Q    Not economic loss arising from loss of employment --
from discharge of employment?

A    Correct.

MS. FORNEY:  Your Honor, I am going to object to
the presentation of Mr. Murphy as an expert in that there has
not been an adequate foundation laid for his expertise.

MR. PRINGLE:  Your Honor, I believe that there is
no difference between calculating future loss of earnings for
a wrongful death action and a wrongful discharge action.  The
elements are basically the same.

THE COURT:  Let's establish that from him.

REDIRECT EXAMINATION AS TO QUALIFICATIONS

BY MR. PRINGLE:

Q    Mr. Murphy, could you tell us how you would calculate
the damages involved in a wrongful death action?

THE COURT:  Wait a minute.

MR. PRINGLE:  I am sorry in a wrongful employment

80

Murphy - Redirect as to Qualifications

1    action.

2                THE COURT:  I think the issue is from him as to

3    whether or not the approaches that he does and the

4    calculation he makes, is there any differences in the

5    procedures that he uses.  And if so, we need to know what

6    they are.

7    BY MR. PRINGLE:

8    Q    Mr. Murphy, are there any differences between the

9    approaches that you use in calculations for lost future

10   earnings in a wrongful death action versus a wrongful

11   discharge action?

12   A    The fundamental theory is the same.  That is there are

13   undamaged earnings in the case for wrongful death, obviously

14   where the individual did not die in a wrongful termination,

15   the fact that the employe was not terminated.

16                The other piece of the economic damage are the

17   given earnings, which in the case of an employment

18   termination are those that you believe that employe is going

19   to earn into the future given the fact that she has been

20   terminated.  Of course, in a wrongful death action, the given

21   is zero.

22                MS. FORNEY: Your Honor, I do --

23                THE COURT:  I am going to take it under

24   advisement.  I will weigh the qualifications and the

25   testimony.

81

Murphy - Direct

DIRECT EXAMINATION

BY MR. PRINGLE:

Q     Did you -- I'm sorry.  I was asking you at the time to identify the information, the data you used to do your calculations.  Did you complete your answer to that?

A     Yes.

Q     Did you make a determination regarding the total lost earnings for Ms. Wilhelm?

A     Yes.  The summary of the report summarizes the net present value.

        THE COURT:  We need your testimony as to how you calculated it and the figure you came up with.

        MR. PRINGLE:  That is my question.

A     Do you want to know the process?

        THE COURT:  Yes, sir.

BY MR. PRINGLE:

Q     Yes, sir.

A     Okay.  The best way to describe the general economic theory is the graph that is in the report immediately following the summary page.  This is a graph of projected economic earnings.

        There are two fundamental building blocks of this calculation represented by the two lines in the graph.  The top line represents --

        MS. FORNEY:  I'm sorry.

82

Murphy - Direct

1    THE COURT:  I think we need that exhibit

2 introduced.

3    MR. PRINGLE:  It is part of the report, Your

4 Honor.

5    THE COURT:  The report does not come in the

6 record.  The testimony does.  So if you want to use that

7 exhibit, that can come into the record.

8    MR. PRINGLE:  It is currently part of the report.

9 We are going to separate it.

10    THE COURT:  Separate it out as another exhibit.

11    MR. PRINGLE:  This would be Plaintiff Exhibit 4.

12    THE COURT:  Go ahead.

13    (Graph created by Robert Murphy of Projected

14 Economic Damages was introduced as Plaintiff Exhibit 4.)

15 A    The top line on the graph represents the cash flows to

16 Ms. Wilhelm but for her termination.

17    THE COURT:  Do you have a copy there for the Law

18 Clerk, please?  All exhibits in a nonjury case are also

19 supposed to be given also to the Law Clerk.

20    THE COURT:  Let's try again.  The red line is

21 what?

22 A    Mine is not in color.  The red line would represent the

23 but for earnings, those earnings that she would have realized

24 had she not been terminated.  The bottom line, which is green

25 perhaps or blue, is the cash flow projections given the

83

Murphy - Direct

1    termination.

2          The gap in between those therefore represents the

3    payment of the cash flow or the economic damage.

4          THE COURT:  What is the green line again?  The

5    bottom line is what?

6    A    The projection of her earnings given the termination.

7    Therefore the difference represents the impairment in her

8    cash flows due to the termination, and that is the economic

9    damage.  We have calculated those on a year by year basis and

10   then discounted those cash flows back to today.

11   BY MR. PRINGLE:

12   Q    And what are the elements of the cash flow?

13          MS. FORNEY: Which cash flow?

14   BY MR. PRINGLE:

15   Q    The but for earnings.

16          THE COURT:  What?

17   BY MR. PRINGLE:

18   Q    The red line, the earnings that she would have had she

19   not been terminated.  The future earnings had she not been

20   terminated.

21          THE COURT:  Let's repeat the question.

22   BY MR. PRINGLE:

23   Q    The question is:  What factors did you take into

24   account to calculate her earnings had she not been

25   terminated?

84

Murphy - Direct

1   A     The top line of that graph, the red line of that graph

2   which indicates the earnings she would have realized had she

3   not been terminated is further explained if we want to -- can

4   I show the report?  In the next page -- no, I can't.

5              THE COURT:  Well, you have to use your memory.

6   You can look at it and read it and then tell us.

7   A     The cash flow projection but for the job dismissal is

8   made up of the earnings that she would have earned from the

9   Pennsylvania State Police.  In order to determine that, we

10  started her at the pay range and step that she was at the

11  date of termination and then just continued to roll her

12  forward through those step increases until she reached the

13  top pay step of 20.

14              And then from there on her appreciation, her

15  increase in salary would be the annual COLA adjustment.

16              THE COURT:  The what?

17  A     The cost of living adjustment.  In determining that, we

18  also needed to estimate what the cost of living adjustment

19  would be.  I have estimated that would be 3.1 percent.

20  BY MR. PRINGLE:

21  Q     On what basis?

22  A     I looked at the past ten years of contracts.  And the

23  average cost of living increase over the past ten years is

24  3.1 percent.

25              We were projecting this earnings out a period of

85

Murphy - Direct

1    twelve years.  Therefore, the ten years to me was a

2    reasonable amount of time to use as an estimate for the

3    future COLA adjustments.

4    Q    Why did you project out for ten years -- I mean twelve

5    years?

6    A    Her anticipated retirement date was September of 2014.

7    Also in the earnings section had she been employed with the

8    Commonwealth, she would have contributed 6.25 percent of her

9    compensation into the State system -- State Retirement

10   System.  So I have shown that as -- considered that as a

11   reduction of cash flow because she would not have received

12   that cash at that point in time.

13           Other items that come into consideration for the

14   cash flow projection but for the job dismissal is sick leave

15   and vacation pay that Ms. Wilhelm would have been entitled to

16   at the dates of her retirement.

17   Q    How did you determine what they would be?

18   A    To determine the sick leave, we estimated what her

19   usage would be as far as the number of sick days she would

20   take in a particular year.  We based that upon the history of

21   Ms. Wilhelm.

22           As far as the sick days allotted, that is a part

23   of the State Employe Benefit Plan.  We projected that through

24   2012 and determined that she was entitled to a given number

25   of days.  As a retiree, she is entitled to be paid for 50

86

Murphy - Direct

1    percent of the rate of pay then in existence.

2            A similar calculation was done for vacation pay;

3    although under the State system, the maximum that she is

4    entitled to is 45 days of vacation to be paid for.  Those

5    cash flows would be due to her in the year 2014.

6            The other items that she would be entitled to

7    would be pension benefits.  On September -- in September of

8    2014, she would have retired, and she would have elected to

9    take what is referred to as her accumulated deductions

10   balance in a single cash payment.

11           We have estimated that balance to be $144,000.00.

12   The accumulated deduction account represents the

13   contributions that the employes have made plus a four percent

14   interest earnings.

15           In addition to that withdrawal, then Ms. Wilhelm

16   would have started to take monthly -- or started to receive

17   monthly pension checks.  We then extrapolated that monthly

18   pension check out to her life expectancy.

19   Q     Which is what?

20   A     I have it at 81.2 years.  The last item under the cash

21   flow projection would be social security.  Social security is

22   based upon the amount of income that an individual earns

23   throughout their lifetime.  And that is how they determine

24   the benefit to be received.

25           That is another item that she would be entitled to

87

Murphy - Direct

1    upon obtaining the age -- we estimate she will start

2    receiving social security at the age of 62 and one month.

3         That represents the cash flows that she would have

4    received but for her termination.  Taking them out over a

5    period up through the year 2038 totals $3,071,194.00.

6         The next step in determining what the damages

7    would be would be to discount those future cash flows back to

8    January 31st.

9    Q    On what basis?  What discount rate did you use?

10   A    I used the discount rate of 5.04 percent.

11   Q    What did you use that?

12   A    Which represents the return on a twenty year treasury.

13   The discounted future cash flows, that three million dollars

14   discounted to today's dollars represents $1,375,517.00 as of

15   January 31st.  That represents the cash flow that she would

16   have received had she not been terminated.  That is the top

17   line of the graph.

18   Q    Can you describe for us how you determined the bottom

19   line of the graph which I think you described as the given

20   cash flow?  Does that represent -- what does that represent

21   again?

22   A    The cash flow projection subject to the effects of the

23   job dismissal.  Now that she is in a position that she has

24   been terminated, what will her cash flows be into the

25   future.

88

Murphy - Direct

1    Q    How did you arrive at that calculation?

2    A    The first thing we consider are mitigating earnings

3    that she would eventually find employment.  For the purposes

4    of this report, I have estimated that she would find

5    employment by April of 2003.

6              In determining what those wages, salaries would

7    be, I looked at the Bureau of Labor Statistics average

8    earnings and determined that her salary in 2003 would be

9    $36,600.00.  I then increased that from 2003 through her date

10   of retirement 2014 at a rate of 3.76 percent.

11   Q    Why that rate?

12   A    The 3.76 percent represents, once again using National

13   Bureau of Labor Statistics, the average increase in the

14   private sector over the last 13 and a half years.

15             THE COURT:  Is six what?

16   A    It's 3.76 percent.  I then increased her compensation

17   3.76 percent through her retirement date which would still be

18   September of 2014.

19             THE COURT:  It is an increase each year?

20   A    It is an increase each year of 3.76 percent.  The cash

21   flow projection subject to the effect of the job dismissal

22   would not include sick leave paid at retirement that she

23   would get from the Commonwealth because she won't be there.

24   She would not have that vacation pay either.

25             Her pension withdrawal, the fact that she was an

89

Murphy - Direct

1    employe with over 20 years of service, she is entitled to

2    pension benefits from the Commonwealth.  She would have a

3    pension withdrawal on 2014 of approximately $73,000.00.  Her

4    monthly pension checks would then begin in October of that

5    year and continue out to her projected date of death.

6            The other items are social security.  The fact

7    that her earnings are less, her social security benefits will

8    also be less.  I used the social security benefit calculator

9    to determine what her benefits would be under both

10   scenarios.  I have extrapolated those out from the time she

11   would begin her social security payments, which is 62 years

12   one month, once again out through the date of death.

13           Those amounts are increased at an annual cost of

14   living adjustment of 2.59 percent.

15           THE COURT:  You are assuming we are going to have

16   a social security fund at that time?

17   A      That is true.  The 2.59 percent represents the average

18   of the COLA adjustments over the past ten years.

19           The other item in the cash flow projection subject

20   to the effects of the job dismissal is health insurance.  Ms.

21   Wilhelm is entitled to health insurance benefits from the

22   Commonwealth.  Obviously, she is not employed there, and she

23   will not have those benefits.

24           She is entitled to those benefits through the term

25   of her employment, as well as through her retirement years.

Murphy - Direct

1          I have calculated her health insurance premium if

2   she is to replace those benefits beginning in 2003 and have

3   extrapolated that over her term of her life.  She would have

4   -- her health insurance premiums up until the age that she

5   is eligible for Medicare would be based upon an individual

6   rate of a Pennsylvania Blue Shield program.

7          For purposes of the reports, I have used a

8   traditional Classic Blue Premium under the individual monthly

9   program system.  I estimated that premium would be $997.00 a

10  month.  We increased that -- I increased that for a period of

11  up to her -- up to the time she was eligible for Medicare at

12  a rate of five percent.  The premiums would increase five

13  percent per year.

14         Once she is eligible for Medicare, I would assume

15  that she would elect Medicare Part B, and that she would also

16  require then a Medigap insurance policy.  I have extrapolated

17  that through the remainder of her life.

18         Those  are the items that are used in the cash

19  flow projection subject to the effects of the job dismissal.

20  Once again, we project that out through the year 2038, and

21  that comes to $979.00 -- I'm sorry -- $979,187.00.

22         THE COURT:  Let me have that again.

23  A     $979,1887.00.  If I go -- the net present value of that

24  amount is $431,181.00.  Therefore, the economic damages is

25  the difference between the net present value of the undamaged

91

Murphy - Direct

1  earnings versus the damaged earnings which comes to

2  $944,336.00.

3           MR. PRINGLE:  At this time, I would like to

4  present Plaintiff Exhibit 4 which is the summary page in the

5  document that was originally labeled Plaintiff Exhibit 1.

6           THE COURT:  Wait a minute.  I thought the chart

7  was 4.

8           THE CLERK:  The chart was 4.

9           MR. PRINGLE:  I'm sorry.  This would be 5.

10           ( Summary Page of economic factors was introduced

11  as Plaintiff Exhibit 5.)

12           THE COURT:  Which one is this now?

13           MR. PRINGLE:  The summary page which is labeled in

14  the report, it is Exhibit 1, but it identifies all the

15  various economic factors and the two columns of the totals.

16  It is labeled at the top Exhibit 1.  It is right after the

17  signature page of the report.

18           THE COURT:  This?

19           MR. PRINGLE:  Yes.

20           THE COURT:  Any objection?

21           MS. FORNEY:  No, Your Honor.

22           THE COURT:  It's admitted.

23           (Plaintiff Exhibit 5 was admitted into evidence.)

24           (Charts of Projected and un-projected cash flows

25  and net present value calculations consisting of six pages

92

Murphy - Direct

1    total was introduced as Plaintiff Exhibit 6.)

2         MR. PRINGLE:  At this time, I would like to

3    present Plaintiff Exhibit 6 which is the information that

4    follows that in the report, which is six pages.

5         THE COURT:  Are those the charts?

6         MR. PRINGLE:  They are the charts.

7         THE COURT:  Any objection?

8         MS. FORNEY:  Yes, Your Honor.  We haven't had any

9    explanation of what this is.  So I do object.

10         MR. PRINGLE:  He has testified --

11         THE COURT:  I think those support his --

12    specifically his general testimony concerning the projected

13    damage and undamaged cash flows for each year.  If you want

14    him to go through all the charts -- why don't you lay a

15    general foundation as to what these are?

16    BY MR. PRINGLE:

17    Q    I am  showing you what has been labeled as plaintiff

18    Exhibit 6 which is six pages of charts.  Can you describe

19    what is contained?  Have you seen this document before?

20    A    Yes.

21    Q    Can you tell us what it is?

22    A    The six pages includes three pages -- the first three

23    pages are Exhibit 2 in my report and represents the projected

24    damage and undamaged cash flows by year, the year 2002 out

25    through the year 2038.  It then has a total at the end.

93

Murphy - Direct

1   The second three pages are Exhibit 3.  And this is

2   the net present value calculation of the projected damage.

3   So each of the numbers on the first schedule then is

4   reflected at its discounted value on the second schedule --

5   discounted at the rate of 5.04 percent to January 31st,

6   2003.

7   MR. PRINGLE:  Your Honor, I move the admission of

8   this document.

9   MS. FORNEY:  Your Honor, no objection subject to

10   our objection to the qualifications.

11   THE COURT:  To the what?

12   MS. FORNEY: To the qualifications of the expert.

13   THE COURT:  It is admitted.

14   (Plaintiff Exhibit 6 is admitted into evidence.)

15   THE COURT:  What about the chart?

16   MR. PRINGLE:  Sorry, Your Honor.  At this time, I

17   would like to move for the admission of the Plaintiff Exhibit

18   4.

19   THE COURT:  Same?

20   MS. FORNEY: Same.

21   THE COURT:  Admitted.

22   (Plaintiff Exhibit 4 was admitted into evidence.)

23   MR. PRINGLE:  I have no further questions, Your

24   Honor.

25   THE COURT:  Are there any other exhibits to be

94

Murphy - Cross

1    admitted under this witness's --

2              MR. PRINGLE:  Yes, Your Honor.

3              MR. PRINGLE:  We would like at this time to admit

4    Plaintiff Exhibit 1, which are the narrative portions of his

5    report.

6              MS. FORNEY:  Objection.

7              THE COURT:  Sustained.

8              MR. PRINGLE:  At this time, I have no further

9    questions and no other exhibits to present.

10              THE COURT:  Cross-examine.

11                        CROSS EXAMINATION

12   BY MS. FORNEY:

13   Q    Mr. Murphy, you mentioned that in projecting the

14   plaintiff's mitigating earnings you relied on average wage

15   figures provided by the Bureau of Labor Statistics; is that

16   right?

17   A    Yes.

18   Q    And those were average wages for all employes covered

19   by unemployment compensation; is that right?

20   A    Yes.

21   Q    And I believe in your deposition, you told me you

22   looked at an average wage for the state of Pennsylvania, an

23   average wage for the metropolitan statistical area including

24   Harrisburg and also a national average wage figure; is that

25   right?

Murphy - Cross

1    A    Yes.

2    Q    And those wages were for private sector employes;

3    correct?

4    A    True.

5    Q    And that wage was approximately $34,000.00; is that

6    right?

7    A    In the year 2001.

8    Q    And then you increased it to bring it forward to the

9    year 2002, and that is how you got you are $36,000.00?

10   A    To the year 2003.

11   Q    Excuse me, to the year 2003.  As I understand what that

12   average statistic is is it includes the wages of all those

13   private sector employes from laborers and fast food workers

14   right up to managers and executives?

15   A    I believe it encompasses 129 million in the national

16   statistics.

17   Q    And it does include everyone from laborer to fast food

18   workers to executives and managers?

19   A    True.

20   Q    So that it is quite possible that if more laborers and

21   fast food workers are included in the survey, the wage -- the

22   average wage is skewed toward the lower end; isn't that true?

23   A    Well, some of the higher waged people may have

24   extremely high wages as well which will skew it in that

25   direction.

Murphy - Cross

1    Q      But it would depend on the ratio of lower paid workers

2    to higher paid workers; wouldn't it?

3    A      That's one of the factors.

4    Q      You don't know what that ratio is; do you?

5    A      No.

6    Q      Now the Bureau of Labor Statistics does maintain data

7    on different occupation groups; doesn't it?

8    A      Yes.

9    Q      So that you could determine the average wage for a

10   person say who worked in administrative and managerial

11   capacities; couldn't you?

12   A      That may be one of the items.  I don't recall it, but

13   it may be one of the classifications.

14              (U.S. Department of Labor Bureau of Labor

15   Statistics Article "National Compensation Survey"

16   Occupational Wages in the United States, 2001" was introduced

17   as Defendant Exhibit 54.)

18   BY MS. FORNEY:

19   Q      I am going to hand you a document which I have marked

20   as Defendant Exhibit 54.  Is this the publication -- one of

21   the publications from the Bureau of Labor Statistics that you

22   used to derive the average wage that you used in your

23   calculation?

24   A      Yes.

25   Q      And as I understand what you told me in your deposition

97

Murphy - Cross

1   if you turn to page three of that document, what you did was

2   on Table One on that page going down the left-hand column,

3   you came to where it said full-time under worker

4   characteristics?

5   A     Yes.

6   Q     And you went over to the column marked private

7   industry, and you took the mean hourly earnings under that

8   column; is that correct?

9   A     Yes.

10  Q     And you multiplied it by the mean weekly hours under

11  that column?

12  A     Yes.

13  Q     And you came up with an average weekly wage?

14  A     Yes.

15  Q     And then you multiplied that by if I recall correctly

16  52.18?

17  A     Yes.

18  Q     And that is how you came up with your $34,000.00?

19  A     Yes.

20  Q     If you turn to page seven on that same report --

21          THE COURT:  Where is the $34,000.00?

22          MS. FORNEY:  Your Honor, I believe it is the

23  result of the calculation that Mr. Murphy just testified to.

24          THE COURT:  I have a 36,600 in here.

25

98

Murphy - Cross

BY MS. FORNEY:

Q    Mr. Murphy, my understanding is that your calculation
came up with approximately $34,000.00; is that right?

A    As of 2001.

Q    And then you increased that in order to bring that
figure forward to 2003?

A    That's correct.

Q    And that is where the $36,600.00 figure came from?

A    Correct.

        THE COURT:  Got it.  Thank you.

BY MS. FORNEY:

Q    Would you turn to page seven of this same report?

A    (Witness complies.)

Q    And this is Table Three.   And this table contains Mean
Hourly Earnings and Weekly Hours for Selected Occupations; is
that correct?

A    That's correct.

Q    And if you go one-third of the way down the left-hand
column, there it says Executive Administrative and Managerial
Employes?

A    Yes, I see.

Q    And it contains -- if you move over to the full-time
category, it has a mean hourly earning; does it not?

A    Yes.

Q    And it also has a mean weekly hours worked?

99

Murphy - Cross

1    A    Yes.

2    Q    I assume you don't have a calculator with you; do you?

3    A    No.

4    Q    You heard Ms. Wilhelm testify, did you not, that she

5    had been employed previously in managerial and supervisory

6    jobs?

7    A    Yes.

8    Q    Here.

9    A    If I can't use it, I will let you know.  I don't know

10   how to turn it on.  I think it is on.

11   Q    We will try it.  All right.  I am going to ask you, if

12   you would please, to multiply the hourly earning -- average

13   hourly earning for executive and administrative and

14   managerial employes by the mean weekly hours.  And that is?

15   A    The weekly, is that what you are asking, to multiply

16   those two?

17   Q    Yes.

18   A    $1,171.31.

19   Q    And to bring that to an annual figure, I am going to

20   ask you to multiply it by 52.18.

21   A    I will be right with you.

22   Q    That is all right.  Take your time.

23   A    $61,118.95.

24   Q    That is certainly larger than the $36,000.00 that you

25   used for your calculations; correct?

100

Murphy - Cross

1    A    Yes.

2    Q    So we can assume that had you elected to use this

3    figure, it would have decreased the overall loss?

4    A    Yes.

5    Q    Now did you do any independent investigation of job

6    opportunities that might be available to Ms. Wilhelm?

7    A    No.

8    Q    Not at all?

9    A    Not at all.

10   Q    If Ms. Wilhelm had obtained a job with the Commonwealth

11   instead of in the private sector as your calculations

12   assumed, that would have affected your calculations; would it

13   not?

14   A    Definitely.

15   Q    It certainly would have affected the calculation for

16   health benefits?

17   A    Certainly.

18   Q    And retirement?

19   A    Certainly.

20   Q    And sick leave?

21   A    Yes.

22   Q    And vacation leave?

23   A    Yes.

24   Q    And it would have affected the wage earnings and the

25   social security calculations, of course, depending on the

101

Murphy - Cross

1    salary --

2    A    Correct.

3    Q    -- that she earned?

4    A    Correct.

5    Q    Let's just take the wage earnings -- strike that.  How

6    would it have affected your calculations if Ms. Wilhelm

7    obtained a job with the Commonwealth instead of a job with

8    the private sector at the same pay rate and benefits that she

9    would have received had she not separated from the State

10   Police?

11   A    Effective -- that job would be effective -- say it is

12   effective today?

13   Q    Yes.

14   A    What the damages would be?

15   Q    Yes.

16   A    From September 12th through today whatever those

17   earnings that she has lost out on.

18   Q    But as to the future?

19   A    As to the future assuming that she gets credit for

20   those years of service in her retirement plan?

21   Q    Yes.

22   A    Her losses would basically be from September 12th

23   through the date of her employment.

24   Q    There would be essentially no future losses; is that

25   what you are saying?

Murphy - Cross

1   A      From the date that she began employment at the exact

2   same rate of pay?

3   Q      Yes.

4   A      That is true.

5   Q      How would it affect your calculations if she obtained a

6   job with the Commonwealth, again, assuming today at say 80

7   percent of the wage rate that she received -- would have

8   received had she remained employed with the State Police?

9           Feel free to use the calculator if that would be

10  of assistance.

11          THE COURT:  I don't think I understand the

12  question.

13  BY MS. FORNEY:

14  Q      The question is:  How would it affect your calculations

15  if Ms. Wilhelm obtained a job with the Commonwealth today at

16  a wage rate 80 percent of what she would have earned had she

17  remained with the State Police?

18  A      Her future earnings, that 20 percent difference

19  extrapolated over the twelve years of her employment would be

20  economic damages.  Her sick leave and vacation pay and

21  retirement would be 20 percent less.

22          Her pension benefits would be reduced because her

23  highest three years would be less than they would be if she

24  had full employment.  And her social security would be

25  slightly reduced as well.

103

Murphy - Cross

Q    Isn't the reduction pretty much proportional?

A    It would be in salary.  I would probably have to run tabulations on the pension benefits.  Probably on the pension benefits.  I am not sure on the social security benefits.

Q    It would entirely -- any job that she would receive with the Commonwealth would eliminate her loss with regard to health benefits; correct?

A    Once she has obtained 25 years of service, that's correct.

Q    Could you since you have the calculator there do the calculation for me with regard to the differences in wage loss?

A    I am not exactly sure what --

Q    What the question is?

A    Yes.

Q    The question is:  If Ms. Wilhelm received a job with the Commonwealth today that paid 80 percent of what she would have earned had she continued her employment with the State Police, how would that affect your calculation on wage loss?  Can you do the calculation to show me how it would affect it?

A    That would be a year by year calculation because my total calculation I have included from September 12 of 02 through January of 03.  It is just not -- it is close to that, but it is not a simple 80 percent of that number.

Q    If I chose a different date, would it make it easier

104

Murphy - Cross

1    for you to do that calculation as to when she would start

2    Commonwealth employment?

3    A    Yes.

4    Q    What date would be easier?

5    A    September 12th would be a good place to go.

6    Q    Why don't we do that?

7         MR. PRINGLE:  Objection, Your Honor.  The fact

8    that that didn't happen, she has not been employed yet, has

9    not received employment by the Commonwealth at this point in

10   time.

11        In addition, this hypothetical assumes facts that

12   are not in the record.  First of all, there is no evidence of

13   any vacancies or any positions with the Commonwealth or the

14   availability of any positions with the Commonwealth.

15   Therefore, the conjecture on what would happen if she got a

16   position with a Commonwealth agency is speculative and not of

17   any probative value.

18        MS. FORNEY:  Your Honor, Mr. Murphy has made

19   certain assumptions in making his calculations.  I believe in

20   cross-examination, I am allowed to explore how his

21   calculations would be affected if he adopted different

22   assumptions.

23        THE COURT:  But the assumption has to be made on

24   something that is of record.  You just can't pull a

25   hypothetical out of the air that has no basis on the record.

Murphy - Cross

1      MS. FORNEY:  Your Honor, I intend to present

2  evidence that will provide basis.

3      THE COURT:  Using the September 12 figure?

4      MS. FORNEY:  With regard to -- with regard to

5  Commonwealth positions that might be available to Ms.

6  Wilhelm, Your Honor.

7      You are asking me with regard to the September 12

8  figure?

9      THE COURT:  Yes.

10      MS. FORNEY:  No.

11      THE COURT:  Let's use another figure that is more

12  relevant to the facts we have.

13  BY MS. FORNEY:

14  Q    Mr. Murphy, can you do the calculation calculating from

15  today?

16      MR. PRINGLE:  Your Honor, my objection is that

17  there is no evidence in the record that there are any

18  positions with the Commonwealth anywhere.

19      THE COURT:  There is a suggestion.  I will permit

20  it.

21  A    You are asking me --

22      THE COURT:  Why can't you take the twenty percent

23  of the figure you have projected and deduct it?

24  A    It is because I have included from September 12th

25  through today lost wages.  I can go through each year.

106

Murphy - Cross

1          THE COURT:  No.  We don't have time to do that.

2    A     But for that period of time, it would not be affected

3    by the 80 or 20 percent.

4    BY MS. FORNEY:

5    Q     Why don't you take it from 2004, the beginning of 2004;

6    would that make it easier?

7    A     If you want me to go through the calculations for these

8    years.

9    Q     I don't understand, Mr. Murphy, why you can't do what

10   the Judge said.  I thought you testified that the difference

11   in wages and retirement and social security would be pretty

12   much proportional; wouldn't it?

13   A     Correct.  If I knew exactly what the wages were total

14   for 2004 through 2012, I would take 80 percent of it and give

15   you that number.

16          THE COURT:  That answers the question.  If

17   necessary, the Court can do her own calculation.

18          MS. FORNEY:  Thank you, Your Honor.

19   BY MS. FORNEY:

20   Q     Mr. Murphy, you included an element in your calculation

21   for the cost of health benefits?

22   A     Yes.

23   Q     And you did that even though you had information that

24   Ms. Wilhelm is covered under her husband's health benefits;

25   is that right?

107

Murphy - Cross

1    A      That's correct.

2    Q      And you had no information to indicate that her

3    husband's health benefits were --

4               MR. PRINGLE:  Objection, Your Honor.  We raised

5    this point before.  It is our position that it is reasonable

6    for the Commonwealth to inquire regarding damages -- actual

7    damages for the period starting September 12 through today's

8    date.  But as to future damages from medical insurance, we

9    believe that is irrelevant.

10              The purpose of front pay and the purpose of Title

11   7 is to make Ms. Wilhelm whole and put her in that same

12   economic position she would have been had she not been

13   wrongfully terminated.

14              In this situation, Commonwealth employes are --

15   Ms. Wilhelm when she was a Commonwealth employe received

16   medical -- the Commonwealth paid for her medical premiums,

17   her medical coverage and made sure she had medical coverage

18   without regard to her marital status.  Now the Commonwealth

19   is asking this Court to take into account her marital status

20   in order to withhold a benefit that she would have had.

21              Why this is important is that Ms. Wilhelm should

22   be able to maintain her independent economic -- economic

23   position independent of her husband.  And in fact, we would

24   argue that Ms. Wilhelm's economic benefit is actually a

25   benefit to her husband, in that he is the third party

108

Murphy - Cross

1    beneficiary to her previous benefits from the state.

2         Why this is relevant also is that if Ms. Wilhelm's

3    husband's employment is terminated or for any reason his

4    benefits are altered, she should still have the economic

5    advantage of maintaining those medical benefits.

6         To ask her questions, to get into any kind of

7    offset or diminish the risk for the Commonwealth in this case

8    we believe is inappropriate and contrary to the goals of

9    Title 7 and contrary to the terms of front pay.

10        MS. FORNEY: Your Honor, we believe the questions

11   do go to mitigation, and the appropriateness of including

12   this calculation, this element in the calculation under the

13   circumstances that presently exist.  The purpose of Title  7

14   is to make Ms. Wilhelm whole but not to give her a windfall.

15        The testimony is she is covered under her

16   husband's medical benefits.  There has been no evidence that

17   he is about to lose his benefits, that their marriage is

18   about to break up, that she is in any expectation of not

19   having those benefits in the future.

20        There is evidence that she has not chosen to

21   supplement her benefits.  So it is our belief that including

22   $963.00 a month in the calculation for health benefits is

23   inappropriate and if awarded would constitute a windfall.

24        THE COURT:  I am going to ask for case law from

25   both of you in support of each of your positions.  In the

Murphy - Cross

1    meantime, I will have to take the testimony subject to it

2    being stricken if you don't support your positions.

3            MS. FORNEY:  Understood.

4            THE COURT:  Or incorporate it if you do support

5    your position.  You may answer can question if you remember

6    what it was.

7    A      I have no idea what it was.

8            MS. FORNEY: I am not sure what it was either.

9    Could we have it?

10           (The question, "And you had no information to

11   indicate what her husband's health benefits were," was read

12   by reporter.

13           MS. FORNEY:  Thank you.

14           THE COURT:  Isn't it at this point a legal

15   argument between the two of you and not a question for him to

16   answer?  Whether he did or he didn't, it is obvious he didn't

17   take into account her coverage.  So it is not his problem.

18   It is our problem; right?

19           MS. FORNEY: I think you are correct, Your Honor.

20   BY MS. FORNEY:

21   Q     Mr. Murphy, in preparing your calculation of Ms.

22   Wilhelm's mitigating earnings, the green line on your chart,

23   you assumed that in the private sector job that she obtained

24   she would receive no retirement benefits whatsoever, is that

25   correct, other than what she had previously earned through

110

Murphy - Cross

1    her state employment?

2    A    That's correct.

3    Q    That the private -- let me restate it since I think I

4    muddled the question.  You assumed that the private sector

5    job she obtained would not have any retirement benefits

6    associated with it?

7    A    That is not true.

8    Q    I didn't hear any testimony with regard to retirement

9    benefits associated with the private sector job.

10   A    Most of the private sector work is going to be 401(k)

11   type plans which are contribution by the employes.  She would

12   certainly be entitled to do that.  I put her salary on there

13   at gross rather than deducting that 401(k) deduction which

14   then she would be entitled to subsequent to her retirement.

15        She would have a period of twelve years to

16   participate in a 401(k) plan.  That would reduce her earnings

17   on an annual basis, and then she would get that money back at

18   the retirement date.

19   Q    When you referred to the 401(k) plan, is that the same

20   as a defined contribution plan, or are they different?

21   A    They are different.

22   Q    Is a defined contribution plan a plan where the

23   employer contributes toward a retirement plan for the

24   employe?

25   A    Yes.

Murphy - Cross

1    Q    The Bureau of Labor Statistics does provide information

2    on employe benefits in private industry; does it not?

3    A    Yes.

4    Q    In fact, you referred to such information in your

5    deposition; did you not?

6    A    Yes.

7           (US Department of Labor, Bureau of Labor

8    Statistics Article "Employe  Benefits in Private Industry,

9    2000" was introduced as Defendant Exhibit 55.)

10    BY MS. FORNEY:

11    Q    I am going to hand you a document which I marked

12    Defendant Exhibit 55.  Is this a Bureau of Labor Statistics

13    Report on Employe Benefits in Private Industry 2000?

14    A    Yes.

15    Q    Is this indeed the report that you referred to in your

16    deposition?

17    A    I believe it is.

18    Q    And on the first page of this report, doesn't it

19    indicate that 48 percent of employes in private industry were

20    covered by retirement benefits of at least one type, either

21    defined benefit plan or a defined contribution plan?

22           I am looking at the third paragraph on the first

23    page.

24    A    Yes.

25    Q    And that an additional seven percent were enrolled in

112

Murphy - Cross

1    both kinds of plans?

2    A    Yes.

3    Q    So that if my math is correct, 48 percent and seven

4    percent -- about 55 percent of employes in private industry

5    are covered by some sort of retirement plan?

6    A    Right.   There is a defined contribution plans and

7    benefit plans.

8    Q    I think you said defined contribution plans refer to

9    plans where the employer makes some contribution toward a

10   retirement fund?

11   A    The defined consideration plans are typically the

12   employer has the opportunity to contribute.   It is not a set

13   amount every given year.

14   Q    But the employer does make some contribution?

15   A    Correct.

16   Q    As I understand it, the defined benefit plan is the

17   sort of plan that the Commonwealth has where employes are

18   entitled to a specific benefit under the program?

19   A    Will you repeat that question?

20   Q    As I understood it, a defined benefit plan is similar

21   to what the Commonwealth has where an employe becomes

22   entitled to a particular benefit?

23   A    That is true.

24   Q    As opposed to any kind of a contribution?

25   A    They are entitled to a defined benefit under a defined

113

Murphy - Cross

1    benefit plan, that's true.

2    Q    I apologize if my question was confusing.  So even

3    though approximately 55 percent of employes in private

4    industry have some retirement coverage in which the employer

5    participates, in your calculation you assume that there would

6    be no such retirement plan for Ms. Wilhelm?

7    A    I assumed that the retirement plan would be rather

8    small.  First of all, I assumed that she would not be in a

9    defined benefit plan.  She would be in an employe elected

10    deferral plan similar to a 401(k) and possibly a defined

11    contribution plan.

12        You will find -- the 401(k) in my experience with

13    the clients that we work with, I find the 401(k) plan to be

14    more prevalent.  A defined contribution plan would contribute

15    for the employe a set percentage.  That may be three, four,

16    five percent.

17        At Ms. Wilhelm's salary, even if it is $40,000.00,

18    that is $2,000.00 a year.  She only has twelve years to

19    contribute to that.  The amount of funds going into that plan

20    are going to be rather insignificant over the term of her

21    employment.

22    Q    That was under the 401(k) plan?

23    A    No.  That is under the -- the 401(k) plan is her

24    money.

25    Q    That is what I understood you to say.

Murphy - Cross

1  A    The 401(k) is her money.  If I would have reduced her

2  earnings for the contribution, I could have then showed the

3  401(k) benefit coming out in later years.

4  Q    You elected not to reduce her earnings to show that?

5  A    Right.  The effect of that would be pretty much zero.

6  Q    You elected not to include a factor showing employer

7  contribution?

8  A    The defined -- right.  The defined contribution I

9  thought would be rather minimal.

10         THE COURT:  We will take a recess until

11  one-thirty.

12         THE CLERK:  Court is in recess.

13         (A recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

115

Murphy - Cross

1    AFTERNOON SESSION

2         THE COURT:  Ms. Forney?

3         MS. FORNEY: Thank you, Your Honor.

4              CROSS EXAMINATION (continued)

5    BY MS. FORNEY:

6    Q    Mr. Murphy, what salary did you assume that Ms. Wilhelm

7    would be earning as of April of 2003 had she not been

8    separated from the State Police?

9    A    I don't specifically have it as of April of 2003.  I

10   could tell you what her total income would have been for

11   2003, but not specifically.

12   Q    When you say total income, you mean --

13   A    For 2003.

14   Q    Let me be sure I understand what you mean.  You mean

15   wages?

16   A    Wages.

17   Q    Okay.

18   A    Is that your question?

19   Q    Yes.

20   A    For the year 2003, 58,753.

21             THE COURT:  That was for what salary, state

22   salary?

23             MS. FORNEY: Yes, Your Honor, had she not been

24   separated.

25             THE COURT:  Thank you.

116

Murphy - Cross

1   BY MS. FORNEY:

2   Q     And the salary that I had you calculate for managerial

3   and administrative employes in the private sector, and I

4   believe it was 61,118; does that sound correct?

5   A     That sounds correct.

6   Q     Would be higher than that; correct?

7   A     Yes.

8   Q     So projected out had you an elected to use that figure

9   for her mitigated earnings instead of the one you did would

10  have meant she had no loss in wages; is that right?

11  A     Off her wages, that's correct.

12  Q     Mr. Murphy, your projection of her mitigated earnings

13  assumes that she would have absolutely no health benefits

14  through private employment; is that correct?

15  A     That is true.

16  Q     And sir, if you were to find Defendant Exhibit 55,

17  isn't it true according to the Bureau of Labor Statistics

18  that 52 percent of the private sector workers have some sort

19  of medical coverage through their jobs?

20  A     Can you point me to that?

21  Q     Sure.  On the first page of Defendant Exhibit 55, the

22  fourth paragraph.

23  A     Yes.

24  Q     And of those employes who have to contribute toward

25  their medical benefits, the average monthly contribution for

117

Murphy - Redirect

1    single coverage is $64.40; is that correct?

2    A    It was in year 2000.  These numbers -- the trend for

3    these numbers has been for fewer people to be covered and the

4    rates to be up.

5    Q    And as of 2000, the cost of -- strike that.  As of

6    2000, the average employe contribution for family coverage

7    was $179.75 for a month; is that right?

8    A    That's correct.

9        MS. FORNEY: No other questions.

10       THE COURT:  Redirect?

11       MR. PRINGLE:  Yes, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. PRINGLE:

14   Q    With respect to your calculations of pension benefits,

15   just so the record is clear, could you explain why you did

16   not include any kind of contribution from Ms. Wilhelm for

17   defined-- defined contributions or contributions from the

18   employer for defined contributions?

19   A    Under the cash flow for the projection subject to the

20   dismissal?

21   Q    Yes.

22   A    The elective deferral 401(k) plans, typically the

23   employe designates a portion of their salary to contribute to

24   that plan.  I have not shown that as a deduction in her cash

25   flow for those years.  Therefore, I don't show the pension

118

Murphy - Redirect

1    money coming out at a later time.

2            The defined contribution plans means the employer

3    has the option every year to contribute a certain percentage

4    of the employe's salary.  I didn't consider that because

5    chances are that would be minimal in that it could be three,

6    four, five percent.  Even five percent of $40,000.00 is

7    $2,000.00.  Over a period of twelve years, that is not an

8    accumulation of a large amount of money to make a pension

9    payment out to 2038.

10            (US Department of Labor, Bureau of Labor

11    Statistics Article "Average Annual Pay in Pennsylvania, 2000"

12    was introduced as Defendant Exhibit 53.)

13    BY MR. PRINGLE:

14    Q    I would like to refer you to Defendant Exhibit 53.

15    A    (Witness complies.)

16    Q    I ask you to turn to page eight.

17    A    I don't believe I have that.

18    Q    You don't?

19    A    I have 54 and 55.

20            (Handed to the witness.)

21    BY MR. PRINGLE:

22    Q    Are you familiar with the salaries in the Central

23    Pennsylvania area private sector generally?

24    A    To the extent that I had information from the Bureau of

25    Labor Statistics.

119

Murphy - Redirect

1    Q    And the information that you received, where did you --

2    -- when you say you got information about salaries, was that

3    based on specifically the Central Pennsylvania or was it

4    national?

5    A    I considered national, and I also considered the

6    metropolitan area which includes Lancaster, Harrisburg and

7    Carlisle.

8    Q    I would like you now to refer to Defendant Exhibit 54.

9    I believe you were asked to testify regarding executive,

10   administrative and managerial positions by Ms. Forney?

11   A    Yes.

12   Q    That would be on page three.

13   A    It is on page seven.

14   Q    Page seven.  Does this page reflect salaries in Central

15   Pennsylvania?

16   A    This is a national survey.

17   Q    Did you have any reason to believe that it was

18   appropriate to use executive, administrative and managerial

19   category for the national level solely as opposed to taking

20   into account the -- strike that.

21           Did you have any basis -- are you aware of any

22   basis for including the executive, administrative and

23   managerial positions and I believe you said -- strike that.

24           I believe you said that the calculated salary was

25   about $60,000.00?

120

Murphy - Redirect

1    A    $61,000.00 and change.

2    Q    Why didn't you use that figure versus the overall that

3    you used?

4    A    I used an average figure.  In discussions with Ms.

5    Wilhelm, she had been unemployed for 33 months and had made

6    efforts to be employed and had not found employment over that

7    period of time.

8         She also believed that as far as her

9    qualifications may not be as affable in the private sector as

10   it is in the government sector since all of her experience

11   has been in the government sector.  Therefore, I just went

12   with the national average not knowing specifically what job

13   she would be able to get.

14        (Resume of Robert Murphy was introduced as

15   Plaintiff Exhibit 7.)

16   BY MR. PRINGLE:

17   Q    At this time, I would like to present you with

18   Plaintiff Exhibit 7.

19        THE COURT:  Defendant Exhibit 7?  I didn't hear

20   what you said.

21        MR. PRINGLE:  Plaintiff Exhibit 7.

22   BY MR. PRINGLE:

23   Q    Can you identify what has been labeled as Plaintiff

24   Exhibit 7, please?

25   A    This is my resume.

Murphy - Recross

1           MS. FORNEY: I object to the use of this document,

2    Your Honor.  It is beyond the scope of my examination.

3           THE COURT:  It should have been presented at the

4    time you were qualifying him unless that is the only thing

5    you want to use it for.

6           MR. PRINGLE:  That is all.

7           THE COURT:  I will permit it and overrule the

8    objection.

9           (Plaintiff Exhibit 7 was admitted into evidence.)

10          MR. PRINGLE:  Thank you, Your Honor.  I have no

11   further questions.

12          THE COURT:  Recross.

13                     RECROSS EXAMINATION

14   BY MS. FORNEY:

15   Q    Mr. Murphy, do I understand your testimony to be that

16   you elected not to use the executive, managerial average pay

17   figure that we have been discussing based just entirely on

18   what Ms. Wilhelm told you?

19   A    Right, yes.

20          THE COURT:  Ms. Forney, move the mike.

21          MS. FORNEY: I'm sorry.

22   BY MS. FORNEY:

23   Q    So you did no independent investigation of her job

24   qualifications or jobs in the private sector that might be

25   suitable for her skills and abilities?

122

Murphy - Recross

1    A    No.

2    Q    Just one question regarding -- I believe you said you

3    were a certified valuation analyst?

4    A    Yes.

5    Q    And that has to do only with business valuations; is

6    that correct?

7    A    That's correct.

8    Q    And do I understand that in order to obtain that

9    certification, it involves taking a five day training?

10   A    Yes.

11   Q    Mr. Pringle referred to your use of wages in Central

12   Pennsylvania in your calculations.  Were those average wages

13   for all workers covered by unemployment insurance?

14   A    Yes.

15   Q    So again, that would include everybody from laborers

16   and fast food workers up to executives?

17   A    Yes.

18   Q    And again, we don't know whether that average was

19   skewed one way or the other; is that correct?

20   A    That is true.

21            MS. FORNEY: No other questions.

22            THE COURT:  You may step down, sir.

23            MR. PRINGLE:  Your Honor, may I ask one more

24   question?

25            THE COURT:  Is it based on what she has asked?

123

Murphy - Redirect

1          MR. PRINGLE:  Yes.

2          THE COURT:  Yes.

3                    REDIRECT EXAMINATION

4     BY MR. PRINGLE:

5     Q     I would like to refer you to what has been labeled --

6          THE COURT:  Do you want to show Ms. Forney?

7     BY MR. PRINGLE:

8     Q     -- Defendant Exhibit 53.  Specifically, I would like to

9     refer you to page three.  Do you have that there?

10    A     Yes.

11    Q     Does that indicate what the wage average is in Central

12    Pennsylvania?

13    A     Yes.

14    Q     Can you give us the information regarding that, what

15    does that show?

16    A     $32,345.  And this is a 2000 survey.

17    Q     I would like you to turn to page eight of that

18    document.

19    A     (Witness complies.)

20    Q     What does page eight reflect?

21    A     These are annual pay for '99- 2000 percent change all

22    covered workers in Pennsylvania.  For 1999, it is

23    $32,696.00.  And for the year 2000, it is $33,999.00.

24         MR. PRINGLE:  I have no further questions.

25         THE COURT:  I will let you rerecross.

124

Miller - Direct

1      FORNEY: Nothing, Your Honor.

2      THE COURT:  You may step down.

3      MR. PRINGLE:  At this time, Your Honor, plaintiff

4  has no further witnesses.

5      THE COURT:  Does the Commonwealth have any

6  witnesses?

7      MS. FORNEY: Yes, Your Honor, we do.  I would like

8  to call Jeffrey Miller.

9

10      JEFFREY MILLER, called as a witness, being duly

11  sworn, testified as follows:

12

13      THE CLERK:  Would you state your name, please?

14  A     Jeffrey B. Miller.

15      THE CLERK:  Thank you.

16                  DIRECT EXAMINATION

17  BY MS. FORNEY:

18  Q     Sir, are you currently employed?

19  A     Yes, I am.

20  Q     What is your job?

21  A     I am a Lieutenant Colonel with the Pennsylvania State

22  Police serving as the Acting Commissioner.

23  Q     And when did you -- when did you begin in that

24  employment?

25  A     I began my employment in 1984, but my current position

125

Miller - Direct

1    on January 21st of this year.

2    Q    And how did you obtain that position?

3    A    I was nominated by Governor Edward Rendell.

4    Q    Is your position considered cabinet level?

5    A    Yes.

6    Q    Have you been nominated to be the Commissioner of the

7    State Police?

8    A    Yes.

9    Q    And you are presently awaiting confirmation of that

10   nomination?

11   A    That's correct.

12   Q    As Acting Commissioner of the State Police, have you

13   made any appointments of Deputy Commissioners?

14   A    Yes, I have.

15   Q    And who have you appointed as Deputy Commissioners?

16   A    I have appointed Major Ralph M. Periandi as a Deputy

17   Commissioner of Operations, Major Henry D. Oleyniczak as the

18   Deputy Commissioner of Staff and Major Cynthia L. Transue as

19   the Deputy Commissioner of Administration.

20   Q    Prior to becoming the Acting Commissioner of the

21   Pennsylvania State Police, were you the Director of the

22   Office of Legislative Affairs for the State Police?

23   A    Yes, I was.

24   Q    And were you the Director at the time that Ms. Wilhelm

25   was dismissed from her position as Legislative Specialist?

126

Miller - Direct

1   A      Yes.

2   Q      Did you recommend her dismissal?

3   A      No.

4   Q      From the time she left employment until the time you

5   assumed your current position as Acting Commissioner, was

6   there a Legislative Specialist in the Office of Legislative

7   Affairs?

8   A      No.

9   Q      Are you aware of any current plans to recreate that

10  position?

11  A      No, there are none.

12  Q      Do you know whether there is presently any other

13  positions for Legislative Specialists within the State

14  Police?

15  A      There are none.

16  Q      Sir, as you know we are here to determine what, if any,

17  equitable relief should be afforded the plaintiff in this

18  case.  What is the Commonwealth's position regarding

19  reinstatement of Ms. Wilhelm to employment?

20  A      The Commonwealth is prepared to offer reinstatement of

21  Ms. Wilhelm to Commonwealth employment.

22  Q      And when will that reinstatement be effective?

23  A      The reinstatement would be effective May 1st of 2000

24  which was the date of her separation from the Department.

25  Q      Now do you understand that there -- strike that.  So

127

Miller - Direct

1    the reinstatement that we are talking about includes both a

2    retroactive component and a prospective component?

3    A    That's correct.

4    Q    Do you understand generally how the retroactive

5    component would be accomplished?

6    A    I do generally, yes.

7    Q    Will you explain that, please?

8    A    My understanding is that the retroactive component

9    would be comprised of the gross pay that she would receive

10   plus any normal taxes, unemployment compensation, retirement

11   contributions that would come out of that.  There would be a

12   net amount that would be payable to the plaintiff.

13   Q    When you are talking about gross pay, are you referring

14   to back pay award?

15   A    Yes, back pay award.

16   Q    Go on.

17   A    My understanding of the reinstatement would be that it

18   would make the plaintiff Ms. Wilhelm whole as if she had

19   never separated from Commonwealth service at all.  And for a

20   period of the first six months, the Pennsylvania State Police

21   would pay all costs associated with a salary benefit,

22   etcetera in support --

23        MR. PRINGLE:  Objection, Your Honor.  We are back

24   to that settlement offer.

25        MS. FORNEY: Your Honor, I am asking him what the

Miller - Direct

1    State Police position is on reinstatement.  He is explaining

2    that.  I think it goes to remedy.

3              MR. PRINGLE:  He is not talking about a

4    reinstatement.  He is talking about a settlement proposal.

5    He is not saying she can have a job with the State Police

6    until such time as the parties decide they don't want to have

7    that employment relationship.

8              He is saying that she could work for the State

9    Police for six months and something else happens after that

10   six month period which she will be not be working for the

11   State Police.  That is not a reinstatement offer.  That is a

12   settlement offer.

13             MS. FORNEY: Your Honor, the position is the

14   Commonwealth is willing to reinstate her.  The testimony goes

15   to the nature of that reinstatement in light of the fact that

16   the Legislative Specialist position no longer exists.

17             THE COURT:  Now apparently to accommodate the

18   plaintiff's lack of desire to be with the Pennsylvania State

19   Police; is that correct?

20             MS. FORNEY: Yes, Your Honor.

21             THE COURT:  I will hear it, but I don't know

22   whether I will take it into consideration.

23             MS. FORNEY: I understand, Your Honor.

24             THE COURT:  Go ahead.

25             THE COURT:  Where were we?

129

Miller - Direct

BY MS. FORNEY:

Q     Let me ask you to talk about the retroactive component of reinstatement.  I believe you said it would -- you talked about how it would affect her back pay.

Is it your understanding that her retirement credits would be restored?

A     Yes.  It is my understanding that her retirement credits would be restored.  It would be as if she never separated from Commonwealth service for any length of time.

Q     What is your understanding about how it would affect your employment records?

A     Her employment records would be purged to the degree that there would be no coding or any other information that would indicate she separated from Commonwealth service at any time.

Q     What is the Commonwealth prepared to do prospectively with regard to Ms. Wilhelm's reinstatement?

A     The Commonwealth is willing to offer a position as a Deputy Press Secretary within the Department of Corrections. During the first six months of that employment, as I stated earlier, the State Police would pay the costs of salary, benefits, etcetera; however, the State Police would have no role whatsoever in the supervision, direction or in any other capacity manage the day-to-day employment operations of Ms. Wilhelm in any way, shape or form.

130

Miller - Direct

1        At the end of that six month period, it is

2   extremely likely that that would be the position that Ms.

3   Wilhelm would hold going forth into the future.  However, if

4   that wouldn't happen for whatever reason, the Commonwealth

5   then is prepared to make a guarantee of finding comparable

6   state employment for her immediately.

7        (Job Description for DOC's Information Specialist

8   was introduced as Defendant Exhibit 94.)

9   BY MS. FORNEY:

10  Q    Now you mentioned a job as a Deputy Press Secretary

11  with the Department of Corrections.  I am handing you a

12  document which has been marked Defendant Exhibit 94.

13          MR. PRINGLE:  I don't have a copy of that.

14          MS. FORNEY: It is among your documents.

15          MR. PRINGLE:  It is.  I am sorry.  I apologize.

16  BY MS. FORNEY:

17  Q    Could you identify this document for me?

18  A    Yes.  It is a job description for the office -- or

19  excuse me -- the position of Deputy Press Secretary within

20  the Press Office in the Department of Corrections.

21  Q    And is this the position that you were referring to

22  that the Commonwealth would be willing to reinstate Ms.

23  Wilhelm to prospectively?

24  A    Yes, it is.

25  Q    And at what salary would she be restored?

131

Miller - Direct

1   A     She would be restored at the same salary with the same

2   benefits that she had on May 1st, 2000.

3   Q     And would that salary reflect any increases that she

4   would have received had she remained employed?

5   A     Yes, it would.  It would take her from where she was on

6   May 1st, 2000 and bring her up-to-date from a salary basis.

7   Q     You were Ms. Wilhelm's supervisor for several months;

8   were you not?

9   A     Yes, I was.

10  Q     You have been in attendance at the trials and hearings

11  held in this case and have heard Ms. Wilhelm testify

12  regarding her prior job experience and her skills; have you

13  not?

14  A     Yes, I have.

15  Q     Would you tell me why you think this job would be

16  appropriate to Ms. Wilhelm?

17        MR. PRINGLE:  Objection.  He has not been

18  established as an expert on resource matters or able to

19  analyze job descriptions or analyze Ms. Wilhelm's resume.

20        THE COURT:  It doesn't require an expert.  He is

21  asked with his knowledge, his experience and supervision over

22  the plaintiff as to why he thinks her skills that he has

23  observed would fit within this job description.

24        MR. PRINGLE:  Your Honor, he hasn't testified that

25  he is familiar with the job itself.

132

Miller - Direct

1              THE COURT:  Can you establish whether he knows

2      anything about the job description or is family with that

3      job?

4      BY MS. FORNEY:

5      Q      Sir, have you reviewed this job description?

6      A      Yes, I have.

7              THE COURT:  I think he needs a little more than

8      just reviewing it.  Is he familiar with any facet of the

9      position?

10     BY MS. FORNEY:

11     Q      Do you have any familiarity with the position?

12     A      I do from the sense that I have a Press Secretary

13     within the Pennsylvania State Police who reports directly to

14     me.  I have been familiar with working with Press Secretaries

15     within the Governor's Office over the last several years.

16     Q      In reviewing this job description, does it appear to

17     correspond with the sort of duties that you have experienced

18     Deputy Press Secretaries performing?

19     A      It does.

20             THE COURT:  Go ahead.

21     BY MS. FORNEY:

22     Q      If you recall my question, you may answer.

23     A      I think I do.  Basically in reviewing the job

24     description for the Deputy Press Secretary, in my opinion, I

25     think it is a position that does suit Ms. Wilhelm's skills.

133

Miller - Direct

1   In my observation of her employment with the Department, she

2   is extremely good at expressing things verbally.  She works

3   well in analyzing information.  This job requires those two

4   things.

5         She is also very skilled with computer

6   technology.  She enjoys that part of the work as she has

7   relayed to me in the past.  I have seen her put on training

8   seminars using computer equipment and Power Point

9   presentations.  She is very good at that.  She seems to enjoy

10  doing that.

11        And much of what the job would entail would be

12  collating information, looking at the website within the

13  Department of Corrections and making content changes and

14  suggestions for improvements, writing news releases,

15  preparing informational packages for distribution to the

16  press, setting up press conferences and releases, working in

17  support of the Secretary of Corrections in defining issues

18  and press strategies for dealing with issues and topics that

19  would come to light, and standing in for the Press Secretary

20  in meetings with executives within the Department of

21  Corrections.

22        All of these things I believe in my observations

23  of Ms. Wilhelm are things that she would do well.

24  Q     Now you mentioned in your testimony that while she

25  worked -- if she chose to work in this job at the Department

134

Miller - Direct

1    of Corrections, she would be on the State Police payroll; is

2    that what I understand?

3    A    Yes.

4    Q    But not supervised by the State Police?

5    A    That's correct.  She would be supervised by the

6    Department of Corrections.

7    Q    Would she be evaluated in any way by the State Police?

8    A    No, not in any way.

9    Q    Why is it that the Commonwealth is willing to offer her

10   the reinstatement as you have described as opposed to

11   returning her to a comparable job within the State Police?

12   A    First of all, I think it is clear from the record that

13   Ms. Wilhelm would be uncomfortable returning to any position

14   within the Pennsylvania State Police.

15       Secondly, I think the fact that we do not have a

16   comparable position for Ms. Wilhelm is obviously a part of

17   that equation.

18       And third, in this case, I think we have

19   identified a position that really does suit her skills and

20   abilities and would be one that I believe she would find

21   interesting and challenging.

22   Q    And, again, what is the Commonwealth prepared to do at

23   the end of six months?

24   A    The Commonwealth is prepared at the end of six months

25   if Ms. Wilhelm would not remain in this position -- which,

Miller - Cross

1  again, there would be a strong possibility that this would be

2  the position that she would be placed in.  But if that

3  wouldn't be the case for whatever reason, the Commonwealth

4  would be obligated to find her a comparable position

5  immediately in Commonwealth employment at the same pay and

6  benefits -- with the same pay and benefits package that is

7  being presented here.

8  Q     Should the Court elect to order reinstatement as you

9  have described it as the Commonwealth is prepared to go

10  forward, would you be willing to have the Court retain

11  jurisdiction for a limited period of time to ensure -- for an

12  appropriate period of time to ensure that the reinstatement

13  is carried out in good faith?

14  A     Yes, I would.

15            MS. FORNEY: No other questions.

16            THE COURT:  Cross-examine.

17                     CROSS EXAMINATION

18  BY MR. PRINGLE:

19  Q     So when you are talking about a settlement, you want to

20  resolve this case by offering Ms. Wilhelm a position with the

21  Commonwealth in exchange for dropping her claims for front

22  pay, is that what we are talking about?

23  A     I think my testimony was that this is an offer of

24  reinstatement for Ms. Wilhelm to a position -- a comparable

25  position within the Commonwealth with the same pay and

136

Miller - Cross

1   benefits that she enjoyed previously without any interruption

2   of state service.

3   Q    Isn't that a settlement offer?

4        THE COURT:  Wait a minute.  I think the issue

5   before this Court is either monetary damages or

6   reinstatement.  You may term it as a settlement, but I have

7   to look at it from the point of view as to what alternative

8   this Court orders.  I have to consider what alternatives

9   there are.

10  BY MR. PRINGLE:

11  Q    Is it appropriate to call you Colonel Miller?

12  A    Sure.

13  Q    When you say the Commonwealth will make sure this

14  happens, are you talking about yourself?

15  A    I am speaking for the Commonwealth, the Governor's

16  Office.

17  Q    The entire Commonwealth is in on this proposal?

18  A    Yes.

19  Q    Who specifically authorized it?

20  A    The Office of General Counsel, the General Counsel

21  Leslie Ann Miller.

22  Q    You say you are familiar with the duties of the Deputy

23  Press Secretary.  Wouldn't it be true that the duties -- that

24  the Deputy Press Secretary should be able to articulate

25  policies of the agency for which he or she is the Deputy

137

Miller - Cross

1    Press Secretary in a manner that is compatible with the

2    philosophy and policies of that agency?

3    A     I think that is probably a fair statement, sure.

4    Q     And have you had occasion to discuss with Ms. Wilhelm

5    her ability to effectively act as Press Secretary regarding

6    the policies and practices of this administration?

7    A     I haven't had that opportunity, no.

8    Q     If she were not able to do that, then you would agree

9    she would not be an effective Deputy Press Secretary?

10   A     I believe she would be able to do that.  But I would

11   agree if she couldn't for some reason, it may be difficult.

12   I can only answer with my observation of her skills, and I

13   think she would be able to handle that job well.

14   Q     Do you think her hostility toward the Commonwealth

15   would have any effect on that?

16   A     I can't really answer that.  My opinion would be that

17   if she were in a position with another agency and not exposed

18   to some of the personalities that appear to have caused

19   problems in the past, that perhaps a fresh start, so to

20   speak, would be something that would be not only in her best

21   interests but would give her some challenging work to do on

22   behalf of the Commonwealth.  That would be the way I would

23   look at it.

24   Q     I am asking you given that she is currently hostile

25   toward the Commonwealth, do you think she is going -- she

138

Miller - Cross

1    would be an effective Deputy Press Secretary?

2    A    In listening to the testimony in the past, I think much

3    of her hostility has been focused on several select

4    individuals.  Those individuals would not, nor would the

5    State Police have anything whatsoever to do with her

6    day-to-day operations in carrying out her functions as a

7    Deputy Press Secretary with the Department of Corrections.

8         In that regard, I believe that the break, so to

9    speak, and the fact she is not exposed to specific

10   individuals or under the control at any time of the

11   Pennsylvania State Police would afford her the freedom

12   necessary to do her job in an environment where she would not

13   feel that hostility or stress, and that she would be able to

14   go forward and really show what she is able to do for the

15   Commonwealth.

16   Q    So you are saying it doesn't matter if she walks into

17   the job hostile, you think it would be okay for her to walk

18   into that job hostile to the Commonwealth and serve as Deputy

19   Press Secretary?

20   A    I can only say that I have seen --

21   Q    Can you answer yes or no?

22   A    Can you please repeat the question?

23   Q    Do you think that it would be a problem -- do you think

24   it would be acceptable for Ms. Wilhelm to accept the job as

25   Deputy Press Secretary when she is hostile to the

139

Miller - Cross

1    Commonwealth; yes or no?

2    A      I can't really answer that.

3    Q      Why?  Don't you understand what a Deputy Press

4    Secretary does?

5    A      No, it is not because I don't understand what the

6    Deputy Press Secretary does.  It is just that I don't know

7    what her -- I don't know that she can't overcome a certain

8    state of mind if she is removed from the agency where she had

9    a problem is what I am saying to you, sir.

10   Q      I didn't ask you that.  I asked you --

11          THE COURT:  Come on, Mr. Pringle.  Your own

12   witness, your own plaintiff has been sitting up here and has

13   gone through great lengths in answering questions.  I am

14   going to permit him to answer this question.  I think he has

15   answered the question.

16   BY MR. PRINGLE:

17   Q      Colonel, is it your position that in order for her to

18   perform this job well, she would have to have a diminished

19   level of hostility to be effective -- hostility toward the

20   Commonwealth to be effective in this job?

21          MS. FORNEY:  I object to the form of the

22   question.  It assumes that he knows the level of her

23   hostility.

24          THE COURT:  Rephrase the question.

25

Miller - Cross

1   BY MR. PRINGLE:

2   Q    If she took the job and was hostile to the

3   Commonwealth, would she be effective?

4           MS. FORNEY: I object.  Asked and answered, Your

5   Honor.

6           MR. PRINGLE:  I don't think he has answered that

7   question.

8           THE COURT:  I think it was the same question about

9   two questions ago.  I could have Vicki go through the record

10  and check it.

11          (The question referred to was read by the

12  reporter.)

13          THE COURT:  The question has been previously

14  asked.

15  BY MR. PRINGLE:

16  Q    If she accepted this reinstatement, as you call it, her

17  continued employment during the six month period at issue

18  would be subject to your policies regarding budget cuts or

19  changes in cash flow?

20  A    When you say my policies, are you talking about the

21  State Police?

22  Q    Assuming you were Commissioner.

23  A    Okay.

24  Q    She would be subject to your decisions regarding the

25  budget or her salary actually?

141

Miller - Cross

1    A    No, sir.

2    Q    Why is that?

3    A    Because she would be working for the Department of

4    Corrections.

5    Q    But you would be paying her salary?

6    A    For a period of six months.  That is only a clerical

7    function if you will.  We have no oversight, and there would

8    be no change in her employment status because of that fact.

9    Q    And why is it that you are limiting this to six months?

10   A    Why is it that we are limiting our particular portion

11   of this part to six months, is that what you are asking me?

12   Q    Yes.

13   A    Because initially, we had made numerous attempts with

14   the Office of Administration previously to try to find a

15   comparable job that would fit Ms. Wilhelm's skills.  We did

16   not have the level of cooperation that I hoped we would have

17   at the end of the previous administration.

18        I think because people did not want to make

19   commitments for positions at the end of an administration.

20   That somewhat hampered our ability to proceed.

21        The new administration just took over.  I think

22   the record reflects the fact that we have moved very quickly

23   with the new administration.  But one of the things we wanted

24   to do before we identified the appropriate position was make

25   an offer that the State Police would pay the salary and

142

Miller - Cross

1    benefits for the first six months, thereby relieving the

2    agency that would be the agency where Ms. Wilhelm would be

3    placed from that responsibility up front.  We just put that

4    out on the table before we actually found the right position,

5    and this position specifically.

6            Once we found this position, we didn't want to

7    renege on anything we put out on table.  But it is my

8    understanding that the Department of Corrections, should that

9    be the place where she ultimately is placed and stays, would

10   pick that -- they have a vacancy that they would be paying

11   for anyway.  It just so happens that the first six months of

12   the compensation would come out of the State Police budget in

13   the overall Commonwealth scheme rather than the Department of

14   Corrections budget.

15           It would be as if she worked for the Department of

16   Corrections and was being paid and compensated by the

17   Department of Corrections for all intent and purpose.

18   Q    Why doesn't the Department of Corrections want to pay

19   for the first six months?

20   A    I'm sorry?

21   Q    Why doesn't the Department of Corrections want to pay

22   for the first six months?

23   A    I am not sure that they don't want to pay for the first

24   six months.  I am just saying to you, sir, when we approached

25   the new administration, we made an offer kind of as a way to

143

Miller - Cross

1    say hey, we want you to take a look at what we're trying to

2    do here.  If you have a comparable position that we believe

3    is and our human resources folks on all ends of the spectrum

4    think is comparable, then we would be happy to pay that for

5    the first six months.

6            We just made that as an offer before we had the

7    appropriate position.  It is not to me -- to my knowledge, it

8    is not that the Department of Corrections doesn't want to pay

9    it.  In fact, they may very well want to pay it.

10           I think they were going to fill this position one

11   way or another and would have been paying for it anyway.  It

12   is not really that it is a huge difference for them.  But she

13   would be working for that first six months just on the

14   clerical bookkeeping side of it, we would be paying the

15   salary.  But we wouldn't have any supervisory authority or

16   her position wouldn't change in any way because of that.

17   Q    Isn't the Deputy Press Secretary a very sensitive

18   position for an agency?

19   A    What do you mean by sensitive?

20   Q    Wouldn't the agency want to know who is coming in

21   there, know more, have information about that person, have a

22   chance to interview before they commit to accepting an

23   employe as a Deputy Press Secretary?

24   A    Well, Ms. Wilhelm's resume and background is extremely

25   good.  When they looked at it, they were comfortable that she

144

Miller - Cross

1    has the skills -- the skill set that they need.  They know

2    that from looking at her resume.

3    Q    Based on your experience, have you ever heard of a

4    Deputy Press Secretary being accepted by an agency without

5    the agency or the agency head interviewing that Deputy Press

6    Secretary?

7    A    I can't name a specific example, but I am sure that it

8    has occurred.

9    Q    What happens if they don't like her?

10   A    You are saying what happens if they don't like her?

11   Q    Day three, they don't like her.  What do they do?

12   A    If that were to happen -- and I certainly don't believe

13   that it would.  But if that were to happen, we would still be

14   committed to placing her the same pay benefit structure that

15   we talked about in a comparable position with the

16   Commonwealth of Pennsylvania.  We are making that commitment.

17   Q    Do you have a fall back position?  Let's say she goes

18   over to Corrections as Deputy Press Secretary, and after a

19   few days they realize that she is not compatible with their

20   programs and policies and philosophy, and that they don't

21   think she is going to work out?  Since they haven't

22   interviewed her, they don't think she is going to work out.

23   What would happen to Ms. Wilhelm in terms of employment?

24   A    She would continue to be paid.  She would continue to

25   be on the Commonwealth benefits, retirement contributions.

Miller - Cross

1    And it would be incumbent upon the Commonwealth to find her

2    another comparable position.

3                I don't really think that would happen.  I mean if

4    she went into the job -- obviously, I am assuming that she

5    would go into the job and do a really good job and would want

6    to show others that she has the skills to do the job, and she

7    would apply herself.

8                If she does that, I am sure she will do a great

9    job.

10   Q    Do you have a fall back position?  I mean if they don't

11   like her at some point in time, let's say within three days

12   they don't like her, do you have another position available?

13   A    Do I within the State Police, or do we within the

14   Commonwealth?

15   Q    The Commonwealth.

16   A    The Commonwealth will have a position available for

17   her, yes.

18   Q    Can you identify it now?

19   A    I can't identify it now.

20   Q    But if they don't like her and it doesn't work out --

21   for whatever reason it doesn't work out, what does she do, go

22   home and collect a salary?  What does she do?

23   A    I am certain that there would be a decision made as to

24   where she could report to to work until such time as they put

25   her with the right agency.  It certainly wouldn't be with the

Miller - Cross

1   State Police, but it would be somewhere with the Commonwealth

2   here in the Harrisburg area.

3          It wouldn't be a hardship or anything like that.

4   It would be something that she could do here in the Capitol

5   area.

6   Q    Are you the one that is guaranteeing this?

7   A    I am speaking on behalf of the administration.  And it

8   is my understanding how it has been communicated to me that I

9   have the authority to speak with regard to that.

10  Q    Isn't it true that it was your recommendation that she

11  be removed from the Legislative Affairs Office?

12  A    That is true.

13  Q    And that one of the reasons you asked her to be removed

14  is because you didn't trust her?

15  A    The reason that I asked her to be removed from the

16  Legislative Affairs Office was because at that time, she

17  refused to do some of the things that I needed her to do to

18  function in that office.  Some of that was based on her own

19  admission because she did not believe she could work with two

20  individuals within the office that she did not feel

21  comfortable dealing with.

22         I was trying to move beyond that, but it was clear

23  to me that she was steadfast in her refusal to communicate

24  with those folks and that that would prevent me from running

25  that office in an effective manner.

147

Miller - Cross

1       So my recommendation that she be removed from the

2  office was based on the fact that she refused to do that.  I

3  didn't know whether she would be in another position with the

4  State Police or in another position with Commonwealth

5  service.  I did not know what was going to happen.  I knew

6  that it wasn't going to work there because I tried to talk to

7  her about that, and she did not want to move beyond it.

8  Q     What leads you to believe that that won't happen when

9  she goes to the Department of Corrections?

10 A     Because I believe that once she is in a different

11 environment where she is not working with the people that she

12 felt hostile towards, that it will be a fresh start for her

13 and will give her the opportunity to work with new employes

14 in a challenging position that I think she would like.

15 Q     Wasn't it your opinion that you didn't totally trust

16 Ms. Wilhelm at the time that she worked for you?

17 A     At the time that she worked for me --

18        THE COURT:  Wait a minute.  We are getting into

19 the -- are we retrying the case?

20        MR. PRINGLE:  No, Your Honor.  The issue here is

21  -- the fundamental issue here is a function of trust.  They

22 were asking Ms. Wilhelm to -- they are representing that

23 there is a reinstatement offer to the Department of

24 Corrections as a Deputy Press Secretary.

25

Miller - Cross

1     That Deputy Press Secretary is an extremely

2  sensitive position regarding policies and philosophies of the

3  administration.  He is asserting there shouldn't be any

4  problems.  She will get along with everybody when his

5  personal experience with her has been the opposite.

6           THE COURT:  We are talking about his personal

7  experience with the Pennsylvania State Police.  What happens

8  in the Department of Corrections is something else.

9           MR. PRINGLE:  Exactly.

10          THE COURT:  Whether he trusted her is one thing.

11 Whether somebody else trusts her is something else.  We are

12 not going to retry the case.

13          MR. PRINGLE:  Your Honor, what I am trying to

14 examine is given that possibility, it's already happened and

15 the result is a recommendation she was removed.  Given that

16 possibility --

17          THE COURT:  All things are possible, Mr. Pringle.

18 All things are possible.  I can't deal in possibilities.

19          MR. PRINGLE:  I am asking you to regard this --

20 what I am asking -- what I am suggesting through this

21 testimony is that this is probable and not impossible.  She

22 had a problem with one -- she had a problem with who is now

23 Colonel Miller.  At the time, he was Director.  As a result

24 of that problem, he recommended that she be removed.  And

25 ultimately, she was fired.

149

Miller - Cross

1      When they make an offer of reinstatement, they are

2  not making assurances that the environment is going to be any

3  different.  They are making an offer that she will have

4  another job for a six month period of time.

5      THE COURT:  Mr. Pringle, that could happen no

6  matter what position of restatement they may offer her.  They

7  may offer her the prime job that she wants.  But there could

8  still be this problem that you foresee.

9      MR. PRINGLE:  The concern that I have is if you

10  listen to Colonel Miller, he is talking about the

11  Commonwealth as an entire entity.  We are not talking about

12  State Police or the Department of Public Welfare, Department

13  of Revenue.

14      This is an assurance of the Commonwealth.  The

15  point is it is one entity.  It is not just -- it is easy to

16  talk in terms of -- it is easy to talk in terms of the

17  Commonwealth as 64 separate employers, but it is actually one

18  employer.

19      If we were talking about IBM, we wouldn't be

20  talking about their Service Division or their Sales

21  Division.  We would be talking about IBM.

22      What I am suggesting to you is that his

23  representations about his experience with knowing the duties

24  of a Deputy Press Secretary and his personal experience with

25  Ms. Wilhelm should be regarded as an entire entity, not

Miller - Cross

1    specific to the Pennsylvania State Police.

2           If she is being placed - our position is that she

3    is not really being placed in a situation where it is viable

4    employment, that there is a viable reinstatement if in fact

5    this is just part of an extension of the conspiracy to

6    terminate her in the first place.

7           THE COURT:  Overrule your objection.

8    BY MR. PRINGLE:

9    Q    Do you know anyone by the name of Robert Roebuck?

10   A    Yes.

11   Q    Who is Robert Roebuck?

12   A    He's an individual that goes to my church.  He was the

13   Food Services Manager at the Academy for a long period of

14   time.

15          MS. FORNEY:  Your Honor -- excuse me.

16   A    If that is who I am talking about, I am not sure.  But

17   I know an individual by that name.

18          MS. FORNEY: Your Honor, I am going to object and

19   ask for an offer of proof as to where this is going.  I

20   believe it may be beyond the scope of direct.  At least, I

21   don't see any connection.

22          MR. PRINGLE:  Your Honor, he has testified that

23   there were no positions within the Legislative Affairs

24   Office.  I want to question him as to the employment of

25   Mr. Roebuck.

151

Miller - Cross

1    I believe that Mr. Roebuck worked in the

2  Legislative Affairs Office for a period of time, and I

3  believe that indicates that there is employment within that

4  Office.

5         THE COURT:  Currently?

6         MR. PRINGLE:  I didn't get a chance to find out.

7         THE COURT:  I will permit the question because it

8  did come up concerning vacancies in the Legislative Affairs

9  Office or if there was a position in Legislative Affairs.

10  But I want a date.

11  BY MR. PRINGLE:

12  Q    Did Mr. Roebuck work in your office?

13  A    He did not work for the Office of Legislative Affairs.

14  Q    Was he located in your office?

15  A    There was a period of time when he was moved from his

16  position at the Academy up to the Executive Administrative

17  Offices, and he was assigned to a location cubicle, if you

18  will, within the Executive and Administrative Offices.

19         Something occurred there, a space problem, and

20  they came to me and said can we temporarily let him work from

21  a desk?  Since you have one desk in this office here that is

22  not being used at the moment, can we put him in that desk for

23  a period of time?  It's much like we have the State Police

24  Medical Officers using a desk in that suite of offices if you

25  will.  I said certainly.

152

Miller - Cross

1    He didn't work for me in any way, shape or form.

2    Q    He was never on your payroll?

3    A    No.

4    Q    And what period of time was this?

5    A    This would have been perhaps a year or so ago,

6    somewhere around that time.  He was still -- my understanding

7    -- and I don't have all the facts on this -- my

8    understanding is that he was still -- his duty assignment was

9    still the Academy.

10    But he was removed from that environment for

11    whatever reason for a period of time, and they tried to find

12    a location where they could put him so that he could work

13    outside of that environment to which he was actually

14    assigned.

15    Q    Did you supervise him at all in terms of his comings

16    and goings?

17    A    No.

18    Q    His salary did not come out of your budget?

19    A    That's correct.

20    MR. PRINGLE:  No further questions.

21    THE COURT:  Redirect?

22    MS. FORNEY: No, Your Honor.

23    THE COURT:  You may step down.

24    MS. FORNEY: Your Honor, it is my intent to excuse

25    the Commissioner.

153

Polek - Direct

1      THE COURT:  Do you have any need to question him

2  any further on any matter?  You can call him on your own

3  behalf.

4          MR. PRINGLE:  No, Your Honor.

5          THE COURT:  You are excused.

6  A      Thank you, Judge.

7          MS. FORNEY: Your Honor, we call Rose Polek to the

8  stand.

9

10         ROSE POLEK, called as a witness, being duly sworn,

11  testified as follows:

12

13         THE CLERK:  Would you state your name for the

14  record, please?

15  A      Rose Polek.

16                    DIRECT EXAMINATION

17  BY MS. FORNEY:

18  Q      Ms. Polek, where are you employed?

19  A      Pennsylvania State Police.

20  Q      What part of the State Police employs you?

21  A      The Bureau of Human Resources.

22  Q      What is your job within that Bureau?

23  A      I am the Director of the Employment Services and

24  Systems Division.

25  Q      Is that the division that is responsible for employment

Polek - Direct

1    transactions?

2    A     That's correct.

3    Q     Can you just explain what we mean when we say

4    employment transaction?

5    A     It is systems work, transactional work that is located

6    on the Commonwealth's computer main frame.  It's transactions

7    or input for salary increases, appointments, promotions

8    transfers, separations.

9    Q     So when we are talking about -- by transactions, we are

10   essentially talking about some change in employment status?

11   A     Correct.

12   Q     Along the lines that you just mentioned?

13   A     Yes.

14   Q     And therefore, it is your unit that is responsible for

15   placing codes to identify these transactions on to the

16   Commonwealth personnel system?

17   A     Correct.

18   Q     Now there was evidence presented at the trial in this

19   case regarding Ms. Wilhelm's coding at the time she separated

20   from the State Police.

21        Do you know what that coding was at the time of

22   her separation?

23   A     It was listed as a dismissal.

24   Q     And you testified at the jury trial; did you not?

25   A     Yes, I did.

155

Polek - Direct

1    Q    I believe you testified that -- something to the effect

2    that that coding had a negative connotation?

3    A    That's correct.

4    Q    Does Ms. Wilhelm's personnel history still show her

5    separation as a dismissal?

6    A    No, it does not.

7            (Printout:Employment History - Control Data was

8    introduced as Defendant Exhibit 56.)

9    BY MS. FORNEY:

10   Q    I am going to hand you a document that has been marked

11   Defendant Exhibit 56.

12           THE COURT:  56?

13           MS. FORNEY: Yes, Your Honor.

14   BY MS. FORNEY:

15   Q    Would you identify that for me, please?

16   A    That is the employment history for Barbara A. Wilhelm.

17   Q    And is there a date in the upper right-hand corner?

18   A    Yes, there is.

19   Q    What is that date?

20   A    That says October 11, 2002.

21   Q    Is that the date this history was generated?

22   A    Yes, it is.

23   Q    Does this history show a transaction code on the date

24   that Ms. Wilhelm separated from the State Police?

25   A    Yes, it does.

156

Polek - Direct

1   Q       Can you indicate where that appears, please?

2   A       On the very first line.

3   Q       The very first set of numbers in the first line is the

4   date?

5   A       Yes.

6   Q       And that is May 1st, 2000?

7   A       Correct.

8   Q       And then next to that, there is a transaction code

9   2100?

10  A       That's correct.

11  Q       What does that transaction code mean?

12  A       Voluntary resignation with notice.

13  Q       When was that changed?

14  A       October 11, 2002.

15  Q       And why was that changed?

16  A       We were informed by the Office of Chief Counsel to

17  change the coding.

18  Q       For what purpose?

19  A       So it would not have a negative impact on reinstatement

20  or employment of Ms. Wilhelm by any other state agency.

21  Q       Why was it that the coding was not changed to a code of

22  furlough?

23  A       As an at will employe, the position as Legislative

24  Specialist II is not within a bargaining unit, not covered by

25  a union or Civil Service rules and regulations.  Therefore,

157

Polek - Cross

1    they do not have any recall rights, and they are not eligible

2    for a furlough.

3    Q    That was your understanding?

4    A    Correct.

5             MS. FORNEY:  No other questions, Your Honor.

6             THE COURT:  Cross-examine.

7                         CROSS EXAMINATION

8    BY MR. PRINGLE:

9    Q    Do you remember Mr. Clites testifying?

10   A    I was not here when he testified.

11   Q    Is there a resignation letter in Ms. Wilhelm's file?

12   A    No, there is not.

13   Q    Is there an explanation as to why the code has been

14   changed to resignation, and there is no resignation letter?

15   A    No.  Not to me, there wasn't.

16   Q    Is the old coding also in her file?

17   A    No, it is not.

18   Q    If she applied to a position with another state agency,

19   how would the Human Resources Department know -- how would

20   the Human Resources Department know that she actually was

21   terminated versus resigned?

22   A    They wouldn't know that she was terminated.

23   Q    Is there any explanation as to -- how would Ms. Wilhelm

24   be able to explain her two and a half years of unemployment?

25   A    I do not know.

158

Polek - Cross

1    Q    Is the letter of dismissal still in the file?

2    A    No, it is not.

3    Q    What happened to that?

4    A    It was purged.

5    Q    If Ms. Wilhelm applies for a job with another

6    Commonwealth agency, what should she tell them?

7    A    As far as?

8    Q    When they say you resigned, why did you resign?

9            MS. FORNEY:  I object to the question, Your Honor,

10   as to why she should speculate as to what Ms. Wilhelm should

11   be telling other Commonwealth agencies.

12           THE COURT:  This change of designation still

13   presents a problem; doesn't it?  It may not be a detrimental

14   effect on her written record or her file, but there is still

15   the problem she has to overcome if she is asked why did you

16   resign.  Is she going to tell the truth?

17           MS. FORNEY: I think that would be up to Ms.

18   Wilhelm, Your Honor.  Certainly, one thing she could explain,

19   which is what her dismissal letter said, was that her office

20   was reorganized.

21           THE COURT:  I think it is an argument for you to

22   make, Mr. Pringle.  I am not too sure this witness can give

23   you an answer to your question.  It is a legitimate argument

24   for you to make during argument.

25

159

Polek - Cross

BY MR. PRINGLE:

Q     Did you ask Ms. Wilhelm whether or not it was okay with her if you changed the coding to resignation, voluntary resignation?

A     No.

Q     Did you contact me?

A     No.

Q     Did someone contact me?

A     I am not aware if anybody contacting you or not.

        MR. PRINGLE:  No further questions.

        THE COURT:  Redirect?

        MS. FORNEY:  No, Your Honor.

        THE COURT:  You may step down.

        MS. FORNEY:  May the witness be excused?

        THE COURT:  Any objection, Mr. Pringle?

        MR. PRINGLE:  Yes, I do, Your Honor.  The reason is that this witness works in the Personnel Department, and I may be calling her for rebuttal based on testimony that may be presented by the Commonwealth.

        THE COURT:  Okay.

        MS. FORNEY:  The witness was not subpoenaed however.

        MR. PRINGLE:  She is here now.  I am asking that --

        THE COURT:  We are only going to go to 4:30.  Put

160

Johnston - Direct as to Qualifications

1    in what you have.

2            MS. FORNEY:  Very well, Your Honor.  We call Oveta

3    Johnston.

4

5            OVETA JOHNSTON, called as a witness, being duly

6    sworn, testified as follows:

7

8            THE CLERK:  Would you please state your name for

9    the record, please?

10   A     Oveta Johnston.

11                      DIRECT EXAMINATION

12   BY MS. FORNEY:

13   Q     Ms. Johnston, where are you employed?

14   A     State Civil Service Commission located here in

15   Harrisburg.

16   Q     What is your job with the Commission?

17   A     I am a Human Resource Analyst II in General

18   Classification.

19   Q     What do you do in your job?

20   A     I do a variety of things.  One of my main functions

21   would be to counsel applicants who would come in looking for

22   possible employment with the Commonwealth.

23           I also do resume evaluations that come through the

24   mail.  Or if someone would drop their resumes off, I review

25   them to see what possible jobs they were qualified for.

Johnston - Direct as to Qualifications

1    Also with the Commonwealth, I work with people

2   with disabilities where I take and set up their testing with

3   either interpreters if they are deaf or if they are blind or

4   visually impaired, we have reader who I set up the testing

5   with them also and contact the applicants as to when they are

6   supposed to take exams.

7    I am also occasionally proctoring examinations in

8   case two or more of our test proctors are not available for

9   testing.  We are on computerized testing now.  So I may

10   occasionally have to do that.

11    I am trying to think what else.  I do a lot of

12   different things.  I do evaluations of applications once a

13   person takes an exam to see if they meet the requirements for

14   that specific job title as well.

15    I can't think of anything -- it's a lot of things

16   I do.

17   Q    That is fine.  When you talk about evaluating resumes

18   for job applicants, are these individuals applying for Civil

19   Service positions?

20   A    Yes.  Everything that comes through our office is Civil

21   Service only.

22   Q    How long have you been doing the job that you just

23   described for us?

24   A    Eighteen years.

25   Q    What is the purpose in your counseling these

162

Johnston - Direct as to Qualifications

1    applicants?

2    A    Basically when an individual comes in, they are not

3    really sure what they may qualify for.  They are kind of

4    overwhelmed at all the different test announcements that we

5    have available.

6         I basically will sit down with them in person and

7    take a look at their resume, and go over that, and try to put

8    together what types of job announcements that are open at the

9    present time that they would be able to qualify for.  I go

10   over --

11   Q    When you talk about job announcements -- let me just

12   interrupt you -- what are you referring to?

13   A    These are announcements or examinations that the

14   agencies that cover Civil Service positions and hire for

15   Civil Service positions want us to open up for them to

16   establish eligible lists.

17   Q    When you say open up, what does that mean?

18   A    That means they are open currently for testing.  A

19   person can put in applications to come into our office and

20   take the exams.

21   Q    All right.  And when you say for an employment list,

22   what do you mean?

23   A    Employment lists are what the different state agencies

24   use that like I said cover Civil Service positions to take a

25   look at that applicant pool to decide who they want to hire

163

Johnston - Direct as to Qualifications

1   for the different job titles that we do their testing for.

2   Q    Are the employment lists essentially the list of people

3   who have successfully passed the Civil Service test?

4   A    Yes, they are.

5   Q    When you sit down -- I think you started to explain how

6   you go about counseling someone.  Would you explain what you

7   do?

8   A    Yes.  By looking at their resume, as I said, I take a

9   look at their educational background, also their work

10  experience, how long they were at that specific job title and

11  what their job duties were.

12       Once I take a look at that, I basically go and

13  physically pull the different test announcements that are

14  open at the present time that they can put in applications

15  for testing.  I do go over with them what the actual function

16  of the counseling and testing unit is all about so that they

17  have a clear picture and try to give them as much information

18  as possible.

19  Q    When you look at test announcements for positions, what

20  information does the test announcement contain about the

21  position?

22  A    It basically has on there -- some of them -- it has the

23  job title.  Some of them may have the salary range on there.

24  It has the nature of work that the person would do once they

25  are hired for the position.  It also tells them what the

164

Johnston - Direct as to Qualifications

1    minimum experience and training requirements are for that

2    specific job title.

3         It also has in there -- if there is a written

4    multiple choice exam, it will give them out lines of the

5    subject matter area that is being covered in that test

6    announcement, how many questions they have to answer, that

7    type of thing.

8         And occasionally, depending on the job title, it

9    may also put in there how many field positions.  And if you

10   want further information, contact certain agencies for

11   further information on job possibilities.

12   Q    Now in doing your counselling, do you have access to

13   other materials about the positions that are available in

14   order to assist you --

15   A    Yes, I do.

16   Q    -- in advising these people?

17   A    Yes, I do.

18   Q    What are the other materials?

19   A    I use the -- we have a summary.  It is an overall

20   listing that comes out the first Friday of the month.

21   Basically what this is is it is an overall list of the all

22   the test announcements for that month that we are doing

23   testing for and accepting applications for at that present

24   time.

25

165

Johnston - Direct as to Qualifications

1        I also use what we call the class specs which are

2   an internal thing that is used within our agency.  Also the

3   evaluation guides, I use those as well, which is an internal

4   thing that is used.

5        I also use what is called a projection list.  It

6   is an overall list of the projections for the fiscal year.

7   Q     Let me have you go back and explain a couple of the

8   things that you have identified.  First, class specification,

9   can you tell us what that is?

10  A     Basically what that is, it goes into a little more

11  detail of the actual position.  It tells the examples of the

12  work.  It talks about the knowledge, skills and abilities

13  that an applicant must have.  And it also talks about the

14  minimum experience training and educational requirements.  It

15  is a little bit more detailed than just your actual test

16  announcements that we have to give to the applicants.

17  Q     And you mentioned an evaluation guide?

18  A     Yes.  The evaluation guide is also something that we

19  use.  It tells a little bit more of minimum experience and

20  training requirements.  It also talks about other types of

21  experience or training that we may accept.  We will take, for

22  instance, if it just says a bachelor's degree or any

23  equivalent combination of experience or training.  This

24  evaluation guide goes into that type of detail so that we

25  know what else we can use to qualify that applicant for the

166

Johnston - Direct as to Qualifications

1    positions.

2    Q    Then you mentioned projections.  What projections are

3    you referring to?  What is that?

4    A    Because the fiscal year is July 1st to June 30th, the

5    agencies compile a list of test announcements or exam

6    programs that they want our agency to open up for testing.

7    This is called a projection list.

8         So it is from the fiscal year July 1st to June

9    30th of the following year.  And that is also what I use.

10   Q    So if I understand you, the projection list will show

11   jobs that perhaps are not open for testing but will be open

12   for testing?

13   A    Yes.

14        MS. FORNEY: Your Honor, at this time, I offer Ms.

15   Johnston as an expert in evaluating resumes, and based on

16   that evaluation determining whether a person is qualified for

17   job classifications within the Civil Service system.

18        MR. PRINGLE:  I am objecting, Your Honor.

19        THE COURT:  Why?

20        MR. PRINGLE:  I don't believe she's laid a

21   foundation as being an expert.  She has not laid a foundation

22   of being an expert at anything other than being able to tell

23   whether these people qualify to take Civil Service tests.

24        THE COURT:  You may voir dire her qualifications.

25

167

Johnston - Cross as to Qualifications

CROSS EXAMINATION AS TO QUALIFICATIONS

1

BY MR. PRINGLE:

2

Q    Tell us your educational background.

3

A    I have a high school diploma.

4

Q    Any college?

5

A    No college.  All experience.

6

Q    No special education in human resources?

7

A    All experience.  I got my experience from being in the

8

-- it is like a stair step.  I did a stair step.

9

Q    Do you have any -- you also have no specialized

10

education in the area of job analysis?

11

A    High school diploma is what I have.

12

            THE COURT:  How many years experience are you

13

saying you have?

14

A    Eighteen years.

15

BY MR. PRINGLE:

16

Q    Do you have any expertise in the proper steps in hiring

17

or firing employes?

18

A    No.  I just go by -- when I do my counseling, I have a

19

flow chart.  I give that to the applicant to explain to them

20

how the system works.

21

Q    Do you have any expertise in the area of forecasting

22

when vacancies might occur in the Commonwealth?

23

            MS. FORNEY:  I object, Your Honor, to the voir

24

dire.  I offered her as an expert to do a specific thing, and

25

Johnston - Cross as to Qualifications

1    this seems to be --

2            THE COURT:  What was the specifics again?

3            MS. FORNEY:  I offered her as an expert in

4    evaluating resumes to determine whether persons qualify for

5    job classifications within the Civil Service system.

6            THE COURT:  Confine your questions to that.

7    BY MR. PRINGLE:

8    Q    If I presented you with a job posting from an agency,

9    is it within your expertise -- are you asserting it is within

10   your expertise to determine if that person is qualified to

11   take that position?

12   A    No, because I don't get into the job postings.  That is

13   not my job function.  My job function is evaluations of

14   applications and resumes and testing.  That is another unit

15   all by itself.

16           THE COURT:  Let me understand something.  Your

17   proffer is to present her as an expert in looking at

18   applications and then deciding whether they should qualify

19   for taking a certain test -- Civil Service test for a certain

20   position?

21           MS. FORNEY: Your Honor, I believe she will explain

22   what that process involves is reviewing an individual's

23   qualifications and matching it with the job classifications,

24   yes.  And that is what allows the person to take the test.

25           Now, of course, the individual would have to pass

169

Johnston - Cross as to Qualifications

1    the test.

2                THE COURT:  I understand.  It is just the

3    matching.   She does the matching?

4                MS. FORNEY:  Yes.  She does the determination of

5    whether the resume, the individual's qualifications match the

6    qualifications for the job title.

7                THE COURT:  Go ahead, Mr. Pringle.

8    BY MR. PRINGLE:

9    Q    All right.  Are you saying that it is outside your

10   expertise to deal with how the list -- the eligibility lists

11   are actually used?  Is that outside of your expertise?

12   A    I don't get into that.

13   Q    Can someone rely on your expertise to determine the

14   probability, for example, of Ms. Wilhelm getting a job with

15   the Commonwealth?

16   A    That is not my function.  I can't do that.

17               MR. PRINGLE:  At this time, Your Honor, I am going

18   to object to this testimony as to relevance.  I am not sure

19   what probative value it has that she can determine whether or

20   not Ms. Wilhelm can take a certain test or not.

21               It doesn't go to whether or not there were any

22   vacancies in the Commonwealth.  It doesn't go to the

23   probability of Ms. Wilhelm getting employment with the

24   Commonwealth.  I am not sure what the relevance is.  We are

25   not asserting that she can't take tests.

170

Johnston - Cross as to Qualifications

1    THE COURT:  What is the proffer of her testimony?

2    MS. FORNEY: Your Honor, this testimony is intended

3    to show that Ms. Wilhelm would qualify for a number of

4    positions within the Civil Service system if she chose to

5    take the test and did well on the test.

6         It is intended to show that there are positions,

7    there are job titles going into the future that she could

8    pursue.

9    MR. PRINGLE:  Your Honor, this witness is

10   specifically not capable of testifying to what Ms. Forney

11   described.  This witness can only testify that Ms. Wilhelm

12   qualifies to take certain tests, tests for certain

13   classifications within the Civil Service system.

14        She is not qualified to testify as to any

15   positions or specific positions which is why I asked her the

16   other question.  She can say that Ms. Wilhelm would take the

17   test, for example, of the Administrative Officer class, but

18   she can't say that Ms. Wilhelm will qualify for an opening

19   that the Department of Revenue has for an Administrative

20   Officer.  That is beyond her expertise.

21   THE COURT:  As I understand, she is going to take

22   Ms. Wilhelm's resume and decide what her skills are and match

23   them up with the skills that are required of a specific job.

24   That's it.

25   MR. PRINGLE:  No, Your Honor.

Johnston - Cross as to Qualifications

1          MS. FORNEY:  The job titles, yes, Your Honor.

2          MR. PRINGLE:  Your Honor, there's a difference

3    between a job and a job title.  The Commonwealth system is

4    set up so there are various classification titles.  For

5    example, you can be an Administrative Officer I.  That means

6    that you have certain -- there are certain minimum

7    requirements to take the test to become an Administrative

8    Officer I under the Civil Service System requirements.

9          Ms. Johnston is qualified to determine whether or

10   not Ms. Wilhelm is qualified to take the test for the

11   Administrative Officer I.  She is not qualified to determine

12   whether or not in the event there is an opening within any

13   agency for Administrative Officer I whether Ms. Wilhelm

14   having taken the test could actually perform the duties for

15   that specific opening.  That is beyond the scope of her

16   expertise.

17         It is my position that if she can't do that and if

18   she can only say that Ms. Wilhelm can take tests -- we are

19   not contesting that Ms. Wilhelm cannot take tests.  What is

20   the relevance of her testimony?

21         MS. FORNEY: Your Honor, if I may.  The way the

22   Civil Service System works -- and I would have the witness

23   explain that as part of her testimony -- is individuals must

24   be qualified to take the test.  They must be qualified after

25   they score on the test to go on the eligibility list.

172

Johnston - Cross as to Qualifications

1    That is done by -- Ms. Johnston testified that she

2    interviews applications after people have tested as well

3    which is again matching job qualifications with class titles

4    in order to make people eligible on an employment list.

5    In other words, she is going to look at Ms.

6    Wilhelm's resume, job experience and say that she would

7    qualify for certain classes of jobs that are within the

8    Commonwealth Civil Service system.

9    Because this is an equitable hearing and that we

10   are projecting into the future, I think it is relevant to job

11   opportunities that Ms. Wilhelm could be pursuing in the

12   future.

13   MR. PRINGLE:  That is exactly our point.

14   THE COURT:  We will take a recess for ten

15   minutes.

16   THE CLERK:  Court is in recess.

17   (A recess was taken.)

18

19

20

21

22

23

24

25

173

Johnston - Cross as to Qualifications

1    AFTER RECESS

2        OVETA JOHNSTON resumes the stand.

3        THE COURT:  I am going to allow the witness to

4    testify by comparing the resume to potential jobs for which a

5    test would be taken.  All right?

6        In other words, I will permit her to match the

7    resume qualifications into the qualifications set forth in

8    the job description.  That is what you proffered her for?

9        MS. FORNEY: Yes, Your Honor.

10       THE COURT:  No?

11       MS. FORNEY:  Yes.  My only hesitation is the term

12   job description.

13       THE COURT:  What is it then?

14       MS. FORNEY:  Classification.  Specification is the

15   Commonwealth's personnel speak.

16       THE COURT:  All right.

17       MS. FORNEY:  If I may, yes.

18       MR. PRINGLE:  Just so the record is clear --

19       THE COURT:  Your objection is noted.

20       MR. PRINGLE:  I am not objecting.  Just so the

21   record is clear, when we are talking about a classification

22   specification, there is no specific -- just so you

23   understand, there is no specific job being offered or

24   available.  There is no representation that there is a

25   specific job being offered, only that you qualify if you can

174

Johnston - Direct

1    find a job.

2              THE COURT:  For a position if it is there and if

3    it is available.

4              MR. PRINGLE:  Yes.

5              (Simplified Flow Chart of the Pennsylvania Civil

6    Service Hiring Process was introduced as Defendant Exhibit

7    57.)

8                        DIRECT EXAMINATION

9    BY MS. FORNEY:

10   Q    Ms. Johnston, I am going put a number of exhibits

11   before you, and we will talk about them.  The first exhibit

12   is Defendant Exhibit 57.

13             As I understand it, this is a flow chart that

14   shows the Civil Service process?

15   A    Yes.

16   Q    Is that correct?

17   A    Yes.

18   Q    Can you just briefly explain that process using the

19   chart?

20             MR. PRINGLE:  Objection, Your Honor.  This is

21   beyond her area of expertise.  She specifically said all she

22   knows about -- all she can testify to is reviewing resumes

23   and determining whether a person is qualified to take a

24   test.

25             This reviews the entire hiring process which she

Johnston - Direct

1    just testified she doesn't have any expertise in.

2          MS. FORNEY:  Your Honor I believe she did testify

3    in explaining what she did that she explained the process to

4    applicants for Civil Service.  I believe she also mentioned

5    that she used a flow chart.  This is simply to put --

6          THE COURT:  Let's find out if that is the flow

7    chart that she used with people she counselled.

8    BY MS. FORNEY:

9    Q     Could you identify Defendant Exhibit 57, please?

10   A     Yes.  This is the simplified flow chart for the hiring

11   process through Civil Service.  This is what I do use when I

12   am counselling applicants.

13         Basically, I give them a copy of this and explain

14   to them that this is showing the overall process of hiring.

15   I just go over where at the bottom applicant gets

16   announcement, application forms, and we go through the whole

17   process.  It is very self-explanatory step by step.

18   Q     At what point in this process does your counselling

19   take place?

20   A     The first one at the bottom where it says applicant

21   gets announcements and application forms.  That is what I

22   give them as I am counseling them, that information.  Then --

23   Q     Excuse me.  You give them the announcement and the

24   application form for jobs that you believe they would qualify

25   for?

176

Johnston - Direct

1    A    For jobs they would qualify for, yes, that are

2    available.

3            MR. PRINGLE:  Objection, Your Honor.  I know I am

4    being picky about this, but it is very important.  And I

5    believe Ms. Johnston would agree with this.  There is a big

6    difference between jobs and the class specifications.

7            When the term jobs is used, that sort of suggests

8    that there are actually vacancies of jobs.

9            THE COURT:  That is a matter for your

10   cross-examination of her.

11           MR. PRINGLE:  Okay.

12   A    I will rephrase what I just said.  Applicant gets

13   examination announcement and application form.  The exam

14   announcement is what we use to tell people they can apply for

15   and take the test for to get on the list.

16           Then from there, I explain to them that they will

17   complete the application form.  Now we do have -- applicants

18   do have access now if we have a website, they can do their

19   application on the web.  I tell them about that.  They can do

20   it on the web versus filling out a paper application.

21           Then it goes on.  I say after you take the test

22   and you meet those requirements that are on the announcement,

23   we will place your name on the list.  You will get your

24   notification in the mail as to your actual score, that type

25   of thing.

177

Johnston - Direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnston - Direct

1  BY MS. FORNEY:

2  Q    Now let me ask you this:  When you look at an

3  individual's qualifications and counsel them that they are

4  qualified to take a particular test and then they take the

5  test and are successful and their application is reviewed, is

6  that application reviewed looking at any different

7  classification specifications than what you used when you

8  counseled them before they take the test?

9          MR. PRINGLE:  Objection.  I am confused.  Is she

10  talking about the review done by Ms. Johnston or review done

11  by some other party?

12          THE COURT:  I think she asked what she used.

13          MS. FORNEY:  That is the intent of the question,

14  yes?

15  A    Okay.  Would you ask that question again, please?

16  BY MS. FORNEY:

17  Q    Maybe I will break it down and try to make it less

18  confusing.  Ms. Johnston, I understand that when an applicant

19  comes in and doesn't know what they might be qualified for,

20  you will counsel them.  You will use their resume.

21          Among the things you mentioned were class

22  specifications; is that right?

23  A    Yes.

24  Q    You determine that they may be qualified to take a

25  particular test.  After that individual takes a test and

179

Johnston - Direct

1    successfully takes the test, your qualifications are reviewed

2    again; is that right?

3    A      While they are there taking their test on the computer,

4    the people that pass the exam we will take and print their

5    application off of the website.  Then we will review their

6    qualifications.

7    Q      When you do that qualification review, do you use class

8    specifications, test announcements and the same materials

9    that you mentioned before?

10   A      Mainly, the class specifications and the evaluation

11   guide.  The evaluation guide is a very important part of

12   doing the application evaluation when the applicant takes

13   that examination.

14   Q      All right.  And then at this point assuming successful

15   completion of the test, the applicant is placed on the

16   employment list?

17   A      Yes.

18   Q      Then would you take us quickly through the rest of the

19   process?

20   A      The applicant is notified, and her name is placed on

21   the eligible list.  Then the state agency has a job opening,

22   and they request the names from the Civil Service list.

23   Q      How long are Civil Service lists active?

24   A      They vary.  Some may be a one year list, a two year

25   list or a three year list.  But no more than that as far as I

180
Johnston - Direct

1    know.

2    Q      So if an individual is on a list and that list expires,

3    then they would have to take the test again?

4    A      They have to reapply and go through the process over

5    again, yes.

6    Q      Can you just finish up the process?

7    A      Yes.  Also beside where it says the state agency has

8    job opening and requests the name from the Civil Service

9    list, then we go to the names of the eligible candidates are

10   sent to state agency.  Then from there, the state agency

11   interviews eligible candidates for the job.

12          One candidate is hired.  Then that one candidate

13   is hired.  If you notice, there is an arrow that goes to the

14   other block that says names of other candidates remain on

15   list for future job openings.

16          Then from there, when that one candidate is hired,

17   they pass the probationary period.  Then it says there, there

18   is another arrow going over to the other block that says

19   employe notified and action taken.

20          I guess if they don't pass the probationary

21   period, then the agency lets them know, and then action is

22   taken from there.  If they do pass the probationary period,

23   that employe obtains Civil Service work experience.  And then

24   from there, the employe applies for promotion.

25   Q      That is the overall view of the process?

181

Johnston - Direct

1    A    Of the hiring process, yes.

2    Q    At my request, did you review Ms. Wilhelm's resume and

3    materials regarding her background and identify job

4    specifications within the Civil Service system that she would

5    qualify for?

6    A    Yes.

7            (Wilhelm resume was introduced as Defendant

8    Exhibit 58.

9            Wilhelm resume submitted to Civil Service

10   Commission was introduced as Defendant Exhibit 59.

11           Wilhelm resume, question #9, was introduced as

12   Defendant Exhibit 60.)

13   BY MS. FORNEY:

14   Q    Before you, you have Defendant Exhibits 58, 59, and

15   60.  Can you tell me what those exhibits are?

16   A    These are the resumes that Ms. Wilhelm had submitted

17   for possible other job titles that she had applied for

18   previously.  And the first one -- they are in progression.

19   They are all -- basically, she added just more information on

20   Exhibit 59 more than on 58.  And then 60, that is more

21   detailed also.

22   Q    Are these the materials that you used when you reviewed

23   her qualifications?

24   A    Yes, these are the ones.

25           (Commonwealth of Pennsylvania's 37 1/2 Hour

182

Johnston - Direct

1  Standard Pay Schedule effective 7/1/02 was introduced as

2  Defendant Exhibit 61.)

3  BY MS. FORNEY:

4  Q    There are quite a few exhibits before.  First of all, I

5  would like you to find Exhibit 61 and just put that aside.  I

6  will ask you about that rather than get it all mixed up.

7          (Job Class Specifications were introduced as

8  Defendant Exhibits 62 through 81.)

9  BY MS. FORNEY:

10          Will you take a look at Exhibits 62 to 81.  And

11  can you tell me after you have had a chance to see what they

12  are, tell me what they are.

13  A    Yes, these are the class specifications that I used in

14  evaluation of her paperwork.

15  Q    Why did you use these class specifications?

16  A    These job specs go into details I said earlier about

17  the definition of the type of work that a person would do as

18   -- we will take, for instance, Administrative Officer I, the

19  work performed and the required knowledge and skills and

20  ability.

21  Q    Are each of these job specifications formatted in the

22  same way?

23  A    Yes.

24          (Job Class Specification for Administrative

25  Officer 1 was introduced as Defendant Exhibit 62.)

183

Johnston - Direct

1    BY MS. FORNEY:

2    Q     So if we can just look at that Exhibit 62 just to

3    orient ourselves to the formatting, it contains the class

4    title?

5    A     Yes.

6    Q     And then underneath that, a general definition?

7    A     Yes.

8    Q     Of the type of work performed?

9    A     Yes.

10   Q     And then after that, it will have examples of the work

11   performed?

12   A     Yes.

13   Q     After that required knowledge, skills and abilities?

14   A     Yes.

15   Q     And then at the very end, minimum experience and

16   training?

17   A     Yes.

18   Q     And are these the class specifications that you found

19   Ms. Wilhelm to be qualified for?

20   A     Yes.

21          (Chart: Classification Titles for Which Plaintiff

22   Qualifies was introduced as Defendant Exhibit 81.)

23   BY MS. FORNEY:

24   Q     I would like you to find Defendant Exhibit 81, please.

25   A     I have it.

184

Johnston - Direct

1    Q    Can you tell me what this is?

2    A    This is just an overall condensed version of the class

3    titles for which Ms. Wilhelm qualifies for.  And it lists the

4    class title, the pay range, and the qualifications and how I

5    came about which job titles the qualifications met with the

6    class title.

7    Q    Are the qualifications her qualifications?

8    A    Yes.

9    Q    And they are her qualifications that you believe

10   qualified her for the class title?

11   A    Yes.

12   Q    I see that on this exhibit, there is an asterisk by

13   class title.  And at the bottom of the page, it says

14   currently open for examination.  Can you explain what that

15   means?

16   A    That means that these are the job titles that are open

17   now for testing.  These are the ones that she can put in

18   applications to take the examination to get on a list for.

19   Q    How does the Commission -- are you familiar with how

20   the Commission determines whether to open something for

21   testing?

22   A    That is based on the agency's request.  We don't do it

23   on our own.  The agencies are the ones that request that

24   these specific job announcements are open for testing.  We

25   are like their work horse.  They tell us what they need, and

185

Johnston - Direct

1    we perform for them.

2    Q    I notice that this chart refers to pay ranges.  I would

3    like you to take a look at the exhibit that I asked you to

4    put aside which is Defendant Exhibit 61.

5    A    Yes.

6    Q    Can you tell me what this is, please?

7    A    Exhibit 61?

8    Q    Yes.

9    A    This is basically showing you the pay range numbers and

10   the steps from step one to step 20 of the progression of the

11   different steps for the pay ranges.

12   Q    Is this the Commonwealth's 37 and a Half Hour Standard

13   Pay Schedule?

14   A    Yes.

15   Q    And is it the one that was effective as of July 1,

16   2002?

17   A    Yes.

18   Q    And if we look at the left-hand side, it shows pay

19   ranges by number?

20   A    Yes.

21   Q    Is that right?  And do those numbers correspond with

22   the pay range numbers on Defendant Exhibit 81?

23   A    Yes.

24   Q    And then I also see that across the top, there are

25   steps.  And there are a steps within each pay range?

186

Johnston - Direct

1    A      Yes.

2              (Chart: Classification Titles for Which Plaintiff

3    Qualifies was introduced as Defendant Exhibit 82.)

4    BY MS. FORNEY:

5    Q      Now there should be one more exhibit up there for you

6    to look at Defendant Exhibit 82.  Can you tell me what this

7    is, please?

8    A      Okay.  These are the positions that the first two, the

9    Retirement Systems Regional Rep Career Link Specialist, these

10   are the ones that were on our projection list to be scheduled

11   to open up for examination during this first quarter of

12   2003.

13             It is just a projection.  This could change

14   depending on whether the agency still want to us open up the

15   program for exam or if they want to put it on hold.  Then the

16   last four could open up in the 2003-2004 fiscal year, after

17   the next fiscal year after July 1st.

18   Q      Are they also on the projection list?

19   A      Not the last four they are not.

20   Q      Why did you include them in your review?

21   A      I included those in there because based on her

22   experience and education and the jobs that I have listed here

23   under her qualifications, when they do open up for

24   examination, she would be able to apply for them.  It is just

25   that they are not on this fiscal year's schedule.

187

Johnston - Direct

1    Q    Have those positions opened for examination in the

2    past?

3    A    Yes, they have.

4    Q    Is there any particular pattern to when they open?

5    A    Usually these programs usually open up every two years

6    or every three years.  Some of them, such as these, do have

7    patterns that we can tell when, you know, if they are going

8    to open up.

9    Q    And going back for a moment to Defendant Exhibit 81,

10   these job classifications that are currently open for

11   examination, do they typically open every two or three years

12   as well?

13   A    No.  These are the ones that are open until further

14   notice.  These don't have closing dates right now.  So we

15   continue to do the testing until we hear differently from the

16   agencies.

17   Q    And just to be clear, Defendant Exhibit 82 is set up in

18   the same fashion as Defendant Exhibit 81?

19   A    Yes.

20   Q    And the qualifications that are referred to in the far

21   right-hand side are Ms. Wilhelm's qualifications that you

22   found suited her for the particular job titles?

23   A    Yes.

24           MS. FORNEY: No further questions, Your Honor.

25           THE COURT:  Cross-examine.

188

Johnston - Cross

CROSS EXAMINATION

BY MR. PRINGLE:

Q    Isn't it true that your expertise does not involve determining whether or not there were actually any vacancies for any of these tests being given?

A    No.  Where I work, we don't get that information.  We just do the testing.

Q    And with respect to the tests that are scheduled but are not currently open for testing, has it occurred in the past that scheduled tests have been canceled?

A    Yes.

Q    Why would an agency cancel tests?

A    It could be they may not have vacancies at that time and don't want the examination open again.  They may have a list of -- enough applicants on the list that they no longer need the program available.

     We don't usually down there at daily testing and counseling, we usually don't know or get that kind of information.  There is another unit that handles all of that.

Q    Who did you get this information from?

A    These here?

Q    Yes.

A    You mean the last four?

Q    I guess Defendant Exhibits 81 and 82.  Did you put

189

Johnston - Cross

1    these documents together?

2    A    Yes, sir.

3    Q    Where did you get this information from as to on 82

4    that these tests are scheduled to be opened?

5    A    Okay.  The first top two, these are the ones that are

6    on our fiscal year schedule right now which is good until

7    June 30th of this year.  The last four, they are not on our

8    schedule right now, but they could possibly open in the next

9    fiscal year.  So I thought it a good idea to put these down

10   so that when they did, she could take advantage and apply for

11   these different positions here.

12          THE COURT:  I think his question was where did you

13   get that information.  That is as to the jobs that were open

14   and open for testing.  Is that what you wanted to know?

15          MR. PRINGLE:  Yes.

16   A    Okay.  The first two like I said are on our projection

17   schedule.

18          THE COURT:  Where did you get that information

19   from initially to know to put that on your chart?

20   A    Okay.  I think I am trying to understand the question.

21   These first two are on our projection schedule which we get

22   on a fiscal year to tell what programs we're supposed to open

23   up for the agencies.  The first two is where I got those

24   from.

25          Now the last four --

190

Johnston - Cross

1      THE COURT:  Does that come from the agency?

2      A    Yes.  They are the ones that tell us.  We have -- it is

3      our Bureau of Personnel Assessment Unit that puts the

4      projection schedule together.  We get that so we know exactly

5      what programs are going to be opening during that fiscal

6      year.

7      So the first two are on our schedule for this

8      fiscal year.  But the last four, they are not on there.

9      BY MR. PRINGLE:

10     Q    You came up with the idea to put the last four on

11     there?

12     A    Yes, I did.

13     Q    And I believe you did testify that you have no

14     expertise in projecting job openings in the future for the

15     Commonwealth?

16     A    No, I really don't.  However, like I said, these four

17     really utilize her background.  I thought it would be a good

18     idea to list them so when this next fiscal year comes, if it

19     is on our schedule, she would be able to apply for these.

20     But they would utilize her background a lot.

21     Q    You don't even know if they will be on the schedule?

22     A    Not really.  No.

23     Q    It is not within your expertise to even project it?

24     A    No.  I just thought it was a good idea to list them for

25     her.

191

Johnston - Redirect

1    MR. PRINGLE:  I have no further questions.

2    THE COURT:  Redirect.

3                    REDIRECT EXAMINATION

4    BY MS. FORNEY:

5    Q    Just one.  As to the last four job titles that you were

6    referring to, over the 18 years that you have been doing job

7    counselling, has there been any pattern to when those

8    particular job titles have opened for testing?

9         MR. PRINGLE:  Objection, Your Honor.  She already

10   testified she has no expertise in this area.

11        THE COURT:  She is just asking her about her

12   experience.  What has her experience been?

13        MR. PRINGLE:  Okay, Your Honor.

14   A    If they have a pattern, these programs usually open up

15   every two or three years.  They are not like a one year

16   list.  So by looking at when they were opened last time, I

17   could usually tell when they are going -- try to tell if they

18   are projected to open up in the next fiscal year.

19   BY MS. FORNEY:

20   Q    In looking at that pattern, is that why you indicated

21   that they might open?

22   A    Yes.

23   Q    In the 2003-2004 fiscal year?

24   A    Yes.  My function as a counselor, I try to give the

25   applicant as much information as possible.  That way they

Johnston - Redirect

1   have an idea of a variety of different programs or should I

2   say different test announcements that they can apply for if

3   they are interested in applying for them.

4          I just don't always zero in on the one thing.  I

5   just give them a variety and let them make that decision if

6   they want to apply and try to be on as many lists as possible

7   for the different jobs.

8   Q    Why is it that you want to give them the opportunity to

9   be on as many lists as possible?

10  A    I always tell them to get their foot in the door.  Once

11  their foot is in the door, then they have that mobility for

12  possible promotion, transfers, whatever.

13         But they shouldn't just limit themselves to like

14  one or two positions.  They should be on as many lists as

15  possible to like I said just to get their foot in the door

16  and then go from there.

17               MS. FORNEY:  No other questions, Your Honor.

18               THE COURT:  Recross?

19               MR. PRINGLE:  No, Your Honor.

20               THE COURT:  You may step down.

21               MS. FORNEY:  The Commonwealth will now call Leeann

22  Ford, Your Honor.

23               MR. PRINGLE:  Objection, Your Honor.

24               THE COURT:  I thought I precluded that.

25               MS. FORNEY:  Your Honor, I believe you allowed the

193

Sidebar Discussion

1  possibility for rebuttal testimony.

2           THE COURT:  Okay.  What is the rebuttal?

3           MS. FORNEY:  Ms. Ford was the individual whose

4  Division in the Bureau of Standard Employment reviewed

5  Mrs. Wilhelm's qualification and referred her for the job at

6  PennDOT and at Revenue that were previously discussed.

7           She also has familiarity with the job at the

8  Department of Revenue.

9           THE COURT:  But I don't know whether the latter

10 would be rebuttal.

11          MS. FORNEY:  I believe it would, Your Honor,

12 because plaintiff testified that in her view, that job

13 required experience in tax and familiarity with tax.  And Ms.

14 Ford can speak to that.

15          THE COURT:  I want counsel to approach, please.

16          (The following discussion was had at sidebar:)

17          THE COURT:  Ms. Forney, with regard to the

18 potential employment in the Department or the Division that

19 requires a tax supervisor, I will not under any circumstances

20 consider putting her in that place.

21          I have to consider how long it would last with

22 someone being in that position who knows nothing about tax

23 supervising people who do know and the conflict that I think

24 that would be potential in that kind of position.  It is like

25 asking me to take a position on a Tax Court appeal which I

194

Sidebar Discussion

1     would be totally, absolutely inept at doing.

2            MS. FORNEY:  If I may, Your Honor?

3            THE COURT:  Go ahead.

4            MS. FORNEY:  Ms. Ford's testimony is going to be

5     that after Ms. Wilhelm declined to interview for that job,

6     she applied for that job.  She got that job.  The job

7     involves management, not tax expertise, and that she has no

8     tax expertise.

9            THE COURT:  I am not too sure that goes to

10    rebuttal.  She is entitled to take the position.  I just

11    don't think I can.  The fact that somebody else took it and

12    it turned out to be something different, I am just not going

13    to hold her to that now.

14           Ms. Ford, what was the other thing she was going

15    to testify to on rebuttal?

16           MS. FORNEY:  That she was in the Bureau of State

17    Employment at the time that Ms. Wilhelm was referred for the

18    PennDOT job and the Revenue job, just to explain why she

19    thought that it was appropriate to refer her for those

20    positions.

21           THE COURT:  What is she rebutting?

22           MS. FORNEY:  Rebutting Ms. Wilhelm's testimony

23    that she just wasn't qualified for the positions at all.  And

24    also the suggestion that this was done in bad faith, and that

25    there weren't vacancies.

195

Sidebar Discussion

1    MR. PRINGLE:  Ms. Wilhelm's testimony was that she

2    talked to someone.  Someone told her there was a job, and she

3    respond to that.  I don't think Ms. Ford can say whether or

4    not -- rebut the content of those conversations, which is all

5    that Ms. Wilhelm said.  She just communicated what she

6    learned after talking with people at the Department of

7    Transportation, the Personnel Director and the people I guess

8    in that Department.

9    Ms. Ford will not be able to rebut any of that

10   because she wasn't a party to it.  There is no question that

11   there was a referral.  Ms. Wilhelm does not deny that there

12   was a referral.

13   THE COURT:  Ms. Ford, did she follow through on

14   the referral?

15   MS. FORNEY:  I am not sure what you are asking.

16   THE COURT:  Did the plaintiff follow through on

17   the referral?  Is Ms. Ford going to testify that she never --

18   what was Ms. Ford's position?

19   MS. FORNEY:  That is where the confusion is

20   perhaps.  Ms. Ford was with the Bureau of State Employment

21   which is responsible for referring people's resumes to

22   agencies where agencies have vacancies.

23   THE COURT:  Okay.  She is going to testify to

24   what?

25   MS. FORNEY:  That in the Bureau of State

196

Ford - Direct

1    Employment, they referred Ms. Wilhelm to the PennDOT position

2    and to the Revenue position because they had information that

3    there were vacancies there.  And that upon review of Ms.

4    Wilhelm's qualifications, they thought that they were

5    appropriate referrals to make.

6           THE COURT:  I will let the testimony in only on

7    the basis to rebut any implication that this was a sham, that

8    there really wasn't any.  She still has her own recollection

9    of what she was told.

10           There was an implication by her testimony that

11   this really wasn't there.

12           MR. PRINGLE:  Your Honor, can we go off the

13   record?

14           THE COURT:  Yes.

15           (An off-the-record discussion was had.)

16

17           LEEANN FORD, called as a witness, being duly

18   sworn, testified as follows:

19

20           THE CLERK:  Would you state your name, please?

21   A     Leeann Ford.

22           THE CLERK:  Thank you.

23                     DIRECT EXAMINATION

24   BY MS. FORNEY:

25   Q     Ms. Ford, can you tell me where you were employed in

Ford - Direct

1    September and October of 2002?

2    A    I was employed by the Office of Administration, Bureau

3    of State Employment.

4    Q    And what was your position within that Bureau?

5    A    I was a Division Chief of the agency Referrals and

6    Programs Division.

7    Q    Can you tell me what the Bureau of State Employment is

8    responsible for?

9    A    Our primary function is to equip the agencies.  When

10   they come in with a vacancy, to fill the vacancies with

11   qualified applicants.

12   Q    How do you do that?

13   A    We do that by having the applicants submit a resume and

14   a personal data sheet.  We scan that information into our

15   Reusmix system and the Reusmix system extracts the skills

16   from their resumes to qualify them for positions.

17   Q    And how does the Bureau of State Employment know about

18    vacancies with agencies?

19   A    The agencies submit the vacancies via e-mail to us.

20   Q    And what did your Division do within the Bureau?

21   A    That was our primary function.  To make sure -- I had

22   four program coordinators who once they got the vacancy would

23   go through the Reusmix system and look for qualified

24   applicants.

25   Q    And what kind of information did the agencies typically

198

Ford - Direct

1  provide about vacancies?

2  A    The vacancy name, the location and any specialized

3  requirements that they might be asking for, along with how

4  many positions they are looking for.

5  Q    Do the agencies provide job descriptions or job

6  postings or information about the nature of the job?

7  A    Most of the time, they do unless it is a position like

8  a Clerk Typist or a Clerk or maybe certain positions that we

9  really did not need one.  If we do request one, they do give

10  us the job posting or a job description.

11  Q    In the fall of 2002, did your Division review Barbara

12  Wilhelm's resume for referral to Commonwealth agencies?

13  A    Yes, we did.

14  Q    I believe there are two documents up there marked

15  Defendant Exhibit 47 and Defendant Exhibit 48.  Would you

16  locate them?

17  A    (Witness complies.)  Okay.

18  Q    Is Defendant Exhibit 47 the personal data sheet that

19  you had on Ms. Wilhelm at the time?

20  A    47, yes, that is the personal data sheet.

21  Q    And is Exhibit 48 the resume that you had?

22  A    Yes, it is.

23  Q    What did you do to determine there were any vacancies

24  that Ms. Wilhelm could be referred for?

25  A    When we reviewed her resume, I looked -- we get a

199

Ford - Direct

1  vacancy sheet that shows all our vacancies on that sheet.

2  And what I did was I looked in the counties that she

3  specified that she would be interested in working in which

4  was county 22 Dauphin County.  I looked to see what jobs we

5  had available right now that were open that we could refer

6  her on.

7  Q    Did you make -- did you refer Ms. Wilhelm?

8  A    Yes, we did.

9  Q    There should be an exhibit on the stand marked

10  Defendant Exhibit 50.

11  A    I have it.

12  Q    Can you tell me what this is?

13  A    This is a job posting for the Department of

14  Transportation in their Office of Communications and Customer

15  Relations, and it is a title of an Administrative Officer

16  III.

17  Q    Is this information that you had at the time that Ms.

18  Wilhelm was referred for jobs?

19  A    Yes, I did.

20  Q    Is this one of the jobs that she was referred for?

21  A    Yes, it was.

22  Q    Can you explain to me why she was referred for this

23  job?

24  A    After looking over her resume and then looking over

25  this job posting, I knew that they were interested in someone

Ford - Direct

1    with some strong writing skills, communications.  They worked

2    with the media and also doing training seminars.

3            And just from looking at her resume, it looked

4    like she would be a compatible fit for this position because

5    she had wrote press releases and done news articles and has

6    extensive managerial experience which was something else the

7    job was asking for.

8    Q     Did you do anything to confirm that there was indeed a

9    vacancy in this position?

10   A     By them reporting it to us, that was the confirmation

11    -- that's all the confirmation I needed.  They reported the

12   vacancy to us.

13   Q     Who was it that reported the vacancy to you?

14   A     The Department of Transportation.

15   Q     After candidates are referred for positions by your

16   Bureau, do agencies report back as to whether people have

17   been interviewed or when they are hired?

18   A     Yes.  After we refer the names to the agency, they have

19   20 working days to get back to us with responses.  And they

20   just come back with a list of responses of why that person

21   was hired -- or just that they were selected -- excuse me --

22   or why they may not have wanted the job or weren't hired.

23   Q     Did the Department of Transportation get back to you

24   with regard to Ms. Wilhelm's referral?

25   A     Yes, they did.

201

Ford - Direct

1    MR. PRINGLE:  Objection to any questions regarding

2    discussions between the Department of Transportation and Ms.

3    Ford.

4    THE COURT:  It would be hearsay.  Is there a

5    document from the Department of Transportation?

6    MS. FORNEY:  No, Your Honor.

7    THE COURT:  It would be hearsay.

8    BY MS. FORNEY:

9    Q    There is another document up there.  It is Defendant

10   Exhibit 52.  Can you tell me what was done with this?

11   A    This is with the Department of Revenue with the Bureau

12   of Individual Taxes in the Division of Property Tax and Rent

13   Rebate.  And it is for an Administrative Officer III.

14   THE COURT:  Ms. Forney, this is the one that I

15   said I wasn't going to permit.  This is the tax job?

16   MS. FORNEY:  Yes, Your Honor.  Excuse me.  I

17   misunderstood your instructions.  I thought I would be

18   allowed to explain why the referral was made.

19   THE COURT:  Why the referral is made, you are

20   correct.  But that is the extent of it.

21   MS. FORNEY:  I understand, Your Honor.

22   BY MS. FORNEY:

23   Q    Was this information that you had at the time that Ms.

24   Wilhelm was referred for jobs?

25   A    Yes.

202

Ford - Direct

1  Q    Was she referred for this job?

2  A    Yes, she was.

3  Q    Can you tell me why she was referred for this job?

4  A    Again, this position required that you had extensive

5  management background because they wanted you to direct the

6  work flow of the Property Tax and Rent Rebate Division, not

7  necessarily doing that work, but monitoring it and

8  supervising the employes in that Division.

9  Q    When you reviewed Ms. Wilhelm's resume, did you note

10 any prior experience that she had in tax work?

11 A    No, I did not.

12 Q    You, nonetheless, referred her for this job?

13 A    Yes.

14 Q    Why is that?

15 A    It does not say on this job description that you have

16 to have a tax background.  Really what it focuses on is

17 actually being the manager of this Division in monitoring the

18 work flow.

19 Q    Is there a particular part of the job description that

20 are saying focuses on management?

21 A    On I guess it is the third page, it does say about

22 supervising, coordinates and evaluates customer service

23 activities with Property Tax and Rent Rebate, continually

24 monitors and analyzes the function, organization, operations

25 of the Division, develops Division objectives, both long and

203

Ford - Direct

1   short term.

2          And just even with the -- I guess it is the third

3   page about ensuring the thorough review of the Property Tax

4   and Rent Rebate claims, just ensuring that this gets done

5   does not necessarily mean that you will be doing it yourself.

6   Q    And what was it about Ms. Wilhelm's qualification that

7   made you think it would be appropriate to refer her?

8          MR. PRINGLE:  Objection, Your Honor.  She has

9   answered this question a couple of times.

10         THE COURT:  I thought she answered this.

11         MS. FORNEY:  I am sorry, Your Honor.  It is

12  getting late in the day.

13         THE COURT:  I think she answered it indirectly by

14  your asking her what requirements of the position did she

15  have that she could fulfill, and she recited the

16  requirements.  So I am just assuming she had those

17  qualifications.

18  BY MS. FORNEY:

19  Q    When the Department of Revenue sent this vacancy to the

20  Bureau of State Employment, did they indicate any special

21  requirements that they had for the position?

22  A    Not that I am aware of.

23         MS. FORNEY: No other questions, Your Honor.

24         THE COURT:  Cross-examine.

25

204

Ford - Cross

CROSS EXAMINATION

BY MR. PRINGLE:

Q     Ms. Ford, why did you look for jobs for Ms. Wilhelm?

A     I had gotten instruction from our Deputy Secretary to
look for positions for Ms. Wilhelm.

Q     Why did he instruct you to do that?

A     That was just the instruction.  Just to look to support
her on our radar.  To see what positions we may have open
that she would qualify for.  That is all the information that
I was given.

Q     Why didn't you look for positions for her before you
got a call from the Deputy Secretary?

A     She was always being looked at for positions as long as
she was in our data base.  But to know her name specifically
to go in and look for her, I did not know her base.

Q     If she was so qualified for this position, why didn't
you find it before you were called?  Why didn't you find
these positions before you were called?

A     Actually, they just really started opening up around
that time.  I didn't know her before.

Q     One of the positions was open since May of 2002.  Why
didn't you notice that she qualified for that position in May
of 2002?

A     I did not actually physically go in and look.  I have a
program coordinator who does that.  I don't know the

205

Ford - Cross

1    specifics of why.  We have a lot of people on file.  Not all

2    the time will someone actually be referred out for a position

3    even though they may qualify for them.

4    Q    Is this vacancy filled now?

5    A    Which one?

6    Q    The position for Transportation.

7    A    I am not sure.

8    Q    On the day that you got a call from the Deputy

9    Secretary, did he tell you to look for jobs -- who is the

10   Deputy Secretary?

11   A    Nancy Dering Martin.

12   Q    Did Ms. Dering tell you to look for anyone else?

13   A    No, she did not.

14   Q    What were her specific instructions to you?

15   A    The instructions were to see if we had Ms. Wilhelm on

16   file, which we did, but she had expired.  So that is when I

17   sent her a letter letting her know that her application had

18   expired and to resubmit a new one.

19        When we did get new information on Ms. Wilhelm, to

20   look to see if there was any positions that she may qualify

21   for.

22   Q    How long did you get a call from Deputy Secretary

23   Dering to find a job for someone?

24   A    Since the time I was in more of an acting capacity

25   because our Director had left.  My Director would have gotten

206

Ford - Cross

1    more phone calls that I would.  Since she had departed during

2    that time, maybe twice including Ms. Wilhelm.

3    Q     Twice in how long?

4    A     Since September.

5    Q     When did you get the call on Ms. Wilhelm?

6    A     I believe it was September or October.  I am not

7    exactly sure of the exact date.

8    Q     When I say how long, I meant how long were you in the

9    acting position?

10   A     In the acting position since September that I would

11   have gotten a call.

12   Q     2002?

13   A     Yes.

14   Q     Then you left the position when?

15   A     January 17th.

16   Q     Are you familiar with the Press Secretary positions?

17   A     No.  We never fill Press Secretary positions in the

18   Bureau of State Employment.

19              MR. PRINGLE:  No further questions.

20              THE COURT:  Redirect?

21              MS. FORNEY:  No, Your Honor.

22              THE COURT:  You may step down.

23              MS. FORNEY: Your Honor, I have no other

24   witnesses.  I wonder if I could have a moment to check my

25   exhibit list to make sure that it is complete before I --

207

1          THE COURT:  Okay.  You have one more or you have

2     no more?

3          MS. FORNEY:  No more, Your Honor.

4          THE COURT:  Okay.  Since you have no more

5     witnesses, are you going to have any rebuttal witnesses?

6          MR. PRINGLE:  Just one, Your Honor.

7          THE COURT:  Who?

8          MR. PRINGLE:  Ms. Wilhelm.

9          THE COURT:  The lady in the back of the courtroom

10    that was requested to stay may leave.

11         THE COURT:  Is there any reason why you can't put

12    her on rebuttal while you are looking over your exhibits?  I

13    won't preclude you from --

14         MS. FORNEY:  Actually, I think I am prepared to

15    move them, Your Honor.

16         THE COURT:  Okay.

17         MS. FORNEY: Defendant Exhibit 45.

18         THE COURT:  Didn't you just use that for

19    impeachment purposes, or you used it in an argument

20    concerning the need to supplement?  I am not too sure it is

21    necessary; is it?

22         MS. FORNEY: It really was used for impeachment to

23    and to support the objection.  You are right, Your Honor.

24    Exhibits 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58,

25    59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73,

208

1    74, 75, 76, 77, 79, 80, 81, 82, and 94, Your Honor.

2              THE COURT:  Any objection?

3              MR. PRINGLE:  Yes, Your Honor.  We object to -- if

4    I refer to Defendant Exhibit 82 which Ms. Johnston used for

5    her testimony, she identified the four classifications at the

6    bottom of the exhibit as positions that she projected might

7    be available for future examination.  And there are

8    corresponding I guess classification descriptions which are

9    Defendant Exhibits 74, 75, 76, 77, 79, 80 which we object to

10   on the basis that it was beyond her area of expertise.  And

11   her testimony regarding the possibility of these positions

12   being open for examination is speculative and irrelevant.

13             THE COURT:  With regard to Exhibit 82, I will

14   admit that except delete the four positions that are

15   scheduled for examination 2003-2004 and any related exhibits

16   that go to those positions.  All other exhibits you have

17   objected to is overruled.

18             Exhibit 82, the positions with the double asterisk

19   and any relating job descriptions will not be admitted.

20   Anything else?

21             MR. PRINGLE:  I would like to move for the

22   admission of Defendant Exhibit 53.

23             THE COURT:  53, what is that?

24             MR. PRINGLE:  It is a Bureau of Labor Statistics

25   publication.

209

Wilhelm - Direct

1      THE COURT:  Was that even introduced?

2      MR. PRINGLE:  I presented it through Mr. Murphy on

3  redirect.

4      THE COURT:  Any objection?

5      MS. FORNEY:  No, Your Honor.

6      THE COURT:  It is admitted.

7      (Defendant Exhibit 53 was admitted into evidence.)

8      THE COURT:  How long is Ms. Wilhelm's testimony?

9      MR. PRINGLE:  One -- two questions.

10      THE COURT:  Do you want to try for three?

11      MR. PRINGLE:  Two questions.

12

13      BARBARA WILHELM, called as a witness, being

14  previously duly sworn, testified as follows:

15

16      THE COURT:  You are under already under oath, Ms.

17  Wilhelm.

18                    DIRECT EXAMINATION

19  BY MR. PRINGLE:

20  Q    Ms. Wilhelm, will you tell us whether or not the state

21  employes -- whether or not State employes receive medical

22  benefits based on whether or not they have a spouse who

23  receives medical benefits?

24  A    No, it is not based on this.

25      MS. FORNEY:  I object, Your Honor.  I don't know

210

Wilhelm - Direct

1   what this is rebutting.

2           THE COURT:  There is a suggestion that she should

3   not be reimbursed for medical expenses because she is now

4   covered by her husband's policy.  I will permit the

5   question.

6   BY MR. PRINGLE:

7   Q     Did you answer the question?

8   A     I don't know if it got --

9           THE COURT:  I think she did.

10          (Answer referred to read by the reporter.)

11          THE COURT:  Did you get that, Mr. Pringle?

12          MR. PRINGLE:  I sorry.  I didn't hear.

13          THE COURT:  She said no, it is not based on that.

14  BY MR. PRINGLE:

15  Q     Are state employes entitled to medical benefits -- to

16  receive medical benefits, medical coverage even if their

17  spouse has medical coverage whether greater or better than

18  the state employe's medical coverage?

19  A     Yes, of course.

20          MR. PRINGLE:  I have no further questions.

21          THE COURT:  Cross?

22          MS. FORNEY:  No, Your Honor.

23          THE COURT:  You may step down.  Anything further?

24          MR. PRINGLE:  No, Your Honor.

25          MS. FORNEY:  No, Your Honor.  I understand that

211

1    the Court will request briefs from us?

2              THE COURT:  I'll tell you what.  Let me give some

3    thought to the testimony that has been presented today, and I

4    will determine whether I want a brief on any particular point

5    or whether I need oral argument on anything.

6              If I do decide that I need some argument, I will

7    try to do it by phone so you people don't need to come in to

8    court unless you prefer that.  I am trying to operate at the

9    convenience of counsel.

10             In the meantime, just sit tight, and I will decide

11   by Order whether I need anything further from you.

12             MR. PRINGLE:  Your Honor, this sounds odd, but

13   actually I would like in doing oral argument, I would prefer

14   to it in your presence.

15             THE COURT:  If I need it, we will do it then.

16   Court is adjourned.

17             MR. PRINGLE:  Thank you, Your Honor.

18             THE CLERK:  Court is adjourned.

19             (Whereupon, the proceedings were concluded.)

20

21

22

23

24

25

212

1          I hereby certify that the proceedings and evidence

2     are contained fully and accurately in the notes taken by me

3     on the trial of the above cause, and that this copy is a

4     correct transcript of the same.

5

6                                    _____

7                                    Vicki L. Fox, RMR

8                                    Official Reporter

9

10         The foregoing certification of this transcript

11    does not apply to any reproduction by any means unless under

12    the direct control and/or supervision of the certifying

13    reporter.

14

15

16

17

18

19

20

21

22

23

24

25