178

1/25/07

ʃᴍ

1

IN THE UNITED STATES DISTRICT COURT.

2

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4  BARBARA A. WILHELM,                    :
        Plaintiff                          :

5                v.                         :    Case 01-CV-1057
                                           :

6  COMMONWEALTH OF PENNSYLVANIA,           :
   PENNSYLVANIA STATE POLICE,              :

7  et al.,
        Defendants

8

9

10              TRANSCRIPT OF PROCEEDINGS

                OPENING STATEMENTS
11              AND CLOSING ARGUMENTS

12

13    BEFORE:    HON. SYLVIA H. RAMBO, Judge

14    DATES:     September 9, 2002
                 September 11, 2002
15

      PLACE:     Courtroom Number Three
16               Federal Building
                 Harrisburg, Pennsylvania
17

18                                         **FILED**
                                           HARRISBURG, PA
19  COUNSEL PRESENT:

20  NATHAN C. PRINGLE, JR., Esquire         JAN 2 5 2007
        For - Plaintiff
21                                          MARY E. D'ANDREA, CLERK
    SUSAN J. FORNEY, Esquire                Per _____
22      For - Defendants                            Deputy Clerk

23

24                                         Vicki L. Fox, RMR
                                           Official Reporter
25

2

1

## I N D E X

2

3

Opening Statements                                   Page

By Mr. Pringle                                         3
By Ms. Forney                                          9


Closing Arguments

By Mr. Pringle                                        18
By Ms. Forney                                         42
By Mr. Pringle, rebuttal closing                     58

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff's Opening                                                3

1      THE COURT:  You may make an opening statement.

2      MR. PRINGLE:  Thank you, Your Honor.  Good

3  morning.  My name is Nathan Pringle.  I represent the

4  Plaintiff Barbara Wilhelm in this case.

5      We met last week, and I want to again thank you

6  for being here and participating in this process.  This is

7  very important to me and my client.

8      The case before you is fairly simple.  I want to

9  apologize at the outset.  It is not going to be sexy.  It is

10  not going to be a lot of fun, but it is important.  It

11  affects Barbara Wilhelm's life.

12      What this case is simply about is her claim that

13  she was retaliated against for filing sex discrimination

14  charges.  We are going to present evidence regarding her

15  background.  We are going to explain to you -- I am going to

16  have Ms. Wilhelm explain to you that she was a long time

17  State employe at the time of her termination.  That is what

18  is involved here.  She had over 21 years of service.

19      She is going to give you a lot of details.  It

20  may sound unimportant or uninteresting to you, but it is

21  very important.  It is a backdrop for the entire case.

22      So I am asking you to please listen to the

23  evidence.  Listen to the evidence as it is presented to you

24  as the Judge said.  The background she is going to give you

25  is that she is a college graduate of York College, that she

Plaintiff's Opening                                          4

1    has a degree in -- a bachelor's degree in Police Science,

2    and that she became a Police Officer, a Capitol Police

3    Officer with the State of Pennsylvania, that she worked

4    there for a number of years.

5              She will testify that her performance in that job

6    was excellent, and that it was recognized throughout the

7    Commonwealth as being excellent.  So much so that she

8    received many offers for positions.

9              One of those offers was with the Governor's

10   Office of Inspector General.  That Office deals with

11   inspections of violations of the law, of abuses and ways

12   within state government affecting all state agencies under

13   the Governor's jurisdiction.

14             She will then explain to you she took a position

15   that she eventually did so well in her job that she got

16   supervisory responsibilities.  And it was also recognized

17   that it was appropriate for her to act as Acting Director of

18   the Capitol Police for a period of time.

19             Eventually, she went back to the Inspector

20   General's Office, continued as a supervisor being

21   responsible for field offices in Philadelphia, the Central

22   Office in Harrisburg and the field office in Pittsburgh.

23             She continued to receive job offers because it

24   was recognized that her performance was excellent.  One of

25   those job offers was with the Pennsylvania State Police.

Plaintiff's Opening                              5

1    She took that one.   This is where we believe her problems

2    started.

3            She worked for the -- we are going to show

4    through her testimony that she worked through the Bureau of

5    Criminal Investigation as an intelligence analyst.   From

6    there because her performance was excellent and recognized

7    even by the Commissioner as excellent, she was offered a

8    position within the Legislative Affairs Office.

9            We are going to have the Director -- former

10   Director of that Office Richard Morris at that time she was

11   -- Major Richard Morris testify as to what the function of

12   that Legislative Office was.   Generally, I would say you

13   will hear testimony that it functioned as a representative

14   for the Pennsylvania State Police within our State

15   Legislature.

16           That Office also included staff of a policy

17   analyst and an Assistant Director by the name of Captain

18   Michael Simmers.   As I said before, this case is about

19   retaliation.   And what we have to show you -- and the Judge

20   will give you instructions on this -- what we have to show

21   you is that she made claims of retaliation to various

22   parties.

23           We will show you that she made various claims of

24   retaliation, that she made various claims of discrimination.

25   We will show you that she made various claims of

Plaintiff's Opening                                6

1    discrimination with respect to how she was treated in that

2    Office.

3              We will show you that she contacted her Director

4    Richard Morris and repeatedly told him that she was treated

5    as a second class citizen merely because she was a female.

6              Specifically, she will say that she was treated

7    as a second class citizen merely because of the fact of them

8    having her do filing work, clerical work merely because she

9    was the only woman in the office.  She will also testify

10   that during her tenure in that office, her male counterparts

11   were free to come and go in the office and were not held

12   accountable for their time in the office.  In contrast

13   because she was a woman in the office, she was held

14   accountable for her time.

15             She will also raise some other issues of

16   discrimination, but I want you to focus on those main parts.

17             You will not hear evidence as to whether or not

18   she was actually discriminated against.  A fine distinction

19   here.  We will only present evidence that she claims she was

20   discriminated against, and she presented that to the

21   appropriate parties.

22             She will not present evidence of discrimination.

23   We are not here to determine whether or not she was actually

24   discriminated against, only if she brought claims.

25             We will present evidence that she presented these

Plaintiff's Opening                                          7

1    claims to her Director Richard Morris, that she also

2    presented claims of discrimination to the Bureau of

3    Professional Responsibility within the Pennsylvania State

4    Police.  That Bureau contains the Internal Affairs Division

5    and the Systems and Process Review Division.  She will

6    present evidence that she made claims to both.

7            We will also present evidence from her Director

8    that he filed a claim on her behalf to the Internal Affairs

9    Division.

10           We will show additional evidence that she

11   presented specific claims to the Systems and Process Review

12   Division which is again part of the Bureau of Professional

13   Responsibility.

14           She also notified Colonel Paul Evanko, the

15   Commissioner for the State Police, that she was making these

16   claims.  She also notified the Director for Equal Employment

17   Opportunity within the Pennsylvania State Police that she

18   was making these claims.  Her name is Virginia Elliot Smith,

19   Major Virginia Elliot Smith.

20           Part of what we have to prove here is that as a

21   result of her filing these claims, some adverse employment

22   action occurred.  As I indicated to you earlier, our

23   assertion will be that the termination -- the termination of

24   her employment is that adverse action.

25           Obviously, we get to present our case.  The other

Plaintiff's Opening                                           8

1    side gets to present their case.  We think there was an

2    adverse employment action because of this.  They are going

3    to say there was not.

4            So in anticipation that they will present a

5    reason that they believe is legitimate nondiscriminatory

6    evidence, we will present you with other evidence to show

7    that in fact their reason was a pretext, a subterfuge, not

8    the real reason.

9            We will present you with evidence.  They will

10   present you we believe with evidence that they reorganized

11   the Office, that they replaced Ms. Wilhelm with a clerical

12   person, and that there was a business necessity for doing

13   that.

14           We will show you that there was no business

15   necessity for doing that.  This was convenient on their

16   part, a convenient means by which to get rid of Ms. Wilhelm.

17           We will also show you that as a direct result of

18   her being terminated and the means by which they terminated

19   her, it adversely affected her future employment

20   opportunities.

21           We will show you that they deliberately wrote in

22   her personnel records and designated a code which was

23   derogatory, and that code could be accessed by other

24   Pennsylvania hiring managers.  We will show you that as a

25   direct result of that, Ms. Wilhelm was not able to get other

Defendants' Opening                                    9

1    employment with the Commonwealth.

2         We will show you other damages.  Obviously, we

3    will show you that there were monetary damages in that she

4    lost income from this job.  And we will show you she was not

5    able to get any other employment despite her valiant efforts

6    to do so.

7         At the end of this case, the Judge is going to

8    give you jury instructions.  I am going to come back to you

9    and give you a closing argument as to why you should find

10   for my client.  Thank you very much.

11        THE COURT:  Ms. Forney?

12        MS. FORNEY:  Good morning ladies and gentlemen.

13   My name is Susan Forney.  We met at jury selection.  I work

14   for the Attorney General's Office, and I am here this

15   morning to represent the State Police, who is the defendant

16   in this case.

17        As Mr. Pringle told you, the question that you

18   are going to be presented with at the end of the day is why

19   was the Plaintiff dismissed from the State Police.  She was

20   not dismissed because she complained about sex

21   discrimination.  She was dismissed because her boss

22   recommended that his Office be reorganized to eliminate her

23   position and to convert that position into a clerical spot.

24   And she was dismissed because there was no other vacant

25   position that she could fill within the State Police.

Defendants' Opening                    10

1        Now her boss recommended reorganization of the

2    office really for two reasons.  He was relatively new in the

3    position.  And as he familiarized ed himself with the

4    operation of the Office, he realized he needed clerical

5    support, and there was nobody in the office who was

6    specifically assigned to do that job.

7        The other reason that he decided he wanted to

8    reorganize the Office was that the Plaintiff made it very

9    clear to him that she was unwilling to communicate openly

10   with other members of the staff of the State Police that

11   were involved in the work of the Office where she worked,

12   and he was very concerned about that.

13       Now what will the evidence show?  The evidence

14   will show that the events leading up to her dismissal were

15   as follows:  Ms. Wilhelm began to work for the State Police

16   Office of Legislative Affairs in January of 1998.  After she

17   had worked there about two years, the Director of that

18   Office Major Richard Morris retired.  That was in about

19   January of 2000.

20       It took six to eight weeks to identify his

21   successor in that position.  That successor was Captain

22   Jeffrey Miller, who is now Major Jeffrey Miller, who is

23   seated at counsel table.

24       Captain Miller spent some time familiarizing

25   himself with the work of the Office of Legislative Affairs

Defendants' Opening                                                  11

1    while he was wrapping up responsibilities he had with his

2    prior job.  During that period, he became concerned that the

3    Office didn't have any clerical support, and he presented a

4    couple of different proposals, floated a couple of ideas

5    about how that might be resolved.  One of those ideas was to

6    bring in a new clerical position.

7             He wasn't allowed to do that.  That wasn't

8    permitted.  So he continued to learn about the Office,

9    observe how employes were operating and get ready to take

10   over.

11            About a month after he was in the position of

12   Director of Legislative Affairs, an incident occurred which

13   caused him to really be concerned about the Plaintiff's

14   willingness to openly communicate with other staff members.

15            One day, the Plaintiff came into the office and

16   discovered that the voice mail system for the telephone in

17   the Office had been removed.  Now this was of some concern

18   because one of the things that the Office did was to get a

19   lot of calls from legislator and their staff, and they

20   needed to respond to the various calls that came in.  And,

21   of course, if the line was full, folks would leave messages.

22   The voice mail system was off.

23            She was convinced that the Director of the Policy

24   Office, a man by the name of Ronald Plesco had caused this

25   to happen.  Now Mr. Plesco had previously been a co-worker

Defendants' Opening                                12

1   of the Plaintiff's, and as the evidence will show there had

2   been some tension in the office earlier and some personality

3   conflicts among the people that worked there.

4          In any event, the Plaintiff informed Captain

5   Miller that Mr. Plesco was responsible for removing the

6   voice mail system from the phone.  Captain Miller was out of

7   the office.  He was down at the Capitol.  The testimony will

8   show his job requires him to attend a lot of meetings, make

9   a lot of contact with folks.  So he wasn't there when this

10  occurred.

11         When he did get back to the office, he spoke with

12  Ms. Wilhelm, and she said it was Ron Plesco who did this.

13  He looked into the situation and discovered that wasn't the

14  case.

15         A few days later, he spoke to Ms. Wilhelm and

16  said it wasn't Ron Plesco.  He didn't cause this to happen.

17  Ms. Wilhelm refused to accept his explanation and did not

18  want to discuss it further.  Captain Miller had some

19  concerns, however, and he wanted to talk to Ms. Wilhelm and

20  tried to talk to Ms. Wilhelm about how she might have

21  handled the situation in a different way.

22         He said that he thought it would have been better

23  had she spoken to Ron Plesco and talked to him about the

24  problem with the voice mail system to see if it could be

25  resolved.  And her response was in no certain terms that she

Defendants' Opening                    13

1   would not speak to Ron Plesco.

2         Captain Miller was a little surprised by this

3   response.  He was now confronted with the following

4   situation:  He had an office that needed clerical support.

5   He had an employe who had said she wasn't willing to speak

6   to the man who was now the Director of the Policy Office in

7   the State Police.  This man was someone by virtue of his

8   responsibilities that the Legislative Affairs people needed

9   to communicate with.

10        You will hear testimony that Policy and

11  Legislative Affairs are closely related, and there needs to

12  be a flow of communication there.  And certainly Captain

13  Miller was concerned that there be a flow of communication.

14        What he did is he went to the Commissioner of the

15  State Police and said I would like to reorganize my office.

16  I need clerical support, and I am concerned that the

17  Plaintiff is not going to communicate the way I would like

18  her to communicate with other staff members.

19        He also said and I really need clerical support

20  more than I need the functions that the Plaintiff is doing.

21  The Commissioner authorized the reorganization.

22        You will hear evidence that the Personnel

23  Director of the State Police, a woman by the name of Linda

24  Bonney was given the job of carrying out the reorganization.

25  Now what Ms. Bonney did first was recognize that the

Defendants' Opening                                    14

1    Plaintiff was in a job which is called an at will position.

2    That means she wasn't a civil servant, and she didn't have

3    the protection of a union contract so she didn't have the

4    right to take another job.

5         You may have heard that referred to as bumping.

6    She didn't have a right to bump into another job, and she

7    didn't have a right to be put on a recall list so that if

8    another job opened, they would call her up, and she would

9    come back.

10        What Ms. Bonney did was look to see if there were

11   other vacancies in the State Police that the Plaintiff was

12   qualified for and she was available for.  She discovered

13   there was none at the time.  The only option at that point

14   was to dismiss Ms. Wilhelm.  And that is what happened.

15        The State Police dismissed her, and they gave her

16   a dismissal letter which explained that this was being done

17   because of the need to reorganize the Legislative Affairs

18   Office.

19        Now Mr. Pringle told you that Ms. Wilhelm was

20   dismissed because she complained about sex discrimination.

21   Did she complain about sex discrimination?  She did.  Once.

22        The evidence will show that on the eve of her

23   prior boss's ease retirement Major Morris' retirement, she

24   wrote him a memo in which she said I want to know what the

25   policies are for taking compensation leave in the office.

Defendants' Opening                                    15

1    My coworkers seem to be taking advantage of these policies,

2    and I am not.  I think this is discriminatory preferential

3    treatment of the males in the office.

4            She sent that memo to Major Morris several days

5    before the effective date of his retirement.  She copied in

6    the Commissioner of the State Police Paul Evanko.  She

7    copies in the Equal Opportunity Officer.

8            Commissioner Evanko received that memo, and he

9    addressed it.  He wrote a memo to the Interim Director of

10   the Legislative Affairs Office reiterating what the State

11   Police policy was on compensatory leave.  He said this is

12   what it is.  I am reinforcing this with you.

13           In addition, it looks like Ms. Wilhelm is raising

14   a complaint of sex discrimination.  I want you to send this

15   memo to the appropriate agencies within the State Police,

16   the appropriate units so that it can be dealt with.  That is

17   what Commissioner Evanko did.

18           The Acting Director of the Office did as

19   instructed and sent Ms. Wilhelm's memo out to the

20   appropriate units within the State Police.  She was not

21   dismissed because she made a complaint about sex

22   discrimination.

23           Now what I say to you as the Judge explained is

24   not evidence.  I am trying to give you a picture of the

25   Defendants' case and what you might hear in the evidence.

Defendants' Opening                                    16

1    The witnesses will testify.  Documents will be presented.

2    And that is the evidence that you must listen to.

3            You will be hearing from Captain Miller, and he

4    will describe to you the situation he confronted in the

5    Legislative Affairs Office.  Commissioner Evanko will also

6    testify about how he responded to Major Miller's concern and

7    what he did.

8            Linda Bonney, the Personnel Director, will tell

9    you how she went about implementing the reorganization.  You

10   will also hear from a gentleman by the name of Richard

11   Clites, he works for another part of the Commonwealth called

12   the Office of Administration.  This is the agency that

13   develops the codes that are used to describe how a person is

14   separated from the Commonwealth, and he will talk to you

15   about the code that was used in this instance and that it

16   was an appropriate code under all of the circumstances.

17           Now we will probably be presenting some

18   additional witnesses and evidence in order to respond to the

19   Plaintiff's case.  And they will be other members of the

20   State Police.

21           Some of the evidence will deal with the

22   organizational structure of the State Police.  It may not be

23   the most exciting evidence in the world, but we are

24   presenting it to you so that you understand how the State

25   Police operates.

Defendants' Opening                    17

1          It is a paramilitary organization.  It has got

2     Colonels, Captains, Lieutenants, Colonels, Majors,

3     Sergeants, Corporals.  And because of that paramilitary

4     structure, its operation and its adherence to chain of

5     command, it is a little bit different than a civilian

6     employment situation might be.  We will present you some

7     information about that, and also the regulations and

8     directives that govern the operation of the State Police.

9          Ladies and gentlemen, there is a very old saying

10    that there are two sides to every story.  That is very true.

11    You have just heard two very different views of what went on

12    in this case.

13         Plaintiff will now have an opportunity to present

14    her evidence to you, and we will follow.  I would just add

15    my request to the Court's request that you keep an open mind

16    until you have heard both sides of the story.  And I think

17    if you do that, I am confident you will conclude the

18    Plaintiff was not dismissed because she complained about sex

19    discrimination, but that she was dismissed for the reasons I

20    outlined.  Thank you for your attention.

21         (Whereupon, the opening statements were

22    concluded.)

23

24

25

SEPTEMBER 11, 2002

CLOSING ARGUMENTS

MR. PRINGLE:  Good morning, ladies and gentlemen of the jury.  We have been here a long time, and I want to again thank you for the time and for your participation in this process.  This has taken two and a half days of your time, and we greatly appreciate it.

I did watch you, and I did notice you were listening very intently, and I greatly appreciate that, and my client appreciates that.  Because your time is valuable, I am going to get straight to the point here.

This issue -- the issue before you, the case before you is whether or not Ms. Wilhelm was retaliated against in violation of Federal Statute VII and State Statute of Pennsylvania Human Relations Act.

In order to prove our case, we had to show a number of things.  The first thing we had to show is that there were complaints.  This is the critical issue here. Actually, all the issues are critical, but this is one of the main critical points here.

Ms. Wilhelm testified that she complained to her Director Major Morris about discrimination with respect to assignment of cars, that she thought it was unfair that the male employes all had cars, and she did not.

She testified that she told Major Morris that she

Plaintiff's Closing Argument                    19

1    didn't think it was fair that she was the clerical

2    receptionist in the office because she was a woman, and the

3    men in the office were not required to do similar -- perform

4    similar tasks.

5            She testified that she didn't think it was fair

6    that the men in the office were permitted to come and go in

7    the office without accounting for their time, and that she

8    was held accountable for her time.  She specifically said

9    that -- she did describe it in terms of gender based

10   discrimination.  But she didn't necessarily say this is

11   gender based discrimination, or this is a Title VII

12   violation.  She is not a lawyer.  She did say it was not

13   fair that I as a woman, I as a female am treated this way

14   and the men in the office are treated another way.

15           What is significant here is Major Morris received

16   it that way.  Major Morris filed a complaint on her behalf.

17   She made the complaint to him.  He filed a complaint on her

18   behalf in June of 1999.

19           Focus your attention on that complaint because

20   that complaint on its face -- and I am sure the Defendant

21   will point it out -- doesn't say sex discrimination,

22   probably again because Major Morris isn't a lawyer and

23   didn't know he had to use certain magic words.

24           What he did when he talked to Corporal Rain, it

25   was clear he was talking about among other issues sex

Plaintiff's Closing Argument                    20

1    discrimination, gender discrimination.  Corporal Rain, now

2    Sergeant Rain, acknowledged that he received and he heard

3    that.  He acknowledged that he understood those were issues

4    being raised.

5              He acknowledged that he even spoke with the EEO

6    Director Major Virginia Elliot Smith.  If there was no EEO

7    issue, why would he go to her?

8              Barbara Wilhelm goes to Major Morris as far as

9    the complaint was concerned.  Major Morris goes to -- I am

10   sorry -- the Major talks to Garret Rain and explains that

11   this is gender based discrimination.  But it didn't have it

12   in there.

13             You can see from the exhibit -- this is the cover

14   sheet for the report that Garret Rain completed and was

15   submitted to Major Morris -- that one of the people who was

16   assigned to review this was the EEO Officer.  So again, all

17   parties knew that there was an equal employment opportunity

18   issue, that there was a discrimination issue here.

19             Did she use the magic words?  I am not sure she

20   did, but she did convey to them that she had a problem

21   because she was being treated differently because she was a

22   woman, differently than the men were being treated.

23             With respect to when she talked to Garret Rain,

24   she communicated to him that she believed, among other

25   things, that she should have gotten a classification survey.

Plaintiff's Closing Argument                    21

1    I am not sure how Garret Rain accepted that document, but

2    her intent was to say look, do a classification survey.  I

3    tried it with the Personnel Office.  I tried to ask them to

4    do it.  They didn't do it.  If you do a classification

5    survey, you will see that I am doing all the clerical work.

6              Again, she is showing she was treated one way

7    because she was a woman, and the men were being treated

8    another way.

9              With respect to that issue as I said before,

10   Garret Rain did go to the EEO Officer to get her guidance

11   recognizing it was an EEO issue.

12             There is another memo here.  There is a

13   memorandum that went to Lieutenant Horgas, and Janet McNeil

14   ultimately had access to it when the Systems and Process

15   Review Team came to the office.

16             There's two things I want you to make note of

17   here.  The report itself, the memo itself, the

18   September 13th memo, it is unfortunate as we were going

19   through this, the September 13th memo does not have the

20   magic words on it.  They don't it well.  Ms. Wilhelm

21   acknowledged that part of the process of receiving

22   complaints within the State Police -- and the regulations as

23   Colonel Hikes acknowledged is that you can do a complaint

24   orally.  There was no rebuttal to that fact.  It was a

25   two-hour meeting.

Plaintiff's Closing Argument                 22

1    The parties sat down, Major Morris, Lieutenant

2    Horgas, Sgt. McNeil, Ms. Wilhelm, another party sat down and

3    discussed that memo.  She testified that she went down item

4    by item by item.

5    Lieutenant Horgas testified that he didn't see it

6    in the room.  I find that to be incredible.  It has yellow

7    state tags on it.  I think it is significant that he didn't

8    bring the memorandum which was supposed to be the subject of

9    the meeting.  Again, that is not credible, that he did not

10   know that those issues were being addressed, or maybe he

11   didn't care.  I don't know.  I don't know.  But I do know

12   the weight of the evidence suggests that the memo itself was

13   discussed at that meeting and all the items were discussed.

14   Lieutenant Horgas would have you believe that

15   nothing was discussed about a hostile or a harassing

16   environment.  It is clearly on the memo.  At least, he

17   should have read it.  I am not sure what he did with that

18   memo.  At least, he should have read it.  And it is not

19   credible that Ms. Wilhelm would go to the trouble of

20   drafting this memo and not discuss it.

21   Major Morris's unrefuted testimony was that --

22   Major Morris testified that the issues were discussed, the

23   issues in the memo were discussed, including unearned

24   compensatory time, including harassing and hostile work

25   environment.

Plaintiff's Closing Argument                    23

1        Barbara Wilhelm and Major Morris both

2    acknowledged that.  Lieutenant Horgas says he doesn't

3    remember these things happening.  I don't think it is

4    credible.  It is on the memo.  The subject must have come

5    up.

6        One of the things you have to do as members of

7    the jury, and I am asking you to do is consider -- you have

8    to consider credibility.  I am asking when you consider

9    credibility, consider the things you heard and the things

10   you did not hear.  Consider things that were presented to

11   you and the things that were not presented to you.

12       Guess who you didn't hear from?  Janet McNeil.

13   Why wasn't she here?  Because she spoke with Barbara

14   Wilhelm, and they didn't want to bring Jane McNeil.

15       Barbara Wilhelm also testified unrefuted that she

16   spoke with Janet McNeil and specifically addressed these

17   discrimination issues.  Nobody was here to refute that.

18       We also have the testimony of Barbara Wilhelm.  I

19   don't think there is any dispute about this -- even the

20   defense would not dispute it -- that there was a memorandum

21   that was sent to Major Morris, that was copied to Col.

22   Evanko and the EEO Director, Major Virginia Smith Elliot.

23   You are going to see them when you review the documents.

24   Colorado Evanko was copied on that.  The EEO Director was

25   also copied on that.  That was dated January 3rd.

Plaintiff's Closing Argument                    24

1           There was another memo dated January 3rd in which

2    those two parties, Corporal Evanko and Major Virginia Smith

3    Elliot were also copied.  So we have complaints to Major

4    Morris.  We have the complaints that Major Morris made to

5    Rain understanding and receiving a complaint of

6    discrimination.

7           We have Ms. Wilhelm's complaint to Janet McNeil

8    alone.  We have Ms. Wilhelm's complaint to the Systems and

9    Process Review Team, Horgas and McNeil, according to Wilhelm

10   and Major Morris where discrimination was discussed.  And we

11   have the documents going to Col. Evanko through Major

12   Morris -- I am sorry -- going to Col. Evanko and going to

13   the EEO Officer.

14          Lastly, we have the unrefuted testimony of Ms.

15   Wilhelm that she also spoke directly with the EEO Officer

16   making these same discrimination complaints.  You never

17   heard from her today or any time.

18          Where is Major Smith Elliot?  She is not here.  I

19   believe she is not here because they didn't want to present

20   her testimony probably because she was not permitted to do

21   her job.

22          If you look at that chart over there -- I know it

23   is hard for you to see.  Is it okay if I approach?

24          THE COURT:  Yes.

25          MR. PRINGLE:  It has been sitting over here all

Plaintiff's Closing Argument                        25

1    the time.  I know it is hard for you to see.  What I want

2    you to recognize is all roads lead to Lieutenant Col. Coury.

3              THE COURT:  Keep your voice up.  Vicki has to

4    hear you.

5              MR. PRINGLE:  All roads lead to Lieutenant Col.

6    Coury.  The complaint was filed with the Systems and Process

7    Review Team.  Eventually, it would get to Col. Coury.

8              If the Complaint was filed with Internal Affairs

9    Division, it goes through the Bureau Director and gets to

10   Col. Coury.  If the complaint is filed with the EEO Officer,

11   it gets to Col. Coury.

12             Just make a note of that.  I am not going to

13   address that issue specifically right now.  I want you to

14   make a note of that.

15             What is more important here at this point just

16   showing the complaint was made is that Major Morris,

17   Corporal -- I am sorry.  There was a meeting with Col.

18   Major Conley at the time.  Now that meeting with Major

19   Conley is where that memo of September 13th was specifically

20   addressed.  He was directed to have a meeting with

21   Lieutenant Col. Coury.

22             Who was at that meeting?  The Officer and legal

23   counsel.  If you don't have a discrimination complaint, why

24   call the EEO Officer?

25             Two, according to Col. Conley -- Lieutenant Col.

Plaintiff's Closing Argument                    26

1    Conley, there were two meetings held with respect to that

2    complaint.  There were two meetings where they discussed her

3    memo.

4            Why would you discuss that and include the EEO

5    Officer if you don't have an EEO issue?  Of course, they

6    knew it was an EEO issue, and they accepted it as such.

7    Lieutenant Col. Conley acknowledged that the document was a

8    complaint.

9            So we have Major Morris.  We have Corporal Rain.

10   We have Lieutenant Coury.  We have at that time Major

11   Conley.  We have two complaints going -- two memos from

12   Barbara Wilhelm going to the EEO, and we have Barbara

13   Wilhelm going to the EEO Officer directly.  All of that

14   information went directly to the EEO Officer.

15           Guess what you didn't see?  You didn't hear from

16   the EEO Office or didn't see the EEO Officer.  That is

17   significant.  They didn't want you to talk to her.  We put

18   in all that to say there was a complaint.  There were

19   several complaints.

20           We didn't get into whether the complaints were

21   valid.  We are not supposed to.  That is why we didn't

22   because we didn't want to.  We couldn't.  We were not

23   supposed to.  That is not what this case is about.

24           We are supposed to present to you relevant

25   evidence.  This case is about retaliation, not about the

Plaintiff's Closing Argument                    27

1    individual complaint of retaliation.

2         On the issue of retaliation, we have to show you

3    the complaints.  You don't have to decide and you should not

4    consider whether or not any of the complaints were valid, or

5    whether she was overly sensitive, or whether she

6    misperceived things, or whether there was good reason for

7    any of this to be happening.

8         Did she perceive herself as having EEO issues and

9    filed a complaint?  We think we have shown that.

10        The next thing we have to show is that there was

11   some kind of adverse employment action.  I think that is

12   pretty easy.  We showed you -- and there is no dispute --

13   the dismissal letter, the testimony of Ms. Bonney, the

14   testimony of Ms. Polec.

15        Barbara Wilhelm was dismissed, and her personnel

16   record recorded that she was dismissed.  It doesn't get much

17   more adverse than that.  She lost her job, and they

18   dismissed her.  She lost her job through a dismissal.

19        We have to also show you there is some kind of

20   relationship between the filing of the complaints and the

21   adverse action.  We have to show you that she filed the

22   complaints, they dismissed her, and that they dismissed her

23   because of the filing of the complaints.

24        I think it goes without stating, but I do have to

25   show you evidence, and we did present evidence.  What we

Plaintiff's Closing Argument                    28

1    showed you is they don't like receiving complaints.  They

2    just don't like it.

3            How do you know they don't like receiving

4    complaints?  Well, the unrefuted testimony was that all

5    those complaints were filed, except for the Morris one -- I

6    am excluding that issue -- Ms. Wilhelm never received any

7    acknowledgement that they got the complaints.

8            According to Col. Hikes, the regulations require

9    -- and you will have the regulations in front of you -- the

10   regulations require some kind of receipt of the complaint.

11   Col. Hikes also told you that a complaint can be made

12   orally.  It didn't have to be presented in writing.

13   Eventually, it had to be put in writing, but it didn't have

14   to be presented in writing.

15           So is there an excuse for not getting a receipt?

16   According to the undisputed testimony of Col. Hikes, there

17   is no good reason for not giving the complaint and the

18   acknowledgement or receipt of the complaint.

19           So almost in every case, they did ignore Ms.

20   Wilhelm.  Even in the case of the Col. Conley meeting with

21   the EEO Officer and legal counsel, they never got back to

22   Ms. Wilhelm.  The issue died.  She never heard from them.

23           Think about what she got.  They never followed

24   their own procedure.  Why?  They wanted it to die.  They

25   didn't want to address it.

Plaintiff's Closing Argument                    29

1          Maybe they don't like litigation.  They have a

2     lot of issues about litigation.  They don't like complaints.

3          Their problem was that Major Morris actually

4     followed the procedure and filed the complaint.  Again,

5     going back to my issue of complaints and whether they

6     received complaints, according to the undisputed testimony

7     of Lieutenant Col. Coury, Major Morris came to him and said

8     I have some problems in my office.  I am getting complaints

9     from Barbara Wilhelm.  What do I do about it?  He said file

10    a formal complaint.  So again just to note, Col. Coury was

11    aware of that.

12         Major Morris listened to him and filed a

13    complaint on behalf of Barbara Wilhelm.  Again, did it say

14    discrimination gender, those words on there?  No, there

15    weren't, but it was discussed.

16         Let's see how much they didn't like people filing

17    complaints.  How did they handle this complaint?  What you

18    are going to see when you get these documents is that on the

19    document that is Plaintiff Exhibit 55, it is a complaint

20    document.  You will see it is in handwriting.  You will see

21    what it looks like.

22         Look on that complaint document.  They received

23    this complaint on June 7th, 1999.  I guess a according to

24    everybody, Corporal Rain, who was investigating it sometime

25    in June -- which would make you think they were right on top

Plaintiff's Closing Argument                    30

1    of things and wanted to get this matter taken care of except

2    here is what happened.  Corporal Rain was sort of like a

3    scout.  Corporal Rain was trying to figure out -- they

4    wanted Corporal Rain to find out whether they had a case,

5    whether litigation was an issue.  That was their main

6    motivation, worrying about if they might have litigation,

7    not protecting people about their complaint.

8            Corporal Rain interviewed Major Morris and found

9    out there were some gender issues.  He checked with the EEO

10   Officer to find out if there's real issues here, do we have

11   a problem here.

12           He talks to Barbara Wilhelm.  She presents him

13   with what he believes to be pertinent information which you

14   will find in the June 21st memo where he talks about

15   Wilhelm's classification.  Corporal Rain takes that

16   information.  She is still ready to work with him.

17           During that conversation, she says do you have to

18   tell the other people, do you have to talk to anybody, etc.?

19   Yeah, I do.  Wait a minute.  Wait a minute.  He tells her

20   that Col. Coury is going to get this information and higher,

21   that he has to turn this over.  Everyone knows that they are

22   friends  -- that they were good friends.

23           Major Morris knew they were good friends.  Major

24   Morris knew they were good friends so much so that he didn't

25   bother to perform a performance evaluation because the only

Plaintiff's Closing Argument                   31

1    kind he could do was a bad one, and he knew it was pointless

2    for him to do one.

3            Barbara says what is the point of this?  If you

4    were in the same situation, you wouldn't have followed

5    through.  It looked fruitless.  So why bother?  She

6    expressed that to Corporal Rain.  She also expressed to him

7    I don't think I am getting any satisfaction through this

8    process.  I might go to outside sources.

9            So what happens?  The Corporal reports that to

10   his superior, including Lieutenant John Brown.  Guess what

11   happens a few days after he reports that after the meeting?

12   Col. Coury calls John Brown, also Major Conley.  We better

13   call Simmers.

14           Lieutenant Brown wants you to believe that the

15   reason that it was important to call Simmers was because he

16   wanted to get on top of this investigation.  We really

17   wanted to do something here, and we have to keep talking to

18   Barbara Wilhelm to find out what the specifics were.

19           What is the real issue?  She didn't make a note.

20   They could have gotten it from Major Morris.  That is

21   assuming they really wanted to do that.

22           As soon as they found out they couldn't get any

23   information from her, they should have gone on with their

24   investigation.

25           Lieutenant Brown makes up some excuses why they

Plaintiff's Closing Argument                    32

1    wait a month later to contact Captain Simmers.  The fact is,

2    they never wanted to talk to Captain Simmers.  They never

3    needed to talk to Captain Simmers.  I am going to ask you to

4    strongly -- I am begging you look at the memo dated July 20,

5    '99.

6          That memo records -- and we have testimony

7    corroborating it -- it records that Col. Conley called the

8    Major only and said we better go -- somebody go talk to

9    Simmers.  Can we talk to Simmers?  Lieutenant Brown is

10   saying I got a call from Lieutenant Col. Coury.  We better

11   -- we got to talk to Simmers because if we dismiss this, it

12   is not going to look good in litigation.  It is going to

13   look bad.  We don't want to look bad.

14         When I talked to her, we know after the hearing

15   comes back, Barbara Wilhelm is talking about going to an

16   outside agency.  We might get scrutinized for this.  We

17   might get scrutinized.  We better start talking to Captain

18   Simmers.

19         I told you a little earlier that I thought the

20   whole thing was a scouting mission.  Look at the document

21   showing the complaint.  They have acknowledged they did not

22   talk to Simmers until around the 25th of August.  I don't

23   remember the date, but it is around that time.

24         Also look at when the complaint was actually

25   assigned, officially assigned.  It wasn't until August 25th.

Plaintiff's Closing Argument                    33

1    Why did they wait so long?  Because Rain was just finding

2    out whether there were any litigation issues or whether

3    there was a valid claim.  They weren't trying to investigate

4    her complaint.  There is no excuse if you are going to get

5    on top of it.

6            If you receive it on June 6th, assign it on

7    June 6th or 7th -- I am sorry -- received it on June 7th,

8    assign it on June 7th or 8th, that was a weekend in June.

9            Why did they wait two months later while he is

10   investigating it?  He was a scout.  They were checking to

11   see if they had any liabilities.  They weren't trying to

12   protect her.  They had no interest in doing that.

13           Since she has gone to outside agencies and they

14   are going to be scrutinized, we have to do something so we

15   will do some kind of investigation.  That is what Garret

16   Rain did, some kind of investigation.

17           There is another way around this.  The other way

18   around it is we will follow this investigation so late that

19   they can't do anything about it.  Remember the issue of

20   maximum adjudication date.  You will see that on Exhibit 56.

21           That is significant.  Because if you wait long

22   enough, even if we have to find that Simmers did something

23   wrong, we can't do anything it.  Col. Coury's buddy is

24   covered.  No problem.

25           And how did they do it?  They gave it to Major

Plaintiff's Closing Argument                    34

1    Morris with less than a week or approximately a week to

2    review it.

3            The report itself is not in evidence.  But you

4    may have seen Corporal Rain holding it.  It is a pretty

5    thick document.  They gave him a week to review that

6    particular document.

7            Major Morris said I don't have enough time to

8    review this.  They knew that.  He also said why are you

9    giving this to me?  I think it is a problem for me to

10   adjudicate this matter when I filed the complaint.  You

11   think about it.  It doesn't make sense.  I am initiating a

12   complaint, and you want me to review it.

13           It is a matter of integrity.  Major Morris had

14   some integrity.  He said I think it is a problem for me to

15   review this document.  You've got to think if they want to

16   establish something, why would they give it to Major Morris?

17   He is the one that wrote it.  If they would give it back to

18   him, what would you expect to happen?

19           There's two issues.  There is a conflict here.

20   He has integrity.  One thing they knew is conflict or not,

21   integrity or not, he didn't have enough time.  Major Morris

22   said may I have more time.  Lieutenant Col. Coury says sure,

23   no problem.  We can get you more time.  We get more time all

24   the time.  We will go to the union and get more time.

25           Did he get back to him?  Never got back to him.

Plaintiff's Closing Argument                      35

1    What did Col. Coury say when he got up here?  Nothing.  So

2    the plan worked.

3           Nothing happened to Simmers.  It never became an

4    issue.  We just say he failed to do it on time.  It was his

5    fault.  The guy who filed it, it is his fault.  If he

6    doesn't have it on time, it is his fault that it didn't get

7    done on time.  And Captain Simmers wasn't disciplined.

8           THE COURT:  You have about two minutes.

9           MR. PRINGLE:  Two minutes.  It is a perfect plan.

10   As far as the other issues, as I said, the issue was the

11   issue of the relationship between Col. Coury as you saw and

12   Captain Simmers.

13          The other thing is having shown you that, they

14   have to present you with a nondiscriminatory legitimate

15   reason.  I thought they were going to be able to do it.  I

16   don't think they did.

17          I am going to ask you to consider the testimony

18   of the key players here, Miller who said on the one hand I

19   didn't get along with her; I did get along with her.  She

20   was polite.  She was helpful.  She got along with Lieutenant

21   Sergeant McNeil.  And she got along with Sgt. McNeil, yet I

22   had to get rid of her.  I needed a clerk.

23          I looked at the decision, the systems and process

24   review, and I needed a clerk.  I really needed a clerk in

25   this office.

Plaintiff's Closing Argument                    36

1      Look at the Systems and Process Review report.

2  It says the clerk would be nice; you didn't need one.  And

3  in fact, if you look over it all, you will see that for a

4  year and a half, for two years, they didn't have a clerk.

5  They were getting along fine.  Look at the rating by the key

6  players in the Governor's Office.  They were happy with the

7  work of the office.

8      According to miller, there was a special meeting

9  at the Academy with the Colonel Coury -- Lieutenant Col.

10  Coury to say I need a clerk more than I need Barbara

11  Wilhelm.  I know about this employment issue, and therefore

12  I need a clerk more that Barbara Wilhelm and I pick the

13  clerk.

14      According to Col. Evanko, he didn't raise

15  anything about an employment issue.  He said Major Miller

16  came to him and said I need a reorganization.  Your Honor, I

17  know I have --

18      THE COURT:  I will give you five more minutes.

19      MR. PRINGLE:  Thank you, Your Honor.  Col. Evanko

20  did not testify that there was an employment issue.  Col.

21  Evanko did not say there was a meeting at the Academy in

22  which this was explained to him.  Col. Evanko didn't say

23  that Col Coury was even present.

24      Col. Coury who testified testified that this had

25  been a long term plan.  It was a long standing plan, even

Plaintiff's Closing Argument                    37

1   talking to Col. Evanko about this for years -- for not

2   years, but for a long time.  He wasn't specific about the

3   time frame.  In early 2000, they had been talking about

4   this.

5            Now which is it?  Was it pursuant to a long term

6   plan, or was it something that Michael Simmers -- I am sorry

7   -- something that he may or may not have come up with

8   because he had a problem with Barbara Wilhelm?

9            Let's look at the problem of Barbara Wilhelm.  He

10  said I had to pick her over.  I picked a clerk over her

11  because she didn't get along with Ronald Plesco.  By the

12  time that Jeffrey Miller is the Director of that office,

13  Ronald Plesco is not in the office.  He doesn't even

14  supervise him.

15           How about the fact that Barbara Wilhelm testified

16  without rebuttal and Plesco never heard -- that is another

17  person you didn't hear from, Ronald Plesco -- testified she

18  could do her job without talking to Plesco.  And Major

19  Morris testified that each of them could do their jobs

20  without talking to each other.

21           How did they do on the job?  Again, Systems and

22  Process Review Report showed outstanding.  The office worked

23  very well.  Did they get along?  No.  No dispute about that.

24  They never got along.  Somehow Major Morris was able to work

25  that out.  Somehow work got done.  I don't think it is

Plaintiff's Closing Argument                    38

1    credible that they had to make a decision her or a clerk.

2         Also, the issue on her versus the clerk goes to

3    the fact he only cited this erratic behavior.  If somebody

4    is harassing you, what are you going to do?  I don't want to

5    talk to him.  I didn't think that is unreasonable.  She

6    didn't want to talk to someone harassing her.

7         It's undisputed.  She was being harassed by

8    Ronald Plesco.  She didn't want to deal with him.  Major

9    Morris worked it out somehow.  Major Miller couldn't work it

10   out.

11        You look at the testimony of Bonney.  Linda

12   Bonney says Col. Coury just said abolish the positions.  No

13   discussion about employment issues.  He just said abolish

14   the issues.  So employment wasn't really the issue.

15        You think back.  They had a position in February

16   where somebody actually -- I am sorry -- in 1999 where

17   somebody actually had that clerk position.  Somebody

18   actually did it.  Somebody was sitting in that office.  The

19   office designed a place.  They sat for the receptionist.

20   There was a place for her.  There was actually a person

21   hired.

22        They never said that that position -- they lost

23   their vacancy.  A person leaves.  You have a vacancy.  What

24   happened to that vacancy?  You didn't hear anything about

25   that.  All of this is very convenient.  All of a sudden,

Plaintiff's Closing Argument                    39

1    they got to do this employment thing.  I think Col. Coury

2    just had it right.  They wanted to get rid of the position.

3    They wanted to get rid of the position because they were

4    thinking in early 2000 that they wanted to get rid of

5    Barbara Wilhelm.

6         Now I have to show you some other reasons why I

7    think that is not valid.  If you look at all of the

8    circumstances, why didn't they give her notice?  They could

9    have.  They didn't.

10        Why didn't they give her more time?  According to

11   Major Miller, they made a decision to hire a clerk.  They

12   had ten days to post it, a week to ten days to interview,

13   and eventually, they hired somebody in mid June.

14        Why didn't they wait the extra six weeks to get

15   rid of Barbara Wilhelm?  What was the rush?  No explanation

16   as to that.  We didn't have any positions.

17        Here is the point.  I don't know if you were

18   bored or paying attention, but Col. Coury when he said he

19   talked to Linda Bonney, he said I told Linda Bonney to see

20   if she can find some positions for her because when people

21   are furloughed, that is what we do.

22        So then we talk about whether or not -- so I am

23   saying to you they had other choices also when we talk about

24   the issue of furlough versus dismissal.  I think you heard

25   what happened to her.  You look at the personnel records not

1    withstanding whatever Mr. Clites said.

2           If you look at the personnel rules, what happened

3    to Barbara Wilhelm, it should have been characterized as a

4    furlough.  It was not.  And their excuse that it had to be

5    civil service collective bargaining doesn't hold up.

6           If you look at the personnel rules, please, back

7    on page 28, it says you can do that for non managerial --

8    civil service managerial employes.  They made it up.  They

9    didn't want to do it.  They wanted to get rid of her.

10          If you look at how bad they really wanted to get

11   rid of her, they were angry with her.  They were angry and

12   sent out a publication saying she has been dismissed;

13   whereas everybody else in the publication were retired or

14   resigned.  They said that code, that code was critical.  The

15   reason why they did dismissal was because they could put it

16   in their code, not because it was actually a dismissal.

17          The code is critical here.  Because if you look

18   at it, you heard Mr. Clites.  When he finally admitted what

19   the situation was, Ms. Polec -- when he finally admitted she

20   was actually furloughed, she would have been furloughed, he

21   treated her as a dismissal because they wanted to put an

22   adverse derogatory remark on her record.

23          What was the impact of that?  She couldn't get

24   another job for 20 years.  She had been a stellar employe,

25   outstanding, and everybody wanted to hire her.  Now all of a

Plaintiff's Closing Argument                    41

1    sudden, she can't get a job.  She doesn't even get a call

2    back.

3                Now what was the damage done here?  It was damage

4    to her reputation, the humiliation of being forced to leave

5    the office the same day under escort -- under escort.  There

6    was the loss of her pension, the opportunity lost and her

7    career, the loss of the independence of her work.

8                For two years, she has not been able to get a job

9    because of the damage they have done to her.  She has lost

10   back pay.  You have a document indicating how much back pay.

11               How do you measure the loss of your reputation?

12   How do you measure the loss of the humiliation, the pain and

13   suffering that comes from humiliation and the fact that

14   everybody knows that this happened?  They made an example

15   out of her.

16               We are asking you to also make an example out of

17   her.  We are asking you to show them that you cannot do this

18   to employes.  When someone files a complaint, you don't

19   worry about the legalities.  You worry about addressing the

20   complaint.  You don't retaliate against them because they

21   asserted their rights.

22               We are simply asking you to do what is the right

23   thing and come back with a verdict, a fair verdict.  And we

24   believe that fair verdict is in favor of Ms. Wilhelm in

25   finding liability and damages liability for the Pennsylvania

Defendants' Closing                                    42

1  State Police and damages -- appropriate damages and fair

2  damages for Barbara Wilhelm.   Thank you very much.

3              THE COURT:  Ms. Forney, you have an additional

4  ten minutes after the half hour since Mr. Pringle went to

5  40 minutes.

6              MS. FORNEY:  Thank you, Your Honor.  Ladies and

7  gentlemen, it has been a long two days.  I would like to

8  echo Mr. Pringle's thanks to you.  You have been very

9  attentive.  I know that you have heard a lot of information

10  in a rather short period of time, and I know that both of

11  the parties appreciate your seriousness about this case.

12              This case is about whether Plaintiff was

13  dismissed because she complained about discrimination.  I

14  think there are two things you need to be concerned about.

15  Number one, did she make a complaint about discrimination;

16  and number two, is there a connection between that complaint

17  and her dismissal.

18              Now in my opening I said yes, she did make a

19  complaint.  And that complaint was the January 3rd, 2000

20  memo that she wrote to Major Morris on the eve of his

21  retirement.  And in that memo, she complained about a

22  discriminatory practice in connection with compensatory

23  leave.  And she used the word discriminatory practice, and

24  she used the word selective preferential treatment of male

25  employes.

Defendants' Closing                              43

1          Now that pretty clearly says I am complaining

2     about discrimination I think we would all agree about that.

3     I agree about that.  She made other complaints which do not

4     use the words discrimination.  They do not use the word

5     disparate treatment.  They do not use the words I am treated

6     badly because I am a woman.

7          Mr. Pringle referred to magic words.  There

8     aren't magic words.  There is not a particular formula that

9     you have to use.  But words are important, ladies and

10    gentlemen.  And discrimination means that you are being

11    treated differently based on your class.

12         In this particular case that class happens to be

13    being a woman.  You have to convey that idea.

14         Now Ms. Wilhelm said she made other complaints.

15    You heard a lot of evidence about it.  You heard evidence

16    about written complaints and oral complaints.  Let me deal

17    with the written complaints first.  You are going to have

18    the documents, and I urge you to look at them.

19         One written complaint that she said she made was

20    to the Personnel Bureau.  And this is a Plaintiff exhibit.

21    And this complaint was made in December of 1998 in

22    connection with her request for reclassification.

23         In that complaint, what she characterized as a

24    complaint, she complains that Captain Simmers was making

25    malicious statements about her serving no legitimate

Defendants' Closing                                    44

1    purpose.  She doesn't say he is doing this to harass me

2    because I am a woman.  She doesn't say he is doing this to

3    me because I am a woman.  She is complaining that he is

4    making inappropriate statements.

5            I think there is a difference between the two.

6    You can complain about somebody doing something

7    inappropriate, breaking rules, engaging in misconduct.  That

8    is not the same thing as discrimination.  The reason the

9    conduct is being carried out is what may make it

10   discrimination or not, and that is not articulated.

11           What other written complaints does she say she

12   made?  She says she gave two documents to the BPR

13   investigator Corporal Rain.  You are going to have those

14   documents.  I urge you to look at those as well.

15           The first one is a June 21st, 1999 memo.  And you

16   heard it read -- portions of it read and testimony.  And the

17   stated purpose of that memo was to request a classification

18   survey of the office because Captain Simmers is not

19   performing as he should and doesn't possess knowledge,

20   skills, etcetera.  That is the stated purpose of the memo.

21   It does not say I am being discriminated against because I

22   am a woman; I am being treated differently because I am a

23   woman.  That is not the purpose of the memo.

24           Now, ladies and gentlemen, Ms. Wilhelm told you

25   that she was an educated woman.  She has held responsible

Defendants' Closing                                    45

1    positions in government.  She has even been an investigator.

2    She is obviously capable of articulating her thoughts, and

3    she didn't do it.  It is not there.

4         And she certainly demonstrated an ability in her

5    January memo to clearly express what she wanted to say which

6    was I think there is discrimination in connection with

7    compensatory leave.

8         Again, she doesn't say it in this memo that she

9    gave to Corporal Rain.  She gave him a second memo.  And

10   actually it is in the form of a letter.  You will see that

11   as well.  It is dated in July.  And it is a very short

12   letter.  It refers to a complaint under the Whistleblower

13   Law.  And then it says she is going to present this to some

14   other entity in state government.

15        Now in her testimony, Ms. Wilhelm said well, to

16   me, the Whistleblower Law included a whole lot of things,

17   waste, fraud, abuse and discrimination.  Well, if the

18   Whistleblower Law deals with a lot of things, then certainly

19   a reference to the Whistleblower Law would not tell the

20   person receiving that document, this is a complaint about

21   discrimination.  That person could certainly conclude that

22   this was a complaint about something else, like waste, or

23   fraud, or misconduct, breaking rules.

24        Finally, we get to a written complaint, what she

25   characterizes as a complaint, that was given to Lieutenant

1    Horgas that resulted in a meeting that was held to review

2    her concerns.  And again, look at the language.

3         The language talks about misconduct, breaking

4    rules, being incompetent for a job all in reference to

5    Captain Simmers apparently.  But it doesn't say I am being

6    harassed because I am a woman.  It doesn't say I am being

7    treated unfairly because I am a woman.  It doesn't say I am

8    being treated differently because I am a woman.  These are

9    not difficult concepts.

10        The idea of discrimination has been something

11   that we have been dealing with in our society for a number

12   of years now.  I think most people know what it means.  It

13   means you are treated differently because -- because you are

14   black, because you are a woman, because you are over forty,

15   because you are disabled.  That is the key.  And that key

16   was never present in any of these written documents that she

17   presented.

18        Now she says she made a lot of oral complaints as

19   well.  And those oral complaints really weren't corroborated

20   very well by the witnesses that you heard.  The only person

21   who said that he thought maybe what she was complaining

22   about was gender discrimination was Major Morris.  You

23   remember that.

24        But when he was pressed about well, was sex

25   discrimination discussed in the meeting with Lieutenant

Defendants' Closing                    47

1    Horgas, did she say to you sex discrimination, he said well,

2    no, I don't think that was really what was said.

3            Now, let me move on to the second thing that you

4    have to think about.  And that is is there a connection

5    between all of this and her dismissal?

6            Now I did say there was one written complaint

7    about discrimination.  Let me address that one first.

8            That was the complaint about compensatory leave.

9    And she copied in Commissioner Evanko on that memo.  And it

10   is clear that she -- that Commissioner Evanko authorized the

11   reorganization of the office which led to her dismissal.  So

12   if the question is is there a connection between that memo

13   that Commissioner Evanko received and her dismissal, I think

14   not.

15           Why not?  For one thing, Col. Evanko immediately

16   responded to that memo by ensuring that her supervisor knew

17   what the appropriate policies for compensatory leave were,

18   and he did that very promptly.  And then he said it looks to

19   me like she is trying to raise an issue of discrimination,

20   and I am directing you to send this memo to the appropriate

21   entities within the State Police so it can be addressed.

22           So certainly, Commissioner Evanko did not exhibit

23   any reluctance to receive that complaint or any reluctance

24   to deal with it.  He did what he was supposed to do within

25   the structure of the State Police.  He acted on it.  He

Defendants' Closing                                    48

1    directed it be sent to the Bureau of Professional

2    Responsibility and to the Equal Opportunity Employment

3    Office.

4            There is something that you need to remember

5    about that memo.  That memo was directed to Major Morris on

6    the eve of his retirement, and it was a complaint about the

7    way he was handling the compensatory leave within the

8    office.

9            On the date that Commissioner -- soon after

10   Commissioner Evanko sent his memo reiterating the policy on

11   compensatory leave and directing that the memo be forwarded

12   for further action, Major Morris was retired.  He was gone.

13   There was nothing to be done with Major Morris because he

14   wasn't there anymore.

15           Now the other thing about connection between that

16   memo and the dismissal in this case is remember how the

17   dismissal came about?  Major Miller was the new Director of

18   the office.  He was the new guy in town, so to speak.  There

19   was absolutely no evidence presented that he knew about any

20   complaints Ms. Wilhelm had made.

21           He was the new supervisor in the office.  He was

22   coming in fresh.  There was absolutely no evidence that he

23   was aware of any of this.

24           He came in with a mandate, and it was a mandate

25   from the Governor's Office which folks in state government

Defendants' Closing                                49

1    tend to take pretty seriously and a mandate from his

2    superior officer, the Commissioner of the State Police.  We

3    want your office to work together to communicate with the

4    policy people, to work hand in hand with the policy people

5    and move forward with the agenda of the State Police and the

6    administration.  This is your mandate.  He came in and

7    intended to go carry out that mandate.

8              And for a while in the office, he had confidence

9    that he would be able to do it with the staff that he had

10   until the incident that he described to you came up with Ms.

11   Wilhelm.  She made it clear to him that she wasn't willing

12   to speak with the Policy Director, the person that Major

13   Miller had been directed to work with, cooperate with, make

14   sure his office communicated with him.

15             This was a problem.  Did Major Miller immediately

16   say that is it?  No, he didn't.  He talked with Ms. Wilhelm.

17   He tried to say and make clear to her his expectation and

18   his need.  I need you to be able to work with this person.

19   I don't know what happened in the past, but let's put that

20   behind us.  Let's go forward.  Not an unreasonable request

21   for a supervisor to make.

22             And she just abruptly told him I can't do that.

23   And in no uncertain terms she reiterated I am not going to

24   talk to this man.

25             Major Miller made a decision.  He made a decision

Defendants' Closing                    50

1    this isn't going to work out.  He went to the Commissioner

2    and said I want to reorganize my office.  I need clerical

3    help, which is something that he had been concerned about

4    early on, the need for clerical help.  He explained to you

5    why.

6              However Major Morris ran the office.  Major

7    Miller liked to dictate things, did dictate things, thought

8    it would be more efficient if he could have some clerical

9    help to assist him with the correspondence and the

10   documentation that that office had to issue.

11             And he moved on that.  And he moved on that

12   because he realized that Ms. Wilhelm was not going to be

13   operating in the office the way he needed her to operate.

14   And if she was removed from the office, he would have a

15   vacancy which would allow him to bring in a clerical

16   employe.

17             That is what he said to the Commissioner, I need

18   clerical help.  Ms. Wilhelm is not going to work out because

19   she has made it clear to me that she is not going to do what

20   I need her to do.  The Commissioner accepted that

21   recommendation and authorized the reorganization of the

22   office.

23             Okay.  Now when you are looking at the question

24   of retaliation, you can also look at is there some other

25   indication that the State Police had some sort of animosity

Defendants' Closing                    51

1    toward Ms. Wilhelm?  Did they have animosity toward Ms.

2    Wilhelm?  And Mr. Pringle talked to you at length about that

3    very issue.

4            Well, let's, since I have been talking about the

5    dismissal, let's talk about how the dismissal was handled.

6    The Commissioner didn't say dismiss Ms. Wilhelm.  The

7    Commissioner said I authorize the reorganization of that

8    office.

9            When Col. Coury spoke to Ms. Bonney, who is the

10   person who is responsible for making all these things happen

11   in the State Police, he didn't say dismiss Ms. Wilhelm.  He

12   said handle this the way we usually handle things.  The

13   office is being reorganized.

14           What did Ms. Bonney do?  Did she immediately

15   write out a letter saying you are dismissed?  No.  She

16   looked for other positions for her.  Unfortunately, there

17   were none.  But she looked for other positions for her.

18           If you are antagonistic toward someone, it is not

19   something that you do.  It is not something that the State

20   Police had to do.  Remember, Ms. Wilhelm was an at will

21   employe.  That meant she didn't have union protection.  She

22   didn't have a right to bump into another job.  She wasn't a

23   civil servant.  She didn't have a right to a job someplace,

24   and they had to find it for her.

25           But nonetheless, they looked for one for her.

Defendants' Closing                                            52

1    These are not the actions of an organization that is out to

2    retaliate against someone.

3           Next let's take a look at the dismissal letter.

4    Yes, it says dismissal.  Nobody likes to be dismissed, but

5    you heard testimony as to why that term was used.

6           You heard from Ms. Polec who said we don't

7    furlough non civil servants.  We don't furlough non contract

8    people.  You heard the same thing from Ms. Bonney.  Then you

9    heard the same thing from Mr. Clites.

10          Now Mr. Clites is not a State Police employe you

11   remember.  Mr. Clites is with the Office of Administration

12   which he explained was a Commonwealth agency.  And that is

13   the agency that runs the personnel transaction system that

14   has all these codes.  And you remember he said that he and

15   his staff were the people that trained personnel folks in

16   the agencies about how to use those codes.

17   And he said the Commonwealth doesn't furlough non civil

18   servants, doesn't furlough contract people.

19          Now Mr. Pringle came back and showed him the

20   personnel rules, and Mr. Clites and Rose Polec both said

21   yeah, the personnel rules say what they say.  You heard

22   those definitions.

23          Well, folks, apparently the Commonwealth practice

24   is not in accord with the personnel rules.  Now either the

25   personnel rules are not drafted very well and fully explain

Defendants' Closing                    53

1    the use of the term furlough or the Commonwealth practice

2    doesn't accord with the personnel rules.

3            But the important point is that the State Police

4    were not out on some frolic and detour when they used that

5    term to describe Ms. Wilhelm's separation.  They were using

6    the term that the Office of Administration told them through

7    Mr. Clites' Division who went out and trained agencies on

8    what they were supposed to use.  And what they were supposed

9    to use for an at will employe who was not a civil servant

10   and who did not have proper contract protection was

11   dismissal.

12           Now let's just spend one more minute on that

13   dismissal letter.  And you will have a chance to look at it.

14   What the dismissal letter says is Ms. Wilhelm was dismissed

15   due to reorganization.  It was required by the

16   reorganization of her office.

17           It doesn't say she was dismissed because she

18   couldn't perform her job.  It doesn't say she was dismissed

19   because she engaged in misconduct.  It does not say she was

20   dismissed because she refused to communicate with someone

21   that her boss wanted her to communicate with.

22           Now as to the last part, the State Police could

23   have legitimately put that in there because that was part of

24   then Captain Miller's recommendation and reason.  But they

25   didn't put that in there.  They put down it was due to

Defendants' Closing                    54

1    reorganization of the office.

2            Now as I said, nobody likes to be dismissed.

3    Nobody likes to have that on their record.  But the fact is

4    people do get dismissed, and people get dismissed for a

5    variety of reasons.

6            You heard Ms. Bonney talk about hiring people who

7    had been dismissed and what she has done in the past when

8    confronted with someone like that.  What she said is you

9    look at the circumstances of the dismissal.  Being dismissed

10   because of a reorganization is not a black mark on your

11   record.

12           And Ms. Wilhelm had a letter from the State

13   Police explaining why she was dismissed.  That was a letter

14   she could present to employers and explain I was dismissed

15   because they reorganized.  And there is no reason that a

16   reasonable employer wouldn't take that into consideration.

17           At the time, if the State Police were out to get

18   Ms. Wilhelm, they wouldn't have given her a letter like

19   that, but they did.  Now what did the State Police do with

20   the complaints Ms. Wilhelm made?  Mr. Pringle talked an

21   awful lot about the Bureau of Professional Responsibility

22   investigation and the complaint that Major Morris had made.

23           What did the State Police do?  They investigated

24   it.  You remember Sgt. Rain talked about it.  How did he go

25   about doing an investigation?  The first thing he did within

Defendants' Closing                                              55

1    a few days after he received it was contact Major Morris who

2    made the complaint.  He talked to Major Morris.  He said

3    what is it that you have?  And he took that information, and

4    he did the next logical thing.  He tried to talk to the

5    person who was the victim of this conduct, at least the

6    alleged victim of this conduct to say what is it, what is

7    going on, tell me.

8            That is a reasonable thing to do.  And she didn't

9    want to tell him.  And he met with her again.  And she still

10   didn't want to tell him.

11           So what did he do?  He talked to Captain Simmers.

12   Now Mr. Pringle makes a great deal out of the time lapse.  I

13   don't think it is such a big deal, ladies and gentlemen.

14           You heard testimony that Corporal Rain did not

15   have one investigation to do at a time.  He had multiple

16   investigations to do.  As with most of us, we are very

17   seldom allowed to do one thing.  We have to juggle.  I guess

18   multi-task is the term that is popular now.

19           We have to multi-task.  We have to juggle

20   everything.  And he was juggling, but he did talk to Captain

21   Simmers.  And in talking to Captain Simmers, he took other

22   steps to try to figure out whether this complaint was

23   supported.

24           And Mr. Pringle talked about the thickness of the

25   document.  Well, I think that speaks to thoroughness with

Defendants' Closing                          56

1    which he tried to pursue that claim.  But understand, ladies

2    and gentlemen, it is difficult to do that when you don't get

3    cooperation from the victim.

4            Put yourself in the shoes of the State Police.

5    You have somebody who is trying to convey something.  They

6    seem to be unhappy.  But we don't have enough to go on.  We

7    just don't have enough to go on.  But nonetheless, they

8    carried it through.

9            Now Mr. Pringle talked a lot about whether the

10   State Police knew whether they had a discrimination

11   complaint or not.  And I am referring now to all of these

12   other complaints.  He points out that the Officer was

13   consulted at the beginning of the BPR; and subsequently when

14   Col. Coury asked that the investigation report, the memo

15   that went to Lieutenant Horgas and some other material be

16   reviewed, that the EEO Officer was involved in those

17   meetings.

18           And Col. Coury told you why the EEO Officer was

19   involved in those meetings.  He said I wanted to be sure

20   that we weren't missing anything.  They didn't know what

21   they had.  I mean it was very difficult to figure out what

22   it was that they had.  They wanted to be sure that they

23   weren't missing anything so the EEO Officer was there.

24           And the report that came back from that meeting

25   from Lieutenant Col. Conley was we have looked at it.  We

Defendants' Closing                                    57

1    think we have done what we can do given the fact that Ms.

2    Wilhelm doesn't want to cooperate with us.

3            Now why wasn't the EEO Officer here?  That is a

4    question that could be asked of the Plaintiff, as much as

5    the Defendant.  We presented you Lieutenant Colonel Coury

6    who asked for the meeting.  They subpoenaed Lieutenant

7    Colonel Conley.  They certainly could have subpoenaed the

8    EEO Officer if they thought that she was going to be helpful

9    to them, but they didn't.  They didn't do it.  If they

10   thought Sgt. Janet McNeil would have been helpful to them,

11   they could have subpoenaed her as well.

12           We presented Lieutenant Horgas who was at the

13   meeting that Ms. Wilhelm requested specifically to talk

14   about her complaints.  We did present him.  And at that

15   meeting, he said I don't recall any complaint about

16   discrimination, disparate treatment, being treated badly

17   because of any gender or sex that came from Ms. Wilhelm.

18           What are we left with, ladies and gentlemen?

19   Well, I think we are left with an individual who had a lot

20   of complaints, and those complaints did not go to

21   discrimination, but for the one.

22           Those complaints went to the fact that she

23   thought a co-worker was incompetent, that she thought a

24   co-worker goofed off, that she thought a co-worker broke

25   rules.  And those were the purposes of her complaints.

Plaintiff's Rebuttal Closing                    58

1      What else do we have?  We have a dismissal, and

2  that dismissal was not caused by the complaints.  That

3  dismissal was caused by two things:  The fact that Major

4  Miller strongly felt he needed some clerical help in his

5  office, and the second thing was Ms. Wilhelm's refusal was

6  clearly expressed to him about working with somebody that he

7  had been told by the Governor's Office and the Commissioner

8  that his office had to work with.

9      Ladies and gentlemen, this is not a case of

10  retaliation for complaining about sex discrimination.  And I

11  am confident when you have the chance to sit down and look

12  at the documents, look at the evidence, confer with each

13  other about the testimony that you have heard, that is what

14  you will conclude.  Thank you very much.

15      THE COURT:  Mr. Pringle, you have very limited

16  rebuttal.

17      MR. PRINGLE:  Thank you, Your Honor.  You know

18  Barbara Wilhelm is a very good investigator and good

19  detective.  But to be frank, she is a lousy lawyer.  She

20  didn't know the exact words to use and unfortunately didn't

21  use them.  She did know how to communicate, but she didn't

22  use the exact form that the writing -- that you use in the

23  beginning or wasn't in the exact form.  But she did

24  communicate that meaning as I told you.

25      The issue here is not whether or not a certain

Plaintiff's Rebuttal Closing                        59

1    form was used or whether even the Police procedures were

2    followed in terms of forms.  The law only requires that she

3    express a complaint of discrimination.

4              We believe that the weight of the evidence shows

5    repeatedly that she expressed a complaint of being

6    discriminated against based on the fact she was a woman and

7    that they recognized it and responded to it based on that

8    fact.  The EEO Officer was repeatedly asked to be involved

9    in this process.

10             As far as whether or not we believe they were

11   being antagonistic.  Let's look at the fact that they were

12   disenchanted.  Contrary to what Ms. Forney says the evidence

13   shows Ms. Bonney said she was told by Col. Coury to abolish

14   the position.  There wasn't a discussion about complaints,

15   or whether we could convert, or whether or not we need a

16   clerk person or someone else.  She was told to abolish the

17   position.  Based on that discussion, she recognized that

18   they wanted her to dismiss Ms. Wilhelm.

19             Now according to Rose Polec, the expert on

20   transactions for the State Police, the word dismissal is a

21   derogatory remark in the personnel record despite the fact

22   that Ms. Forney tells you that they weren't trying to hurt

23   her by putting the derogatory remark.

24             Ms. Polec says if it was left up to me and I had

25   a choice, I would rather be furloughed than dismissed.  That

Plaintiff's Rebuttal Closing                     60

1    is important.  Nobody likes on their record dismissed.  And

2    you know this is just how it works.

3            Well, the fact is that they didn't really do

4    anything to find her a job.  They said they looked for a

5    job, but I will remind you there is a list of jobs,

6    vacancies available in Exhibit 60.

7            Exhibit 60 shows there were 13 positions.  The

8    civil service positions could have been converted to a non

9    civil service position, or any of the non civil service

10   could have been converted to a position by which they could

11   have put Ms. Wilhelm in that office.

12           If they needed to find employment, they had

13   vacancies they could have manipulated in that system.  They

14   did it all the time.  They could have converted one of those

15   vacancies and had Ms. Wilhelm stay.  The fact is they didn't

16   want Ms. Wilhelm to stay there.  They were looking for an

17   excuse to get rid of her.

18           There was no evidence in the record that they

19   attempted to address that issue.  They didn't attempt to

20   address that issue because they really didn't want to find a

21   job for her.

22           The personnel rules are the rules that govern

23   personnel transactions.  You look at the personnel rules.

24   They know how to say what they want to say.  They know what

25   how to bring up civil service issues.  Look through the

Plaintiff's Rebuttal Closing                      61

1    document.  It is very clear.

2            Again on page 98, they say you can't furlough a

3    non civil service managerial employe.  That is beyond

4    dispute.  None of the witnesses testified that the personnel

5    rules were wrong.  You didn't hear that.  They said the

6    personnel rules were valid, and they acknowledged that.

7            Ms. Forney suggests that they weren't trying to

8    give her a derogatory letter.  She could show the letter to

9    any personnel manager and the problem that was on a computer

10   file under work history, she would never get in the door.

11   She would never get the chance to explain anything.  All

12   they knew is she was dismissed according to personnel with

13   it being derogatory, and it was never explained as to why

14   she was dismissed.

15           If you saw a derogatory remark, why would you

16   call her?  She never got a chance to explain, never got any

17   doors opened to her.  She never got a chance to say look at

18   my letter.  She didn't need to.  If they saw a derogatory

19   remark, why would they call that employe?  You wouldn't

20   either.

21           She makes a big deal out of the fact Ms. Wilhelm

22   did not cooperate.  She suggested that they did not

23   cooperate.  The fact is if you hear that whatever you do is

24   going to be sent up to Col. Coury or Evanko, and that is

25   your friend, nothing is going to happen if I present this to

Plaintiff's Rebuttal Closing                    62

1    them.

2         At the time, Major Conley received word from Col.

3    Coury by the September 13th memo, they had that.  They had a

4    document.  Having drafted that document, having met with the

5    people from System and Process Review, it is very clear she

6    was saying whatever I have to do, I am willing to talk about

7    it.  I want you to do something about this.  I am willing to

8    do that.

9         What does it say in that November 3rd memo by

10   Colonel Conley?  She is uncooperative.  They have a memo

11   where she is trying to talk to them.  She is trying to get

12   somebody to do something.  They are not responding.  They

13   are the ones that didn't want to cooperate.

14        It is not our responsibility that Major Smith

15   Elliot, the EEO Director, was not here and McNeil is not

16   here.  Well, we didn't need them here.  Ms. Wilhelm

17   testified as to what took place in those conversations.  We

18   are pretty confident they would not even attempt to rebut it

19   so we didn't bother to contact them.

20        In contrast, every other thing that we presented

21   where they could get someone to contradict our statements,

22   they attempted to do it.  I am not sure in most cases they

23   were successful, but they attempted to do it.

24        It would have been very simple.  Much of this

25   case rests on communication with Ms. Smith Elliot.  Bring

Plaintiff's Rebuttal Closing                    63

1    her in to say no, no one ever talked to me about these

2    issues; no, I did not understand these to be EEO complaints

3    or discrimination complaints; no, Ms. Wilhelm never talked

4    to me about these issues.  If they had that to present, they

5    would have presented it to you.

6            I promised to be brief and will be.  One other

7    point is the conversion with respect to jobs.  Ms. Bonney

8    did testify that within six months of Ms. Wilhelm's

9    dismissal, a position as an intelligence investigator was

10   available.  And in fact, it was offered and accepted by

11   Captain Simmers' daughter.

12           They could have called her.  Did they have a

13   legal obligation to do so?  No. But it seems to me that it

14   is reasonable to infer that they knew that these issues --

15   these issues were going to become available.  They knew that

16   she had just been dismissed.  And they could have called her

17   merely out of courtesy.  This goes to their intent to harm

18   her and that she couldn't get further employment.  Thank you

19   very much.

20           (Whereupon, the closing arguments were

21   concluded.)

22

23

24

25

64

1          I hereby certify that the proceedings and

2    evidence are contained fully and accurately in the notes

3    taken by me on the trial of the above cause, and that this

4    copy is a correct transcript of the same.

5

6                              *Vicki L. Fox, RMR*

7                              Vicki L. Fox, RMR

8                              Official Reporter

9

10

11          The foregoing certification of this transcript

12    does not apply to any reproduction by any means unless under

13    the direct control and/or supervision of the certifying

14    reporter.

15

16

17

18

19

20

21

22

23

24

25